# EXHIBIT C



**TERRENCE B. ROBINSON**
SHAREHOLDER
TERRENCE.ROBINSON@KENNARDLAW.COM

Super Lawyers

**BOARD CERTIFIED**
Labor and Employment Law

August 19, 2013

<u>*Via Facsimile to 713.651.4902 and First Class Mail*</u>
Shirley Almaguer, Investigator
Equal Employment Opportunity Commission
1201 Louisiana Street, 6th Floor
Houston, Texas 77002

| | | |
|---|---|---|
| Re: | Charge No: | 460-2013-02264 |
| | Charging Party: | Artis Ellis |
| | Respondent: | Educational Commission for Foreign Medical Graduates |

Dear Investigator Almaguer:

On behalf of Ms. Artis Ellis, we submit the following Statement of Rebuttal in response to Respondent's Statement of Position.

## Background and Work History

Ms. Ellis began her employment with Educational Commission for Foreign Medical Graduates ("ECFMG") as an Assistant Manager of the Houston Center in April 2005. She performed so well in her role as an Assistant Manager that she was promoted to Center Manager on or about October 2008. Ms. Ellis managed 80 to 100 employees at any given time. Prior to January 2012 Ms. Ellis was supervised by Director Betty Hite. Ms. Ellis and Ms. Hite worked well together and she never received a negative evaluation. In fact, her evaluations were complimentary.

Ms. Ellis felt fortunate to work in a great environment and would never have imagined that her situation would change so dramatically when Ms. Hite retired. Chris Paul replaced Ms. Hite as Director on or about November 2011. Immediately, Mr. Paul started to discriminate against Ms. Ellis. Mr. Paul made inappropriate remarks and harassed Ms. Ellis on multiple occasions. During his first visit to Houston, Mr. Paul told Ms. Ellis that he could fire her at any time. He also commented that "he must pay her too much" because of the type of car she drove. Initially Ms. Ellis thought that his comments were just in poor taste, but it became clear that he limited such remarks to Black employees.

Ms. Ellis met with Mr. Paul to complain about what she felt was racially motivated comments because she preferred to deal with the issue one-on-one and in a professional manner. Mr. Paul apologized and Ms. Ellis thought the issue had been resolved. However, it became clear that Mr. Paul's apology was anything but sincere as he continued to make inappropriate, discriminatory remarks, which put stress on the entire Houston Center. The environment at the Center was so bad that the Assistant Manager resigned as well as one of the trainers and two other key employees. For example, Denies Shaff

5433 WESTHEIMER, SUITE 825, HOUSTON, TEXAS 77056   MAIN: 713.742.0900   FAX: 713.742.0951
TOLL FREE: 855.KENNLAW   WWW.KENNARDLAW.COM

kennard
blankenship
robinson PC.

sent an email to Mr. Paul, Anne Jobe and Ms. Ellis, which listed several instances of Mr. Paul making discriminatory comments during the Root Cause Analysis meetings in July of 2012. Specifically, he told the staff not to mess with Keith Maddox because he was "fat and Black."

In May 2012, Mr. Paul made a "surprise" visit to the Center. He happened to arrive on a day that Ms. Ellis had taken off and proceeded to tell Ms. Ellis's staff that she was not a good leader. Taken aback by the discriminatory remarks Mr. Paul was making to the staff, Ms. Ellis called Executive Director Dr. Ann Jobe to inform her of the situation. Ms. Ellis also emailed Vice President of Human Resources Betty Lehew to report that Mr. Paul was making racial comments about her and other Black employees, such as Myron Williams. Both women assured Ms. Ellis that they would work with Mr. Paul so that she would have no further issues.

Once again, Ms. Ellis was falsely reassured. Her relationship with Mr. Paul continued to deteriorate. On or about August 23, 2012 Ms. Ellis received a call from Mr. Paul letting her know that he had sent a "memo" to her email. The "memo" was a list of concerns that Mr. Paul had regarding Ms. Ellis's performance. The "memo" was the first notice of any performance issues Ms. Ellis had ever been advised of in her seven years of employment with ECFMG. Mr. Paul let Ms. Ellis know that ECFMG had concerns regarding her "ability to successfully make the Houston Center a positive, healthy, and productive workplace." Clearly, the "memo" came as a shock to Ms. Ellis who had never received a reprimand or even a passing remark concerning her performance in her tenure with the ECFMG.

