# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


ARTIS ELLIS                          :

          Plaintiff,                 :

vs.                                  :

EDUCATIONAL COMMISSION               :        C. A. No.

FOR FOREIGN MEDICAL                  :        4:14-cv-02126

GRADUATES,                           :

          Defendant.                 :


VIDEOTAPED DEPOSITION OF ARTIS ELLIS


     Called as a witness by the Defendant, taken before

Peggy Ann Antone, a Certified Shorthand Reporter in and

for the State of Texas, on May 11, 2016, beginning at

9:51 a.m., at the offices of Kennard Richard P.C., 2603

Augusta Drive, Suite 1450, Houston, Texas, pursuant to

the Federal Rules of Civil Procedure.

Artis Ellis

**2**

APPEARANCES

COUNSEL FOR ARTIS ELLIS, Plaintiff:
    Kennard Richard, P.C.
    ALFONSO KENNARD, JR.
    KEENYA HARROLD
    2603 Augusta Drive
    Suite 1450
    Houston, Texas  77057
    Phone:  713.742.0900
    Fax:  713.742.0951
    Alfonso.kennard@kennardlaw.com
    Keenya.harrold@kennardlaw.com

COUNSEL FOR EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL
GRADUATES, Defendant:
    Morgan, Lewis & Bockius, LLP
    ERIN E. O'DRISCOLL
    1000 Louisiana
    Suite 4000
    Houston, Texas  77002
    Phone:  713.890.5000
    Fax:  713.890.5001
    Eodriscoll@morganlewis.com

ALSO PRESENT:

    Barry Pett, Videographer, DepoTexas, Inc.

**4**

6............................. 301

**3**

INDEX

FOR THE DEPOSITION OF

ARTIS ELLIS

ARTIS ELLIS vs. EDUCATIONAL COMMISSION FOR FOREIGN

MEDICAL GRADUATES

05/11/2016

Examination                          Page
QUESTIONS BY MS. O'DRISCOLL.....................10
QUESTIONS BY MR. KENNARD.....................301
QUESTIONS BY MS. O'DRISCOLL.....................317

INDEX OF EXHIBITS.....................4

REQUESTS FOR INFORMATION
Request for information.....................266
Request for information.....................274
Request for information.....................277
Request for information.....................283

INDEX OF VIDEOTAPES
2.....................65
3.....................120
4.....................185
5.....................252

**5**

INDEX OF EXHIBITS

Exhibit No.   Description                     Page
1   Defendant Educational Commission for
    Foreign Medical Graduates' Third
    Amended Notice of Intention to Take
    the Oral Deposition of Plaintiff
    Artis Ellis..........................23
2   ECFMG/Ellis 120-121, Résumé of Artis
    Ellis; CONFIDENTIAL.....................35
3   ECFMG/Ellis 124-126, References for
    Artis Ellis; CONFIDENTIAL..............37
4   ECFMG/Ellis 113-114, Offer letter to
    Artis Ellis dated April 5th, 2005,
    from ECFMG; CONFIDENTIAL...............41
5   ECFMG/Ellis 160-163, and ECFMG/Ellis
    92-93, Benefits package for Artis
    Ellis; CONFIDENTIAL....................42
6   ECFMG/Ellis 144-147, Job description
    for Artis Ellis as center assistant
    manager; CONFIDENTIAL.................58
7   ECFMG 73-74, Letter dated October
    27th, 2008, promoting Artis Ellis to
    acting center manager; CONFIDENTIAL... 62

2  (Pages 2 to 5)

Artis Ellis

**6**

1  8  ECFMG/Ellis 75-78, Job description as
2     center manager for Artis Ellis;
3     CONFIDENTIAL...................... 63
4  9  ECFMG 03-05, Clinical Skills
5     Evaluation Collaboration (CSEC)
6     Ownership, Confidentiality, and
7     Non-Disclosure Agreement;
8     CONFIDENTIAL...................... 64
9  10  ECFMG/Ellis 360-368, Application for
10     Employment of Troi Alan Bryant;
11     CONFIDENTIAL...................... 70
12  11  ECFMG 369-370, ECFMG New PTAN
13     Employee Form re:  Troi Alan Bryant;
14     CONFIDENTIAL...................... 79
15  12  ECFMG/Ellis 371-376, Letters from
16     ECFMG to Artis Ellis beginning
17     10-4-2006; CONFIDENTIAL ............... 83
18  13  ECFMG New PT As Needed Employee Form
19     for Jackie Bryant...................... 89
20  14  ECFMG Ellis 80, Release to return
21     form for Artis Ellis dated 8-27-2008;
22     CONFIDENTIAL...................... 92
23  15  Letter dated 11-3-2008 from Artis
24     Ellis to Troi Bryant.................. 99
25

**7**

1  16  Ellis 233-239, E-mail exchange
2     between Artis Ellis and John Repasch,
3.     February 20 through February 21st,
4     2014...................... 99
5  17  ECFMG/Ellis 356-357, ECFMG's policy
6     on employment of relatives and
7     relationships in the workplace;
8     Policy No. HR-305; CONFIDENTIAL........ 108
9  18  ECFMG/Ellis 377-389, FMLA documents
10     for Artis Ellis in January of 2012;
11     CONFIDENTIAL...................... 117
12  19  ECFMG 390-396, Artis Ellis FMLA leave
13     documents for 2012; CONFIDENTIAL...... 121
14  20  Ellis 005 through 0024, Sun Life
15     Assurance Company of Canada Short
16     Term Disability Claim Packet.......... 132
17  21  ECFMG/Ellis 397, Fitness for Duty
18     document dated 1-16-12; CONFIDENTIAL... 142
19  22  ECFMG/Ellis 398-399, Letter from
20     ECFMG dated October 19th, 2012,
21     addressed to Artis Ellis;
22     CONFIDENTIAL...................... 154
23  23  ECFMG/Ellis 358-359, Site business
24     functions chart; CONFIDENTIAL.......... 168
25

**8**

1  24  ECFMG/Ellis 000308 through 310, Data
2     Security Policy No. 237; CONFIDENTIAL.. 170
3  25  ECFMG/Ellis 443-638; Letter dated
4     2-26-2015 from Texas Workforce
5     Commission to RoseMarie Chambers re:
6     Artis Ellis, 140905-021; CONFIDENTIAL.. 177
7  26  ECFMG/Ellis 238-240, ECFMG Incident
8     Reporting Manual, September 2012
9     Update; CONFIDENTIAL................. 214
10  27  Plaintiff's Original Complaint........ 220
11  28  ECFMG/Ellis 220-223, E-mail chain
12     beginning 5-11-12 from Artis Ellis to
13     Betty LeHew; CONFIDENTIAL............. 235
14  29  ECFMG/Ellis 225-230, Corrective
15     action for Artis Ellis from Chris
16     Paul dated 8-23-2012; CONFIDENTIAL..... 240
17  30  ECFMG/Ellis 3837-3838, Exit interview
18     for Sharon Trowell-Roman with Brent
19     Biggs...................... 247
20  31  ECFMG/Ellis 3836, Chris Paul notes
21     from employee exit interviews related
22     to Bea Bright Davies and Kristy Edens.. 249
23
24
25

**9**

1  32  ECFMG/Ellis 003883-003904, Direct
2     Questions to be Propounded to
3     Custodian of Records for:  Sun Life
4     Assurance Company of Canada...... 259
5  33  Ellis 127-129,  Handwritten notes by
6     Artis Ellis...................... 264
7  34  Ellis 224-228, EEOC Charge of
8     Discrimination by Artis Ellis.......... 266
9  35  ECFMG/Ellis 3080-3123, RAIVS Requests
10     for Tax Return Photocopy of Taxpayer
11     Filed Returns...................... 276
12  36  Ellis 218-220, Bank records............ 285
13  37  Ellis 197, E-mail dated 6-27-2012
14     from Chris Paul to Artis Ellis, et
15     al., re:  Sign off process............. 287
16  38  Ellis 130-137, Employment offer
17     letters...................... 289
18  39  E-mail chain beginning 6-11-2012 from
19     Artis Ellis to Brent Biggs, et al.,
20     re:  RE:  Backgound checks for HOU
21     Sps...................... 293
22  40  ECFMG/Ellis 316-355, ECFMG Employee
23     Handbook Last Revised:  April, 2012;
24     CONFIDENTIAL...................... 298
25

3  (Pages 6 to 9)

Artis Ellis

**10**

PROCEEDINGS

1  MS. O'DRISCOLL: Pursuant to the rules. Do
2
3  y'all have anything else?
4  MR. KENNARD: We do not.
09:50 5  THE VIDEOGRAPHER: Today is May 11th, 2016.
6  This is the video deposition of Ms. Artis Ellis. The
7  time is approximately 9:51. The court reporter may now
8  swear in the witness.
9  ARTIS ELLIS,
10  having been first duly sworn, testified as follows:
11  EXAMINATION
12  QUESTIONS BY MS. O'DRISCOLL:
13  Q. Ms. Artis -- Ms. Ellis, can you state your full
14  name for the record?
09:51 15  A. Sure. It's Artis Ellis.
16  Q. Okay. Ms. Ellis, my name is Erin O'Driscoll.
17  We met just a moment ago when you walked in.
18  You understand that I represent ECFMG,
19  the -- your former employer that you filed a lawsuit
09:51 20  against?
21  A. Yes, I do.
22  Q. Okay. And you understand that -- that you're
23  the plaintiff that's lodged a lawsuit that your -- that
24  your attorneys have filed on your behalf?
09:51 25  A. Yes.

**11**

1  Q. Okay. I just wanted to go over a couple of
2  ground rules.
3  You understand I represent your -- your
4  former employer, and this is my time to ask you
09:51 5  questions about what your allegations are in this
6  lawsuit.
7  If -- if you don't understand anything that
8  I've asked you, please just let me know. I'm happy to
9  rephrase it. I want to make sure that -- that the
09:52 10  record is clear so that our court reporter, when she's
11  writing down everything that we say, I want to make sure
12  that -- that the record makes sense.
13  So can I have your agreement that if you
14  don't understand a question that you'll be sure and let
09:52 15  me know?
16  A. Yes.
17  Q. Okay. And if you answer the question, then
18  I'll assume that -- that -- that you've understood my
19  question and that you've responded in the best of your
09:52 20  knowledge.
21  A. Yes.
22  Q. Okay. And you're doing a great job of doing
23  this.
24  As you can see, we have a videographer, as
09:52 25  well as a court reporter taking down everything that

**12**

1  you're saying. And so if you could continue to provide
2  verbal responses, a yes, no, whatever your response may
3  be as opposed to huh-uh, uh-huh, since that won't be
4  clear on the written record.
09:52 5  Do you understand that?
6  A. Yes.
7  Q. Okay. Great. If you at any time need a break,
8  please let me know. I'm happy to take a break as
9  needed. I would just ask that if there is a question
09:53 10  that's pending, if you could go ahead and answer that
11  and then -- and let me know and we can take a brief
12  break outside. Okay?
13  A. Yes.
14  Q. Okay. Are you currently on any medication that
09:53 15  would prevent you from being able to testify or remember
16  to the best of your knowledge the facts in this case?
17  A. Not at this time.
18  Q. And have you taken any medication the last
19  month that would impact your memory or your ability to
09:53 20  testify today?
21  A. Can you rephrase the question?
22  Q. Sure. Are you aware of any medication that you
23  may have taken in the last month that would impact your
24  ability to give truthful testimony to the best of your
09:54 25  knowledge today?

**13**

1  A. Not to my under -- not to my knowledge.
2  Q. Okay. And you feel fine going forward today
3  with your deposition.
4  A. Yes.
09:54 5  Q. Okay. And you understand that you're under
6  oath and this is just as if we're in front of a judge
7  and jury.
8  Do you understand that?
9  A. Yes.
09:54 10  Q. Okay. Have you ever had your deposition taken
11  before?
12  A. Yes.
13  Q. Okay. How long ago was that?
14  A. I don't recall, Erin.
09:54 15  Q. Was it within the past year?
16  A. No.
17  Q. Okay. Was it longer than a few years ago? Do
18  you -- do you have any -- any idea --
19  A. In the -- over ten years ago.
09:55 20  Q. Over ten years. Okay.
21  And -- and what type of a case was that?
22  A. I don't recall.
23  Q. I mean, I'm just asking generally, do you
24  recall if it was a car accident, a divorce, an
09:55 25  employment matter? Do you have any recollection as to

**4  (Pages 10 to 13)**

Artis Ellis

**14**

1    the --
2      A. I don't recall.
3      Q. Were you -- was it your lawsuit, or were you a
4    witness in a lawsuit?
09:55 5    A. In a deposition, would it be, like in a
6    accident, giving a statement would be the same?
7      Q. Well, it would be -- it would be a little bit
8    different. For example, if a police officer took a
9    statement or if an attorney took a statement, a sworn
09:56 10    statement would be different than what we're doing here
11    in a -- in a deposition setting with a -- with a court
12    reporter.
13      A. So repeat your question.
14      Q. I was just -- do you recall what type of
09:56 15    lawsuit it was that --
16      A. I don't.
17      Q. And -- but you do think you were deposed?
18      A. Yes.
19      Q. Okay. And you don't recall if you brought the
09:56 20    lawsuit or if you were just a witness?
21      A. No, I don't.
22      Q. Okay. Do you have an e-mail account, a
23    personal e-mail account?
24      A. I do.
09:56 25    Q. Okay. And what is that e-mail account?

**15**

1      A. AFHarden, H A R D E N, @Yahoo.com.
2      Q. And do you have any other e-mails currently,
3    e-mail accounts?
4      A. No.
09:57 5    Q. Have you had any other e-mail accounts other
6    than your -- your prior e-mail at EC -- ECFMG?
7      A. Not that I can recall.
8      Q. Okay.
9      A. I seem to remember having that one forever.
09:57 10    Q. Okay. And -- and Harden, is that a -- is that
11    a maiden name or a former name?
12      A. Maiden.
13      Q. Maiden?
14      A. Uh-huh.
09:57 15    Q. Have you gone by any other name? Other than
16    Artis Ellis, Artis Harden, has there been any other
17    names?
18      A. Fowler.
19      Q. And was that a prior marriage?
09:57 20    A. No.
21      Q. And what was Fowler?
22      A. Birth.
23      Q. Birth name. Okay. I apologize. And when I --
24    when I -- when you said "maiden," I thought you meant
09:57 25    that was your birth name. And I apologize.

**16**

1      A. No.
2      Q. So Fowler is your birth name?
3      A. Yes.
4      Q. Okay. And then when you said maiden name for
09:58 5    Harden?
6      A. Harden is marriage name. I'm sorry. Let me
7    clarify that.
8      Q. I apologize.
9      A. No. So Harden is marriage -- previous marriage
09:58 10    name, and Fowler is -- I'm sorry -- you told me not to
11    say uh. Harden is previous marriage, and Fowler is
12    maid -- birth.
13      Q. Birth name. Okay.
14        And when were you married to Mr. Harden?
09:58 15    A. Back -- back in the '80s. I don't recall the
16    exact year.
17      Q. Okay. The 1980s?
18      A. Yeah. 1980s.
19      Q. Do you remember for how many years you were
09:58 20    married?
21      A. Maybe -- probably around nine or ten.
22      Q. Nine to ten years.
23        And were there any children from that
24    marriage?
09:59 25    A. One.

**17**

1      Q. One. And what is that child's name?
2      A. Brandon.
3      Q. Brandon or Brendan?
4      A. Brandon.
09:59 5    Q. Brandon. Okay. And -- and his -- and that's a
6    male; correct?
7      A. Yes.
8      Q. Okay. And is his last name Harden?
9      A. Yes.
09:59 10    Q. Okay. And does he live in Harris County?
11      A. Currently?
12      Q. Yes.
13      A. No.
14      Q. Did he used to live in Harris County?
09:59 15    A. Yes.
16      Q. When did he move out of Harris County?
17      A. Three years ago.
18      Q. And -- and what was your former husband's first
19    name, Mr. Harden's first name?
09:59 20    A. Rodney.
21      Q. And does he live in Harris County?
22      A. Currently, I don't -- I can't answer that. I
23    don't --
24      Q. Not sure?
10:00 25    A. Not sure.

5 (Pages 14 to 17)

Artis Ellis

**18**

1    Q. Okay. And do you have any other children?
2    A. Yes.
3    Q. And what are their names?
4    A. My oldest child is Brittani.
10:00 5    Q. And what's her last name?
6    A. Davis.
7    Q. And does she live in Harris County?
8    A. No.
9    Q. And is Davis her married name?
10:00 10    A. Yes.
11    Q. And when was she married?
12    A. Two years ago.
13    Q. And what was her maiden name, her name before
14    she got married?
10:00 15    A. Bryant.
16    Q. Okay. She's your oldest?
17    A. Yes.
18    Q. And then who's the next child?
19    A. Brendan.
10:00 20    Q. Brendan. Okay. And then who's next?
21    A. Kaila.
22    Q. I'm sorry. Kaila?
23    A. Kaila. Uh-huh.
24    Q. And what's Kaila's last name?
10:01 25    A. Ellis.

**19**

1    Q. And is her father your current husband?
2    A. Yes.
3    Q. Okay. And does she live in Harris County?
4    A. Yes.
10:01 5    Q. And what's your husband's first name?
6    A. Kenneth.
7    Q. Are there any more children?
8    A. No.
9    Q. Okay. So four children.
10:03 10    A. Three.
11    Q. I'm sorry. Three children.
12        And do you have any stepchildren?
13    A. Yes.
14    Q. And what are their names?
10:01 15    A. Corey.
16    Q. Is that with a C or a K?
17    A. C.
18    Q. C O R Y?
19    A. Yes. Uh-huh. C O R E Y.
10:01 20    Q. E Y. Okay. And what's Corey's last name?
21    A. Ellis, and Keenan Ellis.
22    Q. And Corey and Keenan are -- stepchildren.
23    They're Mr. Ellis' children by a prior marriage?
24    A. They're Mr. Ellis' children, but they're not
10:02 25    married -- he wasn't married.

**20**

1    Q. He wasn't married.
2    A. Yes.
3    Q. Okay. Okay. And do they live in Harris
4    County?
10:02 5    A. No.
6    Q. Okay. Brittani, how old is she currently?
7    A. 29.
8    Q. And Brendan?
9    A. 25.
10:02 10    Q. And Kaila?
11    A. 14.
12    Q. And Corey?
13    A. Corey is 20 -- I'm sorry. Corey is -- I think
14    he's 20. I believe he's 20.
10:03 15    Q. Okay. And how about Keenan?
16    A. Keenan is 18.
17    Q. And did Brittani grow up in your household?
18    A. Brittani did grow up in my household.
19    Q. Okay. And -- and what is her father's name?
10:03 20    A. Her father's name is Troi Bryant.
21    Q. And did she also grow up in Mr. Bryant's home?
22    A. No, she did not grow up in Mr. Bryant's home.
23    Q. Did -- did she visit him or what -- how often
24    would she visit Mr. Bryant?
10:03 25    A. She had court visitation to go every other

**21**

1    weekend and on holidays. I don't recall how often on
2    holidays, because that's been such a long time.
3    Q. And was this up until she was 18 years old?
4    A. Well, the court visitation was up until 18, but
10:04 5    I think at a certain period, the -- she stopped going,
6    probably around 12.
7    Q. And you said court visitation. Are there court
8    documents that are related to Mr. Bryant's paternity
9    with Brittani?
10:04 10    A. It was a court order.
11    Q. Okay.
12    A. Uh-huh.
13    Q. And did you file a lawsuit, or how did that
14    court order come about?
10:04 15    A. I think it was a child support order that was
16    in place.
17    Q. Okay. And do you -- did you file something
18    to -- to seek child support from Mr. Bryant?
19    A. The Attorney General.
10:04 20    Q. Attorney General did.
21    A. Uh-huh.
22    Q. Okay. On your behalf?
23    A. Yes.
24    Q. Okay. And -- and did he pay child support
10:04 25    pursuant to that court order?

6 (Pages 18 to 21)

Artis Ellis

**22**

1   A. He did.

2   Q. And do you have copies of that court order?

3   A. I do not.

4   Q. And where do -- where do you currently reside?

10:05 5   What is your address?

6   A. 3915 Oakside Drive.

7   Q. And how long have you lived there?

8   A. 25 years.

9   Q. And is that Houston?

10:05 10   A. Yes. 77053.

11   Q. And is that where Brittani lived --

12   A. Yes.

13   Q. -- as a child?

14   Did -- did any of the other children live

10:06 15   in that household in Oakside Drive?

16   A. All -- all the children lived on Oakside Drive

17   with the exception of the stepchildren.

18   Q. Okay. And where did the stepchildren live?

19   A. Keenan lived in Paris, I believe, Paris, Texas,

10:06 20   and Corey is just now coming on the scene, so I'm not

21   sure where he actually grew up.

22   Q. Okay. But Brittani, Brendan, and Kaila all

23   lived with you?

24   A. Yes.

10:06 25   Q. And do you have a current -- a cell phone

**23**

1   number?

2   A. Yes.

3   Q. What is that?

4   A. 832-322-5050.

10:06 5   Q. And who is your cell provider?

6   A. T-Mobile.

7   Q. And how long have you had that mobile number?

8   A. I'm not sure how long.

9   Q. Do you think it's longer than a year?

10:07 10   A. Yes.

11   Q. All right. Do you think it's -- did you have

12   that number when you were working at ECFMG?

13   A. Yes.

14   Q. Ms. Ellis, I'm going to hand you what we're

10:07 15   going to mark as Exhibit 1.

16   (Discussion off the stenographic record.)

17   (Exbn. No. 1 was marked.)

18   A. Uh-huh.

19   Q. (BY MS. O'DRISCOLL) And have you seen this

10:08 20   deposition notice?

21   A. Yes.

22   Q. Okay. And am I correct in reading the title,

23   it's the third amended deposition notice?

24   A. Where do you see that?

10:08 25   Q. Up towards the top, in the bold print. Not the

**24**

1   very top, the sort of halfway down the page. And let me

2   ask it a different way.

3   Do you understand that -- that we've

4   scheduled your deposition a couple of times in this

10:09 5   case?

6   A. Yes.

7   Q. Okay. And have you been hospitalized over the

8   past year?

9   A. Yes.

10:09 10   Q. And what were you hospitalized for over the

11   past year?

12   A. I had -- I was hospitalized the last time we

13   had scheduled a deposition for low blood sugar, for

14   hypoglycemia.

10:09 15   Q. And is that something that you've -- that

16   you've struggled with for longer than this year? Is

17   this a new onset?

18   A. New onset.

19   Q. Okay. And have you been hospitalized for

10:09 20   anything else this year?

21   A. Yes.

22   Q. And what else?

23   A. Low blood pressure.

24   Q. And is -- is that a new onset, or is that

10:10 25   something that you've struggled with?

**25**

1   A. New onset.

2   Q. And is this the first time you've been

3   hospitalized for low -- low blood pressure?

4   A. Yes.

10:10 5   Q. And that was -- was that in 2015 or 2016?

6   A. I don't recall.

7   Q. Okay. Do you recall who the doctor was for low

8   blood pressure?

9   A. No. I went to the emergency room, and then

10:10 10   they referred me to -- sent me to the hospital.

11   Q. Okay. And do you remember which hospital that

12   was?

13   A. For the low blood pressure or the hypoglycemia?

14   Q. The low -- low blood pressure.

10:10 15   A. Was -- you know, it wasn't -- I had low blood

16   pressure with low -- with -- my sodium was low, blood

17   sodium, so it was Southwest Memorial. Hermann Southwest

18   Memorial.

19   Q. And how about for the hypoglycemia?

10:11 20   A. I was at -- no, I'm sorry. Hermann Clear Lake

21   was the low sodium, and then Hermann southwest was for

22   the hypoglycemia.

23   Q. And those were both over the last year?

24   A. Yes.

10:11 25   Q. Do you recall being hospitalized for anything

7 (Pages 22 to 25)

Artis Ellis

26

1  else in the last year?
2    A. Not that I can think of right now.
3    Q. And, again, if you need to take a break to get
4  something sweet or -- or anything, please let us know.
10:11 5    A. Thank you.
6    Q. Okay?
7      I forgot to ask you, does your husband have
8  an e-mail that you communicate with?
9    A. No.
10:12 10    Q. He doesn't --
11    A. I don't communicate with him through e-mail.
12    Q. You do not?
13    A. Huh-uh.
14    Q. And where are you currently employed?
10:12 15    A. I'm currently not employed.
16    Q. And have you had any employment since the time
17  that you left ECFMG?
18    A. Yes. I started my own business.
19    Q. And what's the name of that business?
10:12 20    A. Heaven's Closet.
21    Q. And is that still in existence?
22    A. I'm re -- because of some life-changing events,
23  I'm re-getting it started back. So it's not actually
24  actively started, but I'm starting it back over.
10:13 25    Q. Okay. And what were those life-changing

27

1  events?
2    A. I had two deaths in my family with major
3  illness, and that was the death of my brother and the
4  death of my mother, and just major illness between my
10:13 5  husband and I, with hospitalizations and -- major
6  hospitalizations and major illness.
7    Q. And your husband's been hospitalized, as
8  well --
9    A. Sure.
10:13 10    Q. -- this last year?
11    A. Sure.
12    Q. Do you remember -- when you say that you're
13  restarting Heaven's Closet --
14    A. Uh-huh.
10:13 15    Q. -- do you -- do you have a lease?
16    A. I had a lease.
17    Q. Okay. And did you let that lease lapse?
18    A. No. I lived out the lease.
19    Q. Okay. You still have the lease?
10:13 20    A. No. I lived it out.
21    Q. Okay. So then -- and do you remember when the
22  lease expired?
23    A. I believe in May of -- you know, Erin, I don't
24  recall the actual month and year. But I lived out -- I
10:14 25  started a lease and then actually lived it out.

28

1    Q. Do you -- and do you remember how long that
2  lease was for?
3    A. I believe nine months to a year.
4    Q. And do you recall if -- I know you said you
10:14 5  don't recall the month that you closed it.
6      Do you -- do you recall the year that --
7  that you --
8    A. It's still active.
9    Q. Okay.
10:14 10    A. So I have a website, and it's online.
11    Q. And if a customer calls the number on the
12  website, can they come and -- and shop?
13    A. They can come and shop.
14    Q. Okay. And --
10:14 15    A. I can come to them.
16    Q. Or you go to them?
17    A. Uh-huh.
18    Q. Okay. And are you doing any business with that
19  currently?
10:15 20    A. Well, since I'm just getting out of the
21  hospital and just trying to get myself prepared for the
22  deposition and get me together, yes, I will -- I'm just
23  getting together. So once I get everything back on
24  track, then, of course, I will be able to go either to
10:15 25  them or find a location. So --

29

1    Q. And -- and what is the -- what type of business
2  is it? Is it a personal shopper?
3    A. Yes.
4    Q. Okay.
10:15 5    A. It's a personal shopper, along with having
6  items in a -- it's a boutique.
7    Q. And do you remember when you opened that store?
8    A. No, because then I would be able to remember
9  how long the lease is. Or was, I should say.
10:15 10    Q. And after -- after leaving ECFMG, do you recall
11  applying for employment at any other location besides
12  opening Heaven's Closet?
13    A. Absolutely.
14    Q. Okay. And where did you apply for jobs?
10:16 15    A. Everywhere. I -- I've gone on different
16  interviews. I've -- you know, put my application on
17  LinkedIn and Monster and Career Builder, so -- Harris
18  County, City of Houston, some temporary agencies.
19    Q. And did you obtain any employment through any
10:16 20  of those avenues?
21    A. No, because I'm a committed worker, Erin, so I
22  would not want to be in a position where, as I gave
23  ECFMG full commitment, a hundred percent, in seven
24  years, and then fall ill, like I -- I didn't foresee --
10:16 25  in three years, I didn't see myself being in this

8  (Pages 26 to 29)

Artis Ellis

30

1   position that I'm in. I didn't see myself, like you
2   said, in the last year, being in the hospital that many
3   times. I didn't see my mother dying. I didn't see my
4   brother dying. So, no, I would not have done that to an
5   employer.
6       Q. Well, were -- were you offered a -- a position
7   at any of those --
8       A. I was not offered a position.
9       Q. Okay. Who did you -- who did you go on job
10  interviews with?
11      A. Aldine Independent School District.
12          I can't think of this temporary agency.
13  I -- let me -- I have to come back to you on that one.
14      Q. Anyone else you can think of, the temp agency
15  and Aldine school district, that you would have gone on
16  interviews with?
17      A. City of Houston.
18      Q. Okay. You did go on interviews with that one?
19      A. Uh-huh.
20      Q. And what about Harris County that you
21  mentioned?
22      A. Harris County, yes.
23      Q. And what were you referring to when you said
24  that you didn't foresee the illness and you didn't
25  foresee the deaths, the two -- the two major deaths in

31

1   your family? What were you referring to in relation to
2   you applying for jobs?
3       A. So if a job was offered and I was actually
4   given a job, I don't know how I would have been able to
5   maintain and stayed on a job that long, being that I
6   would have been ill.
7       Q. So you don't think you could have worked?
8       A. Yeah, I'm sure I could have worked.
9       Q. Okay.
10      A. I know I could have worked. But being that I
11  was sick, I didn't see that, foresee all my illness
12  coming up to this point.
13      Q. Okay.
14      A. Did I answer that question for you?
15      Q. I think so.
16      A. Okay.
17      Q. I think so. And if you remember the name of
18  the temp agency, just let me know.
19      A. Sure.
20      Q. And you can just say that it suddenly popped
21  into your head.
22      A. Okay.
23      Q. Because it'll probably happen in a couple of
24  hours when we're talking about something else.
25      A. Okay.

32

1       Q. Do you have a diary?
2       A. No.
3       Q. Have you ever had a diary?
4       A. No.
5       Q. Or any type of a journal or anything that you
6   just jot things down?
7       A. I wouldn't call it a diary.
8       Q. But some sort of a journal?
9       A. No. I just have things maybe I take notes
10  on --
11      Q. Okay.
12      A. -- paper.
13      Q. So just -- just a notebook or a note pad?
14      A. Not -- no. Just note paper.
15      Q. Okay. Do you -- do you collect those papers
16  anywhere?
17      A. I wouldn't say I collect them. I have papers
18  that I may just write down words or notes.
19      Q. Have you -- have you given your lawyers any --
20  any notes or any -- anything you might have jot --
21  jotted down that's relevant to the time frame in your
22  employment and leaving ECFMG?
23          MR. KENNARD: Objection to the extent that
24  it calls for a legal conclusion.
25          You may answer the question if you can.

33

1       Q. (BY MS. O'DRISCOLL) Do you -- do you
2   understand the question, because I'm happy to rephrase
3   it.
4       A. Please rephrase it.
5       Q. To the extent that you've jotted down any notes
6   or -- or put your thoughts into writing during the time
7   frame that's related to this lawsuit, to the time that
8   you worked at ECFMG, have you given those writings to
9   your attorney?
10          MR. KENNARD: Same objection.
11          You may answer the question if you
12  understand it.
13      A. Sure.
14      Q. (BY MS. O'DRISCOLL) Is, sure, a yes that
15  you've given the writings to your attorney?
16      A. Yes.
17      Q. Are you aware of any other writings that --
18  that would relate to your time while you worked at ECFMG
19  that you haven't given to your lawyer?
20      A. Repeat that one more time.
21      Q. And -- and I'm just -- I'm just asking if you
22  have any pieces of paper where you jotted down your
23  thoughts related to the time that you worked for the
24  defendant in this case --
25      A. Uh-huh.

9   (Pages 30 to 33)

Artis Ellis

34

1    Q. Do you have any -- have you come across any
2    writings that you haven't given to your lawyer yet?
3    A. I'm not sure.
4    Q. So you think you may have come across writings?
10:21 5    A. That I have not given to my lawyers?
6    Q. Correct.
7    A. No.
8    Q. Okay. So -- so you don't -- you're not
9    aware -- as you sit here, you're not aware of any -- any
10:21 10    writings that would relate to this case that you have
11    not given to your lawyer yet.
12    A. Not at this time.
13    Q. Okay. Okay. And if you do find any, you'll be
14    sure to give them to your lawyer so that he can give
10:21 15    them to me?
16    A. Absolutely. Yes.
17    Q. Thank you.
18    A. Erin, this would be a good time to take a
19    break.
10:22 20    Q. You need a break now?
21    A. Yes.
22    Q. Sure.
23    A. Thank you.
24    THE VIDEOGRAPHER: Time is approximately
10:22 25    10:22. We're off the record.

35

1    (Recess taken from 10:22 a.m. to 10:34
2    a.m.)
3    THE VIDEOGRAPHER: Time is approximately
4    10:34. We're back on the record.
10:33 5    Q. (BY MS. O'DRISCOLL) Ms. Ellis, I'm going to
6    hand you what's been marked as Exhibit 2.
7    (Exb. No. 2 was marked.)
8    Q. (BY MS. O'DRISCOLL) This is ECFMG/Ellis 120
9    through 121.
10    Do you recognize this document?
11    A. Yes.
12    Q. And what is that document?
13    A. My résumé.
14    Q. And is this the résumé you submitted to ECFMG
10:34 15    when you were applying for a job there?
16    If you looked at the second page, it might
17    help you refresh your memory.
18    A. Yes.
19    Q. And you recall when you applied for that job
10:34 20    that you submitted a cover letter to -- to human
21    resources, Betty LeHew?
22    A. Yes.
23    Q. And Betty LeHew was the same human resources
24    person that still worked for ECFMG throughout --
10:34 25    throughout your employment; correct?

36

1    A. I'm sorry?
2    Q. Betty LeHew was the same human resources person
3    that still worked at ECFMG throughout your employment;
4    correct?
10:35 5    A. Yes.
6    Q. And this Exhibit Number 2, it appears you
7    applied for the assistant manager for the Houston center
8    location?
9    A. Yes.
10:35 10    Q. And -- and you obtained that position?
11    A. Yes.
12    Q. And did you -- do you remember what month you
13    started in that position?
14    A. I believe April.
10:35 15    Q. April of 2005?
16    A. Yes.
17    Q. And who was your supervisor?
18    A. John Repasch.
19    Q. And was he the center manager?
10:35 20    A. Yes.
21    Q. And did you interview with Mr. Repasch for that
22    position?
23    A. I originally interviewed with Betty LeHew.
24    Q. Okay.
10:35 25    A. And then John Repasch.

37

1    Q. And was Mr. Repasch the center manager until
2    the time that you were promoted to center manager?
3    A. Yes.
4    (Exb. No. 3 was marked.)
10:36 5    Q. (BY MS. O'DRISCOLL) I hand you Exhibit 3.
6    This is ECFMG/Ellis 124, 125, and 126.
7    If you turn to the second page --
8    MR. KENNARD: I've got to step out for a
9    second. You can continue.
10:36 10    MS. O'DRISCOLL: Do you want us to pause?
11    MR. KENNARD: No.
12    Q. (BY MS. O'DRISCOLL) If you turn to the second
13    page, is -- are these the written references that you
14    filled out on the job application for ECFMG?
10:37 15    A. On the second page?
16    Q. Yes, ma'am.
17    A. I don't see where it says references.
18    Q. Well, I'm sorry, work experience. I apologize.
19    A. Yes.
10:37 20    Q. Okay. And I just wanted to briefly touch on
21    where you worked prior to the time that you applied at
22    ECFMG.
23    I see Harris Counseling Services from March
24    2004 to present, to March 2005, when you were applying;
10:37 25    is that correct?

10   (Pages 34 to 37)

Artis Ellis

38

1      A.  That is correct.
2      Q.  Okay.  And that was contract work?
3      A.  Yes.
4      Q.  Okay.  And you described it as providing
10:37  5  home-based counseling to seniors -- the senior citizen
population; is that right?
7      A.  That is correct.
8      Q.  And prior to that, did you work at Gulf Shores
9  Outpatient services?
10:38  10      A.  Yes.
11      Q.  And that was from June, 2001, until October of
12  2004?
13      A.  Yes.
14      Q.  And is that correct that you supervised staff
10:38  15  and you were a liaison providing, looks like, liaison
16  duties to various community -- and it might be cut off a
17  little bit there, diverse -- what group were you serving
18  in that position?
19      A.  Children, adults, underprivileged communities.
10:38  20      Q.  And you left there to complete school?
21      A.  Yes.
22      Q.  And which degree was that, that you -- that you
23  left Gulf Shores to complete?
24      A.  My master's degree.
10:38  25      Q.  And -- and is that a master's in counseling?

39

1      A.  Yes.
2      Q.  And that was at TSU?
3      A.  Yes.
4      Q.  And prior to that, you worked at New Directions
10:39  5  from 1997 until May of 2001?
6      A.  Yes.
7      Q.  And you were program director?
8      A.  Yes.
9      Q.  And that facility closed?
10:39  10      A.  Yes.
11      Q.  Did it dissolve entirely, or did it move to
12  another location?  Do you remember?
13      A.  It lost its funding.
14      Q.  Okay.  And what about Correctional Medical
10:39  15  Services?  That was from December, 1995, until September
16  of 1997?
17      A.  Where do you see that?
18      Q.  It's right below New Directions on the right
19  side, Correctional Medical Services?
10:39  20      A.  And what are you asking me?
21      Q.  Is that correct, that you worked for
22  Correctional Medical Services --
23      A.  Yes.
24      Q.  -- from December, 1995, to September of 1997?
10:40  25      A.  Yes.

40

1      Q.  And staff supervision to six staff members, you
2  were program director; is that correct?
3      A.  Yes.
4      Q.  And what did you do there?
10:40  5      A.  I worked -- there was a women's prison.  It was
6  a 500-unit women's prison in Dayton, Texas.
7      Q.  In Dayton?
8      A.  Yes.
9      Q.  And did that facility close, as well?
10:40  10      A.  No.  I left.
11      Q.  And -- okay.  And why did you leave there?
12      A.  To take on the position at New Direction and to
13  be closer to home, in Houston.
14      Q.  So when you said reason for leaving, facility
10:40  15  closing, that's not accurate?
16      A.  Oh, I'm sorry.  I didn't -- I didn't know that.
17  So if I said facility closed, then they closed down.  I
18  may have gotten confused with New Direction.
19      Q.  Okay.  And that one says facility closed, as
10:41  20  well.
21      A.  Yes.
22      Q.  So do you think both of them closed, or you
23  think you were confused when you wrote this down?
24      A.  No.  Correctional Medical Service closed, and
10:41  25  they went to another agency.  I didn't stay with that

41

1  agency.  I moved to New Direction.  The prison is still
2  there.
3      Q.  Okay.  And I noticed that the -- your
4  supervisor at Harris Counseling Service, Michelle
10:41  5  Bryant, is Michelle related to your -- your daughter's
6  husband?
7      A.  No.
8      Q.  Okay.  So it just happens that they have the
9  same last name?
10:41  10      A.  Yes.
11      Q.  Okay.  So that's not an aunt or a cousin or any
12  type of familial --
13      A.  No.
14      Q.  Okay.  And what were your job duties when you
10:42  15  were hired as assistant center manager at ECFMG?
16      A.  Do you have something I can reference back to a
17  job description?
18      Q.  I can locate that, but just, do you recall what
19  some of your job responsibilities were?
10:43  20      A.  Erin, that's been such a long time ago, I would
21  have to reference back to a job description.
22      Q.  Okay.  Let me mark as Exhibit 4 --
23          (Exh. No. 4 was marked.)
24      Q.  (BY MS. O'DRISCOLL)  Ms. Ellis, if you could
10:43  25  take a look at ECFMG/Ellis 113 through 114.

11  (Pages 38 to 41)

Artis Ellis

**42**

1   Is this your offer letter dated April 5th,
2   2005, as assistant center manager when you started at
3   ECFMG?
4       A. Yes.
5       MS. O'DRISCOLL:  Mark as Exhibit 5 --
6       MR. KENNARD:  Is this together, 5?
7       MS. O'DRISCOLL:  Yeah.
8       (Exh. No. 5 was marked.)
9       Q. (BY MS. O'DRISCOLL)  Ms. Ellis, if you could
10  just take a minute, this is ECFMG/Ellis 160 through 163,
11  and then also ECFMG/Ellis 92 and 93.  And I'm just
12  referring to the numbers, I should have mentioned to
13  you, in the bottom right-hand corner, we call those
14  Bates numbers.  Those are just the numbers on documents
15  that have been exchanged in this lawsuit.
16      If you'd just take a minute to look at
17  this, this appears to be your -- your benefits,
18  dependents for medical insurance -- is that correct? --
19  while you were working at ECFMG?
20      A. Yes.
21      Q. And the dependents listed, tell me -- tell me
22  if I'm reading this correctly, you listed Brendan Ellis;
23  correct?
24      A. No.  This is incorrect.
25      Q. Okay.  If you -- maybe I'm reading this

**43**

1   incorrectly.
2       In the bottom right-hand corner of ECFMG
3   160, does that list Brendan Ellis?
4       A. It does list Brendan Ellis, but that's
5   incorrect, as well as Brittani Bryant being a male is
6   incorrect.
7       Q. Okay.  So are you saying that you did not have
8   Brendan Ellis as a dependent?
9       A. I had Brendan Harden as a dependent.
10      Q. Okay.  So -- so that should be Brendan Harden.
11      A. Uh-huh.
12      Q. Okay.  And then Brittani Bryant, obviously,
13  she's a female.
14      A. That's correct.
15      Q. And she was a dependent?
16      A. Correct.
17      Q. And then Kaila Ellis?
18      A. Correct.
19      Q. And then if you look on the next page, Keenan
20  Ellis?
21      A. Yes.
22      Q. And you -- you added Keenan, it looks like, a
23  couple of years after you started --
24      A. Correct.
25      Q. You -- it looks like you added him in 2007?

**44**

1       A. That is correct.
2       Q. And Keenan, I'm just looking back at my list,
3   is -- is one of your stepchildren.
4       A. That's correct.
5       Q. Through Mr. Ellis.
6       A. Uh-huh.
7       Q. Was there -- do you recall if there was
8   anything -- strike that.
9       Was there anything in the court order with
10  the attorney general's office that required Mr. Bryant
11  to either carry Brittani for medical insurance or
12  contribute in some way, costwise, to help with medical
13  insurance?
14      A. When she was a minor?
15      Q. Well, during -- for the period of time that
16  covered the court order; correct?
17      A. I don't recall.
18      Q. But you said that she did visit him every other
19  weekend and holidays.
20      A. Yes.
21      Q. And do you remember if -- I know you have
22  Brittani listed here, and her date of birth is March
23  8th, 1987?
24      A. Yes.
25      Q. And I believe the date on this, it's -- the

**45**

1   effective date is May 1, 2005, on this designation.
2       A. Yes.
3       Q. Did you carry Brittani as a dependent at your
4   employer prior to this?
5       A. Yes.
6       Q. And you said that Troi Bryant was Brittani's
7   father.
8       Did you -- were you ever married to -- to
9   Mr. Bryant?
10      A. No.
11      Q. And -- and when -- when were you -- when did
12  you have a relationship with him?
13      A. I didn't have a relationship with Mr. Bryant.
14      Q. Okay.  He is the father of your daughter.
15      A. Yes.
16      Q. And biologically.
17      A. Yes.
18      Q. And so there was some sort of a relationship;
19  correct?
20      A. No.
21      Q. There was some sort of an encounter that
22  resulted in a child; correct?
23      A. Yes.
24      Q. Okay.  And -- and did that happen around 1986?
25      A. Yes.

**12   (Pages 42 to 45)**

Artis Ellis

46

1   Q. And do you recall the year that the court order
2   was put into place with the attorney general on -- to --
3   to provide visitation and -- and court-ordered child
4   support for Brittani from Mr. Bryant?
10:51  5   A. I don't recall.
6   Q. You don't recall what year?
7   A. Not the year.
8   Q. Do you recall how old she was?
9   A. If -- if I -- I married Rodney somewhere in
10:51  10   19 -- probably late 1980s, so probably around 1988.  So
11   maybe '88.
12   Q. You think the court order was put in place
13   around 1988?
14   A. Yes.
10:51  15   Q. Okay.  And do you recall where Mr. Bryant was
16   working during that time period?
17   A. No.
18   Q. And do you recall where he was living during
19   that time period?  You said that Brittani had
10:52  20   visitation.
21   A. I believe in Spring, Texas.
22   Q. And did he live in -- in Spring, do you
23   remember how long he lived there for?
24   A. No.
10:52  25   Q. For visitation, did -- did you ever drop

47

1   Brittani off at her father's?
2   A. No.
3   Q. Did Mr. Bryant ever come to your house to pick
4   her up?
10:52  5   A. No.
6   Q. So how -- how would the child go to visit her
7   father?
8   A. He would pick her up at the day care or at my
9   mother's house and would drop her off at my mom's.
10:52  10   Q. And that's how it was always handled?
11   A. (Witness indicated by nodding head.)
12   Q. Was it the same for holidays?
13   A. Yes.
14   Q. I'm sorry.  Was that a yes?
10:52  15   A. Yes.
16   Q. And -- and was it also the same for holidays?
17   A. Yes.
18   Q. And when Mr. Bryant would mail your child
19   support check, how would you receive that check?  Was it
10:53  20   a direct deposit, or did you receive a check in the
21   mail?
22   A. He wouldn't mail me a child support check.  The
23   attorney general would.
24   Q. So he would make the payment to the attorney
10:53  25   general and then the attorney general would make the

48

1   payment to you.
2   A. Yes.
3   Q. Did Brittani ever go on family vacations with
4   Mr. Bryant?
10:53  5   A. Not that I can recall.
6   Q. And your address at Oakside, what school is
7   that zoned to?  What school did Brittani attend?
8   A. Houston Independent School District.
9   Q. And what -- what junior high and high school is
10:54  10   that?
11   A. That junior high was Lamar -- I mean -- I'm
12   sorry, Lanier Middle School.  And she attended Carnegie
13   High School and Jones High School.
14   Q. And Jones?
10:54  15   A. Uh-huh.  Excuse me.  Yes.
16   Q. And you said that -- that -- that Mr. Bryant
17   would pick up Brittani from -- was it your mother or his
18   mother?
19   A. My mother.
10:54  20   Q. Your mother.
21   And where did your mother live?
22   A. 11402 Bay Cedar Drive, Houston, Texas, 77048.
23   Q. And was that closer to your house, closer to
24   Mr. Bryant -- or closer to Mr. Bryant's?
10:55  25   A. She lived in Houston.  Mr. Bryant lived in

49

1   Spring.
2   Q. And was there a time that Mr. Bryant came to
3   apply for a job at ECFMG?
4   A. Was there a time that he came to apply for
10:55  5   EC -- a job at ECFMG?
6   Q. Yes.
7   A. Yes.  He works -- he worked there.
8   Q. And do you remember when he applied for a job
9   at ECFMG?
10:56  10   A. I do not.
11   Q. Do you remember how long he -- he was, in fact,
12   hired; correct?
13   A. He -- yes, because he worked there.
14   Q. And how long did he work at ECFMG?
10:56  15   A. I don't recall.
16   Q. And back to the visitation with Mr. Bryant
17   and -- your daughter, did you ever speak with him
18   about parental issues or, you know, feeding issues or
19   buying clothes or anything -- anything of that nature
10:56  20   related to Brittani?
21   A. Not at all.
22   Q. And why didn't you speak with him?
23   A. He had a court order, and he followed the court
24   order.
10:56  25   Q. But as far as decisions related to the child --

13 (Pages 46 to 49)

Artis Ellis

50

1    A. It was spelled out in the court order.
2    Q. And, I mean, is there a reason that you didn't
3    have any discussions with him?
4    A. We didn't have to, because it was completely
10:57 5    spelled out, what he was supposed to do, when he was
6    supposed to pick her up, bring her back, and he
7    complied.
8    Q. What about if, for example, the child was sick,
9    and, you know, something simple like, hey, make sure she
10:57 10   gets her medicine or make sure she gets -- goes to the
11   doctor, you never had conversations like that?
12   A. No. She never -- I mean, she didn't get sick,
13   or if he did -- or if she did, then he took care of it,
14   and I'm sure he would have called or told me if she got
10:57 15   sick.
16   Q. Okay. So you would talk about certain parental
17   issues like that?
18   A. No, we didn't have to.
19   Q. Well, you said I'm sure he would call you.
10:57 20   A. If she -- if she got sick. I don't recall that
21   ever happening.
22   Q. Or something related to her school.
23       Do you ever remember having conversations
24   related to school?
10:57 25   A. Not at all. She was an excellent student,

51

1    performed really well, graduated in the top of her
2    class, so it was never a school issue.
3    Q. And so would a student like that, did she
4    receive awards at the school?
10:57 5    A. She did receive awards.
6    Q. And did you attend awards ceremonies for her?
7    A. When she graduated high school?
8    Q. Throughout school.
9    A. Yes.
10:58 10   Q. I mean, if she was an honor student --
11       MR. KENNARD: Hold on. I want to make sure
12   we're not talking on top of each other so that the court
13   reporter can get everything down.
14       MS. O'DRISCOLL: Thank you.
10:58 15       MR. KENNARD: Just make sure that you heard
16   her question before you answer, and she will give you
17   the courtesy of waiting to allow you to answer before
18   she asks her next question.
19       THE WITNESS: Thank you.
10:58 20       MR. KENNARD: Sure.
21   Q. (BY MR. KENNARD) So you said that Brittani was
22   an excellent student.
23   A. (Witness indicated by nodding head.)
24   Q. And even prior to graduation -- I'm sorry. Is
10:58 25   that a yes?

52

1    A. Yes.
2    Q. Okay. Just remember to answer verbally.
3    A. Thank you.
4    Q. So she was an excellent student.
10:58 5    A. Yes.
6    Q. And did she receive awards throughout her
7    education, not just at graduation, but growing up?
8    A. Yes.
9    Q. And did you attend awards ceremonies?
10:58 10   A. Yes.
11   Q. And did Mr. Bryant attend awards ceremonies?
12   A. I -- I can't recall if he did or he did not.
13   Q. So you think he may have?
14   A. He could have.
10:58 15   Q. Okay. And do you remember going to
16   parent/teacher conferences?
17   A. Yes.
18   Q. And did Mr. Bryant attend those, as well?
19   A. No.
10:59 20   Q. Do you remember holidays, if there was a school
21   holiday or a -- or a school closure, did -- did you
22   communicate with Mr. Bryant about issues like that?
23   A. No.
24   Q. And when Mr. Bryant applied to ECFMG, you
10:59 25   approved him applying -- coming to work there, didn't

53

1    you?
2    A. No, I did not.
3    Q. You did not?
4    A. No.
10:59 5    Q. Did you -- do you remember finding out -- how
6    you found out that he came to work there?
7    A. I did not know that Mr. Bryant was working
8    there until his actual orientation.
9    Q. At orientation?
10:59 10   A. Yes.
11   Q. And so do you help with the orientation?
12   A. I help with the -- yes, as the center manager,
13   I was the only center manager there, so yes, I would
14   help with orientation.
11:00 15   Q. Okay. So prior to orientation, do you receive
16   a list from human resources or your assistant or -- or
17   somewhere so that you can -- that you find out who the
18   new employees are?
19   A. At that particular time, I was out on leave,
11:00 20   so, no, I did not know any of the new hires, and I was
21   not part of the interviewing process.
22   Q. But you did -- you were there for his
23   orientation, and you helped at the orientation.
24   A. I was there at the orientation, and yes, I
11:00 25   helped at the orientation.

**14  (Pages 50 to 53)**

Artis Ellis

54

1    Q. And what were you out on leave for?

2    A. I believe -- when did -- I need to know when

3    was Troi's start date?

4    Q. And we'll get some documents in a minute, but I

11:00 5    believe it was November of 2008.

6    A. It was for a kidney transplant.

7    Q. Is that for your husband?

8    A. Yes.

9    Q. So you came back from leave.

11:01 10    A. Uh-huh. Yes.

11    Q. And you went to go present at the orientation.

12    A. Yes.

13    Q. And at that time, do you recall if you were

14    assistant center manager or center manager?

11:01 15    A. I was the interim center manager.

16    Q. And had -- is it Mr. Repasch? How do you say

17    his last name?

18    A. Repasch.

19    Q. Repasch?

11:01 20    Had Mr. Repasch moved to another location?

21    Is that when you became interim, or was he still there?

22    A. I think he was in transition of moving.

23    Q. Okay. So you were interim center manager.

24    A. Yes.

11:01 25    Q. And when you went to the orientation, do you

55

1    remember how big the orientation class was?

2    A. I don't know how many was actually hired, how

3    many was there at that particular day.

4    Q. But you recall seeing Mr. Bryant there?

11:02 5    A. Yes.

6    Q. And when you saw Mr. Bryant there, did you

7    think of telling Mr. Repasch or -- or anybody else at

8    the company that -- that he was the -- your daughter's

9    father?

11:02 10    A. Mr. Repasch was -- I believe Mr. Repasch had

11    already transitioned.

12    Q. Okay. Did he go to Philadelphia at that time?

13    A. Yes.

14    Q. Okay. And so do you believe Mr. Repasch hired

11:02 15    Mr. Bryant?

16    A. Yes. Had made the offer to Mr. Repasch -- I

17    mean, to Mr. Bryant.

18    Q. And when you were doing the orientation and you

19    noticed that Brittani's father was there and had been

11:02 20    hired, did you think to tell anyone at ECFMG that your

21    daughter's father was working for the company?

22    A. No.

23    Q. And why not?

24    A. I didn't -- it just didn't cross my mind. It

11:03 25    was not -- I didn't think it was of an issue or a

56

1    concern. He had already interviewed with John, had

2    already -- John had already made an offer to him, and he

3    was there to work.

4    Q. And did you supervise Mr. Bryant?

11:03 5    A. I supervised all employees.

6    Q. So is that a yes?

7    A. Yes.

8    Q. And -- and you approved raises for Mr. Bryant?

9    A. I approved raises for all employees.

11:03 10    Q. Including Mr. Bryant?

11    A. Including Mr. Bryant.

12    Q. And you approved Mr. Bryant's promotion to a

13    full-time position?

14    A. No. I -- I mean, I -- I approved all

11:03 15    promotions.

16    Q. Including Mr. Bryant's promotion.

17    A. Including Mr. Bryant's.

18    Q. Okay.

19    A. He was an employee.

11:03 20    Q. An employee under your supervision in Houston;

21    correct?

22    A. As well as all the employees.

23    Q. But -- but you were supervising Mr. Bryant.

24    MR. KENNARD: Objection. Asked and

11:04 25    answered.

57

1    Q. (BY MS. O'DRISCOLL) Is that a yes?

2    A. Can you repeat the question?

3    Q. You were supervising Mr. Bryant in the Houston

4    center, the Houston center for ECFMG; correct?

11:04 5    A. I was the center manager, so I supervised all

6    the employees.

7    Q. So that's a yes?

8    A. Yes.

9    Q. And do you remember how long Mr. Bryant worked

11:04 10    for the company?

11    A. When did you say his start date was?

12    Q. November 3rd, 2008.

13    A. So somewhere about four years. Three to four

14    years, I should say.

11:04 15    Q. And during that three to four-year period, you

16    never mentioned to anyone at ECFMG that it was your

17    daughter's father?

18    A. No.

19    Q. And as you sit here today, in retrospect, do

11:05 20    you -- do you believe that you should have mentioned

21    that to ECFMG?

22    A. I don't -- no, I don't think so.

23    Q. You don't see a reason to have mentioned that

24    to -- to ECFMG management?

11:05 25    MR. KENNARD: Objection. Asked and

15 (Pages 54 to 57)

Artis Ellis

58

1    answered.
2        Q. (BY MS. O'DRISCOLL)  As you sit here today.
3            MR. KENNARD:  Objection.  Asked and
4    answered.  Calls for speculation.
11:05  5        Q. (BY MS. O'DRISCOLL)  As you sit here today, in
6    your mind, do you believe that you should have mentioned
7    it, that Mr. Bryant worked for -- that Mr. Bryant was
8    your daughter's father when he was working for ECFMG?
9            MR. KENNARD:  Same -- same objection.
11:05  10        Q. (BY MS. O'DRISCOLL)  You can answer.
11        A. No.
12        Q. Have you at any time ever -- ever thought that
13    you should have mentioned it to your former employer?
14            MR. KENNARD:  Same as my previous
11:06  15    objection.  Asked and answered.  Calls for speculation.
16        Q. (BY MS. O'DRISCOLL)  I'm just asking what your
17    belief is, not anybody's else's belief, but your belief.
18            MR. KENNARD:  Same objection.  Sorry.
19        A. No.
11:06  20        Q. (BY MS. O'DRISCOLL)  I'll mark as Exhibit 6,
21    ECFMG/Ellis 144 through 147.  I found that document you
22    asked for, your job description as assistant manager.
23        A. Thank you.
24        Q. If you could just take a brief look at that.
11:06  25            (Exb. No. 6 was marked.)

59

1        Q. (BY MS. O'DRISCOLL)  You just let me know once
2    you've finished reviewing that.
3        A. Okay.
4        Q. Under -- on the third page, in the bottom
11:07  5    right-hand corner, it's ECFMG 146, at the top it says,
6    "Responsibilities and Duties."
7            We were -- we were discussing your job
8    duties as assistant center manager a little bit ago, and
9    does this refresh your recollection about your job
11:08  10    duties as assistant center manager for ECFMG?
11        A. Yes.
12        Q. And you understood that you were to assist
13    management in operating the center, administering the
14    standardized testing for medical students?
11:08  15        A. Yes.
16        Q. And making sure that the testing was secure?
17        A. Yes.
18        Q. And you also supervised all center staff under
19    the direction of the center manager when Mr. Repasch was
11:08  20    there?
21        A. Yes.
22        Q. And you also trained employees while you were
23    an assistant center manager?
24        A. Yes.
11:08  25        Q. And did you have to train them on ECFMG

60

1    policies?
2        A. Yes.
3        Q. And would you also continue to -- train
4    employees and ensure that employees followed policies
11:08  5    when you were promoted to center manager, as well?
6        A. No.
7        Q. It wasn't one of your responsibilities to -- to
8    train and ensure that employees followed ECFMG policies
9    while you were both assistant manager and center
11:09  10    manager?
11        A. I would just have to refer back to the center
12    manager's job responsibilities.
13        Q. So -- so you didn't consider it one of your job
14    duties when you became a center manager to ensure that
11:09  15    policies were followed at the company?
16        A. I would just need to refer back to the
17    responsibilities as the center manager on the job
18    description.
19        Q. Oh, you're saying you want to see the job --
11:09  20        A. Yes.
21        Q. I'm sorry.  I thought you were saying you
22    referred it to someone --
23        A. Huh-uh.
24        Q. -- else to handle.  I apologize.  Okay.  I
11:09  25    misunderstood.

61

1            And one of your jobs as assistant manager
2    was to help with staffing needs and making sure that the
3    test could be administered properly?
11:09  4        A. Yes.
5        Q. And if you can, for the jury, can you just tell
6    the jury what type -- what kind of testing are we
7    talking about?
8        A. For the examinees?
9        Q. Yes.
11:10  10        A. It's an exam for examinees to -- any doctors
11    that wanted to get a license here in Texas -- I'm
12    sorry -- a license in the United States, so if they were
13    U.S. or an international, they will come to one of the
14    six centers to be tested.
11:10  15        Q. And -- and that was to be a physician?
16        A. Yes, to be licensed as a physician and to
17    practice in the United States.
18        Q. And as assistant manager, there were procedures
19    and policies that -- that you had to follow in
11:10  20    collaborating with UC -- USMLE; correct, to administer
21    the tests?
22        A. Repeat your question.
23        Q. As center manager, one of your job duties was
24    to ensure that you followed the procedures agreed upon
11:11  25    with USMLE; correct?

16  (Pages 58 to 61)

DepoTexas, Inc.

Artis Ellis

**62**

1  A. So is that with -- as the center manager or

2  assistant manager because you said earlier assistant

3  manager.

4  Q. We're talking about assistant manager here.

11:11  5  A. Okay. Now, repeat one more time.

6  Q. So one of your job duties as assistant center

7  manager was to ensure that the standards and procedures

8  required by USMLE, that those were followed; correct?

9  A. Correct.

11:11  10  Q. And do you recall that you also had to do that

11  as center manager, as well?

12  A. Yes.

13  Q. I'll mark as Exhibit 7 ECFMG 73 through 74.

14  (Exb. No. 7 was marked.)

11:12  15  Q. (BY MS. O'DRISCOLL) And this letter -- let me

16  know once you've reviewed it briefly.

17  A. Yes.

18  Q. And this is a letter dated October 27th, 2008,

19  promoting you to acting center manager; is that correct?

11:12  20  A. Yes.

21  Q. Okay. And -- and that's your signature down at

22  the bottom dated October 29th, 2008?

23  A. Yes.

24  Q. I'll mark as Exhibit 8 ECFMG/Ellis 75 through

11:13  25  78.

**63**

1  (Exb. No. 8 was marked.)

2  Q. (BY MS. O'DRISCOLL) Take a moment to look at

3  that. I believe that's your job description as center

4  manager.

11:13  5  And let me know once you've finished taking

6  a look at that.

7  A. Yes. Erin, yes.

8  Q. Okay. And that last page there, that's your

9  signature signing the job description dated 10-27-08,

11:14  10  correct?

11  A. That is correct.

12  Q. Okay. And as center manager for ECFMG, it was

13  still your responsibility as center manager to implement

14  and enforce the center policies; correct?

11:15  15  A. Yes.

16  Q. And it was also your job to ensure that exams

17  were conducted in a secure fashion; correct?

18  A. That is correct.

19  Q. Okay. And it was your job -- it was -- it

11:15  20  continued to be your job to implement policies and

21  procedures at ECFMG.

22  A. Yes.

23  Q. To ensure that they were followed by all the

24  employees?

11:15  25  A. Yes.

**64**

1  Q. I'll mark as Exhibit 9. This is ECFMG 03

2  through 05.

3  (Exb. No. 9 was marked.)

4  Q. (BY MS. O'DRISCOLL) Let me know when you've

11:16  5  just taken a moment to -- to briefly refresh your memory

6  on this document.

7  A. Yes.

8  Q. And this is the clinical skills evaluation

9  collaboration document; is that right?

11:16  10  A. Yes.

11  Q. And on the last page, on 005, that is your

12  signature dated January 10th, 2012; correct?

13  A. Yes.

14  Q. And the clinical skills evaluation

11:16  15  collaboration, this agreement sets out the relationship

16  between ECFMG and the national board for medical

17  examiners; correct?

18  A. Yes.

19  Q. And by signing this agreement, you recognized

11:17  20  that you were going to be provided access to secure,

21  confidential, proprietary material and information as an

22  employee of ECFMG; correct?

23  A. Yes.

24  Q. And -- and you understood that handling that

11:17  25  information properly was -- was a very important aspect

**65**

1  of your job; correct?

2  A. That is correct, yes.

3  Q. And, in fact, you had to sign this agreement

4  multiple times while you worked for ECFMG; correct?

11:17  5  A. Once a year.

6  Q. Once a year. Okay.

7  Was there any additional training

8  associated with this agreement, as well?

9  A. No.

11:17  10  Q. And you also understood as center manager that

11  you were provided with a secure password related to your

12  job duties as center manager; correct?

13  A. Correct.

14  MR. KENNARD: Are we going to break for

11:19  15  lunch at some point? Is that -- it's only 11:15.

16  MS. O'DRISCOLL: Are you going to want --

17  if you're going to want to.

18  MR. KENNARD: At some point.

19  THE VIDEOGRAPHER: Off the record. Are we

11:19  20  going to go off the record for that?

21  Time is approximately 11:20. We're off the

22  record.

23  (Recess taken from 11:20 a.m. to 11:28

24  a.m.)

11:27  25  THE VIDEOGRAPHER: This begins disc 2. The

**17  (Pages 62 to 65)**

Artis Ellis

66

1     time is approximately 11:28. We're on the record.
2        Q. (BY MS. O'DRISCOLL) Ms. Ellis, we're back on
3     the record after a brief -- brief break. I just wanted
4     to touch back on -- you had said that you were out on
11:28 5   leave when Mr. Bryant was hired, and you said it was
6     leave for your husband's kidney transplant.
7        Did I remember that correctly?
8        A. Yes.
9        Q. Okay. And did he have more than one kidney
11:28 10  transplant or just one?
11       A. No, he had two kidney transplants.
12       Q. Okay.
13       A. But the first one was rescheduled, so I came
14    back from leave --
11:28 15      Q. Okay.
16       A. -- for the first one because it was canceled.
17    And then the second one, we did have the transplant.
18       Q. I'm sorry. Did have the transplant?
19       A. We did, yes.
11:28 20      Q. Okay. And when you said it was canceled, was
21    that within a couple of month period, or was that -- did
22    more time pass in between there?
23       A. I don't understand your question.
24       Q. Well, when it was initially scheduled, was it
11:28 25  rescheduled just a month or two later, or was there some

67

1     bigger time of -- time span that happened?
2        A. It was rescheduled a couple of weeks.
3        Q. Okay. So just a couple of weeks?
4        A. Uh-huh.
11:28 5       Q. So you -- did you actually take FMLA leave to
6     assist him with that?
7        A. With the first one?
8        Q. With the kidney transplant, yes, ma'am.
9        A. I was his donor.
11:29 10      Q. Okay. So you -- you took FMLA leave as his
11    donor when -- and I said "his," meaning your husband,
12    when he was getting a kidney transplant.
13       A. Yes.
14       Q. And did you go out on leave when it was
11:29 15  initially scheduled?
16       A. Yes.
17       Q. And do you remember why it was canceled?
18       A. Because my doctor was not available.
19       Q. And you applied for FMLA leave through ECFMG to
11:29 20  assist your husband with that transplant; correct?
21       A. Correct.
22       Q. And there wasn't any FMLA request that was
23    denied related to that incident; correct?
24       A. No.
11:29 25      Q. And do you remember how long you went out on

68

1     leave?
2        A. For the first one?
3        Q. Yes, ma'am.
4        A. It -- it was denied. I mean, it was not
11:29 5   denied. It was canceled, so I didn't stay on leave
6     long.
7        Q. Okay.
8        A. So I just came back.
9        Q. And then a couple of weeks later, when it was
11:29 10  rescheduled, then you went back out on leave.
11       A. Yes. We had the kidney transplant surgery, and
12    then we had a hurricane, Hurricane Ike was here. So
13    when Hurricane Ike came, the center was closed because
14    of the damage that was done here in Houston.
11:30 15      Q. And were you out on leave when the hurricane
16    came?
17       A. Yes.
18       Q. Okay. So he got the -- y'all had performed the
19    procedure before the hurricane hit?
11:30 20      A. Yes.
21       Q. Okay. And -- and were y'all in the hospital
22    when the hurricane came?
23       A. I don't -- I think we were at home.
24       Q. Okay. Recuperating?
11:30 25      A. Yes.

69

1        Q. Okay. And I know you said that there were two
2     times that you went out on leave within a few-week
3     period related to your husband's kidney.
4        Do you recall going out on leave while you
11:30 5   worked for ECFMG at any other time?
6        A. I did.
7        Q. Okay. And what were the other times you went
8     out on leave?
9        A. I went out just one other time.
11:30 10      Q. Okay. And do you remember when that was?
11       A. I don't actually remember the year, but I -- I
12    remember -- I recall having -- before my husband's
13    kidney transplant, going out on leave.
14       Q. Do you remember what it was for?
11:31 15      A. I think it was to take care of my dad. He went
16    out on leave. I mean, he had a surgery, a big surgery
17    and came and stayed with me.
18       Q. And did you have any difficulty getting that
19    leave approved?
11:31 20      A. I did not.
21       Q. Okay. So you went out on leave for your
22    husband's transplant, kidney transplant, and then also
23    for your father to help him with his surgery.
24       Do you remember any other FMLA leave while
11:31 25  you worked for ECFMG?

18  (Pages 66 to 69)

Artis Ellis

70

1    A.  No.
2    Q.  I'll mark as Exhibit 10 ECFMG/Ellis 360 through
3    368.
4        (Exb. No. 10 was marked.)
11:32  5    Q.  (BY MS. O'DRISCOLL)  If you could just take a
6    brief look at this document.
7        Have you -- and -- and once you take a
8    brief look at it, let me know if you've ever seen this
9    document before.
11:32  10    A.  The -- Troi's application or the ECFMG
11    application?
12    Q.  Yes, ma'am.  Troi's application.
13    A.  No, I've never seen it.
14    Q.  But you recognize the form that ECFMG uses?
11:32  15    A.  I do recognize the form.
16    Q.  Okay.  And you see there in the upper
17    right-hand corner, on 0360, date of application,
18    11-4-08?
19        Do you see that?
11:33  20    A.  I do see that.
21    Q.  And that was shortly after you were promoted to
22    center manager; correct?
23    A.  That is correct.
24    Q.  You were promoted on October 27th, 2008;
11:33  25    correct?

71

1    A.  That is correct.
2    Q.  And if you go a little bit further down, it
3    looks like Mr. Bryant was applying for the standardized
4    position patient -- I'm sorry -- standardized patient
11:33  5    position; is that correct?
6    A.  Yes.
7    Q.  And what does a standardized patient do?
8    A.  They work in the exam.  But remember that this
9    is just an application.  This does not mean that he was
11:33  10    hired.  It just means that he applied for that position.
11    Q.  Okay.
12    A.  On that particular day.
13    Q.  Okay.  Fair enough.  Okay.
14        And if you look a little bit further down,
11:34  15    where it says, "How did you learn about Step 2 CS?"
16    A.  Uh-huh.
17    Q.  Do you know what step 2 CS means?
18    A.  Yes.
19    Q.  What does that mean?
11:34  20    A.  Step 2 clinical exam.
21    Q.  Okay.  CS?
22    A.  CS means clinical exam.
23    Q.  Okay.  Okay.  And it says, "How did you learn
24    about Step 2?"
11:34  25        And it says, "Relative.

72

1        "Who?"
2        "Jackie Bryant."
3    A.  Yes.
4    Q.  And who is Jackie Bryant?
11:34  5    A.  Jackie Bryant is Troi Bryant's wife.
6    Q.  And did Ms. Bryant also work for ECFMG?
7    A.  She did.
8    Q.  And do you remember when she -- when she
9    started working for ECFMG?
11:34  10    A.  I do not recall when she started working with
11    ECFMG.
12    Q.  And did you hire her?
13    A.  She -- I did --
14    Q.  Okay.
11:34  15    A.  -- hire Jackie Bryant.
16    Q.  And when you hired Ms. Bryant, did you let
17    anybody at ECFMG know that you were hiring your
18    daughter's stepmother?
19    A.  No, because I don't have a relationship or no
11:35  20    relations with them, so I just believed that you should
21    get a job based on your abilities and your skills, not
22    because of who you know.  So I am related to my
23    daughter, not to Troi or Jackie.  I have no family
24    relations to either of them.
11:35  25    MS. O'DRISCOLL:  Objection to the

73

1    nonresponsive portions after no and move to strike that
2    portion of the testimony.
3    MR. KENNARD:  What's the basis, Counsel?
4    MS. O'DRISCOLL:  The question was:  Was --
11:35  5    can you read back the question?
6    THE REPORTER:  Question:  "And when you
7    hired Ms. Bryant, did you let anybody at ECFMG know that
8    you were hiring your daughter's stepmother?"
9    MR. KENNARD:  And, Counsel, plaintiff would
11:35  10    respond that the witness was simply doing what she could
11    to answer the question as best she knew how.
12    Q.  (BY MS. O'DRISCOLL)  And -- and -- and that was
13    a yes or a no answer; correct?
14    MR. KENNARD:  Object.  Calls for
11:35  15    speculation or a legal conclusion.
16    Q.  (BY MS. O'DRISCOLL)  If you could back it up,
17    and I'll just re-ask the question.  Thank you.  So I'll
18    re-ask the question.
19        And when you hired Ms. Bryant, did you let
11:36  20    anybody at ECFMG know that you were hiring your
21    daughter's stepmother?  Yes or no?
22    A.  No.
23    MR. KENNARD:  And let me -- let --
24    A.  It --
11:36  25    MR. KENNARD:  Objection.  Calls for

19  (Pages 70 to 73)

Artis Ellis

**74**

1 speculation and infers facts not in evidence.
2     MS. O'DRISCOLL: Counsel, can you explain
3 your basis?
4     MR. KENNARD: Sure. Stepmother. To the
5 extent that you're using the term stepmother, we -- no
6 one has established whether or not that moniker has ever
7 been utilized by the witness or anyone else for that
8 matter. So I -- my objection is strictly and primarily
9 to your assertion that this individual is a stepmother
10 without providing a basis for what a stepmother is or is
11 not.
12     Q. (BY MS. O'DRISCOLL) As you testified
13 previously, Jackie Bryant is the wife of Troi Bryant;
14 correct?
15     A. That is correct.
16     Q. And Jackie Bryant lives with Troi Bryant?
17     A. Yes.
18     Q. As his wife.
19     A. Yes.
20     Q. And your daughter, Brittani Bryant; correct, is
21 Brittani Bryant; correct?
22     A. She's Brittani Davis.
23     Q. Okay. And her maiden name is Bryant; correct?
24     A. Yes.
25     Q. And you've already testified that Troi Bryant

**75**

1 is her father; correct?
2     A. Yes.
3     Q. And when Brittani would go and visit her father
4 every other week, would she go and stay in the same home
5 with Jackie Bryant and Troi Bryant?
6     A. Yes.
7     Q. And what -- how would Brittani refer to
8 Mrs. Bryant?
9     A. As Jackie.
10     Q. And do you consider Jackie to be -- to be
11 Brittani's stepmother?
12     A. Jackie's Troi's wife, yes.
13     Q. So that's a yes?
14     A. Yes.
15     Q. Okay. Okay.
16     A. Troi is someone I --
17     Q. If you -- if you -- if you could just answer
18 the questions when I ask them. Okay?
19     A. Thank you.
20     Q. Okay.
21     MR. KENNARD: Were you still attempting to
22 answer the previous question?
23     THE WITNESS: Yes.
24     MR. KENNARD: If so, I would ask counsel to
25 allow the witness to fully complete her answer to the

**76**

1 question that was posed before cutting her off and not
2 allowing her to complete her thoughts and complete her
3 answer to counsel's previous question.
4     MS. O'DRISCOLL: The plaintiff answered my
5 question.
6     MR. KENNARD: Well, you thought she did,
7 but she clearly did not and was thinking about it and
8 was not done.
9     Did you finish answering the question?
10     THE WITNESS: I -- I wasn't, but --
11     MS. O'DRISCOLL: Okay.
12     MR. KENNARD: Okay. So then you should be
13 allowed to answer the question.
14     Q. (BY MS. O'DRISCOLL) So is there something more
15 you'd like to add to your answer, in addition to the
16 fact that Ms. Bryant was considered to be Brittani's
17 stepmother?
18     A. Troi was just a -- not even a boyfriend in high
19 school.
20     Q. A boyfriend of whom?
21     A. Not -- not even -- I'm saying, not even a
22 boyfriend in high school. It was someone I had an
23 encounter with.
24     Q. A sexual encounter.
25     A. Yes.

**77**

1     Q. That resulted in the birth of your daughter.
2     A. Yes.
3     Q. Okay.
4     MR. KENNARD: Are we still at -- are we
5 answering more -- did you finish answering the last
6 question?
7     THE WITNESS: About Jackie?
8     MR. KENNARD: Yes.
9     THE WITNESS: Yes.
10     MR. KENNARD: Okay. All right.
11     Q. (BY MS. O'DRISCOLL) And -- and you hired
12 Jackie Bryant --
13     A. Yes.
14     Q. -- when she came to work at ECFMG?
15     A. Yes.
16     Q. And do you remember when she was hired?
17     A. I do not.
18     Q. Okay. And Troi Bryant, do you know -- do you
19 know if Troi Bryant knew that you worked at ECFMG when
20 he applied to the company?
21     A. I'm sure he did because Jackie worked there.
22     Q. And were there Christmas parties at ECFMG?
23     A. Yes.
24     Q. Was it -- was that an annual tradition?
25     A. Yes.

**20   (Pages 74 to 77)**

Artis Ellis

78

1      Q. And would Jackie attend the Christmas parties?
2      A. I -- I don't recall if Jackie attended a
3  Christmas party.
4      Q. Do you recall Mr. Bryant attending Christmas
11:40  5  parties?
6      A. I don't recall during the time Jackie was hired
7  if she -- if we had a Christmas party and Troi attended.
8  I don't -- I don't know if they came or not.
9      Q. Do you -- do you recall if Brittani ever
11:40  10  attended the Christmas parties or company events with
11  you?
12      A. Brittani attended a Christmas party with me
13  when Troi was no longer working there.
14      Q. And -- why do you remember that
11:40  15  specifically?
16      A. Because she came with my brother.
17      Q. And -- why do you remember that
18  specifically?
19      A. Because my brother is no longer here.
11:40  20      Q. So you remember what year that was?
21      A. I think it was the last -- yeah, because it was
22  the last Christmas party I attended.
23      Q. Your last Christmas party?
24      A. Yes.
11:41  25      Q. So would that be 2011, December of 2011?

79

1      A. Yes.
2      Q. Okay.
3      MR. KENNARD: I apologize. There's some
4  electrical work happening in the suite, so there will be
11:41  5  random noises.
6      Q. (BY MS. O'DRISCOLL) And do you recall -- when
7  Mr. Bryant applied for this position, do you recall
8  Jackie Bryant mentioning to you that Troi applied for a
9  position?
11:41  10      A. Jackie never mentioned to me that Troi applied
11  for a position.
12      Q. And -- and you previously testified that you
13  first realized that Mr. Bryant had been hired when you
14  saw him at orientation and you were performing
11:42  15  orientation as center manager; correct?
16      A. That is correct.
17      Q. Okay. I'll mark as Exhibit 11 ECFMG 369
18  through 370.
19      (Exh. No. 11 was marked.)
11:42  20      Q. (BY MS. O'DRISCOLL) If you could just take a
21  brief look at that document, Ms. Ellis. Just let me
22  know when you've looked at it.
23      A. Okay.
24      Q. And is this the -- the new employee form that
11:43  25  was used at ECFMG regularly?

80

1      A. This is.
2      Q. And on the second page, ECFMG 370, at the -- at
3  the top of that page, is that your signature dated
4  November 3rd, 2008?
11:43  5      A. This is my signature.
6      Q. Dated November 3rd, 2008?
7      A. Yes.
8      Q. Okay. And so this is the new hire document for
9  Mr. Bryant and -- and you signed off on it as center
11:43  10  manager.
11      A. Yes. But this is -- I don't fill out. I don't
12  do any of the HR paperwork, the SPOS. So this is not
13  my -- SPOS used to do all the HR paperwork before I
14  would do the all the -- before the center manager would
15  do the human -- I'm sorry -- the -- the introduction to
11:43  16  the -- for the new hires to the center. They would do
17  the tour, they would introduce them to the trainers,
18  they will show a slide show. So I did not do -- this
19  is -- all of this on the first sheet is not my -- my
11:43  20  writing.
21      Q. Understood. Understood. But the second
22  page --
23      A. That is my signature.
24      Q. Okay.
11:44  25      A. And that is my date.

81

1      Q. Okay. And -- and you're listed as hiring
2  manager; correct?
3      A. Because I was the only manager.
4      Q. Okay. For the center in Houston.
11:44  5      A. For the center in Houston.
6      Q. Okay. And you knew that -- but you knew that
7  you were signing a new hire document for Mr. Bryant;
8  correct?
9      A. And all the other employees that was hired on
11:44  10  that particular day.
11      Q. Okay. Including Mr. Bryant.
12      A. Including Mr. Bryant.
13      Q. Okay. And is it your testimony that this
14  document would be completed prior to the orientation?
11:44  15      A. This document is completed during the
16  orientation.
17      Q. During the orientation. Okay.
18      So -- so you may have signed this document
19  on or about the same day that you were conducting the
11:44  20  orientation for Mr. Bryant?
21      A. It was signed on the day of orientation.
22      Q. Okay. Okay. And he was hired in as a
23  nonexempt position on an as-needed basis as a
24  standardized patient?
11:45  25      A. Yes.

21  (Pages 78 to 81)

Artis Ellis

82

1          Q. Okay.  Did he ever indicate to you that -- that
2     he wanted to get promoted to a full-time position?
3          A. He did not.
4          Q. Is it your understanding that at a later date
11:45  5     that he did get promoted to -- to a full-time position?
6          A. Yes.
7          Q. And did you have to approve that promotion?
8          A. Yes.
9          Q. And --
11:45 10          A. But, let me clarify --
11          Q. Sure.
12          A. -- that he would -- he did send his application
13     or his intent to HR, and he did not have to let me know
14     that he was applying for a full-time position.
11:45 15          Q. Okay.  But you -- but you would approve that?
16          A. After HR will do the first round of interviews,
17     and then they will let me know who their top three
18     candidates were.
19          Q. Okay.  And then of the top three candidates,
11:46 20     when -- when he was applying for the full-time position,
21     you chose him.
22          A. Along with my assistant manager.
23          Q. Okay.  And was that Brent Bates at the time?
24          A. Yes.
11:46 25          Q. Okay.  Mark as Exhibit 12 ECFMG/Ellis 371

83

1     through 376.
2          (Exb. No. 12 was marked.)
3          Q. (BY MS. O'DRISCOLL)  If you could briefly take
4     a look at that.  I know it's a few pages long.  I just
11:46  5     wanted to walk through the dates on -- on these
6     documents.  So if you can let me know once you're
7     familiar with what this document is, or package of
8     documents.
9          A. So which one are we going to go over first?
11:47 10          Q. So let's start with the first one, ECFMG 371.
11     This -- this is a letter dated October 4th,
12     2006, addressed to you; correct?
13          A. Yes.
14          Q. And it states that ECFMG is in receipt of your
11:47 15     FMLA leave request; correct?
16          A. Yes.
17          Q. As well as your health care certification
18     paperwork.
19          A. Yes.
11:47 20          Q. And do you recall what you went out on FMLA for
21     in 2006?
22          A. This is the one I recall saying it was -- I
23     recall going out on leave.  I just did not recall what
24     it was for.
11:48 25          Q. Okay.  So this is not the one that was for your

84

1     father's surgery?
2          A. It could have been.
3          Q. Okay.
4          A. I think I had a surgery while my father was
11:48  5     also recovering from a surgery, as well.
6          Q. Okay.  If you go to the third page -- so that
7     was either for your surgery or possibly your father's or
8     maybe both?
9          A. They -- they ran concurrent.
11:48 10          Q. Okay.  And then if you go to the third page, at
11     the bottom right-hand corner, it's 373, dated -- top
12     left corner it's dated May 8th, 2008.  And it's -- this
13     is a letter from ECFMG addressed to you.
14          And it says, "I was very sorry to hear that
11:49 15     you/your husband will need surgery."
16          A. Yes.
17          Q. Do you know what that surgery was for in May,
18     2008?
19          A. Kidney transplant.
11:49 20          Q. Okay.  And do you know how long you were out on
21     leave for the kidney transplant?  I know you said there
22     was a couple of week break.
23          A. Yeah, that's one that was rescheduled.
24          Q. Okay.  If you go three more pages over in the
11:49 25     bottom right-hand corner, it's 375, this letter is dated

85

1     June 25th, 2008, "We are in receipt of your FMLA
2     request"?
3          A. That's the one that we had actual the surgery.
4          Q. The actual kidney surgery?  Okay.
11:49  5          A. Yes.  And I'm sorry.  I -- I want to clarify
6     that.  I said it was a couple of weeks, so it was a
7     couple of months.
8          Q. Okay.  I know some time has passed, so it's
9     hard to remember dates.
11:49 10          June, 2008, you -- you donated a kidney to
11     your husband.
12          Did you donate a kidney?
13          A. I did.
14          Q. Okay.  And this letter in the bottom paragraph
11:50 15     states, "Your healthcare provider has indicated a
16     recovery period of... 6 weeks, with a return to work...
17     August 4th...."
18          And then if you look at the next page,
19     dated July 7th, 2008, it looks like --
11:50 20          A. Oh, that's the one that had been rescheduled.
21          Q. And this is still related to your husband's
22     transplant?
23          A. Yes.
24          Q. Okay.  So it was rescheduled for July 17th,
11:50 25     2008, according to this letter.

22  (Pages 82 to 85)

Artis Ellis

86

1    A. Yes.
2    Q. Okay.
3    A. So I need to clarify that.
4    Q. Yes, ma'am.
11:50  5    A. Because I've had brain surgery, so I'm trying
6    to recall this.
7        So we did have the surgery done in 2008.
8    Originally the first one was scheduled for June, but we
9    didn't have it until July.
11:51 10    Q. Okay. And do you remember how long your leave
11    lasted in July?
12    A. The leave was for six weeks, but we had the
13    Hurricane Ike to come, so we stayed a little bit longer.
14    Q. Now, when Mr. Bryant was hired in November,
11:51 15    which would have been from early July, so all of July,
16    all of August, all of September, beginning of November,
17    do you think you were back -- well, I know you -- you
18    signed the new hire document. We've already discussed
19    that.
11:51 20        But does this refresh your recollection
21    that -- that you actually were back from leave?
22    A. When Mr. Bryant --
23    Q. Was hired.
24    A. For his start -- for his orientation?
11:52 25    Q. Well, when he -- when Mr. Bryant was actually

87

1    hired.
2    A. His start date for orientation was in November.
3    When he was hired and was offered the job, I don't know
4    when that actually happened, because I was not there.
11:52  5    Q. Okay. Okay. Understood.
6        And -- and you didn't tell John Repasch
7    that -- that that was Brittani's father; correct?
8    A. I wasn't there.
9    Q. But when you --
11:52 10    MR. KENNARD: Hold on. Hold on. Let's let
11    her -- let's let her finish answering the question
12    before you ask another one, please.
13    A. I wasn't there. So when he talked to John, I
14    wasn't there.
11:52 15    Q. (BY MS. O'DRISCOLL) And when you returned and
16    you were conducting the orientation --
17    A. Orientation.
18    Q. -- you did not advise John that --
19    A. John wasn't there. I was the only manager that
11:52 20    was there.
21    Q. Understood. He'd already gone to Philadelphia.
22    A. Yes.
23    Q. Okay. Got it.
24        And then if you go to the last page of that
11:52 25    package of documents, ECFMG/Ellis 377 --

88

1    A. I don't have 377. Mine stop at 376.
2    MR. KENNARD: Mine stops at 6, too.
3    MS. O'DRISCOLL: Well, there might have
4    been a snafu with the copier.
11:53  5    MR. KENNARD: I don't know if there's
6    another page. I didn't look. They may have been
7    inverted inadvertently.
8    MS. O'DRISCOLL: Let's see.
9    MR. KENNARD: If you need to run a copy,
11:53 10    I'm happy to.
11    MS. O'DRISCOLL: Thank you. Let me see if
12    it might be in this other -- I think it may be included
13    in this other set.
14        Let's see.
11:54 15    MR. KENNARD: It's six minutes till noon.
16    I don't know if this is a stopping point or not.
17    MS. O'DRISCOLL: We can stop now. That's
18    fine.
19    THE VIDEOGRAPHER: Time is approximately
11:54 20    11:54. We're off the record.
21        (Recess taken from 11:54 a.m. to 12:51
22        p.m.)
23    THE VIDEOGRAPHER: The time is
24    approximately 12:51. We're back on the record.
12:50 25    Q. (BY MS. O'DRISCOLL) Ms. Ellis, just before the

89

1    break, we were talking about Ms. Jackie Bryant getting
2    hired at ECFMG.
3        Do you remember that discussion?
4    A. Yes.
12:51  5    Q. Okay. I'm going to mark as Exhibit 13 these
6    documents related to Ms. Bryant.
7        (Exb. No. 13 was marked.)
8    MS. O'DRISCOLL: And, Alfonso, I need to
9    give you a Bates -- a Bates numbered version of that.
12:51 10    MR. KENNARD: Okay. Sure. There is a
11    Bates-numbered version?
12    MS. O'DRISCOLL: No, I need to put Bates
13    numbers on it.
14    MR. KENNARD: Have these been previously
12:51 15    produced?
16    MS. O'DRISCOLL: These have not, not
17    related to Ms. Bryant.
18    MR. KENNARD: Let me look at them first.
19    MS. O'DRISCOLL: Sure.
12:52 20    MR. KENNARD: And just for purposes of the
21    record, I'm going to object to the use of these
22    documents as they've not been previously produced to
23    counsel prior to today's deposition and as to relevance.
24    My objection is noted.
12:52 25    MS. O'DRISCOLL: Duly noted. Just let me

23  (Pages 86 to 89)

Artis Ellis

90

1  know when you've finished reviewing.
2      MR. KENNARD:  Okay.
3      Q.  (BY MS. O'DRISCOLL)  Did you have an
4  opportunity to review those, Ms. Ellis?
12:52  5      A.  Yes.
6      Q.  Okay.  And these are -- are new hire documents
7  for Ms. Jackie Bryant; correct?
8      A.  Yes.
9      Q.  And if you look on the second page, in -- in
12:52 10  the upper left-hand corner or midway through, that's
11  your signature, Artis Ellis, dated 9-11-06; correct?
12      A.  That is correct.
13      Q.  Okay.  And that was you approving the new hire
14  for Ms. Bryant.
12:53 15      A.  That is correct.
16      Q.  And if you -- the next document there is
17  Ms. Bryant's job description as proctor; is that
18  correct?
19      A.  Yes.
12:53 20      Q.  And she reports to the center manager and
21  assistant manager; correct?
22      A.  Yes.
23      Q.  And in '06, in 2006, you were the assistant
24  center manager; correct?
12:53 25      A.  That is correct.

91

1      Q.  Okay.  And then if you go a little further to
2  the signature page for that job description, that's your
3  signature at the top dated September 11th, 2006?
4      A.  Yes.
12:53  5      Q.  And then the last three -- four pages appear to
6  be the telephone reference check form.
7          And at the bottom of the first telephone
8  reference check for Ms. Bryant, is that your signature
9  dated September 14th, 2006?
12:54 10      A.  Yes, it is.
11      Q.  Okay.  And, likewise, the next reference check
12  that covers on the last two pages for Almeda Dental,
13  that's your signature dated September 14th, 2006?
14      A.  On the first sheet?
12:54 15      Q.  The first reference -- it looks like both
16  references.  There's two -- there's two forms for each
17  reference check, and both of them it looks like you
18  conducted the references for September -- on September
19  14th, 2006; correct?
12:54 20      A.  Yes.
21      Q.  And -- and you approved the references?
22      A.  Yes.
23      Q.  And -- and approved the new hire as indicated
24  on the first page.
12:54 25      A.  Yes.

92

1      Q.  -- of that set.
2          Okay.  For Ms. Bryant?
3      A.  Yes.
4      Q.  And just before the break, we were talking
12:54  5  about dates related to the hiring of Mr. Bryant, Jackie
6  Bryant's husband; correct?
7      A.  Correct.
8      Q.  And -- and, again, Mr. Bryant is your
9  daughter's father.
12:55 10      A.  Yes.
11      Q.  I'll mark as Exhibit 14 -- this is ECFMG/Ellis
12  80.
13          (Exb. No. 14 was marked.)
14      Q.  (BY MS. O'DRISCOLL)  We were talking about
12:55 15  dates in the fall of 2008, and this form -- did you take
16  a minute to look at it?
17      A.  Yes.
18      Q.  And this form is the ECFMG personnel
19  information indicating that you had been released to
12:56 20  return from FMLA in 2008; correct?
21      A.  Yes.
22      Q.  And the date that this was signed by ECF
23  management, looks like your manager signed it at August
24  19th, 2008; Betty LeHew in HR signed it August 27th,
12:56 25  2008; and Betty Hite signed it August 25th, 2008.

93

1          Did I read those dates correctly?
2      A.  Yes.
3      Q.  And the effective date that's listed midway
4  through below the box shows that the effective date for
12:56  5  your return from FMLA in 2008 was August 18th.
6          Does that refresh your recollection of when
7  you were released to return to work?
8      A.  It's typed in.  That's stated on this form,
9  August the 18th, 2008.
12:57 10      Q.  And does that refresh your recollection that it
11  would have been in mid August that you were released to
12  return back to work at ECFMG from that leave in 2008?
13      A.  Can I go back to look at one of these forms?
14      Q.  Of course.
12:57 15          And it might be Exhibit 12 you are looking
16  for.
17      A.  I -- can I have the -- where the doctor signed
18  the return to work?  Do you have that?
19      Q.  I don't have that for 2008, but this is the
12:58 20  return to work approval that I have for 2008.
21      A.  Yeah.
22      Q.  The one that we just discussed.
23      A.  I can't really testify when the doctor
24  actually -- because I don't have my signature -- when
12:58 25  the doctor actually released me to return back to work

24  (Pages 90 to 93)

Artis Ellis

94

1    for August, 2008.
2        Q. Okay. Fair enough. Fair enough.
3            And I know you said that you believe that
4    your -- you stayed out a little bit longer due to
12:58 5    Hurricane Ike.
6        A. That's correct.
7        Q. In the fall, 2008. And -- and let the record
8    reflect, we'll take judicial notice that Hurricane Ike
9    occurred September 1st to September 14th of 2008,
12:50 10   according to the weather sources online. I looked up
11   when Hurricane Ike actually occurred.
12       MR. KENNARD: I'm going to object to any
13   judicial notice being taken without anything more
14   concrete than my esteemed counsel looking up something
12:59 15   somewhere.
16       Q. (BY MS. O'DRISCOLL) Assuming that Hurricane
17   Ike, which I specifically recall being involved in that
18   hurricane as well, was in the fall of 2008, was in
19   September, and -- and you recall returning back to the
12:59 20   office once it opened after the hurricane; correct?
21       A. I recall going to Philadelphia for a training,
22   for manager's training, and then going back to Houston.
23   I was offered a promotion as -- to become the center
24   manager, and then going back to Houston in 2008 after
12:59 25   the hurricane.

95

1        Q. Okay. And do you remember how long that
2    training was?
3        A. I don't recall.
4        Q. Less than a week, probably?
12:59 5    A. Yes.
6        Q. Okay. Okay. So with those dates in mind, if
7    we look back at Exhibit 11, which was Mr. Bryant's
8    written application signed off on, on November 3rd. And
9    then if you look at Exhibit 10 -- and you stated that
13:00 10   you conducted his orientation on -- on November 3rd.
11       A. November the 3rd?
12       Q. You stated that you conducted his orientation
13   the same day that this was filled out. That was what
14   you testified.
13:00 15   A. Yes.
16       Q. And then you'll notice on Exhibit 10, if you
17   look at the last -- the -- I'm sorry -- the date of the
18   application, the electronic application on the first
19   page of Exhibit 10.
13:00 20   A. Yes.
21       Q. That's dated the following day after the
22   orientation, November 4th.
23       A. Then --
24       MR. KENNARD: What are you looking at
13:01 25   again, Counsel?

96

1        MS. O'DRISCOLL: Exhibit 10 is the
2    electronic application that Mr. Bryant filled out the
3    day after his new -- new hire form was signed by Ms. --
4    Ms. Ellis.
13:01 5    A. Then he could have just put the date wrong. I
6    can't testify to why this date is wrong on the
7    application, because that could -- I've never seen this
8    form.
9        Q. (BY MS. O'DRISCOLL) Okay.
13:01 10   A. So this date could have just been wrong. I
11   don't know.
12       Q. Well, let's take a minute to look at our
13   high-tech images, which is Mr. Bryant's offer letter,
14   dated November 3rd, 2008. And if you -- if we scroll
13:01 15   down --
16       MR. KENNARD: Can I scroll right here, or
17   are you going to scroll for me?
18       MS. O'DRISCOLL: Is it showing as I scroll?
19   Yes.
13:01 20   MR. KENNARD: Okay. I can see.
21       MS. O'DRISCOLL: I'll scroll very slowly.
22       MR. KENNARD: I don't control it, right, I
23   just view?
24       MS. O'DRISCOLL: You view.
13:02 25   MR. KENNARD: Strictly view.

97

1        Q. (BY MS. O'DRISCOLL) And this is an offer
2    letter to Mr. Bryant dated November 3rd. Tell me if I'm
3    reading this correctly. In the first bullet, it says,
4    "You will report directly to Artis Ellis, Acting Center
13:02 5    Manager"; correct?
6        A. Acting center manager.
7        Q. I read that correctly?
8        A. Yes.
9        Q. Okay. And then the second bullet says, "Your
13:02 10   start date will be November 3rd, 2008"; is that correct?
11       A. Correct.
12       Q. And then if you scroll down --
13       MR. KENNARD: Can you go up again one
14   second?
13:02 15   MS. O'DRISCOLL: Uh-huh.
16       MR. KENNARD: Up more.
17       MS. O'DRISCOLL: Up more?
18       MR. KENNARD: Right there is fine. Okay.
19   Got it.
13:02 20   Q. (BY MS. O'DRISCOLL) And then if we -- if we
21   scroll down, midway through it looks like it gives his
22   orientation and workshops and that SP, standardized
23   patient orientation is November 3rd, 2008, which
24   coincides with what your recollection was, that he
13:02 25   did -- he did orientation that day, on November 3rd;

25  (Pages 94 to 97)

Artis Ellis

98

```
 1    correct?
 2         A. Correct.
 3         Q. And then if you scroll -- and this is his offer
 4    letter to -- as his hire for ECFMG, on the last page, if
13:03 5   you scroll down, this is an offer letter signed by you.
 6         A. Yes. But, remember, I was just rubber stamping
 7    letters. I did not complete these letters. These were
 8    done by the SPOS.
 9         Q. Okay. But you knew that you were signing an
13:03 10  offer letter for Mr. Troi Bryant.
11         A. Yes.
12         Q. As a new -- as a new hire.
13         A. Yes.
14         Q. Okay. Okay. And then if we --
13:03 15       MR. KENNARD: What Exhibit Number is this?
16             MS. O'DRISCOLL: I'm sorry. This -- this
17    is going to be -- this is Exhibit 15, and I will --
18             MR. KENNARD: Has this been previously
19    produced?
13:03 20       MS. O'DRISCOLL: This is the document that
21    was -- this has not been previously produced.
22             MR. KENNARD: Okay. I'm again going to
23    object to its usage as it hasn't been previously
24    produced. Will you be submitting --
13:03 25       MS. O'DRISCOLL: We'll send -- yeah, we'll
```

99

```
 1    send you a Bates-labeled copy.
 2         And this, of course, is discovery still
 3    open, and we'll -- we'll -- we're going to supplement
 4    the production with this document.
13:04 5        MR. KENNARD: Sure. My only concern is
 6    that if it was pertinent to the deposition that it would
 7    have been produced prior to the deposition so that
 8    counsel for plaintiff could have reviewed it instead of
 9    being what -- counsel is not accusing of being
13:04 10  blindsided, but we would have -- it would have been
11    preferable to have this documentation before today's
12    date so that all parties could have reviewed it prior
13    to. So that is the purpose of my objection, but please
14    proceed.
13:04 15       MS. O'DRISCOLL: Thank you. Thank you,
16    Counsel.
17        (Exb. No. 15 was marked.)
18         Q. (BY MS. O'DRISCOLL) So with regard to
19    Mr. Bryant, he started in -- in the fall at ECFMG of
13:04 20  2008 while you were acting center manager -- center
21    manager; correct?
22         A. That is correct.
23         Q. Okay. That was 15. So Exhibit 16 is going to
24    be Ellis 233 to -- through 239.
13:05 25      (Exb. No. 16 was marked.)
```

100

```
 1         Q. (BY MS. O'DRISCOLL) And if you would just take
 2    a moment. This is a document that your lawyer produced
 3    to us, as indicated by the Bates-labeled version at the
 4    bottom of these documents. And just let me know once
13:05 5    you've refreshed your memory on this document.
 6         And we're going to walk through it in
 7    detail, so I just want to --
 8         A. Yes.
 9         Q. Whenever you're ready.
13:06 10       A. I'm ready.
11         Q. Okay. So if you'd turn to the last page, Ellis
12    239, which appears to be the beginning of this e-mail
13    chain --
13:06 15       Q. -- am I correct, this is an e-mail exchange
16    between you at your e-mail, AFHarden@Yahoo.com, with
17    John --
18         A. Repasch.
19         Q. Repasch, who was your former center manager
13:06 20  that -- that is still with the company, ECFMG, and
21    transferred to Philadelphia; correct?
22         A. Correct.
23         Q. Okay. And so the date on this e-mail exchange
24    is -- looks like it's over the course of a couple of
13:07 25  days, February 20th, 2014, and through February 21st,
```

101

```
 1    2014; am I correct?
 2         A. Yes, you are correct.
 3         Q. And -- and that's subsequent to the time that
 4    you left the company, ECFMG. It's after -- these --
13:07 5    this e-mail exchange is after you were already a former
 6    employee.
 7         A. Yes.
 8         Q. Okay. So if you look at the -- the last page,
 9    which -- which starts -- sorry -- the second to last
13:07 10  page, it starts at the very bottom, February 20th at
11    1:39 p.m., John Repasch wrote, "Hey Artis, Thanks for
12    sharing the pictures. They looked wonderful and I hope
13    everything went well. I need to ask you a serious
14    question."
13:07 15       Is that -- did I read that accurately?
16         A. Correct.
17         Q. And it looks like there's some of this exchange
18    that's discussing Brittani, your daughter, yours and
19    Mr. Bryant's daughter, her wedding; correct?
13:08 20       A. Yes.
21         Q. Okay. So if you go, at the bottom of 237, on
22    February 21st, 2014, at 6:52 a.m., John asks, "Is Troi
23    Brittani's father?"
24         Did I read that correctly?
13:08 25       A. Yes.
```

26  (Pages 98 to 101)

Artis Ellis

102

1    Q. And this -- and during the exchange, you
2    describe how Brittani -- you and -- and Mr. Troi -- I'm
3    sorry -- Troi Bryant had an encounter and -- and that
4    Brittani was born back after prom night; is that
5    correct?
6    A. That is correct.
7    Q. Okay. And -- pardon?
8    MR. KENNARD: I just said, prom night. Got
9    to be careful on prom night.
10   Q. (BY MS. O'DRISCOLL) So with this, at the
11   bottom of the second page, it's a long e-mail chain
12   discussing this, where Mr. Repasch is asking you about
13   Brittani's father. You say, on February 21st, which is
14   at Ellis 234, you state -- and, actually, if you would
15   read that document.
16   A. I don't know where you're at.
17   Q. On 234 is at the bottom on February 21st.
18   A. 234? You saying Bates number 234?
19   Q. Yes.
20   A. On Friday, 2-21-14?
21   Q. Yes.
22   A. Here -- starting with "Here's the deal"?
23   Q. Yes.
24   A. Okay. "Here's the deal. Yes, Troi's
25   Brittani's biological father.  I met my ex -- ex-husband

103

1    when Brittani was three months.  I got pregnant right
2    after high school (prom) night.  I didn't go to the prom
3    with Troi.  I was" with a young -- "I was young and
4    made... poor" decisions.  "Troi" was "active in" --
5    "active in" -- that's -- "our lives because" -- I guess
6    it wasn't supposed to be -- in our -- "wasn't active in
7    our lives because I had married and moved on.  Troi
8    worked a lot so he didn't get a chance to spend a lot of
9    time with her.  Our paternity terms were first and
10   third, fifth weekend.  Troi/parents" -- "Troi/parents
11   wife whomever would pick Brit up from daycare and return
12   her to my mother's home."
13   Q. And if I could just interrupt you right there
14   where it says, "Troi/parents," that's -- and Troi's
15   wife, that would be Jackie Bryant there; correct?
16   A. Yes.
17   Q. Okay. Okay. I just wanted to make sure that I
18   was -- okay. And then -- and then you go -- then you go
19   further, 25 years later --
20   A. No. I want to finish what I was -- what I
21   finished writing.
22   Q. Wherever you finish wherever you left off.
23   A. Okay. -- would pick up -- pick her "up from
24   daycare and return her to my mother's home.  Troi and I
25   was never in a relationship.  25 years later Jackie

104

1    started working at ECFMG.  Brittani is grown so I have
2    no hard feelings about" Troi or Jackie.
3    "Troi asked you if he could work there as
4    an SP. I" was "out on leave for the first kidney
5    transplant.  Then we had Ike by the time I was back
6    fully at work Troi was hired as an SP.  And I was the
7    manager. I" did not "have... feelings about Troi
8    because I was not related to him in any way.  I couldn't
9    have told you where Troi lived.  Two years later he
10   applies for a full-time job."
11   Q. And if you go --
12   A. Can I finish reading?
13   Q. Sure. Sure.
14   A. Or did you want me to stop there?
15   Q. Well, there -- there's a portion above that
16   where --
17   MR. KENNARD: Did you finish answering your
18   question -- or her question?
19   A. No, she didn't answer, if she wanted me to
20   continue or you wanted me to stop.
21   Q. (BY MS. O'DRISCOLL) You -- that's enough for
22   that portion of the e-mail.
23   A. Okay.
24   Q. And if you go further up, where Mr. Repasch --
25   it starts at the very bottom of the first page, 233. He

105

1    responds and states -- and tell me if I'm reading this
2    correctly -- "First and foremost, I'm talking to you as
3    your friend and not as an ECFMG employee.
4    "Second, know that I" didn't -- "I do not
5    nor would I ever judge you for your past."
6    A. I'm sorry, Erin, I do not know where you're at.
7    Q. Oh. So it started at the very bottom of 233,
8    and then it's at the -- it's at the top.
9    A. I'm with you now.
10   Q. Okay. And then, if you -- if you skip down to
11   "BUT, I wish" --
12   Do you see that "BUT" all in capitals?
13   A. Can we finish "First and foremost" and then
14   "Second"? The -- the full -- so we can get the gist and
15   put it on record, the full gist of what he's talking to.
16   Q. And this document is going to be in the record
17   and attached, but you're welcome to read that full
18   paragraph.
19   A. You were reading, so I just want to make sure
20   we're getting the whole thing of what he was saying, in
21   all fairness.
22   Q. Okay. "First and foremost, I'm talking to you
23   as" a "friend and not as an ECFMG employee.
24   "Second, know that I do not nor would I
25   ever judge you for your past.  First, I am no saint and

27 (Pages 102 to 105)

Artis Ellis

106

```
 1        second, I have a" 25 "year old stepdaughter and a 40
 2        year old wife... do the math.  And like Patty, I have
 3        always had a tremendous respect for you because you
 4        worked hard to build yourself up while raising three
13:13 5   amazing children.
 6               "BUT, I wish you had been straight with me
 7        when we hired Jackie.  I can't say, knowing this
 8        information now, whether we would have hired Troi, but
 9        we could have at least cleared either of their hiring
13:13 10  with Hite and HR."
 11              And Hite was the head of ECFMG at the time;
 12       correct?
 13        A.  Not --
 14        Q.  Betty Hite?
13:14 15   A.  She wasn't the head.  She was our director.
 16        Q.  Was the director.
 17        A.  Yes.
 18        Q.  That was who you-all reported to at the time.
 19        A.  Yes.
13:14 20   Q.  Okay.  "Doing that would have eliminated any
 21       appearance of conflict of interest or that you had tried
 22       to hide your relationship with them.  And you have to
 23       know from other people's perspective that's how it
 24       appears to them.  I hope" that "makes sense."
13:14 25         And then you respond to that; correct?  You
```

107

```
 1        respond to that e-mail on the front of the first page on
 2        February 21st, 2014.
 3        A.  Yes.
 4        Q.  Okay.  And in this response to -- to
13:14 5   Mr. Repasch, you state, "Just for the record....I wasn't
 6        hiding anything from you, I really couldn't see the
 7        problem.  Now I can see your point how someone could
 8        have perceived malice intent."
 9               Did I read that correctly?
13:15 10   A.  I -- I think you're missing a whole lot of
 11       other things, too, Erin.  I also said, "You have no idea
 12       how much shame I dealt with about" the "pregnancy."  I
 13       was a 18-year-old girl that went to a prom that had a
 14       one-night stand and got pregnant.  I did not abort my
13:15 15  child.  I had a baby.  I was very young.  And then right
 16       after that, I kind of grew up.  I went to school, tried
 17       to make a difference for myself.  And I was also
 18       explaining to that.  That was John's point of view, and
 19       I said, yeah, okay, if that's what -- how other people
13:15 20  have seen that, hey, I can -- yeah, I can see maybe how
 21       their point of view could have been taken, but now I'm
 22       over 40.  My daughter, by the time Troi came there, she
 23       had already graduated with a degree.  There was nothing
 24       to gain.  So, no, I -- I mean, I -- I still don't think
13:15 25  that hiring Troi or being part of that, I'm not going to
```

108

```
 1        associate myself with that.
 2        Q.  Okay.  So even though the policy at ECFMG
 3        was -- was not to have direct reporting relationships
 4        and hiring decisions and promoting decisions and
13:16 5   evaluations performed by folks that are related by
 6        blood, that -- or that have similar relationships.
 7        A.  I'm not --
 8               MR. KENNARD:  Hold on.  I'm going to
 9        object.  Assumes facts not in evidence.  A compound
13:16 10  question.  And misstates previous testimony.
 11       Q.  (BY MS. O'DRISCOLL)  So this would be a good
 12       time, we'll look at the policy that ECFMG has.  I'm
 13       going to mark this as Exhibit 17.
 14              (Exh. No. 17 was marked.)
13:16 15   Q.  (BY MS. O'DRISCOLL)  And I know you've seen
 16       this policy before.
 17              This is ECFMG/Ellis 356-357.  And the title
 18       of this document is "Employment of Relatives and
 19       Relationships in the Workplace."
13:16 20         Did I read that correctly?
 21        A.  Yes.
 22        Q.  And -- and this is a policy that you were
 23       familiar with at ECFMG; correct?
 24        A.  Correct.
13:17 25   Q.  And you were aware that this policy existed
```

109

```
 1        both while you were assistant center manager as well as
 2        while you were the center manager; correct?
 3        A.  That is correct.
 4        Q.  Okay.  Roman numeral I for the -- states that
13:17 5   the policy -- "It is the policy of ECFMG to regulate the
 6        working and reporting relationships of individuals who
 7        are related by blood, adoption, marriage, or domestic
 8        partnership, affianced or significant other in order to
 9        avoid real or perceived conflicts of interest,
13:17 10  influence, or favoritism."
 11              And that's the conflict of interest that
 12       you and John were discussing on that e-mail; correct?
 13        A.  That is not.
 14        Q.  It's not?
13:17 15   A.  No.
 16        Q.  How -- how is that not?
 17        A.  Because I am not related to Troi Bryant by
 18       blood, adoption, marriage, domestic partnership,
 19       affianced, significant others, in order -- by no means
13:17 20  am I related to him.  I am -- I am the mother of
 21       Brittani Bryant, not Troi Bryant or Jackie Bryant.
 22        Q.  And, again, Troi Bryant was paying child
 23       support through the attorney general's office and -- and
 24       as Brittani's father to this day, and during the time he
13:18 25  worked with -- worked for ECFMG; correct?
```

28  (Pages 106 to 109)

Artis Ellis

110

1    A. No.

2         MR. KENNARD: Objection. Calls for

3    speculation and assumes facts not in evidence.

4         A. No, he was not. At the time when --

13:18  5    Q. (BY MS. O'DRISCOLL) He was not her father?

6         A. No. He -- no, I'm not saying he was not her

7    father. I'm saying, no, he was not paying child support

8    during the time that he was working for ECFMG.

9         Q. But he was still her father; correct?

13:18  10   A. That is correct.

11        Q. And if you look further, under definitions,

12   under Roman numeral II, "Significant Other, for the

13   purpose of this policy is any other internal --

14   inter-personal relationships between individuals which

13:18  15   create a relationship similar to those described in the

16   definition above may be included under the provisions of

17   this policy if one of the parties has influence over the

18   other."

19        A. And there is no significant other.

13:19  20   Q. The -- creating a relationship similar to

21   those -- someone who is -- two people who are acting as

22   parents, you're -- you're telling the judge and jury

23   that you don't consider two people acting as parents for

24   the same child to be a significant other relationship?

13:19  25        MR. KENNARD: Objection to the extent it

111

1    calls for a legal conclusion and assumes facts not in

2    evidence.

3         Q. (BY MS. O'DRISCOLL) As center manager and

4    assistant manager of ECFMG, we've already established

13:19  5    that it was your job to educate employees and ensure

6    that policies were followed at the Houston center;

7    correct?

8         A. Yes.

9         Q. And you understand that this policy was in

13:19  10   place during the entire duration of your employment at

11   ECFMG; correct?

12        A. Correct.

13        Q. And when you read the definition of significant

14   other, as -- as the leading person and the second in

13:20  15   command at the Houston ECFMG, is it your testimony that

16   you're telling the judge and jury that you did not

17   consider a co-parenting relationship to be a significant

18   other relationship covered by this policy? Is that your

19   testimony?

13:20  20        MR. KENNARD: Objection. Calls for

21   speculation. Assumes facts not in evidence, and is

22   misleading as to the term co-parenting.

23        You may answer if you're able to.

24        Q. (BY MS. O'DRISCOLL) I'll break that down into

13:20  25   five questions, and we'll -- we'll be here for the full

112

1    time today.

2         You've already established -- you've

3    already testified that you and Mr. Bryant were both

4    parents of Brittani; correct?

13:20  5    A. We -- yes. We are her mother -- I am her

6    mother, and he is her father.

7         Q. And he had visitation of your daughter

8    throughout her childhood; correct?

9         A. Yes.

13:21  10   Q. And holidays.

11        A. Yes. It's also my testimony that when

12   Brittani -- I'm sorry -- when Mr. Bryant started working

13   with ECFMG, my daughter had already -- already completed

14   grad school, so there was no child support taken, she

13:21  15   was already 25 years old.

16        Q. And -- but you're still paying -- you will be

17   Brittani's mother until you die; correct?

18        A. That is correct.

19        Q. And Mr. Bryant will be Brittani's father until

13:21  20   he dies.

21        A. That is correct.

22        Q. And even -- depending on your religious beliefs

23   after death, but you will always be her parents;

24   correct?

13:21  25   A. That is correct.

113

1    Q. Okay. So regardless of that, regardless of how

2    old she was at the time, that relationship exists from

3    the day that she was born or, I should say, from the day

4    of her inception, prior to being born, to -- to --

13:21  5    for -- for her whole life; correct?

6         MR. KENNARD: Objection. Argumentative,

7    and we'll leave it there.

8         A. What relationship? The relationship that I

9    have with Brittani?

13:22  10   Q. (BY MS. O'DRISCOLL) You are Brittani's mother,

11   and he is -- and Troi Bryant is Brittani's father;

12   correct?

13        A. So the relationship that I have with Brittani

14   will always be there. The relationship that I have with

13:22  15   Troi, I don't talk to him now.

16        Q. But you will always share Brittani as a

17   daughter.

18        A. Yes.

19        Q. And if you -- if you look at the definition of

13:22  20   significant other --

21        A. Uh-huh.

22        Q. -- and -- and for purposes of this policy, is any

23   other -- any other interpersonal relationship between

24   individuals which create a relationship similar to those

13:22  25   described above.

29  (Pages 110 to 113)

Artis Ellis

**114**

1　A. We are not relatives. We are not domestic
2　partners. Based on -- we were not engaged to be
3　married. We are not significant others. So based on
4　the policy of ECFMG, I am -- in my good conscience, I
13:23　5　did not violate any policy.
6　Q. If you --
7　A. And to keep in mind when this was brought to my
8　attention, Troi Bryant had not worked there for a year.
9　Q. But -- but there were complaints by other
13:23　10　employees about you hiring family and friends; correct?
11　MR. KENNARD: Objection. Calls for
12　speculation.
13　Q. (BY MS. O'DRISCOLL) Were you aware of
14　complaints by other employees?
13:23　15　A. I was not aware until the day I walked in and
16　was ambushed.
17　Q. Okay. If you look to the second page of this
18　policy --
19　A. And that would be no different than Betty
13:23　20　having her daughter work -- her stepdaughter to work
21　there.
22　MS. O'DRISCOLL: Objection. There is not a
23　question on the table right now, and this is my
24　deposition. So if you could please answer the questions
13:24　25　that I'm asking. Okay?

**115**

1　MR. KENNARD: Was that -- I'd ask that the
2　witness not be harassed or harangued when she's trying
3　to answer a question.
4　Was that in response to her last question?
13:24　5　THE WITNESS: Yes.
6　Q. (BY MS. O'DRISCOLL) There was not a question
7　pending.
8　MR. KENNARD: She -- again, you may not --
9　you may not like the answer, but it is -- I just asked
13:24　10　the witness if it's a continuation of her previous
11　response and she said, yes. You've got to remember this
12　is someone that's had brain surgery and may not be as
13　quick to respond as we may otherwise as attorneys be
14　accustomed to. So I would ask that we provide the
13:24　15　witness with the appropriate deference and respect. And
16　if she is slow to answer at times, that is part of what
17　we deal with when deposing a witness in -- in her
18　condition, so I ask that we be patient. Thank you.
19　MS. O'DRISCOLL: And as you well know, I've
13:24　20　been very, very patient throughout this entire day.
21　MR. KENNARD: I like you, Erin, you're a
22　good person.
23　Q. (BY MS. O'DRISCOLL) And assuming --
24　assuming -- regardless of what, as you sit here right
13:24　25　now, and -- and we're mincing the definition of

**116**

1　relationship, letter D on the second page specifically
2　spells out that a failure to disclose can result in
3　termination; correct?
4　A. It says may be grounds for termination of
13:25　5　employment.
6　Q. Can or may; correct?
7　A. May.
8　Q. And -- and -- and so termination, a failure to
9　follow this policy can -- may result in termination.
13:25　10　A. Correct.
11　Q. Okay. And -- and this policy, was it posted on
12　the intranet, or where would one -- where did you see
13　this policy at ECFMG?
14　A. We had a hard copy.
13:25　15　Q. Okay.
16　A. As well as the intranet.
17　Q. Okay. And it's also mentioned in the handbook
18　as well; correct?
19　A. Correct. But keep in mind, Erin, because I
13:26　20　feel like strongly why we're here today is because I did
21　not violate this policy.
22　Q. Okay.
23　A. Because Troi was not related to me.
24　Q. Under -- understood. But if ECFMG interpreted
13:26　25　him as being -- having a significant relationship and

**117**

1　the fact that you co-parented, then that could be a
2　violation of the policy; correct?
3　MR. KENNARD: Objection. Objection. Calls
4　for speculation.
13:26　5　A. Was there a question?
6　Q. (BY MS. O'DRISCOLL) If management interpreted
7　it as a violation, then --
8　A. After Troi was gone a year, when they brought
9　that to me the first day I walked in the door from my
13:26　10　medical leave.
11　Q. If we -- let's look back at your medical leave,
12　because I think there were a few dates that might have
13　been confusing.
14　A. Uh-huh.
13:26　15　Q. And I want to make sure the record is clear on
16　this.
17　This is going to be Exhibit 18.
18　(Exb. No. 18 was marked.)
19　Q. (BY MS. O'DRISCOLL) And while you're taking a
13:26　20　look at that, ECFMG/Ellis 377 through 389, did -- did
21　Mr. Ellis for kidney -- for the kidney transplant, did
22　you go out on leave twice for that reason or just once?
23　A. I went out originally, like I told you, twice.
24　Q. I'm sorry. I know it was within that short
13:27　25　time period in '08, but was -- was there a -- two major

30 (Pages 114 to 117)

DepoTexas, Inc.

Artis Ellis

118

1   leaves, years apart, though, for the transplant?
2       A. The --
3           MR. KENNARD: Objection. Confusing and
4   misleading.
13:27 5     Q. (BY MS. O'DRISCOLL) Okay. Earlier we were
6   talking about the summer of 2008 that his transplant had
7   been canceled and rescheduled; correct?
8       A. Yes. We clarified that earlier when we talked
9   about that.
13:27 10    Q. Okay. Now, if you take a look briefly at these
11  documents, which are dated January, 2012, for you going
12  out on leave for his transplant.
13          And so what I'm trying to figure out is
14  were there two transplant incidents years apart, not
13:27 15  just the couple of months in 2008?
16          MR. KENNARD: Same objection.
17          You may answer if you understand the
18  question.
19      Q. (BY MS. O'DRISCOLL) I'll rephrase the question
13:28 20  if it's confusing.
21          Barring the fact that the summer of 2008
22  you went out in June and July, when it was -- when the
23  transplant was rescheduled for your husband; correct?
24      A. Correct.
13:28 25    Q. Barring those couple of leaves that -- leaves

119

1   that were short and back to back in 2008, as you sit
2   here, do you recall taking a leave in 2012 for a kidney
3   transplant, as well?
4       A. Yes.
13:29 5     Q. And what was the -- what was the second surgery
6   for?
7       A. My husband lost the first kidney in 2008 and
8   then received another kidney in 2012.
9       Q. Okay. And -- and did you actually give him the
13:29 10  transplant in 2012 or 2008?
11      A. I did not give him the transplant in 2012.
12      Q. Okay. Only in 2008.
13      A. Yes.
14      Q. Okay. And these documents at Exhibit 18, these
13:29 15  are the -- the FMLA documents that you filled out so
16  that you could care for your husband in January of 2012;
17  correct?
18      A. I need to take some time to look over them,
19  please.
13:29 20    Q. Sure.
21      A. So some of them are duplications.
22      Q. Understood.
23          But generally these are related to that
24  January, 2012, kidney transplant for your husband?
13:30 25    A. Yes.

120

1       Q. Okay. And did you have any difficulty
2   requesting or obtaining taking this leave in --
3       A. No.
4       Q. -- 2012?
13:30 5     A. No.
6       Q. Okay. And the person that you had to send this
7   leave paperwork to in January, 2012, is listed as
8   Sharon Trowell-Roman -- hyphen, Roman at ECFMG.
9           Was she the same person that handled your
13:31 10  leave paperwork later that year, in 2012?
11      A. For when I had to have -- for myself?
12      Q. For your surgery, yes, ma'am.
13      A. Yes.
14      Q. Okay.
13:31 15    A. Erin, this would be a great time to take a
16  break.
17      Q. You need -- you need another break right now?
18      A. I do.
19      Q. Okay.
13:31 20    A. I do.
21          MS. O'DRISCOLL: Off the record.
22          THE VIDEOGRAPHER: Time is approximately
23  1:32. This ends disc 2. We're off the record.
24          (Recess taken from 1:32 p.m. to 1:42 p.m.)
13:41 25        THE VIDEOGRAPHER: This begins disc 3. The

121

1   time is approximately 1:42. We're on the record.
2       Q. (BY MS. O'DRISCOLL) Okay. Ms. Ellis, we were
3   talking about your FMLA leave -- leaves at --
4           THE VIDEOGRAPHER: Microphone.
13:42 5     Q. (BY MS. O'DRISCOLL) We were talking about your
6   FMLA leaves at ECFMG just prior to the break, and I want
7   to look at -- after the January, 2012, leave that you
8   took for your -- for your husband, for his kidney, did
9   you take another leave after that, another FMLA leave?
13:43 10    A. You going to show me something?
11      Q. Did you take another leave after that?
12      A. I took one for myself.
13      Q. Okay. And that was in the fall of 2012?
14      A. Yes.
13:43 15    Q. Okay. Take a look at Exhibit 19, ECFMG 390
16  through 396.
17          (Exb. No. 19 was marked.)
18      Q. (BY MS. O'DRISCOLL) I believe these are the
19  leave documents that you filled out, you and/or your
13:43 20  physicians filled out related to that leave for yourself
21  in -- in 2000 -- the fall of 2012. So let me know when
22  you've finished looking at those documents.
23      A. This was a package. It's incomplete, but --
24      Q. Okay. We're going to look at the documents
13:44 25  that we have.

31  (Pages 118 to 121)

Artis Ellis

122

1    A. Okay.
2    Q. But I wanted to walk through -- because some of
3    the documents have -- that were given to us, that were
4    given to you, I've seen different pages. So let's just
5 13:44  walk through it so I know whose handwriting, if you
6    know.
7    A. Okay.
8    Q. On this first page on Ellis -- ECFMG 390, is
9    that -- is this your writing on the form?
10 13:44  A. Yes.
11    Q. And for that entire duration of that document,
12    that's your handwriting?
13    A. Yes, with the exception of Sharon Trowell's
14    signature.
15 13:44  Q. Okay. Thank you. And so that's your signature
16    dated October 2nd, 2012?
17    A. Yes.
18    Q. And this is your request for FMLA leave for a
19    serious health condition, quote, that makes me unable to
20 13:45  perform the essential functions of my job.
21    A. Yes.
22    Q. Okay. And by the description, it says -- I'm
23    not sure what that first word is, the M word.
24    A. Major.
25 13:45  Q. Major. Okay. "Major tumor removed from the

123

1    brain."
2        Is that what that says?
3    A. Yes.
4    Q. Okay. And it says, "I need" the "Leave of
5 13:45  Absence to begin" -- "to begin" and you filled in
6    September 12th, 2012, to October 22nd, 2012; is that
7    correct?
8    A. That is correct.
9    Q. Now, on the next page, this is entitled
10 13:45  "Request for Short Term Disability."
11        Is this also your handwriting?
12    A. Yes.
13    Q. Except for Sharon's signature?
14    A. Yes.
15 13:45  Q. Okay. And this is where you agreed to receive
16    short-term disability for 80 percent of your salary?
17    A. Yes.
18    Q. And, in fact, you did receive that short-term
19    disability through Sun Life; correct?
20 13:46  A. That is correct.
21    Q. Now, if you'd go to the next page, this is a
22    continuation of the FMLA documents, and with each
23    section it appears that someone different fills it out.
24        Am I -- am I interpreting that correctly?
25 13:46  A. That is correct.

124

1    Q. So the top section it says, "Completion by the
2    EMPLOYER"; correct? In the -- in the top section on
3    392, it says, "Section 1: For Completion by the
4    EMPLOYER"?
5 13:46  A. Yes.
6    Q. And then it says, "Section 2: For Completion
7    by the EMPLOYEE"; is that right?
8    A. Yes.
9    Q. And then "Section 3: Completion by the HEALTH
10 13:46  CARE PROVIDER"; is that right?
11    A. Yes.
12    Q. So the health care provider in that bottom
13    section, how do you -- how do you pronounce your -- is
14    it -- your doctor, Daniel?
15 13:47  A. Yoshor.
16    Q. Yoshor. So he was your physician for
17    neurosurgery in this -- for this FMLA leave?
18    A. He was the surgeon.
19    Q. Okay. And that's his -- and then do you know
20 13:47  who -- for the completion by the health care provider on
21    the bottom of that page, do you know who filled that out
22    at the physician's office?
23    A. No.
24    Q. Do you know how they were given this document?
25 13:47  A. Joe Plush e-mailed it to, I believe, his nurse.

125

1    Q. And Mr. Plush works for ECFMG in benefits?
2    A. Yes.
3    Q. Okay. So he e-mailed it to the physician's
4    nurse --
5 13:47  A. Yes.
6    Q. -- is your understanding?
7    A. It's my understanding.
8    Q. Okay. And then if you go to the next page, it
9    appears this is a continuation of Section 3 that the
10 13:47  physician's office is supposed to fill out; correct?
11    A. Yes.
12    Q. Okay. Did you talk with Dr. Yoshor -- did you
13    talk with his office at all during this time when this
14    was being filled out?
15 13:48  A. I -- I don't recall.
16    Q. Do you recall -- okay. If we go -- if we go
17    further on, looking at the bottom, the corner, ECF --
18    A. Can you give me a Bates number, please?
19    Q. ECFMG 393.
20 13:48  And it states, at the top, it says,
21    "MEDICAL FACTS" -- "PART A, MEDICAL FACTS"; correct?
22    A. No. I don't see that.
23    Q. Okay. In the -- and I'm just looking at the
24    form, because I want to verify, this is still the
25 13:49  physician's office filling --

32  (Pages 122 to 125)

Artis Ellis

126

1    A. Yes. Page 2 at the top? Page 2?
2    Q. Yes. And part A, it says, "MEDICAL FACTS"?
3    A. Yes.
4    Q. Okay. So this is -- this is being filled out,
5 to your understanding, by your physician's office.
6    A. Yes.
7    Q. And tell me if I'm reading this correctly.
8 "Approximate date condition commenced: Unknown"; is
9 that correct?
10    A. Yes.
11    Q. "Probable duration: Unknown"; correct?
12    A. Correct.
13    Q. And then it's talking about your overnight --
14 overnight stay at St. Luke's Episcopal; correct?
15    A. No. From 9-12 to 9-14?
16    Q. Yes. It says, "Was the patient admitted... an
17 overnight stay in a hospital, hospice, or residential
18 medical?" And they checked, "Yes."
19    A. Yes.
20    Q. "9-12-12, St. Luke's"; correct?
21    A. Correct.
22    Q. Okay. Now, the next line says, "Date you
23 treated the patient for condition: 9-14-12."
24    A. Yes. With continuation.
25    Q. And then it says, "Will the patient need to

127

1 have treatment visits at least twice per year due to the
2 condition"? And it says, "No."
3    A. Correct.
4    Q. "Was medication, other" -- "other than
5 "over-the-counter medication, prescribed?" And it says,
6 "No."
7    A. Correct.
8    Q. The next line says, "Was the patient referred
9 to other health care provider(s) for evaluation or
10 treatment?" And they checked, "No."
11    A. Correct.
12    Q. So -- so that -- I correctly read all of that.
13    A. Correct.
14    Q. Now, obviously the -- the question about
15 pregnancy doesn't apply here.
16    Now, number 3, tell me if I read this
17 correctly -- "Use the information provided by the
18 employer in Section 1 to answer this question. If the
19 employer fails to provide a list of the employee's
20 essential functions or a job description, answer these
21 questions based upon the employee's own description of
22 his or her job functions."
23    And the question: "Is the employee unable
24 to perform any of his or her job functions due to...
25 condition?" And you check, "No," or "Yes," and they

128

1 checked, "Yes," didn't they?
2    A. Here it says, "Yes."
3    Q. Okay. And then it says, "If so, identify the
4 job functions the employee is unable to perform."
5    And then the doctor's office filled in,
6 "Need to stay off four to six weeks to recover from
7 surgery."
8    Did I read that correctly?
9    A. That is correctly.
10    Q. Okay.
11    A. But I think we just need to clarify. This is
12 during the time that I was recovering that they were
13 referencing to, during the four to six weeks that I was
14 off that they are referencing to.
15    Q. Okay. Understood.
16    And I think there's a date a couple of
17 pages after this, where you're -- and we're getting
18 there.
19    A. Okay.
20    Q. And if you turn the page, Part B, "AMOUNT OF
21 LEAVE NEEDED" is stated at the top.
22    And it says, "Will" -- number 5 --
23    A. Uh-huh.
24    Q. -- "Will the employee be incapacitated for a
25 single continuous period of time due to his or her

129

1 medical condition, including any time for treatment and
2 recovery?" And they checked, "Yes."
3    A. Yes.
4    Q. "If so," what's the estimate of beginning and
5 ending dates. And they listed September 12th, 2012,
6 through October 22nd, 2012.
7    A. -- and was that the time period that --
8 that you wanted to be out on leave?
9    A. Yes.
10    Q. Okay. And then number 6 says, "Will the
11 employee need to attend follow-up treatment appointments
12 or work part-time or on a reduced schedule because of
13 the employee's medical condition?" And they checked,
14 "No."
15    Is that correct?
16    A. Yes.
17    Q. And then further down, on number 7, it says,
18 "Will the condition cause episodic" -- "episodic
19 flare-ups periodically preventing the employee from
20 performing his or her job functions?" And they checked
21 "No," and that's correct?
22    A. Keep in mind that this is from the surgeon, so
23 I also had a team of doctors that was following me after
24 surgery. So --
25    Q. Understood.

33   (Pages 126 to 129)

Artis Ellis

130

```
 1      A. -- this was during the visit of -- this was
 2   very early on. So the doctors after the surgeon saw me,
 3   because when this was completed, I still had a team of
 4   doctors that still had to sign off on me.
13:53  5      Q. Okay.
 6      A. So I didn't see the surgeon after -- you know,
 7   if everything was going okay, then he was -- he signed
 8   off on me, but the other team of doctors still had to
 9   see me.
13:53 10      Q. Okay.
11      A. The neurologist and endocrinologist.
12      Q. Understood. Understood.
13          And -- and the next page, it has the
14   physician's signature dated, dated, I think what you
13:53 15   were getting at, September 25th, 2012.
16      A. Yes.
17      Q. Okay. And then if you turn to the next page,
18   it's the designate -- designation notice, where it says,
19   "Your FMLA leave request is approved. All leave taken
13:54 20   for this reason is designated as FMLA leave," in that
21   box -- and that line is checked.
22          And this is the -- this is the approval
23   notice that you received for FMLA; correct?
24          And this is Bates number ECFMG 396.
13:54 25      A. I don't know, because I've seen so many forms,
```

131

```
 1   so there may be another form for approval.
 2          So do you have any more?
 3      Q. I do not, for approval, but I wanted to -- I
 4   wanted to go further down.
13:54  5          This -- this is the approval for September
 6   12th, 2012, through October 22nd, 2012, provided there's
 7   no deviation.
 8          That's what this notice says; correct?
 9      A. That is correct.
13:54 10      Q. And then if you go further down, it says,
11   "Please be advised," and there's two Xs in that section,
12   there's an X next to "We are requiring you to substitute
13   or use paid leave during your FMLA leave," and you
14   understood that to be the case; correct, that you were
13:55 15   using paid leave during your FMLA leave?
16      A. No.
17      Q. You did not?
18      A. No. I was using short-term -- short-term
19   disability.
13:55 20      Q. And FMLA leave.
21      A. And FMLA.
22      Q. And then the second box that's checked, "You
23   will be required to present a fitness-for-duty
24   certificate to be restored to employment."
13:55 25          And you understood that?
```

132

```
 1      A. Yes.
 2      Q. To come -- to come back to work, you had to
 3   have a fitness for duty from your physician.
 4      A. Yes.
13:55  5      Q. Okay. Now, I wanted to look at another -- we
 6   can look at the documents related to FMLA that your
 7   lawyer produced, as well, because I think that might be
 8   what you're referring to.
 9          Mark this as Exhibit 20 PCF -- I'm sorry --
13:56 10   Ellis 005 through 0024. And this is a -- this is a
11   group of documents that your lawyers produced to us that
12   has short-term disability documents as well as some of
13   the FMLA documents. This is the -- the group of
14   documents that were sent to us.
13:57 15          And some of them we just looked at were the
16   FMLA documents, so this is going to touch on both
17   your -- your short-term and your FMLA.
18          (Exh. No. 20 was marked.)
19      Q. (BY MS. O'DRISCOLL) Now, on this first page,
13:57 20   the Sun Life insurance -- Life Assurance Company, that's
21   who you received your short-term disability from;
22   correct?
23      A. Yes.
24      Q. And is that your handwriting on this first
13:57 25   page, Ellis 005?
```

133

```
 1      A. That is my handwriting.
 2      Q. Okay. And did you have to mail this packet in
 3   or fax it, do you know, to Sun Life?
 4      A. I just recall -- what I do recall and what I
13:58  5   can testify is that it was kind of last-minute, because
 6   this was an emergency surgery. And I recall that it was
 7   just kind of a lot of static trying to get this done, so
 8   I don't remember it just kind of just being really
 9   smooth. It's just trying to just get it in, hurry,
13:58 10   hurry, hurry.
11      Q. Okay. So you don't know if it was e-mailed or
12   faxed or mailed?
13      A. I don't recall.
14      Q. Okay. Related to -- if you go further in this
13:58 15   document -- these documents produced by you, the third
16   page, 008, see this -- it has some of the Sun short-term
17   disability, and then it also has some of the FMLA
18   documents. They're kind of intermixed the way that they
19   were numbered here.
13:58 20          And we already talked about that 008,
21   that's -- that's your handwriting there.
22      A. On which Bates number?
23      Q. On page 008. That was the similar document
24   that we looked at previously.
13:59 25      A. Yes.
```

34  (Pages 130 to 133)

DepoTexas, Inc.

Artis Ellis

134

1   Q. And then the next page, 009, is that still your
2   handwriting?
3       A. Yes.
4   Q. And this is the short-term disability claim
13:59 5   packet, and it has -- is that your signature at the
6   bottom dated October 2nd, 2012?
7       A. Yes.
8   Q. And if you go to the next page, again, that's
9   your signature on the bottom of 0010; correct?
13:59 10      A. Yes.
11   Q. And the -- these document -- and if you go to
12   the next page, 11, that's your signature again dated
13   October 2nd, 2011?
14      A. Yes.
14:00 15   Q. I'm sorry. 2012?
16      A. Yes.
17   Q. Okay. Now, if you go to Ellis 0014, this is
18   Sun Life insurance -- Assurance Company, and it -- okay.
19       So Section C at the top, it says,
14:00 20   "Attending Physician's Statement."
21       So was this filled out, not by you, but by
22   your physician's office?
23      A. Correct.
24   Q. Okay. And on number 4, where it says,
14:00 25   "Progress," and it says -- on number 4, "Progress: Has

135

1   patient" and then there's a -- a block -- a box that
2   they can check. They checked, "Recovered."
3       Is that correct?
4      A. Yes.
14:01 5   Q. So they could have checked, "Recovered,"
6   "Unchanged," "Improved," or "Retrogressed," and they
7   checked, "Recovered."
8      A. Right.
9   Q. Okay. Now, if you go to the next page --
14:01 10      A. Just for clarification for my testimony --
11   Q. Yes.
12      A. -- that I was recovering when this was filled
13   out.
14   Q. And -- and -- understood. And your doctor's
14:01 15   office checked that box, "Recovered."
16      A. Yes.
17   Q. You weren't regressing, but that you were
18   recovered?
19      A. That I was recovering.
14:01 20   Q. Right. I'm just going by what the box is that
21   they checked.
22      A. Right. Because I don't think there's any other
23   thing that it -- to reflect that I was -- I was not --
24   it wasn't unchanged or improved or retrogressed, that I
14:01 25   was -- so, yes, I was recovering.

136

1   Q. Okay. And then if you go to the next page,
2   "Restrictions and Limitations."
3       And the restrictions listed, it says,
4   "Patient should stay off work four to six weeks to allow
14:01 5   complete recovery."
6      A. Uh-huh.
7   Q. Did I read that correctly?
8      A. That is correct.
9   Q. Okay. And it's clear that they're saying that
14:02 10   you can't work now while you're recovering after the
11   surgery. It says, "If" -- "If no, how many hours
12   could... she work?"
13       And it says, "Not work now."
14       Under "Physical Impairment," it states --
14:02 15   there's Classes 1, 2, 3, 4, 5, and they -- they checked,
16   "Severe limitation; incapable of minimum (sedentary*)
17   activity"; is that correct?
18      A. Yes.
19   Q. Okay. And -- and this is -- and this is within
14:02 20   a couple of weeks of -- of your surgery; correct? If
21   this is the bottom date on the bottom that your doctor
22   signed, it was 9-25-12?
23      A. Yes.
24   Q. Do you -- do you recall the date of your
14:02 25   surgery?

137

1      A. I believe it was 9-14.
2   Q. Okay. And if you look in this -- after
3   "Physical Impairment," there's also "Mental impairment,
4   Class 1, No limitation."
14:03 5       So there was no mental impairment
6   limitation associated, according to your doctor.
7      A. Correct.
8       MR. KENNARD: Objection. Assumes facts not
9   in evidence and calls for speculation.
14:03 10   Q. (BY MS. O'DRISCOLL) Based on this form that
11   your doctor submitted on your behalf, to short-term
12   disability, did I read that correctly that it says
13   "Mental impairment (if applicable), Class 1, No
14   limitation"?
14:03 15       Did I read that correctly?
16      A. You did.
17   Q. Okay. Now, if you go to the next section,
18   where it says, "Return-to-work," number 1 says, "When
19   will patient recover sufficiently to perform duties?"
14:03 20       And under "Patient's occupation full-time,"
21   it says, "Date: 10-22-12."
22       And that's when you returned to work, isn't
23   it, 10-22-12?
24      A. Yes, that's the day that I -- I didn't clock
14:03 25   in. That's the day that I just walked through the door

35  (Pages 134 to 137)

Artis Ellis

**138**

```
1    and didn't put my purse down or anything.
2      Q. That's the date you returned to work; correct?
3      A. That's the day I walked through the doors.
4      Q. So you were released by your physician to
5    return to work, and you returned to work on that day;
6    correct?
7      A. Yes, I walked in the office, and that's when I
8    was told all the things that was going on. But prior to
9    that, a lot of people were calling. I was still working
10   because people were calling me at the -- at my home
11   telling me things that was going on in the office.
12     Q. Okay. And we're going to talk about that time
13   period in just a minute, but I -- I just wanted to make
14   sure that I understand these documents and whose
15   handwriting this is.
16     A. Uh-huh.
17     Q. And, number 2, where it says, "After reviewing
18   the material and substantial duties of the patient's
19   occupation, would you recommend vocational counseling
20   and/or rehabilitation or job modification?" And they
21   checked, "No."
22         Did I read that correctly?
23     A. Yes.
24     Q. Okay. And then -- and then at the bottom,
25   there's your physician again, Daniel Yoshor, and his
```

**139**

```
1    signature dated 9-25-12.
2      A. Yes.
3      Q. Now, if you could skip ahead, there's some
4    additional signature pages on Sunday -- Sun Life
5    Assurance.
6      A. Can you give me Bates numbers?
7      Q. Yes. I was just about to say that. Ellis 020,
8    if you could skip to that page.
9          Now, as I mentioned, the way that these
10   documents were produced, they were -- I think they may
11   have gotten out of order, and they're -- they're printed
12   here base -- based on the Bates numbered document?
13         But you see -- on 020, what I wanted to ask
14   you was whose handwriting that is. And I think that's a
15   continuation from the physician's office.
16     A. It's not my handwriting.
17     Q. Do you -- it's not yours; right?
18     A. No.
19     Q. Okay. And -- and this is similar to another
20   page that --
21     A. This is what -- we've already gone over this
22   one.
23     Q. Right.
24     A. This is one you talked about.
25     Q. In the other packet --
```

**140**

```
1      A. Yes.
2      Q. -- which was in the packet that ECFMG received
3    that we -- that we went through before, and then these
4    are documents that you -- that you produced -- your
5    lawyer produced.
6      A. Okay.
7      Q. Now, if you go to -- so we're looking at 020,
8    and then it skips back to some more Sun Life documents,
9    and there's some duplicates in here. But if you go to
10   Ellis 020, which is the last page, where at the top it
11   says, "PART B: AMOUNT OF LEAVE NEEDED." Number 5,
12   "Will the employee be incapacitated for a single
13   continuous period of time due to his or her...
14   condition, including any time for treatment and
15   recovery?"
16         And this is similar to the page that we
17   looked at earlier, and it's checked, "Yes," because you
18   were having your surgery, the single continuous period.
19         And then it says, "If so, estimate the
20   beginning and ending dates" of "the period of
21   incapacity." "9-12-12 through 10-22-12?"
22         Did I read that correctly?
23     A. Yes.
24     Q. And is that your handwriting in that part?
25     A. No.
```

**141**

```
1      Q. Okay. Is any of this document your
2    handwriting?
3      A. No.
4      Q. Number 6, it says, "Will the employee need to
5    attend follow-up treatment appointments or work
6    part-time or on a reduced schedule because of the
7    employee's medical condition?" And it's checked, "No."
8          Did I read that correctly?
9      A. Yes.
10     Q. And -- and it's your understanding that once
11   you were released to come to work for October 22nd,
12   2012, that -- that you were released to come full time;
13   correct?
14     A. At -- remember, this is dated 9-25, so this was
15   very shortly after I had surgery. So I don't know how
16   things were going to transition from after I had surgery
17   from 9-25 to 10-22. So what I did is I talked to Betty
18   LeHew, I talked to Sharon Trowell and told them that the
19   first week that I returned that I was probably going to
20   need to go part time and I was going to need
21   accommodation.
22     Q. Did you -- did you ever -- well, let -- let's
23   look at your fitness for duty that your -- that your --
24     A. Sure.
25     Q. -- that your physician -- that your physician
```

36 (Pages 138 to 141)

DepoTexas, Inc.

Artis Ellis

142

1    provided.
2          Mark this as Exhibit 21, ECFMG/Ellis 397.
3          (Exb. No. 21 was marked.)
4          Q. (BY MS. O'DRISCOLL) If you could take a look
14:09  5  at this. This was the only fitness for duty that I --
6    that I've seen, both produced by you and -- and given to
7    me by my client.
8          Are you aware of any other fitness for duty
9    document?
14:09 10  A. I am not. But when I talked with -- this was
11   my first time to ever send Tom what -- I talked with
12   Sharon as well as with Betty and Chris. I told them,
13   the three of them, that I was -- a lot of the employees
14   were calling me and telling me all the things that Chris
14:09 15  was doing at the center, and so I needed to just get
16   back to work. And so when I was talking to Tom, the
17   first time, because I was on a lot of different
18   medications from when Dr. Yoshor had seen me, so the --
19   he told me, Dr. Thomas, that I can't afford to lose you
14:09 20  on this side of the table, that my -- I was not
21   producing any of the hormones to deal with any stress.
22          And I --
23          Q. Was he your endocrinologist?
24          MR. KENNARD: Hold on. Can we allow her to
14:10 25  finish her response.

143

1          MS. O'DRISCOLL: Just to get -- she was
2    calling him Tom, so I'm trying to figure -- I want to
3    give context.
4          Q. (BY MS. O'DRISCOLL) You're talking about
14:10  5  Dr. Tom Thomas?
6          A. Yes. I didn't know him.
7          Q. Okay.
8          A. So this was my first time ever seeing him. It
9    was an appointment just to follow up from my labs --
14:10 10  from my labs from being in the hospital, and I just
11   asked him if he could just sign my return back to work.
12   And from that point on, I've never seen him since then.
13          Q. Okay. So you don't believe -- you haven't seen
14   him since October 16th of 2012?
14:10 15  A. I have not.
16          Q. Okay. But you did see him on -- on this day,
17   October 16th, 2012?
18          A. I -- I did see him on this particular day.
19          Q. And --
14:10 20  A. I had a -- I'm sorry, Erin. Can I finish?
21          Q. Go ahead.
22          A. Okay. I had a team of doctors. I had a
23   neurologist that told me that I may have to pull you
24   off. You know, I said, "Can I go back to work?"
14:10 25          And he said, you know, "I may not -- can't

144

1    release you, because I don't think you're ready."
2          And I think the neurologist should have
3    signed off on it, I believe that the endocrinologist
4    should have signed off on it, the team that was working
14:11  5  with me, the primary care physician, and only Tom signed
6    off.
7          Q. Okay.
8          A. I took -- I took that to ECFMG. I didn't know
9    that I needed the whole team to sign off on my return
14:11 10  back to work.
11          Q. But you understood that ECFMG, based on the --
12   on the FMLA documents you had received that we talked
13   about a little bit ago that said in order to return to
14   work, that they needed to -- to see your fitness for
14:11 15  duty form.
16          You understood that; correct?
17          A. I didn't understand that it needed to be from
18   the whole team of doctors. I just thought you just
19   needed a doctor to sign off.
14:11 20          Q. But you understood that whatever document that
21   ECFMG received, that they would interpret this as that
22   document as your return to work and -- and any -- a full
23   release; correct?
24          MR. KENNARD: Hold on. Objection. Calls
14:11 25   for speculation and assumes facts not in evidence.

145

1          Q. (BY MS. O'DRISCOLL) Well, let's look at this
2    document 0037, which we've marked as Exhibit 21.
3          Is that your signature dated 10-16-12,
4    towards the bottom of 00397?
14:12  5  A. Yes, it is.
6          Q. Okay. And is this the form -- the fitness for
7    duty authorization to return from medical leave that you
8    presented to Dr. Thomas?
9          A. Yes.
14:12 10  Q. And he was your endocrinologist?
11          A. He was the doctor that I was told to go to,
12   so --
13          Q. And -- and who told you to go to him?
14          A. Dr. Yoshor.
14:12 15  Q. Dr. Yoshor, who was your neurologist -- your
16   neurosurgeon.
17          A. Yes.
18          Q. Okay. And so when -- when this form was
19   completed by Dr. Thomas, were you actually in his office
14:12 20  on 10-16 when he signed off on this?
21          A. Yes.
22          Q. Okay. And did you have a discussion with him
23   that day about returning to work?
24          A. No. I -- I told him, "Can you please fill this
14:12 25   form out so I can go back to work?"

37 (Pages 142 to 145)

Artis Ellis

146

1    Q.   Okay.  And when you talked to him, did you --
2    did you -- did you talk through what the -- what your
3    job functions were?
4    A.   No, because the job functions were supposed to
14:13  5    be attached, as it says here, to this form, and they
6    were not.
7    Q.   Did you -- you attached them to the other FMLA
8    documents, but not to this one?
9    A.   They were not attached to this document, as
14:13  10   well.
11   Q.   Okay.  Did -- did you talk through what the job
12   functions were?
13   A.   No, I did not.
14   Q.   Did Dr. Thomas ask you at all about what your
14:13  15   job functions were?
16   A.   No, he did not.
17   Q.   Okay.  Did you -- did you tell him that -- that
18   you needed to come back in any other capacity besides
19   full time?
14:13  20   A.   I -- I basically just said, "I need to go back
21   to work.  Can you please sign this form?"
22   Q.   And when he signed this form, number 1, it
23   says, "Is employee able to perform the essential
24   functions of the position as highlighted on the attached
14:13  25   job description with or without... accommodation?

147

1    (Answer the question only after reviewing the attached
2    job description... discussing with the employee....
3    Check Yes or No."
4    And he checked, "Yes"; correct?
14:14  5    A.   Yes.
6    Q.   That -- that's correct?
7    A.   But it wasn't anything attached.
8    Q.   Okay.  Well, this is the -- this is the fitness
9    for duty form that you brought to your physician?
14:14  10   A.   Yes.
11   Q.   Okay.
12   A.   But there is no job description attached, and
13   we did not have a conversation about what my job
14   responsibilities were.
14:14  15   Q.   Okay.  Did you have a conversation with any
16   physician -- any other physician so that they could
17   provide a different fitness for duty to ECFMG?
18   A.   No.
19   Q.   Okay.
14:14  20   A.   I gave him the form and asked him to just sign,
21   you know, that I needed to go back to work.  And I told
22   my employer that -- I didn't know what my accommodations
23   may be at that time.  I had just had surgery, and I was
24   trying to get back to work.
14:14  25   Q.   And -- and, in fact, it says, "Date the

148

1    employee is able to return to work and perform all
2    functions."
3    A.   And I told him what date I was returning back
4    to work.
14:15  5    Q.   And -- and that's the date that you walked back
6    in the door, 10-22-12.
7    A.   That's correct.
8    Q.   Okay.  And then number 3, it says, "If an
9    accommodation is needed for an ADA covered disability,
14:15  10   please indicate suggestions for the type of
11   accommodation that would enable the employee to
12   perform... essential functions of his or her job."
13   And those two blanks are left blank, aren't
14   they?
14:15  15   A.   They are blank.
16   Q.   Okay.  And then -- and then you signed this
17   document and dated it 10-16-12.
18   A.   Right.
19   Q.   Now, with this document, did -- did you fax it
14:15  20   to ECFMG or -- or mail it, or did your doctors's office?
21   A.   I -- I believe that Sharon had me to -- because
22   it was a lot of pressure, and I had to have it Monday
23   before I walked in the door.  I had to have it back
24   to -- to them, so I believe I Fed Ex'd it back.
14:15  25   Q.   Okay.

149

1    A.   Or faxed -- it may have been faxed, but I
2    didn't have a fax machine at home.  I remember we just
3    had to find a fax machine, hurry up, and get it back.
4    Q.   I see a fax number at the top.  It says Fiesta
14:16  5    22.  I don't know if that rings a bell at all.  I don't
6    know what that means.
7    But does that mean anything to you?
8    A.   Yeah.  I think my husband had to fax it back.
9    Q.   Okay.  So -- so this document was faxed back
14:16  10   as your fitness --
11   A.   I believe so.
12   Q.   -- as your fitness for duty back to ECFMG?
13   A.   Yes, because I was trying to get back to work.
14   Q.   Okay.  Okay.
14:16  15   A.   But I had already -- I had called and said, "I
16   need some accommodations, but I just don't know,"
17   because my eyes were crossed and I was wearing a patch.
18   And I just didn't know, you know, if I was going to need
19   something with the lights, with the computer screen.  I
14:16  20   just didn't know at that time what it was going to be.
21   Q.   And -- and when did they -- when did you
22   receive the eye patch?
23   A.   I received the eye patch right after surgery.
24   I had the eye patch before surgery.  And during surgery,
14:16  25   my -- the nerves came aloose, and so I had double

38 (Pages 146 to 149)

Artis Ellis

150

1  visions for -- even when I came back, and, you know,
2  thereafter.
3      Q. And did -- did you -- when you mentioned the
4  eye patch, did you say, "It's not going to affect my
14:17 5  job, I just need my husband to drive me to work because
6  I can't drive"?
7      A. No.
8      Q. You didn't say anything like that?
9      A. No. I said I'm going to need accommodation. I
14:17 10  just don't know what they are yet. May be, you know, a
11  screen, it may be the lighting for the computers, a
12  different font. I'm not sure.
13      Q. And -- and did you ever, in fact, ask for a
14  specific accommodation when you went back?
14:17 15      A. Yes.
16      Q. What was --
17      A. Not specific, because I -- I wasn't given that
18  opportunity to say what the specific accommodations
19  were. I just said, "I know I'm going to need some
14:17 20  accommodation."
21      Q. Did -- but you didn't say a -- what a specific
22  accommodation was that you needed?
23      A. I said --
24          MR. KENNARD:  Objection to the extent that
14:18 25  it calls for a legal conclusion.

151

1      Q. (BY MS. O'DRISCOLL)  Did you -- did you ask for
2  anything specific that you needed when you returned?
3      A. I just said I needed possibly a computer
4  screen, that it needs to be larger, those things.
14:18 5      Q. You did actually say that?
6          MR. KENNARD:  Hold on.  Hold on.  Let's let
7  her finish answer -- hold on.  Let's let her finish
8  answering the question, then you're free to ask her
9  another question as it pertains to anything that she
14:18 10  responded with.  But I would really ask that we allow
11  her, before we jump in and cut her off, to let her
12  finish answering the question.
13          So you may continue, with your response.
14  Were you done?
14:18 15      A. Computer screen may need to be larger, the
16  lighting, chair.  I didn't know exactly which one
17  because I had not been at work.  I walked into my
18  office -- to the office, said hello to a few of the
19  employees, and then I was ambushed by these special
14:19 20  needs or concerns.
21      Q. (BY MS. O'DRISCOLL)  Okay.  And let's talk
22  about -- let's talk about your -- your return.
23          On October 22nd --
24      A. Yes.
14:19 25      Q. -- 2012, that's the day we're talking about;

152

1  correct?
2      A. Yes.
3      Q. And -- and this is -- when you first walked in,
4  did you meet with -- with Betty LeHew from HR?
14:19 5      A. No.  When I first walked in, I said hello to a
6  few of the employees.
7      Q. And then did you meet with someone?
8      A. Yes.
9      Q. Did you meet --
14:19 10      A. I said hello.
11      Q. Did you meet alone with Ms. LeHew?
12      A. I wouldn't say meet.  I said, "Hello."  And
13  when I walked in my office, Betty LeHew was in my
14  office, and then we exchanged.  Betty told me that --
14:19 15  because I had told Betty and Sharon and people in HR
16  that I could not be under stress.  My doctor said that,
17  the same thing, that he could not afford to lose me on
18  this side of the table and I could not be up under
19  that -- up under stress.  And Betty said, "Well, your
14:20 20  directors are here, and they need to talk to you about
21  some concerns they have."
22          And I said, "Was this one of those meetings
23  we should have at the hotel?"
24          And she said, "Well, do you think we need
14:20 25  to go to the hotel?"

153

1          I said, "I don't know what the meeting is
2  about."
3          And then she -- they -- they walked in,
4  Betty and -- I'm sorry -- Nancy and Chris.
14:20 5      Q. Okay.  And before she walked in, though, did
6  Betty tell you that -- that ECFMG had received the full
7  release -- your full release to return to work?
8      A. I don't recall her saying that to me.
9      Q. Did she say, "I want to make sure that you're
14:20 10  fine to proceed.  We're about to have a discussion.  I
11  want to make sure that you're feeling good and that
12  you're fine to proceed with this meeting today."
13          Do you remember that?
14      A. She said something similar to that, yes.
14:20 15      Q. Okay.  And then did you assure her, yes, let's
16  go forward with the meeting?
17      A. I did.
18      Q. Okay.  And then you said that you also met with
19  was it Nancy Ambrose?
14:21 20      A. It was Nancy Ambrose and Chris Paul and Betty
21  LeHew.
22      Q. Okay.  And where were -- where were you-all at
23  ECFMG that day?
24      A. We were in my office.
14:21 25      Q. Okay.  So before we -- before we turn to that,

39  (Pages 150 to 153)

Artis Ellis

154

1    let me just -- there's one document I will mark as
2    Exhibit 22nd.
3            (Exb. No. 22 was marked.)
4        Q.  (BY MS. O'DRISCOLL)  I'm sorry.  22, and that's
5    ECFMG/Ellis 398 through 399.
6            And just let me know once you've finished
7    reviewing this document.
8        A.  Yes.
9        Q.  So this is a letter dated October 19th, 2012,
10   addressed to you; correct?
11       A.  Yes.
12       Q.  From ECFMG?
13           Sharon Trowell-Roman, that was the HR
14   manager that you'd be working with on your FMLA leave;
15   correct?
16       A.  Yes.
17       Q.  And in this letter, she tells you that -- that
18   they received the fit for duty form completed by your
19   physician releasing you to return to work at full
20   capacity as of October 22nd, 2012.
21           Did I read that correctly?
22       A.  Yes.
23       Q.  And then the second paragraph, it says, she
24   reminds -- she tells you about the leave, that "You
25   previously used FMLA leave beginning January 18th, 2012,

155

1    until January 30th, 2012, to care for your spouse.  You
2    currently have four weeks and six days of FMLA remaining
3    in this 12 month period.  If you have the need for
4    additional FMLA" leave -- "FMLA time, please contact
5    me."
6            Did I read that correctly?
7        A.  That is correct.
8        Q.  Okay.  And did you ever contact Ms. Sharon
9    Trowell-Roman for any additional leave after this
10   letter?
11       A.  I did.  I did.  I talked --
12       Q.  When -- when did you do that?
13       A.  I contacted her before I went back to work to
14   tell her that I was going to be going to work only for
15   half days for the first week.
16       Q.  Did you provide any documentation at all from
17   your physician --
18       A.  I --
19       Q.  Wait.  Let me finish.
20           MR. KENNARD:  Let her finish.
21       Q.  (BY MS. O'DRISCOLL)  Did you provide any
22   documentation from your physician or any additional FMLA
23   paperwork to request half days?
24       A.  I don't recall -- I don't believe I did.  I
25   told her that I would be using some of my sick time for

156

1    those half days.
2        Q.  So for the -- for the half days, were you
3    wanting to use sick time and not FMLA?
4        A.  Correct.
5        Q.  Okay.  So in using -- in using the sick time,
6    you didn't believe that you needed to fill out any
7    additional paperwork?
8        A.  Correct.
9        Q.  Okay.  And when you returned on October 22nd,
10   2012, you were starting to tell me that you met with
11   Ms. Ambrose as well as Chris Paul and that Ms. LeHew --
12   that they were in your office on that day; correct?
13       A.  They weren't in my office.  I met with Betty --
14   I met with the -- I walked down the hallway, saw a few
15   employees, and then Betty was in my office, and then
16   Nancy Ambrose and Chris Paul walked in shortly
17   thereafter.
18       Q.  Okay.  Okay.  And what did they say when --
19   when they walked in?
20       A.  We greeted each other, said hello, with some
21   pleasantries, and then they ambushed with firing -- they
22   knew I wasn't supposed to be up under stress.  They
23   started ambushing with firing questioning and gave me
24   a -- they didn't even give me a list of concerns.  They
25   just started with a whole list of things that -- it was

157

1    brought to my attention, employees stated, management --
2    manage -- management did this, and none of -- a lot of
3    it I had never even heard before.
4        Q.  Do you -- do you remember anything specific?
5    Does anything specific come to mind that -- that they
6    addressed with you that day?
7        A.  It was brought to my attention about Troi
8    Bryant.  It was brought to my attention about some
9    robes, plates.
10       Q.  I'm sorry.  What did you say, some robes and
11   plates?
12       A.  Robes.
13       Q.  Anything else?
14       A.  Something about I was eating someone's food.
15       Q.  And did they tell you that -- that these were
16   complaints that they had received from other employees?
17       A.  Yes, but they never told me who the employees
18   were.  I had never heard that before or the complaints
19   before.  Never was given a corrective written action
20   to -- to even correct the -- the action.  Never even
21   seen a memo like that before.  And then I brought -- you
22   know, we stopped it, and brought it to Betty LeHew's
23   attention that a list of people that had called me, gave
24   her specific names that she needed to investigate and
25   talk to and with part time and full time that during my

40  (Pages 154 to 157)

Artis Ellis

158

1   whole FMLA time, being off work, how these employees
2   every day were calling my home till my husband had to
3   finally say, "My wife is recovering," to please stop
4   calling my home.
14:27  5       Q.   Did -- you said you gave a list of names to
6   Betty to investigate?
7       A.   Yes.
8       Q.   What did you want her to investigate?
9       A.   Because the -- employees were saying that
14:27  10  Chris was undermining everything that I was doing, so I
11  wanted her to talk to all of the full-time employees
12  that were calling my home during my leave of absence,
13  and saying these things that was going on, the part-time
14  employees, as well, that were saying these things.  And,
14:27  15  I mean, I couldn't even refute all the things that were
16  said.  I wasn't given the opportunity to refute.
17       I was told by Betty LeHew that -- you know,
18  I said, "Well, Betty, I can go back on leave."
19       And she said, "No.  You should take -- off
14:28  20  the record, you should take the personal leave of
21  absence."
22       And I said, "Okay," because I didn't know
23  any -- I didn't -- I didn't know.  I didn't know.  So I
24  said, "Okay."  Called my husband.  She told me to give
14:28  25  her my cell phone.  I gave her my cell phone, called my

159

1   husband to come pick me up.  She walked me outside, and
2   that was it until I heard back from -- Betty left a
3   message on my voice mail to meet her at a hotel, I did,
4   gave them my things, and then we started corresponding
14:28  5   on how to get my personal belongings.
6       Q.   Okay.  Let's -- let's back up a little bit.
7   On -- when you were having this discussion with
8   Ms. Ambrose, Mr. Paul, and Ms. LeHew, you said they gave
9   you a list of concerns.
14:28  10      A.   I did not say they gave me a list of concerns.
11      Q.   They -- they -- they listed a list of concerns.
12      A.   Yes.
13      Q.   You eventually were given a list; correct?
14      A.   I had to request a list.
14:28  15      Q.   Okay.  And you were given that list?
16      A.   Yes.
17      Q.   Okay.
18      A.   After I requested that list.
19      Q.   Okay.  And did you receive that list that day
14:29  20  or some day after that?
21      A.   That day.
22      Q.   Okay.  And did you -- that day, on October
23  22nd, 2012 -- I was making a list of the items that
24  you -- that I noted that you mentioned.
14:29  25       The first thing you mentioned was Troi

160

1   Bryant and --
2       A.   That was not the first thing I mentioned.
3       Q.   I wrote down Troi Bryant, robes and plates, and
4   eating someone's food.
14:29  5        Did I miss one?
6       A.   There was a list.  We can go back on -- the
7   court reporter to see, actually, what I said.
8       MS. O'DRISCOLL:  Can we go back to what she
9   responded had been --
14:25  10      THE REPORTER:  QUESTION:  "Do you -- do you
11  remember anything specific?  Does anything specific come
12  to mind that -- that they addressed with you that day?"
13       ANSWER:  It was brought to my attention
14  about Troi Bryant.  It was brought to my attention about
14:25  15  some robes, plates.
16       MS. O'DRISCOLL:  Thank you.
17      Q.   (BY MS. O'DRISCOLL)  So I wanted to get a
18  little more detail, when you say they brought to your
19  attention about Troi Bryant, are you referring to fact
14:30  20  that he's your daughter's father?
21      A.   Yes.
22      Q.   And did they reference the relationship policy
23  at that time?
24      A.   No, I don't recall it.
14:30  25      Q.   Okay.  Do you remember, did they reference

161

1   that -- that they believed that there was some sort of a
2   policy violation related to Troi Bryant working there,
3   having been your daughter's father?
4       A.   Betty did bring that to my attention, and I
14:30  5   said, "Betty, Troi hasn't worked here in over a year,
6   and -- why is that a difference when you have David and
7   Heidi working together."  And Betty has her stepdaughter
8   and it clearly states about stepdaughter, Troi is not
9   related to me.
14:31  10      Q.   Did -- did Betty or -- or Ms. Ambrose or
11  Mr. Paul, did anyone ask you:  Is Troi Bryant your
12  daughter's father?
13      A.   Yes.
14      Q.   And did you respond to that question?
14:31  15      A.   I -- I did, and I was trying to say that he --
16  he is, but, I mean, we were not related.
17      Q.   Did -- did you say that day?  Was your
18  response that day?
19      A.   I did not.  I was trying to get out that he's
14:31  20  the father, but he's not related to me in any kind of
21  way, because as I mentioned earlier in the testimony, is
22  that -- that was -- that was a lot of shame, and that
23  was over 25 years ago, or longer.  And that was a lot of
24  shame that was about that, regarding that, having a
14:31  25  child out of wedlock, and it was just a one-night stand.

41  (Pages 158 to 161)

Artis Ellis

162

1  But later that evening, I believe I called Betty or
2  shortly thereafter I called her and just went ahead and
3  just said, "Betty, you know, Troi is the father of
4  Brittani, but there is no relation or -- there's --
14:32  5  we're not relatives, though."
6      Q. In fact, when Betty asked you that day, on the
7  22nd, she -- when she asked you if Troi was Brittani's
8  father, didn't you say that he -- he stepped up, but
9  no, he wasn't her father, but he -- he stepped up,
14:32  10  something to that -- something -- something to that
11  effect?
12      MR. KENNARD: Objection. Calls for
13  speculation. Assumes facts not in evidence. And
14  misstates testimony.
14:32  15      Q. (BY MS. O'DRISCOLL) I'll restate -- restate
16  the question.
17      When Betty asked you if Troi was Brittani's
18  father, did you -- in that -- in that sitting, on
19  October 22nd, did you deny that Troi was Brittani's
14:32  20  father?
21      A. Indirectly.
22      Q. And -- and can you give me a little more detail
23  on what you said?
24      A. As I was stating earlier, I didn't just
14:33  25  directly say, yes, he's the -- he's her father, because

163

1  of the shame that was related to that.
2      I was giving a story that, yes, but we're
3  not -- there is no blood relation or I'm not -- I'm
4  related to Brittani, but not to Troi, but -- so --
14:33  5      Q. Do you remember saying anything, something to
6  the effect of he stepped up or stepped in or something
7  to -- of that nature?
8      MR. KENNARD: Objection. Misleading.
9  Confusing. And assumes facts.
14:33  10      Q. (BY MS. O'DRISCOLL) I'm just asking you if you
11  remember saying anything like that.
12      A. I don't remember. I don't recall that.
13      Q. Okay. Okay. Do you -- do you remember calling
14  Betty either that evening or the next day and saying, "I
14:33  15  have to clean my conscience, Troi's Brittani's father"?
16      A. I --
17      Q. Clear my conscience.
18      MR. KENNARD: Objection. Assumes facts.
19  And calls for speculation.
14:34  20      Q. (BY MS. O'DRISCOLL) Did you ever say anything
21  like that to Betty --
22      MR. KENNARD: Same objection.
23      Q. (BY MS. O'DRISCOLL) -- that you have to clear
24  your conscience?
14:34  25      MR. KENNARD: Same objection.

164

1      Q. (BY MS. O'DRISCOLL) You can answer.
2      MR. KENNARD: You can answer if you're able
3  to?
4      A. I recall calling Betty saying that Troi was
14:34  5  Brittani's father.
6      Q. (BY MS. O'DRISCOLL) Do you remember saying
7  something to the effect of, I have to clear my
8  conscience?
14:34  9      A. I don't recall that.
10      Q. Okay. Do you also remember being asked on
11  October 22nd about sharing your password?
12      A. Yes.
13      Q. Okay. And what -- what did -- and who said it,
14  and what did they say? Was it Ms. Ambrose or Mr. Paul
14:34  15  or Ms. LeHew?
16      A. I don't remember who said -- who asked me about
17  it, but I was told that I -- I -- who I shared it with.
18  I didn't know who I had shared it with.
19      Q. Were you asked if you shared your password?
14:35  20      A. Yes. And I responded with a list of people,
21  was it Flores, was it -- because I didn't know. I was
22  under a lot -- I was having brain surgery. I talked to
23  a lot of people. I was under a lot of different
24  medication.
14:35  25      Q. And did you admit to sharing your password with

165

1  someone?
2      A. After I was told that I did. And I'm not --
3  I'm a fairly honest person, so I said -- if my
4  employer -- I worked with these people for seven years.
14:35  5  If they told me that I did that, then I -- I just
6  believe that they had no reason to lie to me.
7      Q. Did -- did you -- did you tell them that you
8  had shared the password with a woman named Sharon?
9      A. No. They told me.
14:35  10      Q. They told you that that's who it was?
11      A. Yes.
12      Q. Okay. And for the benefit of the jury, what --
13  what is -- what is this password? What does it do?
14      A. The -- when they told -- it certified the exam.
14:36  15      Q. Okay. And does that mean that -- what does
16  that mean, "certifying the exam"?
17      A. It actually benefits the company. It made sure
18  that the -- the examinees actually got their scores on
19  time, so it benefit the company.
14:36  20      Q. What goes into certifying an exam? What does
21  that mean?
22      A. Two buttons, that the exam happened that day,
23  and all the paperwork was done correctly, yes, yes.
24      Q. And when you provided your password to Sharon,
14:36  25  was she a management-level employee?

42  (Pages 162 to 165)

Artis Ellis

---

**166**

1    A. She was acting as the assistant manager,
2  because again, I was put in a position to be the manager
3  because the assistant manager had resigned and had left.
4  So I was the manager by myself.
14:36 5    Q. She was the acting assistant manager.
6    A. Like unofficial, yes.
7    Q. So what does that mean, "unofficial"?
8    A. She had not -- she had not gone through HR and
9  approved, but Chris had -- I had asked Chris about her
14:37 10  being -- acting assistant center manager, so she was
11  doing things for me that -- she assisted me.
12    Q. And was she given management-level
13  responsibilities to certify exams?
14    A. No.
14:37 15    Q. And you understood that your password should
16  only be used by you; correct?
17    A. Yes. But keep in mind that I -- I was not even
18  aware that I had given my password to anyone until it
19  was brought to me that day on the 22nd.
14:37 20    Q. Which was the first day you came back to work.
21    A. Which was the first day I came back to work.
22  Bearing that I was working while they were calling me on
23  leave.
24    Q. And when you say you were -- when you were
14:38 25  working, did you ever tell Betty LeHew or anyone with

---

**167**

1  human resources, "Hey, I'm getting calls from -- from
2  the center. I'm being asked to work while I'm on
3  leave"? Did you tell anybody?
4    A. Not until -- well, Betty knew because they were
14:38 5  interviewing the assistant center manager. And Chris
6  called me and said that I could come to the center and
7  sit in the room while they were interviewing assistant
8  center managers to, I guess, give some feedback or
9  something, but at -- during the interview, I couldn't
14:38 10  say anything.
11    Q. Did --
12    A. And I was on leave during that time.
13    Q. Did you come in --
14    A. I did not.
14:38 15    Q. -- during the interviews?
16    A. I did not. And that was a choice that I made,
17  but I was asked to.
18    Q. And who was -- who was covering center
19  manage -- your center manager responsibilities while you
14:38 20  were out on leave, in Houston?
21    A. All the center managers stepped up, with the
22  exception of John, and came to the center.
23    Q. And how many other centers are there around the
24  U.S.?
14:39 25    A. There's five other centers. Houston would be

---

**168**

1  six.
2    Q. And they were all filling in to -- to help
3  pitch in for the -- the center manager responsibilities?
4    A. Yes.
14:39 5    Q. Okay. And you said except John?
6    A. Yes.
7    Q. And what location is he located at?
8    A. Philadelphia.
9    Q. Okay. Mark this as Exhibit 23, ECFMG 358-359.
14:40 10    (Exh. No. 23 was marked.)
11    Q. (BY MS. O'DRISCOLL) If you could take a look
12  at that chart and tell me if you've seen that chart
13  before.
14    A. I don't recall this chart.
14:40 15    Q. You don't recall ever seeing this chart?
16    A. What's the name of it?
17    Q. It's -- it's the site business functions chart,
18  listing the -- the business functions and
19  responsibilities.
14:41 20    You don't recall ever seeing it?
21    A. (Witness indicated by shaking head.)
22    Q. Okay. But you knew that as center manager
23  that -- that for -- for certifying a session, you knew
24  that only center management could do that or central
14:41 25  S -- CSEC; correct?

---

**169**

1    A. CSEC is -- CSEC is the -- the -- the satellite
2  offices.
3    Q. The executive director, the director, and
4  assistant director; correct?
14:41 5    A. No.
6    Q. Well, if you look -- if you haven't seen this
7  chart before, it may not help. But on the right side
8  where it says "Central Business Functions with People or
9  Title," in the third group down on the right, "Central"
14:42 10  SEC -- "CSEC," says "Executive Director," "Director,"
11  and "Assistant Director."
12    Is that not accurate?
13    A. It says that about what, though? What are you
14  referencing?
14:42 15    Q. So in the very bottom, I'm just talking about
16  who has the ability to certify a session, certify a
17  test. And the very bottom in the left-hand corner,
18  "Session certification."
19    Do you see that?
14:42 20    A. Uh-huh. Yes.
21    Q. And then if you go over to the right, it
22  says -- there's an X, which if you follow that up, goes
23  to "Center management."
24    So that would that be you -- correct? --
14:42 25  for session certification?

---

43  (Pages 166 to 169)

Artis Ellis

170

1    A. Yes.
2    Q. And then if you go a little further over to the
3  right and you follow that X up, says, "Central CSEC,"
4  which would be the executive director, director, or
14:43 5  assistant director. Those are the only two groups that
6  have the ability to certify an exam; correct?
7    A. Now, keep in mind, Erin, as I stated earlier,
8  that I didn't know that I had given Sharon my password
9  to certify the exam. And Sharon was acting in the role
14:43 10  as my assistant, so I -- I wasn't even aware, and I was
11  heavily medicated.
12    Q. Understood.
13    But -- but you never -- you never received
14  official approval that Sharon could act as an acting
14:43 15  assistant manager; correct?
16    A. She -- no. She wasn't acting as an official
17  assistant manager.
18    Q. And she's an hourly, nonexempt employee;
19  correct?
14:43 20    A. She is.
21    Q. Okay. If we look at the data security
22  policy -- I'm not sure why these got lumped together,
23  but I'll unlump them.
24    Exhibit 24, ECF 0308 through 310.
14:44 25    (Exb. No. 24 was marked.)

171

1    Q. (BY MS. O'DRISCOLL) Do you recognize this
2  policy, CSEC data security policy?
3    A. Yes. It's changed a little bit, because center
4  manager and assistant manager has been scratched out.
14:45 5    Q. Where -- I'm sorry. Where are you referring
6  to?
7    A. On the 310.
8    Q. Okay. And -- and what's been scratched out.
9    A. "Center Manager, Assistant Manager."
14:45 10    Q. Where do you see that scratched out?
11    A. Last bullet.
12    Q. Oh, got it. Okay. Got it. "Ability to
13  download data from Center Manager, Assistant Manager and
14  Trainer Laptops and PCs." I see what you're saying.
14:45 15    So you're saying that -- there was one --
16  that one change in this policy?
17    A. Yes, probably.
18    Q. Okay. That first bullet that says, "Each
19  manager, assistant manager and trainer shall adhere to
14:45 20  ECFMG's current password security policy and shall not
21  share or communicate their password with any other
22  person."
23    You were aware of that rule; correct?
24    A. But I also am aware that I was told by my
14:45 25  director to give my password to our IT person when we

172

1  were out of the office to do some work while we were
2  there. So it was all -- the policy was always violated
3  with the password.
4    Q. You said your -- your director told you to do
14:46 5  that?
6    A. Yes. Yes.
7    Q. Who is that, Mr. Paul?
8    A. Yes.
9    Q. So Mr. Paul told you to give your password to
14:46 10  whom?
11    A. Bea Bright Davies. And the common password was
12  used was Brent Biggs.
13    Q. And are you aware of any time that a password
14  was used to certify an exam?
14:46 15    A. I wasn't aware that my password was used to
16  certify an exam.
17    Q. But once you were asked about it, you recalled
18  that you did, in fact, share your password?
19    A. I was -- I did not recall that, until it was
14:46 20  brought to my attention. And when they told me that I
21  did that, I said, "Okay," because I didn't -- I didn't
22  know.
23    Q. But once you were reminded that you did it, did
24  you recall doing it?
14:47 25    A. I did not recall. I just -- I had to -- if

173

1  they told me I did it, I was under medication, I didn't
2  know I did it. So I didn't know, so because they told
3  me I did, I just went along with it, because they said I
4  did. I didn't believe that they would tell me that I
14:47 5  did something that I didn't do.
6    Q. Okay. You said Mr. Paul told you to give Bea
7  Davis your password?
8    A. Yes.
9    Q. And what was that for?
14:47 10    A. Because he had to do something -- we was off
11  site doing a -- I believe it was sometime in January --
12  I can't recall the year, but we were doing a food bank
13  drive and Bea had needed something to do in the office
14  with the computer. She was our IT person, and they
14:47 15  needed a password to get in, and he called me up and
16  said I had to give her my password.
17    Q. And it was for some sort of an IT function?
18    A. Yes.
19    Q. Okay.
14:48 20    A. It should be on their e-mails, because it was
21  e-mailed back and forward.
22    Q. Okay. And do you remember thinking that there
23  was anything wrong with that, sharing your password?
24    A. No, because I knew I could change it.
14:48 25    Q. Did you change it?

44  (Pages 170 to 173)

Artis Ellis

174

1      A. I'm sure I did.  Yes.
2      Q. Do you know if you did?
3      A. I don't recall -- I'm almost 99.9 percent that
4   I did.  And you have several different passwords for
14:48 5   several different programs, so the program that she
6   needed that password for, just like for the
7   certification, that was a password only for
8   certification, so it could not get into other databases.
9      Q. Okay.  And, again, you're not aware of anyone
14:48 10   sharing their certification password with any person
11   that -- that shouldn't have been shared with?  Any --
12   anyone else?  You're not aware of anyone else doing
13   that?
14      A. Like who?
14:49 15      Q. I mean, anyone in any center.  Have you ever
16   heard of anyone sharing their password to certify an
17   exam and sharing it with a nonexempt person?
18      A. Again, I wasn't aware that I shared mine, so
19   I -- I'm sure no one -- we didn't talk about that, so --
14:49 20      Q. And the person Sharon, her last name was
21   Dalberg; correct?
22      A. Yes.
23      Q. That you shared your password with?
24      A. I -- I wasn't aware that I shared my password
14:49 25   with Sharon --

175

1      Q. But that's --
2      A. -- until it was brought to my attention.
3      Q. But that's the person that you all discussed
4   that you shared it with; correct?
14:49 5      A. That is correct, Sharon Dalberg.
6      Sharon also did other things, too, Erin,
7   that she assisted me with:  Scheduling, and the things
8   on the job responsibility as assistant manager, she
9   helped out with.
14:50 10      Q. Okay.  But with regard to certifying an exam,
11   you could have had Nancy Ambrose do that for you;
12   correct?
13      A. If I was conscious and aware of what I was
14   doing and thinking, I would not have even -- I was
14:50 15   having surgery and out on FMLA.  I would not have even
16   thought about working.  I mean, I guess my question
17   would be to myself now, in retrospect, why was I even
18   worried about the exam or even thinking about work when
19   I was in a -- you know, life-changing event that I don't
14:50 20   know if I was going to be alive or not or even capable
21   of going back to work.  So I -- I didn't think -- I
22   wouldn't have thought about calling Nancy.  I wouldn't
23   have thought about work.
24      Q. Well, you had had Nancy help you certify exams
14:51 25   in the past; correct, Nancy Ambrose?

176

1      A. If needed, you know, if on vacation or if just
2   out on personal day or just a regular sick day, but in
3   an emergency, I wouldn't have thought to call Nancy.
4      Q. But -- but that's a yes, that you have had
14:51 5   Nancy certify exams for you in the past?
6      A. Nancy has certified exams in the past.
7      Q. For you.
8      A. For all centers.
9      Q. But for you as well.
14:51 10      A. Including Houston.
11      Q. Okay.  While you were center manager.
12      A. Yes.
13      Q. Okay.
14      A. But I think that's for -- just so I make sure
14:51 15   that we're all on the same page, I think that would be
16   for everyone.  Nancy would put out a list that she's
17   going to certify the exam for everyone.
18      Q. Because she -- because it was either the center
19   manager or Nancy that were the key people that would
14:51 20   certify exams; correct?
21      A. Or the assistant center manager.
22      Q. And which you didn't have an assistant center
23   manager, since Brent had resigned.
24      A. That is correct.
14:52 25      Q. Okay.  When you attended your unemployment

177

1   hearing with the Texas Workforce Commission, did you
2   admit that you should not have shared your password in
3   violation of the data security policy?
4      A. I would have to look back over that.
14:52 5      Q. Okay.
6      (Exh. No. 25 was marked.)
7      Q. (BY MS. O'DRISCOLL)  Mark as Exhibit 25, and
8   this is a big one because we can jump around a little
9   bit.
14:53 10      A. Okay.
11      Q. ECFMG 443 through 638.
12      MS. O'DRISCOLL:  And I only have one extra
13   copy if you guys can share.  I'm only going to hit a few
14   pages in there, but --
14:53 15      MR. KENNARD:  Sure.  Just tell me what
16   we're going to talk about.
17      MS. O'DRISCOLL:  The transcript of her
18   testimony at 617.
19      A. What's the Bates number you said, 433?
14:53 20      Q. (BY MS. O'DRISCOLL)  617.
21      MR. KENNARD:  You want to make a copy of
22   those?
23      MS. O'DRISCOLL:  If you -- if you want to.
24   I just have my copy and that copy, because it's so big.
14:53 25      MR. KENNARD:  I'll just look off hers.

45  (Pages 174 to 177)

Artis Ellis

**178**

MS. O'DRISCOLL: Okay.

MR. KENNARD: But before you answer any questions, I want to look at the page before. Okay?

Q. (BY MS. O'DRISCOLL) And if you could, look where it says -- has a line, and it says the word "end" and then a line on 617, where it has in all caps, which is the testimony that was given at the hearing. And I should preface with, this is a certified copy that was ordered from the Texas Workforce Commission that is a notarized copy of everything that was submitted.

MR. KENNARD: Has this been produced?

MS. O'DRISCOLL: Yes.

Q. (BY MS. O'DRISCOLL) So if you could look at that first paragraph and share with your counsel, in all caps, it's after "END."

And tell me if I'm reading this correctly. Right after the word "end," with the lines, it says -- we're on the 617. "If they have a policy or not I should have not have done that. I understand they said it was a violation of the data security policy."

Did I read that correctly?

MR. KENNARD: I read it.

A. I --

MR. KENNARD: Go ahead. Yes. She's starting right there at the top. Right there.

**179**

A. Okay.

MR. KENNARD: You may want to go through that again?

MS. O'DRISCOLL: Sure.

Q. (BY MS. O'DRISCOLL) Just let me know if I'm reading this correctly. "If they" -- "If they have a policy or not I should have not have done that. I understand they said it was a violation of the data security policy."

Did I read that correctly?

A. Yes.

Q. And if you go to the next page, at the top. Okay. Actually, I'm sorry, at the bottom of the page we were just on, it's talking about the Bryant matter -- I'm sorry. If you go -- go back one page and then at the bottom sentence on that page.

MR. KENNARD: Bless you.

MS. O'DRISCOLL: God bless you.

Q. (BY MS. O'DRISCOLL) If you start with "I understand," if you could show your counsel. It's those last two sentences at the bottom, "I understand they said that."

MR. KENNARD: Yes.

Q. (BY MS. O'DRISCOLL) So tell me if I'm reading this correctly. "I understand" that "they said that the

**180**

following day on the phone with the AVP of HR that I admitted that I lied about Mr. Bryant being my daughter's father because my conscious needed to come clean. That is true."

Did I read that correctly?

A. That's what's typed here, yes.

Q. Okay. And this was testimony that -- that you gave under oath to the Texas Workforce Commission related to your unemployment; correct?

A. I don't recall this, because this was so long ago, but --

Q. But you could have said that?

A. I could have.

Q. If you go further, it says, "That is true. When I got ambushed with this information" --

MS. O'DRISCOLL: Do you want to read this next paragraph, Alfonso, or --

MR. KENNARD: I read it.

Q. (BY MS. O'DRISCOLL) The top, "When I got ambushed with this information I lied out of fear but I came back and said the truth. Regarding the second violation, this is correct. I had been put under alot of stress. I was given a list before I got sick of concerns. I was in the hospital having major brain surgery. I made a bad decision on my part. I gave a

**181**

regular employee my password to certify the exam."

Did I read that correctly?

A. Yes, but I -- I think it was not put all in context what -- everything I was -- I said.

Q. I understand there was additional testimony, but this is -- this is the -- rather than reading the entire document -- and the entire document is an exhibit and in the record, so it's there.

A. Okay.

Q. But I just wanted to pull out portions since it was referring to earlier discussions that you and I had about giving your conscience clean and things of that nature. I just wanted to make sure I was reading that correctly.

A. Yeah, you -- you read this -- what is typed correctly.

Q. Okay. Okay. If you could also turn to, in that set, ECFMG --

A. Did you read, also, we had no -- we were never married, we have no blood relation?

Q. Yes.

A. Okay.

Q. If you could turn to ECFMG 530 --

A. 530.

Q. -- in the same exhibit.

46 (Pages 178 to 181)

Artis Ellis

## 182

```
1    A. 530 is blank.
2    Q. Actually, I think it might be earlier.  It's
3  copied incorrectly.  It should look -- internet claim
4  certification.
5    MR. KENNARD:  That might be a good break
6  point.
7    MS. O'DRISCOLL:  Yeah.  You want to take
8  quick break?  We -- or wait here -- wait till here?
9  Okay.  We'll finish this document.
10   Q. (BY MS. O'DRISCOLL)  So you're on the ECFMG
11  530?
12   A. Yes.
13   MR. KENNARD:  All right.  Let me see.
14   Q. (BY MS. O'DRISCOLL)  And when you were applying
15  for unemployment with the Texas Workforce Commission,
16  did you fill out an online application seeking
17  unemployment?
18   A. Yes.
19   Q. And if you wouldn't mind just taking a look at
20  this ECFMG 530, does this appear to be the questions
21  that you answered online?
22   A. Yes.
23   Q. And did you have to go in each week and -- and
24  answer forms like this -- answer questions on a form
25  like this, for unemployment?
```

## 183

```
1    A. I don't recall how often I had to go in.  I
2  know I was told that if I signed a waiver that ECFMG
3  would not fight me on my unemployment, and they had
4  offered me a severance package.
5    Q. Okay.  But I -- I just want to know the answer
6  to my question, if you had to go in each week and answer
7  questions with the un -- for the unemployment?
8    A. I don't recall --
9    Q. Okay.
10   A. -- if it was each week or if it was every other
11  week.
12   Q. Okay.  Do you remember the date of your
13  termination?
14   A. So technically the date was October the 22nd,
15  because I never went back to the office.
16   Q. Well, you were put on administrative leave
17  while they were conducting an investigation; correct?
18   A. That is correct.
19   Q. Okay.  And during that time, you were told that
20  Betty and her colleague were going to investigate any
21  allegations that you made related to what employees were
22  saying; correct?
23   A. That is correct.
24   Q. And you were also told that Ms. Ambrose was
25  going to investigate the list of violations -- or
```

## 184

```
1  potential violations that you were given that day on the
2  22nd, once you asked for that list and you -- and it was
3  given to you, you were told that Ms. Ambrose was going
4  to look into that.
5    A. I don't remember being told that.
6    Q. You don't remember being told, "We're going to
7  put you on administrative leave while -- while we
8  investigate what you're saying investigate what these
9  allegations are"?
10   A. No, because I was -- it was my understanding
11  that since they had brought my -- those concerns to me
12  that the investigation had already been completed
13  because why would they bring those concerns to me?
14   Q. Well, didn't they tell you that they wanted to
15  finish talking through the issues with you, and -- and,
16  in fact, you -- you did speak with Betty the next day on
17  additional bullet points?
18   A. I remember telling Betty that, of course, you
19  know, I didn't ask for someone's food, because Betty,
20  like -- Betty had a relationship with me.  Betty LeHew.
21  She had a relationship with me.  She's known me over
22  seven years, and we agreed to that.  And we had a
23  cordial relationship.
24   And I don't recall them telling me about
25  Nancy was going to investigate those list of concerns.
```

## 185

```
1  I know I asked Betty to do the investigation -- so it
2  was my understanding that Betty was going to do the
3  investigation of those -- the list of the people that I
4  had given her.
5    Q. And did you have an understanding if she
6  completed -- completed that investigation?
7    A. I never heard back if they had completed the
8  investigation, if they talked to anyone, what was the
9  outcome of the investigation, it never came back to me.
10   Q. Okay.  Did -- do you remember one of the -- let
11  me just pull that list up.
12   Actually, you know what, I know we have the
13  five-minute break.  We'll go ahead and take that.
14   THE VIDEOGRAPHER:  Okay.  Time is
15  approximately 3:04.  This ends disc 3.  We're off the
16  record.
17   (Recess taken from 3:04 p.m. to 3:26 p.m.)
18   THE VIDEOGRAPHER:  This begins disc 4.  The
19  time is approximately 3:26.  We're on the record.
20   Q. (BY MS. O'DRISCOLL)  Okay.  Ms. Ellis, if we
21  could take a look at, in that big group, which I think
22  was our last exhibit, is it 25 that we were on, if you
23  could show it to your counsel.  I'm going to look at
24  page -- it's towards the front, in the bottom right-hand
25  corner, ECFMG 452.  And actually, it's a couple of pages
```

47  (Pages 182 to 185)

DepoTexas, Inc.

Artis Ellis

186

1  long, so it's two and a half pages long.
2    A. Ending at 454?
3    Q. Yes. 454, yes, ma'am.
4      Do you recognize this document called
5  Houston issues?
6    A. Yes.
7    Q. Okay. And I know we've talked at length about
8  the first two items, that -- Mr. Bryant being Brittani's
9  father and working at ECFMG, and then also the second
10  issue related to sharing your password.
11      The third bullet point, I wanted to talk
12  about some of the other issues that were addressed in
13  that October 22nd meeting, and then subsequent
14  conversations that you had with Ms. Ambrose and Betty
15  LeHew.
16      That third bullet, "It has been discovered
17  that the exam had been short scheduled of staff, which
18  is risking integrity and validity of the exam. It is
19  the manager's responsibility to appropriately schedule
20  the exam. There were also days when people were
21  scheduled to work when there was no exam, thus wasting
22  payroll dollars and possibly allowing preferential
23  treatment to some employees, again the responsibility of
24  the Center Manager."
25      And then in italics after that, it shows

187

1  what the investigation showed to Ms. Ambrose. "The
2  investigation uncovered one day in September that staff
3  had been scheduled to work a shift when there
4  actually" -- "actually was no exam scheduled."
5      Did --
6    A. I didn't do the schedule, and that was just an
7  error on a paper copy. And once the -- Sharon had did
8  the schedule. And once it was discovered that it was
9  not an exam, then she said -- she took it off. So it
10  was not that someone was actually scheduled and they
11  could work and they were given money or was paid. It was
12  a schedule that was out six weeks ahead of time, and no
13  one got paid. It was just a mistake on her part.
14    Q. Okay. So you -- it's your understanding that
15  that was fixed?
16    A. Yes.
17    Q. Okay. But -- but you have to approve all
18  scheduling; correct?
19    A. That is correct.
20    Q. As center manager?
21    A. That is correct.
22    Q. Okay. If you look at the next bullet, "Artis
23  did not follow policy when removing SPs from the exam
24  in terms of paying them."
25    A. And I wanted to go back --

188

1    Q. Yes, ma'am.
2    A. -- to the one that talked about -- that was
3  never an exam that was not fully -- the one that talked
4  about the exam not fully covered, and that it was short
5  staffed. Even with short staff, we -- because people
6  were resigning and going -- for whatever reason, they
7  said they were going back to school or they was moving
8  or whatever, because we had a retrofit, and so some
9  people just could not get the new way of doing the exam.
10      And when they said they did not no longer
11  want to work there, it was okay, you know, we have to
12  now find new staff and --
13    Q. And when you say "retrofit" -- "retrofit," just
14  so everyone under -- I understand what you're saying,
15  but can you describe for everyone else what that means,
16  retrofat -- "retrofit"?
17    A. Yes. So the exam was going to be done a
18  different way than what we were doing -- the way that it
19  was used to being done, so it was -- it was're --
20  completely redone. .
21    Q. And so you had to retrain the patients?
22    A. Retrain all the SPs.
23    Q. Okay. And there were significant staffing
24  issues that -- that you had to attend to make sure
25  that the center was ready for those changes; correct?

189

1    A. That is correct.
2    Q. And that was something that you were working
3  with, with Chris, and your assistant center manager,
4  Brent Biggs, and that your team -- that was the main
5  focus in the months leading up to the spring of 2012?
6    A. Along with the trainers, along with all staff.
7    Q. Okay. And -- and you did have a lot of people
8  leaving during that time.
9    A. Along with other centers, we knew that was
10  going to be some transitions.
11    Q. Okay. So staffing was one of your key
12  responsibilities; correct?
13    A. And every exam had -- was fully staffed.
14  When --
15    Q. You're not aware of any short-staffed exams?
16    A. No, no short-staffed exams.
17    Q. Okay.
18    A. Because the exam could not go on if it was
19  short staffed, so you had to have SPs to be in every
20  exam.
21    Q. Okay. Are you aware of any SPs being
22  improperly paid, that if they were sent home, which is
23  the next bullet, "Artis did not follow policy when
24  removing" standardized patients, "SPs from the exam in
25  terms of paying them. Artis, after pulling people,

48  (Pages 186 to 189)

Artis Ellis

190

1  forced them to," quote, "'clock out' and leave which is
2  against company policy."
3      A. No, I was not aware of this. That was the
4  first time I ever heard of that.
5      Q. But when you were made aware of it at this
6  time, did you hear the outcome of the investigation with
7  Ms. Ambrose?
8      A. No.
9      Q. She didn't explain to you that there were
10  thousands of dollars that had to be -- in wages that
11  were not paid to SPs that should have been paid?
12     A. No.
13     Q. You mentioned robes a little bit earlier. I
14  think it may pertain to this next bullet. "Artis
15  abandoned the policy that required SP's to wear robes in
16  all common areas of the building."
17     A. That's not true. When I left, everyone was
18  wearing robes. That was part of something that was
19  discussed during orientation. You either wore a robe
20  that ECFMG provided for you or you bought a robe to
21  your -- you know, your own personal robe. So when I
22  wasn't there at the center, I can't testify if anyone
23  had -- if they had on their robes or not. When I left,
24  they had to wear a robe. And they knew that.
25     Q. And you enforced that?

191

1      A. Yes.
2      Q. The next bullet, "Artis changed the policy,
3  without authorization, of SP's returning to the exam
4  room within two minutes of the next encounter. Artis
5  changed it to three minutes."
6      A. Yes. One of the things that we were allowed to
7  do was to manage our own center, so whatever worked at
8  our center to make it work, so that SPs wouldn't be
9  late. They were in their room -- that was one -- 60
10  seconds, so I gave them a -- I believe, a -- I can't
11  remember -- so many seconds so that they can get to
12  their rooms on time, and that actually worked for our
13  center in Houston. Everyone was there. They were on
14  time in their rooms. And we had never a late start.
15  And it wasn't a policy.
16     Q. Well, does something like that change the
17  dynamics of the exam?
18     A. Not at all.
19     Q. So because the exam's supposed to be the same
20  in every center across the U.S.; right, so that there's
21  uniformity; correct?
22     A. No, that is not correct.
23     Q. It's not correct?
24     A. No. So at a point the exams -- you know,
25  centers were allowed to do whatever worked for their

192

1  center. So if Houston did something that changed --
2  that worked for Houston, then Houston was able to do
3  that. If Chicago did something that worked for them,
4  then Chicago was able to do that.
5      Q. Did you have to get approval from anyone higher
6  up in management to make changes?
7      A. Well, that --
8      Q. Pardon? Did you have to get approval from --
9  from anyone above to make changes, anyone above you?
10     A. No. Betty Hite, when she managed the centers,
11  she would just say, whatever worked for your center,
12  just make it work. And that's what we -- all the
13  managers did.
14     Q. What about the next bullet, "Artis violated
15  policy by having five years of paper... lists stored at
16  the center. These are to be kept for no longer than 90
17  days. Along with other confidential exam materials that
18  should have been destroyed that were kept in a supply
19  cabinet"?
20     A. Never. Never.
21     Q. So if other managers observed this in your
22  center?
23     A. That wouldn't have never -- I never heard of
24  that. I mean, never would have allowed any paperwork to
25  be left anywhere unsecure, because we know the

193

1  importance of shredding and keeping things for 90 days.
2  So -- and I had never heard of that, never was brought
3  to my attention until that day.
4      Q. And the investigation showed that "It is our
5  policy that paper... lists should be scanned in and
6  stored electronically for USMLE and then shredded after
7  four months."
8      A. Yeah, that --
9      Q. "It appears that" that "was never done and the
10  checklists" were "backlogged for a number of years."
11  That was what the investigation showed.
12     A. That was never brought to me, so I'm not aware,
13  because I don't do checklists. And we had a checklist,
14  we had triple checklists, sign offs, and we watched that
15  very closely. So I had never even heard of that, and
16  they never even told me or showed me anything.
17     Q. Well, part of the checklists and the scanning
18  in documents and -- and keeping all the documentation in
19  a -- in a -- kept in a specific way, that was all part
20  of making sure that the exams ran in a certain way and
21  part of the certification process; correct?
22     A. No, it didn't work that way. So you --
23  there -- there's an assistant manager and then there was
24  an FOC and then you had two different people that
25  actually signed off and kept all of that paperwork

49  (Pages 190 to 193)

Artis Ellis

194

```
 1    together and it was kept in a secure file cabinet, and I
 2    never saw that. We had that -- actually, you know, a
 3    manual that would just have signatures of the employees
 4    who actually did the checklists. So we triple checked
 5    everything, and then the FOC and probably a trainer or
 6    another person would actually do the shredding.
 7         Q. Okay. Well, if -- if there was a backlog
 8    that -- when the other managers were filling in while
 9    you were out, and there was a backlog of four -- of --
10    of years --
11         A. I don't think --
12         Q. -- and it was supposed to be shredded after
13    four months, I mean, ultimately, anything at your center
14    was your -- was -- ultimately came down to -- to you
15    being able to make sure policy was followed; correct?
16         MR. KENNARD: Objection. Assumes facts.
17         Q. (BY MS. O'DRISCOLL) As the highest ranking
18    manager at the Houston center, it was your
19    responsibility to make sure that all policies were
20    followed; correct?
21         A. I never knew that that happened. That was
22    never brought to my attention. It was supposed to been
23    only one file. It was not several. We -- we would have
24    known that based on the cases. It wouldn't -- it wasn't
25    enough room to have five years of cases, check -- paper
```

195

```
 1    checklists. It would have been this large on just one.
 2         Q. So if -- if managers report -- that were
 3    filling in, if they reported seeing this, you -- you
 4    don't -- you don't believe that to be true?
 5         A. I -- I think some -- someone else would have
 6    seen it and would have brought that to my attention. It
 7    would have been seen by someone else before another
 8    manager would have come and seen that.
 9         Q. Do you recall -- did you discuss the -- the
10    rest of the bullets with Betty or Ms. Ambrose or with
11    anybody else on this list?
12         A. I think we talked about plates.
13         Q. Does that have to do with the supplies? Or
14    which bullet are you on?
15         A. Supplies.
16         Q. Okay. "It is the program's policy to supply
17    basic needs such as tea, dish soap, and other items to
18    SP's. Artis had the SP's buying their own supplies."
19         A. They did not buy their own supplies. We used
20    paper plates, and they -- we still supplied paper
21    plates. They wanted real plates, and they had -- if
22    they brought in real plates they bought in -- we had
23    dishwashing liquid, so they would get some dishwashing
24    liquid. But for the most part, they had their own paper
25    disposable things. They wanted, I guess, real things,
```

196

```
 1    real plates and utensils, and not disposable.
 2         Q. Okay. So you didn't have them buying their own
 3    supplies?
 4         A. No.
 5         Q. Did you tell anybody that, Ms. Ambrose or
 6    Ms. LeHew or --
 7         A. This is my first day back, and this is what I
 8    was brought, and I -- I said no.
 9         Q. What about "A special exam, scheduled back in
10    May of 2011... was supposed to happen on" May "9-17 was
11    not communicated to staff nor was the center set up for
12    the exam"?
13         A. That is not true. Charise scheduled all
14    special accommodations, and she put out an e-mail saying
15    that she had made a mistake. So as you can tell, I'm
16    being falsely accused of things that I did not do or
17    know.
18         Q. Well, but not all -- not all of these
19    bullets -- you haven't denied all of these bullets.
20    These were -- these were -- these were presented by the
21    managers while you were out on leave to --
22         A. I don't know --
23         Q. -- to management, and so then management
24    brought it to you to discuss when you -- when you
25    returned; correct?
```

197

```
 1         A. That is not correct. I don't know who
 2    present -- who presented these. No one told me that
 3    these were presented by management or managers. This
 4    said it was brought to my attention or Artis violated.
 5    I don't know who presented this.
 6         Q. Okay. But this was presented to you so that
 7    they could talk with you on the 22nd. And as we talked
 8    about earlier, there's earlier bullet -- bullets that
 9    you admitted to related to sharing your password
10    improperly, Mr. Bryant, in fact, being the father of
11    your daughter. So when you say that you're denying all
12    of these bullets, that's not accurate.
13         A. I'm not saying that I'm denying all of them,
14    but I'm saying that these things that was brought to my
15    attention when I -- I feel like when I came back to work
16    and I shared already that I could not be up under a lot
17    of stress, I feel like I was ambushed, I feel like that
18    these things were not even true. I wasn't given the
19    opportunity to even share or even make some of the
20    corrections being that it was a center manager -- being
21    that I was a center manager. I wasn't even given the
22    opportunity to even be called on Friday saying, "Hey,
23    Artis, we're going to have a meeting on Monday. There
24    are some concerns."
25         Q. Well, you had a meeting on the 22nd, and -- and
```

50 (Pages 194 to 197)

Artis Ellis

198

1    you asked for a list, you were given the list, and then
2    you were told that you were being put on administrative
3    leave while these items were investigated; correct?
4    A. No. I don't remember saying these items going
15:43   5    to be investigated. I remember asking Betty if she can
6    investigate the people that had been calling me,
7    full-time and part-time staff, about some of the
8    concerns that was going on with Houston, not about this
9    list.
15:43   10   Q. You don't remember Ms. Ambrose saying, "I'm
11   going to look into these issues. We're going to put you
12   an administrative leave. Betty said I'm going to look
13   into your concerns and -- and look into any employees
14   that called you while they were on leave," but,
15:44   15   separately, Ms. Ambrose said, "I'm going to look into
16   these issues"?
17   A. I would have gone --
18   MR. KENNARD: Hold on. Hold on.
19   Objection. Compound question. Assumes facts. And
15:44   20   calls for speculation.
21   Q. (BY MS. O'DRISCOLL) Did Ms. Ambrose tell you
22   that she was going to look into these issues while you
23   were placed on administrative leave?
24   A. I don't recall that. I would have thought
15:44   25   before Betty would have allowed them to bring this to

199

1    me, she would have already looked into these issues.
2    Q. So you don't recall being told that this was
3    being investigated?
4    A. If this was brought to me, I would have thought
15:44   5    that this would already have been investigated, that --
6    that this was brought to whoever this was brought to.
7    And Betty had already flown to Houston, so she had
8    already talked to someone. So I would have thought that
9    they had already investigated this and this was factual
15:45   10   to them, and -- that this was factual to them so Betty
11   would not have needed to tell me that she was going to
12   investigate this, because they would have already looked
13   into this.
14   Q. But they hadn't gotten your responses yet;
15:45   15   correct?
16   A. No, they had not gotten my responses yet.
17   Q. And that was -- and that was the purpose of
18   meeting with you on the 22nd and putting you on
19   administrative leave so that they could look into your
15:45   20   responses; correct?
21   A. They hadn't -- they did not get my responses to
22   all of these bullet points.
23   Q. But they did to most of them, didn't they?
24   A. I can't say to most.
15:45   25   Q. Well, didn't you have a conversation with

200

1    Ms. Ambrose -- well, you had the conversation on the
2    22nd, and then you also had additional conversation with
3    Betty when you called Philadelphia; correct?
4    A. But it was not a very intense, long
15:45   5    conversation with Betty.
6    Q. You didn't talk about multiple bullets on this
7    list?
8    A. No, I talked about probably two or three.
9    Q. And what two or three did you talk about with
15:46   10   Betty?
11   A. I know I talked to her about the food, and I
12   know I -- I believe I talked to her about the robes.
13   Q. And you talked to her about Mr. Bryant being
14   Brittani's father.
15:46   15   A. I did talk to her about Mr. Bryant being
16   Brittani's father.
17   Q. And do you remember talking about any of the
18   other bullet points?
19   A. I don't recall.
15:46   20   Q. When you met with Ms. Ambrose and Mr. Paul and
21   Ms. LeHew on the 22nd, they didn't finish going through
22   all the bullets yet in that setting; correct?
23   A. Correct.
24   Q. And did they tell you, "We're going to consider
15:46   25   your comments on what we've discussed thus far, we're

201

1    going to look into it further, and we're going to put
2    you on administrative leave"?
3    A. No. Betty said -- off the record, Betty --
4    Q. Before -- before -- before -- okay. You're
15:47   5    talking about something. And if you could just walk me
6    through, while all -- Ms. Ambrose, Mr. Paul, Betty and
7    you, while you guys were all in that same room together.
8    A. Yes.
9    Q. So first you spoke with Betty, and then --
15:47   10   alone. And then you went into the room, and there were
11   the -- and it was the four of you; correct?
12   A. Correct.
13   Q. And then at the end of that conversation with
14   the four of you, didn't someone in that room -- and I
15:47   15   don't know if it was Mr. Paul or Mr. Ambrose --
16   Ms. Ambrose or Ms. LeHew -- but didn't someone in that
17   room say, "We're going to put you on administrative
18   leave, paid administrative leave while we look into
19   these issues"?
15:47   20   A. Chris Paul said that you're going to go on
21   leave. I requested to go on family -- back on FMLA, and
22   asked for a copy of this. And then Betty LeHew -- Chris
23   told me, no, I could not get a copy of this. Betty
24   said, "Yes, she can." And then Betty asked them to step
15:48   25   out, Betty -- Nancy and Chris to step out of the room.

51 (Pages 198 to 201)

Artis Ellis

202

1    Then Betty and I talked and --
2    Q.  And what -- what did -- what did y'all talk
3    about when you and Betty talked?
4    A.  When I told Betty that I need to go back on
15:48  5    leave.  And she then said, "Well, off the record, you
6    can go on leave -- personal leave of absence."
7    And she said that -- I said, "Betty, you
8    know me."
9    And she said, "I do."  And she said that --
15:48  10    I said, "They have -- staff have been
11    calling me from -- at home while I was on leave and I
12    was sick and they were calling me about all this stuff
13    that's going on in the center and then I would come into
14    work and this is what I get."
15:48  15    And she said, "Well, you know" --
16    I said, "This is a list of people."  I
17    told -- I gave her a list of some names of people that
18    she needed to talk to.  And as I stated earlier, that
19    she asked for my cell phone, and I called my husband to
15:49  20    come and pick me up.
21    Q.  And did you specifically say, "I need to go out
22    on FMLA leave"?
23    A.  I specifically told her I need -- I wanted to
24    go back on FMLA leave.
15:49  25    Q.  And --

203

1    A.  In that group.
2    Q.  You said that your -- you said it in the group,
3    not just to Betty?
4    A.  I said it in the group, and I said it to Betty.
15:49  5    And then that's when she said, "Off the record, you need
6    to go back -- you know, on personal leave of absence."
7    Q.  What --
8    A.  Because I knew I can go back on leave.  I had
9    leave time from Sharon's letter.
15:49  10    Q.  And -- and how did you -- you had just received
11    your fitness for duty to return for work with a clear,
12    full release; correct?
13    A.  Correct.
14    Q.  How did you think that you could go -- that you
15:49  15    qualified to go back out on leave?
16    A.  Because I knew that Dr. Tom said, "I cannot
17    afford to lose you on this side of the table," and that
18    that was still some concerns with my neurologist as well
19    as the endocrinologist.
15:50  20    Q.  So did you at any time -- either on the October
21    22nd or anytime prior to your termination on November
22    1st, did you ever call any of your physicians and get
23    some sort of a modified fitness for duty or -- or some
24    sort of a modification that you could turn in to ECFMG
15:50  25    to request leave, to request FMLA leave?

204

1    A.  At that time, I was not -- I was not working.
2    I was on administrative leave, so --
3    Q.  You were on paid administrative leave.
4    A.  Paid administrative leave, as Betty had
15:50  5    instructed me to go.
6    Q.  But did you at any time between October 22nd
7    and November 1st ever request to go back out on FMLA and
8    tell ECFMG, "I have a doctor's note.  I have a serious
9    medical condition, or some other qualifying need, I need
15:50  10    to go back out on FMLA"?  Did you ever say anything like
11    that?
12    MR. KENNARD:  Objections.  It assumes facts
13    and calls for a legal conclusion.
14    Q.  (BY MS. O'DRISCOLL)  Did you ever ask FMLA --
15:51  15    did you ever ask to go back out on FMLA for a serious
16    medical condition?
17    A.  No, because I was on personal leave of absence.
18    Q.  And did --
19    A.  Administrative leave of absence.  I'm sorry.
15:51  20    Q.  -- and you never called Sharon Roman
21    Trowell [sic] up in Philadelphia to request FMLA
22    paperwork to fill out; correct?
23    A.  Because I was on administrative leave, I was
24    waiting for them to call me to let me know what was the
15:51  25    outcome of Betty's investigation, and I -- I knew that I

205

1    was probably going to be terminated.
2    Q.  So the answer is to my -- and could you read
3    back the question that I asked?
4    THE REPORTER:  QUESTION:  "And -- and you
15:51  5    never called Sharon Roman Trowell up in Philadelphia to
6    request FMLA paperwork to fill out; correct?"
7    MR. KENNARD:  Objection.  Asked and
8    answered.
9    Q.  (BY MS. O'DRISCOLL)  Is that statement correct,
15:52  10    that you never contacted Sharon Trowell for FMLA
11    paperwork?
12    MR. KENNARD:  Same objection.
13    Q.  (BY MS. O'DRISCOLL)  Is that correct?
14    A.  I never called Sharon while I was on
15:52  15    administrative leave to ask for additional FMLA
16    paperwork.
17    Q.  And you never contacted any of your doctors for
18    a doctor's note to go back out on FMLA leave, did you?
19    A.  I was not physically at work.  I was on paid
15:52  20    administrative leave, so I was at home.  I wasn't
21    physically in the office.
22    Q.  So the answer to that question is no, you never
23    contacted doctor -- doctors for a doctor's note to go
24    back out on leave; correct?
15:53  25    MR. KENNARD:  Objection.  Confusing.

52 (Pages 202 to 205)

Artis Ellis

206

1  Misleading as worded.  And to the extent that it calls
2  for a legal conclusion.
3      Q.  (BY MS. O'DRISCOLL)  October 22nd, 2012, or any
4  day thereafter prior to your termination, did you ever
5  call one of your physicians and ask for a doctor's note
6  to approve FMLA leave?
7      A.  No, because I was out on administrative leave.
8      Q.  Okay.  And during that time after October 22nd,
9  2012, and thereafter, you were able and willing to work;
10  correct?  You were in a physical condition such that you
11  could work; correct?
12      A.  Repeat the question one more time.
13      Q.  October 22nd, 2012, when you returned to work
14  on full release, you, from that point forward, were able
15  to work; correct?
16      MR. KENNARD:  Hold on.  Objection.  Assumes
17  facts.  Misstates -- and to the extent it misstates
18  previous testimony.  And misleading as worded.
19      MS. O'DRISCOLL:  How does that misstate
20  previous testimony?
21      MR. KENNARD:  Can you repeat back the
22  question, please?  And to the extent that it does, but
23  go ahead and read back the question.
24      THE REPORTER:  QUESTION:  "October 22nd,
25  2012, when you returned to work on full release, you,

207

1  from that point forward, were able to work; correct?"
2      MR. KENNARD:  So you -- by stating that she
3  was on full release, she testified earlier that one
4  doctor had given her a note, but that others had not
5  released her, one; two, and when you talk about leave
6  return, and as I've objected in other questions, you're
7  inferring that -- and trying to get her to reach some
8  legal conclusion that FMLA is the only vehicle by which
9  to get additional leave.  As you know, the Americans
10  with Disabilities Act provides for additional leave or
11  additional time off as an accommodation in the
12  workplace.  So whether it was -- she asked for FMLA or
13  not does not necessarily mean that she couldn't have
14  asked for a reasonable accommodation under the Americans
15  with Disabilities Act.  So to that extent, it
16  potentially calls for a legal conclusion and misstates
17  previous testimony.
18      Q.  (BY MS. O'DRISCOLL)  I'm simply asking if you
19  were physically able to work October 22nd and forward?
20      A.  With accommodation.
21      Q.  And you never asked your -- your physician to
22  sign a document saying that you needed an accommodation;
23  correct?
24      A.  I didn't -- what -- what document?  The -- what
25  document are we talking --

208

1      Q.  Any type of a doctor -- doctor's note, anything
2  of any sort that would say I can come back to work but I
3  need X, Y and Z, you never had a physician do that, did
4  you?
5      A.  The physicians knew that I had a -- a patch.
6  My eyes were -- were crossed.  Betty knew.  Sharon knew.
7  I mean, Nancy and Chris were there.  They saw it.  They
8  knew.
9      Q.  But did you ever have a doctor's note saying
10  anything to that effect?
11      MR. KENNARD:  Objection.  Asked and
12  answered.
13      MS. O'DRISCOLL:  Well, she actually hasn't
14  answered it.
15      MR. KENNARD:  You asked -- she's answered
16  it.  You don't like the way that she's answered it.  I
17  trust that she's answering it to the best of her
18  ability.  But asking the same question over and over
19  again doesn't necessarily mean that she's going to give
20  you some response.
21      MS. O'DRISCOLL:  No.  Asking a question to
22  get an answer to the question I'm asking, not the
23  question that she wants it to be, but an answer to the
24  question I am asking.
25      MR. KENNARD:  If she --

209

1      MS. O'DRISCOLL:  That's all I'm asking for.
2      MR. KENNARD:  Well, the problem is --
3      MS. O'DRISCOLL:  There's two different --
4      MR. KENNARD:  -- I'm hearing the same
5  question over and over again.
6      MS. O'DRISCOLL:  That's because she's not
7  answering the questions.
8      MR. KENNARD:  Okay.  I don't know what to
9  tell you, but you can't keep asking the same question
10  over and over again.  If you want to phrase it in a way
11  that she might understand it better or ask it in a
12  different way, I mean, that's fine.  But the same
13  question over and over again until you get the answer
14  that you think she should be giving, well, that's not
15  allowed for by the rules.
16      MS. O'DRISCOLL:  Well, that's two different
17  things, Alfonso, and you know that.  That's why this is
18  taking so long, because I ask a question and I'm not
19  getting an answer to my question.  She can give whatever
20  is a truthful honest answer --
21      MR. KENNARD:  Sure.
22      MS. O'DRISCOLL:  In front of a judge and a
23  jury, and that's all I want.
24      MR. KENNARD:  Sure.
25      MS. O'DRISCOLL:  I just want a truthful

53  (Pages 206 to 209)

Artis Ellis

### 210

1  answer.

2  MR. KENNARD: And she's been -- she's under

3  oath. And if you have any reason to believe that she's

4  being untruthful, that's certainly something that can be

15:57 5  addressed at some later date. But for my purposes and

6  for the purpose of my objection, which is strictly that

7  it's been asked and answered, that's all my objection

8  is.

9  MS. O'DRISCOLL: Okay. Okay.

15:58 10  MR. KENNARD: I'm hearing the same question

11  over and over again. I'd be remiss not to object. 1

12  would probably --

13  MS. O'DRISCOLL: I understand. I don't

14  want to use any more of my time on this.

15:58 15  MR. KENNARD: Or can ask it a different

16  way.

17  MS. O'DRISCOLL: I've asked it 800

18  different ways.

19  Q. (BY MS. O'DRISCOLL) Ms. Ellis, did you wear a

15:58 20  patch to work on October 22nd, 2012?

21  A. Yes, I did.

22  Q. And did you have it on during these meetings

23  that you had with Ms. Ambrose, Mr. Paul, and Mr. LeHew?

24  A. Yes, I did.

15:58 25  Q. How long after that day on October 22nd did you

### 211

1  continue to wear an eye patch?

2  A. To the best of my knowledge, probably about six

3  months.

4  Q. And did you wear an eye patch every day?

15:58 5  A. Yes.

6  Q. And if it varied, you can say, but would it --

7  is this something that you wear all day long or only

8  when you do certain activities? Can you give us a sense

9  as to how long you would wear it?

15:58 10  A. For the most part, all day.

11  Q. All day every day.

12  A. Yes.

13  Q. For six months.

14  A. Yes.

15:59 15  Q. And this was a result of -- of the surgery that

16  you had had.

17  A. Yes.

18  Q. And did you in any way see that wearing an eye

19  patch was going to impact your job duties at all as

15:59 20  center manager?

21  A. Maybe using a computer or the lighting.

22  Q. Anything else?

23  A. Not that I can think of.

24  Q. Aside from the eye patch, did you feel

15:59 25  physically able to work October 22nd and after?

### 212

1  A. I did.

2  Q. And, in fact, did you tell the Texas Workforce

3  Commission on your online entries that you were ready

4  and able to work?

15:59 5  A. I did.

6  Q. If we go back to that big packet that we had,

7  if you could look at ECFMG/Ellis 542, and that is

8  Exhibit 25.

9  And if you look at the top, it says, "Texas

16:00 10  Workforce Commission Internet Claim Certification," and

11  it has your name, Artis Ellis --

12  A. On 542?

13  Q. Yes.

14  A. I'm looking at 4.

16:00 15  Q. Yes, 542.

16  Is this a document that -- that you filled

17  out on -- at multiple -- for different time periods for

18  the -- online with the TWC?

19  A. Yes.

16:01 20  Q. And at the top it says, "Texas Workforce

21  Commission Internet Claim Certification," and it has

22  your name, "Artis Ellis," and then "Claim Week Dated:

23  11-10-12, 11-17-12, Claim Period Covers 11-4-12 through

24  11-17-12."

16:02 25  So this is -- this is for the period of

### 213

1  time shortly -- just right after you were terminated

2  on -- on November 1st; correct?

3  A. That is correct.

4  Q. It says, "Initial Claim... 11-4-12.

16:02 5  "Filing date, 11-18," and then there's a

6  series of questions. And if you look at question number

7  5, "Were you physically able to work each day?" And you

8  checked, "Yes"; is that correct?

9  A. Yes.

16:02 10  Q. And number 6, "Were you available to accept

11  full-time work for all of the days and hours required

12  for the type of work that you are seeking, if it had

13  been offered?" And you checked, "Yes"; is that correct?

14  A. Yes.

16:02 15  Q. And you had to fill this out for -- for a

16  period of time while you were seeking unemployment.

17  Do you ever remember checking the box

18  saying, no, that you weren't able to work?

19  A. No.

16:03 20  Q. Okay. Do you recall what day you stopped

21  receiving short-term disability from Sun?

22  A. I do not.

23  Q. Do you recall if you received it right up until

24  the time you went back to work on -- on October 22nd,

16:04 25  2012?

**54 (Pages 210 to 213)**

Artis Ellis

**214**

1    A. I recall receiving it the length of time I was
2    supposed to get it.
3    Q. Do you ever recall receiving phone calls from
4    Sun to -- to check in on the status of your short-term
16:04 5    disability?
6    A. No.
7    Q. You mentioned briefly that certifying the --
8    certifying an exam at the center was just the click of a
9    button; correct?
16:05 10    A. Yes.
11    Q. There was also a -- a checklist that -- that
12    you needed to go through to certify an exam; correct?
13    A. I don't recall that.
14    Q. If we look over at -- I'll mark as Exhibit 26
16:05 15    the "Incident Reporting Manual." This is ECFMG
16    238 through--
17    A. So are we finished with this?
18    Q. You can set that aside, yes, ma'am. Thank you.
19    238 through 240.
16:05 20    (Exb. No. 26 was marked.)
21    Q. (BY MS. O'DRISCOLL) And are you familiar with
22    this -- the "Incident Reporting Manual"?
23    A. Somewhat.
24    Q. Okay. You recall -- if you turn to page 2,
16:06 25    it's ECFMG 239 towards the bottom. That last paragraph

**215**

1    says, "Certification criteria."
2    Do you see that?
3    A. Yes.
4    Q. "Below is the list of the session data
16:06 5    certification criteria. The assumption is that the data
6    for the session being certified is," quote, "'as good as
7    it gets.'"
8    And then if you turn to the next page, it
9    lists four items that need to be done to certify an
16:06 10    exam.
11    Can you just briefly read those?
12    A. Sure. "Incident reports entered, or scanned
13    where appropriate, reviewed, and grouped."
14    Number 2, "SP checklists entered or scanned
16:06 15    where appropriate. The system will" not "verify that
16    all individual SP checklist items are completed for each
17    encounter."
18    Number 3, "Data Corrections are completed."
19    Example, "(When... problems) require -- 'requires'" that
16:07 20    "the database administrator's intervention also known
21    as" the "'back door' fix)."
22    And number 4, "Effective 6-3-2005, patient
23    notes must be scanned into the CIA application before
24    session certification is allowed. CIA has a column
16:07 25    which displays a count of all missing Patient Notes for

**216**

1    each session. The session cannot be certified as long
2    as" patient notes "are missing. If a" patient note "is
3    permanently missing, it must be marked as such in IRS to
4    allow certification to proceed.
16:07 5    "Patient note images will be available for
6    review (through the CIA Review Notes function) up until
7    the point that the session is certified."
8    Q. And then it says, "To certify, The site manager
9    or assistant manager should review all the incident
16:07 10    reports and make sure any missing checklists are entered
11    into the system. Go to the website... and click on the
12    'Certify' button, next to the session date and time you
13    wish to certify."
14    Who made sure all of these items were done
16:08 15    on the -- the two exams that were certified with your
16    password?
17    A. So the AOD. So this process is old, this
18    policy. I mean, it's -- it's not --
19    Q. Did you say it's old?
16:08 20    A. Yes. So the AOD is the one that does the
21    patient notes and scan them through the system so the
22    patient notes cannot -- I mean, it's automatic now. So
23    it goes directly into the system, and the SPs go
24    directly into the system, and so you cannot certify an
16:08 25    exam because it would flag it. And you just go in, and

**217**

1    the incident reports are already done. They are done by
2    the AOD. And so the center manager or the assistant
3    manager would just go in and just certify the exam,
4    because they're already reviewed. And it's the AOD
16:09 5    review, the administrator on duty.
6    Q. Okay. And so -- so you're saying that all --
7    all of -- even though someone -- even though Sharon used
8    your password to certify the exam incorrectly that all
9    of these items were done, were taken care of?
16:09 10    A. Absolutely. You cannot certify the exam unless
11    all those items were done. And Sharon was an
12    administrative on duty, so she knows that process, how
13    that goes, as well. So she could not certify an exam
14    unless every one of those things had been done.
16:09 15    Q. And did you discuss any of those items with
16    her?
17    A. No. That's the process. All the AODs know how
18    to do that.
19    Q. And what -- what do you believe -- you're
16:10 20    making a claim in this case under the -- the ADA, the
21    Americans with Disabilities Act; correct?
22    A. Yes.
23    Q. And what do you believe your disability is or
24    was at -- at the time that you worked for ECFMG?
16:10 25    MR. KENNARD: Objection to the extent that

**55 (Pages 214 to 217)**

Artis Ellis

**218**

1  it would call for a legal conclusion.
2      Q.  (BY MS. O'DRISCOLL)  Do you know what you
3  believe was your disability?
4      A.  I sought out counsel to help me along with this
5  case, so they guided me down which path I should go.
6      Q.  And is there anything that you can tell me that
7  you believe -- that you suffered from a disability as of
8  October 22nd, 2012?
9      A.  Is there anything I believe that I suffered?
10      Q.  That you -- that you had -- had a disability on
11  October 22nd, 2012?
12          MR. KENNARD:  Objection to the extent that
13  it calls for a legal conclusion.
14      Q.  (BY MS. O'DRISCOLL)  Do you know if you had a
15  disability?
16          MR. KENNARD:  Same objection.
17          You can answer the question if you
18  understand it.
19      Q.  (BY MS. O'DRISCOLL)  I mean, I understand
20  you're not a lawyer.  But as a person sitting here
21  that's suing your former employer and you're bringing a
22  discrimination claim on the basis of disability, are you
23  aware of any disability that you had as of October 22nd,
24  2012?
25      A.  I -- I believe that my disability would be

**219**

1  having a brain surgery and -- a brain tumor and --
2  removed and, also, having eye issues.
3      Q.  Anything else?
4      A.  Just array of medical -- medical issues.
5      Q.  Any other medical issues that you can think of
6  at -- at that time period, as of October 22nd, 2012?
7      A.  From the brain tumor, I've had major --
8  strokes.
9      Q.  Since -- since -- since you've left ECFMG,
10  after leaving ECFMG; correct?
11      A.  I left ECFMG October the 22nd.
12      Q.  Well, you were terminated on November 1st;
13  correct?
14      A.  I -- my last day at the office was October the
15  22nd.  Then I went on personal -- administrative leave
16  and was given November the 1st as my termination date.
17  And from November the 1st, yes, I've had some medical
18  issues.
19      Q.  But -- but prior -- prior to the time that you
20  were terminated from ECFMG, are there any other medical
21  issues that you believe you suffered from?
22      A.  From the surgery?
23      Q.  From -- from -- not just the surgery, but -- I
24  just -- I'm trying to get a sense of what you believe is
25  the basis of your disability claim.

**220**

1  Why do you believe you were discriminated
2  against?
3      A.  Because when I asked for accommodation, I was
4  not given those accommodations, or when I even -- I
5  wasn't even given the opportunity to come back to work
6  and see how I could work or if I could work.
7      Q.  Anything else?
8      A.  No.
9      Q.  If we look at your complaint -- I know I have
10  three copies of it.  Let me just find -- here we go.
11  Mark as Exhibit 27 your complaint.
12          (Exb. No. 27 was marked.)
13      Q.  (BY MS. O'DRISCOLL)  Have you ever reviewed the
14  complaint that your lawyers filed on your behalf in this
15  lawsuit?
16      A.  I reviewed some documents that my lawyer had
17  given me.
18      Q.  But did you ever reviewed this document,
19  plaintiff's original complaint?
20      A.  Yes.
21      Q.  And if you look -- if you look at paragraph 18
22  under "Disability discrimination," "Defendant, by and
23  through Defendant's agents, intentionally engaged in
24  unlawful employment practices involving Plaintiff
25  because of her disability."

**221**

1  Other than -- well, you've already told me
2  that you believe your disability was your brain surgery,
3  your brain tumor, your eye issues, and you said medical
4  issues generally.
5          Is there any -- any other basis that you
6  believe you're bringing a claim for today, your
7  disability claim?
8      A.  Not that I'm aware of.
9      Q.  Did you ever hear any comments from Ms. Ambrose
10  or Mr. Paul or Betty LeHew or anyone else at ECFMG
11  management saying that they believed you were disabled?
12      A.  That they told me that I was disabled?
13      Q.  That they believed -- did they ever tell you
14  that they believed you were disabled?
15      A.  No.  I never heard them tell me that.
16      Q.  Did you ever hear any -- any negative comments
17  about any of these conditions that you -- that you
18  mentioned:  Brain surgery, brain tumor, eye issues,
19  medical issues?  Did you ever hear any negative comments
20  from Ms. LeHew, Ms. Ambrose, Mr. Paul, or any other
21  EC -- ECFMG management?
22      A.  Did I hear any negative comments?
23      Q.  Yes.
24      A.  No.
25      Q.  On number 19, you say, "At all times material

Artis Ellis

222

1  hereto, Plaintiff was able to perform the essential
2  functions of her position with accommodations.
3  Plaintiff's disability substantially limited at least
4  one major life activity."
16:19  5        Do you know what major life activity was
6  limited?
7        A.  I -- I don't -- I mean, driving,
8        Q.  Anything else?
9        A.  Not at this time.
16:19  10        Q.  And how long were you unable to drive?
11        A.  Over -- way over six months.
12        Q.  And did that begin just before you had your
13  surgery?
14        A.  Before I had surgery?
16:19  15        Q.  Well, not being able to drive, did that -- did
16  that happen after your surgery or just before your
17  surgery, going out six months?  I was trying to get a
18  time frame.
19        A.  It was after surgery.
16:19  20        Q.  Okay.  After surgery and then going out six
21  months.
22        A.  Yes.
23        Q.  Okay.  You also say that you believe that you
24  were retaliated against by opposing acts unlawful under
16:20  25  the ADA.

223

1        And I understand you're not a lawyer,
2  but -- but what do you believe that you -- why do you
3  believe you were retaliated against?
4        MR. KENNARD:  Objection to the extent that
16:20  5  it calls for a legal conclusion.
6        Q.  (BY MS. O'DRISCOLL)  You can answer.
7        MR. KENNARD:  If you're able to.
8        A.  What number are we on?
9        Q.  (BY MS. O'DRISCOLL)  Number 19, that last
16:20  10  sentence that refers to retaliation.
11        A.  I believe because I had a disability and I had
12  been out on FMLA a couple of times that they were at the
13  point of just -- they didn't believe that I can come in
14  and fully do my job.
16:21  15        Q.  And -- and why do you believe that?
16        A.  I -- I just -- that's my belief.  I just
17  believe that --
18        Q.  Did anyone say anything to make you believe
19  that, anyone at AC -- ECFMG management?
16:21  20        A.  I mean, based on these concerns that they had
21  brought to me on that day.
22        Q.  The concerns that were brought to you on
23  October 22nd?
24        A.  Yes.
16:21  25        Q.  In any of those concerns or in any of the

224

1  meetings that you had between October 22nd up until
2  the -- the day of your termination on November 1st, did
3  anyone in ECFMG management ever say, "I don't believe
4  you're going to be able to come back and do the job"?
16:21  5        Did anyone ever say that or anything of
6  that nature, not those specific words, but anything to
7  that effect?
8        MR. KENNARD:  Objection.  Confusing.
9  Misleading.  And compound.
16:21  10        You can answer the question if you're able
11  to.
12        Q.  (BY MS. O'DRISCOLL)  You just -- you just said
13  I believe that I was retaliated against because I had a
14  disability and I took familiar leave.
16:21  15        All I want to know is why -- what is the
16  basis for that belief?  Why do you believe that?
17        A.  That's just my belief, that based on me taking
18  a leave, or going out on leave, because I had had a
19  brain surgery or a brain tumor, I don't think that they
16:22  20  thought that I was going to be the same.
21        Q.  Did anyone ever tell you that?
22        A.  It's just my belief.
23        Q.  Okay.  Fair enough.
24        Did you -- and the date of your
16:22  25  termination, did -- did you meet off campus with

225

1  Ms. LeHew and Ms. Ambrose?
2        A.  I did.
3        Q.  And where did y'all meet?
4        A.  At a hotel.
16:22  5        Q.  And what took place during that discussion?
6        A.  I was just told that I was terminated, and I
7  gave my badge and I believe a Sam's card, and they told
8  me they were going to pack up my office, and that was
9  it.  Oh, they gave me a -- a letter that -- and -- that
16:23  10  stated that if I didn't file a lawsuit and I can look
11  at -- they were going to give me a severance package to
12  have my -- you know, have it signed by an attorney, and
13  if -- they would not fight my unemployment.
14        Q.  Did they -- did they tell you the reason for
16:23  15  your termination?
16        A.  They -- they -- I think they told me.  I -- I
17  don't -- I think they told me.  I can't recall.
18        Q.  Did they -- did they tell you that -- that --
19  did they reference any of the bullet points that had
16:23  20  been previously discussed?
21        A.  That was 2012, this is 2016.  I'm sure they
22  did.  I mean, I would not think Betty LeHew or Nancy
23  would not have told me that, but I cannot answer that to
24  be truthful yes or no.
16:24  25        Q.  And after taking FMLA leave in -- let me back

57  (Pages 222 to 225)

Artis Ellis

226

1    up.
2         You took FMLA leave in 2006; correct?
3    A.  I did.
4    Q.  And then multiple times in 2008; correct?
16:24 5    A.  I -- I remember taking it one time in 2008.  I
6    requested it twice in 2008, but I came back to work
7    because one -- my husband's -- our transplant was
8    rescheduled.
9    Q.  Okay.  But you -- you had requested it, and it
16:24 10   was approved for you to take it multiple times in 2008,
11   but you think you only took it once.
12   A.  I -- it was -- not multiple times, twice.
13   Q.  Well, more than once.
14   A.  Yes.
16:24 15   Q.  And -- and then you took leave again in January
16   of 2012 for -- for your husband's transplant -- to redo
17   the transplant; correct.
18   A.  That is correct.
19   Q.  And then you took leave again in the fall of
16:25 20   2012 for your brain surgery.
21   A.  That is correct.
22   Q.  And -- and you never heard a negative comment
23   related to any of those FMLA leaves from management?
24   A.  Because -- because I was approved.  I was -- I
16:25 25   qualified each time.

227

1    Q.  And -- and no one ever tried to prevent you
2    from taking FMLA leave; correct?
3    A.  Legally, I don't think they could.  And --
4    Q.  But did anyone try to prevent you from taking
16:25 5    your FMLA leave?
6         MR. KENNARD:  Were you done answering your
7    previous -- were you done with your answer to the
8    previous question?
9         THE WITNESS:  Yes.
16:25 10        MR. KENNARD:  Okay.
11   Q.  (BY MS. O'DRISCOLL)  And -- and do you --
12   you feel like anyone tried to dissuade you from taking
13   leave, in ECFMG management, or tried to prevent you from
14   taking leave?
16:25 15   A.  No.  I worked there over seven years.  So if I
16   was there over seven years and these life-changing
17   events happened, I qualified each time to take it.
18        So no one said, "No, you cannot take it,"
19   because I qualified.
16:26 20   Q.  Okay.  Understood.
21        And in your complaint, you also allege FMLA
22   interference.
23        What -- what leave were you prevented from
24   taking?
16:26 25   A.  No.  That interference that I received

228

1    calls every day from staff, multiple times during the
2    day -- during the day.
3    Q.  Well, if -- if staff called -- did you tell the
4    staff not to call you?
16:26 5    A.  You -- absolutely.  They knew not to call me.
6    Chris, I think, made mention to them about calling me,
7    and they continued to call me.
8    Q.  And -- and Chris told them not to call you.
9    A.  Correct.
16:26 10   Q.  And --
11   A.  And even my husband told them not to call me.
12   Q.  And did you tell anybody in human resources
13   that you were being contacted by staff?
14   A.  At that time, I didn't even think to call human
16:27 15   resource to say the staff is contacting me.  They
16   were -- they were disturbed, the center was in a rut,
17   and it was just a lot of things going on.  They were
18   unhappy, and they were venting.  And -- they were
19   calling to check on me, to see how things were going,
16:27 20   and then they were also just telling me, you know, when
21   are you coming back, we really need you to come back,
22   are you better, hurry up and get better so you can come
23   back and we can stop all this, because this -- the
24   center is just in an uproar.
16:27 25   Q.  Did anyone from ECFMG management ever call you

229

1    to perform work during that time?
2    A.  Chris called me to come in the office for
3    interview -- for --
4    Q.  To --
16:27 5    A.  -- to conduct interviews for the assistant
6    center manager.
7    Q.  To see if you wanted to participate in an
8    interview?
9    A.  To come in, to participate in a -- to -- for
16:28 10   interviews.
11   Q.  He didn't -- he didn't say, "I know you're on
12   leave, but I want you to know these interviews are going
13   on.  If you want to put -- give us input, great.  If
14   not, please stay on your leave"?  Did -- was there any
16:28 15   type of an explanation or anything that he said?
16   A.  No.  That was a -- a discussion that was going
17   on, or Robert Phelps and Billy Valerie had gotten into
18   it about the assistant manager.  And if Artis is going
19   to be back, then why can't Artis do the leaves.  And so
16:28 20   he felt that, okay, well, maybe she -- I don't know --
21   maybe she should come back and sit in on the interviews
22   or whatever.  But they made contact with me to come in,
23   and I -- at that time I think I started waking up.
24   Remember, I'd just had surgery and was still under a lot
16:28 25   of medication.  And to drive 45 minutes to an hour, I

58  (Pages 226 to 229)

Artis Ellis

230

1  didn't think that would probably be the most safest and
2  appropriate thing for me. So at that point, I think I
3  started waking up, saying, "No, this is work-related. I
4  should not be going to the center, nor should my
16:29  5  director be calling me to come in to be doing work.
6  That's work related, and I should not be there."
7  Q. And you said, "No, I'm not coming in"; correct?
8  A. No. I just did not show.
9  Q. Okay. And were you ever written up or
16:29  10  reprimanded or ever given a verbal reprimand for not
11  coming in for that interview?
12  A. I was never given a verbal reprimand or written
13  corrective action for anything during my duration at
14  ECFMG. I think one time, and I didn't even know it was
16:29  15  a corrective -- written -- a corrective action. I had
16  to call Betty and ask her about it. And I was making
17  several complaints to HR about my director at that
18  particular time.
19  Q. About Mr. Paul?
16:29  20  A. Yes.
21  Q. And when you say "at that time," is this -- is
22  this prior to the time that you went out on leave in the
23  fall?
24  A. This was prior -- this was prior to the time I
16:30  25  went out on leave.

231

1  Q. Okay. And what type of complaints did you make
2  about Mr. Paul?
3  A. I complained that he -- he was retaliating
4  against me, he was -- he called me names, or out of my
16:30  5  name. He -- he subjected me to a lot of things that
6  other managers did not have to talk about.
7  Q. Like what? Like what?
8  A. Oh, he used inappropriate language.
9  Q. Like what?
16:30  10  A. I choose not to repeat those things. I can't
11  even recall a lot of the stuff. I know he called me a
12  witch.
13  Q. Anything else?
14  A. I think it's in my -- he -- he was telling my
16:30  15  staff that I wasn't a good manager.
16  Q. Who -- who told you that Mr. Paul said you
17  weren't a good manager?
18  A. David Strom.
19  Q. How do you spell the last name?
16:31  20  A. S T R O M.
21  Q. M as in Mary?
22  A. Yes.
23  Q. And when did he tell you that Mr. Paul said
24  that you weren't a good manager?
16:31  25  A. I don't recall the -- the month and day.

232

1  Q. Was it before you went out on leave?
2  A. Yes.
3  Q. Okay. When you said that Mr. Paul was
4  retaliating against you, what does that mean to you?
16:31  5  A. That means that anytime I would bring something
6  to him, he then will just come full force and would say
7  things negative to my staff or to -- if I brought
8  anything to his attention, he would say negative things
9  to my staff or to other managers, to my assistant
16:32  10  manager.
11  Q. And what -- what was he saying to staff and
12  managers about you?
13  A. Some of the things I just mentioned to you.
14  Q. Well, I -- I was taking notes while you were
16:32  15  saying them, and you said called names and using
16  inappropriate language, but -- and specifically I have
17  that he called you a witch.
18  Is there anything else specific that you
19  can -- that you can recall that he --
16:32  20  A. I know he said that I wasn't a good manager,
21  because I remember I had called -- I had text him and
22  told him I -- and that's how we used to -- we could text
23  him and say that we weren't going to be in the office if
24  we needed to take a sick day. And I text him, and he
16:32  25  came into Houston, pulled in unexpectedly, and I texted

233

1  him and told him that I was going to be out. And he
2  said that I wasn't a good manager to David, and David
3  had e-mailed me.
4  He -- it was several things. He told Brent
16:33  5  a couple of things. It was inappropriate. And when I
6  would -- like, he would call Brent a baby, and he was
7  still on breast milk. And so when I would talk to him
8  side-bar or on the outside of the office, just he and I,
9  saying can you please not address staff inappropriately,
16:33  10  he then will retaliate and say things, you know,
11  publicly, or openly in a group setting about me or
12  something like that.
13  Q. So other than -- other than Mr. Paul saying
14  that you weren't a good manager, can you think of any
16:33  15  other specific comments that -- that you -- that you
16  heard, either from him or from staff telling you that he
17  said?
18  A. I report -- I -- I reported them to HR. I
19  reported them to Ann Jobe, his -- his manager. And
16:34  20  seeming that when I reported them to his manager, things
21  had gotten worse.
22  Q. And when you -- when you reported them to his
23  manager and to HR, do you feel like ECFMG listened
24  and -- and looked into what -- what you were saying?
16:34  25  A. At first, I thought they did. And then at a

59  (Pages 230 to 233)

Artis Ellis

234

1  period, it shifted and the complaints seemed to have
2  just stopped. I mean, it was -- Betty and I met, and
3  she had asked me if I was willing to step down to the
4  assistant manager position. And I told her, no, that I
5  wasn't willing to step down to the assistant manager
6  position, that I was okay with staying, that Chris and I
7  just had some difference -- philosophical differences,
8  some differences and that we just should learn -- we're
9  going to have to learn how to work together. Because
10  she --
11  Q. And was --
12  A. -- told me that --
13  Q. I'm sorry. I was going to ask for a time
14  frame. Is this -- is this in the -- when is this?
15  A. This is after May -- this is when we had dinner
16  at Del Frisco. So it was after May, probably around --
17  before I left in September, so somewhere July.
18  Q. Okay. After May, maybe around July. So around
19  July is when you said, Chris and I -- Chris and I have
20  differences, but we just need to find a way to work
21  together.
22  A. Because she told me Chris wasn't going
23  anywhere, and I realized that ECFMG was not going to --
24  I mean, they were probably tired of me making complaints
25  about Chris, because she made it clear, Chris wasn't

235

1  going anywhere. So -- and I wasn't stepping down to go
2  to the ACM position, so we just had to learn how to work
3  together.
4  Q. And did you -- did you feel like your main
5  complaint about Chris was his management style?
6  A. It was beyond his management style. It was --
7  I never complained about Chris' management style. It
8  was Chris, the way he -- he addressed me. He was very
9  inappropriate.
10  Q. What's an example of being inappropriate?
11  A. I'm -- I was the only African-American manager,
12  and I really believe that Chris had some racial issues.
13  And he just came across very, very aggressive, and like
14  I'm going to keep you in your place.
15  And when I wasn't accepting about being in
16  my place, he was let -- he let me know clearly that he
17  was the director.
18  Q. Let's look at this set of e-mails I'm going to
19  mark as Exhibit 28, ECFMG/Ellis 220 through 223.
20  (Exb. No. 28 was marked.)
21  Q. (BY MS. O'DRISCOLL) If you could just take a
22  minute to glance at these, and we can walk through them,
23  see if they're in chronological order.
24  You recall these e-mails?
25  A. I do.

236

1  Q. Okay. And is this during the time -- spring
2  and summer of 2012 when you were talking with Betty and
3  ECFMG management about Chris?
4  A. Yes.
5  Q. If you look at the -- the third page, ECFMG
6  222, this appears to be an e-mail from you to Betty
7  thanking her for lunch and the opportunity to be heard;
8  is that right?
9  A. Uh-huh.
10  Q. And did you -- based on this e-mail, it appears
11  you felt good that you could get everything off your
12  chest.
13  A. Yes.
14  Q. And -- and that you valued Betty, her
15  friendship and her mentoring you; is that right?
16  A. Yes.
17  Q. Did you later -- that was dated May 1st, 2012.
18  There's another e-mail from you to Ann Jobe and also to
19  Chris Paul copied -- I'm sorry, to Ann Jobe and Chris
20  Paul, "Hi Ann, I hope this e-mail finds you well. I
21  just had a meeting with Chris and we have come to an
22  impasse. I'm requesting your" -- you "assisting so
23  Chris and I... have a professional working relationship.
24  I like to share some concerns I have with you that I
25  have shared with Chris. Please let me know a good time

237

1  we can meet. My son is graduating... therefore I'm
2  traveling on Friday. This is not an urgent request,
3  but" -- "but a well needed one."
4  Did I read that correctly?
5  A. You did.
6  Q. And if you look at the first page, so the ECFMG
7  220, at the very bottom, you send it to Betty and say,
8  "Betty, please call me to discuss. I will be in the
9  office.... Sorry I forgot to CC you on the e-mail."
10  It appears you meant to copy her on that --
11  on that e-mail I read a moment ago?
12  A. I did.
13  Q. And did Betty get back with you quickly so that
14  you-all could address your concerns about Chris?
15  A. Betty LeHew?
16  Q. Yes.
17  A. Based on the e-mail?
18  Q. Well, I mean, do you recall after these e-mails
19  you reaching out again? It sounded like you guys had
20  lunch and then --
21  A. No. These are separate -- yes, Betty got back
22  with me. She was -- Betty was part of it. She knew --
23  she heard my complaints. That was a period -- yes,
24  Betty was fully aware that was going on during that time
25  period. This was in May. This was when I made the

60  (Pages 234 to 237)

Artis Ellis

238

1    complaint. Ann Jobe did not get right back with me.
2        Q. But Betty LeHew was getting back with you?
3        A. Betty LeHew did get back with me.
4        Q. Okay. And did you -- did you feel like, in
16:40 5   these discussions, that -- that they were trying to help
6    you move forward and -- and find a -- a middle ground
7    for you and Chris to work together better?
8        A. I was told that they had spoke with Chris and
9    that some things were going to change, and it did not.
16:41 10      Q. And when you say "it did not," what --
11       A. When Chris would come to Houston, he would
12   still be him -- himself. I think he was trying to work
13   on it, but he -- he could not find that ground to move
14   forward. So we were still coming that -- that impasse,
16:41 15  and I would still call Betty and tell her and complain
16   that these are still some issues that are going on.
17       Q. Did -- I know you said that you wouldn't
18   characterize it as a -- as a difference in -- in
19   management style.
16:41 20           Would you characterize it as a personality
21   conflict?
22       A. I would -- I would characterize it as a
23   personality conflict. And I would see him more as a
24   bully.
16:41 25      Q. In -- in what sense?

239

1        A. He was -- he's real tall, he's real big, he
2    just came across as you do what I say or you have to go.
3    He said that, "I'll wait till you get down. And when
4    you get down, then I stomp on you when you're down."
16:42 5   And I really believe that when I had my surgery, I was
6    down, I could not -- I wasn't up. I was still, you
7    know, kind of recovering. And so he -- that's -- that
8    was his opportunity, when he was in the center, even
9    when I was in the hospital when I called him and said,
16:42 10  "Chris, I'm going to have surgery."
11           He said, "Why are you calling me?"
12       Q. Well, did he say, "Why are you calling me?" You
13   should be focusing on yourself, your husband already
14   called"?
16:42 15      A. No, he didn't say all of that. He said, "Why
16   are you calling me?"
17           And from that point on, when I called
18   Sharon Trowell, she said, "Don't call Chris anymore,
19   just, you know, call me if you need anything."
16:42 20      Q. Did -- and I know we talked about earlier that
21   there was the -- the refit that -- in the -- and the
22   test changed significantly in that -- in earlier in
23   2012; correct?
24       A. The retrofit?
16:42 25      Q. Yes, the retrofit. Yes. We talked about that

240

1    earlier?
2        A. Uh-huh. Yes.
3        Q. Leading up to that time, did you receive a memo
16:43 4   from Chris that talked about a number of performance
5    issues in -- in August of 2012?
6        A. Which he was incorrect on a lot of those
7    things, too, that I made some corrections, and he had to
8    take some things out.
16:43 9       Q. So if we can look at ECFMG/Ellis 225 through
10   230, I'm marking as Exhibit 29. And I printed color
11   copies, so I'm hoping that it'll be easier to walk
12   through this.
13           (Exh. No. 29 was marked.)
16:43 14      A. And once again, I want to say that this was one
15   that came late in -- this was supposed to have been
16   my first corrective action, my entire time at ECFMG. I
17   called Betty LeHew when I received this through an
18   e-mail, and she told me that this was -- "Yes, consider
19   it a corrective action."
16:44 20           I have to question it, why was my
21   corrective action different than anyone else? It was
22   not on the right -- the same form that I had to do
23   corrective actions on, so that's why I'm saying I -- I
24   felt like I was treated different than any other
16:44 25  employees.

241

1        Q. (BY MS. O'DRISCOLL) Have you ever seen a
2    corrective action that Chris has done for another center
3    manager?
4        A. No.
16:44 5       Q. So you don't know, he could have very well done
6    it the same way.
7        A. I'm saying, so then that goes against ECFMG
8    policies, that if the policies are to do corrective
9    actions and all employees are to be treated the same and
16:44 10  fairly, then why are -- why am I treated differently? I
11   don't know about anyone else. I'm saying how I had to
12   do corrective actions, and I --
13       Q. You're a center manager; correct?
14       A. I am a center manager, and that should be done
16:44 15  the same corrective action, I believe, on the same forms
16   that any other -- I'm still an employee.
17       Q. But you don't know if other center managers
18   received corrective actions in this format is what I'm
19   asking.
16:44 20           You don't know that?
21       A. No --
22       Q. Okay.
23       A. This doesn't even say corrective action. It
24   says, "Concerns," so I'm thinking this is just a memo.
16:45 25      Q. Well, and this is a memo detailing concerns and

61  (Pages 238 to 241)

Artis Ellis

242

1    expectations going forward that -- that you received,
2    even prior to going out on leave; correct?
3        A.   That is correct.  And the -- and then you will
4    see my -- my responses are in the different colors.
16:45  5        Q.   And so it appears -- and tell me if I'm
6    right -- the black font is Chris' font; correct?
7        A.   Yes.
8        Q.   And then your response is in red.
9        A.   Yes.
16:45 10        Q.   And then he responded to your red in blue.
11        A.   Yes.
12        Q.   And then it looks like you responded back in
13    between there in red, as well.
14            So this -- this memorandum, which is dated
16:45 15    August 23rd, 2012; correct?
16        A.   Yes.
17        Q.   This is the result of an e-mail exchange back
18    and forth between you and Mr. Paul and a number of
19    issues that were going on with staffing and -- and the
16:46 20    retrofit -- fit leading up to August 23rd; correct?
21        A.   I guess we need to go through it, because, no.
22        Q.   Sure.  I mean, if you -- if you look at -- in
23    the bottom where it talks about examples of ineffective
24    performance management and staff leadership, number 1 is
16:46 25    "Substantial turnover in the last ten months, including

243

1    six full time employees and 29 PTAN employees, many of
2    which were due to factors such as... lack of... coaching
3    and supervision... reported... negative atmosphere in
4    the center. ... included complaints of intimidation and
16:46  5    overall unconstructive feedback."
6            And that's his -- that is definitely something
7    that I -- I would think Chris would say, just being a
8    bully and what his -- how his management style would be,
9    being an intimidator.  That's not something that I said,
16:46 10    and that's not correct.  That's why I responded back in
11    red.
12        Q.   So you're not aware of any employees
13    complaining about you intimidating them or -- or them
14    resigning because they just weren't happy with your
16:47 15    management style?
16        A.   Not at all.  This is the first time I ever
17    heard that from you, Erin.
18        Q.   Okay.
19            What about "The following behaviors are
16:47 20    examples of a combination of what has been reported by
21    both current and past employees... observed by corporate
22    management and is what is meant by ineffective and staff
23    leadership"?  And I'm on number 2, and this is ECFMG
24    226.
16:47 25            "That at the beginning of... ACS process,

244

1    you held several meetings in the commons where you
2    repeatedly told SP's to look around as half... the room
3    will not make it through ACS since it has been so hard."
16:47  4            You don't recall saying anything like that?
5        A.   No, because I wouldn't know, because I had not
6    done ACS.  So I would not know that it would be hard
7    or -- or easy.
8        Q.   And it's true that during the retrofit, the
9    center was not performing well; correct?
16:48 10        A.   The center performed well.  It was not --
11        Q.   During the retrofit?
12        A.   During the retrofit.  I have not heard the
13    center did not perform well.  And I think I even made
14    mention of that here.
16:48 15        Q.   Well, b -- 2b., it says, "When the center
16    opened from the retro-fit and was not performing well,
17    instead of taking... responsibility for the center, you
18    went into the commons and gave a '15-minute tongue
19    lashing' to... SP's stating it was all their fault."
16:48 20            And then you responded saying, "As...
21    Manager of the... Center, I accept... responsibility of
22    any lack of effort to perform center goals daily.  I am
23    not in a position to place blame or fault on any staff
24    member.  I do express to staff that there is
16:48 25    accountability on all levels as a team, including

245

1    management."
2            I -- I don't see any disagreement there
3    where you -- where you said, "Oh, the Houston center
4    performed exceptionally, and we -- we did great through
16:49  5    the retrofit."
6        A.   We hadn't even gotten through retrofit.
7        Q.   Through -- as of October 23rd, 2012.
8        A.   This is, remember, August 23rd.
9        Q.   I'm sorry.  Yeah, August 23rd, 2012?
16:49 10        A.   Yeah.  We had --
11        Q.   This is just prior to going out on leave?
12        A.   Right.  We hadn't --
13        Q.   Y'all weren't -- y'all weren't performing under
14    the new retrofit yet?
16:49 15        A.   I don't believe so.  I think we were going
16    through the process.
17        Q.   Okay.  You don't think you had done even new
18    tests yet?
19        A.   I don't believe so.  And it does not -- I'm not
16:49 20    agreeing with him that we were performing poorly,
21    because I don't believe that we -- I don't ever believe
22    that Houston performed poorly.
23        Q.   On the third page, ECFMG 227, letter f., "It
24    has been reported that you have been disrespectful and
16:50 25    verbally abusive to some of your staff to the point

62  (Pages 242 to 245)

Artis Ellis

**246**

1 they... are afraid to say or do anything for fear of
2 retaliation from you."
3     A. I believe this is retaliation.  No one -- Betty
4 sat in with me during a -- when I had to address some --
16:50 5 some staff members' behavior.  And as soon as I found
6 out any type of behaviors that was not conducive to a
7 safe work environment, as soon as I found out, I
8 addressed those issues.
9         And it is in no way that I would let staff or
16:59 10 myself be unprofessional and address issues and let them
11 go on a long time and not address those issues.
12     Q. Are you -- did you ever read Brent Biggs' exit
13 interview?
14     A. I read portions of his exit interview.
16:51 15     Q. And when you say "portions," do you remember
16 him complaining about your management style and being
17 the reason why he was leaving?
18     A. I -- no.  Brent Biggs informed me he was
19 leaving because he had received a job as a teacher.  I
16:52 20 gave him a reference.  And as soon as I found out, I
21 called and informed Sharon, as well as Betty.  If Brent
22 made a decision to leave or any employee made a decision
23 to leave and -- and move on, then that was their
24 decision.  And if they state that I was the cause of
16:52 25 them leaving, then I can't control their decision

**247**

1 making.
2     Q. Do you -- do you recall reading Brent Biggs'
3 exit interview, though?
4     A. I recall reading Brent -- portion of Brent
16:52 5 Biggs' exit interview.
6     Q. And why -- why do you say a portion?  Do you
7 believe it was --
8     A. I think Betty LeHew or Sharon, one of them,
9 sent me something that they had typed, Sharon had typed,
16:53 10 but I did not actually see -- I don't know if Brent --
11 that wasn't something he told me.  I don't know if that
12 was -- it wasn't the whole thing, if it was mistyped, I
13 don't know.  I just read portion.  I didn't get the
14 whole -- see the whole thing.  The -- was I only seeing
16:53 15 some of it?
16     Q. I'll enter Exhibit 30, which is ECFMG/Ellis
17 3837-3838.
18         (Exb. No. 30 was marked.)
19     Q. (BY MS. O'DRISCOLL)  This is a -- a copy of the
16:53 20 exit interview that we produced in this matter, and this
21 is Sharon Trowell-Roman's exit interview with Brent
22 Biggs.  I just wanted to touch on a few of the -- the
23 points that -- that he reported to Sharon.
24         She did the exit interview on August 16th,
16:54 25 2012, and "He said in general his feedback about his

**248**

1 performance from Artis was quiet frequent.  He thought
2 the feedback was rather rough and hard; usually it was
3 that he was not doing a good job, he was making too many
4 mistakes, and he was not living up to expectations of
16:54 5 his job."
6         He said that there were so many changes.
7 And he said in the fourth year, in paragraph 3, "it was
8 more like from Artis, 'You don't grow, you got to go.'"
9         Is that some -- that's saying I've
16:54 10 seen repeated.
11         Is that some saying that you -- that you
12 said to employees?
13     A. No.  Betty Hite used to say, "This job is not
14 for everyone."  That's what you -- I've never said you
16:54 15 got to grow or -- you got to -- you got to grow or you
16 got to go.  Now, if that's his interpretation of
17 something, I can't testify to what he believed.
18     Q. If you look at the second-to-last paragraph on
19 ECFMG 3837, "He stated that Artis would make comments
16:55 20 when there was a concern with him, she would say, 'I
21 don't have the energy to give you feedback right now.'
22 He said that it appeared that" -- "that they were this
23 perfect team, but there were issues.
24         "Brent was asked" why he didn't speak to
16:55 25 "anyone about his concerns about Artis.  He stated

**249**

1 that" -- that it was his personal belief that you don't
2 go to HR to complain about management -- to complain
3 about your boss.  "He said... if you don't get along
4 with your boss then you leave.  A manager needs to work
16:55 5 it out or move on.  Brent said that decisions about the
6 Houston team he and Artis made together.  For hiring" --
7 "hiring decisions Brent said he would make a
8 recommendation for a candidate but Artis would
9 overdrive -- overdrive them."  Probably override them.
16:56 10         He said there was lots of turnover for the
11 center, had nothing to do with the retrofit.
12         Do you remember hearing any complaints at
13 all from Brent about your management style?
14     A. Not at all.  Brent never, ever told me.  He
16:56 15 said that he didn't bring these things to me.
16     Q. Well, he said he didn't bring it to HR, but --
17     A. He never brought them to me.
18     Q. Mark as Exhibit 31 ECFMG 3836.
19         (Exb. No. 31 was marked.)
16:56 20     Q. (BY MS. O'DRISCOLL)  If you'd take a look at
21 this.  These are notes from an exit interview that were
22 produced in this matter related to Bea Bright Davies,
23 who resigned earlier that year, January 20, 2012, and
24 Kristy Edens resigned in July of 2012.  So both of these
16:57 25 are just within months of Brent resigning.

**63  (Pages 246 to 249)**

Artis Ellis

### 250

1        What did Bea Bright Davies -- what did she
2  do at the Houston center?
3     A. She was the -- the -- the person that did
4  the -- the IT person.
16:57  5     Q. Okay. That's right. You mentioned her name
6  earlier.
7     A. Right.
8     Q. She reported that she felt like there were two
9  factions and everyone is not treated equally. "She
16:57 10  stated there is... fear to say anything because Artis
11  will...'get even.' She has seen others mention some
12  changes or improvements only to have a CA within the
13  next week or so."
14        What does that mean, a C -- oh, corrective
16:57 15  action?
16     A. Uh-huh.
17     Q. "Bea feels there is no teamwork and if you're
18  on Artis' side then you... get away with murder."
19     A. Then who wrote --
16:58 20      MR. KENNARD: Hold on. Hold on. Is there
21  a question there?
22     Q. (BY MS. O'DRISCOLL) Have you ever -- have you
23  ever heard of any of this criticism of your management
24  style from Bea or anybody else?
16:58 25     A. No. And who did this come from?

### 251

1     Q. This -- these are -- these are Houston
2  resignation notes.
3     A. So we have something with Bea stating this with
4  her signature on it?
16:58 5     Q. It's an exit interview.
6     A. Did she write it out?
7     Q. I can't answer that question.
8     A. So I would -- I mean, I've never seen this.
9  I've never heard of this. And if Chris wrote this, then
16:58 10  I -- it goes back to me saying I don't -- I don't
11  know -- I don't trust what Chris wrote or said.
12     Q. What about Kristy Edens? Did you -- do you
13  feel -- did you ever hear any complaints from her about
14  your management style?
16:58 15     A. I never heard a complaint about Kristy -- I
16  mean, Kristy never brought a complaint to me about my
17  management style.
18     Q. She also talks about the two factions, "those
19  hired by Artis who are allowed to do whatever they want
16:59 20  and get away with things" like "sleeping in their
21  office."
22        Have you ever heard of any of these types
23  of complaints?
24     A. Never.
16:59 25     Q. And you don't remember Kristy stated that she

### 252

1  had tried to have conversations with Artis about her
2  management style and interactions with Kristy only to be
3  retaliated -- retaliated against a day or two later?
4  You don't remember any conversations with Kristy?
16:59 5     A. Kristy -- we never had a conversation, talked
6  about retaliation, never.
7       MS. O'DRISCOLL: Could we take a quick
8  break?
9       MR. KENNARD: Sure.
17:00 10      MS. O'DRISCOLL: Just want to grab a couple
11  of documents.
12       THE VIDEOGRAPHER: Time is approximately
13  5:01. We're off the record.
14       (Recess taken from 5:01 p.m. to 5:18 p.m.)
17:17 15      THE VIDEOGRAPHER: This begins disc 5. The
16  time is approximately 5:18. We're on the record.
17     Q. (BY MS. O'DRISCOLL) Ms. Ellis, you're aware --
18  are you aware that we -- that we subpoenaed your medical
19  records from some of the medical providers?
17:17 20     A. Yes, I am.
21     Q. And one of your providers, Baylor College of
22  Medicine -- double check who the physician is. Looks
23  like Dr. Rod Foroozan. I'm sorry. Dr. Rod Foroozan and
24  Daniel Rosher.
17:18 25       Are they in the same office at Baylor?

### 253

1     A. No.
2     Q. They're not? So Dr. Rosher, I know was your
3  neurosurgeon; correct?
4     A. Dr. Yoshor.
17:18 5     Q. Yoshor. Yoshor. I'm sorry.
6     A. Uh-huh.
7     Q. Yoshor.
8     A. Uh-huh.
9     Q. And then what does Dr. Foroozan treat you for?
17:19 10     A. He's a -- he's a neuro-ophthalmologist.
11     Q. And did you -- do you recall visiting him in
12  the months after you were terminated from ECFMG?
13     A. I do not recall visiting him after November
14  1st. I don't -- I do not recall visiting him after
17:19 15  November the 1st, but I'm -- surely I did.
16     Q. Okay.
17     A. I don't recall it.
18     Q. Okay. Oh, he has progress notes for February
19  13th, 2013, at Baylor.
17:19 20       And in his notes, he says, "She has met
21  with her endocrinologist about one of the medications
22  she is taking. She says one day she woke up and she was
23  driving without a patch, perhaps two or three months
24  ago, and the diplopia has rarely returned or she has had
17:19 25  blurred vision."

64 (Pages 250 to 253)

Artis Ellis

254

1    And -- and that reference is made in the
2  medical records a couple of times as of -- as of
3  February, 2013.
4    So two or three months prior to that, do
17:20 5  you recall telling your physician that?
6    A. The ophthalmologist?
7    Q. That -- well, this was Dr. Foroozan.
8    A. He's the ophthalmologist.
9    Q. Do you recall telling him that, that you didn't
17:20 10  have to wear the -- the -- you just woke up one day,
11  didn't have to wear the patch anymore?
12    A. That I was driving and I didn't have the patch.
13    Q. And -- right. And that you didn't have to wear
14  it. Woke up and she was driving without a patch,
17:20 15  perhaps two or three months ago, and -- and that you --
16  it rarely returned or -- or she has had blurred vision.
17    A. What rarely returned?
18    Q. It -- it says, "She one day woke up, and she
19  was driving without a patch, perhaps two or three months
17:20 20  ago, and the diplopia" -- I don't know what that medical
21  term is. It has to be something with your eye -- "has
22  rarely returned or she has had blurred vision."
23    So based on this note, what I'm trying to
24  understand is, did you tell your physician that you had
17:20 25  stopped wearing the eye patch two or three months prior

255

1  to this?
2    A. If he stated that, then I told him that.
3    Q. Because this would have been February, 2013, so
4  this -- that's anywhere from -- that means that right
17:21 5  after you were terminated from ECFMG, you stopped
6  wearing the patch, either right away or within about a
7  month, based on this comment in the medical records.
8    A. So what's your question?
9    Q. So my question is: Do you recall telling your
17:21 10  physician that, that you woke up one day and didn't have
11  to wear your patch anymore?
12    A. I recall telling -- I recall driving one day
13  without a patch.
14    Q. And -- and -- and that you weren't having --
17:21 15  you were no longer having the blurred vision?
16    A. If I didn't have the patch on, then I didn't
17  have the blurred vision.
18    Q. Okay. Okay. I'm just trying to understand,
19  earlier you testified that you thought you were wearing
17:22 20  that patch for six months plus, but based on the medical
21  records, it appears that you stopped wearing it pretty
22  quickly.
23    A. No, I --
24    MR. KENNARD: Objection. Assumes facts.
17:22 25  And misleading as worded.

256

1    A. I testified that I wore the patch after surgery
2  about six months. So that was -- if you kind of count
3  it up.
4    Q. (BY MS. O'DRISCOLL) Okay. Okay. But if your
17:22 5  doctor -- if -- your doctor's record says what it says;
6  right?
7    A. If -- well, from my recollection, it was from
8  probably September up until maybe February is what I was
9  thinking about.
17:22 10    Q. Okay. Okay. Can you look back at Exhibit 20,
11  the last page? It's a document you produced to us,
12  Ellis 0024.
13    MR. KENNARD: 0024?
14    MS. O'DRISCOLL: Yes.
17:24 15    Q. (BY MS. O'DRISCOLL) Between -- do you know
16  whose handwriting this is on this page?
17    A. I -- I can't recall. I don't know whose
18  handwriting this is.
19    Q. Do you ever -- and I know Dr. Yoshor filled out
17:25 20  your FMLA documents previously.
21    Do you ever remember talking to him at all
22  about working four hours a day daily?
23    A. Dr. Yoshor office?
24    Q. Yes.
17:25 25    A. I did talk to his nurse about going back to

257

1  work half a day after I talked to Dr. Tom.
2    Q. And -- and you testified earlier that you've
3  never submitted -- submitted any additional FMLA
4  paperwork that -- that related to anything less than a
17:25 5  return to full duty.
6    A. That is correct.
7    Q. And so this document, 024, is different than
8  the documents that I have. The documents I have, this
9  four hours per day daily per week, that's not on any of
17:25 10  the documents I've seen. This is the only document.
11  And so I'm trying to figure out whose handwriting that
12  is.
13    And do you -- do you have any idea who
14  could have filled this out?
17:26 15    A. I do not.
16    Q. And you don't have any confirmation that this
17  was actually ever submitted to ECFMG or to Sun Life?
18    A. No, because this was -- would have been part of
19  the Sun Life packet. This is what I have.
17:26 20    Q. Well, it's -- it's a little bit unclear if it
21  is part of the Sun Life packet, because this -- this
22  packet that -- that your lawyer produced is actually
23  kind of a mix mash of Sun Life and FMLA docs.
24    And -- and so I -- I'm trying to figure
17:26 25  out -- I mean, is it your belief that that last page was

65  (Pages 254 to 257)

Artis Ellis

258

1  submitted to Sun Life?
2          MR. KENNARD: Object to the side-bar
3  previous to the question. Assumes facts. Misleading.
4  And mischaracterizes prior testimony.
17:27  5      MS. O'DRISCOLL: What testimony did I
6  mischaracterize?
7          MR. KENNARD: Read back the question.
8  You're inferring something that she stated before as
9  part of your question. That was a long question.
17:27  10     MS. O'DRISCOLL: Okay. Let me break it
11  down.
12         MR. KENNARD: If it's confusing me, one,
13  I'm not sure that she understands it. And there was a
14  long sidebar that -- that just assumed things before you
17:27  15  got to the question, so that's my objection.
16     Q. (BY MS. O'DRISCOLL) Okay. Let me -- let me
17  show you --
18         MR. KENNARD: Bless you.
19     MS. O'DRISCOLL: Bless you.
17:28  20     Q. (BY MS. O'DRISCOLL) I'll mark as Exhibit 32 --
21  these are Sun Life documents that we subpoenaed. It's
22  ECFMG 3883 through 3904.
23         MS. O'DRISCOLL: And Alfonso, take a look
24  at those. I don't know if the ones that you received
17:28  25  had the legals on top of them, because I know it took

259

1  forever for us to get the legals, but these are the
2  documents that we received in response to our subpoenas
3  to Sun Life.
4          (Exb. No. 32 was marked.)
17:28  5      MR. KENNARD: It's all been produced;
6  right?
7          MS. O'DRISCOLL: I believe so. I just
8  don't know if it got produced with the legals. That's
9  what I'm wondering.
17:29  10     MR. KENNARD: I won't know as I sit here
11  right now, but we should be okay. Go ahead.
12     Q. (BY MS. O'DRISCOLL) This -- this is the full
13  file that Sun Life has. This is what we received to
14  them, pursuant to the subpoena. And that last page that
17:29  15  we were just discussing that -- that you produced at
16  Exhibit 20 is not included in the Sun Life documents
17  that -- the page that looks like -- that looks like
18  Ellis 024.
19          I've just never seen that document before,
17:29  20  so I'm -- I'm trying to put together a puzzle and wanted
21  to see if you could shed light on it.
22     A. I'm not able to help you on this one.
23     Q. Okay. But -- but you're confident that that --
24  that that page never -- that requested part-time reduced
17:29  25  schedule, four hours per day daily days per week from

260

1  10-22-12 through 10-26-12, that this -- that that
2  document never made it to ECFMG?
3          MR. KENNARD: Objection. Calls for
4  speculation.
17:30  5      Q. (BY MS. O'DRISCOLL) I mean, you have no
6  knowledge of this being sent to ECFMG?
7      A. I wasn't --
8          MR. KENNARD: Same objection.
9          Go ahead, if you can answer.
17:30  10     A. I can't answer that. I was --
11     Q. (BY MS. O'DRISCOLL) I mean, do you have any
12  knowledge of it -- of it being sent to -- to your former
13  employer?
14     A. I was not involved with these paperwork
17:30  15  being -- I filled out my portion, and that was what I
16  filled out.
17     Q. And, you know, the part that's confusing
18  on this is number 6, "Will the employee need to" amend
19  follow-up -- I'm sorry -- "attend follow-up treatment
17:30  20  appointments or work part-time or on a reduced schedule
21  because of the employee's medical condition?" And the
22  answer is, "No."
23         MR. KENNARD: Object to the side-bar. Is
24  there a question?
17:31  25     Q. (BY MS. O'DRISCOLL) And the question is: And

261

1  then after that, there's something -- something that --
2  it contradicts is all I'm saying.
3          MR. KENNARD: Same objection, and to
4  testifying.
17:31  5      Q. (BY MS. O'DRISCOLL) Did -- did Dr. Yoshor
6  state that he was going to submit anything with these
7  types of requests?
8      A. When I talked to Dr. Yoshor's office and told
9  them that I had spoke with Dr. Tom's office and what he
17:31  10  said, I don't know if they made any amendments to this,
11  because I was at that point now not -- I had not seen
12  Dr. Yoshor. I -- I -- I don't know. I -- I cannot help
13  you with who -- I -- I was -- I hadn't done anything. I
14  don't know. There is no signature on this page. I --
17:32  15     Q. And that -- and that's another point. The
16  other documents that we have actually have the doctor's
17  signature page at the bottom, whereas these don't.
18          So I'm not aware of any signature page, are
19  you?
17:32  20     A. Only based on what I've seen, that I can
21  testify to that the -- the documents, because I've seen
22  two different documents. So this is all that I can
23  testify to what I have -- have seen.
24     Q. Okay. So you've never seen a -- a physician's
25  signature page with -- with this document; correct?

**66 (Pages 258 to 261)**

Artis Ellis

262

1    A. No.
2    Q. Have you -- have you ever filed an EEOC charge
3 against an employer prior to the one that you filed
4 against ECFMG?
17:33 5       MR. KENNARD: Objection. Relevance.
6    You can answer if you know.
7    A. I can't speak to that.
8    Q. (BY MS. O'DRISCOLL)  Well, how many times have
9 you been to the EEOC?
17:34 10   A. Once.
11   Q. In your life?
12   A. That I can recall.
13   Q. And was that to file a charge against EC --
14 ECFMG?
17:34 15   A. No.
16   Q. What -- what was the purpose of the EEOC visit
17 that you're -- that you're envisioning?
18   A. I went to the EEOC to -- I -- I did go to file
19 a -- a claim against another employer.
17:34 20   Q. Okay. And what employer was that?
21   A. I don't recall the employer.
22   Q. Was it before or after you worked at ECFMG?
23   A. It was before.
24   Q. And did anything come out of that charge?
17:35 25       MR. KENNARD: Objection. Relevance. And

263

1 misleading as worded.
2    Q. (BY MS. O'DRISCOLL)  Did -- you can answer the
3 question.
4    A. I -- I don't remember.  I don't remember.
17:35 5    Q. Did you ever -- have you ever filed a lawsuit
6 against any other employer for discrimination or any --
7 any other reason?
8    A. It was an EEOC claim, but I don't remember if
9 anything came from the -- the claim.
17:35 10   Q. You don't know if you filed a lawsuit?
11   A. It was a right to sue.
12   Q. You got a right to sue?
13   A. Yes.
14   Q. Do you know if you filed a lawsuit?
17:35 15       MR. KENNARD: Objection. Relevance.
16   You can answer if you are able to.
17   A. I'm unable to answer.
18   Q. (BY MS. O'DRISCOLL)  Unable to answer?
19   A. Yes.
17:35 20   Q. Do you have any recollection as to what you
21 were complaining about at the EEOC?
22       MR. KENNARD: Objection. Relevance.
23   Q. (BY MS. O'DRISCOLL)  You can answer.
24   A. I'm unable to.
17:36 25   Q. Can you -- I'll mark as Exhibit 33 -- this is a

264

1 little bit hard to read the way it was produced to me.
2 This is Ellis 127 through 129.
3       (Exb. No. 33 was marked.)
4    Q. (BY MS. O'DRISCOLL)  If you could tell me if
17:36 5 this is your handwriting.
6    A. Yes.
7    Q. And I know it's a little bit faded up top.  Do
8 you know what that says at the top on Ellis 127?
17:37 9    A. "My observation and recommendation on Chris
10 Paul, 3-5-2012 to 3-14-2012."
11   Q. Did you ever provide these notes to anyone
12 besides your lawyer?
13   A. No.  To Chris.  I talked to Chris about these.
14   Q. You talked to Chris?
17:37 15   A. Yes.
16   Q. Okay.  And so where it says, "I will start with
17 the areas of concern or observation," and there's
18 numbers, did you talk about each of these with Chris?
19   A. Yes.
17:37 20   Q. Okay.  And is this what started the dialogue
21 between you-all before you came -- before you came to an
22 impasse?
23   A. Yes.
24   Q. Okay.  And I know these are dated 3-9-2012
17:38 25 through 3-14-2012.

265

1       You already said this is your handwriting;
2 correct?
3    A. That is correct.
4    Q. And when this was written, were you -- were you
17:38 5 writing it on or about that -- those days in March?
6    A. Yes.
7    Q. Or did you write it at some later time and --
8 and say, "Oh, I was thinking this back during that
9 time"?
17:38 10   A. No.
11   Q. So you wrote it in March?
12   A. Yes.
13   Q. Okay.  And is this part of a -- a bigger
14 notebook somewhere, where it has thoughts about Chris or
17:38 15 thoughts about anything that would be in any way related
16 to this litigation?
17   A. No.
18   Q. So these are all the pages that you have?
19   A. Yes.
17:38 20   Q. Okay.  Look on the last page, Ellis 129, number
21 3 says, "Wednesday (March 7, 2012) You made a very
22 inappropriate comment by referencing I was a" -- "a"
23 wicked "witch from the west."  I know that -- that's one
24 of the names that you mentioned that you felt like were
17:39 25 inappropriate.

67   (Pages 262 to 265)

Artis Ellis

266

1    Can you think of anything else that Chris
2    said that you believed to be inappropriate?
3        A. I think some of this was cut off.
4        Q. Okay. I'm glad you asked that -- or stated
17:40 5    that.
6        On -- so on 0129, you think that was cut
7    off?
8        A. Yes. Yes, at the bottom.
9        Q. Do you -- do you still have the original, or
17:40 10    did you give the original to your lawyer such that we
11    can get a complete copy of that?
12        MR. KENNARD: We're going to -- I'll have
13    to look.
14        MS. O'DRISCOLL: Okay.
17:40 15        MR. KENNARD: I'll figure it out.
16        MS. O'DRISCOLL: Okay.
17        (A request for information made.)
18        MR. KENNARD: Leave a blank in the
19    deposition for that. I'll be happy to do that.
17:41 20        MS. O'DRISCOLL: Okay.
21        Q. (BY MS. O'DRISCOLL) I'll mark as Exhibit 34
22    Ellis 024 -- 224 through 228.
23        (Exh. No. 34 was marked.)
24        Q. (BY MS. O'DRISCOLL) You talk about some of
17:42 25    Chris's remarks in this EEOC charge.

267

1    This is what you filed with the EEOC?
2        A. Can you give me a Bates number, please?
3        Q. Ellis 224 through 226.
4        A. Can you be a little bit more specific on which
17:43 5    one you're talking about?
6        Q. Well, in the very beginning, you're talking
7    about Chris and making inappropriate remarks, and you --
8    you -- you reference calling Ms. Ellis a bad witch and
9    that she would melt. "I must pay you too much money
17:43 10    because of the car she drives."
11        These remarks are all centered around --
12    around racial issues. And you mentioned race earlier.
13        There aren't any other comments or remarks
14    other than what are -- are mentioned here; correct?
17:43 15        A. There were several other different remarks that
16    he made just -- there -- there were several that we had
17    to endure, like the one that I will make sure that I get
18    you when you're down, I'll step on you when -- when
19    you're down.
17:44 20        Q. And is there anything else that you can think
21    of?
22        A. There were -- there were several. I can't -- I
23    mean, no, I can't think of all of them, but I made
24    reports. I reported them as they came up. So to come
17:44 25    here four years -- nearly four years later on all of

268

1    them, I can't think of all of them.
2        Q. Who do you believe discriminated against you on
3    the basis of disability?
4        A. The -- the people?
17:45 5        Q. Yes.
6        A. I believe Chris Paul.
7        Q. Anyone else?
8        A. I mean, he worked with Nancy and Betty. I
9    believe that Betty just was given information. I
17:45 10    don't -- I think she just, you know, had to kind of try
11    to be as -- I think she -- she tried to be neutral --
12    mutual, I'm sorry -- but I think she just end up going
13    along with -- with what she -- Chris was the director,
14    and she was a director at that time, and then Nancy was
17:45 15    a director. So I was just a manager, and it was two of
16    them against me.
17        Q. And -- and what -- you mentioned Chris, you
18    mentioned Nancy, you said that Betty was facilitating
19    information.
17:46 20        What do you believe one or any of those
21    individuals did that you believe to have been
22    discriminatory towards you?
23        A. I -- I believe that Chris knew that I had been
24    out on medical leave several times, and he just
17:46 25    completely saw an opportunity to -- he said, "I'm going

269

1    to get" -- you know, he was out to get me, and he saw
2    that opportunity to get -- get me while you, know, he
3    said, while you're down. So from the onset, he said
4    that he -- he, you know, had these remarks that he would
17:46 5    make and comments that were kind of off-putting. And
6    his plan on his part was to -- to get me. And so with
7    my disability, I believe that that was just an
8    opportunity.
9        He knew I had had brain surgery, he had
17:47 10    came into the office and he was, you know, finding any
11    way, having closed-door meetings, he was saying I was
12    related to people, I was having sex with all the guys in
13    the office, going in, saying, I know, you know, you can
14    tell me, she's sleeping with you, I know she is, I'm not
17:47 15    going to say anything, just go ahead on and tell me.
16    That's -- that wasn't me. That was --
17        Q. Who told you that he said that?
18        A. The employees were calling me telling me.
19        Q. But which employees?
17:47 20        A. Myron Williams.
21        Q. Anyone else?
22        A. Kenneth Rhome. And it just so happened that he
23    was asking the black men were they sleeping with me.
24        Q. Did anybody else --
17:47 25        A. David Strom had called me saying that he

Artis Ellis

270

1 thought he was having a heart attack with all of the
2 things and stress that he was put up under, that he
3 couldn't even go to work.
4        Sharon Dalberg called and complained to me
17:48 5 about the things that she was doing that he started
6 going, you know, even against her, and she complained
7 even. She said she complained to Betty.
8        Rupa Shukia, she complained to Betty LeHew
9 of the things that was going on at the office.
17:49 10       So they all made their complaints, and then
11 they all said -- they called me when they had their
12 meeting saying that their complaints that they said,
13 they just got to the point that they wasn't even afraid
14 anymore to make their complaints. At first they were
17:48 15 all afraid to even speak up and say anything.
16       Q. So when you say "making complaints," are you
17 saying that they were complaining about Chris, as well,
18 and -- and his, I think you said it was a personality
19 conflict?
17:48 20       A. I think it was not a personality conflict. It
21 was more or less like his management, just being a
22 manager, being the director, and being able to have that
23 power over the employees, knowing that if he -- ECFMG
24 kind of had that culture, that if two or three people
17:49 25 say that you did it, then you must have done it.

272

1       MS. O'DRISCOLL: Okay. And if -- if I need
2 to ask her more questions about it, I can.
3       MR. KENNARD: You can -- you can send us a
17:50 4 DWU as to that specifically.
5       Q. (BY MS. O'DRISCOLL) Anybody else that you
6 believe had disabilities in that group that you
7 mentioned: Myron Williams, Kenneth Rhome, David
8 Strom -- you already mentioned David Strom -- and
17:50 9 Rupa -- Sharon and Rupa?
10       A. Kenneth Rhome.
11       Q. You believe Kenneth Rhome has a disability?
12       A. During the time that I was working there.
13       Q. Any -- any of those others?
14       A. That -- that's -- yeah, that -- that's good.
17:51 15       Q. That's as much as you know?
16       A. Yes.
17       Q. Okay. If you look at Ellis 0227, you list six
18 witnesses there.
19       I believe you gave these names to the EEOC;
17:51 20 is that right?
21       A. I gave these to my attorney.
22       Q. Your attorney?
23       A. Yes.
24       Q. Okay. Okay. And do you have anything to add
17:52 25 to the knowledge that these folks might have?

271

1       Q. And so all of these folks, you said, complained
2 about -- complained about Chris for -- for reasons
3 similar that you were complaining about him.
4       A. Absolutely.
17:49 5       Q. And did any of those folks -- are you aware of
6 them having any disabilities?
7       A. I know that David has a disability.
8       Q. And what is that?
9       A. I -- I'm not -- I -- I'm sure I can't disclose
17:49 10 what other people's disabilities are.
11       Q. Well, you can. I mean, we have ways to -- to
12 protect information through a protective order, so
13 you -- you can do that.
14       MR. KENNARD: If -- if you don't feel
17:49 15 comfortable answering that question --
16       MS. O'DRISCOLL: We can ask it in an
17 interrogatory if we need to.
18       MR. KENNARD: Yeah, that might -- that
19 might -- that's not a good idea for various reasons that
17:50 20 she -- that she testify to that now. We can -- we
21 can -- if you want to -- if you want to get that
22 information, you can get that through some other
23 vehicle. But I think right now is probably not the best
24 until we've had a chance to sit and think about it for a
17:50 25 little while.

273

1       A. No.
2       Q. Nothing further on that one?
3       A. No.
4       Q. If you look at the next page, Ellis 00228, is
17:53 5 this a list that you also provided to your attorney?
6       A. Yes.
7       Q. And is this a work search log?
8       A. Yes.
9       Q. Okay. So these -- I see the name of -- of --
17:53 10 is that a potential employer, like for example, Crystal
11 Ward -- and we're on Ellis 228. Crystal Ward, 3-4-15.
12 Oh, that's probably a contact person. I apologize.
13 Crystal Ward.
14       What is -- what is number 1? Let me just
17:53 15 ask it that way.
16       A. That was a place that I applied for employment.
17       Q. And when you look at these -- at this list, I
18 know you told me that you did, in fact, interview at a
19 couple of these. You listed the City of Houston, and I
17:54 20 think the county.
21       Did you interview at any of these other
22 potential employers?
23       A. No.
24       Q. And I noticed that for the first 29, there's
17:55 25 dates listed. And then for entries 30 through 56, there

69  (Pages 270 to 273)

Artis Ellis

274

1    are no dates listed.
2        Is there a reason?
3        A.  I -- I don't -- I can't testify why the dates
4    are not on here, why it broke off.
17:55  5        Q.  Do you believe you provided dates?
6        A.  I believe so.  If I started with the dates,
7    then I'm sure I went through with dates and names.  But
8    it could be that I applied for the positions and the
9    name of the -- the job that I applied for.
17:56  10       Q.  And just -- and that you just didn't list the
11   date?
12       A.  I'm sure I listed the dates.  I don't know if
13   the format, the way it was formatted, if it came out
14   different from how I sent it.
17:56  15       Q.  Do you have the original such that you could
16   resend it to your counsel?
17       MS. O'DRISCOLL:  Can we check to see if you
18   guys have it?
19       MR. KENNARD:  Yeah.  We can check.  We'll
17:56  20  check.
21       (A request for information made.)
22       Q.  (BY MS. O'DRISCOLL)  That's Exhibit 34.
23       Do you recall -- the last date I see listed
24   is April 9th, 2015.
17:57  25       Do you recall applying to potential

275

1    employers after that date?
2        A.  Yes.
3        Q.  Okay.  So some of those that are listed below,
4    that could be for 2015 and 2016?
17:57  5        A.  Well, in 2016, I've had some hospital stays.
6        Q.  So probably not any in 2016?
7        A.  Not in 2016.
8        Q.  But you think there might have been some in
9    2015?
17:57  10       A.  Yes.
11       Q.  Okay.  And did you receive any job offers from
12   any of these folks?
13       A.  No.  You remember I said I started a business,
14   so my focus, too, was on getting a business up and
17:57  15  going.
16       Q.  And when -- when you were working on Heaven's
17   Closet prior to getting sick and prior to your family
18   losses, how many hours a week would you -- just roughly,
19   approximate, would you work on Heaven's Closet?
17:58  20       A.  About 45.
21       Q.  And was that a normal week?
22       A.  That's a normal week.
23       Q.  And do you get paid per -- when you have that
24   functioning, do you get paid per -- let me back up.
17:58  25       How do you get paid?

276

1        A.  Per customer.
2        Q.  Does the customer pay a flat fee, or is it for
3    your time?  Is it per hour?  How do they pay?
4        A.  Per item.
17:58  5        Q.  Per item that they buy.
6        A.  Yes.
7        Q.  I wasn't sure with the -- with I know it has
8    the personal shopper/boutique components, so I wasn't
9    sure if there's -- when you're doing personal shopper
17:58  10  side of it, do you get -- is it a -- is it an hourly
11   rate, or it's just -- you just get paid on the items you
12   sell them?
13       A.  It's -- yes, it's built into the item that's
14   sold.
17:59  15       Q.  Okay.  I'll mark as Exhibit 35 ECFMG/Ellis
16   308023123.  These are the IRS records that we subpoenaed
17   pursuant to your release.
18       (Exb. No. 35 was marked.)
19       Q.  (BY MS. O'DRISCOLL)  And I know that they
17:59  20  note -- the IRS notes on the very front that they don't
21   have forms for 2013, that they don't have tax records
22   for 2013.
23       Do you recall specifically filing in 2013?
24       A.  I -- I don't recall.
18:00  25       Q.  And if you'll look at these tax records, is

277

1    your husband currently employed?
2        A.  He's on disability.
3        Q.  And what is he on disability for?
4        A.  Medical.
18:00  5        Q.  Is it related to his kidney issues?
6        A.  Yes.
7        Q.  Have -- I forgot to ask you.  Have you ever
8    applied for any disability through the state or -- or
9    any other type of disability funds?  Separate and apart
18:01  10  from the short-term disability that you received while
11   you were still employed at ECFMG, have you ever applied
12   for any other disability for yourself?
13       A.  I have applied for disability.
14       Q.  And did you get it?
18:01  15       A.  I have not received disability.
16       Q.  You have not received it?
17       A.  No.
18       Q.  Is it still pending?
19       A.  It's still pending.
18:01  20       Q.  And I don't believe I've seen those documents
21   produced to us and I can include that in a letter, but
22   can you provide any documents that you completed
23   applying for disability to your attorneys?
24       MR. KENNARD:  Yeah, we'll find it.
18:01  25       (A request for information made.)

70  (Pages 274 to 277)

DepoTexas, Inc.

Artis Ellis

278

1    Q. (BY MS. O'DRISCOLL) And when did you apply for
2  disability?
3    A. I would have to look and see the actual when I
4  applied.
18:01 5    Q. Do you believe it was in 2015 or 2016, or -- or
6  earlier than that?
7    A. I would -- I would have to look, because I
8  don't recall exactly what year I applied.
9    Q. Okay. No problem. I'll look at the documents
18:02 10  when we get them from your lawyer.
11    And -- and forgive me if you answered this.
12  That's still pending currently; correct?
13    A. That is still pending.
14    Q. Okay. Okay. And you -- have you ever saw a
18:02 15  physician or a psychiatrist for the -- the mental
16  anguish damages that you're alleging in this case?
17    A. I've seen a psychiatrist for it, yes.
18    Q. And which psychiatrist is that?
19    A. Dr. Mendez.
18:02 20    Q. And does he office in Houston?
21    A. Yes.
22    Q. When did you go see him?
23    A. What year?
24    Q. Yes.
18:03 25    A. Sometime in 2015.

279

1    Q. 2015?
2    And what -- what types of complaints did
3  you give to Dr. Mendez?
4    A. Migraines, anxiety, sleep -- insomnia.
18:03 5    Q. And in talking with Dr. Mendez, do you
6  attribute any of those ailments to having lost your job
7  at ECFMG?
8    A. Absolutely. I think part of that would be with
9  the loss, because that's considered a life-changing
18:04 10  event.
11    Q. Did you -- was this the first time that you saw
12  Dr. Mendez was in 2015?
13    A. I don't recall the first time I saw Dr. Mendez.
14    Q. Is -- does he -- does he office with the
18:04 15  hospital or -- or a practice group?
16    A. UT. UT. I believe it's UT physicians.
17    Q. He wasn't listed on your physicians list, so I
18  don't have records from -- from him yet, but I'll go
19  ahead and request those.
18:04 20    Are there any other psychiatrists or
21  physicians that you believe you visited related to any
22  mental anguish type damages?
23    A. Psychiatrists?
24    Q. Psychiatrists or -- or physicians related to --
18:04 25  I don't want to say mental issues, but any mental --

280

1  anything that you would associate with your mental
2  anguish damages.
3    A. I've seen Dr. Warfel.
4    Q. Warfel?
18:05 5    A. Uh-huh.
6    Q. And who is he with?
7    A. She.
8    Q. I'm sorry. Who is she with?
9    A. UT physicians.
18:05 10    Q. Okay. I also didn't have her name before.
11    When did you start seeing her?
12    A. You should -- I start seeing her in 2013.
13    Q. I apologize. That's -- it's W I R F E L?
14    A. Yes.
18:05 15    Q. I apologize. I just got that name actually a
16  couple of days ago. I apologize.
17    So she's an endocrinologist?
18    A. Yes.
19    Q. Okay. But you believe that you have seen her
18:05 20  related to mental anguish?
21    A. Yes.
22    Q. And what have you seen her for?
23    A. She is the one that does all of the hormonal
24  changes with medication adjustments. So anything that
18:05 25  have to do with the endo -- endo system, then it would

281

1  be her.
2    Q. Okay. And you had problems with insomnia. I
3  know you mentioned for Dr. Mendez that you saw him for
4  migraines, anxiety, sleep insomnia. You had problems
18:06 5  with insomnia before, didn't you, before -- before you
6  were terminated from ECFMG?
7    A. I wouldn't say problems.
8    Q. Well, I -- I recall seeing in your medical
9  records where you sought treatment, and I believe you
18:06 10  had said it was ever since your husband had his kidney
11  problems that you had insomnia.
12    A. Can you show me the records that you --
13    Q. I don't have it offhand, but the records will
14  speak for themselves.
18:06 15    Does that ring a bell at all?
16    A. I would have to have something to recall that.
17    Q. Okay. It's -- it's a physician at Memorial
18  Hermann, sleep apnea. Previously in 2004, Memorial
19  Hermann record, you started having insomnia after
18:07 20  donating a kidney and waking up due to gastric reflux
21  and/or frequent urination.
22    Does any of that sound familiar?
23    A. No.
24    Do you know what doctor?
18:07 25    Q. It's Memorial Hermann, so I can figure it out.

71  (Pages 278 to 281)

Artis Ellis

282

1    There was a sleep study in 2013 with
2    Ruckshanda Majid, doctor at Memorial Hermann. I think
3    that might -- I think that might be the one.
4        Does that ring a bell at all?
10:08 5    A. Does --
6    Q. Related to your sleep study?
7    A. Rephrase the question.
8    Q. Well, does that ring a bell at all that you
9    were -- that you were suffering for -- that you had
10:08 10    reported suffering from insomnia since the time that you
11    donated a kidney to your husband?
12    A. I donated the kidney in 2008.
13    Q. Right. I realize that. I don't know why --
14    what the 2004 thing is, but -- but they -- in these
10:08 15    records, they associated.
16        Does that ring a bell at all to you?
17    Refresh -- does that -- do you remember ever telling a
18    doctor that?
19        MR. KENNARD: In 2004?
10:08 20        MS. O'DRISCOLL: Well, in -- I think it
21    would be 2008. I don't know why the -- what the 2004
22    notation is, but --
23        MR. KENNARD: Let's -- objection to the
24    extent it assumes facts not in evidence.
10:08 25        You can answer if you're able to.

283

1    A. I can't answer that.
2    Q. (BY MS. O'DRISCOLL) Okay. Back to your tax
3    records, which I think that's Exhibit 35.
4        Do you and your husband file jointly?
10:09 5    A. Yes.
6    Q. In 2000 -- so for 2013 it's missing from the
7    IRS, and you don't have any reason to -- to know where
8    that might be?
9    A. I do not.
10:10 10    Q. Okay. If you find it, will you give it to your
11    lawyer, for 2013?
12    A. Yes.
13        (A request for information made.)
14    Q. (BY MS. O'DRISCOLL) For 2014, there's a 1099.
10:10 15    That's going to be at -- there's a few 1099s, and -- if
16    you look at ECFMG 3107, tax county and district
17    retirement for over 13,000.
18        Is that something that your husband took
19    out or -- or received funds from?
10:12 20    A. It's -- it's my husband's.
21    Q. Okay. And that's also his for Nationwide
22    retirement at ECFMG, 3109 for 4800, 4857?
23    A. That's not with ECFMG.
24    Q. I'm sorry?
10:12 25    A. That's not with ECFMG.

284

1    Q. No, I -- I was just asking, that's -- it's a
2    1099 for 4857 with Nationwide retirement.
3    A. Yes.
4    Q. Do you -- do you recall your husband taking out
10:12 5    multiple retirement -- I'm not sure what -- if these
6    are -- what these payments are exactly.
7        Do you know?
8    A. I don't know.
9    Q. If you look at the -- at 03 -- I'm sorry --
10:12 10    3111, it's for teacher's insurance annuity. It's an
11    annuity for 6 -- $6,441. And this recipient's name is
12    you.
13        Do you know what that's for?
14    A. That was my -- what I had with -- he -- the
10:13 15    teacher's retirement with ECFMG.
16    Q. Okay. And you took out on that annuity?
17    A. Yes.
18    Q. Okay. Same with Merrill Lynch at ECFMG 3113?
19    A. Yes.
10:13 20    Q. I didn't see any income listed for Heaven's
21    Closet.
22        Have you-all filed any tax returns for
23    that?
24    A. No, we have not.
10:13 25    Q. I did see one thing that you produced. I'll

285

1    mark as Exhibit 36 -- this is Ellis 218. It's an online
2    banking, it looks like -- 218 to 220, for Bank of
3    America.
4        (Exb. No. 36 was marked.)
10:14 5    Q. (BY MS. O'DRISCOLL) For this time frame,
6    April, 2000 -- sorry. It's going backwards. January
7    12th, 2015, through April, 2015, is this -- is this an
8    account separate that you have for Heaven's Closet?
9    A. Yes.
10:15 10    Q. And this is where you deposit all of your --
11    any income that you make for Heaven's Closet?
12    A. Yes.
13    Q. Okay. And would it only be for this time
14    period, January, 2015, to April, 2015?
10:15 15    A. Yes.
16    Q. I just want to confirm, I have been asking for
17    physician names to make sure I had all of them, and the
18    note that I received, you already told me about Kelley,
19    Dr. Kelley Warfel, for endocrinology, since 2013.
10:15 20    Gabriel Aisenberg with UT physicians,
21    internal medicine. Ms. Aisenberg is your primary care
22    physician?
23    A. Mr. -- Doctor. It's a male.
24    Q. Okay. It's a doctor, because this one says Ms.
10:16 25    Sorry.

72   (Pages 282 to 285)

DepoTexas, Inc.

Artis Ellis

286

1          Mary Ellen VanDerlick, a neurology
2    consultant?
3          A. She's my neurologist.
4          Q. Okay. And that's who you're seeing currently?
10:16  5          A. Yes.
6          Q. In March, when you were hospitalized, did you
7    visit Dr. Amin Jamal, an endocrinologist at Southwest
8    Hermann?
9          A. Yes.
10:16  10          Q. And then --
11          A. No.
12          Q. No?
13          A. Dr. Jamal -- I'm sorry. Dr. Jamal was at
14    southwest Hermann.
10:16  15          Q. Okay. And then you were transferred to St.
16    Luke's where you saw a Dr. Vivian Rodriguez,
17    endocrinologist and Shamoon Ahmed, internal medicine?
18          A. That is correct.
19          Q. And these are the hospitalizations that -- that
10:16  20    we talked about, seems like longer than this morning,
21    ago, related to blood sugar and sodium.
22          Was that those physicians?
23          A. No.
24          Q. In March?
10:17  25          A. Those physicians were only for low blood sugar.

287

1          Q. Okay. Just low blood sugar?
2          A. Uh-huh.
3          Q. Okay.
4          A. I stayed in the hospital for six weeks.
10:17  5          Q. You were in the hospital for six weeks?
6          A. Yes.
7          Q. For -- for the low blood sugar?
8          A. Yes.
9          Q. And is that something that you started
10:17  10    experiencing, low blood sugar, after you left ECFMG?
11          A. Yes.
12          Q. Do you remember when you had the first incident
13    of that?
14          A. I just had it.
10:17  15          Q. Okay.
16          A. I went to the emergency room and then they
17    transferred me and that's my story.
18          Q. Okay. Let me just double check this e-mail
19    with you. I'll mark as Ellis number 37 -- I'm sorry --
10:18  20    defendant's Exhibit Number 37, Ellis 197. There's just
21    one page.
22          (Exh. No. 37 was marked.)
23          Q. (BY MS. O'DRISCOLL) And this appears -- this
24    is an e-mail that you produced, appears to be from Chris
10:18  25    Paul to you, copy to Ann Jobe and Scott Collette.

288

1          Who -- who is Scott Collette?
2          A. Collette Scott.
3          Q. Oh, I'm sorry. Collette Scott. Who is that?
4          A. She was one of the directors with MBME.
10:18  5          Q. Okay. And this e-mail -- take a minute to read
6    this e-mail. I'm not sure.
7          Are you familiar with this one?
8          A. You said this is something I produced?
9          Q. Yes, ma'am. In the lower right-hand corner
10:20  10    where it says Ellis 197. This is a document that --
11    that you produced. I know we were talking about going
12    live earlier and kind of the timing of that. This
13    e-mail is dated June 27th, 2012. And -- and this
14    e-mail, it's talking about going live and -- and recent
10:20  15    errors in Houston.
16          Does this refresh your recollection as to
17    issues that were going on in the Houston center?
18          A. I -- I don't recall any errors in Houston, so
19    I -- I just -- I don't recall it.
10:21  20          MR. KENNARD: How much time is left?
21          (Discussion off the stenographic record.)
22          Q. (BY MS. O'DRISCOLL) Do you recall stating,
23    "Artis expressed to me the understanding of the
24    seriousness of everything that has transpired and that
10:21  25    USMLE is also aware and are questioning the integrity of

289

1    the exam in Houston, she stated that she will meet with
2    her team and relay the new process to them but also
3    reinforce with them the significance of making sure we
4    get Houston back on stable grounds and moving forward."
10:21  5          Do you recall any of that?
6          A. I -- I do not.
7          Q. Okay. I have to two more items, and then I'm
8    just going to double check my notes. I think we're --
9    we can take a break after these two items, and then I
10:22  10    can double-check.
11          I'm going to mark as Exhibit 38, Ellis 130
12    through 137.
13          (Exb. No. 38 was marked.)
14          Q. (BY MS. O'DRISCOLL) If you wouldn't mind
10:22  15    taking a minute, these are -- these are documents that
16    you produced in this lawsuit. And if you can tell me
17    why you believe they're relevant to this lawsuit and
18    what they are.
19          A. These are offer letters.
10:23  20          Q. Okay. And -- and why do you believe it's
21    relevant to this litigation?
22          A. To show that you do not interview a person on
23    one day and they start work the very next day.
24          Q. Okay. Do you not interview them one day and
10:23  25    then they start the next day?

73  (Pages 286 to 289)

Artis Ellis

290

1    A. So you don't put it -- like normally, you put
2  in an application, you may interview with a person.  If
3  I put in an application today with Alfonso, I may
4  interview with him on tomorrow and then start work maybe
5  next Monday.
6    Q. Right.
7    A. Well, ECFMG process may be that they may not
8  start work until three months down the line.
9    Q. Okay.
10   A. So just because your start date -- your
11  interview -- your -- your interview date may be today,
12  your start date may not be until three months.
13   Q. Okay.  And -- and what does that relate to?
14   A. To Troi Bryant.
15   Q. Okay.  So specifically, you -- you were trying
16  to make a comparison?
17   A. Yes.
18   Q. Okay.  So -- and just help me understand with
19  Mr. Bryant, his new hire document that we talked about
20  earlier was dated November 3rd, 2008.  His online
21  application was dated November 4th, 2008.  And the offer
22  letter from you, I believe, was dated November 3rd,
23  2008, and he started orientation on the 3rd.
24     So how -- just help me understand why you
25  believe these folks shed any light on Mr. Bryant's

291

1  situation.
2    A. Because Troi was interviewed.  He had to
3  actually talk to someone and was interviewed prior to
4  actually starting and coming to an orientation.  He had
5  to have met with the trainers, he had to have met with a
6  manager, and he had had to have met with the medical
7  advisor before even getting to orientation.
8    Q. Okay.  And do you know for a fact that -- that
9  Mr. Bryant did, in fact, meet with all those folks
10  before he got to orientation?
11   A. If you look -- yeah, because you have an SP
12  orientation, training guidelines, and training sessions.
13  So he already, before he had even gotten to this
14  orientation, and had an offer, he -- he had already had
15  met with someone to interview him.
16   Q. Okay.  Well, if we look -- I know we were
17  looking at his --
18     What did I do with my iPad?
19     We were looking at his offer letter
20  earlier, and it was our electronic exhibit.  And I think
21  that one had a schedule.  Let me just double check that.
22     Okay.  So his offer letter dated November
23  3rd, 2008 has his orientation as November 3rd, 2008, his
24  CIS workshop was December 8th, 2008, his joint --
25  there's an SEP workshop, joint workshop, final and post

292

1  final.
2     Is that what you're referring to?
3    A. No.
4    Q. Okay.
5    A. I'm saying that he had already had an interview
6  or talked with John, who hired him, told him when all of
7  this was to take place, and I wasn't even there.
8    Q. Okay.
9    A. I wasn't part of that interviewing process,
10  because I did not meet Troi or see Troi until the
11  orientation.
12   Q. Okay.  Understood.
13     And these that you -- that you produced --
14  and I'm sure I received these in the past year.
15     Just out of curiosity, how -- how did you
16  obtain these?  Did you have these in a file somewhere?
17   A. Yes, along with some of these other documents
18  that you saw, as well.
19     And these are the same people that Chris
20  had told me to put through without doing criminal
21  background checks, as well.
22   Q. Okay.  And --
23   A. That was against company policy.
24   Q. Well, was that -- was that a modification that
25  was made in multiple centers in -- in an attempt to

293

1  staff up for the -- for the -- the new test?
2    A. I can't testify to anything that happened in
3  any other center.
4    Q. Okay.
5    A. I can say that here I am talking about policies
6  that I violated, but there were several policies that my
7  director told me to violate.
8    Q. And, in fact, did you ask to try to shorten the
9  timeline on the background checks?
10   A. Did I do what?
11   Q. Did you -- did you ask Chris --
12   A. No.
13   Q. -- or anyone else in management?
14   A. No.  Chris told me to do that.  And, Erin, he
15  also sent an e-mail admitting that he told me to do that
16  and he was at fault for that.
17     Do you have that e-mail?
18   Q. I don't know if I do.  I was looking to see if
19  I did have -- I'm not sure.
20     MS. O'DRISCOLL: Okay.  Alfonso, if you
21  could take a look at this, because this has not been
22  produced.  I just received that.  I'll give you a Bates
23  labeled copy, but I think this refers to what Ms. Ellis
24  is maybe talking about.
25     (Exb. No. 39 was marked.)

74  (Pages 290 to 293)

Artis Ellis

294

1  Q. (BY MS. O'DRISCOLL)  If you look at the
2  beginning of this e-mail chain, the last page, dated
3  June 7th, 2012, it's from -- from you, Ms. Ellis, to
4  Helen Coin -- is Helen in HR?  Helen Coin, was she a
18:31 5  person in HR?
6  A. Yes.
7  Q. Okay.  And then Amanda GleasonMack, was she
8  also in HR, if you remember?
9  A. I don't remember.  Yes, Amanda did work in HR.
18:31 10  Q. Okay.  And then Kiandra Johnson --
11  A. Yes.
12  Q. -- Johnson.  Sorry.  And there's a copy to
13  Chris and Betty LeHew, "Subject:  Background checks for
14  HOU Sps."
18:32 15  And your e-mail says, "Hi Ladies, I just
16  faxed over 11 background checks for potential SPs.  Can
17  you please if possible work on this ASAP.  The goal is
18  to have a New Hire Orientation for these potential
19  employees Monday, June 11th.
18:32 20  "As always your help is greatly
21  appreciated."
22  And then Helen responds and asks for a list
23  of the names, and then -- and then you send back a list
24  of the names.  And it looks like it's a lot of -- I
18:32 25  think it's all of these -- Ms. Matthews, Mr. -- so I

295

1  think it's these folks in -- in this -- these offer
2  letters.
3  Then if you look on the third page, midway
4  down, sort of quarter way down, from Helen Coin to you
18:32 5  on Friday, June 8th, at 2012, CC to Brent Biggs,
6  background checks.  "Thank you, Artis!  I will order the
7  background checks today.  It can take anywhere between
8  one day to two weeks to receive a completed" order.  "I
9  will update you" as soon "as they come in."
18:33 10  Do you remember that communication?
11  A. Yes.
12  Q. Okay.  And then you respond back, "Thanks
13  Helen...!!!  I'm keeping my fingers crossed.
14  "Betty question for you.  If a person
18:33 15  disclosed" -- and you ask about the conviction and how
16  that would be handled.
17  Do you remember that?
18  A. Yes.
19  Q. Okay.  Okay.  And then on the first page, on
18:33 20  June 11th, where it's talking about the new SPs and they
21  were told to come back and then you say, "I checked with
22  HR and none of the background checks are in yet.  I say
23  let's move forward with training since we have flown
24  people in to help.  I would find it hard to believe ten
18:33 25  people would not pass the background check.

296

1  The first training session could be...
2  generic... like training guidelines and training
3  protocols.
4  "If we don't hear anything tomorrow from HR
18:34 5  I'm not sure how you would like for us to proceed.
6  "I have Faith it will... work...."
7  Is this related to what you're talking
8  about, about going around some of the protocols to try
9  to get SPs in there?
18:34 10  A. Yes.  And then Chris told me to move forward.
11  Q. So was this -- was that a creative idea that
12  you had to -- to try to -- because I know that you were
13  short on SPs.
14  A. No.  I talked with Chris, and he told me to
18:34 15  move on those SPs and to send HR an e-mail and to bring
16  them in without doing the background check.  And then he
17  sent another one, when one came back, which I had
18  already -- the guy had already disclosed that he had
19  something on his record that was, I think, five years
18:35 20  old.  And so when it came back, I had to go back to him
21  and say that we had to let him go.  And Chris did send
22  another e-mail saying that he takes responsibility
23  because he told me to move forward with hiring all of
24  them.
18:35 25  Q. Okay.  And, I mean, in that second paragraph

297

1  where it says, "I checked with HR and none of the
2  background checks are in," quote, "I say let's move
3  forward with training since we have flown people in."
4  A. That's what he told me to do.  And if you have
18:35 5  the e-mail from Chris, it would say that he took full
6  responsibility --
7  Q. Okay.
8  A. -- for telling me to go ahead on and move
9  forward.
18:35 10  Q. Okay.
11  A. And as you see, I don't believe all ten of them
12  can come back, and I said that I -- that -- Betty, how
13  would we handle, because one had already disclosed.
14  Q. Okay.  I have one more document to double
18:36 15  check.
16  MS. O'DRISCOLL:  Do you want to keep -- a
17  quick break?
18  No? Okay.  All right.
19  THE WITNESS:  I'm good.
18:36 20  MR. KENNARD:  [Indiscernible].
21  MS. O'DRISCOLL:  Okay.
22  MR. KENNARD:  Because I'm going to have
23  about an hour or more myself.
24  MS. O'DRISCOLL:  Oh, really?  Okay.
18:36 25  MR. KENNARD:  I ain't even started.

75  (Pages 294 to 297)

Artis Ellis

298

1  Q. (BY MS. O'DRISCOLL) So Exhibit 40, this is the
2  ECFMG handbook produced, ECFMG 316 through 355.
3      (Exb. No. 40 was marked.)
4  Q. (BY MS. O'DRISCOLL) Do you recall having this
10:37  5  handbook while you were employed at ECFMG?
6  A. Yes.
7  Q. And this handbook references a number of
8  different policies in addition to the -- to the separate
9  copies of policies that we talked about earlier;
10:37  10  correct?
11  A. Correct.
12  Q. And -- and you understood that based on the
13  policies as well as the handbook, that ECFMG is an equal
14  opportunity employer and has policies against
10:37  15  discriminating on basis of disability and other
16  protected -- protected basis; correct?
17  A. Yes.
18  Q. Okay. And you also understood that procedures
19  related to FMLA were contained in the handbook?
10:38  20  A. I did know FMLA was in the handbook.
21  Q. You know, I gave you the wrong copy. Let me --
22  sorry. That one's highlighted. I apologize. I'll
23  just -- I thought I had one highlighted, and I was
24  thinking I imagined it.
10:38  25      Okay. Sorry. And I apologize. I

299

1  interrupted you.
2      Did -- what were you saying?
3  A. No, I did know that FMLA was in the handbook.
4  Q. Okay. And then also the policy related to
10:38  5  employment of relatives is also touched on in the
6  handbook; correct?
7  A. Yes.
8  Q. And you understood that if you for some reason
9  didn't understand a policy or needed clarification on a
10:39  10  policy, that you could always contact center management
11  in Philadelphia and talk to Betty or anyone else in
12  management; correct?
13  A. Human resource?
14  Q. Yes.
10:39  15  A. Yes.
16  Q. Have you asked anybody to be a witness in this
17  case on your behalf?
18  A. On the -- the list. I just gave the list to my
19  lawyer. Possible witness, but I have not talked to
10:40  20  anyone about being a witness.
21  Q. Okay. And the list that you're referring to is
22  that -- the list that we talked about a few minutes ago
23  that had David listed and Rupa; is that right?
24  A. A list of witnesses, yes.
10:40  25  Q. And -- did you know Rupa from a -- a prior

300

1  employment?
2  A. Yes.
3  Q. And did Betty Hite ever talk to you about the
4  importance -- after Rupa was hired, about the importance
10:41  5  of sharing that -- if you'd known someone from a prior
6  employment or prior relationship that you should always
7  share that information?
8  A. She did, but Sharon Trowell knew that I knew
9  Rupa.
10:41  10  Q. But Betty did talk to you about that?
11  A. Betty did talk to me about that. So prior to
12  Rupa coming to work there, HR knew that I knew Rupa.
13  And when I was asked to do a reference, I told them that
14  I did not want to do a reference with Rupa because it
10:41  15  had been over ten years since I had even seen or talked
16  to Rupa.
17  Q. Okay. And do you remember what year Rupa was
18  hired?
19  A. I don't remember what year Rupa was hired.
10:42  20  Q. Oh, and I just wanted to clarify. Rupa had you
21  listed as a reference and they asked you to be a
22  reference, to see if you wanted to offer a reference and
23  you said I -- you declined?
24  A. I don't know if she had me listed as a
10:42  25  reference.

301

1  Q. Okay. Okay. But you had been asked by HR?
2  A. Yes.
3  Q. All right.
4  A. To do a reference check.
10:42  5  Q. Got it. Okay.
6      MR. KENNARD: Time?
7      (Discussion off the stenographic record.)
8      MS. O'DRISCOLL: I think I am ready to pass
9  the witness.
10:43  10  MR. KENNARD: You pass the witness?
11      MS. O'DRISCOLL: Yes.
12      THE VIDEOGRAPHER: I need to go off the
13  record and change.
14      MR. KENNARD: Go ahead.
10:43  15  THE VIDEOGRAPHER: Time is approximately
16  6:44. We're off the record.
17      (Recess taken from 6:44 p.m. to 6:51 p.m.)
18      THE VIDEOGRAPHER: This begins disc 6.
19  Time is approximately 6:51. We're on the record.
10:50  20      EXAMINATION
21  QUESTIONS BY MR. KENNARD:
22  Q. All right. Ms. Ellis, I don't have all that
23  many questions for you.
24      THE VIDEOGRAPHER: Could you put a mic on?
10:50  25  MR. KENNARD: I'm sorry. I was looking for

76  (Pages 298 to 301)

Artis Ellis

302

1    it.  What did I do?
2        Q.  (BY MR. KENNARD)  All right.  How old were you
3    when you met Troi Bryant?
4        A.  18.
10:50 5    Q.  Did y'all date?
6        A.  No.
7        Q.  You go to prom with him?
8        A.  No.
9        Q.  Was he at that prom?
10:51 10   A.  Yes.
11       Q.  Y'all had what some folks might call a
12   one-night stand; is that right?
13       A.  Yes.
14       Q.  Okay.  And you gave birth to a daughter as a
10:51 15   result; is that right?
16       A.  Yes.
17       Q.  Did you marry Troi?
18       A.  No.
19       Q.  Were you ever common law married in any way?
10:51 20   A.  No.
21       Q.  Did you maintain a relationship with him beyond
22   any communication that you would have to have because of
23   your daughter?
24       A.  No.
10:51 25   Q.  Did you hire his wife, Jackie?

303

1        A.  Yes.
2        Q.  Are you related to Jackie?
3        A.  No.
4        Q.  Are you aware of any individuals that have
10:52 5    hired relatives at ECFMG and were not subject to
6    discipline or termination?
7        A.  Yes.
8        Q.  Can you tell me who?
9        A.  Betty LeHew.
10:52 10   Q.  Who did she hire?
11       A.  Her stepdaughter.
12       Q.  Does Betty still work there?
13       A.  Yes.
14       Q.  Does the stepdaughter still work there?
10:52 15   A.  Yes.
16       Q.  Anybody else that you are aware of?
17       A.  That are married?
18       Q.  Or that -- that has hired a relative -- that's
19   in a management position and has hired a relative and
10:52 20   that has not been disciplined or otherwise discharged?
21       A.  No.
22       Q.  And what is Betty LeHew's position?
23       A.  Vice president of human resource.
24       Q.  What about at the time that -- that you were
10:53 25   still with ECFMG?

304

1        A.  Director of human resource.
2        Q.  So is going from director to vice president a
3    promotion within the ECFMG structure, to the best of
4    your knowledge, having been management there?
10:53 5    A.  Yes.
6        Q.  Is it your testimony that someone that hired
7    their stepdaughter actually got promoted within a
8    company infrastructure at ECFMG?
9        A.  Yes.
10:53 10       MR. KENNARD:  Can I see Exhibit 15, please?
11       (Discussion off the stenographic record.)
12       MS. O'DRISCOLL:  Is it the offer letter?
13   Do you need it?
14       MR. KENNARD:  Yeah, if you have it.
10:54 15       MS. O'DRISCOLL:  It's the Troi offer
16   letter?
17       MR. KENNARD:  Yeah, if I can just see it.
18       MS. O'DRISCOLL:  I trust you with my iPad.
19       MR. KENNARD:  I was going to show it to
10:54 20   her.
21       MS. O'DRISCOLL:  Okay.
22       Q.  (BY MR. KENNARD)  We will show -- we're about
23   to show -- I'll show you exhibit -- thank you -- Exhibit
24   15 that will later be added to the record in the form of
10:54 25   a formal hard copy exhibit.

305

1        But in the interim, could you look at the
2    first page?  Do you see it?
3        A.  Yes.
4        Q.  Okay.  What -- what is the date of this letter?
10:54 5    A.  November the 3rd, 2008.
6        Q.  Okay.  And what date was it signed by
7    Mr. Bryant?
8        A.  November the 3rd, 2008.
9        Q.  Okay.  So the offer letter is dated the same
10:55 10   day that he signed it; is that correct?
11       A.  Yes.
12       Q.  Can you explain that?
13       Thanks.
14       Let me ask you a better question.
10:55 15   So did you send out that offer letter to
16   him?
17       A.  He would have received it in orientation.  It's
18   not sent.
19       Q.  Okay.  So it would have been handed to him at
10:55 20   orientation; correct?
21       A.  That is correct.
22       Q.  It would have been dated the date of the
23   orientation; correct?
24       A.  Correct.
10:55 25   Q.  So he would have signed it the date of the

77  (Pages 302 to 305)

Artis Ellis

### 306

```
 1   orientation; correct?
 2       A. Correct.
 3       Q. But he would have been offered the job sometime
 4   well before the orientation; correct?
18:55 5      MS. O'DRISCOLL: Objection. Leading.
 6       Q. (BY MR. KENNARD) When -- when is someone
 7   offered -- made an offer before orientation?
 8       A. He would have told to come back on that day,
 9   during the -- when he made -- when he made application
18:56 10 and interviewed, he would have told: Come back on
11   October -- on November the 3rd.
12       Q. Okay. As you sit here today, did you know that
13   he would have be there at the orientation on November the 3rd
14   prior to him being there?
18:56 15     MS. O'DRISCOLL: Objection. Asked and
16   answered.
17       Q. (BY MR. KENNARD) You can answer the question.
18       A. Can you repeat?
19       Q. Can you repeat the question, please?
18:56 20     THE REPORTER: QUESTION: "Okay. As you
21   sit here today, did you know that he would be there at
22   the orientation on November the 3rd prior to him being
23   there?"
24       A. No.
25       (Discussion off the stenographic record.)
```

### 307

```
 1       Q. (BY MR. KENNARD) All right. Ma'am, I will
 2   refer you to Exhibit 17, please.
 3       All right. Looking at number 1, policy, it
 4   states, "It is the policy of ECFMG to regulate the
18:57 5   working and reporting relationships of individuals who
 6   are related by blood, adoption, marriage, or domestic
 7   partnership."
 8       Are you related to Troi Bryant by blood?
 9       A. No.
18:58 10     Q. Are you related to Jackie Bryant by blood?
11       A. No.
12       Q. Are you related to Troi Bryant by adoption?
13       A. No.
14       Q. Are you related to Jackie Bryant by adoption?
18:58 15     A. No.
16       Q. Are you married -- are you -- have you married
17   or ever been married to Troi Bryant?
18       A. No.
19       Q. Have you married or ever been married to Jackie
18:58 20  Bryant?
21       A. No.
22       Q. Have you ever been in a domestic partnership
23   with Jackie Bryant?
24       A. No.
18:58 25     Q. Have you ever been in a domestic partnership
```

### 308

```
 1   with Troi Bryant?
 2       A. No.
 3       Q. Have you ever been engaged to Jackie Bryant?
 4       A. No.
 5       Q. Have you ever been engaged to Troi Bryant?
18:58 6      A. No.
 7       Q. Have you ever deemed Troi Bryant to be a
 8   significant other?
 9       A. No.
18:58 10     Q. Have you ever deemed Jackie Bryant to be a
11   significant other?
12       A. No.
13       Q. Part 2, definitions, when it talks of relative,
14   it says, "Relative is defined as any of the following
18:59 15  including those by virtue of by blood, adoption,
16   marriage, or remarriage, or domestic partnership
17   (significant other or affianced)."
18       Are you -- do you consider yourself a
19   relative of Troi or Jackie Bryant by virtue of blood?
18:59 20     A. No.
21       Q. By virtue of adoption?
22       A. No.
23       Q. By virtue of marriage?
24       A. No.
18:59 25     Q. Remarriage?
```

### 309

```
 1       A. No.
 2       Q. Domestic partnership?
 3       A. No.
 4       Q. Okay. You can put that away.
18:59 5      Could you have worked after October 22nd,
 6   2012, at ECFMG if you had been given a reasonable
 7   accommodation?
 8       A. Yes.
 9       Q. All right. Were you ever presented with any
19:00 10  documentation by ECFMG for you to fill out requesting a
11   reasonable accommodation in the workplace?
12       MS. O'DRISCOLL: Objection. Form.
13   Leading.
14       Q. (BY MR. KENNARD) You can answer the question.
19:00 15     A. No.
16       Q. Did you tell someone at ECFMG that you were
17   requesting accommodation -- not more FMLA, but an
18   accommodation on or after October of 2012?
19       A. Yes.
19:00 20     Q. And who did you tell?
21       A. Betty LeHew.
22       Q. Okay. And what is her position?
23       A. At the time or currently?
24       Q. At the time.
19:00 25     A. Director of human resource.
```

78 (Pages 306 to 309)

Artis Ellis

310

1      Q. So did the director of human resources hand you
2   any document for you to fill out requesting an
3   accommodation on the workplace?
4      A. No.
19:01 5    Q. Did she tell you that you needed to submit some
6   sort of document or documentation in order to get an
7   accommodation in the workplace on or after October of
8   2012?
9      A. No.
19:01 10      I also told Sharon Trowell.
11     Q. Okay.
12     A. And Chris Paul.
13     Q. Did any of those individuals offer you
14   documentation for you to submit so that you could
19:01 15   request an accommodation in the workplace on or after
16   October of 2012?
17     A. No.
18     Q. Did any of them advise you that you needed to
19   submit some written form of documentation in order to
19:01 20   formally request an accommodation in the workplace on or
21   after October of 2012?
22     A. No.
23     Q. You testified earlier that you believe you and
24   Chris had a personality conflict.
19:01 25      Can you tell the ladies and gentlemen of

311

1   the jury why you believe he had a personal --
2   personality conflict with you?
3      A. I believe because -- as I testified earlier,
4   because I was an African-American woman, I was strong
19:02 5   and confident, and I just believe that he strongly just
6   went against me from the very beginning.  When he did
7   not know me, he called me names.  He stated he was
8   going -- he was out to get me, he paid me too much money
9   because I drove an old Lexus.  I don't know what that
19:02 10   was about, but he just made comments after comments.
11     Q. How did he treat you once he was aware that you
12   had medical issues?
13     A. He said he was out to get me.  He made remarks
14   that was off-putting.
19:03 15     Q. Did he then treat you better or even worse once
16   he realized you had medical issues?
17      MS. O'DRISCOLL:  Objection.  Form.
18     A. I think he treated me worse.
19     Q. (BY MR. KENNARD)  Okay.
19:03 20     A. And everything that I put in place at the
21   Houston center, he undid.
22     Q. Okay.  And what was his position?
23     A. Center director.
24     Q. So you reported to him?
19:03 25     A. I reported to him.

312

1      Q. All right.  Was he the one that hired you?
2      A. No.
3      Q. Who hired you?
4      A. John Repasch.
19:03 5      Q. Okay.  So Chris Brown inherited you; is that
6   correct?
7      A. Chris Paul.
8      Q. I'm sorry.  Chris Paul.  Sorry.  I'm going from
9   an entertainer to a basketball player.
19:03 10      He inherited you; is that right?
11     A. Yes.
12     Q. Okay.  It was not his decision to hire you?
13     A. No.
14     Q. Are you personally aware that you gave any
19:04 15   ECFMG company password to anyone else?
16     A. No.
17      MS. O'DRISCOLL:  Objection.  Form.
18     Q. (BY MR. KENNARD)  Do you have personal
19   knowledge or personal recollection of ever having given
19:04 20   a password, an ECFMG password to anyone?  And, if so,
21   who?
22      MS. O'DRISCOLL:  Objection.  Form.
23     Q. (BY MR. KENNARD)  You can answer the question.
24     A. No.
19:04 25     Q. At any time when you were not on medical leave,

313

1   did anyone request your password from you?
2      A. No.
3      Q. Okay.  At any time while you were not on
4   medical leave, do you recall giving any of your
19:05 5   passwords to anybody?
6      A. Yes.
7      MS. O'DRISCOLL:  Objection.  Form.
8     Q. (BY MR. KENNARD)  Okay.  Tell me who.
9     A. Bea Bright Davies.
19:05 10     Q. Tell me why.
11     A. My direct supervisor told me to give her my
12   password so that they can do some updates.
13     Q. Okay.  And who was your direct supervisor at
14   the time?
19:05 15     A. Chris Paul.
16     Q. Okay.  Is it your testimony that the same
17   individual that wrote you up for giving away a password
18   at one time asked you to give your password away?
19     A. Yes.
19:05 20      MS. O'DRISCOLL:  Objection.  Form.
21     Q. (BY MR. KENNARD)  While you were out on medical
22   leave, did any of your supervisors reach out to you?
23     A. Yes.
24     Q. Tell me who.
19:06 25     A. Chris Paul.

79 (Pages 310 to 313)

Artis Ellis

314

```
 1      Q. Why?
 2      A. To come in to sit in on the assistant manager
 3   interviews.
 4      Q. Did he know that you were out on medical leave?
 5      A. Yes.
 6      Q. As far as you understand, were you supposed to
 7   be contacted with work-related matters while you were
 8   out on medical leave?
 9      A. Repeat.
10      Q. Do you believe that you should have been
11   contacted, or do you believe -- strike that.
12          Do you believe that you should have been
13   contacted by a supervisor regarding work-related
14   activities while you were out on medical leave?
15      A. No.
16      Q. Earlier, Ms. O'Driscoll asked you about --
17   asked you to review some information from a TWC
18   transcript.
19          Do you remember that?
20      A. Yes.
21      Q. Okay. Do you agree with the contents that were
22   in that transcript?
23          MS. O'DRISCOLL: Objection. Form.
24      Q. (BY MR. KENNARD) I.e., do you remember having
25   made those statements?
```

315

```
 1          MS. O'DRISCOLL: Objection. Form.
 2      Q. (BY MR. KENNARD) You can answer the question.
 3      A. I don't remember making those statements.
 4      Q. Okay. So it's possible that you made those
 5   statements since they appeared on the transcript, but
 6   you don't personally remember having made those
 7   statements.
 8          Is that your testimony?
 9      A. That is my testimony.
10      Q. Okay. To the extent you're confused or don't
11   recall certain statements that you allegedly made, can
12   you explain to the ladies and gentlemen of the jury why,
13   in your estimation, that might be the case?
14          MS. O'DRISCOLL: Objection. Form. Calls
15   for a medical diagnosis.
16      Q. (BY MR. KENNARD) You can answer the question.
17      A. Time.
18      Q. Okay.
19      A. And having to look over it in such a short
20   period at this particular time right now.
21      Q. Did your medical issues impact your memory at
22   all?
23          MS. O'DRISCOLL: Objection. Form.
24      A. I would say yes.
25      Q. (BY MR. KENNARD) You did have brain surgery;
```

316

```
 1   right?
 2      A. I had brain surgery. I've been on a lot of
 3   medication. My hormones are going up and down.
 4      Q. Okay.
 5      A. It's a big concern.
 6      Q. So someone -- doctors, cut open your skull and
 7   went into your brain and performed surgery; is that
 8   right?
 9          MS. O'DRISCOLL: Objection. Form.
10      Q. (BY MR. KENNARD) Go ahead.
11      A. They went in my nose.
12      Q. They went in your nose. Okay.
13          They went through your nose and into your
14   brain and started poking around in your brain; is that
15   right?
16      A. They removed a tumor off of my pituitary
17   glands.
18      Q. Okay. Do you think -- and I know you're not a
19   doctor. Do you think that had something to do with your
20   recollection and memory?
21      A. Oh, definitely.
22          MS. O'DRISCOLL: Objection. Form.
23      Q. (BY MR. KENNARD) Okay. So as you sit here
24   today, you're -- I presume you were trying to give the
25   best and most honest testimony you can; is that correct?
```

317

```
 1      A. Yes. And definitely the medication that I'm on
 2   has -- part of the side effects is memory loss, as well.
 3      Q. Okay.
 4          MR. KENNARD: Pass the witness.
 5          FURTHER EXAMINATION
 6   QUESTIONS BY MS. O'DRISCOLL:
 7      Q. Ms. Ellis, do you remember at the very
 8   beginning of our deposition, I asked you if you were
 9   taking any medication that could potentially conflict
10   with your ability to recall events and accurately recall
11   events? Do you remember when I asked you that?
12      A. I do recall that.
13      Q. And do you remember that you confirmed for me
14   that you were not on any medication that would impact
15   your memory or your ability to -- to recall events?
16          MR. KENNARD: Objection. Misleading.
17   Assumes facts. That was testimony as to today's
18   proceeding.
19      Q. (BY MS. O'DRISCOLL) And you recall telling me
20   that your -- that your medication would not interfere
21   with your memory and inability to recall facts?
22      A. For today.
23      Q. So if I had asked the question, would it --
24   could it potentially impact your memory to recall events
25   for anytime since 2012, what would your answer be?
```

80  (Pages 314 to 317)

Artis Ellis

**318**

1    A.  During the time in 2012?  Then I would say,
2  yes, that my medication had some effects on 2012.
3    Q.  So when do you believe that your medication
4  stopped having effects on your memory?
5    A.  They're constantly changing my medication, and
6  new things are constantly happening, new onsets of new
7  diagnosis that are coming up, so I -- I can't testify to
8  say when a memory change, because they would give me a
9  new medication, and there could be a possibly side
10  effect.
11    Q.  So just so I understand, when you say that your
12  medication could -- could have impacted your memory in
13  2012, are you saying, as you sit here today, recalling
14  2012, that it could impact your memory?  Is that what --
15  is that what you're -- I'm just trying to understand
16  what you think your medication is impacting.
17    A.  Yes.  The medications that I was on in 2012
18  could have definitely had an impact.
19    Q.  On what you were saying in 2012 or on what
20  you're saying today about 2012?
21    A.  On what happened in 2012.
22    Q.  And so what -- what you're -- so the
23  distinction -- you're making a distinction between
24  taking medicine today versus taking medicine --
25  medication in 2012?

**319**

1    A.  No, Erin, what I'm saying is the medication
2  that I was taking in 2012, I definitely had some memory
3  loss.
4    Q.  And when --
5    A.  And --
6    Q.  When do you stop knowing --
7    MR. KENNARD:  No.  Were you done answering?
8    THE WITNESS:  No.
9    A.  I think we -- and today -- I'm testifying today
10  saying that the medication that I was taking in 2012 had
11  some memory loss.
12    Are you asking me can I testify today
13  clearly, with the medication that I'm on, without having
14  memory loss?  I can testify today.
15    Q.  (BY MS. O'DRISCOLL)  Okay.  And when you gave
16  testimony at the Texas Workforce Commission on your --
17  on your unemployment -- I'm confused by your answer with
18  your counsel a little bit ago.
19    So the testimony that you gave under oath
20  at the Texas Workforce Commission that was much closer
21  in time to the events --
22    And let me see if I can find an exact date
23  of when these transcripts were created.  It had to have
24  been late -- late 2012.
25    Are you saying that the testimony that you

**320**

1  gave at this hearing under oath may have been impacted
2  by your medication?
3    MR. KENNARD:  Objection.  Assumes facts.
4    Q.  (BY MS. O'DRISCOLL)  I'm trying to understand
5  what -- what testimony you gave to your lawyer a moment
6  ago.
7    A.  And I guess I'm confused about what you're
8  asking me.
9    Q.  Well, he brought up the impact of your
10  medication and your brain surgery and your ability to
11  recall events back at the hearing that was given under
12  oath that was close in time to the events versus today.
13    And so I'm just trying to understand how
14  you see your ability to remember today versus your
15  ability to remember within a month or two of the events
16  that we're talking about.
17    A.  Because closer to the event was closer to the
18  surgery.
19    Q.  And so -- and so -- and you're saying --
20    A.  I wasn't finished answering.
21    Q.  Okay.  Go ahead.
22    A.  So closer to the event was closer to the
23  surgery.  So I was on different medications that had
24  different impact versus now we're three years out,
25  almost four years out.  And as we -- as I testified

**321**

1  earlier, I'm still having some changes from the brain
2  surgery.
3    Q.  And have you been able to recall memories that
4  may not have existed back in 2012 that exist now?
5    A.  I don't understand what you're asking.
6    Q.  If you had medication that was impacting your
7  memory in 2012 and you're not on that medication
8  anymore, have you suddenly been able to recall certain
9  things?
10    MR. KENNARD:  Objection.  Misleading as
11  worded.
12    A.  Can you rephrase, because I don't even
13  understand what you're asking.
14    Q.  (BY MS. O'DRISCOLL)  Well, a moment ago you
15  said that you were on certain medications in 2012 that
16  impacted your memory.
17    A.  Uh-huh.
18    Q.  Is that correct?
19    A.  Yes.
20    Q.  And you're saying that you're not currently on
21  those same medications; correct?
22    A.  Some medications have changed and -- some, I'm
23  not on, and some I'm still on.
24    Q.  Okay.  And so you -- you said that the
25  medication you're on today impacts your memory

81 (Pages 318 to 321)

Artis Ellis

**322**

1 differently than your -- than the medication you were on
2 back in 2012; correct?  Is that what you're saying?
3 　　MR. KENNARD:  Objection.  Misleading as
4 worded.  Assumes facts.
19:17 5 　　Q.  (BY MS. O'DRISCOLL)  Well, let me put it this
6 way.  The testimony that you gave to the Texas Workforce
7 Commission was under oath; correct?
8 　　A.  That is correct.
9 　　Q.  And as the transcript was written, as you
19:17 10 stated earlier, you could have said -- you could have
11 said those things, and -- and some things you may or may
12 not recall.
13 　　A.  That is correct.
14 　　Q.  Okay.  I'll just leave it at that, and we'll
19:17 15 look to the transcript.
16 　　　　You testified earlier, when your counsel
17 asked you a few questions about Ms. LeHew's daughter, I
18 believe it's her stepdaughter?
19 　　A.  Yes.
19:18 20 　　Q.  How did you come to learn that -- that she had
21 been hired to work at ECFMG?
22 　　A.  I -- I knew Betty.  We talked.
23 　　Q.  And -- and when -- and when -- how did you come
24 to learn that her daughter worked at ECFMG?
19:18 25 　　A.  We just had a -- I mean, just conversing.  I

**323**

1 don't know how that information just came out.  It's
2 just in, you know, conversing.  I don't -- I don't
3 recall who told me or how it came out.
4 　　Q.  Well, I mean, did Betty tell you, or did some
19:18 5 other person tell you?
6 　　A.  I -- I don't recall.  Betty may have told me.
7 　　Q.  Do you recall what position her stepdaughter
8 worked in?
9 　　A.  She worked in HR and I believe she was a temp
19:19 10 and Betty shared that in our -- in my unemployment
11 hearing.
12 　　Q.  And you believe that her step -- that Betty's
13 stepdaughter was a temp, is that what you said, that
14 worked in HR?
19:19 15 　　A.  I believe she was a temp originally.
16 　　Q.  And do you have any knowledge as to whether or
17 not it was a -- a summer job?
18 　　A.  She was employed at ECFMG.  I don't know if she
19 worked in the summer or if she worked part time.  I
19:19 20 don't know.
21 　　Q.  Do you have any knowledge as to whether or not
22 it was a -- a summer job for a person who was in -- in
23 school at the time?
24 　　A.  It's against the policy, according to ECFMG
19:19 25 policy.

**324**

1 　　Q.  That's not answering my question.
2 　　　　Do you know whether or not the position
3 that -- that Betty's daughter was working, her
4 stepdaughter, if she was working, if it was a summer job
19:20 5 for a student?  Do you know?
6 　　A.  I don't know.
7 　　Q.  Okay.  And do you know if -- prior to her
8 daughter being hired for the summer, do you know if
9 Betty went to management and asked for clearance on this
19:20 10 prior to her being hired?
11 　　A.  I don't know.
12 　　Q.  So you don't have any of the details
13 surrounding any discussions that took place with
14 management related to hiring Betty's daughter for the
19:20 15 summer?
16 　　A.  I -- I don't know if she worked for the summer.
17 　　Q.  And -- and do you know how long she worked?
18 　　A.  I -- I don't know.
19 　　Q.  And do you know if there were -- do you know
19:20 20 who her daughter reported to while she was working for
21 ECFMG?
22 　　A.  Betty was the director.
23 　　Q.  But do you know if there was a manager that the
24 daughter was -- her stepdaughter was reporting to?
19:21 25 　　A.  Betty was the director of HR, so they all --

**325**

1 everyone were going to report to Betty.
2 　　Q.  But do you know if there was anyone that her
3 stepdaughter was directly reporting to?
4 　　A.  I -- I don't know the structure.  I mean,
19:21 5 who -- who all worked there.  I just know that her
6 daughter worked in the HR department, and Betty was the
7 director of HR.
8 　　Q.  Okay.  Can you pull back out Exhibit 17?
9 　　MR. KENNARD:  How much time do we have
19:22 10 left?  How much time?  Can you tell me?
11 　　　　(Discussion off the stenographic record.)
12 　　MR. KENNARD:  You might be out of time, my
13 friend.
14 　　MS. O'DRISCOLL:  Well, I mean, you -- you
19:22 15 brought these questions up, so I'm just crossing her
16 based on your questions.
17 　　MR. KENNARD:  I'm not out of time.  You
18 might be out of time, though.
19 　　MS. O'DRISCOLL:  I think -- I don't know if
19:22 20 it counts for cross.  I'm responding --
21 　　MR. KENNARD:  You've got total -- you've
22 got total amount.  You didn't leave yourself any time
23 for rebuttal, quite frankly.
24 　　THE VIDEOGRAPHER:  It was 13 minutes.  It
19:23 25 was 13 minutes before your last thing, so I didn't -- I

82 (Pages 322 to 325)

DepoTexas, Inc.

Artis Ellis

326

1    didn't see it was -- I don't know what time we went back
2    on.
3         MR. KENNARD:  You've got a total amount of
4    time.  The rules don't indicate that you have --
19:23  5       MS. O'DRISCOLL:  Okay.  Well, I should have
6    gone off the record when I was double checking my notes.
7    I shouldn't have let you --
8         MR. KENNARD:  Well, I didn't -- you've had
9    enough.
19:23 10       MS. O'DRISCOLL:  I'm pretty sure I have a
11   couple of minutes left.
12        MR. KENNARD:  I mean, how much -- I'm happy
13   to give you some leeway.  If you're going into some
14   extended --
19:23 15       MS. O'DRISCOLL:  I'm just following up
16   on --
17        MR. KENNARD:  Okay.
18        MS. O'DRISCOLL:  -- on your questions.
19        Q.  (BY MS. O'DRISCOLL)  Do you have Exhibit 17 up
19:23 20  in front of you?
21        A.  I do.
22        Q.  Okay.  And that's the relation -- relationship
23   policy; correct?
24        A.  Yes.
19:23 25       Q.  Okay.  I'm trying to find a copy of it in front

327

1    of me.
2         The -- when you look back at the
3    definition -- I know you talked with your counsel about
4    the definition of "relative," the definition of
19:24  5  "significant other."
6         Can you read that definition out loud?
7         A.  "For the purpose of this policy" -- for this
8    "policy is any other inter-personal relationships
9    between individuals which create a relationship similar
19:24 10  to those described in the definition above may be
11   included under the provision of this policy if one of
12   the parties" have "influence over the other."
13        Q.  And you understand the whole purpose of this
14   policy is to prevent any perceived conflicts of
19:24 15  interest, influence, or favoritism; correct?
16        MR. KENNARD:  Understand -- I'm sorry.
17   Objection.  Assumes facts.  And counsel is testifying.
18        Q.  (BY MS. O'DRISCOLL)  Do you have an
19   understanding that -- that that's the purpose of this
19:25 20  policy?
21        MR. KENNARD:  Same objection.
22        Q.  (BY MS. O'DRISCOLL)  Do you have an
23   understanding?
24        MR. KENNARD:  Same objection.
19:25 25       Q.  (BY MS. O'DRISCOLL)  Okay.  Let's start at the

328

1    very beginning under Roman numeral 1, policy.
2         What's the stated purpose of this policy?
3    When you look at paragraph 1 right there.
19:25  4       MR. KENNARD:  Are you asking her to read
5    it?
6         MS. O'DRISCOLL:  Yes.
7         MR. KENNARD:  Go ahead and read it.
8         A.  "It is the policy of ECFMG to regulate the
9    working and reporting relationships of individuals who
19:25 10  are related by blood, adoption, marriage, or domestic
11   partnership, affianced or significant other in order to
12   avoid real or perceived conflicts of interest,
13   influence, or favoritism."
14        Q.  (BY MS. O'DRISCOLL)  And what was your
19:25 15  understanding -- when you read that paragraph, what is
16   your understanding of the purpose of this policy?
17        A.  That you will not show any type of favoritism
18   by hiring relatives in the workplace.
19        Q.  Okay.  And -- and it's more than just
19:25 20  relatives; correct?
21        MR. KENNARD:  Objection.  Assumes facts.
22   Counsel is testifying.
23        MS. O'DRISCOLL:  I'm asking an adverse
24   witness a leading question that I can ask about a policy
19:26 25  that's in front of her.

329

1         Q.  (BY MS. O'DRISCOLL)  It's more than just
2    relatives, isn't it?
3         MR. KENNARD:  Same objection.  Are you
4    referring her to the policy, or are you -- are you
19:26  5  referring that it should include other people that
6    aren't relatives?  That's -- that's where you're
7    testifying.
8         MS. O'DRISCOLL:  I'm referring to the
9    policy that is --
19:26 10       MR. KENNARD:  Right.
11        MS. O'DRISCOLL:  -- that is not
12   specifically limited to relatives.  Everyone at this
13   table knows that.
14        MR. KENNARD:  Okay.  You want to -- if she
19:26 15  understands the question, she can answer it.
16        Q.  (BY MS. O'DRISCOLL)  You -- you understand that
17   this policy is more than just blood relatives; correct?
18        A.  Yeah.  It clearly defines in the definitions of
19   what the policy is saying.  It's relatives, domestic
19:26 20  partners, someone that you're engaged to, or significant
21   others.
22        Q.  And are you -- are you testifying to the judge
23   and jury that a person that you've had sexual
24   intercourse with would not constitute a significant
19:27 25  other, that you have a daughter with?

83  (Pages 326 to 329)

Artis Ellis

330

1          MR. KENNARD:  Objection.  Harassing the
2     witness.
3          MS. O'DRISCOLL:  It's a legitimate
4     question.
19:27 5     Q.  (BY MS. O'DRISCOLL)  Are you -- is that what
6     you're telling the jury?
7          MR. KENNARD:  Same objection.  You don't
8     have -- you don't have to answer that question.
9          MS. O'DRISCOLL:  She does have to answer
19:27 10     that.
11          MR. KENNARD:  I'm going to instruct you not
12     to answer that question.  That -- that's just offensive.
13     So are we going -- we going to talk about every single
14     ex-boyfriend or girlfriend we've had and so somehow
19:27 15     we're supposed to consider them to be our significant
16     other?  Now this is just harassing, and it's getting
17     beyond what I think is acceptable at this point.
18     That's --
19          MS. O'DRISCOLL:  Alfonso, this is not --
19:27 20     this is not a harassing question.
21          MR. KENNARD:  It is.
22          MS. O'DRISCOLL:  I'm asking about the
23     definition of "significant other."
24          MR. KENNARD:  You're asking her -- she's
19:27 25     already told you that she does not deem, and you were

331

1     here when she stated earlier that she did not deem this
2     individual to be a significant other.  Now you're
3     telling her:  Well, you had sex with him, didn't you?
4     Shouldn't you consider him a significant other?
19:28 5          MS. O'DRISCOLL:  It's a question.
6          MR. KENNARD:  Well, that's offensive, and
7     I'm not going to allow her to answer it.  You can call
8     the judge on that.
9          (Discussion off the stenographic record.)
10          MR. KENNARD:  I'm not -- I'm going to
11     instruct the witness not to answer the question.  You
12     can take that up with the judge at the appropriate time.
13     Additionally, you are out of time, Counsel.  You have
14     asked in excess of the time you have allotted to you to
19:28 15     ask questions of this witness.  At the time that you
16     address that and any other issues you deem pertinent
17     with the judge, you may also, as you know, request
18     additional time, if you believe that you are entitled to
19     it.  But at this time, it is now 7:30, and I am going to
19:28 20     suspend this deposition, because I don't have any more
21     questions and you're out of time.  So --
22          MS. O'DRISCOLL:  And I will -- and I will
23     reserve my questions and bring them to the judge if I
24     need to.
19:28 25          MR. KENNARD:  Okay.  All right.  Fair

332

1     enough.
2          MS. O'DRISCOLL:  Thank you for your time.
3          THE WITNESS:  Thank you.
4          THE VIDEOGRAPHER:  Time is approximately
19:28 5     7:29.  We're off the record.
6          (Deposition was concluded at 7:28 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

333

1     ARTIS ELLIS vs. EDUCATIONAL COMMISSION FOR FOREIGN
2     MEDICAL GRADUATES
3     ARTIS ELLIS
4
5     CHANGES AND SIGNATURE
6     PAGE LINE CHANGE          REASON
7     _____
8     _____
9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____
25     _____

84  (Pages 330 to 333)

Artis Ellis

**334**

```
 1        ARTIS ELLIS
 2          Page 2
 3    _____
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9        I, ARTIS ELLIS, have read the foregoing
10    deposition and hereby affix my signature that same is
11    true and correct, except as noted above.
12
13
14
15        ARTIS ELLIS
16
17
18
19
20
21
22
23
24
25
```

**335**

```
 1    THE STATE OF TEXAS:
 2    COUNTY OF HARRIS:
 3
 4        I, Peggy Ann Antone, Certified Shorthand
 5    Reporter in and for the State of Texas, do hereby
 6    certify that the facts stated by me in the caption
 7    hereto are true; that the foregoing deposition of ARTIS
 8    ELLIS, the witness hereinbefore named, was taken by me
 9    in machine shorthand, the said witness having been by me
10    first duly cautioned and sworn under oath to tell the
11    truth, the whole truth and nothing but the truth, and
12    later transcribed from machine shorthand to typewritten
13    form by me.
14        I further certify that the above and
15    foregoing deposition, as set forth in typewriting, is a
16    full, true and correct transcript of the proceedings had
17    at the time of taking said deposition.
18        I further certify that I am neither
19    attorney or counsel for, nor related to or employed by
20    any of the parties to the action in which this
21    deposition is taken, and further that I am not a
22    relative or employee of any attorney or counsel employed
23    by the parties hereto, or financially interested in the
24    action.
25        I further certify that signature of the
```

**336**

```
 1    witness was requested, and, if requested, the
 2    corrections/changes are attached.
 3        I further certify that charges for the
 4    preparation of the foregoing completed deposition were $
 5    _____ for the original thereof, charged to
 6    Attorney(s) for _____.
 7        GIVEN under my hand and seal of office on
 8    this, the 20th day of May, 2016.
 9
10
11    ---------------------------------------
12    Peggy Ann Antone, RMR, CRR
13    Notary Public, State of Texas
14    Commission expires 8/28/16
15
16    DepoTexas, Inc.
17    Firm Registration No. 95
18    13101 Northwest Freeway, Suite 210
19    Houston, Texas  77040
20    (281) 469-5580
21
22
23
24
25
```

85  (Pages  334  to  336)

Artis Ellis

1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF TEXAS

3      HOUSTON DIVISION

4

5   ARTIS ELLIS                    :

6          Plaintiff,              :

7   vs.                            :

8   EDUCATIONAL COMMISSION          :        C. A. No.

9   FOR FOREIGN MEDICAL             :        4:14-cv-02126

10  GRADUATES,                      :

11          Defendant.              :

12

13      VIDEOTAPED DEPOSITION OF ARTIS ELLIS

14

15      Called as a witness by the Defendant, taken before

16  Peggy Ann Antone, a Certified Shorthand Reporter in and

17  for the State of Texas, on May 11, 2016, beginning at

18  9:51 a.m., at the offices of Kennard Richard P.C., 2603

19  Augusta Drive, Suite 1450, Houston, Texas, pursuant to

20  the Federal Rules of Civil Procedure.

21

22

23

24

25

Artis Ellis

333

1    ARTIS ELLIS vs. EDUCATIONAL COMMISSION FOR FOREIGN

2              MEDICAL GRADUATES

3              ARTIS ELLIS

4

5            CHANGES AND SIGNATURE

6    PAGE LINE CHANGE              REASON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Subject: [No Subject]

From: Artis Ellis (afharden@yahoo.com)

To: afharden@yahoo.com;

Date: Saturday, June 11, 2016 7:56 PM

1. Betty Lehew was present during the deposition; however her name does not appear in the appearance.

2. Page 13 #1 I was in the hospital within the past 30 days. I have been on a lot different medicines that could have effective my memory. Reason: I am not a doctor and I don't know all the side effects of all the medication.

3. Pg 14 #18 I don't recall having a deposition like I had on May 11, 2016 Reason: I don't recall.

4. Pg 17 #17 Brandon has been out of Harris County for seven years. Reason:I did not count the four years when was in College that were not in Harris County.

5. Pg 18 #19 Brandon Reason: Spelling incorrect.

6. Pg 19 #21 Cory's last name is Battle. Reason: I gave the wrong last name.

7. Pg 24 #23 TIA's, low blood sodium and migraine. Reason# I did not recall at the time of deposition.

8. Pg 25 #6 2015 Reason: I did not recall the year during the testimony.

9. Pg 26 #8 My husband email address is
                    Reason: Email is not the normal communication, however I have sent,forward and

received emails to my husband.

10. Pg 27 #23 The lease expired May 2015 Reason: I recall the year.

11. Pg 28 #3 6 months Reason: I had a six month lease.

12. Pg 29 # 8 I opened November 2014 Reason: I recall

13. Pg 59 #21 No. Reason: John supervised all staff.

14. Pg 59 #24 No. Reason: I assigned staff to train new employees. Such as Proctors, Control Room, Receptionist

15. Pg 68 #11 No hurricane but bad weather and the center was close. Reason: I associated the bad weather with hurricane Ike.

16. Pg 81 #21 the document could have been signed several days after orientation. Before the SPOS sent it to HR and was dated the day of Orientation. Reason: I recall

17. Pg 147 #5 no Reason: Answer incorrectly.

18. Pg 158 #20 Administrative Leave Reason: I used the wrong word.

19. Pg 161 #23, 30 years ago. Reason: I gave wrong time frame.

20. Pg 164 # 21 Forest. Reason: Name spelled wrong

21. Pg 172 #1 while we were not. Reason: CR left "not" there

22. Pg 173 #10 we. Reason: wrong word, it's we instead of he.

23. Pg 174 #8 so she. Reason: wrong word change it to

"she".

24. Pg 205 #6 "administration leave" Reason: not personal leave

25. Pg 203 #4 I did not say it to the group. Reason: add "I did not"

26. Pg 203 #6 Administration Leave. Reason: not personal leave.

27. Pg 222 #14 after surgery. Reason: I was driving before surgery.

28. Pg 223 # 16 President of the company. Reason: Dr. Cassimatie ask me if the tumor was benign. I was supposed to have emailed him when I received the pathology report. I recall.

29. Pg 229# 17 remove Billy. Reason: I don't know a Billy.

30. Pg 229 #19 remove leaves add hiring. Reason: mistake on word choice.

31. Pg 279 #4 Add depression. Reason: I fail to mention depression.

32. Pg 287 #4. Four weeks Reason: gave six weeks I recall it was four weeks

33. Pg 288 #4 NBME Reason: typo

34. Pg 312 #16 yes. Reason: I recall Bea Bright-Davies.

Sent from my iPhone

334

ARTIS ELLIS

Page 2

1
2
3
4
5
6
7
8
9        I, ARTIS ELLIS, have read the foregoing
10   deposition and hereby affix my signature that same is
11   true and correct, except as noted above.
12
13
14   _____
15       ARTIS ELLIS
16
17
18
19
20
21
22
23
24
25

Artis Ellis

335

1    THE STATE OF TEXAS:

2    COUNTY  OF  HARRIS:

3

4              I, Peggy Ann Antone, Certified Shorthand

5    Reporter in and for the State of Texas, do hereby

6    certify that the facts stated by me in the caption

7    hereto are true; that the foregoing deposition of ARTIS

8    ELLIS, the witness hereinbefore named, was taken by me

9    in machine shorthand, the said witness having been by me

10   first duly cautioned and sworn under oath to tell the

11   truth, the whole truth and nothing but the truth, and

12   later transcribed from machine shorthand to typewritten

13   form by me.          I further certify that the above and

14

15   foregoing deposition, as set forth in typewriting, is a

16   full, true and correct transcript of the proceedings had

17   at the time of taking said deposition.

18              I further certify that I am neither

19   attorney or counsel for, nor related to or employed by

20   any of the parties to the action in which this

21   deposition is taken, and further that I am not a

22   relative or employee of any attorney or counsel employed

23   by the parties hereto, or financially interested in the

24   action.

25              I further certify that signature of the

Artis Ellis

336

1    witness was requested, and, if requested, the

2    corrections/changes are attached.

3                    I further certify that charges for the

4    preparation of the foregoing completed deposition were $

5    312.90  for the original thereof, charged to

6    Attorney(s) for  Defendant  .

7                    GIVEN under my hand and seal of office on

8    this, the 20th day of May, 2016.

9

10

11   _____

12   Peggy Ann Antone, RMR, CRR

13   Notary Public, State of Texas

14   Commission expires 8/28/16

15

16        DepoTexas, Inc.

17        Firm Registration No. 95

18        13101 Northwest Freeway, Suite 210

19        Houston, Texas   77040

20        (281) 469-5580

21

22

23

24

25