# EXHIBIT 28

# Texas Workforce Commission
A Member of Texas Workforce Solutions

February 26, 2015

RoseMarie Chambers
Morgan Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX  77002

**Date Received: 9/5/2014**
Request No.    : 140905-021
Total Charges : $95.10
Balance Due   : $0.00

RE:  Artis Ellis
     140905-021

Dear RoseMarie Chambers:

Enclosed please find the certified results of our search for records regarding the above-referenced subject.

This letter will also confirm that we have received payment in full for the total charges associated with this request, as listed above.

Should you have any questions regarding the enclosed information, please feel free to contact me at the phone number listed below.

Sincerely,

Shauntay Black
Assistant Disclosure Officer
512-305-9871

EXHIBIT NO. 25
P. Antone, CRR

Texas Workforce Commission, Open Records Section
• 101 E. 15th Street, Room 266 • Austin, Texas 78778-0001 • Tel: (512) 463-2422 • Fax: 512/463-2990 •
• Relay Texas: 800-735-2989 (TDD) 800-735-2988 (Voice) • open.records@twc.state.tx.us • www.twc.state.tx.us •
Equal Opportunity Employer/Services

CONFIDENTIAL   ECFMG/Ellis000443



STATE OF TEXAS              §

COUNTY OF TRAVIS    §

### CERTIFIED COPY OF PUBLIC RECORDS

RE:   Artis Ellis
Ref #:  140905-021

I, Shauntay Black, Assistant Disclosure Officer for the Texas Workforce Commission (Commission), an administrative agency of the State of Texas, hereby certify that the Commission has conducted a diligent search for the following records regarding the above referenced individual and the employer – Education Commission of Foreign Medical Graduates (ECFMG)

Publication - UI Program Booklets
Reports
Telecenter-6485-McAllen
Appeals-FileNet
Online Claimant Response
UI-Teleserve UI-Determinations
UI Claim Info. Within last 10 yrs

I further certify that the documents attached hereto are true and correct copies of documents located as a result of this search and that these documents consist of official records or reports, or entries therein, or of documents authorized by law to be recorded or filed and actually recorded or filed in a public office.

Texas Workforce Commission policy and procedures for maintenance and retention of records relating to the Agency's primary program operations are provided on the attached document entitled "Retention Schedule for Major Program Records."

Witness my hand and the official seal of the Texas Workforce Commission, in Austin, Texas on 2/25/2015.

Shauntay Black
Assistant Disclosure Officer
Texas Workforce Commission

CONFIDENTIAL   ECFMG/Ellis000444

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 3 / 6101

From: "kjohnson@ecfmg.org" <kjohnson@ecfmg.org>
Sent: Tuesday, November 27, 2012 10:54 AM
To: UcmRfiResponse_talx;  sroman@ecfmg.org
Subject: Addtnl info on Termination- RE: Reply By: 11/27/2012 Unemployment  State
Call on ARTIS  ELLIS, ###-##-9208 Inhouse:  FU8J Loc: UNKWN UNIDENTIFIED

From: ucmrfiresponse@talx.com
Sent: Nov 21, 2012 1:20:08 PM CST
To: kjohnson@ecfmg.org, sroman@ecfmg.org, agleasonmack@ecfmg.org
Subject: Reply By: 11/27/2012 Unemployment State Call on ARTIS ELLIS, ###-##-9208 Inhouse: FU8J Loc: UNKWN UNIDENTIFIED

# TALX

SSN: ■■■■■■

To:
Kiandra Johnson
ECFMG EDUCATIONAL COMMISSION
FOR FOREIGN MEDICAL GRADUATES
Fax: (215) 966-3124

**State Request for Additional Details Needed by 11/27/2012, 06:42 AM (CT).**

A state official has recently contacted our office requesting detailed information concerning the claimant shown below. Limited time is given to respond to this request; failure to comply by the state enforced deadline could result in an unfavorable determination.

| Claimant: ARTIS  ELLIS | SSN: ■■■■■ | Claim State: TX |
|---|---|---|

**Claimant statement of Last Date Worked:**

**Following, you will find additional questions related to this document:**

1. Who discharged the claimant and when? Nancy Ambrose – Assistant Director of Center Operations on November 1, 2012.
2. Please provide the name, title, and date. Above
3. What were the date and details of the final incident? An investigation of alleged policy violations by Artis took place from October 22nd through October 31st and she during the investigation admitted to the making two major policy violations, first violation was discovered that she had a close, personal relationship to a former employee (he is the father of her daughter) who she hired and subsequently promoted in a direct reporting relationship without disclosing the relationship to anyone; the second violation was that she gave her confidential, secure password to sign off the exam on 9/13/2012 to a non-management, non-authorized employee without permission.
4. Please provide a copy of any warnings the claimant was issued.  See attached
5. Please provide a copy of the violated policy and the signed acknowledgement. See attached

Name of person completing
form:_____Date:_____

CONFIDENTIAL   ECFMG/Ellis000451

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 4 / 61 उ‍ा

Houston Issues

- It has been discovered that Artis may have had a personal relationship with a former employee, Troi A Bryant, (who is reportedly the father of her daughter). This employee was hired and subsequently promoted as a direct report to Artis. It is a violation of ECFMG policy to employ relatives or close, personal relations in the line of supervision. We are not aware that Artis disclosed her personal relationship this employee to her supervisor or HR.

*During the investigation, Artis denied that the former employee she hired and promoted, Troi Bryant, was her daughter's biological father, and she said that he just took responsibility as a friend when Artis was pregnant at young age, but that he was not part of her daughter's life. The following day on the phone with the AVP of HR, Artis admitted that she lied about Troi being her daughter's father because her conscious needed to "come clean" and that she did not disclose this to anyone. This is a violation of policy.*

- Exam session of Thursday 9-13 was certified with Artis' password while Artis was out on FMLA leave and did not have access to her computer. It is a violation of policy to have an exam session certified by anyone other than center management or above. It is also a violation of policy to given login/password anyone, thus allowing that staff person access to confidential information.

