**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ARTIS ELLIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:14-cv-02126 |
| | § | |
| EDUCATIONAL COMMISSION OF | § | |
| FOREIGN MEDICAL GRADUATES, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT EDUCATIONAL COMMISSION OF FOREIGN MEDICAL GRADUATES'
AMENDED[1] MOTION FOR COMPLETE SUMMARY JUDGMENT**

Despite the fact that Defendant Educational Commission of Foreign Medical Graduates ("ECFMG") expressly prohibits relationships with subordinates in the direct line of reporting, Plaintiff Artis Ellis, ECFMG's Houston Center Manager and the highest ranking manager on site, violated ECFMG's Relationship Policy when she hired, promoted, and supervised her daughter's father for three years and never disclosed the relationship to ECFMG. Ellis violated yet another key ECFMG policy when she gave her secure password to a non-management employee to certify a medical exam for licensing physicians. ECFMG's policy clearly states that only management employees are permitted to certify an exam. Ellis's decision to share her password also gave a non-management employee unlimited access to confidential information she was not privy to. As a result of Ellis's two serious policy violations, her dishonesty, and the lack of trust that ECFMG had in Ellis to manage the Houston Center, ECFMG had no choice but to terminate her employment.

Although ECFMG terminated Ellis's employment for violating two, independent and important policies and therefore for legitimate, non-discriminatory, and non-retaliatory reasons,

---

[1] ECFMG timely filed its Motion for Complete Summary Judgment on October 7, 2016. Dkt. 32. Subsequent to filing, ECFMG realized that the final version of the Motion was not filed. Rather, ECFMG inadvertently filed a previous version. ECFMG respectfully files its Amended Motion which contains only non-substantive revisions and almost exclusively to the citations. No new arguments are made or exhibits attached.

Ellis nevertheless brought suit against ECFMG on July 24, 2014. In her Original Complaint, Ellis alleges that ECFMG violated the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), and the Texas Labor Code. Specifically, Ellis claims that ECFMG violated the FMLA by interfering with the medical leave she took while employed and by retaliating against her for taking this leave. Incredibly, she brings FMLA claims against ECFMG after taking her <u>fifth</u> FMLA leave over the course of her seven years of employment and admitting that she never heard any negative comments about taking leave, was never discouraged from taking leave, and was never denied any leave. Ellis further claims that ECFMG violated the ADA and the Texas Labor Code by discriminating and retaliating against her as a result of her alleged disability.

## I.    SUMMARY OF THE ARGUMENT

### A.    Ellis's FMLA Claims Fail as a Matter of Law

Each basis supporting Ellis's FMLA interference claim fails as a matter of law. First, Ellis's FMLA interference claim fails because ECFMG reinstated her to her position as Center Manager after her FMLA leave ended. Second, Ellis's interference claim cannot be supported by her manager's invitation to Ellis to attend an interview of a candidate for the Assistant Center Manager ("ACM") position or by friendly employees calling Ellis to check on her recovery while she was on leave. Courts hold that both instances are examples of *de minimis* activity insufficient to state an interference claim as a matter of law.

Ellis likewise fails to state a genuine issue of material fact with respect to her FMLA retaliation claim because ECFMG terminated Ellis's employment for legitimate, non-retaliatory reasons, and because there is no evidence of pretext or but-for causation between her protected leave and the termination decision. In addition, Ellis fails to meet her ultimate burden in an FMLA case because she can only support this claim with her subjective belief of retaliation and the

temporal proximity between her leave and the termination of her employment.  This support for her FMLA claim is insufficient as a matter of law.

**B.      Ellis's ADA Claims Fail a Matter of Law**

Ellis's discrimination claim similarly fails under the ADA because it is premised solely upon her subjective belief that discrimination occurred and on the close temporal proximity between the termination of her employment and her surgery.  In addition, Ellis fails to satisfy her *prima facie* case of discrimination under the ADA because there is no evidence of other employees who violated the same policies under "nearly identical" circumstances but were treated more favorably. Ellis's ADA discrimination claim fails for yet another reason, because Ellis cannot show pretext as there were no negative comments related to her alleged disability, or any evidence that ECFMG's stated reason for terminating Ellis's employment was false.

Ellis's ADA retaliation claim also fails because Ellis cannot establish her *prima facie* case. Specifically, Ellis presents no evidence that she engaged in protected activity under the ADA. Instead, she claims that taking FMLA leave or making generalized complaints constitutes protected activity.  Neither do.[2]  Ellis's ADA retaliation claim also fails for all of the reasons her FMLA retaliation claim fails.  That is, Ellis lacks evidence of pretext and has no evidence that but-for her alleged disability her employment would not have been terminated.

There are no genuine issues of material fact with respect to any of the claims Ellis has alleged in this lawsuit.  As a result, all of Ellis's claims should be dismissed as a matter of law.

---

[2]      When she filed her Complaint, Ellis also lodged a failure to accommodate claim under the ADA.  Dkt. 1. ECFMG moved to dismiss this claim on September 5, 2014 because Ellis failed to exhaust her administrative remedies with respect to this claim at the Equal Employment Opportunity Commission ("EEOC") stage.  Dkt. 6.  This Court agreed and granted ECFMG's Partial Motion to Dismiss.  Dkt. 18.

## II.    FACTUAL BACKGROUND[3]

Ellis started her employment with ECFMG at the Houston Center on April 8, 2005 as an ACM.  Ex. 1, Excerpts from Ellis's Depo, 36:2-37:3; Ex. 2, Ellis Initial Offer Letter.  ECFMG's Director at the time, Betty Hite, promoted Ellis to Acting Center Manager on October 27, 2008, and to Center Manager on January 26, 2009.  Ex. 1, 70:16-71:1.  Executive Director at the time, Ann Jobe, approved the promotion.  Ex. 3, Promotion Offer Letter.  Nancy Ambrose, the Assistant Director, made the decision to terminate Ellis's employment, and Jobe concurred in the decision.  Ex. 4, Ambrose Depo, 13:18-24; Ex. 5, LeHew Depo, 6:11-18.  As Center Manager, Ellis was responsible for managing approximately 80-100 part-time and full-time employees at the Houston Center location and for implementing and enforcing Center policies and procedures.  Ex. 1, 56:4-7.

ECFMG is a non-profit organization that partners with the National Board of Medical Examiners ("NBME"), for the purpose of developing and administering clinical skills examinations for doctors.  Specifically, ECFMG administers Step Two, Clinical Skills ("Step 2 CS"), which is part of the United States Medical Licensing Exam ("USMLE") required of medical students and graduates.  ECFMG has six Centers across the United States, and ECFMG leadership is located in Philadelphia.[4]  The following summarizes the key facts in this case in chronological order:

- Spring 1986:  Ellis and Troi Bryant had sexual intercourse after prom that resulted in the birth of their daughter.  Ex. 1, 20:17-20, 44:18-24, 45:6-25, 76:14-77:2; Ex. 6, Bryant Depo, 15:8-20:3.

- March 8, 1987:  Ellis's and Bryant's daughter, Brittani Bryant, was born.  Ex. 1, 44:21-24.  Bryant was and is actively involved in his daughter's life and Ellis and Bryant "co-parent" their daughter.  Ex. 1, 20:17-21:16; Ex. 6, 22:20-25:11, 25:23-27:5.

---

[3]     In support of its Motion for Summary Judgment, ECFMG relies on the pleadings on file in this action, the deposition testimony of Ellis, Betty LeHew, and Nancy Ambrose, and additional supporting exhibits.

[4]     Each ECFMG Center location has a Center Manager, an ACM, Trainers, administrative staff, and employees who simulate medical cases in the clinical exam as Standardized Patients ("SP").  Ex. 1, 59:4-60-2, 71:7-8.  The management level leadership outside of the individual Centers during the relevant time consisted of Executive Director (Dr. Ann Jobe), Director of Center Operations (Chris Paul), and Assistant Director (Nancy Ambrose).  Ex. 4, 11:23-12:15, 16:7-24, 19:14-18.  In addition, Betty LeHew is Assistant Vice President of Human Resources.  *Id.*; Ex. 5, 7:23-8:3.

- April 5, 2005:  ECFMG hired Ellis as ACM for Houston.  Ex. 2.  At this time, Ellis received the Employee Handbook and all applicable policies.[5]  Ex. 1, 59:4-24; *see also*, Ex. 13, CSEC Assistant Center Manager Job Description.  The critical policies applicable to this matter are:

    o The **Relationship Policy** which regulates "the working and reporting relationships of individuals who are related by blood, adoption, marriage, or domestic partnership, affianced or significant other in order to avoid real or perceived conflicts of interest, influence, or favoritism."  Ex. 8, §I.  The policy also broadly defines the term "significant other" as "any other  inter-personal relationships between individuals which create a relationship *similar to* those described in the definition above[6] may be included under the provisions of this policy if one of the parties has influence over the other" (emphasis added).[7]  The policy also clearly mandates that "[a]n employee who fails to disclose the knowledge of **any type of personal relationship with another employee in the lines of reporting may be grounds for termination of employment**." Ex. 8, §D (emphasis added).  Further, "Department Managers have discretion to determine whether employees who are involved in one of the relationships above will be permitted to work in the same department."  Ex. 8, §E.[8]

    o The **Data Security Policy** which provides that each manager "shall not share or communicate their password with any other person," and the **Certification Policy** which mandates that only management level employees can certify an exam.  Exs. 9, 10.