Ms. Ellis met with Mr. Paul to discuss the "memo" and he agreed to revise some portions of it. On August 28, 2012 Mr. Paul emailed Ms. Ellis the revised "memo" and Ms. Ellis requested the weekend to respond to ECFMG's concerns. Mr. Paul reluctantly acquiesced and gave her until September 4, 2012 to respond. Ms. Ellis responded to each and every concern cogently, but she was under a terrible amount of stress caused by what she believed to be Mr. Paul's retaliation for complaints she made to Human Resources about race discrimination.

On August 29, 2012 Ms. Ellis was suffering from extreme stress, anxiety, and headaches and ended up in the emergency room. While at the hospital, Ms. Ellis was told she had a mass on her brain and that she would need an MRI and further diagnosis. Ms. Ellis sent an email to ECFMG letting management know that she had been in the hospital and would have to be further evaluated. Ms. Ellis went back to the doctor on August 31, 2012 and attempted to make appointments with neurologists over Labor Day Weekend. Ms. Ellis returned to work on September 4th and worked through September 11th. On September 12, 2012 Ms. Ellis contacted Mr. Paul to let him know that she had a migraine and would be unable to come into work. Once again, Ms. Ellis returned to the emergency room. Ms. Ellis was told she had a brain tumor that required immediate surgery. She went into surgery on September 14, 2012.

As required by law, Ms. Ellis requested Family Medical Leave Act leave for the time she missed work and for the time it would take her to recover from brain surgery. During the course of her recovery, Ms. Ellis received calls from her employees. Her employees were frantic because Mr. Paul had come into the Houston Center and had proceeded to change the manner in which it was run. According to Houston Center employees, Mr. Paul was conducting investigations on Ms. Ellis as soon as she took leave and throughout her recovery. He went so far as to interview male employees regarding sexual relationships with Ms. Ellis. Interestingly, Mr. Paul only asked the Black male employees about their sexual history with Ms. Ellis. Ultimately, Mr. Paul's investigation confirmed that Ms. Ellis did not engage in sexual relationships with male employees, Black or otherwise.

While Ms. Ellis was set to return to work on October 22, 2012, she kept ECFMG apprised of her health in the interim. She let Human Resources Manager Sharon Trowell know that her doctor had

advised that she not be in stressful situations because that would cause an adverse reaction to her medication, which would have an adverse effect on her recovery. She also advised Ms. Trowell that one of her eyes was weak as the muscle had detached during surgery and she would require the use of eye patch. Ms. Ellis told Ms. Trowell and Mr. Paul that as a result of her eye, she would need ADA accommodations when she returned, but was not sure which ones as she had not yet returned to work. Finally, Ms. Ellis told Ms. Trowell the week before she returned to work that her doctor was signing off on her to return to work for just half days the first week.

Ms. Ellis returned to work on October 22, 2012 expecting everything in the Houston Center to have returned to normal. Instead, she walked into an ambush. When Ms. Ellis entered her office she was met by Mr. Paul, Ms. Lehew, and Nancy Ambrose, Assistant Director. They had yet another list, apart from the August "memo," pointing out the areas in which Ms. Ellis had failed as a Manager. Ms. Lehew and Mr. Paul went down the list with her that included such minute things as: "It has been reported that management has discarded employee's personal belonging[s] such as food, clothing, cups and dishes without proper notification." Despite the fact that Ms. Ellis was not supposed to undergo stress and that EFCMG knew this, they continued to press her on her alleged "mistakes."

Ms. Lehew and Mr. Paul also asked her about Troi Bryant, a former employee of ECFMG. According to them, Ms. Ellis had violated ECFMG policy by hiring him and allowing him to be her subordinate without notifying human resources. Significantly, Mr. Bryant had not worked at the Houston Center for more than a year and was not originally hired by Ms. Ellis. While it is true that Ms. Ellis and Mr. Bryant had a child together twenty-six (26) years ago, they were never married and did not have a personal relationship of any kind at the time of his hire or in the twenty-six (26) years since the birth of their child. Mr. Bryant was hired for a part-time position in 2008. When a full-time position became available, Mr. Bryant applied and went through the human resources process. Human Resources sent Ms. Ellis the top three candidates for the position and her Assistant Manager interviewed and hired him because he was the best candidate for the position.