*During the investigation, Artis admitted to giving her password to Sharon Dalberg, a non-management employee, and asking Sharon to sign off the exam on 9/13/2012, while Artis was on leave of absence. Artis admitted that she knew it was a secure password and she did this without anyone's permission. This is a violation of security policy. The CSEC Data Security Policy (effective date 6/1/2007) specifically states that "each manager, assistant manager and trainer shall adhere to ECFMG's current password security policy and shall not share or communicate their password with any other person." This policy is referenced in the Security Manual which all CSEC Staff is required to be familiar with.*

- It has been discovered that the exam had been short scheduled of staff, which is risking the integrity and validity of the exam. It is the manager's responsibility to appropriately schedule the exam. There were also days when people where scheduled to work when there was no exam, thus wasting payroll dollars and possibly allowing preferential treatment to some employees, again the responsibility of the Center Manager.

*The investigation uncovered one day in September that staff had been scheduled to work a shift when there actually was no exam scheduled.*

- Artis did not follow policy when removing SP's from the exam in terms of paying them. Artis, after pulling people, forced them to "clock out" and leave which is against company policy.

- Artis abandoned the policy that required SP's to wear robes in all common areas of the building.

CONFIDENTIAL   ECFMG/Ellis000452

*Artis specifically told the Assistant Director that she let SPs wear shorts under their gowns in lieu of robes during the Asst Director's visit to the Houston Center the week of September 4th. During our 10.22.12 meeting with Artis she denied ever saying this.*

*Artis is responsible to ensure the employees reporting to her follow the handbook policies and the SP Handbook clearly states the following:*

"You must exhibit modesty in your habits whether resting or exercising and prevent exposure by wearing a robe while in the hallways and common areas.  You are always visible in the exam room, even between encounters."

- Artis changed the policy, without authorization, of SP's returning to the exam room within 2 minutes of the next encounter. Artis changed it to 3 minutes.

- Artis violated policy by having 5 years of paper checklists stored at the center. These are to be kept for no longer than 90 days. Along with other confidential exam materials that should have been destroyed that were kept in a supply cabinet.

*It is our policy that paper checklists should be scanned in and stored electronically for USMLE and then shredded after 4 months. It appears that this was never done and the checklists are backlogged for a number of years in Houston.*

- It is the programs policy to supply basic needs such as tea, dish soap, and other items to SP's. Artis had the SP's buying their own supplies.

- A special exam, scheduled back in May of 2011, which was supposed to happen on Monday 9-17 was not communicated to staff nor was the center set up for the exam.

- Artis threw away SP's personal belongings such as food, dishes and clothing without notifying SP's.

- Artis would constantly threaten her team by saying "maybe this is not the right job for you"

- The physical condition of the building was unacceptable; server room had piles of "junk" in the corner. Ceiling tiles were mis-colored from issues that had happened months ago, there were boxes and boxes of things put in closets that the center had no use for that should have been thrown away long ago.

- Artis has developed an environment where "telling" on your coworker, instead of supporting each other, it is excepted and expected. There is no sense of team work. One example is that a trainer had left central station unlocked and instead of locking it the next staff member who tried to enter the room left a posted noted that said security violation on the door, but did not lock it, and a second ran to Nancy Ambrose and said the door is unlocked instead of locking the door themselves. There is a climate that everything that happens at the center must

CONFIDENTIAL   ECFMG/Ellis000453

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 6 / 8TB

immediately be reported back to Artis, even though she is on leave, and there are several examples of this. If you do not call Artis the feeling is that you "do not have her back" and that there will be retribution.

- Artis was having conversations about one of her SP's with a trainer from a different center reporting "we are trying to fire him anyway" as they discussed how he was performing his case.

- Artis had instructed her FOC to "hoard/hide" supplies thus leaving the center staff to run around and try to patch things together rather than have the supplies they needed to run the exam.

- Artis would often go in and ask her SP's to provide her with food.

CONFIDENTIAL   ECFMG/Ellis000454

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 7 / 61ΘΥ

**To:** Artis Ellis
**From:** Chris Paul
**Date:** August 23, 2012
**Re:** Concerns

Artis, as center manager you are expected to lead your team and meet all performance goals by modeling the way in terms of behavior and performance. Over the last several months, there have been several issues that combined have caused concerns for your ability to effectively run the Houston Center. As the Center Manager, you set the tone for the Center and the work environment you establish and support dictates the cooperation, teamwork and success of the staff.

We have heard from several employees both current and past who have expressed concerns specifically with the management of the center and we have observed and experienced some of the same concerns for your ability to successfully make the Houston Center to a positive, healthy and productive workplace.

Chris, I thank you for presenting your concerns in regards to the work environment at the Houston Center. I understand as the Manager of the Houston Team, I am a model of expectations and performance of our center. The ability/inability of the success of the Houston Center is determined through a team effort. I understand there may be concerns from past/present employees that have been brought forth. If the focus is teamwork, any concerns that were presented to you regarding the Houston Center Management Team, did not offer us an opportunity to resolve these concerns. You have specifically stated that (you and others) have observed and experienced the same concerns of my ability to successfully make the Houston Center a positive, healthy, and productive workplace. My focus has always been a team effort by communicating with staff, as well as with 3750. I would like some clarification in regards to any concerns observed and experienced by Houston staff and 3750 that were not communicated to the Houston Management Team prior to these issues becoming concerns.