- October 27, 2008:  Jobe promoted Ellis to Acting Center Manager.  Ex. 1, 62:13-63:25; Ex. 3; Ex. 15, Center Manager Job Description.

- November 3, 2008:  Ellis signed Bryant's new hire paperwork as a part-time SP. Ex. 16, Troi Bryant Personnel Documents.  She also saw him at orientation on his first day of work, but never disclosed her relationship with her daughter's father, despite the fact that Ellis and Bryant co-parented their daughter for over twenty years at this time. Ex. 1, 53:5-14, 22-25; Ex. 6, 22:21-25.  Bryant reported to Ellis and she supervised, evaluated, and awarded raises

---

[5]    All of ECFMG's policies are located in public folders which every employee can readily access through Outlook. Ex. 1, 116:11-16.  These policies are also summarized in the Employee Handbook. Ex. 1, 298:4-20, 299:4-15; Ex. 7, Excerpts from Employee Handbook.  Ellis received a copy of the Harassment and Non-Discrimination policy, the Equal Employment Opportunity Policy, and all other policies governing her employment when she began working at ECFMG.  Ex. 1, 108:17-109:3, 111:3-12; 115:23-116:19; Ex. 7; Ex. 8, Relationship Policy; Ex. 9, CSEC Data Security Policy; Ex. 10, Certification Policy; Ex. 11, Clinical Skills Evaluation Collaboration, Confidentiality, and Non-Disclosure Agreement; Ex. 12, Non-Harassment and Non-Discrimination Policy.

[6]    The "definitions above" the term "significant other" are definitions of the terms employee, relative, domestic partner, and affianced. Ex. 8.

[7]    Ellis's and Bryant's daughter was born in March of 1987 and Bryant was hired in November 2008. Ex. 1, 44:21-24; Ex. 6, 24:15-25:9.

[8]    On September 11, 2006, Ellis hired and supervised her daughter's step-mother.  Ex. 14, Jackie Bryant Personnel Documents.  Ellis never disclosed this relationship either.  Ex. 1, 71:14-72:15, 74:12-75:19, 77:11-15.

to him.  Ex. 1, 53:5-14, 22-25, 56:4-57:8, 70:16-71:12, 80:2-7, 21-81:25, 97:1-98:13; Ex. 16; Ex. 17, Betty LeHew Declaration.

- January 26, 2009:  Jobe promoted Ellis to Center Manager.  Ex. 3; Ex. 5, 45:20-23.  Ellis's and Bryant's daughter moved in with Bryant after college and lived with him off and on for two years.  Ex. 6, 25:23-26:7; Ex. 16.

- May 10, 2010:  Ellis interviewed and promoted Bryant to a full-time position as an SP Trainer.  Ex. 6.  Ellis still failed to disclose to ECFMG her relationship with Bryant.  Ex. 1, 57:3-18; Ex. 16.  Indeed, Ellis admitted at her deposition that she signed Bryant's new hire paperwork, supervised him, approved raises, and interviewed and promoted him to a sought after full-time position with benefits.  Ex. 1, 56:4-57:18, 79:24-82:4-8, 97:1-98:13; Ex. 15.

- September 2011:  Chris Paul began supervising Ellis.  Ex. 4, 16:17-17:4.  Around this same time period, Paul also began coaching Ellis on how to prepare for the new exam which required retraining the staff and hiring new staff.  Ex. 1, 188:13-189:6.

- Spring 2012:  Ellis's performance issues became evident when all of the Centers across the country were charged with retrofitting the administered exam due to the introduction of a new "Clinical Skills Enhancement" portion of the test.[9]  Around this time, Ellis complained to Executive Director Jobe and to Assistant Vice President of Human Resources LeHew that she did not like Paul's management style and she also said she had a personality conflict with him.[10]  *See* Ex. 1, 230:9-234:17, 235:10-238:24; 310:23-311:10; Ex. 5, 44:5-22, 46:8-47:8.  During this time, a number of key employees resigned from the Houston Center, citing Ellis's management style as a reason for their resignation.  Ex. 22, Exit Interviews.

- Mid-August 2012: ACM Brent Biggs resigned.  Ex. 22.  Shortly after, Paul received an anonymous letter from the Houston Center complaining about Ellis.[11]  Ex. 23.

---

[9]     As a result of the retrofitting, the Centers had to increase staffing and undergo significant staff training.  Ex. 1, 188:13-189:1.  Ellis did not adapt the way she managed her Center to the heightened demands of the new exam.  Ex. 18, Email regarding new exam.  Paul observed this on multiple visits to Houston to assess the progress when he repeatedly witnessed a lack of teamwork.  Ex. 19, Email regarding memorandum in color; Ex. 20, Memorandum of Performance.

[10]    In fact, LeHew flew to Houston from her office in Philadelphia to take Ellis out to dinner and listen to her concerns.  Ex. 21, Emails between Ellis, LeHew, and Jobe.

[11]    Paul and Ambrose did not learn who wrote the letter until later in September/October 2012 when they were filling in at the Center during Ellis's leave and upon receiving more complaints from Employees.  Ex. 23, Anonymous Letter.  They later learned that Gary Dempsey wrote the anonymous letter.  Ex. 4, 25:15-24, 54:6-57:4.

- August 23, 2012:   Paul gave Ellis a written counseling for on-going performance problems.[12]  *See* Ex. 20.

- September 12, 2012:  Ellis went out on FMLA leave for surgery.[13]  Ellis asked for and was approved to take FMLA leave on September 12, 2012 until October 19, 2012.  Ex. 1, 123:4-8.  This was far from Ellis's first FMLA leave of absence while employed at ECFMG.  *Id.;* Ex. 1, 226:2-227:3, 227:11-19.  Indeed, Ellis requested and was approved for FMLA leave on four separate occasions in 2006, twice in 2008, and twice in 2012.  *Id.*

- September 13, 2012:  A medical exam was certified with Ellis's password although Ellis was out on leave.  Ex. 4, 29:19-24.  Ambrose later discovered during her investigation that Ellis gave her secure password to a non-management employee (Sharon Dalberg) to certify the exam, violating the policy which only permits management to certify exams.[14]  Ex. 5, 37:4-38:3; Ex. 24; Ex. 25, Emails between Ambrose and Information Technology.

- While Ellis was on leave, other Center Managers from around the country flew in for weeks at a time to fill in for Ellis.[15]  Ambrose and Paul also helped manage the Houston Center for about one month each.  Ex. 4, 54:6-22, 55:4-7.  A number of employees complained to the interim managers about staffing issues and their perception of favoritism by Ellis.  *Id.*; Ex. 5, 34:20-35:23.  Specifically, they reported that Ellis hired and promoted friends and family.  *Id.*  Paul and Ambrose also learned that Gary Dempsey wrote the anonymous letter while Ellis was on leave.  Ex. 4, 55:23-57:4.  Paul investigated and learned that Myron Williams, a current employee, was not a relative as some of the employees thought, but Troi Bryant, a former employee, was Ellis's daughter's father.  Ex. 4, 19:4-28:25, 54:6-57:4; Ex. 5, 30:17-31:3.

- October 16, 2012:  Ellis's doctor signed her Fitness for Duty to return to work form without any restrictions.  Ex. 1, 130:17-132:4, 142:8-10, 154:4-22; Ex. 27, Letter regarding Return to Work; Ex. 28, Fitness for Duty.

- October 22, 2012:  Ellis returned to work as Center Manager.  Ex. 1, 154:9-22.  LeHew met with Ellis prior to the meeting to review her full return and Fitness for Duty form and to

---

[12]     This exhibit is printed in color.  The black ink represents the original memorandum submitted to Ellis by Paul.  Paul encouraged Ellis to respond to the Memo which she did as indicated in the red ink.  Exs. 19, 20.  The blue ink reflects Paul's reply to Ellis's responsive comments.  Ambrose, Jobe, and LeHew reviewed and approved the content of the performance memo prior to the time Paul presented it to Ellis.  Ex. 20; Ex. 1, 240:9-242:16.

[13]     Ellis admits that she never heard negative comments from ECFMG about her taking leave or requiring surgery, she was never denied leave, and she was always permitted to take the leave she requested without any issue.  Ex. 1, 67:22-24, 227:11-19.

[14]     Ellis admits that Ambrose has certified exams on her behalf multiple times and when Ellis was on FMLA leave.  Ellis could have reached out to Ambrose to certify that exam because Ambrose is also a manager.  Ex. 1, 175:24-176:24; Ex. 4, 29:1-31:3; Ex. 24, Emails regarding certification.  Ambrose met with Sharon Dalberg during her investigation and confirmed that Ellis called Dalberg and asked Dalberg to use Ellis's password to log-in to Ellis's computer and certify the exam.  Ex. 4, 29:19-24; Exs. 9, 10.