After being interrogated by three people in complete disregard for her request for reasonable accommodation, Ms. Ellis feared that the stress she was suffering would cause her to fall ill. Ms. Ellis asked Ms. Lehew if she could take the rest of her FMLA time to which Ms. Lehew responded: "Off the record, it is best that you go on paid leave instead of FMLA." Once the meeting ended, Mr. Paul informed Ms. Ellis that she was going to be placed on paid administrative leave for four days to two weeks. Ms. Lehew made it seem that going back on FMLA leave would be troublesome and not worth the hassle. Ms. Ellis was not allowed to contact the staff or the Houston Center while on leave. On November 1, 2012 Ms. Ellis met with Ms. Ambrose and Ms. Lehew at a hotel. Ms. Ambrose told Ms. Ellis that she was terminated for her failure to follow ECFMG procedure in Mr. Bryant's hire. Ms. Ellis was given a severance agreement to sign and it was agreed that the Houston Center staff would be told that she was resigning due to her health.

In short, not only did ECFMG or its agents discriminate against Ms. Ellis due to her race, those same agents/employees also retaliated against her for taking FMLA leave, interfered with Ms. Ellis's plans to take further FMLA leave, and terminated her for requesting reasonable ADA accommodations as well as because of her actual and perceived disabilities. Ms. Ellis had never experienced performance problems in her role as Assistant Manager or Manager of the Center until Mr. Paul became her supervisor. She complained to him and human resources that he was unprofessional and made inappropriate remarks, especially with regard to race. Specifically, she complained to Mr. Paul about his comments in the July 2012 Root Cause Analysis meetings, where he called Mr. Maddox "big, fat and Black" and he called Roberts Phelps "old and forgetful." Soon after her complaint Ms. Ellis was retaliated against with a "memo" outlining her performance problems. When Ms. Ellis developed a brain

Shirley Almaguer
August 19, 2013
Page 4 of 7

tumor (disability) and went out on FMLA leave, Mr. Paul sought to discredit her with her employees and implied that she had maintained sexual relationships with the Black male employees. When Ms. Ellis returned from FMLA leave, she was retaliated against for her actual and perceived disabilities and taking FMLA leave by being placed on administrative leave and then terminated. Ms. Ellis's intention to take further FMLA leave was further interfered with by Ms. Lehew when she advised her to take leave instead of FMLA time. Ms. Lehew's advice was a ruse to dissuade Ms. Ellis from taking leave before she could terminate her employment. Ms. Ellis was terminated on or about November 1, 2012—a mere ten days after her return from FMLA leave for brain surgery, which resulted in her having to wear an eye patch because the muscles in one of her eyes detached during surgery.

### Race and Disability Discrimination and Retaliation

ECFMG claims to have terminated Ms. Ellis' employment for legitimate, non-discriminatory and not-retaliatory reasons and only after conducting a thorough investigation. That statement is incorrect. ECFMG began an investigation into Ms. Ellis' conduct/performance only **after** she complained about racial harassment and discrimination and **after** she asked for reasonable accommodations for disabilities related to her surgery and recuperation from a brain tumor. Significantly, Ms. Ellis had not previously encountered performance issues with ECFMG in her eight (8) years of employment—a fact that her former supervisor can and did attest to at Ms. Ellis' unemployment appeal. As is further explained below, we maintain that Ms. Ellis was discriminated because of her race and disabilities and retaliated against because she reported racial harassment and discrimination and asked for reasonable accommodations. As a result, ECFMG acted in direct violation of Title VII and the ADA.