Artis, thanks for meeting with me yesterday to discuss these concerns as well as plans for continued success of the Houston center, as I stated yesterday many of these concerns you and I have been speaking about since February. I can recall a conversation regarding Tyrone Campbell immediately after receiving a corrective action relating to exam issue. No additional information was brought to my attention regarding issues' or concerns for Houston. I have made the changes we discussed and remain committed to your success and the success of the center please let me know if you have any questions, also please respond back to this email letting me know that you have received it.

Examples of ineffective performance management and staff leadership at the Center:

1) Substantial turnover in the last ten months, including 6 full time employees and 29 PTAN employees, many of which were due to factors such as the lack of proper

CONFIDENTIAL   ECFMG/Ellis000455

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 8 / 610r

coaching and supervision or t reported a negative atmosphere in the center. This included complaints of intimidation and overall unconstructive feedback to large groups. The substantial turnover within the ten month period stated is one of many variables. The full time employees and part-time as needed employees receive the necessary training to fulfill the duties expected of them. All team members are encouraged to perform their duties to the best of their ability. Although attempts to motivate staff members are provided, it takes an individual effort from each team member to contribute to this process. It is not the practice of the Houston Management Team to supervise staff through methods of intimidation. All staff is encouraged to focus on the center goals and maintain cordial and professional conduct through these efforts. Any feedback provided to the Houston staff is to be utilized in a positive manner for improved performance and decision making with work related concerns. As the Houston Center Manager, an open door policy has been extended to all staff with any concerns. The staff is encouraged to utilize this policy if needed.

2) The following behaviors are examples of a combination of what has been reported by both current and past employees and observed by corporate management and is what is meant by ineffective staff leadership:

   a. That at the beginning of the ACS process you held several meetings in the commons where you repeatedly told SP's to look around as half of the room will not make it through ACS since it has been so hard. In the beginning of ACS, all meetings were held to advise staff of information that has been provided in regards to the ACS process. No staff member has been discouraged through the ACS process. In an effort to provide a positive environment, motivational meetings were held during the mornings to promote positivity for the day.

   b. When the center opened from the retro-fit and was not performing well, instead of taking the responsibility for the center, you went into the commons and gave "a 15 minute tongue lashing" to the SP's stating it was all their fault. As the Manager of the Houston Center, I accept the responsibility of any lack of effort to perform center goals daily. I am not in a position to place blame or fault on any staff member. I do express to staff that there is accountability on all levels as a team, including management. Although I disagree with the terminology of issuing a "tongue lashing" to SP's. I do understand I have no control over individual perception. As the Houston Center Manager, I have an expectation for staff to continue to remain professional and learn from any mistakes made.

   c. Prior to his leaving your ACM was told repeatedly, "either grow or you will go" but then he was never given the direction and leadership to grow or the corrective action to hold him accountable. My goal as Center Manager is to be a leader for all staff including the ACM. The focus is to prepare the ACM to become a leader not only in my absence, but to work together as a successful team. Brent was encouraged to attend workshops in leadership development and encouraged to utilize books I personally provided to assist

CONFIDENTIAL   ECFMG/Ellis000456

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 9 / 61@r

his professional development. It appeared Brent had made some improvements with his communication skills; however, there were areas he needed continue development such as delegation and leadership. During the first quarter I reached out to you in regards to an issue Brent was having with mistakes. You encouraged me to work with him on coaching and counseling. I have made no statement to Brent to "grow or go". He has never shared this information with me. I have offered suggestions for professional development. I am to assume he was paraphrasing with his statement. I have never made this particular comment to Brent.

d.  You have told your staff members: "you will take feedback in any way I choose to give it" you have told staff not to "air dirty laundry" in front of anyone from outside of the Houston CSEC center, implying that employees are not permitted to contact management or HR in the corporate office about any issues in the Houston Center. Several staff hav met with you to address issues of concerns (Basil, Alaire and Mary C.) that I am aware of. I strongly encourage all staff to address any issues they may have. As I recently directed several staff to speak with Betty Lehew during her visit to Houston last week. August 20th and August 21st. I have also empowered the team (Rupa, Robert and Dr. Shaff) to speak directly to you when they have brought concerns to me regarding issues they have had with you.

e.  You have had continual, excessive numbers of issues with employee confrontations and inappropriate behaviors at the center that result from and environment with low morale that is not supportive and encouraging for employees. All issues regarding employee relations have been addressed as soon as I became of aware of them. The most recent issues I addressed with you last week. (Harold White, Brent Wallace, Thomas and Myron). Any other issues you are referring to I would need more information.

f.  It has been reported that you have been disrespectful and verbally abusive to some of your staff to the point that they are afraid to say or do anything for fear of retaliation from you. Poor communication skills, which have hindered team development, and not at the level expected from someone who has been a leader for over 4 years. Which include the tongue lashing and Statements made in the commons, as noted above. Verbal abuse is not tolerated at this center at any level. It is the expectation that everyone is treated with dignity and respect. I have brought to your attention in regard to how I feel about verbal abuse (I have addressed the issue with you raising your voice at me in May 2012 when we had a discussion).Please refer to bullet "E" I have encourage staff to address any issues or concerns they may have with center operation. Also, you and HR have consistently informed staff to come directly to you with any concerns. At our mandatory meeting in July 2012, all staff was directed by you to call or email you as needed.

g.  Reactionary and impetuous decision-making which has cost you the respect and credibility of your team. Please be more specific regarding this issue. which includes wanting to put Nila in as interim ACM In regards to Nila as interim ACM, I asked you if she could help while we are in the recruitment process. This was no different when we gave Dave a special project to help