[15]     ECFMG has testing Centers in Philadelphia (2 centers), Atlanta, Chicago, Houston, and Los Angeles.  Ex. 4, 44:23-46:13; Ex. 5, 40:11-41:12.  Ex. 26, Email regarding fantastic team.

ensure that she was ready to proceed with what she warned Ellis could be a stressful meeting. Ex. 1, 153:5-17.  Paul, Ambrose, and LeHew met with Ellis to discuss the list of concerns and potential policy violations compiled based on the concerns expressed by and to the interim managers from employees.  Ex. 1, 159:6-12.  They provided Ellis with a list of these concerns at the meeting.  Ex. 1, 159:11-16; Ex. 5, 20:4-6; Ex. 29, List of Houston Issues and Concerns.

- When asked about her suspected violation of the Relationship Policy, Ellis initially denied that Bryant was her daughter's father.  Ex. 1, 161:10-162:5.  Her story evolved and changed significantly throughout the conversation.[16]  Ellis admitted to the second violation of sharing her password to certify the exam.  Ex. 5, 36:23-37:16.  Because additional investigation was needed, Paul placed Ellis on paid administrative leave so that they could consider Ellis's responses to the concerns raised and finish looking into the remainder of the list of concerns that they did not address during the meeting.  Ex. 1, 174:20-175:5, 183:16-18.  After Ellis was placed on administrative leave, Ellis asked LeHew to talk to Houston Center employees regarding Paul's management style toward Ellis.  Ex. 1, 157:15-158:16.  Lehew complied. Ex. 5, 35:8-23.

- October 23, 2012:  Ellis called LeHew and admitted that she lied about Bryant, and confessed that Bryant is her daughter's father.  Ex. 1, 179:24-180:13, 315:4-19; Ex. 30; Ex. 31.  Ellis reported that her "conscience" required her to "come clean." Id.; Ex. 5, 33:20-34:1; Ex. 31.  At this point, Ambrose began investigating the list of policy violations presented to Ellis.  Id.  While doing so, Ambrose considered Ellis's responses to these allegations.[17]  Ex. 29.  Over the course of the next week, Ambrose confirmed that Ellis violated critical ECFMG policies, namely the Relationship Policy and the Password Sharing/Exam Certification Policies, and other protocols.[18]  Ex. 4, 29:19-24.

- November 1, 2012:  Ambrose met with Ellis to terminate her employment.  LeHew was also present for the termination meeting.  Ex. 4, 51:3-9.  Ambrose made the decision to terminate

---

[16]  Ellis first said that Bryant was a close family friend, and someone that she had known for over 30 years, who just took responsibility to act as her daughter's father because Ellis became pregnant at a young age.  Ex. 29.  When asked how her daughter had Bryant's last name, Ellis said he stepped forward to help raise her daughter and he put his name on her daughter's school papers.  Id.  LeHew inquired further and specifically asked Ellis whether Bryant was her daughter's biological father, or if he had legally adopted her daughter.  Id.  Ellis replied "no" to both questions.  Ex. 5, 12:1-15, 218-13; Ex. 29.  Ellis also admitted that she had previously been warned by her former Director (Betty Hite) that she was required to disclose any personal relationships.  Ex. 1, 160:25-162:5, 162:17-163:1, 300; Ex. 30, Statements given by Ellis to Texas Workforce Commission (ECFMG/ELLIS 0615-618); Ex. 31, Helen Coin Notes. (Ellis was also dishonest about the robe policy violation.  Ex. 4, 36:24—38:23, 40:5-19.  Ellis failed to enforce the robes policy which required all SPs to wear bathrobes in all common areas at the Center, and lied to Ambrose during the investigation into her decision not to require SPs to wear their robes at all times.  Ex. 4, 37:18-38:15, 40:5-41:2; Ex. 29; Ex. 32, Clinical Skills Guide, SP Dress Code and Pay Policy).

[17]  Because Ellis had complained about Paul's management style, LeHew and Jobe asked Ambrose to conduct the investigation into Ellis's policy and protocol violations.  Ex. 5, 6:21-7:7.  Paul abstained from assisting in the investigation, and Ambrose performed the investigation since she had worked with Ellis for a number of years.  Id.

[18]  The investigation also revealed that Ellis failed to pay SPs under the policy and failed to fully staff multiple exams, among other significant performance issues.  Ex. 29.  Ellis did not comply with ECFMG's policy of compensating SPs due to illness or injury and ECFMG was required to pay thirty-eight (38) employees back wages as a result.  Ex. 4, 14:3-6; Ex. 29; Ex. 32.

Ellis, and Jobe and LeHew concurred.  Ex. 4, 13:13-14:4.  Interestingly, Ellis admits she did not have concerns about LeHew or Ambrose ever treating her unfairly.  Ex. 1, 268:2-6. Ellis's complaints were only about Paul.

- November 30, 2012:  Ellis admitted to the Texas Workforce Commission ("TWC") that she **"lied out of fear but came back and said the truth"** when she was asked about her daughter's father.  Ex. 30.  With regard to the password violation, Ellis testified under oath to the TWC that, **"regarding the second violation.  This is correct.  I had been put under a lot of stress.  I was given a list before I got sick of concerns.  I was in the hospital having major brain surgery.  I made a bad decision on my part.  I gave a regular employee my password to certify the exam."**  Ex. 1, 99:23-102:6, 106:6-107:8, 178:13-180:13, 322:5-8; Ex. 30; Ex. 33, Email between Ellis and John Repasch (admitting she could see how it could be viewed as "malice intent").

- April 30, 2013:  Ellis filed a charge of discrimination with the EEOC.  Ex. 34, EEOC Charge of Discrimination.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); Fed. R. Civ. P. 56(c).  Summary judgment is warranted if Ellis fails to establish the existence of an essential element of her case.  *Celotex*, 477 U.S. at 322.  Unsubstantiated beliefs and opinions are not competent summary judgment evidence.  *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003).  Conclusory allegations unsupported by evidence will not preclude summary judgment.  *Nat. Ass'n of Gov't Emp. v. City Pub. Serv. Board*, 40 F.3d 698, 713 (5th Cir. 1994). Moreover, Ellis must do more than show "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit.  Disputes over irrelevant or unnecessary facts will not preclude summary judgment.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Moreover, if the opposing party bears the burden of proof at trial, the moving party need not submit

evidence negating the existence of every material fact but, rather, need only point out the absence of evidence supporting an essential element of the opposing party's claim. *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991). Because Ellis cannot demonstrate a genuine issue of material fact as to her interference and retaliation claims under the FMLA, or her discrimination and retaliation claims under the ADA and the Texas Labor Code, ECFMG is entitled to summary judgment as a matter of law on all claims.

## IV.    ARGUMENT AND AUTHORITIES

### A.    Ellis's FMLA Interference and Retaliation Claims Fail as a Matter of Law

#### 1.    ECFMG did not interfere with Ellis's rights under the FMLA

The "FMLA prohibits employers from 'interfer[ing] with, restrain[ing], or deny[ing]' the exercise or the attempt to exercise, any right provided under' the act." *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005) (quoting the FMLA, 29 U.S.C. § 2615(a)(1)). To establish a *prima facie* case of interference under the FMLA, a plaintiff must show, among other things, that: (1) her employer denied her the benefits to which she was entitled under the FMLA; and (2) she was prejudiced. *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013). Summary judgment is appropriate in this case because Ellis cannot prove these elements of her *prima facie* case. That is, there is no evidence that ECFMG denied her any FMLA benefit or that its actions prejudiced her. Ex. 1, 226:2-227:19; Ex. 35, FMLA Leave Documents. Ellis admits that ECFMG never denied her the leave she requested, and never discouraged her from taking leave. Ex. 1, 204:3-206:7, 227:1-19. Indeed, Ellis applied for and took FMLA leave five times throughout her employment at ECFMG between 2005 through 2012 without incident.[19]

During her fifth and last leave while employed with ECFMG, Ellis took FMLA leave for her own serious medical condition related to a surgery. Ellis's last FMLA leave began on September

---

[19]    Ellis's FMLA claim in this lawsuit only relates to her leave for surgery in the fall of 2012.

13, 2012 and ended on October 19, 2012.  Ex. 1, 121:5-14, 124:1-18, 127:4-13, 130:13-132:4, 137:2-142:7, 147:15-148:18; Ex. 27; Ex. 35.  ECFMG does not dispute that Ellis's surgery in the fall of 2012 was a qualifying FMLA event.  For her part, Ellis does not dispute that she applied for and was approved to take FMLA leave for the full amount of time that she requested.  Ex. 1, 227:1-19; Ex. 35; Ex. 36, Sun Life Insurance.  Ellis alleges, however, that ECFMG interfered with her leave in violation of the FMLA in three ways: 1) terminating her employment "on the first day" she returned to work from leave; 2) inviting her to attend an interview for a candidate for her ACM position while on leave;[20] and 3) calling her to check on her recovery while she was on leave.  Dkt. 1, ¶27.  None of these allegations support a claim for interference under the FMLA and summary judgment is required as a result.

> ### a.  Ellis's interference claim based on discharge her first day back from leave fails

Ellis's interference claim based on her termination of employment after returning from FMLA leave should be dismissed for two reasons: 1) her interference claim is duplicative of her FMLA retaliation claim; and 2) ECFMG reinstated Ellis to her position as Center Manager, but placed her on paid administrative leave her first day back so that ECFMG could investigate the concerns raised by employees in the Houston Center.  Ex. 37, Kronos timekeeping.