### Ms. Ellis' Performance

It is important to clarify that Ms. Ellis is not "blaming" anyone for her alleged poor performance because she specifically denies ECFMG's allegations that she had any performance problems. In fact, Ms. Ellis asserts that Mr. Paul criticized her performance from the beginning of his employment not because of her actual performance but because of her protected characteristic and actions. Ms. Ellis had never received a bad review nor been reprimanded during her time at ECFMG until Mr. Paul took over as Director. Ms. Ellis not only complained about Mr. Paul's management style, she also complained about his discriminatory comments. While ECFMG is keen on pointing out Ms. Ellis' alleged policy violations, they are completely ignoring Mr. Paul's own violation of policies and protocols—once again proving that her termination was discriminatory. Mr. Paul instructed Ms. Ellis to bypass several protocols in the hiring of employees at ECFMG. Because the hiring process at ECFMG is slow and deliberate the Houston Center was not adequately staffed (as you point out in your letter), thus Mr. Paul instructed Ms. Ellis to bypass the required criminal background checks of applicants. ECFMG was well aware of Mr. Paul's lapse in judgment, but he was not terminated.

The fact that Ms. Ellis attempted to work with Mr. Paul and adjust to his management style is not a detriment to her claims. Instead, it shows that Ms. Ellis was committed to ECFMG and interested in creating healthy working relationships. Despite her efforts, Mr. Paul continued to nit-pick and harass Ms. Ellis. Mr. Paul's ruthless attempts to oust Ms. Ellis from her position only intensified when she went out on FMLA leave. It was only then that he opened an investigation into Ms. Ellis' performance and policy violations. The **very day** Ms. Ellis returned from FMLA leave she was ambushed with a series of performance problems. Also, when Ms. Ellis requested to take the rest of her FMLA time she was told "off the record" that it would be better for her to take a paid leave until the conclusion of their investigation. Finally, at the conclusion of ECFMG's investigation they terminated Ms. Ellis for allegedly violating two critical policies.

Shirley Almaguer
August 19, 2013
Page 5 of 7

### **Alleged Policy Violations**

ECFMG claims that Ms. Ellis violated two "critical" policies by not disclosing her alleged "relationship" with Troi Bryant and by sharing a secure password. ECFMG also points to the fact that Ms. Ellis "admitted" violating these policies. ECFMG is twisting Ms. Ellis' words to justify its pretextual reason for terminating her employment.

*Employment of Relatives & Relationships in the Workplace*

ECFMG claims that its policies are available to employees on Outlook Public Folders, that Ms. Ellis signed an acknowledgment form in the Handbook, and that Ms. Ellis' job description as Center Manager charges her with implementing and enforcing ECFMG policies. We do not dispute those facts nor do we argue that Ms. Ellis was unaware of the relationship policy. In fact, our argument is quite simple: Ms. Ellis did not violate the policy. The policy reads as follows:

> It is the policy of ECFMG to regulate the working and reporting relationship of individuals who are related by blood, adoption, marriage, or domestic partnership, affianced or significant other in order to avoid real or perceived conflicts of interest, influence, or favoritism.

The policy goes on to define the following terms: "employee," "relative," "domestic partner," "affianced," and "significant other." Ms. Ellis' and Mr. Bryant's supposed "relationship" does not fall into the definition of any of the terms listed above (as defined by the policy). While it is true that Ms. Ellis and Mr. Bryant share an adult daughter (26 years old), they are not related by blood, adoption, marriage, or remarriage nor are they now nor have they ever been in a domestic relationship or affianced. ECFMG alleges that their "relationship" falls into the significant other definition which reads as follows: "any other inter-personal relationships between individuals which create a relationship similar to those described in the definition above . . . if one of the parties has influence over the other." ECFMG further alleges that Ms. Ellis did not disclose her "relationship" to Mr. Bryant, thus making her violation a terminable offense.

Once again, Ms. Ellis did not violate the policy. Ms. Ellis and Mr. Bryant never had a "relationship." Their daughter, conceived just after high school, was a result of one sexual encounter and they never maintained a romantic relationship. In fact, Mr. Ellis and Mr. Bryant had not personally interacted in the years leading up to his applying for employment with ECFMG. Ms. Ellis was unaware that he had applied and did not personally interview him for the position he was initially hired for in 2008. Ms. Ellis was given a stack of approved applications in 2008 and signed her name on his application just as she did all others—**after** they had been screened by a number of other individuals at ECFMG. Ms. Ellis did not disclose her "relationship" because she did not have a relationship with Mr. Bryant to disclose. ECFMG wishes to harp on the fact that Ms. Ellis was not entirely forthcoming when first approached about the paternity of her child, but she was not initially willing to discuss the issue because it is not ECFMG's concern who Ms. Ellis had sexual encounters with in the past. Ms. Ellis was shocked that she was even asked those questions, especially given that fact that Mr. Bryant had not worked for ECFMG more than a year prior to the issue being raised. Furthermore, ECFMG's assertion that the policy and the definition of "significant other" are broad enough to encompass any relationship between Ms. Ellis and Mr. Bryant is simply not credible given the common and regular meaning of the term "significant other," which is a spouse or romantic partner.