CONFIDENTIAL   ECFMG/Ellis000457

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-48 on line [1] for: McAllen Attention To - Pg 10 / 61x̃

with when JP resigned. You agreed Nila could help with assisting me with daily operations, but you saw no need to aid her to ACM meeting. I informed you by email and telephone conversation I saw no need to give Nila rights to certify the exams or kronos. and not taking ownership when there were issues with SP's who played live incorrectly you blamed the team for this. I would not jeopardize the exam with playing someone live without being signed-off. Could you please be more specific with cases you are referring too?

h. You have lied to your team on several occasions Please be more specific to lies I have told to my team. (This issue was not addressed) No clear precise information was warrant to be called a liar or stated I lied to my team.

i. including the reason for Betty Lehew's visit several months ago where you fabricated that Betty was there because Houston had won some sort of contest, when this was not the purpose of her visit. I apologize for any miscommunication on my behalf during Betty's visit. I was making a concerted effort to congratulate the team on the hard work they did on the recycling program. I agree this could have been presented in a different way. Never was it my intent to yield something positive in a negative aspect. you have told the team that they were doing poorly as far as portrayal and ACS only to have the actual numbers come out which showed they were doing well, I have not by any way told anyone they were doing poorly on ACS or Portrayal. We have not received data to verify performance results. It was brought to the staff by you that Houston cost ECFMG $312,000.00 and we were also performing in the 94th percentile. This was the first time I've heard how Houston was doing with ACS  and you have told me on several occasions that you have read and understood emails that have been sent only to have me question further and find out you actually had not read the email at all. This creates an atmosphere lacking trust and respect for you as the Center Manager.

3) An unacceptably low number of case combinations and SP's who were qualified to play live in the exam and you continue to struggle to get those numbers to acceptable levels. We had reported to USMLE that we would go live 60 SP's playing a minimum of 60 case combinations at each center; you started off with 42 SP's with only 48 viable case combinations. Currently our numbers are at 45 Live SP's with 8 in training, a substantial variance from the established expectation. Prior to retrofit we had the expectation moving forward with 60 case combinations. However, we had an unexpected turnover with SPs after ACS. This issue was discussed with you and a plan was put in place to do an immediate recruitment for SPs. We hired 10 new SPs and today 6 are still with us from that group.

4) Impacting the validity of the exam by running unapproved SP's in "live" exam, including 2 SP's who had contradictory physical findings. This issue was addressed in ballet "H" Not taking ownership. Chris I supported you with emails from Carly Grant approving SPs sign-off. In our previous meeting you told me you were going to remove this ballet and you have not.

CONFIDENTIAL   ECFMG/Ellis000458

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 11 / 61Y

**Expectations going forward**

1) Regain the trust and respect of your team through open and honest communications; encouragement and support, professional methods of holding people accountable and by your accepting responsibility for areas where you need to improve in your management and leadership style with demonstrated, immediate improvement. This will be measured by the reduced turn over and through direct communication with staff members in Houston. As the Houston Center Manager, I will work toward opening communication with staff through strategic suggestions and professional self development. I will start by creating suggestion boxes for staff compliments and complaints. I will review and address all complaints with staff to maintain a continued effort to communicate and establish trust.

   We discussed that I was not convinced you would get a strong enough feel for what is going on with just using a suggestion box. I feel as though your team does not trust the response they would get. I suggested to you that you be out with your team as much as possible and demonstrate your true commitment to open communication. We have also discussed in the past having a series of meeting with your team to help facilitate a more open dialogue and if you felt it was necessary I could come out to help you facilitate those meetings. (Every 10-15 minutes staff meet together to debrief and share non work related issues early in the morning. We find this to be invaluable. Also, most staff join the morning conversation and find it to be invaluable). I complete a walk around to visit CROS and Proctors.

2) Meet or exceed all center goals for staffing levels and maintain such   I will meet or exceed all center goals for staffing levels through team development and continue recruitment and hiring process.

3) Improve your strategic planning ability so that you are more aware of the centers current and future needs as well as the ensuring that all full time staff are performing at acceptable levels and actively communicating such with you on a regular basis. I will work on center needs and planning through communication with staff and you to maintain consistency and be efficient with center goals. (See previous comment about suggestion boxes in paragraph one).

CONFIDENTIAL   ECFMG/Ellis000459

We also discussed becoming more of a partner with your "key" team members including your ACM, Forest and Keith to ensure that you knew exactly what was happening in the center and what the needs of the center are.

4) Empower your team to effectively do their jobs without t micro-managing, while still having full awareness of what is happening in each area of the center. This comes when employees trust and respect the manager enough to come and willingly discuss updates on what they are doing, any concerns they have and to get support and resolution without hesitation or fear. All staff will be advised of center updates upon receipt by me. I will delegate a spokesperson from each area of the center to provide me with status updates and concerns that may require immediate attention. I will uplift staff by Encouraging the Heart and By Modeling the way. While maintaining a level of accountability when professional performance is low.

Your team still feels the need to run every decision and communication past you for approval, as stated above we have discussed several options for you to help improve this. Your team needs to know they have your support when they make decisions and if a decision is made that could have been done differently this is used as a teaching moment not always a performance issue. (Most staff competent to perform well with their job skills and abilities) I am the fortunate one. They bring me information as needed to know. I will continue to empower them to make sound and reasonable judgment. During our weekly staff meeting the staff get to share with other member's opportunities for learning experiences.