The "Fifth Circuit has held that when a plaintiff receives the leave [s]he requests and returns to the job [s]he left, [s]he has no interference claim as a matter of law." *Lister v. Nat'l Oilwell Varco, LP,* No. H-11-0108, 2013 WL 5515196, *29 (S.D. Tex. Sept. 30, 2013) (*citing De La Garza–Crooks v. AT & T,* No. 00–50969, 2001 WL 361099, at *1 (5th Cir. Mar. 22, 2001)).  Moreover, under these circumstances, a plaintiff's interference claim should be dismissed, and the

---

[20]     Paul invited Ellis to attend the interview of a candidate for the position of ACM. Ex. 1, 166:24-167:17; Ex. 17. The position had been vacant for two months as a result of Biggs resigning in early August 2012. Exs. 17, 22.  ACM is the second highest ranking position in the Houston Center (working directly under Ellis) and the position needed to be filled.  Ex. 17.  Paul wanted Ellis to feel free to sit in on the interview to give her thoughts on the candidate since she would be working closely with this manager upon her return from leave.  Ex. 17.  Ellis declined to participate in the interview and ECFMG respected this decision.  *Id.*

plaintiff should instead pursue a wrongful termination claim. *Lister,* 2013 WL 5515196 at *29 (S.D. Tex. Sept. 30, 2013) (dismissing FMLA interference claim); *see also Carroll v. Sanderson Farms, Inc.,* No. H10–3108, 2012 WL 3866886, at *21 (S.D. Tex. Sept. 5, 2012) (J. Harmon) (holding that "the record does not demonstrate that Plaintiff was not restored to the same job… when she returned from leave, but only that she was **discharged that same day**. Thus she has <u>no entitlement claim</u> based on a failure to restore her to the same or an equivalent positions under 29 U.S.C. § 2614(a)(1).") (emphasis added).

Ellis's attempt to relate her discharge to her FMLA interference claim fails as a matter of law because ECFMG restored her to her position as Center Manager upon her return from leave on October 22, 2012 when ECFMG received a full release and Ellis's Fitness for Duty to return to work without restrictions from her doctor.  Ex. 1, 147:15-148:18; Ex. 28.  On October 22, 2012, ECFMG met with Ellis to discuss ECFMG's list of concerns that came to light while Ellis was on FMLA leave, and placed Ellis on paid administrative leave so that ECFMG could investigate and consider her responses to those concerns.  Ex. 1, 159:6-21; Ex. 29.  Ambrose conducted a thorough investigation and did not terminate Ellis's employment until over a week later on November 1, 2012.  Ex. 4, 19:4-24:11; Ex. 29.  As a result, Ellis's FMLA interference claim based on the timing of her termination of employment should be dismissed as a matter of law because ECFMG reinstated her to her position as Center Manager when she returned to work.  *See Carroll,* 2012 WL 3866886 at *21 (dismissing an FMLA interference claim on summary judgment when the plaintiff returned from leave and was discharged on the same day).

      **b.**      **Ellis's interference claim based on an invitation to attend an interview to fill her vacant ACM position fails**

"[T]here is no right in the FMLA to be 'left alone' "or [to] be completely relieved from responding to an employer's discrete inquiries." *Smith-Schrenk v. Genon Energy Serv., L.L.C.*, No. H-13-2902, 2015 WL 150727, *9 (S.D. Tex. Jan. 12, 2015) (quoting *O'Donnell v. Passport Health*

*Commc'n, Inc.,* 561 F. App'x 212, 218 (3d Cir. 2014) ("*de minimis* contacts did not require [the employee] to perform work to benefit the company and did not materially interfere with her leave"). An employer's request for modest unburdensome work while the employee is on leave is not considered interference. *See Sabourin v. Univ. of Utah*, 676 F.3d 950, (10th Cir. 2012) (affirming summary judgment on an FMLA interference claim); *Daugherty v. Wabash Ctr., Inc*., 577 F.3d 747, 751 (7th Cir. 2009) (requesting keys and passwords to enable the employer to operate without the employee did not constitute interference). Moreover, fielding occasional calls about one's job while on leave is a professional courtesy and does not abrogate or interfere with the exercise of an employee's FMLA rights. *Smith-Schrenk*, 2015 WL 150727 at *9 (citing *Kesler v. Barris, Sott, Denn & Driker, P.L.L.C.,* 482 F. Supp. 2d 886, 910–11 (E.D. Mich. 2007) (holding occasional phone calls inquiring about files did not qualify as "interference" with FMLA leave). When the communications are limited in duration and frequency, and limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments, employers do not violate the FMLA by making such calls to an employee on leave. *See Reilly v. Revlon, Inc.,* 620 F. Supp. 2d 524, 537 (S.D. N.Y. 2009).

Ellis testified that part of her basis for claiming interference with her FMLA rights was her supervisor's invitation, on one occasion, for her to attend an interview of a candidate for the ACM position. Ex. 1, 166:24-167:17. Ellis chose not to attend the meeting. Ex. 1, 166:24-167:17, 228:25-229:10, 230:7-14. ECFMG took no action against Ellis for not attending the interview. Ex. 1, 230:7-25; Ex. 17. This isolated request is a "*de minimis*" contact and is not actionable.

Moreover, to sustain an FMLA interference claim, a plaintiff must establish that she "has been prejudiced by the [alleged] violation in some way." *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 89 (2002). Ellis did not suffer any prejudice as a result of the invitation to attend the ACM interview. Ex. 1, 166:24-167:17; Ex. 17. Moreover, Ellis admits that she received all of the

FMLA leave she requested and she was never discouraged from taking her leave.  Ex. 1, 227:1-19; *see Arismendiz v. Univ. of Texas at El Paso*, 536 F. Supp. 2d 710 (W.D. Tex. 2008) (granting summary judgment on an interference claim where there was no evidence that FMLA leave was denied).  In light of these admissions, there is no evidence that Ellis was prejudiced in any way by her manager seeking her insight on the ACM candidate on one occasion.  Thus, Ellis fails to satisfy her burden on her FMLA interference claim on this basis and the claim should be dismissed as a matter of law.

> ### c.      Ellis's interference claim based on staff calling to check on her recovery fails

Ellis also claims that some of her staff called her to check on her recovery.  Ex. 1, 227:21-228:24.  Similar to her other allegations of interference described above, Ellis fails to submit any evidence that she was denied any rights under the FMLA as a result these "*de minimis*" contacts or prejudiced in any way.  For all of the reasons stated above, summary judgment is required on Ellis's FMLA interference claim.

> ### 2.      Ellis's FMLA retaliation claim fails as a matter of law

> ### a.      Legal Standards

When there is no direct evidence of retaliatory intent, courts rely on the familiar *McDonnell-Douglas* burden shifting framework in FMLA retaliation cases.  *See Paris v. Sanderson Farms, Inc.,* 542 Fed. Appx. 370, 374 (5th Cir. 2013).  To state a *prima facie* case of retaliatory discharge under the FMLA, the employee must show that: (1) she engaged in a protected activity; (2) the employer discharged her; and (3) the adverse decision was made because of her request for leave under the FMLA, or other employees who did not request FMLA leave were treated more favorably than she was treated.  *See Bocalbos v. Nat'l Western Life Ins. Co*., 162 F.3d 379, 383 (5th Cir. 1998).  A plaintiff must satisfy all three elements.

Only if Ellis satisfies her *prima facie* case will the burden shift to ECFMG to state a legitimate non-retaliatory reason for terminating Ellis's employment. *See Paris,* 542 Fed. Appx. at 374 (noting that courts use the familiar burden shifting in FMLA retaliation cases). Once ECFMG articulates a legitimate, non-discriminatory reason for its actions, the burden of persuasion shifts to Ellis to establish that ECFMG's stated reason is pretextual, and that engaging in the protected activity (taking FMLA leave) was the "but-for" cause of her termination of employment under *McDonnell Douglas* burden shifting. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Paris,* 542 Fed. Appx. at 374 (affirming summary judgment for the employer in an FMLA retaliation case because the plaintiff failed to prove pretext); *Richardson,* 434 F.3d at 333 (applying burden-shifting and affirming summary judgment in an FMLA retaliation case).

### b.  ECFMG terminated Ellis's employment for legitimate, non-retaliatory reasons[21]

ECFMG terminated Ellis's employment for legitimate non-retaliatory reasons—violations of the Relationship Policy, violations of the Certification/Password Policy, an overall lack of trust, and other performance issues. Ex. 4, 19:4-24; Ex. 5, 21:8-24:7. Whether ECFMG's decision was the "correct one, or the fair one, or the best one," is not a question for the jury. *See Sauer v. ICI Paints in N. Am.*, 44 F. Supp. 2d 827, 829 (W.D. Tex. 1999). Courts have repeatedly held that anti-discrimination laws "are not a vehicle for judicial second-guessing of business decisions." *Carroll,* 2012 WL 3866886 at *11 (quoting *Walton v. Bisco Indus.*, 119 F.3d 368, 372 (5th Cir. 1997)). The "anti-discrimination statutes *do not* prevent employers from disciplining employees who violate company rules or policies, and an employee cannot use such a statute as a shield against legitimate disciplinary action." *Hoogstra v. West Asset Mgmt., Inc.,* 560 F. Supp. 2d 515, 525 (E.D. Tex.