It is clear that the relationship policy does not apply to all ECFMG employees equally. During Ms. Ellis' unemployment appeal Betty Lehew admitted that her step-daughter once worked in the human

resources department in a direct reporting relationship to her. While ECMFG's broad policy allows discretion for department managers to decide if a relationship will be permitted within the same department, it states nothing about discretion for reporting relationships. In Ms. Lehew's case ECFMG chose to ignore its policy, but for Ms. Ellis they seem intent on interpreting the policy to create a violation where one did not exist.

*CSEC Data Security Policy*

We have not been provided with the second policy Ms. Ellis allegedly violated, but ECFMG states that she shared her secure password with an hourly, non-exempt employee. Ms. Ellis admitted that she may have shared her password with another employee, but only after she initially told Ms. Lehew, Mr. Paul, and Ms. Ambrose that she would have to think about whether she had in fact shared her password. Ms. Ellis does not specifically remember sharing her password because she was in the hospital. At the time of the alleged password disclosure, Ms. Ellis was about to have brain surgery for a tumor. Thus, she was on FMLA leave and ECFMG's employees should not have been contacting her. Not only did Ms. Ellis fear for her life and the future of her family, she was heavily medicated when she allegedly disclosed the password. Because Ms. Ellis' memory of her time in the hospital is hazy, she cannot be certain about whether she did in fact give her password to another employee.

It seems ludicrous that Ms. Ellis would be held to the same standard as other employees with regard to securing her password when she lay in a hospital bed, medicated and not knowing whether she would live to see the next day. Leaving ECFMG's lack of compassion aside, ECFMG does not apply its policies equally to all employees. There have been many instances of password disclosure amongst employees. It was well known at the ECFMG Houston Center that if someone in IT or otherwise needed a password for the computers they could use Brent Bigg's password. Rich Kahn, a case developer and hourly employee of NBME, was given Mr. Bigg's password when he had to work out of the Houston office. On a separate occasion in January of 2012, it was Mr. Paul himself that directed Ms. Ellis to give her password to another employee, Ms. Bea Bright-Davis. Ms. Ellis and other ECFMG Houston employees were offsite when an exam had to be certified and Mr. Paul instructed Ms. Ellis to give her password to Ms. Bright-Davis, who was physically present at the Center. ECFMG was aware of these incidents of password sharing and did nothing. The fact that ECFMG is now harping on Ms. Ellis sharing her password is a mere pretext to cover up the real reason Ms. Ellis was terminated—discrimination.

## Conclusion

Ultimately, Ms. Ellis was discriminated against because of her race, her disability and/or her perceived disability. Once Ms. Ellis took her FMLA leave, ECFMG moved to push her out of the company. ECFMG attempts to veil its discrimination and retaliation behind allegations that Ms. Ellis was terminated for policy violations, one a year old and the other while she was out on FMLA leave. The truth of the matter is that ECFMG terminated Ms. Ellis because she was a black employee with a disability and/or perceived disability.

Ms. Ellis was treated less favorably than her black, disability free co-worker. ECFMG also failed to properly accommodate Ms. Ellis by interrogating her as soon as she returned to work from her brain surgery, and penalizing her for taking medical leave as part of her reasonable accommodation. Because of the discrimination and retaliation set forth above, and violations of the Title VII; ADA; and Texas Labor Code, we urge you to issue a finding of cause in support of Ms. Ellis' claims.

Shirley Almaguer
August 19, 2013
Page 7 of 7

                                            Very truly yours,

                                            kennard
                                            blankenship
                                            robinson P.C.

                                            Terrence B. Robinson

TR/jm

cc:     Client