Artis, you are aware of our process to support and encourage employees to be successful, which is the purpose of this memo. We hope that you are successful, but you also know that you must meet the expectations of this position to continue in it. It is imperative that the Houston Center be lead by a person who is confident, yet humble and who supports and encourages the team while holding individuals accountable. It is also imperative that the operational standards for staffing and exam validity be met and maintained in Houston. Failure to achieve these expectations may result in termination of your employment. I thank you for the opportunity to address your concerns. I apologize for any miscommunication/misunderstanding on my behalf. I am always open to constructive criticism that will continue to help me with my professional growth and development. I am willing to attend any workshops or seminars to assist me with this process. I am proud to be the Houston Center Manager and grateful for the opportunity

Artis as I have stated from the beginning of my tenure of Director of Center Operations, I am here to help you and support you to be the best center manager possible and to help the Houston center be a healthy team environment, anything I can do to help with this I am here for you and the team.

Chris

Regards,

Artis Ellis

CONFIDENTIAL   ECFMG/Ellis000460

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 13 / 61Y

## Notice to All Employees and Acknowledgement of Receipt

**All employees must read this page, complete the bottom and return the signed page to Human Resources.**

This manual neither implies nor establishes a contract between ECFMG and the employee. The contents of this Employee Handbook summarize current policies and programs and are intended as guidelines only. For more detailed information regarding these policies, please refer to the policies themselves. Policies are posted on the Human Resources Public Folders and are available for all employees. ECFMG retains the right to change, modify, suspend, interpret, or cancel in whole or in part, any of the published or unpublished personnel policies or practices without advance notice.

Nothing contained in this handbook should be construed as a guarantee of continued employment, but rather, employment with ECFMG is on an at-will basis. This means that either ECFMG or the employee may terminate the employment relationship at any time or for any reason not expressly prohibited by law. Any written or oral statement to the contrary by a supervisor, or other agent of ECFMG is invalid and should not be relied upon by any prospective or existing employee.

I acknowledge receipt of the ECFMG Employee Handbook. I understand that I am required to read the Handbook, to familiarize myself with the policies and procedures contained herein and to comply with the provisions of the policies, procedures and rules set forth at all times. If I have any questions about the contents of the Handbook, I will consult the specific Policy to which my question pertains, or contact Human Resources.

I specifically acknowledge that I have read and understand the contents of the above "Notice to all Employees."

*Artis Ellis*
Employee Signature

*4/8/05*
Date

*Artis Ellis*
Employee Name (Print)

*Clinical Skills Evaluation Center*
Department

CONFIDENTIAL   ECFMG/Ellis000461

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 18-48 on line [1] for: McAllen Attention To - Pg 14 / 61}Σ'



# C S E C
### Clinical Skills Evaluation Collaboration

Administrative Offices
3750 Market Street,
Philadelphia, PA 19104
215-590-9444 Fax

NBME*



ECFMG*

### Clinical Skills Evaluation Collaboration (CSEC) Ownership, Confidentiality, and Non-Disclosure Agreement

I, the undersigned, acknowledge that in connection with activities associated with the United States Medical Licensing Examination® (USMLE®) Step 2 CS program and my involvement in the Clinical Skills Evaluation Collaboration (CSEC) between the Educational Commission for Foreign Medical Graduates (ECFMG®) and the National Board of Medical Examiners (NBME®), I will be provided access to secure, confidential and proprietary material and information of the ECFMG®, the NBME®, and/or the Federation of State Medical Boards (FSMB), or I may prepare secure, confidential and proprietary materials (together referred to as: "Confidential Materials"), which include, but are not limited to:

(1) details of a case including the overall description, the detailed scenario, case development forms, performance checklists and rating scale forms, interstation exercises forms, training materials and questionnaire/survey forms;

(2) data (including, but not limited to video/audio tapes of examinee-patient encounters, completed checklists and rating scales, completed interstation exercises, completed questionnaires/surveys, raw scores, score reports and aggregated test results);

(3) notes or summary information prepared by me or another in connection with activities associated with the Step 2 CS program; and

(4) personal information about the ECFMG® Standardized Patient employees who are matched to the patient cases, such as age, race, gender, weight, BMI, and medical findings related to case matching.

I understand and agree that all Confidential Materials are a valuable and unique asset and are the confidential property of the ECFMG®, the NBME®, and/or the FSMB. I agree that all such materials will be treated by me as confidential, and I agree that I will not, either during or after my employment with the ECFMG®, the NBME® or my involvement in the CSE Collaboration, disclose the nature or substance of the materials/information to, or use any of the materials for the benefit of any individual or entity other than the ECFMG®, the NBME®, or the FSMB for any reason whatsoever, except as may be required or appropriate for the proper discharge of my duties and responsibilities under this Agreement. I acknowledge and agree to use the materials only for my duties associated with the Step 2 CS program.

Confidential Materials shall not include: (i) information in the public domain or known generally in the industry through no fault of me, and (ii) information that is not treated by the ECFMG® or the NBME® or the FSMB as confidential or is disclosed by the ECFMG® or the NBME® or the FSMB to third parties without a duty of confidentiality imposed on such third parties.

I understand and agree that no copies of the Confidential Materials will be made and that no Confidential Materials will be removed from the NBME®'s premises without express prior authorization

*Page 1 of 3*

*A Collaboration of the Educational Commission for Foreign Medical Graduates*
and the National Board of Medical Examiners*

CONFIDENTIAL   ECFMG/Ellis000462

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 18-46 on line [1] for: McAllen Attention To - Pg 15 / 81Y




# C S E C
### Clinical Skills Evaluation Collaboration
Administrative Offices
3750 Market Street, 2nd Floor
Philadelphia, PA 19104
215-386-5703 Fax

NBME®                                    ECFMG®

by the NBME® or from the ECFMG®'s premises without express prior authorization by the ECFMG®. I understand that "premises" include test centers as well as the locations of the NBME® and the ECFMG® offices. I understand the Confidential Materials will not be discussed or transmitted electronically on or to non-ECFMG or non-NBME e-mail accounts.