---

[21]  ECFMG does not believe that Ellis can state a *prima facie* case of retaliation because neither her request for leave nor her taking leave resulted in ECFMG's adverse employment decision. For purposes of this Motion, however, ECFMG has no need to disprove Ellis's *prima facie* case of FMLA retaliation because Ellis cannot establish her ultimate burden in this case. That is, Ellis cannot prove that but for her FMLA leave ECFMG would not have terminated her employment.

2006) (quoting *Jarjoura v. Ericsson, Inc.*, 266 F. Supp. 2d 519, 533 (N.D. Tex. 2003) (granting summary judgment on an FMLA retaliation claim).  Ellis must produce evidence rebutting all of ECFMG's proffered nondiscriminatory reasons for terminating her employment in order to create a fact question on her FMLA retaliation claim.  *See McArdle v. Dell Products, L.P.*, 293 Fed. Appx. 331, 340 (5th Cir. 2008) (affirming summary judgment on an employee's FMLA retaliation claim because the employee was unable to rebut his employer's legitimate nonretaliatory reason for terminating his employment—poor performance).  Likewise, Ellis is unable to satisfy her burden, because she cannot rebut ECFMG's legitimate, non-retaliatory reasons for terminating her employment.

Indeed, Ellis admitted that when she was questioned about her relationship with Bryant on October 22, 2012 after returning from leave, she "lied out of fear but came back and said the truth." Ex. 1, 315:4-9, 322:5-13; Ex. 30.  Moreover, Ellis also admitted to the Texas Workforce Commission less than a month after her termination that "today I would do things differently now that I have a better understanding of their policy of their belief system."  Ex. 1, 314:21-315:9; Ex. 30.  Ellis also admitted to the TWC, "regarding the [Password and Certification Policies] violation. This is correct.  I had been put under a lot of stress.  I was given a list before I got sick of concerns. I was in the hospital having major brain surgery.  I made a bad decision on my part.  I gave a regular employee my password to certify the exam."  Ex. 1, 180:1-181:16; Ex. 30.

Ellis's decision to lie about her relationship with Bryant during the investigation resulted in Ambrose distrusting Ellis and questioning Ellis's ability to autonomously manage the Houston Center that is over a thousand miles away from ECFMG headquarters in Philadelphia.  Ex. 4, 19:14-24, 54:18-22.  Ambrose determined that Ellis's overall management of the Center displayed a lack of good judgment and terminating her employment for violating ECFMG policies was required. Ex. 4, 37:18-38:15, 40:5-41:2; Exs. 29, 32.

ECFMG easily satisfies its burden of production because it had at least two legitimate non-retaliation reasons for terminating Ellis's employment.  As a result, the burden shifts to Ellis to prove pretext and but-for causation.

### c.    Ellis fails to rebut ECFMG's reasons for terminating her employment by proving pretext or proving "but for" causation

Ellis does not meet her ultimate burden on her FMLA retaliation claim.  Her disagreement with ECFMG's termination reasons (or interpretation of the policies), her subjective belief about her policy violations, and the temporal proximity of her termination to her leave all fail to meet her ultimate burden.  There is no evidence that ECFMG's reasons for terminating Ellis's employment are a pretext for retaliation.

First, simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext.  *Hoogstra,* 560 F. Supp. 2d at 524 (holding that the plaintiff failed to prove pretext where he simply denied the policy violation).  Whether Ellis believes she violated the policies or whether she in fact violated ECFMG's policies is irrelevant and immaterial.  "An employment decision does not have to be correct, and can even be arbitrary or unreasonable."  *Id.* The undisputed evidence establishes that ECFMG had a good faith reason to believe that Ellis's relationship with Bryant violated its Relationship Policy.[22]  *Jones v. Continental Airlines, Inc.* is instructive.  No. Civ.A. H-04-2246, 2005 WL 2233619, *4 (S.D. Tex. Sept. 14, 2005) (J. Harmon).  In this case, the court granted summary judgment for the employer on an employee's FMLA retaliatory discharge claim, noting:

> Continental has articulated a legitimate reason for terminating Jones's employment—his perceived dishonesty.  Under *McDonnell-Douglas*, Jones must now introduce sufficient evidence for a jury to believe that this legitimate basis is false and that retaliation was the <u>real motive</u>.  To do so, Jones insists in his affidavit

---

[22]    Uninterested witnesses, Dempsey and other employees, informed ECFMG (Ambrose, Paul, and other managers) that Bryant had a daughter with Ellis and the employees complained about favoritism by Ellis and their belief that Ellis hired her relatives. Ex. 4, 25:15-24.  The complaints prompted ECFMG's investigation. Ex. 4, 25:21-24, 54:9-22.

> that he was never dishonest.  This, however, is not enough.  Rather, it is
> Continental's good faith belief in his dishonestly that he must disprove.

*Id*. at *4 (emphasis added) (holding plaintiff's denial of violating a policy is not sufficient to defeat

summary judgment).

Second, Ellis's subjective belief that ECFMG's decision to terminate her employment was

somehow related to her FMLA leave will not satisfy her burden.  *Jarjoura*, 266 F. Supp. 2d at 531-

532 ("Plaintiff clearly has a subjective belief that his being on full FMLA leave was the reason he

was discharged.  A subjective belief, however, cannot establish a genuine issue of material fact

regarding pretext…").  Ellis does not have any evidence, other than her subjective belief, that

ECFMG terminated her employment for exercising her rights under the FMLA.  She testified:

> Q: [Y]ou just said I believe that I was retaliated against because I had a disability and I
> took family leave.  All I want to know is why—what is the basis for that belief?  Why do
> you believe that?
>
> A:  That's just my belief, that based on me taking a leave, or going out on leave, because
> I had had a brain surgery or a brain tumor, I don't think that they thought that I was going
> to be the same.
>
> Q:  Did anyone ever tell you that?
>
> A:  **It's just my belief.**

Ex. 1, 224:12-22 (emphasis added).  It is well settled that a plaintiff's subjective belief of retaliation

is insufficient to satisfy her ultimate burden.  *Jarjoura*, 266 F. Supp. 2d at 532 (granting summary

judgment on an FMLA retaliation claim because plaintiff's subjective belief was insufficient to

prove pretext), aff'd 82 Fed. Appx. 998 (5th Cir. 2003)).[23]

Third, courts affirmatively reject the notion that any purported temporal proximity between

FMLA leave and termination standing alone can be sufficient proof of "but for" causation because

---

[23]  Furthermore, Ellis admits she was previously warned by the prior Director, Betty Hite, that she needed to inform the Director if she was considering hiring someone who she personally knew and to comply with the Relationship Policy, yet she failed to do so.  Ex. 1, 299:25-300:16.  That evidence weighs against her subjective belief that ECFMG unlawfully terminated her employment since she admits she was well aware of the Relationship Policy.

such a rule would unnecessarily tie the hands of employers. *See McKenna v. Liberty Mut. Grp., Inc.,* No. 11-30704, 2012 WL 1292771 (5th Cir. April 16, 2012) (affirming summary judgment on an FMLA retaliation claim despite the fact that the termination was in close proximity to plaintiff's leave). The court in *Ramroop v. Cooper Cameron Corp.* addressed the issue of close temporal proximity between an FMLA leave and a termination. No. Civ. A. H-05-1681, 2006 WL 696653, at *4 (S.D. Tex. March 20, 2006). In *Ramroop,* the court held that even when the plaintiff's employment was terminated on the day he returned from leave, the temporal proximity was not sufficient to rebut the legitimate, non-retaliatory reason for his discharge because "[t]o hold otherwise would effectively eliminate the additional burden that the test imposes upon a plaintiff when a defendant proffers a legitimate rationale for an adverse employment action." *Id.* When a plaintiff's failure to present any evidence from which a jury could infer that the employer's proffered reason for termination (i.e. a violation of company policy) is pretextual, a retaliation claim fails. *See McCollum v. Puckett Mach. Co.,* 628 Fed. Appx. 225, 230 (5th Cir. 2015 (affirming summary judgment of an FMLA retaliation claim when an employee was fired for being intoxicated at a sales meeting).

Because Ellis cannot present any evidence to raise a material question of fact as to pretext or but-for causation on her FMLA retaliation claim, ECFMG is entitled to summary judgment on this claim.

**B.      Ellis's Discrimination and Retaliation Claims Under the ADA  Fail  as  a  Matter  of  Law[24]**

> **1.      Ellis's ADA discrimination claim fails as a Matter of Law**

> > **a.      Legal Standards Regarding ADA Discrimination**

The burdens of proof in an employment discrimination case are well established when there is no direct evidence of discrimination.  In these cases a plaintiff may use the indirect method of proof set forth in *McDonnell Douglas,* 411 U.S. at 802-803.  First, under this framework, the plaintiff must establish a *prima facie* case of discrimination.  *See Burch v. Coca-Cola Co*., 119 F.3d 305, 320 (5th Cir. 1997) (applying burden shifting in ADA discrimination case).  In a disparate treatment case such as this one, a plaintiff has the burden to make a *prima facie* showing of disability discrimination by producing probative evidence that: (1) she is disabled, has a record of having a disability, or is regarded as disabled; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) non-disabled employees were treated differently under nearly identical circumstances to her.  *See Carroll,* 2012 WL 3866886 at *16-17 (citing *McInnis v. Alamo Cmty. College Dist.,* 207 F.3d 276, 279-80 (5th Cir. 2000)).