I acknowledge and agree that all right, title and interest in the Confidential Materials and to any intellectual property which results, to any extent, from my use of the ECFMG®'s, the NBME®'s, or the FSMB's premises, property, or Confidential Materials, is a work for hire under the Copyright Act of the United States, 17 U.S.C. §101 et seq. and shall be owned, together with all worldwide rights therein under patent, copyright, trade secret, confidential information, or other property rights or laws, by the ECFMG®, the NBME®, and/or the FSMB.

Upon request, I shall execute and deliver any and all instruments and documents and take such other actions as may be necessary or desirable to assign and transfer all right, title, and interest in such intellectual property to the ECFMG®, the NBME®, and/or the FSMB. The term "intellectual property" as used herein includes, by way of example and without limitation, confidential materials, trade secrets, patents and patent applications, trademarks and trademark registrations and applications, service marks and service mark registrations and applications, trade names, copyrights and copyright registrations and applications.

Employees are not permitted to discuss USMLE® STEP 2 CS-related information with the media unless specifically authorized to do so. I will report any and all outside requests to a member of management in CSEC who will refer all inquires to the Executive Director, CSEC, at the central office in Philadelphia.

I understand that if I receive an inquiry, I may ask the media representative for their organizational affiliation, the general nature of the inquiry and the inquirer's contact information. However, I shall not respond to any substantive questions of any kind or provide any information or opinion regarding the ECFMG®'s or the NBME®'s policies, procedures, programs, or operations. This media policy shall apply to employees while in/or out of the regular workplace.

I acknowledge and agree that during the term of employment or affiliation with the ECFMG® or the NBME® and for eighteen (18) months thereafter, I will not accept employment, serve as a consultant, or act in any other capacity for any commercial or academic preparatory programs designed to or purporting to prepare individuals to take the USMLE®. I further agree that with regard to any educational activities within any medical school or graduate medical education program, I will not use the Confidential Materials or my specific knowledge to the design or content of the USMLE® Step 2 CS examination to prepare or otherwise aid students preparing for the USMLE® Step 2 CS examination.

I acknowledge and agree that I will not use my affiliation with the ECFMG® and the USMLE® Step 2 CS program for commercial exploitation, publicity, or advertisement.

The Parties agree that this Agreement may not be changed, modified or released, discharged, abandoned or otherwise terminated in whole or in part, except by agreement of the parties in writing.

*Page 2 of 3*

*A Collaboration of the Educational Commission for Foreign Medical Graduates and the National Board of Medical Examiners*

CONFIDENTIAL   ECFMG/Ellis000463

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 16 / 61] r




# C S E C
*Clinical Skills Evaluation Collaboration*

Administrative Offices
3750 Market Street, 2nd Floor
Philadelphia, PA 19104
215-386-5703 Fax

NBME*                                    ECFMG*

In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, the remaining portions thereof shall remain in full force and effect.

This Agreement shall be governed by and construed in accordance with the laws of the State of Pennsylvania.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date indicated below.

Signature: _____

Print Name: ARTIS ELLIS

Date: 1/10/12

Supervisor or Manager: _____

Date: _____

CSEC Executive Director: _____

Date: 1-24-2012

Original to Executive Director's office
Original filed with respective employer's (ECFMG® or NBME®) Human Resources Department

Revised November 2010


RECEIVED
JAN 2 6 2012
ECFMG/HUMAN RESOURCES

*Page 3 of 3*
*A Collaboration of the Educational Commission for Foreign Medical Graduates and the National Board of Medical Examiners**

CONFIDENTIAL   ECFMG/Ellis000464

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 17 / 81∑

| **ECFMG**<br>EDUCATIONAL COMMISSION FOR FOREIGN<br>MEDICAL GRADUATES<br><br>POLICY AND PROCEDURES MANUAL | SUBJECT:<br>EMPLOYMENT OF RELATIVES &<br>RELATIONSHIPS IN THE WORKPLACE | POLICY NO:<br>HR-305 |
|---|---|---|
| | DEPARTMENT:   HUMAN RESOURCES | |
| | DISTRIBUTION:   ALL DEPARTMENTS | |
| | EFFECTIVE DATE:<br>11/05/09 | Page 1 of 2 |

## I.  POLICY

It is the policy of ECFMG to regulate the working and reporting relationships of individuals who are related by blood, adoption, marriage, or domestic partnership, affianced or significant other in order to avoid real or perceived conflicts of interest, influence, or favoritism.

## II.  DEFINITION

<u>Employee</u>, for the purpose of this policy, is any staff member who is compensated through the ECFMG® payroll, independent contractors, agency contractors and/or agency temporary staff.

<u>Relative</u> is defined as any of the following including those by virtue of by blood, adoption, marriage, or remarriage, or domestic partnership (significant other or affianced): spouse, children, grandchildren, parents, grandparents, siblings, uncles, aunts, nephews, nieces and cousins.

<u>Domestic Partner</u>, for the purpose of this policy is two people of either gender who are living together and involved in a personal, intimate, committed relationship.

<u>Affianced</u> is defined as engaged to be married.

<u>Significant Other</u>, for the purpose of this policy is any other inter-personal relationships between individuals which create a relationship similar to those described in the definition above may be included under the provisions of this policy if one of the parties has influence over the other.

## III.  ELIGIBILITY

This policy applies to all employees, independent contractors, agency contractors, agency temporary staff and interns.

## IV.  GUIDELINES

ECFMG will not hire or employ anyone in a reporting relationship with the following relation to an existing full-time or part-time employee: spouse, parent, child or sibling, including step or adoptive relationships, grandparent or grandchild, or in-laws to the same degree.

ECFMG will not hire or employ anyone on a full or part time basis in the same department with a supervisory relationship to an existing full-time or part-time employee.