Second, if the plaintiff satisfies her burden at the *prima facie* stage, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action.  *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir. 1995).  The defendant need only articulate such a reason to satisfy its burden of production, it does not need to prove the reason was true.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  The inference of discrimination created by the *prima facie* case then disappears, leaving the plaintiff to prove "that the legitimate reasons offered by the defendant were not its true reason, but were a pretext for

---

[24]      "The [TCHRA] purports to correlate state law with federal law in the area of discrimination in employment.  Federal law prohibiting disability discrimination by employers is found in the ... [ADA], and thus courts must look to this statute in interpreting the TCHRA."  *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999).  In addition, the legislature "intended to correlate state law with federal law in employment discrimination cases."  *Wal-Mart Stores, Inc., v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003).  As a result, ECFMG relies on the federal law of the ADA when analyzing Ellis's Chapter 21 disability discrimination and retaliation claims.

discrimination" and the real reason for termination was discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, (1993). Finally, the plaintiff bears the ultimate burden of proving that the defendant's actions were based on *intentional* discrimination. *St. Mary's Honor Ctr.,* 509 U.S. at 508.

### b. Ellis cannot establish a *prima facie* case of disability discrimination

Ellis is unable to satisfy the fourth prong of the *prima facie* disability discrimination case because she was not treated differently than non-disabled employees under "nearly identical circumstances:"

> The employment actions being compared will be deemed to have been taken under nearly identical circumstances when employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable employment histories.

*Carroll*, 2012 WL 3866886 at \*16 (citing *Lee v. Kansas City S. Ry. Co.,* 574 F.3d 253, 262 (5th Cir. 2009); *see also Paske v. Fitzgerald*, 785 F.3d 977 (5th Cir. 2015). "The 'nearly identical' standard… is a stringent standard. Employees with … different work rule violations or different disciplinary records are not considered to be 'nearly identical.'" *Coleman v. Exxon Chem. Corp.*, 162 F. Supp. 2d 593, 608 (S.D. Tex. 2001) (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514-15 (5th Cir. 2001)). "Our precedent is clear that for a plaintiff to show disparate treatment, [s]he must demonstrate that the misconduct for which [s]he was discharged is "nearly identical" to that engaged in by an employee outside of [her] protected class whom the employer retained." *McCollum,* 628 Fed. Appx. at 230. Not only must the comparator report to the same decision-maker and perform similar duties, but the conduct at issue, as well as its impact and consequences, must likewise be nearly identical. *See Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).

There is no evidence that a comparator was treated more favorably under "nearly identical circumstances" with regard to the Relationship Policy.  Ellis alleges that LeHew violated the Relationship Policy by supervising LeHew's step-daughter in her Human Resources department during LeHew's step-daughter's summer job while home from college.  The Relationship Policy specifically provides that "Department Managers have the discretion to determine whether employees who are involved in one of the relationships described [in the policy] will be permitted to work in the same department."  Ex. 8, §V.E.  Accordingly, once there is approval there is no violation of policy.   Although LeHew's step-daughter is a relative and the relationship is covered by the policy, in LeHew's step-daughter's case, LeHew openly disclosed the relationship and senior level management approved it.[25]   Ellis admits that she has no knowledge of LeHew's prior disclosure or the circumstances related to any approval LeHew obtained prior to her step-daughter working in LeHew's department as a summer intern.  Ex. 1, 160:25-161:9, 322:16-324:11.

Moreover, Lehew is not a proper comparator to Ellis.  First, Lehew did not violate the Relationship Policy because she disclosed her relationship to her step-daughter and obtained prior approval pursuant to the policy.  Second, LeHew is not comparable to Ellis because she holds a different position.  *See Lee,* 574 F.3d at 262; Ex. 17.  As Vice President of Human Resources, Lehew did not perform similar duties to Ellis.  Ex. 5, 5:11-15, 7:13-22; *s*ee *Bryant,* 413 F.3d at 478.  Third, Lehew and Ellis are not comparable because Lehew reports to a different supervisor than Ellis.  Ex. 1, 313:13-15; Ex. 5, 11:11-23, 45:24-46:4; *See Lee,* 574 F.3d at 262.

Ellis also alleges that David Strom, an SP Trainer, and Heidi Strom, a receptionist, had a personal dating relationship and then married, allegedly in violation of the Relationship Policy.  Ex. 1, 161:1-7.  As Ellis is well aware, the Stroms did not report to or supervise one another, so they

---

[25]     The Relationship Policy prohibits working and reporting relationships of individuals who are related by blood, adoption, marriage, or domestic partnership, affianced, or significant other in order to avoid real or perceived conflicts of interest, influence, or favoritism.  Ex. 8, §I.  The policy further provides that "step or adoptive relationships" are included.  Ex. 8, §IV. Ex. 5, 26:21-27:21; Ex. 4, 57:18-59:5.

were not a "working and reporting relationship" covered by the policy.  As a result, the Stroms did not violate the Relationship Policy.  In addition, as the manager of the Center, the onus was on Ellis to address any concerns she may have had with their relationship, but she did not.  Ellis on the other hand, violated the Relationship policy because she admitted that she supervised and promoted Bryant (her daughter's father) to a full-time position.  The Relationship Policy prohibits this precise type of conflict of interest.  In addition, the Stroms are not proper comparators since they did not report to the same supervisor as Ellis.  *See Lee,* 574 F.3d at 262.  In fact, the Stroms reported to Ellis as Center Manager.  Ex. 1, 79:6-82:24; Ex. 17.  The Stroms are also improper comparators because they held different positions and performed different job duties than Ellis.  *Bryant,* 413 F.3d at 478.

Regarding Ellis's second serious policy violation, Ellis admits that she has no evidence that any other ECFMG manager has shared his/her password with a non-exempt employee to certify an exam in violation of the policy that Ellis violated.  Ex. 1, 171:1-173:18, 176:4-21.  Instead Ellis alleges that she was instructed to share her password with Information Technology ("IT") generally or Bea Bright-Davis who was in IT in the past.  *Id*.  She also alleges that her former ACM's (Biggs') password was used by IT.  These examples do not satisfy the strict "nearly identical" standard.  An employee sharing a password with IT to perform an IT function such as running computer updates is not identical to the highest ranking employee on site asking a non-management level employee to certify a high stakes medical exam and giving a non-management level employee unfettered access to confidential data that only management level staff can access.  Ellis's examples of "comparators" on the second policy violation do not come close to satisfying the "nearly identical" requirement because not only were the impact and consequences different (an exam certification was not involved), but Ambrose (the decision-maker in Ellis's termination) was not a decision-maker in these other instances relied on by Ellis, since these instances occurred in Ellis's

Houston Center, Ellis supervised all employees in her Center, and Ellis never reported any incidents of violating the password policy.  Ex. 5, 39:12-19; Ex. 15; Ex. 17.  Again, to the extent she was aware of any policy violations, she should have addressed them as Center Manager.

Ellis's allegations do not satisfy the "nearly identical" standard.  *Toronka v. Cont'l Airlines*, Inc., 411 Fed. Appx. 719, 723 (5th Cir. Feb. 14, 2011) (affirming summary judgment from this Court where the plaintiff failed to satisfy the "nearly identical" comparator standard required in discrimination cases).  Ellis's failure to establish a *prima facie* case is fatal to her disability discrimination claim and her claim should be dismissed as a matter of law without additional analysis under *McDonnell Douglas* as a result.

### c. ECFMG terminated Ellis's employment for a legitimate nondiscriminatory reason

Assuming *arguendo* that Ellis is able to satisfy her *prima facie* case of disability discrimination, the burden shifts to ECFMG to articulate a legitimate nondiscriminatory reason for ECFMG's decision to terminate Ellis.  Here, and as set forth above, the summary judgment evidence demonstrates that ECFMG had legitimate, nondiscriminatory reasons for terminating Ellis's employment.  ECFMG satisfies its burden of production in light of Ellis's violation of its Relationship Policy and Data Security Password/Certification Policy as violations of both policies are terminable offenses.  Ex. 4, 13:5-14:4, 23:4-25:7, 28:7-29:25; Ex. 5, 7:1-7, 12:1-7; Exs. 8, 9, 10.

As discussed above, ECFMG had a good faith belief that Ellis violated its policies and initially lied about her relationship with Bryant during the investigation resulting in Ambrose's loss of trust in Ellis's ability to continue to lead the Houston Center.  *See Waggoner v. City of Garland,* 987 F.2d 1160, 1165 (5th Cir. 1993) (holding that the employer's good faith belief is the court's focus and whether the employer based the termination decision on that belief).  It is well settled that a plaintiff's differing opinion as to whether she violated an employer's policies does not, of course, prove discrimination.  *See Sweeney & Co. v. N.L.R.B.*, 437 F.2d 1127, 1133 (5th Cir. 1971); *see*

*also Evans v. Texas Dept. of Trans.,* 547 F. Supp. 2d 626, 648 (E.D. Tex. 2007) (granting summary judgment because an employee's subjective belief did not overcome an employer's legitimate nondiscriminatory reason for termination).