## V.  PROCEDURES

A.  ECFMG will not allow relatives to be placed or promoted into supervisor/subordinate reporting relationships.

CONFIDENTIAL   ECFMG/Ellis000465

Received 11/27/2012 3:32:32 PM [Central Standard Time] in 16-46 on line [1] for: McAllen Attention To - Pg 18 / 61}Σ`

POLICY: EMPLOYEE LEAVE OF ABSENCE
Page 2 of 2

B.  ECFMG will not allow relatives to be placed or promoted into supervisor/subordinate reporting relationships.  No present employee may participate in or affect any recruitment or selection procedure or other action concerning the potential employment of any person to whom he is related.

C.  In the case where two employees marry, continuing employment is available for both spouses, providing they are not in a reporting relationship.  If both members of a newly married couple work in a reporting relationship, one will have to transfer to a position that is not in the direct supervisory line with the other employee, if one is available, or end their employment with ECFMG.  The decision as to who remains shall be made based on first, the agreement of the two employees and secondly, seniority.

D.  An Employee who fails to disclose the knowledge of a relative relationship with another employee may be grounds for termination of employment.  An Employee who fails to disclose the knowledge of any type of personal relationship with another employee in the lines of reporting may be grounds for termination of employment.

E.  Department Managers have the discretion to determine whether employees who are involved in one of the relationships described above will be permitted to work in the same department.

F.  ECFMG® will make every effort to relocate existing full-time employees with relatives in the same department, if a reporting relationship is created, if a position is available.

G.  ECFMG® will make every effort to relocate existing employees who disclose a new relationship within the lines of reporting, if a position is available.

Responsibility for Policy: Policy Coordinator

Approved by Senior Staff _____11/05/02_____
                                                        Date

Approved by _____       _____
                   Emmanuel G. Cassimatis, M.D., President                Date

CONFIDENTIAL   ECFMG/Ellis000466

10 - A

Benefits – Non-Monetary Determinations
Fact Finding

SSN: ███████████     ARTIS ELLIS          Case Nbr: 6
Issue Nbr: 1     Type: FIRED     Reason: VIOLATION OF COMPANY RULE(S)/POLICY
Stmt Nbr: 3     of: 4     Stmt of: Claimant          Taken: 11-27-2012 02:53:44 PM

Name: ARTIS ELLIS          Title:
Phone Stmt: Y     Claim ID: 2012-11-04     Claim Dt: 11-04-2012     Rebuttal: Y     Footnote: Y

What was reason for separation from work?
  I HAD BEEN SUSPENDED WITH_PAY
  FROM 102212 THROUGH 110212 AND THEN FIRED.
What was reason given to claimant?
  VIOLATION OF COMPANY POLICY HIRING
  PRACTICE
Name and title of person discharging claimant.
  NANCY AMBROSE, ASST DIRECTOR
When/how discharged?
  IN PERSON 110112
  1010119405 1THE DIRECTOR HIRED MY DAUGHTERS FATHER OVER 5 YRS  9405 2AG
Exactly what happened?
  NOT HIRE HIM. HE DID WORK UNDER MY TEAM. HE WAS NOT EV
  YOU ARE NOT ALLOWED TO HIRE A RELATIVE WHICH IS 4070 2A SPOUSE OR FAMILY
  IN THE HANDBOOK. 4011 2
Aware actions could lead to discharge?
  N
Explain.
  BECAUSE WE WERE NEVER MARRIED NOR DID WE LIVE TOGETHER WHICH WOULD
  DENY WORKING WITH A RELATIVE.
Employer action toward others who violated rule/policy?
  I AM NOT SURE.
Rule(s)/policy(s) equally enforced?
  N
Prior warning(s)?
  Y
If yes, when; by whom; reason(s) for warning(s); written/oral; signed by claimant (if applicable)?
  082312 CORRECTIVE PLAN IN WHICH I MET
  THEM ALL AND ADDRESSED ALL ISSUES.
Prior suspension(s)?
  N
Progressive disciplinary policy?
  Y
Was policy followed?
  N
Explain.
  COACHING COUNSELING, VERBAL IF NECESSARY, 3 WRITE UPS AND THEN
  PLACED ON FINAL THEN TERMINATION.
Time lapse between incident and discharge?
  Y
If yes, explain.

CONFIDENTIAL   ECFMG/Ellis000615

**11 - A**

I WAS SUSPENDED.

-------------------------------------------------- END --------------------------------------------------

I NEVER TOLD ANYONE NOR HE TOLD ANYONE WE HAD A DAUGHTER TOGETHER. I DONT
KNOW HOW THEY FOUND IT, IT COULD HAVE BEEN THEY WENT THROUGH MY
COMPUTER. WE ONLY DISCUSSED BUSINESS HE WAS ALREADY MARRIED AND I WAS
MARRIED. IT   WAS ALWAYS BUSINESS NOTHING PERSONAL. I WAS AWARE OF THE
POLICY AND I WAS WELL VERSED ON THE POLICY AND WHAT CLASSIFIED AS HIRING
RELATIVE. I DID   WRITE HIM UP. NO ONE KNEW BECAUSE WE WERE ALWAYS
PROFESSIONAL.                                                    OUR DAUGHTER HAD
ALREADY GRADUATED HIGHSCHOOL.
I HAVE BEEN ABLE AND AVAILABLE FOR WORK WITHOUT RESTRICTIONS. I AM
LOOKINGFOR COORDINATOR WORK, CUSTOMER SERVICE WORK.