Indeed, Ellis admitted that when she was questioned about her relationship with Bryant on October 22, 2012 after returning from leave, she "lied out of fear."  Ex. 1, 179:24-180:13, 315:4-9, 322:9-13; Ex. 30.  Moreover, Ellis also admitted to the Texas Workforce Commission shortly after her termination of employment that she would have done things differently.  Ex. 1, 314:24-315:9. Finally, Ellis admitted that she "made a bad decision" when she shared her password with a "regular employee" to certify the exam.  Ex. 1, 180:19-181:4.

In light of these admissions, and because ECFMG satisfies its burden of production that it had a legitimate nondiscriminatory reason for terminating Ellis's employment, the inference of discrimination is dissolved and the burden shifts back to Ellis to prove pretext.

> **d.**     **Ellis fails to prove pretext and meet her ultimate burden in this case—i.e. establish that ECFMG discriminated against her because of her disability**

Ellis has the final burden to demonstrate that the employer's stated reason for termination is a pretext for discrimination.  To provide evidence sufficiently suggestive of pretext, the plaintiff must show both that the employer's articulated reason is pretextual (or false) and that the plaintiff's disability was the true reason for the employer's action.  *See St. Mary's Honor Ctr.,* 509 U.S. at 506; *EEOC v. Louisiana Office of Comty. Servs.,* 47 F.3d 1438 (5th Cir. 1995).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Cnty. Affairs,* 450 U.S. at 203.  Ellis fails to satisfy her burden.

**(i)** **Ellis admits she never heard any comments, negative or otherwise, about her alleged disability or medical condition**

Ellis admits that she never heard any comments (negative or otherwise) from ECFMG management regarding her alleged disability and further admits that no comments related to her medical condition were made.  Ex. 1, 221:9-24.  Without any evidence to support her subjective belief of disability discrimination, Ellis believes that Paul knew she was out on leave and "he saw an opportunity to get [her]."  Ex. 1, 268:20-269:16.  As previously mentioned, Ambrose rather than Paul investigated and made the decision to terminate Ellis's employment.  Ellis testified that her basis for this belief is because Paul was "having closed-door meetings, he was saying I was related to people, I was having sex with all the guys in the office…"  Ex. 1, 269:9-20.  Again, Ellis's subjective belief of discrimination does not prove pretext.  Furthermore, Paul's investigation was the result of employee complaints about Ellis, and entirely unrelated to her medical condition.

**(ii)** **Ellis violated the Relationship Policy and her personal opinion that she did not is immaterial**

Ellis's opinion that she did not violate ECFMG's policies is immaterial and does not defeat summary judgment on a disability discrimination claim.  *See Brown v. CSC Logic, Inc*., 82 F.3d 651, 657 (5th Cir. 1996) (finding evidence that "merely question [ed]" the prudence of the employer's methods to be insufficient to defeat summary judgment).  ECFMG concluded in good faith that Ellis hired, supervised, and promoted Bryant, her daughter's father.  Ex. 4, 13:18-14:21, 21:2-22.  Ambrose concluded that co-parenting a child for twenty-one years (at the time of Bryant's hiring) qualifies as a "significant relationship" under the policy.  In addition, the policy clearly mandates that "**any personal relationship in a reporting line must be disclosed**" to avoid a real or

perceived conflict of interest, influence, or favoritism, otherwise the employee faces termination. Ex. 5, 24:3-7, 30:7-31:3, 34:24-36:16; Ex. 8.[26]

A sexual encounter that resulted in a child who the mother and father co-parented for over twenty years at the time Bryant started working for ECFMG is a "personal relationship" under a plain reading of the policy, and more importantly, under ECFMG's and Ambrose's reading of the policy.  Ex. 4, 23:4-22.  It is disingenuous for Ellis to argue otherwise.[27]  To make matters worse, Ellis continued to supervise Bryant after he was hired and later interviewed and promoted him to a full-time position in 2010 awarding him a significant raise and benefits, and still at no time did Ellis disclose the relationship.  Ex. 1, 56:4-57:18; Ex. 16.

> **(iii)** **Ellis admitted that she violated the Password and Certification policies**

Furthermore, Ellis admitted to the other terminable policy violation—improperly sharing her secure password with a non-exempt employee to certify an exam that only managers have the authority to certify.  Ex. 1, 175:1-5.  Despite her admission, Ellis alleges that her password sharing violation should be *excused* because she was highly medicated and in the hospital when she gave her password to Dalberg.  Ex. 1, 164:10-165:11 175:1-5.[28]

It is well established that excuses do not satisfy an employee's burden of proving pretext. *McCollum,* 628 Fed. Appx. at 230 (affirming summary judgment on the plaintiff's ADA discrimination claim where the plaintiff attended a sales meeting intoxicated in violation of

---

[26]     Moreover, the fact that Ellis initially lied about the relationship with Bryant when she was questioned during the investigation resulted in Ambrose's loss of trust in Ellis's ability to lead the Houston Center in Texas.  Ex. 4, 36:4-38:23, 47:1-25.  This is especially important since the management Ellis reported to was over a thousand miles away in Philadelphia.  *Id.*

[27]     Bryant testified that he had a close relationship with their daughter.  Ex. 6, 25:1-26:22.  Bryant was very involved in their daughter's life both financially and by spending time with her.  *Id.*  Their daughter regularly visited Bryant, he paid child support until she was eighteen years of age, and he provided financial assistance even after college. *Id.*  Bryant also testified that their daughter lived with him for two years on and off after college around the time Bryant worked at ECFMG.  *Id.*

[28]     Ellis testified that Dalberg was filling in on some of the ACM duties since her ACM had resigned.  Ellis admitted, however, that she never obtained approval from ECFMG management to permit Dalberg (a non-exempt employee) to perform management duties, which she was required to do.  Ex. 1, 166:1-14; Exs. 20, 29.

company policy despite plaintiff's excuse that he took Ambien and drank wine the night before and was about to have surgery again related to his prostate cancer)); *Rhodes v. Curascript, Inc*., No. G-07-192, 2008 WL 4449905, *1 (S.D. Tex. Sept. 30, 2008) (granting summary judgment because there was no evidence of pretext in a discrimination case where the employee was terminated for assaulting a co-worker and rejecting the employee's excuse that the assault occurred because she was given a date-rape drug) (J. Harmon); *Hoogstra*, 560 F. Supp. 2d at 524  (granting summary judgment where plaintiff violated the relationship policy and plaintiff's pretext argument failed).

In light of Ellis's admissions and applicable case law, Ellis cannot satisfy her burden to prove pretext or that she did not violate the ECFMG policies for which she was terminated.  As a result, Ellis's discrimination claim fails as a matter of law.  *See Ramsey v. Henderson,* 286 F.3d 264, 269-70 (5th Cir. 2002) (cautioning that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" nonmovant's burden in summary judgment motion); *Vance v. Union Planters Corp*., 209 F.3d 438, 444 (5th Cir. 2000) (holding that mere subjective belief that discrimination occurred, unsupported by any specific factual evidence, is insufficient to rebut employer's evidence of legitimate, nondiscriminatory reasons for its actions).

**2.      Ellis's ADA retaliation claims fails**

For all of the reasons that Ellis's FMLA retaliation claim fails, her ADA retaliation claim fails too.  *See* Section III. A. 2. above  (i.e. there is no evidence of pretext or "but for" causation). In addition, Ellis cannot satisfy even her initial burden related to the first prong of her *prima facie* case for ADA retaliation because there is no evidence that she engaged in protected activity under the ADA.

**a.      Legal Standards**

To establish a *prima facie* of an ADA retaliation case, Ellis must prove that: 1) she engaged in protected conduct under the ADA; 2) she was thereafter subjected to an adverse employment

action; and 3) the adverse employment action was taken in response to her protected conduct. *See Feist v. Louisiana, Dept. of Justice,* 730 F.3d 450, 454 (5th Cir. 2013).   Summary judgment is appropriate if Ellis cannot support all three elements. *Id.*   Ellis fails to satisfy the first and third prongs of her *prima facie* case. *See Evans,* 547 F. Supp. 2d at 654.

### b.       Ellis did not engage in protected activity under the ADA

A general claim of retaliation without any evidence to demonstrate protected activity is insufficient to overcome summary judgment. *See Alvarado v. Shipley Donuts*, 526 F. Supp. 2d 746, 765 (S.D. Tex. 2007) (granting summary judgment on retaliation claims where the plaintiff's deposition testimony lacked facts supporting protected activity).[29]   Ellis cannot raise a material question of fact on the first element of her retaliation *prima facie* case because her conduct did not constitute "protected activity."   Ellis claims she satisfies her burden of demonstrating protected activity under the ADA in three ways: 1) her March and October 2012 complaints about Paul regarding a personality conflict, not liking his management style, and the alleged inappropriate comments he made; 2) taking FMLA leave; and 3) stating she "may" need an accommodation upon her return from leave and ECFMG's alleged refusal of her request for accommodation.   None of these allegations satisfy Ellis's burden to prove protected activity under the ADA and Ellis's *prima facie* case of retaliation under the ADA fails as a result.