CONFIDENTIAL    ECFMG/Ellis000616

12 - A

Page: 4

Benefits – Non-Monetary Determinations
Fact Finding

| | | | |
|---|---|---|---|
| SSN: ███████ | ARTIS ELLIS | | Case Nbr: 6 |
| Issue Nbr: 1 | Type: FIRED | Reason: VIOLATION OF COMPANY RULE(S)/POLICY | |
| Stmt Nbr: 4 | of: 4 | Stmt of: Claimant | Taken: 11-30-2012 10:21:06 AM |

Name: ARTIS ELLIS   Title:
Phone Stmt: Y   Claim ID: 2012-11-04   Claim Dt: 11-04-2012   Rebuttal: Y   Footnote: YY

    1010119405 1 9405 2
    4070 2
    4011 2

------------------------------------------- END -------------------------------------------
IF THEY HAVE A POLICY OR NOT I SHOULD HAVE NOT HAVE DONE THAT. I
UNDERSTAND THEY SAID IT WAS A VIOLATION OF THE DATA SECURITY POLICY.IT HAS
BEEN READ TO ME WHAT THEY ARE SAYING HAPPENED REGARDING THE    FINAL
INCIDENT AND THAT BOTH THOSE ISSUES ARE VIOLATION OF COMPANY POLICIES.
REGARDING THE FIRST VIOLATION, ON OCTOBER 22ND I RETURNED FROM A    MEDICAL
LEAVE AND I WAS INFORMED ABOUT THIS. THE INVESTIGIATON WAS    DONE WHILE I
WAS ON LEAVE. MR BRYANT WAS HIRED IN 2008 BUT WAS NOT HIRED  BY ME. HE WAS
HIRED BY THE CENTER MANAGER JOHN REPACH AND MY TITLE AT    THE TIME I WAS
THE ASST CENTER MGR.    I WAS ON LEAVE WHEN HE WAS HIRED. IVE NOT HAD A
PERSONAL CLOSE RELATIONSHIP WITH HIM OVER 26YRS AGO. HE IS  THE FATHER OF MY
CHILD. WHEN I WAS LET GO HE HAD NOT WORKED THERE IN OVER A YEAR.
ACCORDING TO THEIR POLICY IT HAS NOTHING TO           DO WITH A CLOSE
FRIEND. I WAS NEVER MARRIED TO HIM AND WE HAD NO BLOOD.
                                      IN 2008 HE WAS HIRED AS A PART TIME
*F8*
EMPLOYEE. IN 2009 OR 2010 THERE WAS   A FULLTIME POSITION OPEN. HE APPLIED THRU
HR AND HE WAS SCREENED AND INTERVIEWED. THEY SENT THE TOP THREE PEOPLE TO
THE HIRING TEAM. AT THE TIME I WAS THE CENTER MANAGER SO MYSELF AND THE
ASSISTANT MANAGER INTERVIEWED THETOP THREE CANDIDATES WHICH INCLUDED
HIM AND BASED ON HIS EXPERIENCE AND  MERIT HE WAS PROMOTED TO A FULLTIME
EMPLOYEE. HE WAS UNDER MY SUPERVISION WHERE HE WOULD REPORT TO THE
ASSISTANT MANAGER AND THE ASSISTANT           MANAGER WOULD REPORT DIRECTLY
TO ME.                                              WHEN MR BRYANT WAS
HIRED OR WHEN HE WAS PROMOTED DO YOU THINK THAT YOU   SHOULD HAVE
DISCLOSED TO YOUR SUPERVISOR THAT THE EMPLOYEE MR BRYANT AND  YOURSELF
HAD A CHILD TOGETHER YEARS AGO?AT THE TIME OF HIRING I DID NOT   THINK I WAS IN
VIOLATION OF POLICY BECAUSE I HAD NO CONTACT WITH HIM. IT  WAS A PROFESSIONAL
RELATIONSHIP THAT I DID NOT THINK SOMETHING WAS WRONG. HE WAS THE BEST
PERSON FOR THE JOB. SINCE WE HAD NO TYPE OF RELATIONSHIP I DID NOT THINK
ANYTHING WAS WRONG. TODAY I WOULD DO THINGS *F8*       DIFFRENTLY NOW THAT I
HAVE A BETTER UNDERSTANDING OF THEIR POLICY OF THEIRBELIEF SYSTEM.
I UNDERSTAND THEY SAID THAT DURING THE INVESTIGATION THAT I DENIED THAT   MR
BRYANT WAS MY DAUGHTERS BIOLOGICAL FATHER AND THAT HE TOOK
RESPONSIBILITY AS A FRIEND WHEN I WAS PREGNANT AT A YOUNG AGE AND THAT HE
WAS NOT   PART OF MY DAUGHTERS LIFE. I UNDERSTAND THEY SAID THAT THE
FOLLOWING DAY  ON THE PHONE WITH THE AVP OF HR THAT I ADMITTED THAT I LIED
ABOUT MR.   BRYANT BEING MY DAUGHTERS FATHER BECAUSE MY CONSCIOUS
NEEDED TO COME CLEAN. THAT IS TRUE. WHEN I GOT AMBUSHED WITH THIS

CONFIDENTIAL   ECFMG/Ellis000617

**13 - A**

INFORMATION I LIED OUT OF  FEAR BUT I CAME BACK AND SAID THE TRUTH.
REGARDING THE SECOND VIOLATION. THIS IS CORRECT. I HAD BEEN PUT UNDER    ALOT
OF STRESS. I WAS GIVEN A LIST BEFORE I GOT SICK OF CONCERNS. I WAS   IN THE
HOSPITAL HAVING MAJOR BRAIN SURGERY. I MADE A BAD DECISION ON MY   PART. I
GAVE A REGULAR EMPLOYEE MY PASSWORD TO CERTIFY THE EXAM. *F8*

CONFIDENTIAL   ECFMG/Ellis000618