### (i)       Generalized complaints are not protected activity

"[N]ot all abstract grumblings or vague expressions of discontent are actionable as complaints." *Hagan v. Echostar Satellite, LLC,* 529 F.3d 617, 626 (5th Cir. 2008).   An employee's statement cannot be deemed "opposition" to a discriminatory practice unless it refers to a specific practice of the employer that is allegedly unlawful. *Conary v. Martin Foods*, No. 4:12cv582, 2014

---

[29]       Ellis does not allege that she participated in any EEOC activity that qualifies as protected activity as a basis for her retaliation claim.   Although she filed a charge of discrimination, she did not do so until April 30, 2013, almost six months <u>after</u> her termination. As a result, Ellis's charge of discrimination is irrelevant to her ADA retaliation claim. *Baker v. American Airlines, Inc*., 430 F.3d 750, 755 n.5 (5th Cir. 2005); *see* Ex. 34.

WL 261289, *6-7 (E.D. Tex. Jan. 23, 2014) (granting summary judgment when the employee made a nonspecific complaint of general mistreatment and bullying); *Evans,* 547 F. Supp. 2d at (granting summary judgment because the employee did not engage in protected activity in an ADA retaliation case). In *Evans*, although the plaintiff complained about a hostile work environment, at no time did she suggest that her supervisor's conduct was related to a specific protected category (i.e. disability). *Evans*, 547 F. Supp. 2d at 654.

Similar to *Evans*, Ellis's alleged internal complaint to LeHew about Paul was too vague to constitute protected "opposition." Ellis's vague complaints of a personality conflict with Paul, not liking Paul's management style, and bullying are insufficient to constitute statutorily protected activity. Ex. 1, 310:23-311:10; *Harris-Childs v. Medco Health Sol., Inc*., 169 Fed. Appx. 913, 916 (5th Cir. 2006) (finding a complaint to the employer of general harassment unprotected); *see also Dobias-Davis v. Amazon.com.kydc, LLC et al*, No. 3:15-cv-00393, 2016 WL 153085 at *3 (E.D. Virg., Jan. 11, 2016) (dismissing a retaliation claim for lack of protected activity based on complaints of a personality conflict with manager). Ellis's generalized complaints against Paul are insufficient to satisfy her burden of proving that she engaged in protected activity. *See Price v. City of Terrell,* No. Civ. A. 3:99-CV-0296-D, 2001 WL 1012697 at *4 (N.D. Tex. Aug. 15, 2001) (stating that plaintiffs who complain "solely about general employment conditions and adverse treatment generally and not about disability discrimination" are not engaged in protected activity under ADA).

Additionally, Ellis's complaint about Paul's allegedly "inappropriate" comments, are insufficient to satisfy her burden of proving protected activity because the alleged comments did not in any way relate to Ellis's alleged disability or medical condition. Paul allegedly referred to  Ellis as a "bad witch," said "she would melt" if she got rained on, told Ellis's staff that she was not a good manager, and stated that he "must pay Ellis too much money" because of the car she drove.

Ex. 1, 265:20-267:19; Ex. 34.   When asked why she believed Paul was "inappropriate," Ellis testified: "I was the only African-American manager, and I really believe that Chris had some racial issues.   And he just came across very, very aggressive, and like I'm going to keep you in your place."   Ex. 1, 235:10-17, 310:23-311:10.   Ellis believes her complaints about Paul related to his "racial issues," but she never complained about treatment or comments related to her alleged disability.[30]   Ellis thought she and Paul had "philosophical differences and that [they] just should learn to work together."   Ex. 1, 233:13-234:17.

These generalized complaints do not support protected activity under the ADA.   Moreover, many of these complaints were allegedly made in the spring of 2012, approximately six months before her FMLA leave for surgery.   Ex. 1, 230:9-234:17.   Not only are these comments wholly *unrelated to any alleged disability*, which she describes as medical issues related to removal of a benign brain tumor in September 2012, but the allegedly "inappropriate" comments she complains of started in March 2012, long before Paul had any knowledge that Ellis would go out on leave for surgery that following September 2012.[31]   Ex. 21.

> ### (ii)      Taking FMLA leave is not "protected activity" sufficient to establish an ADA retaliation claim

A request for FMLA leave is not protected activity under the ADA.   *See Brackens v. Dallas Indep. Sch. Dist.,* No. 3:09-cv-0642-D, 2010 WL 5464823 at *22 (N.D. Tex. Sept. 20, 2010) (granting summary judgment on an ADA retaliation claim where the plaintiff alleged that FMLA leave was protected activity); *Munoz v. Echosphere, LLC,* 2010 WL 2838356 at *13 (W.D. Tex. July 15, 2010) (holding that taking FMLA leave is not protected activity related to an ADA retaliation claim); *Murphy v. Gallery Model Homes, Inc.,* No. Civ. A. H-04-0621, 2005 WL

---

[30]      Ellis previously alleged race discrimination in her charge of discrimination and she similarly attributed these comments to her race (African-American).   Ex. 34.   Ellis, however, did not file suit based on that claim.   Dkt. 1.

[31]      Moreover, Paul did not make the decision to terminate Ellis—Ambrose did.   Ex. 4, 13:18-14:4; Ex. 5, 6:15-18. Ellis never complained about Ambrose, and the only person who Ellis believed retaliated against her was her Director, Paul.   Ex. 1, 230:9-231:22, 268:2-6.

5394658 at *14 (S.D. Tex. Feb. 24, 2005) (holding that FMLA leave is not protected activity under the ADA); *Price*, 2001 WL 1012697 at *3-4 (holding that taking FMLA leave does not constitute protected activity under the ADA).  To the extent Ellis argues that her FMLA leave is the basis for protected activity under the ADA in support of her retaliation claim, summary judgment is appropriate.

> (iii)   **Ellis did not exhaust administrative remedies related to retaliation based on a request for accommodation under the ADA**

Lastly, Ellis argues that she was retaliated against for requesting an accommodation that was not provided to her.  This Court found, however, that Ellis failed to exhaust her administrative remedies with respect to her failure to accommodate claim, so this allegation cannot serve as evidence of protected activity.[32]  Ex. 1, 219:23-220:8.        As this Court already held in its Order granting ECFMG's partial motion to dismiss:

> The Court agrees with ECFMG that Ellis's leave after her surgery was under the FMLA, and furthermore her request for leave was granted.  The factual allegations in the charge relating to her alleged or perceived disability under the ADA relate to discrimination and retaliation, specifically a discriminatory and/or retaliatory discharge, based on that disability, and not to a failure to reasonably accommodate her disability based on any requests from her… **There are no allegations in the charge that she requested any reasonable accommodation for her disability or perceived disability, no less facts showing that ECFMG refused any request by her for accommodation.**  Thus her charge of discrimination, itself, would not trigger the investigatory and conciliatory procedure of the EEOC regarding any failure to reasonably accommodate any requests made by Ellis for her disability…

Dkt. 18, pp. 26-27(emphasis added); Ex. 34.  In light of the Court's ruling on ECFMG's partial motion to dismiss at Dkt. 18, Ellis should not be permitted to rely on a request for accommodation as a basis for protected activity on her ADA retaliation claim.

---

[32]       To the extent Ellis alleges a request for accommodation or a failure to accommodate as her basis of protected activity on her ADA retaliation claim, that basis is not properly before this court and should be dismissed under Rule 12(b) (1), (6) and/or Rule 56.  FED. R. CIV. P. 12(b), 56.

     **c.**       **Ellis fails to prove her termination was a pretext for retaliation and but for her alleged protected activity she would not have been terminated**

For all of the reasons set forth in Section III. A. 2 above regarding retaliation under the FMLA, the analysis related to pretext and but for causation similarly applies to Ellis's ADA retaliation claim.  *See Seaman v. CSPH, Inc.,* 179 F.3d 297, 300 (5th Cir. 1999) (holding that a plaintiff bringing an ADA retaliation claim must satisfy pretext and "but for" causation in addition to a *prima facie* case).

## V.    CONCLUSION

For the foregoing reasons, ECFMG respectfully requests that the Court grant its Motion for Complete Summary Judgment on Ellis's remaining claims, and grant ECFMG any other legal or equitable relief to which it is justly entitled.

Respectfully submitted,

*/s/ Stefanie R. Moll*
Stefanie R. Moll
State Bar No. 24002870
Federal ID No. 22861
stefanie.moll@morganlewis.com
1000 Louisiana, Suite 4000
Houston, Texas 77002
(713) 890-5000 - Telephone
(713) 890-5001 – Facsimile

Of Counsel:
Erin E. O'Driscoll
State Bar No. 240460
Federal ID No. 582983
erin.odriscoll@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana, Suite 4000
Houston, Texas 77002
(713) 890-5000 - Telephone
(713) 890-5001 – Facsimile

ATTORNEYS FOR DEFENDANT
EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of October 2016, the foregoing was served via CM/ECF to the following:

Alfonso Kennard, Jr.
Keenya R. Harrold
KENNARD RICHARDS P.C.
2603 August Drive, Suite 1450
Houston, Texas 77057

*/s/ Erin O'Driscoll*
Erin O'Driscoll