# EXHIBIT 1

Artis Ellis

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    HOUSTON DIVISION

4

5    ARTIS ELLIS                    :

6         Plaintiff,               :

7    vs.                           :

8    EDUCATIONAL COMMISSION         :        C. A. No.

9    FOR FOREIGN MEDICAL            :        4:14-cv-02126

10   GRADUATES,                     :

11        Defendant.               :

12

13        VIDEOTAPED DEPOSITION OF ARTIS ELLIS

14

15       Called as a witness by the Defendant, taken before

16   Peggy Ann Antone, a Certified Shorthand Reporter in and

17   for the State of Texas, on May 11, 2016, beginning at

18   9:51 a.m., at the offices of Kennard Richard P.C., 2603

19   Augusta Drive, Suite 1450, Houston, Texas, pursuant to

20   the Federal Rules of Civil Procedure.

21

22

23

24

25

Artis Ellis

2

1                      A P P E A R A N C E S

2

3     COUNSEL FOR ARTIS ELLIS, Plaintiff:

4          Kennard Richard, P.C.

5               ALFONSO KENNARD, JR.
                KEENYA HARROLD
6               2603 Augusta Drive
                Suite 1450
7               Houston, Texas  77057
                Phone:  713.742.0900
8               Fax:  713.742.0951
                Alfonso.kennard@kennardlaw.com
9               Keenya.harrold@kennardlaw.com

10

      COUNSEL FOR EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL
11    GRADUATES, Defendant:

12         Morgan, Lewis & Bockius, LLP

13              ERIN E. O'DRISCOLL
                1000 Louisiana
14              Suite 4000
                Houston, Texas  77002
15              Phone:  713.890.5000
                Fax:  713.890.5001
16              Eodriscoll@morganlewis.com

17

      ALSO PRESENT:

18
                Barry Pett, Videographer, DepoTexas, Inc.
19

20

21

22

23

24

25

Artis Ellis

**20**

```
         1      Q.   He wasn't married.

         2      A.   Yes.

         3      Q.   Okay.   Okay.   And do they live in Harris

         4   County?

10:02    5      A.   No.

         6      Q.   Okay.   Brittani, how old is she currently?

         7      A.   29.

         8      Q.   And Brendan?

         9      A.   25.

10:02   10      Q.   And Kaila?

        11      A.   14.

        12      Q.   And Corey?

        13      A.   Corey is 20 -- I'm sorry.   Corey is -- I think

        14   he's 20.   I believe he's 20.

10:03   15      Q.   Okay.   And how about Keenan?

        16      A.   Keenan is 18.

        17      Q.   And did Brittani grow up in your household?

        18      A.   Brittani did grow up in my household.

        19      Q.   Okay.   And -- and what is her father's name?

10:03   20      A.   Her father's name is Troi Bryant.

        21      Q.   And did she also grow up in Mr. Bryant's home?

        22      A.   No, she did not grow up in Mr. Bryant's home.

        23      Q.   Did -- did she visit him or what -- how often

        24   would she visit Mr. Bryant?

10:03   25      A.   She had court visitation to go every other
```

Artis Ellis

**21**

1    weekend and on holidays.  I don't recall how often on

2    holidays, because that's been such a long time.

3        Q.  And was this up until she was 18 years old?

4        A.  Well, the court visitation was up until 18, but

10:04  5    I think at a certain period, the -- she stopped going,

6    probably around 12.

7        Q.  And you said court visitation.  Are there court

8    documents that are related to Mr. Bryant's paternity

9    with Brittani?

10:04 10        A.  It was a court order.

11        Q.  Okay.

12        A.  Uh-huh.

13        Q.  And did you file a lawsuit, or how did that

14    court order come about?

10:04 15        A.  I think it was a child support order that was

16    in place.

17        Q.  Okay.  And do you -- did you file something

18    to -- to seek child support from Mr. Bryant?

19        A.  The Attorney General.

10:04 20        Q.  Attorney General did.

21        A.  Uh-huh.

22        Q.  Okay.  On your behalf?

23        A.  Yes.

24        Q.  Okay.  And -- and did he pay child support

10:04 25    pursuant to that court order?

Artis Ellis

36

         A.   I'm sorry?

         Q.   Betty LeHew was the same human resources person
that still worked at ECFMG throughout your employment;
correct?

10:35    A.   Yes.

         Q.   And this Exhibit Number 2, it appears you
applied for the assistant manager for the Houston center
location?

         A.   Yes.

10:35    Q.   And -- and you obtained that position?

         A.   Yes.

         Q.   And did you -- do you remember what month you
started in that position?

         A.   I believe April.

10:35    Q.   April of 2005?

         A.   Yes.

         Q.   And who was your supervisor?

         A.   John Repasch.

         Q.   And was he the center manager?

10:35    A.   Yes.

         Q.   And did you interview with Mr. Repasch for that
position?

         A.   I originally interviewed with Betty LeHew.

         Q.   Okay.

10:35    A.   And then John Repasch.

Artis Ellis

**37**

1    Q.   And was Mr. Repasch the center manager until

2    the time that you were promoted to center manager?

3    A.   Yes.

4              (Exb. No. 3 was marked.)

10:36   5    Q.   (BY MS. O'DRISCOLL)   I hand you Exhibit 3.

6    This is ECFMG/Ellis 124, 125, and 126.

7              If you turn to the second page --

8              MR. KENNARD:   I've got to step out for a

9    second.   You can continue.

10:36  10              MS. O'DRISCOLL:   Do you want us to pause?

11              MR. KENNARD:   No.

12    Q.   (BY MS. O'DRISCOLL)   If you turn to the second

13    page, is -- are these the written references that you

14    filled out on the job application for ECFMG?

10:37  15    A.   On the second page?

16    Q.   Yes, ma'am.

17    A.   I don't see where it says references.

18    Q.   Well, I'm sorry, work experience.   I apologize.

19    A.   Yes.

10:37  20    Q.   Okay.   And I just wanted to briefly touch on

21    where you worked prior to the time that you applied at

22    ECFMG.

23              I see Harris Counseling Services from March

24    2004 to present, to March 2005, when you were applying;

10:37  25    is that correct?

Artis Ellis

**44**

1    A.   That is correct.

2    Q.   And Keenan, I'm just looking back at my list,

3 is -- is one of your stepchildren.

4    A.   That's correct.

10:48  5    Q.   Through Mr. Ellis.

6    A.   Uh-huh.

7    Q.   Was there -- do you recall if there was

8 anything -- strike that.

9              Was there anything in the court order with

10:48 10 the attorney general's office that required Mr. Bryant

11 to either carry Brittani for medical insurance or

12 contribute in some way, costwise, to help with medical

13 insurance?

14    A.   When she was a minor?

10:49 15    Q.   Well, during -- for the period of time that

16 covered the court order; correct?

17    A.   I don't recall.

18    Q.   But you said that she did visit him every other

19 weekend and holidays.

10:49 20    A.   Yes.

21    Q.   And do you remember if -- I know you have

22 Brittani listed here, and her date of birth is March

23 8th, 1987?

24    A.   Yes.

10:49 25    Q.   And I believe the date on this, it's -- the

Artis Ellis

**45**

effective date is May 1, 2005, on this designation.

    A.  Yes.

    Q.  Did you carry Brittani as a dependent at your employer prior to this?

10:49    A.  Yes.

    Q.  And you said that Troi Bryant was Brittani's father.

          Did you -- were you ever married to -- to Mr. Bryant?

10:50    A.  No.

    Q.  And -- and when -- when were you -- when did you have a relationship with him?

    A.  I didn't have a relationship with Mr. Bryant.

    Q.  Okay.  He is the father of your daughter.

10:50    A.  Yes.

    Q.  And biologically.

    A.  Yes.

    Q.  And so there was some sort of a relationship; correct?

10:50    A.  No.

    Q.  There was some sort of an encounter that resulted in a child; correct?

    A.  Yes.

    Q.  Okay.  And -- and did that happen around 1986?

10:50    A.  Yes.

Artis Ellis

53

1    you?

2         A.   No, I did not.

3         Q.   You did not?

4         A.   No.

5         Q.   Did you -- do you remember finding out -- how

6    you found out that he came to work there?

7         A.   I did not know that Mr. Bryant was working

8    there until his actual orientation.

9         Q.   At orientation?

10        A.   Yes.

11        Q.   And so do you help with the orientation?

12        A.   I help with the -- yes, as the center manager,

13   I was the only center manager there, so, yes, I would

14   help with orientation.

15        Q.   Okay.  So prior to orientation, do you receive

16   a list from human resources or your assistant or -- or

17   somewhere so that you can -- that you find out who the

18   new employees are?

19        A.   At that particular time, I was out on leave,

20   so, no, I did not know any of the new hires, and I was

21   not part of the interviewing process.

22        Q.   But you did -- you were there for his

23   orientation, and you helped at the orientation.

24        A.   I was there at the orientation, and yes, I

25   helped at the orientation.

Artis Ellis

56

1    concern.  He had already interviewed with John, had

2    already -- John had already made an offer to him, and he

3    was there to work.

4         Q.  And did you supervise Mr. Bryant?

11:03  5         A.  I supervised all employees.

6         Q.  So is that a yes?

7         A.  Yes.

8         Q.  And -- and you approved raises for Mr. Bryant?

9         A.  I approved raises for all employees.

11:03  10        Q.  Including Mr. Bryant?

11        A.  Including Mr. Bryant.

12        Q.  And you approved Mr. Bryant's promotion to a

13   full-time position?

14        A.  No.  I -- I mean, I -- I approved all

11:03  15   promotions.

16        Q.  Including Mr. Bryant's promotion.

17        A.  Including Mr. Bryant's.

18        Q.  Okay.

19        A.  He was an employee.

11:03  20        Q.  An employee under your supervision in Houston;

21   correct?

22        A.  As well as all the employees.

23        Q.  But -- but you were supervising Mr. Bryant.

24             MR. KENNARD:  Objection.  Asked and

11:04  25   answered.

Artis Ellis

**57**

1    Q.   (BY MS. O'DRISCOLL)   Is that a yes?

2    A.   Can you repeat the question?

3    Q.   You were supervising Mr. Bryant in the Houston

4    center, the Houston center for ECFMG; correct?

11:04  5    A.   I was the center manager, so I supervised all

6    the employees.

7    Q.   So that's a yes?

8    A.   Yes.

9    Q.   And do you remember how long Mr. Bryant worked

11:04 10   for the company?

11   A.   When did you say his start date was?

12   Q.   November 3rd, 2008.

13   A.   So somewhere about four years.   Three to four

14   years, I should say.

11:04 15   Q.   And during that three to four-year period, you

16   never mentioned to anyone at ECFMG that it was your

17   daughter's father?

18   A.   No.

19   Q.   And as you sit here today, in retrospect, do

11:05 20   you -- do you believe that you should have mentioned

21   that to ECFMG?

22   A.   I don't -- no, I don't think so.

23   Q.   You don't see a reason to have mentioned that

24   to -- to ECFMG management?

11:05 25              MR. KENNARD:   Objection.   Asked and

Artis Ellis

59

1    Q.  (BY MS. O'DRISCOLL)  You just let me know once

2    you've finished reviewing that.

3    A.  Okay.

4    Q.  Under -- on the third page, in the bottom

11:07  5    right-hand corner, it's ECFMG 146, at the top it says,

6    "Responsibilities and Duties."

7         We were -- we were discussing your job

8    duties as assistant center manager a little bit ago, and

9    does this refresh your recollection about your job

11:08  10    duties as assistant center manager for ECFMG?

11    A.  Yes.

12    Q.  And you understood that you were to assist

13    management in operating the center, administering the

14    standardized testing for medical students?

11:08  15    A.  Yes.

16    Q.  And making sure that the testing was secure?

17    A.  Yes.

18    Q.  And you also supervised all center staff under

19    the direction of the center manager when Mr. Repasch was

11:08  20    there?

21    A.  Yes.

22    Q.  And you also trained employees while you were

23    an assistant center manager?

24    A.  Yes.

11:08  25    Q.  And did you have to train them on ECFMG

Artis Ellis

60

1   policies?

2        A.   Yes.

3        Q.   And would you also continue to -- to train

4   employees and ensure that employees followed policies

11:08   5   when you were promoted to center manager, as well?

6        A.   No.

7        Q.   It wasn't one of your responsibilities to -- to

8   train and ensure that employees followed ECFMG policies

9   while you were both assistant manager and center

11:09  10   manager?

11       A.   I would just have to refer back to the center

12   manager's job responsibilities.

13       Q.   So -- so you didn't consider it one of your job

14   duties when you became a center manager to ensure that

11:09  15   policies were followed at the company?

16       A.   I would just need to refer back to the

17   responsibilities as the center manager on the job

18   description.

19       Q.   Oh, you're saying you want to see the job --

11:09  20       A.   Yes.

21       Q.   I'm sorry.  I thought you were saying you

22   referred it to someone --

23       A.   Huh-uh.

24       Q.   -- else to handle.  I apologize.  Okay.  I

11:09  25   misunderstood.

Artis Ellis

**62**

1        A.   So is that with -- as the center manager or

2   assistant manager because you said earlier assistant

3   manager.

4        Q.   We're talking about assistant manager here.

11:11  5        A.   Okay.  Now, repeat one more time.

6        Q.   So one of your job duties as assistant center

7   manager was to ensure that the standards and procedures

8   required by USMLE, that those were followed; correct?

9        A.   Correct.

11:11  10       Q.   And do you recall that you also had to do that

11  as center manager, as well?

12       A.   Yes.

13       Q.   I'll mark as Exhibit 7 ECFMG 73 through 74.

14            (Exb. No. 7 was marked.)

11:12  15       Q.   (BY MS. O'DRISCOLL)  And this letter -- let me

16  know once you've reviewed it briefly.

17       A.   Yes.

18       Q.   And this is a letter dated October 27th, 2008,

19  promoting you to acting center manager; is that correct?

11:12  20       A.   Yes.

21       Q.   Okay.  And -- and that's your signature down at

22  the bottom dated October 29th, 2008?

23       A.   Yes.

24       Q.   I'll mark as Exhibit 8 ECFMG/Ellis 75 through

11:13  25  78.

Artis Ellis

63

1          (Exb. No. 8 was marked.)

2      Q.  (BY MS. O'DRISCOLL)  Take a moment to look at

3  that.  I believe that's your job description as center

4  manager.

11:13  5          And let me know once you've finished taking

6  a look at that.

7      A.  Yes.  Erin, yes.

8      Q.  Okay.  And that last page there, that's your

9  signature signing the job description dated 10-27-08;

11:14  10  correct?

11      A.  That is correct.

12      Q.  Okay.  And as center manager for ECFMG, it was

13  still your responsibility as center manager to implement

14  and enforce the center policies; correct?

11:15  15      A.  Yes.

16      Q.  And it was also your job to ensure that exams

17  were conducted in a secure fashion; correct?

18      A.  That is correct.

19      Q.  Okay.  And it was your job -- it was -- it

11:15  20  continued to be your job to implement policies and

21  procedures at ECFMG.

22      A.  Yes.

23      Q.  To ensure that they were followed by all the

24  employees?

11:15  25      A.  Yes.

Artis Ellis

**67**

1    bigger time of -- time span that happened?

2         A.   It was rescheduled a couple of weeks.

3         Q.   Okay.  So just a couple of weeks?

4         A.   Uh-huh.

11:28  5  Q.   So you -- did you actually take FMLA leave to

6    assist him with that?

7         A.   With the first one?

8         Q.   With the kidney transplant, yes, ma'am.

9         A.   I was his donor.

11:29 10  Q.   Okay.  So you -- you took FMLA leave as his

11   donor when -- and I said "his," meaning your husband,

12   when he was getting a kidney transplant?

13        A.   Yes.

14        Q.   And did you go out on leave when it was

11:29 15  initially scheduled?

16        A.   Yes.

17        Q.   And do you remember why it was canceled?

18        A.   Because my doctor was not available.

19        Q.   And you applied for FMLA leave through ECFMG to

11:29 20  assist your husband with that transplant; correct?

21        A.   Correct.

22        Q.   And there wasn't any FMLA request that was

23   denied related to that incident; correct?

24        A.   No.

11:29 25  Q.   And do you remember how long you went out on

Artis Ellis

70

1        A.   No.

2        Q.   I'll mark as Exhibit 10 ECFMG/Ellis 360 through

3   368.

4             (Exb. No. 10 was marked.)

11:32  5        Q.   (BY MS. O'DRISCOLL)   If you could just take a

6   brief look at this document.

7             Have you -- and -- and once you take a

8   brief look at it, let me know if you've ever seen this

9   document before.

11:32 10        A.   The -- Troi's application or the ECFMG

11  application?

12        Q.   Yes, ma'am.   Troi's application.

13        A.   No, I've never seen it.

14        Q.   But you recognize the form that ECFMG uses?

11:32 15        A.   I do recognize the form.

16        Q.   Okay.   And you see there in the upper

17  right-hand corner, on 0360, date of application,

18  11-4-08?

19             Do you see that?

11:33 20        A.   I do see that.

21        Q.   And that was shortly after you were promoted to

22  center manager; correct?

23        A.   That is correct.

24        Q.   You were promoted on October 27th, 2008;

11:33 25  correct?

Artis Ellis

71

         A.  That is correct.

         Q.  And if you go a little bit further down, it
looks like Mr. Bryant was applying for the standardized
position patient -- I'm sorry -- standardized patient
11:33  position; is that correct?

         A.  Yes.

         Q.  And what does a standardized patient do?

         A.  They work in the exam.  But remember that this
is just an application.  This does not mean that he was
11:33  hired.  It just means that he applied for that position.

         Q.  Okay.

         A.  On that particular day.

         Q.  Okay.  Fair enough.  Okay.

              And if you look a little bit further down,
11:34  where it says, "How did you learn about Step 2 CS?"

         A.  Uh-huh.

         Q.  Do you know what step 2 CS means?

         A.  Yes.

         Q.  What does that mean?

11:34    A.  Step 2 clinical exam.

         Q.  Okay.  CS?

         A.  CS means clinical exam.

         Q.  Okay.  Okay.  And it says, "How did you learn
about Step 2?"

11:34         And it says, "Relative.

Artis Ellis

72

1           "Who?

2           "Jackie Bryant."

3      A.   Yes.

4      Q.   And who is Jackie Bryant?

11:34  5      A.   Jackie Bryant is Troi Bryant's wife.

6      Q.   And did Ms. Bryant also work for ECFMG?

7      A.   She did.

8      Q.   And do you remember when she -- when she

9 started working for ECFMG?

11:34 10      A.   I do not recall when she started working with

11 ECFMG.

12      Q.   And did you hire her?

13      A.   She -- I did --

14      Q.   Okay.

11:34 15      A.   -- hire Jackie Bryant.

16      Q.   And when you hired Ms. Bryant, did you let

17 anybody at ECFMG know that you were hiring your

18 daughter's stepmother?

19      A.   No, because I don't have a relationship or no

11:35 20 relations with them, so I just believed that you should

21 get a job based on your abilities and your skills, not

22 because of who you know.  So I am related to my

23 daughter, not to Troi or Jackie.  I have no family

24 relations to either of them.

11:35 25           MS. O'DRISCOLL:  Objection to the

Artis Ellis

**74**

1   speculation and infers facts not in evidence.

2            MS. O'DRISCOLL:  Counsel, can you explain

3   your basis?

4            MR. KENNARD:  Sure.  Stepmother.  To the

11:36  5   extent that you're using the term stepmother, we -- no

6   one has established whether or not that moniker has ever

7   been utilized by the witness or anyone else for that

8   matter.  So I -- my objection is strictly and primarily

9   to your assertion that this individual is a stepmother

11:36  10  without providing a basis for what a stepmother is or is

11  not.

12       Q.  (BY MS. O'DRISCOLL)  As you testified

13  previously, Jackie Bryant is the wife of Troi Bryant;

14  correct?

11:37  15       A.  That is correct.

16       Q.  And Jackie Bryant lives with Troi Bryant?

17       A.  Yes.

18       Q.  As his wife.

19       A.  Yes.

11:37  20       Q.  And your daughter, Brittani Bryant; correct, is

21  Brittani Bryant; correct?

22       A.  She's Brittani Davis.

23       Q.  Okay.  And her maiden name is Bryant; correct?

24       A.  Yes.

11:37  25       Q.  And you've already testified that Troi Bryant

Artis Ellis

75

1    is her father; correct?

2         A.   Yes.

3         Q.   And when Brittani would go and visit her father

4    every other week, would she go and stay in the same home

11:37  5    with Jackie Bryant and Troi Bryant?

6         A.   Yes.

7         Q.   And what -- how would Brittani refer to

8    Mrs. Bryant?

9         A.   As Jackie.

11:37  10        Q.   And do you consider Jackie to be -- to be

11   Brittani's stepmother?

12        A.   Jackie's Troi's wife, yes.

13        Q.   So that's a yes?

14        A.   Yes.

11:38  15        Q.   Okay.   Okay.

16        A.   Troi is someone I --

17        Q.   If you -- if you -- if you could just answer

18   the questions when I ask them.   Okay?

19        A.   Thank you.

11:38  20        Q.   Okay.

21             MR. KENNARD:   Were you still attempting to

22   answer the previous question?

23             THE WITNESS:   Yes.

24             MR. KENNARD:   If so, I would ask counsel to

11:38  25   allow the witness to fully complete her answer to the

Artis Ellis

76

1    question that was posed before cutting her off and not

2    allowing her to complete her thoughts and complete her

3    answer to counsel's previous question.

4            MS. O'DRISCOLL:  The plaintiff answered my

11:38  5    question.

6            MR. KENNARD:  Well, you thought she did,

7    but she clearly did not and was thinking about it and

8    was not done.

9            Did you finish answering the question?

11:38  10            THE WITNESS:  I -- I wasn't, but --

11            MS. O'DRISCOLL:  Okay.

12            MR. KENNARD:  Okay.  So then you should be

13    allowed to answer the question.

14        Q.  (BY MS. O'DRISCOLL)  So is there something more

11:39  15    you'd like to add to your answer, in addition to the

16    fact that Ms. Bryant was considered to be Brittani's

17    stepmother?

18        A.  Troi was just a -- not even a boyfriend in high

19    school.

11:39  20        Q.  A boyfriend of whom?

21        A.  Not -- not even -- I'm saying, not even a

22    boyfriend in high school.  It was someone I had an

23    encounter with.

24        Q.  A sexual encounter.

11:39  25        A.  Yes.

Artis Ellis

77

1    Q.  That resulted in the birth of your daughter.

2    A.  Yes.

3    Q.  Okay.

4              MR. KENNARD:  Are we still at -- are we

11:39  5    answering more -- did you finish answering the last

6    question?

7              THE WITNESS:  About Jackie?

8              MR. KENNARD:  Yes.

9              THE WITNESS:  Yes.

11:39  10             MR. KENNARD:  Okay.  All right.

11    Q.  (BY MS. O'DRISCOLL)  And -- and you hired

12   Jackie Bryant --

13    A.  Yes.

14    Q.  -- when she came to work at ECFMG?

11:39  15    A.  Yes.

16    Q.  And do you remember when she was hired?

17    A.  I do not.

18    Q.  Okay.  And Troi Bryant, do you know -- do you

19   know if Troi Bryant knew that you worked at ECFMG when

11:39  20   he applied to the company?

21    A.  I'm sure he did because Jackie worked there.

22    Q.  And were there Christmas parties at ECFMG?

23    A.  Yes.

24    Q.  Was it -- was that an annual tradition?

11:40  25    A.  Yes.

Artis Ellis

79

1    A.   Yes.

2    Q.   Okay.

3              MR. KENNARD:   I apologize.   There's some

4    electrical work happening in the suite, so there will be

11:41   5    random noises.

6    Q.   (BY MS. O'DRISCOLL)   And do you recall -- when

7    Mr. Bryant applied for this position, do you recall

8    Jackie Bryant mentioning to you that Troi applied for a

9    position?

11:41   10   A.   Jackie never mentioned to me that Troi applied

11   for a position.

12   Q.   And -- and you previously testified that you

13   first realized that Mr. Bryant had been hired when you

14   saw him at orientation and you were performing

11:42   15   orientation as center manager; correct?

16   A.   That is correct.

17   Q.   Okay.   I'll mark as Exhibit 11 ECFMG 369

18   through 370.

19              (Exb. No. 11 was marked.)

11:42   20   Q.   (BY MS. O'DRISCOLL)   If you could just take a

21   brief look at that document, Ms. Ellis.   Just let me

22   know when you've looked at it.

23   A.   Okay.

24   Q.   And is this the -- the new employee form that

11:43   25   was used at ECFMG regularly?

Artis Ellis

80

 1      A.   This is.

 2      Q.   And on the second page, ECFMG 370, at the -- at

 3  the top of that page, is that your signature dated

 4  November 3rd, 2008?

11:43  5      A.   This is my signature.

 6      Q.   Dated November 3rd, 2008?

 7      A.   Yes.

 8      Q.   Okay.  And so this is the new hire document for

 9  Mr. Bryant and -- and you signed off on it as center

11:43 10  manager.

11      A.   Yes.  But this is -- I don't fill out.  I don't

12  do any of the HR paperwork, the SPOS.  So this is not

13  my --  SPOS used to do all the HR paperwork before I

14  would do the all the -- before the center manager would

11:43 15  do the human -- I'm sorry -- the -- the introduction to

16  the -- for the new hires to the center.  They would do

17  the tour, they would introduce them to the trainers,

18  they will show a slide show.  So I did not do -- this

19  is -- all of this on the first sheet is not my -- my

11:44 20  writing.

21      Q.   Understood.  Understood.  But the second

22  page --

23      A.   That is my signature.

24      Q.   Okay.

11:44 25      A.   And that is my date.

Artis Ellis

81

Q.  Okay.  And -- and you're listed as hiring

manager; correct?

A.  Because I was the only manager.

Q.  Okay.  For the center in Houston.

A.  For the center in Houston.

Q.  Okay.  And you knew that -- but you knew that

you were signing a new hire document for Mr. Bryant;

correct?

A.  And all the other employees that was hired on

that particular day.

Q.  Okay.  Including Mr. Bryant.

A.  Including Mr. Bryant.

Q.  Okay.  And is it your testimony that this

document would be completed prior to the orientation?

A.  This document is completed during the

orientation.

Q.  During the orientation.  Okay.

So -- so you may have signed this document

on or about the same day that you were conducting the

orientation for Mr. Bryant?

A.  It was signed on the day of orientation.

Q.  Okay.  Okay.  And he was hired in as a

nonexempt position on an as-needed basis as a

standardized patient?

A.  Yes.

Artis Ellis

**82**

1    Q.   Okay.  Did he ever indicate to you that -- that

2  he wanted to get promoted to a full-time position?

3    A.   He did not.

4    Q.   Is it your understanding that at a later date

11:45  5  that he did get promoted to -- to a full-time position?

6    A.   Yes.

7    Q.   And did you have to approve that promotion?

8    A.   Yes.

9    Q.   And --

11:45  10    A.   But, let me clarify --

11    Q.   Sure.

12    A.   -- that he would -- he did send his application

13  or his intent to HR, and he did not have to let me know

14  that he was applying for a full-time position.

11:45  15    Q.   Okay.  But you -- but you would approve that?

16    A.   After HR will do the first round of interviews,

17  and then they will let me know who their top three

18  candidates were.

19    Q.   Okay.  And then of the top three candidates,

11:46  20  when -- when he was applying for the full-time position,

21  you chose him.

22    A.   Along with my assistant manager.

23    Q.   Okay.  And was that Brent Bates at the time?

24    A.   Yes.

11:46  25    Q.   Okay.  Mark as Exhibit 12 ECFMG/Ellis 371

Artis Ellis

97

1    Q.   (BY MS. O'DRISCOLL)   And this is an offer

2  letter to Mr. Bryant dated November 3rd.   Tell me if I'm

3  reading this correctly.   In the first bullet, it says,

4  "You will report directly to Artis Ellis, Acting Center

13:02  5  Manager"; correct?

6    A.   Acting center manager.

7    Q.   I read that correctly?

8    A.   Yes.

9    Q.   Okay.   And then the second bullet says, "Your

13:02 10  start date will be November 3rd, 2008"; is that correct?

11    A.   Correct.

12    Q.   And then if you scroll down --

13         MR. KENNARD:   Can you go up again one

14  second?

13:02 15         MS. O'DRISCOLL:   Uh-huh.

16         MR. KENNARD:   Up more.

17         MS. O'DRISCOLL:   Up more?

18         MR. KENNARD:   Right there is fine.   Okay.

19  Got it.

13:02 20    Q.   (BY MS. O'DRISCOLL)   And then if we -- if we

21  scroll down, midway through it looks like it gives his

22  orientation and workshops and that SP, standardized

23  patient orientation is November 3rd, 2008, which

24  coincides with what your recollection was, that he

13:02 25  did -- he did orientation that day, on November 3rd;

Artis Ellis

98

1    correct?

2         A.   Correct.

3         Q.   And then if you scroll -- and this is his offer

4    letter to -- as his hire for ECFMG, on the last page, if

13:03  5    you scroll down, this is an offer letter signed by you.

6         A.   Yes.  But, remember, I was just rubber stamping

7    letters.  I did not complete these letters.  These were

8    done by the SPOS.

9         Q.   Okay.  But you knew that you were signing an

13:03 10    offer letter for Mr. Troi Bryant.

11         A.   Yes.

12         Q.   As a new -- as a new hire.

13         A.   Yes.

14         Q.   Okay.  Okay.  And then if we --

13:03 15              MR. KENNARD:  What Exhibit Number is this?

16              MS. O'DRISCOLL:  I'm sorry.  This -- this

17    is going to be -- this is Exhibit 15, and I will --

18              MR. KENNARD:  Has this been previously

19    produced?

13:03 20              MS. O'DRISCOLL:  This is the document that

21    was -- this has not been previously produced.

22              MR. KENNARD:  Okay.  I'm again going to

23    object to its usage as it hasn't been previously

24    produced.  Will you be submitting --

13:03 25              MS. O'DRISCOLL:  We'll send -- yeah, we'll

Artis Ellis

99

1    send you a Bates-labeled copy.

2              And this, of course, is discovery still

3    open, and we'll -- we'll -- we're going to supplement

4    the production with this document.

13:04  5              MR. KENNARD:  Sure.  My only concern is

6    that if it was pertinent to the deposition that it would

7    have been produced prior to the deposition so that

8    counsel for plaintiff could have reviewed it instead of

9    being what -- counsel is not accusing of being

13:04  10   blindsided, but we would have -- it would have been

11   preferable to have this documentation before today's

12   date so that all parties could have reviewed it prior

13   to.  So that is the purpose of my objection, but please

14   proceed.

13:04  15             MS. O'DRISCOLL:  Thank you.  Thank you,

16   Counsel.

17             (Exb. No. 15 was marked.)

18        Q.  (BY MS. O'DRISCOLL)  So with regard to

19   Mr. Bryant, he started in -- in the fall at ECFMG of

13:04  20   2008 while you were acting center manager -- center

21   manager; correct?

22        A.  That is correct.

23        Q.  Okay.  That was 15.  So Exhibit 16 is going to

24   be Ellis 233 to -- through 239.

13:05  25             (Exb. No. 16 was marked.)

Artis Ellis

**100**

1      Q.   (BY MS. O'DRISCOLL)   And if you would just take

2   a moment.   This is a document that your lawyer produced

3   to us, as indicated by the Bates-labeled version at the

4   bottom of these documents.   And just let me know once

13:05  5   you've refreshed your memory on this document.

6               And we're going to walk through it in

7   detail, so I just want to --

8      A.   Yes.

9      Q.   Whenever you're ready.

13:06  10      A.   I'm ready.

11      Q.   Okay.   So if you'd turn to the last page, Ellis

12   239, which appears to be the beginning of this e-mail

13   chain --

14      A.   Yes.

13:06  15      Q.   -- am I correct, this is an e-mail exchange

16   between you at your e-mail, AFHarden@Yahoo.com, with

17   John --

18      A.   Repasch.

19      Q.   Repasch, who was your former center manager

13:06  20   that -- that is still with the company, ECFMG, and

21   transferred to Philadelphia; correct?

22      A.   Correct.

23      Q.   Okay.   And so the date on this e-mail exchange

24   is -- looks like it's over the course of a couple of

13:07  25   days, February 20th, 2014, and through February 21st,

Artis Ellis

**101**

1    2014; am I correct?

2         A.   Yes, you are correct.

3         Q.   And -- and that's subsequent to the time that

4    you left the company, ECFMG.  It's after -- these --

13:07  5    this e-mail exchange is after you were already a former

6    employee.

7         A.   Yes.

8         Q.   Okay.  So if you look at the -- the last page,

9    which -- which starts -- sorry -- the second to last

13:07  10   page, it starts at the very bottom, February 20th at

11   1:39 p.m., John Repasch wrote, "Hey Artis, Thanks for

12   sharing the pictures.  They looked wonderful and I hope

13   everything went well.  I need to ask you a serious

14   question."

13:07  15            Is that -- did I read that accurately?

16        A.   Correct.

17        Q.   And it looks like there's some of this exchange

18   that's discussing Brittani, your daughter, yours and

19   Mr. Bryant's daughter, her wedding; correct?

13:08  20        A.   Yes.

21        Q.   Okay.  So if you go, at the bottom of 237, on

22   February 21st, 2014, at 6:52 a.m., John asks, "Is Troi

23   Brittani's father?"

24            Did I read that correctly?

13:08  25        A.   Yes.

Artis Ellis

**102**

Q.  And this -- and during the exchange, you

describe how Brittani -- you and -- and Mr. Troi -- I'm

sorry -- Troi Bryant had an encounter and -- and that

Brittani was born back after prom night; is that

13:08   correct?

A.  That is correct.

Q.  Okay.  And -- pardon?

MR. KENNARD:  I just said, prom night.  Got

to be careful on prom night.

13:09   Q.  (BY MS. O'DRISCOLL)  So with this, at the

bottom of the second page, it's a long e-mail chain

discussing this, where Mr. Repasch is asking you about

Brittani's father.  You say, on February 21st, which is

at Ellis 234, you state -- and, actually, if you would

13:09   read that document.

A.  I don't know where you're at.

Q.  On 234 is at the bottom on February 21st.

A.  234?  You saying Bates number 234?

Q.  Yes.

13:09   A.  On Friday, 2-21-14?

Q.  Yes.

A.  Here -- starting with "Here's the deal"?

Q.  Yes.

A.  Okay.  "Here's the deal.  Yes, Troi's

13:09   Brittani's biological father.  I met my ex -- ex-husband

Artis Ellis

**106**

1    second, I have a" 25 "year old stepdaughter and a 40

2    year old wife... do the math.  And like Patty, I have

3    always had a tremendous respect for you because you

4    worked hard to build yourself up while raising three

13:13    5    amazing children.

6              "BUT, I wish you had been straight with me

7    when we hired Jackie.  I can't say, knowing this

8    information now, whether we would have hired Troi, but

9    we could have at least cleared either of their hiring

13:13    10    with Hite and HR."

11              And Hite was the head of ECFMG at the time;

12    correct?

13         A.  Not --

14         Q.  Betty Hite?

13:14    15         A.  She wasn't the head.  She was our director.

16         Q.  Was the director.

17         A.  Yes.

18         Q.  That was who you-all reported to at the time.

19         A.  Yes.

13:14    20         Q.  Okay.  "Doing that would have eliminated any

21    appearance of conflict of interest or that you had tried

22    to hide your relationship with them.  And you have to

23    know from other people's perspective that's how it

24    appears to them.  I hope" that "makes sense."

13:14    25              And then you respond to that; correct?  You

Artis Ellis

**107**

1    respond to that e-mail on the front of the first page on

2    February 21st, 2014.

3        A.  Yes.

4        Q.  Okay.  And in this response to -- to

13:14  5  Mr. Repasch, you state, "Just for the record....I wasn't

6    hiding anything from you, I really couldn't see the

7    problem.  Now I can see your point how someone could

8    have perceived malice intent."

9            Did I read that correctly?

13:15  10       A.  I -- I think you're missing a whole lot of

11   other things, too, Erin.  I also said, "You have no idea

12   how much shame I dealt with about" the "pregnancy."  I

13   was a 18-year-old girl that went to a prom that had a

14   one-night stand and got pregnant.  I did not abort my

13:15  15  child.  I had a baby.  I was very young.  And then right

16   after that, I kind of grew up.  I went to school, tried

17   to make a difference for myself.  And I was also

18   explaining to that.  That was John's point of view, and

19   I said, yeah, okay, if that's what -- how other people

13:15  20  have seen that, hey, I can -- yeah, I can see maybe how

21   their point of view could have been taken, but now I'm

22   over 40.  My daughter, by the time Troi came there, she

23   had already graduated with a degree.  There was nothing

24   to gain.  So, no, I -- I mean, I -- I still don't think

13:15  25  that hiring Troi or being part of that, I'm not going to

Artis Ellis

**108**

1    associate myself with that.

2         Q.   Okay.  So even though the policy at ECFMG

3    was -- was not to have direct reporting relationships

4    and hiring decisions and promoting decisions and

13:16  5    evaluations performed by folks that are related by

6    blood, that -- or that have similar relationships.

7         A.   I'm not --

8              MR. KENNARD:  Hold on.  I'm going to

9    object.  Assumes facts not in evidence.  A compound

13:16  10    question.  And misstates previous testimony.

11         Q.   (BY MS. O'DRISCOLL)  So this would be a good

12    time, we'll look at the policy that ECFMG has.  I'm

13    going to mark this as Exhibit 17.

14              (Exb. No. 17 was marked.)

13:16  15         Q.   (BY MS. O'DRISCOLL)  And I know you've seen

16    this policy before.

17              This is ECFMG/Ellis 356-357.  And the title

18    of this document is "Employment of Relatives and

19    Relationships in the Workplace."

13:16  20              Did I read that correctly?

21         A.   Yes.

22         Q.   And -- and this is a policy that you were

23    familiar with at ECFMG; correct?

24         A.   Correct.

13:17  25         Q.   And you were aware that this policy existed

Artis Ellis

**109**

1    both while you were assistant center manager as well as

2    while you were the center manager; correct?

3        A.   That is correct.

4        Q.   Okay.  Roman numeral I for the -- states that

13:17  5    the policy -- "It is the policy of ECFMG to regulate the

6    working and reporting relationships of individuals who

7    are related by blood, adoption, marriage, or domestic

8    partnership, affianced or significant other in order to

9    avoid real or perceived conflicts of interest,

13:17 10    influence, or favoritism."

11              And that's the conflict of interest that

12    you and John were discussing on that e-mail; correct?

13        A.   That is not.

14        Q.   It's not?

13:17 15        A.   No.

16        Q.   How -- how is that not?

17        A.   Because I am not related to Troi Bryant by

18    blood, adoption, marriage, domestic partnership,

19    affianced, significant others, in order -- by no means

13:17 20    am I related to him.  I am -- I am the mother of

21    Brittani Bryant, not Troi Bryant or Jackie Bryant.

22        Q.   And, again, Troi Bryant was paying child

23    support through the attorney general's office and -- and

24    as Brittani's father to this day, and during the time he

13:18 25    worked with -- worked for ECFMG; correct?

Artis Ellis

111

1   calls for a legal conclusion and assumes facts not in

2   evidence.

3       Q.   (BY MS. O'DRISCOLL)   As center manager and

4   assistant manager of ECFMG, we've already established

13:19  5   that it was your job to educate employees and ensure

6   that policies were followed at the Houston center;

7   correct?

8       A.   Yes.

9       Q.   And you understand that this policy was in

13:19  10  place during the entire duration of your employment at

11  ECFMG; correct?

12      A.   Correct.

13      Q.   And when you read the definition of significant

14  other, as -- as the leading person and the second in

13:20  15  command at the Houston ECFMG, is it your testimony that

16  you're telling the judge and jury that you did not

17  consider a co-parenting relationship to be a significant

18  other relationship covered by this policy?  Is that your

19  testimony?

13:20  20          MR. KENNARD:  Objection.  Calls for

21  speculation.  Assumes facts not in evidence, and is

22  misleading as to the term co-parenting.

23          You may answer if you're able to.

24      Q.   (BY MS. O'DRISCOLL)  I'll break that down into

13:20  25  five questions, and we'll -- we'll be here for the full

Artis Ellis

**115**

1    MR. KENNARD:  Was that -- I'd ask that the

2    witness not be harassed or harangued when she's trying

3    to answer a question.

4    Was that in response to her last question?

13:24  5    THE WITNESS:  Yes.

6    Q.  (BY MS. O'DRISCOLL)  There was not a question

7    pending.

8    MR. KENNARD:  She -- again, you may not --

9    you may not like the answer, but it is -- I just asked

13:24  10   the witness if it's a continuation of her previous

11   response and she said, yes.  You've got to remember this

12   is someone that's had brain surgery and may not be as

13   quick to respond as we may otherwise as attorneys be

14   accustomed to.  So I would ask that we provide the

13:24  15   witness with the appropriate deference and respect.  And

16   if she is slow to answer at times, that is part of what

17   we deal with when deposing a witness in -- in her

18   condition, so I ask that we be patient.  Thank you.

19   MS. O'DRISCOLL:  And as you well know, I've

13:24  20   been very, very patient throughout this entire day.

21   MR. KENNARD:  I like you, Erin, you're a

22   good person.

23   Q.  (BY MS. O'DRISCOLL)  And assuming --

24   assuming -- regardless of what, as you sit here right

13:24  25   now, and -- and we're mincing the definition of

Artis Ellis

**116**

relationship, letter D on the second page specifically
spells out that a failure to disclose can result in
termination; correct?

    A.  It says may be grounds for termination of
employment.

    Q.  Can or may; correct?

    A.  May.

    Q.  And -- and -- and so termination, a failure to
follow this policy can -- may result in termination.

    A.  Correct.

    Q.  Okay.  And -- and this policy, was it posted on
the intranet, or where would one -- where did you see
this policy at ECFMG?

    A.  We had a hard copy.

    Q.  Okay.

    A.  As well as the intranet.

    Q.  Okay.  And it's also mentioned in the handbook
as well; correct?

    A.  Correct.  But keep in mind, Erin, because I
feel like strongly why we're here today is because I did
not violate this policy.

    Q.  Okay.

    A.  Because Troi was not related to me.

    Q.  Under -- understood.  But if ECFMG interpreted
him as being -- having a significant relationship and

Artis Ellis

**121**

1    time is approximately 1:42.  We're on the record.

2         Q.  (BY MS. O'DRISCOLL)  Okay.  Ms. Ellis, we were

3    talking about your FMLA leave -- leaves at --

4              THE VIDEOGRAPHER:  Microphone.

13:42  5         Q.  (BY MS. O'DRISCOLL)  We were talking about your

6    FMLA leaves at ECFMG just prior to the break, and I want

7    to look at -- after the January, 2012, leave that you

8    took for your -- for your husband, for his kidney, did

9    you take another leave after that, another FMLA leave?

13:43  10        A.  You going to show me something?

11        Q.  Did you take another leave after that?

12        A.  I took one for myself.

13        Q.  Okay.  And that was in the fall of 2012?

14        A.  Yes.

13:43  15        Q.  Okay.  Take a look at Exhibit 19, ECFMG 390

16    through 396.

17              (Exb. No. 19 was marked.)

18        Q.  (BY MS. O'DRISCOLL)  I believe these are the

19    leave documents that you filled out, you and/or your

13:43  20    physicians filled out related to that leave for yourself

21    in -- in 2000 -- the fall of 2012.  So let me know when

22    you've finished looking at those documents.

23        A.  This was a package.  It's incomplete, but --

24        Q.  Okay.  We're going to look at the documents

13:44  25    that we have.

Artis Ellis

123

1   brain."

2              Is that what that says?

3        A.  Yes.

4        Q.  Okay.  And it says, "I need" the "Leave of

13:45 5  Absence to begin" -- "to begin" and you filled in

6   September 12th, 2012, to October 22nd, 2012; is that

7   correct?

8        A.  That is correct.

9        Q.  Now, on the next page, this is entitled

13:45 10 "Request for Short Term Disability."

11             Is this also your handwriting?

12        A.  Yes.

13        Q.  Except for Sharon's signature?

14        A.  Yes.

13:45 15       Q.  Okay.  And this is where you agreed to receive

16   short-term disability for 80 percent of your salary?

17        A.  Yes.

18        Q.  And, in fact, you did receive that short-term

19   disability through Sun Life; correct?

13:46 20       A.  That is correct.

21        Q.  Now, if you'd go to the next page, this is a

22   continuation of the FMLA documents, and with each

23   section it appears that someone different fills it out.

24             Am I -- am I interpreting that correctly?

13:46 25       A.  That is correct.

Artis Ellis

**124**

1    Q.   So the top section it says, "Completion by the

2   EMPLOYER"; correct?   In the -- in the top section on

3   392, it says, "Section 1:  For Completion by the

4   EMPLOYER"?

13:46  5    A.   Yes.

6    Q.   And then it says, "Section 2:  For Completion

7   by the EMPLOYEE"; is that right?

8    A.   Yes.

9    Q.   And then "Section 3:  Completion by the HEALTH

13:46  10   CARE PROVIDER"; is that right?

11    A.   Yes.

12    Q.   So the health care provider in that bottom

13   section, how do you -- how do you pronounce your -- is

14   it -- your doctor, Daniel?

13:47  15    A.   Yoshor.

16    Q.   Yoshor.   So he was your physician for

17   neurosurgery in this -- for this FMLA leave?

18    A.   He was the surgeon.

19    Q.   Okay.   And that's his -- and then do you know

13:47  20   who -- for the completion by the health care provider on

21   the bottom of that page, do you know who filled that out

22   at the physician's office?

23    A.   No.

24    Q.   Do you know how they were given this document?

13:47  25    A.   Joe Plush e-mailed it to, I believe, his nurse.

Artis Ellis

**127**

have treatment visits at least twice per year due to the
condition"?  And it says, "No."

    A.   Correct.

    Q.   "Was medication, other" -- "other than
"over-the-counter medication, prescribed?"  And it says,
"No."

    A.   Correct.

    Q.   The next line says, "Was the patient referred
to other health care provider(s) for evaluation or
treatment?"  And they checked, "No."

    A.   Correct.

    Q.   So -- so that -- I correctly read all of that.

    A.   Correct.

    Q.   Now, obviously the -- the question about
pregnancy doesn't apply here.

         Now, number 3, tell me if I read this
correctly -- "Use the information provided by the
employer in Section 1 to answer this question.  If the
employer fails to provide a list of the employee's
essential functions or a job description, answer these
questions based upon the employee's own description of
his or her job functions."

         And the question:  "Is the employee unable
to perform any of his or her job functions due to...
condition?"  And you check, "No," or "Yes," and they

Artis Ellis

130

A.   -- this was during the visit of -- this was very early on.  So the doctors after the surgeon saw me, because when this was completed, I still had a team of doctors that still had to sign off on me.

Q.   Okay.

A.   So I didn't see the surgeon after -- you know, if everything was going okay, then he was -- he signed off on me, but the other team of doctors still had to see me.

Q.   Okay.

A.   The neurologist and endocrinologist.

Q.   Understood.  Understood.

And -- and the next page, it has the physician's signature dated, dated, I think what you were getting at, September 25th, 2012.

A.   Yes.

Q.   Okay.  And then if you turn to the next page, it's the designate -- designation notice, where it says, "Your FMLA leave request is approved.  All leave taken for this reason is designated as FMLA leave," in that box -- and that line is checked.

And this is the -- this is the approval notice that you received for FMLA; correct?

And this is Bates number ECFMG 396.

A.   I don't know, because I've seen so many forms,

DepoTexas, Inc.

Artis Ellis

**131**

1    so there may be another form for approval.

2                    So do you have any more?

3         Q.  I do not, for approval, but I wanted to -- I

4    wanted to go further down.

13:54  5                    This -- this is the approval for September

6    12th, 2012, through October 22nd, 2012, provided there's

7    no deviation.

8                    That's what this notice says; correct?

9         A.  That is correct.

13:54 10         Q.  And then if you go further down, it says,

11    "Please be advised," and there's two Xs in that section,

12    there's an X next to "We are requiring you to substitute

13    or use paid leave during your FMLA leave," and you

14    understood that to be the case; correct, that you were

13:55 15    using paid leave during your FMLA leave?

16         A.  No.

17         Q.  You did not?

18         A.  No.  I was using short-term -- short-term

19    disability.

13:55 20         Q.  And FMLA leave.

21         A.  And FMLA.

22         Q.  And then the second box that's checked, "You

23    will be required to present a fitness-for-duty

24    certificate to be restored to employment."

13:55 25                    And you understood that?

Artis Ellis

132

A.   Yes.

Q.   To come -- to come back to work, you had to have a fitness for duty from your physician.

A.   Yes.

13:55   Q.   Okay.  Now, I wanted to look at another -- we can look at the documents related to FMLA that your lawyer produced, as well, because I think that might be what you're referring to.

Mark this as Exhibit 20 PCF -- I'm sorry -- 13:56 Ellis 005 through 0024.  And this is a -- this is a group of documents that your lawyers produced to us that has short-term disability documents as well as some of the FMLA documents.  This is the -- the group of documents that were sent to us.

13:57   And some of them we just looked at were the FMLA documents, so this is going to touch on both your -- your short-term and your FMLA.

(Exb. No. 20 was marked.)

Q.   (BY MS. O'DRISCOLL)  Now, on this first page, 13:57 the Sun Life insurance -- Life Assurance Company, that's who you received your short-term disability from; correct?

A.   Yes.

Q.   And is that your handwriting on this first 13:57 page, Ellis 005?

Artis Ellis

**133**

A.   That is my handwriting.

Q.   Okay.  And did you have to mail this packet in or fax it, do you know, to Sun Life?

A.   I just recall -- what I do recall and what I can testify is that it was kind of last-minute, because this was an emergency surgery.  And I recall that it was just kind of a lot of static trying to get this done, so I don't remember it just kind of just being really smooth.  It's just trying to just get it in, hurry, hurry, hurry.

Q.   Okay.  So you don't know if it was e-mailed or faxed or mailed?

A.   I don't recall.

Q.   Okay.  Related to -- if you go further in this document -- these documents produced by you, the third page, 008, see this -- it has some of the Sun short-term disability, and then it also has some of the FMLA documents.  They're kind of intermixed the way that they were numbered here.

          And we already talked about that 008, that's -- that's your handwriting there.

A.   On which Bates number?

Q.   On page 008.  That was the similar document that we looked at previously.

A.   Yes.

Artis Ellis

137

1       A.   I believe it was 9-14.

2       Q.   Okay.  And if you look in this -- after

3  "Physical Impairment," there's also "Mental impairment,

4  Class 1, No limitation."

14:03  5            So there was no mental impairment

6  limitation associated, according to your doctor.

7       A.   Correct.

8            MR. KENNARD:   Objection.   Assumes facts not

9  in evidence and calls for speculation.

14:03  10      Q.   (BY MS. O'DRISCOLL)  Based on this form that

11  your doctor submitted on your behalf, to short-term

12  disability, did I read that correctly that it says

13  "Mental impairment (if applicable), Class 1, No

14  limitation"?

14:03  15           Did I read that correctly?

16      A.   You did.

17      Q.   Okay.  Now, if you go to the next section,

18  where it says, "Return-to-work," number 1 says, "When

19  will patient recover sufficiently to perform duties?"

14:03  20           And under "Patient's occupation full-time,"

21  it says, "Date: 10-22-12."

22           And that's when you returned to work, isn't

23  it, 10-22-12?

24      A.   Yes, that's the day that I -- I didn't clock

14:03  25  in.  That's the day that I just walked through the door

Artis Ellis

138

1    and didn't put my purse down or anything.

2         Q.   That's the date you returned to work; correct?

3         A.   That's the day I walked through the doors.

4         Q.   So you were released by your physician to

14:04  5    return to work, and you returned to work on that day;

6    correct?

7         A.   Yes, I walked in the office, and that's when I

8    was told all the things that was going on.  But prior to

9    that, a lot of people were calling.  I was still working

14:04 10   because people were calling me at the -- at my home

11   telling me things that was going on in the office.

12        Q.   Okay.  And we're going to talk about that time

13   period in just a minute, but I -- I just wanted to make

14   sure that I understand these documents and whose

14:04 15   handwriting this is.

16        A.   Uh-huh.

17        Q.   And, number 2, where it says, "After reviewing

18   the material and substantial duties of the patient's

19   occupation, would you recommend vocational counseling

14:04 20   and/or rehabilitation or job modification?"  And they

21   checked, "No."

22              Did I read that correctly?

23        A.   Yes.

24        Q.   Okay.  And then -- and then at the bottom,

14:04 25   there's your physician again, Daniel Yoshor, and his

Artis Ellis

**139**

1    signature dated 9-25-12.

2         A.  Yes.

3         Q.  Now, if you could skip ahead, there's some

4    additional signature pages on Sunday -- Sun Life

14:05  5    Assurance.

6         A.  Can you give me Bates numbers?

7         Q.  Yes.  I was just about to say that.  Ellis 020,

8    if you could skip to that page.

9              Now, as I mentioned, the way that these

14:05 10   documents were produced, they were -- I think they may

11   have gotten out of order, and they're -- they're printed

12   here base -- based on the Bates numbered document?

13             But you see -- on 020, what I wanted to ask

14   you was whose handwriting that is.  And I think that's a

14:06 15   continuation from the physician's office.

16        A.  It's not my handwriting.

17        Q.  Do you -- it's not yours; right?

18        A.  No.

19        Q.  Okay.  And -- and this is similar to another

14:06 20   page that --

21        A.  This is what -- we've already gone over this

22   one.

23        Q.  Right.

24        A.  This is one you talked about.

14:06 25        Q.  In the other packet --

Artis Ellis

140

1    A.   Yes.

2    Q.   -- which was in the packet that ECFMG received

3    that we -- that we went through before, and then these

4    are documents that you -- that you produced -- your

14:06 5    lawyer produced.

6    A.   Okay.

7    Q.   Now, if you go to -- so we're looking at 020,

8    and then it skips back to some more Sun Life documents,

9    and there's some duplicates in here.  But if you go to

14:06 10   Ellis 024, which is the last page, where at the top it

11   says, "PART B:   AMOUNT OF LEAVE NEEDED."  Number 5,

12   "Will the employee be incapacitated for a single

13   continuous period of time due to his or her...

14   condition, including any time for treatment and

14:07 15   recovery?"

16          And this is similar to the page that we

17   looked at earlier, and it's checked, "Yes," because you

18   were having your surgery, the single continuous period.

19          And then it says, "If so, estimate the

14:07 20   beginning and ending dates" of "the period of

21   incapacity."  "9-12-12 through 10-22-12?"

22          Did I read that correctly?

23   A.   Yes.

24   Q.   And is that your handwriting in that part?

14:07 25   A.   No.

Artis Ellis

141

        Q.   Okay.  Is any of this document your
handwriting?

        A.   No.

        Q.   Number 6, it says, "Will the employee need to
attend follow-up treatment appointments or work
part-time or on a reduced schedule because of the
employee's medical condition?"  And it's checked, "No."

                Did I read that correctly?

        A.   Yes.

        Q.   And -- and it's your understanding that once
you were released to come to work for October 22nd,
2012, that -- that you were released to come full time;
correct?

        A.   At -- remember, this is dated 9-25, so this was
very shortly after I had surgery.  So I don't know how
things were going to transition from after I had surgery
from 9-25 to 10-22.  So what I did is I talked to Betty
LeHew, I talked to Sharon Trowell and told them that the
first week that I returned that I was probably going to
need to go part time and I was going to need
accommodation.

        Q.   Did you -- did you ever -- well, let -- let's
look at your fitness for duty that your -- that your --

        A.   Sure.

        Q.   -- that your physician -- that your physician

Artis Ellis

142

1    provided.

2            Mark this as Exhibit 21, ECFMG/Ellis 397.

3            (Exb. No. 21 was marked.)

4        Q.  (BY MS. O'DRISCOLL)  If you could take a look

14:09  5    at this.  This was the only fitness for duty that I --

6    that I've seen, both produced by you and -- and given to

7    me by my client.

8            Are you aware of any other fitness for duty

9    document?

14:09  10       A.  I am not.  But when I talked with -- this was

11    my first time to ever send Tom what -- I talked with

12    Sharon as well as with Betty and Chris.  I told them,

13    the three of them, that I was -- a lot of the employees

14    were calling me and telling me all the things that Chris

14:09  15    was doing at the center, and so I needed to just get

16    back to work.  And so when I was talking to Tom, the

17    first time, because I was on a lot of different

18    medications from when Dr. Yoshor had seen me, so the --

19    he told me, Dr. Thomas, that I can't afford to lose you

14:09  20    on this side of the table, that my -- I was not

21    producing any of the hormones to deal with any stress.

22            And I --

23       Q.  Was he your endocrinologist?

24            MR. KENNARD:  Hold on.  Can we allow her to

14:10  25    finish her response.

Artis Ellis

**147**

1  (Answer the question only after reviewing the attached

2  job description... discussing with the employee....

3  Check Yes or No."

4          And he checked, "Yes"; correct?

14:14  5      A.  Yes.

6      Q.  That -- that's correct?

7      A.  But it wasn't anything attached.

8      Q.  Okay.  Well, this is the -- this is the fitness

9  for duty form that you brought to your physician?

14:14 10      A.  Yes.

11      Q.  Okay.

12      A.  But there is no job description attached, and

13  we did not have a conversation about what my job

14  responsibilities were.

14:14 15      Q.  Okay.  Did you have a conversation with any

16  physician -- any other physician so that they could

17  provide a different fitness for duty to ECFMG?

18      A.  No.

19      Q.  Okay.

14:14 20      A.  I gave him the form and asked him to just sign,

21  you know, that I needed to go back to work.  And I told

22  my employer that -- I didn't know what my accommodations

23  may be at that time.  I had just had surgery, and I was

24  trying to get back to work.

14:14 25      Q.  And -- and, in fact, it says, "Date the

Artis Ellis

148

1    employee is able to return to work and perform all

2    functions."

3        A.  And I told him what date I was returning back

4    to work.

5        Q.  And -- and that's the date that you walked back

6    in the door, 10-22-12.

7        A.  That's correct.

8        Q.  Okay.  And then number 3, it says, "If an

9    accommodation is needed for an ADA covered disability,

10    please indicate suggestions for the type of

11    accommodation that would enable the employee to

12    perform... essential functions of his or her job."

13             And those two blanks are left blank, aren't

14    they?

15        A.  They are blank.

16        Q.  Okay.  And then -- and then you signed this

17    document and dated it 10-16-12.

18        A.  Right.

19        Q.  Now, with this document, did -- did you fax it

20    to ECFMG or -- or mail it, or did your doctors's office?

21        A.  I -- I believe that Sharon had me to -- because

22    it was a lot of pressure, and I had to have it Monday

23    before I walked in the door.  I had to have it back

24    to -- to them, so I believe I Fed Ex'd it back.

25        Q.  Okay.

14:15  (timestamps at lines 5, 10, 15, 20, 25)

Artis Ellis

153

1      I said, "I don't know what the meeting is

2  about."

3      And then she -- they -- they walked in,

4  Betty and -- I'm sorry -- Nancy and Chris.

14:20  5      Q.   Okay.  And before they walked in, though, did

6  Betty tell you that -- that ECFMG had received the full

7  release -- your full release to return to work?

8      A.   I don't recall her saying that to me.

9      Q.   Did she say, "I want to make sure that you're

14:20  10  fine to proceed.  We're about to have a discussion.   I

11  want to make sure that you're feeling good and that

12  you're fine to proceed with this meeting today."

13      Do you remember that?

14      A.   She said something similar to that, yes.

14:20  15      Q.   Okay.  And then did you assure her, yes, let's

16  go forward with the meeting?

17      A.   I did.

18      Q.   Okay.  And then you said that you also met with

19  was it Nancy Ambrose?

14:21  20      A.   It was Nancy Ambrose and Chris Paul and Betty

21  LeHew.

22      Q.   Okay.  And where were -- where were you-all at

23  ECFMG that day?

24      A.   We were in my office.

14:21  25      Q.   Okay.  So before we -- before we turn to that,

Artis Ellis

154

1    let me just -- there's one document I will mark as

2    Exhibit 22nd.

3              (Exb. No. 22 was marked.)

4        Q.  (BY MS. O'DRISCOLL)  I'm sorry.  22, and that's

14:21  5    ECFMG/Ellis 398 through 399.

6              And just let me know once you've finished

7    reviewing this document.

8        A.  Yes.

9        Q.  So this is a letter dated October 19th, 2012,

14:22  10   addressed to you; correct?

11       A.  Yes.

12       Q.  From ECFMG?

13             Sharon Trowell-Roman, that was the HR

14   manager that you'd been working with on your FMLA leave;

14:22  15   correct?

16       A.  Yes.

17       Q.  And in this letter, she tells you that -- that

18   they received the fit for duty form completed by your

19   physician releasing you to return to work at full

14:22  20   capacity as of October 22nd, 2012.

21             Did I read that correctly?

22       A.  Yes.

23       Q.  And then the second paragraph, it says, she

24   reminds -- she tells you about the leave, that "You

14:23  25   previously used FMLA leave beginning January 18th, 2012,

Artis Ellis

**157**

brought to my attention, employees stated, management --

manage -- management did this, and none of -- a lot of

it I had never even heard before.

Q.  Do you -- do you remember anything specific?

Does anything specific come to mind that -- that they

addressed with you that day?

A.  It was brought to my attention about Troi

Bryant.  It was brought to my attention about some

robes, plates.

Q.  I'm sorry.  What did you say, some robes and

plates?

A.  Robes.

Q.  Anything else?

A.  Something about I was eating someone's food.

Q.  And did they tell you that -- that these were

complaints that they had received from other employees?

A.  Yes, but they never told me who the employees

were.  I had never heard that before or the complaints

before.  Never was given a corrective written action

to -- to even correct the -- the action.  Never even

seen a memo like that before.  And then I brought -- you

know, we stopped it, and brought it to Betty LeHew's

attention that a list of people that had called me, gave

her specific names that she needed to investigate and

talk to and with part time and full time that during my

Artis Ellis

**158**

whole FMLA time, being off work, how these employees

every day were calling my home till my husband had to

finally say, "My wife is recovering," to please stop

calling my home.

Q.  Did -- you said you gave a list of names to

Betty to investigate?

A.  Yes.

Q.  What did you want her to investigate?

A.  Because the -- the employees were saying that

Chris was undermining everything that I was doing, so I

wanted her to talk to all of the full-time employees

that were calling my home during my leave of absence,

and saying these things that was going on, the part-time

employees, as well, that were saying these things.  And,

I mean, I couldn't even refute all the things that were

said.  I wasn't given the opportunity to refute.

I was told by Betty LeHew that -- you know,

I said, "Well, Betty, I can go back on leave."

And she said, "No.  You should take -- off

the record, you should take the personal leave of

absence."

And I said, "Okay," because I didn't know

any -- I didn't -- I didn't know.  I didn't know.  So I

said, "Okay."  Called my husband.  She told me to give

her my cell phone.  I gave her my cell phone, called my

Artis Ellis

**159**

1    husband to come pick me up.  She walked me outside, and

2    that was it until I heard back from -- Betty left a

3    message on my voice mail to meet her at a hotel, I did,

4    gave them my things, and then we started corresponding

14:28    5    on how to get my personal belongings.

6        Q.  Okay.  Let's -- let's back up a little bit.

7    On -- when you were having this discussion with

8    Ms. Ambrose, Mr. Paul, and Ms. LeHew, you said they gave

9    you a list of concerns.

14:28    10        A.  I did not say they gave me a list of concerns.

11        Q.  They -- they -- they listed a list of concerns.

12        A.  Yes.

13        Q.  You eventually were given a list; correct?

14        A.  I had to request a list.

14:28    15        Q.  Okay.  And you were given that list?

16        A.  Yes.

17        Q.  Okay.

18        A.  After I requested that list.

19        Q.  Okay.  And did you receive that list that day

14:28    20    or some day after that?

21        A.  That day.

22        Q.  Okay.  And did you -- that day, on October

23    22nd, 2012 -- I was making a list of the items that

24    you -- that I noted that you mentioned.

14:29    25            The first thing you mentioned was Troi

Artis Ellis

160

1    Bryant and --

2         A.   That was not the first thing I mentioned.

3         Q.   I wrote down Troi Bryant, robes and plates, and

4    eating someone's food.

14:29  5              Did I miss one?

6         A.   There was a list.  We can go back on -- the

7    court reporter to see, actually, what I said.

8              MS. O'DRISCOLL:  Can we go back to what she

9    responded had been --

14:25  10             THE REPORTER:  QUESTION:  "Do you -- do you

11   remember anything specific?  Does anything specific come

12   to mind that -- that they addressed with you that day?"

13             ANSWER:  It was brought to my attention

14   about Troi Bryant.  It was brought to my attention about

14:25  15   some robes, plates.

16             MS. O'DRISCOLL:  Thank you.

17        Q.   (BY MS. O'DRISCOLL)  So I wanted to get a

18   little more detail, when you say they brought to your

19   attention about Troi Bryant, are you referring to fact

14:30  20   that he's your daughter's father?

21        A.   Yes.

22        Q.   And did they reference the relationship policy

23   at that time?

24        A.   No, I don't recall it.

14:30  25        Q.   Okay.  Do you remember, did they reference

DepoTexas, Inc.

Artis Ellis

**161**

that -- that they believed that there was some sort of a

policy violation related to Troi Bryant working there,

having been your daughter's father?

        A.  Betty did bring that to my attention, and I

14:30  said, "Betty, Troi hasn't worked here in over a year,

and -- why is that a difference when you have David and

Heidi working together."  And Betty has her stepdaughter

and it clearly states about stepdaughter, Troi is not

related to me.

14:31      Q.  Did -- did Betty or -- or Ms. Ambrose or

Mr. Paul, did anyone ask you:  Is Troi Bryant your

daughter's father?

        A.  Yes.

        Q.  And did you respond to that question?

14:31      A.  I -- I did, and I was trying to say that he --

he is, but, I mean, we were not related.

        Q.  Did -- did you say that that day?  Was your

response that day?

        A.  I did not.  I was trying to get out that he's

14:31  the father, but he's not related to me in any kind of

way, because as I mentioned earlier in the testimony, is

that -- that was -- that was a lot of shame, and that

was over 25 years ago, or longer.  And that was a lot of

shame that was about that, regarding that, having a

14:31  child out of wedlock, and it was just a one-night stand.

Artis Ellis

**162**

But later that evening, I believe I called Betty or

shortly thereafter I called her and just went ahead and

just said, "Betty, you know, Troi is the father of

Brittani, but there is no relation or -- there's --

14:32  we're not relatives, though."

Q.  In fact, when Betty asked you that day, on the

22nd, she -- when she asked you if Troi was Brittani's

father, didn't you say that he -- he stepped up, that,

no, he wasn't her father, but he -- he stepped up,

14:32  something to that -- something -- something to that

effect?

MR. KENNARD:  Objection.  Calls for

speculation.  Assumes facts not in evidence.  And

misstates testimony.

14:32  Q.  (BY MS. O'DRISCOLL)  I'll restate -- restate

the question.

When Betty asked you if Troi was Brittani's

father, did you -- in that -- in that sitting, on

October 22nd, did you deny that Troi was Brittani's

14:32  father?

A.  Indirectly.

Q.  And -- and can you give me a little more detail

on what you said?

A.  As I was stating earlier, I didn't just

14:33  directly say, yes, he's the -- he's her father, because

Artis Ellis

**163**

of the shame that was related to that.

I was giving a story that, yes, but we're not -- there is no blood relation or I'm not -- I'm related to Brittani, but not to Troi, but -- so --

Q.  Do you remember saying anything, something to the effect of he stepped up or stepped in or something to -- of that nature?

MR. KENNARD:  Objection.  Misleading. Confusing.  And assumes facts.

Q.  (BY MS. O'DRISCOLL)  I'm just asking you if you remember saying anything like that.

A.  I don't remember.  I don't recall that.

Q.  Okay.  Okay.  Do you -- do you remember calling Betty either that evening or the next day and saying, "I have to clean my conscience, Troi's Brittani's father"?

A.  I --

Q.  Clear my conscience.

MR. KENNARD:  Objection.  Assumes facts. And calls for speculation.

Q.  (BY MS. O'DRISCOLL)  Did you ever say anything like that to Betty --

MR. KENNARD:  Same objection.

Q.  (BY MS. O'DRISCOLL)  -- that you have to clear your conscience?

MR. KENNARD:  Same objection.

Artis Ellis

164

Q.  (BY MS. O'DRISCOLL)  You can answer.

MR. KENNARD:  You can answer if you're able to?

A.  I recall calling Betty saying that Troi was Brittani's father.

Q.  (BY MS. O'DRISCOLL)  Do you remember saying something to the effect of, I have to clear my conscience?

A.  I don't recall that.

Q.  Okay.  Do you also remember being asked on October 22nd about sharing your password?

A.  Yes.

Q.  Okay.  And what -- what did -- and who said it, and what did they say?  Was it Ms. Ambrose or Mr. Paul or Ms. LeHew?

A.  I don't remember who said -- who asked me about it, but I was told that I -- I -- who I shared it with. I didn't know who I had shared it with.

Q.  Were you asked if you shared your password?

A.  Yes.  And I responded with a list of people, was it Flores, was it -- because I didn't know.  I was under a lot -- I was having brain surgery.  I talked to a lot of people.  I was under a lot of different medication.

Q.  And did you admit to sharing your password with

Artis Ellis

165

1   someone?

2       A.   After I was told that I did.  And I'm not --

3   I'm a fairly honest person, so I said -- if my

4   employer -- I worked with these people for seven years.

14:35   5   If they told me that I did that, then I -- I just

6   believe that they had no reason to lie to me.

7       Q.   Did -- did you -- did you tell them that you

8   had shared the password with a woman named Sharon?

9       A.   No.   They told me.

14:35   10       Q.   They told you that that's who it was?

11       A.   Yes.

12       Q.   Okay.   And for the benefit of the jury, what --

13   what is -- what is this password?   What does it do?

14       A.   The -- when they told -- it certified the exam.

14:36   15       Q.   Okay.   And does that mean that -- what does

16   that mean, "certifying the exam"?

17       A.   It actually benefits the company.   It made sure

18   that the -- the examinees actually got their scores on

19   time, so it benefit the company.

14:36   20       Q.   What goes into certifying an exam?   What does

21   that mean?

22       A.   Two buttons, that the exam happened that day,

23   and all the paperwork was done correctly, yes, yes.

24       Q.   And when you provided your password to Sharon,

14:36   25   was she a management-level employee?

Artis Ellis

166

A.   She was acting as the assistant manager,
because again, I was put in a position to be the manager
because the assistant manager had resigned and had left.
So I was the manager by myself.

Q.   She was the acting assistant manager.

A.   Like unofficial, yes.

Q.   So what does that mean, "unofficial"?

A.   She had not -- she had not gone through HR and
approved, but Chris had -- I had asked Chris about her
being -- acting assistant center manager, so she was
doing things for me that -- she assisted me.

Q.   And was she given management-level
responsibilities to certify exams?

A.   No.

Q.   And you understood that your password should
only be used by you; correct?

A.   Yes.  But keep in mind that I -- I was not even
aware that I had given my password to anyone until it
was brought to me that day on the 22nd.

Q.   Which was the first day you came back to work.

A.   Which was the first day I came back to work.
Bearing that I was working while they were calling me on
leave.

Q.   And when you say you were -- when you were
working, did you ever tell Betty LeHew or anyone with

Artis Ellis

**167**

human resources, "Hey, I'm getting calls from -- from

the center.  I'm being asked to work while I'm on

leave"?  Did you tell anybody?

    A.  Not until -- well, Betty knew because they were

interviewing the assistant center manager.  And Chris

called me and said that I could come to the center and

sit in the room while they were interviewing assistant

center managers to, I guess, give some feedback or

something, but at -- during the interview, I couldn't

say anything.

    Q.  Did --

    A.  And I was on leave during that time.

    Q.  Did you come in --

    A.  I did not.

    Q.  -- during the interviews?

    A.  I did not.  And that was a choice that I made,

but I was asked to.

    Q.  And who was -- who was covering center

manage -- your center manager responsibilities while you

were out on leave, in Houston?

    A.  All the center managers stepped up, with the

exception of John, and came to the center.

    Q.  And how many other centers are there around the

U.S.?

    A.  There's five other centers.  Houston would be

Artis Ellis

**171**

1    Q.  (BY MS. O'DRISCOLL)  Do you recognize this

2    policy, CSEC data security policy?

3    A.  Yes.  It's changed a little bit, because center

4    manager and assistant manager has been scratched out.

14:45 5    Q.  Where -- I'm sorry.  Where are you referring

6    to?

7    A.  On the 310.

8    Q.  Okay.  And -- and what's been scratched out?

9    A.  "Center Manager, Assistant Manager."

14:45 10    Q.  Where do you see that scratched out?

11    A.  Last bullet.

12    Q.  Oh, got it.  Okay.  Got it.  "Ability to

13    download data from Center Manager, Assistant Manager and

14    Trainer Laptops and PCs."  I see what you're saying.

14:45 15        So you're saying that -- there was one --

16    that one change in this policy?

17    A.  Yes, probably.

18    Q.  Okay.  That first bullet that says, "Each

19    manager, assistant manager and trainer shall adhere to

14:45 20    ECFMG's current password security policy and shall not

21    share or communicate their password with any other

22    person."

23        You were aware of that rule; correct?

24    A.  But I also am aware that I was told by my

14:45 25    director to give my password to our IT person when we

Artis Ellis

**172**

were out of the office to do some work while we were

there.  So it was all -- the policy was always violated

with the password.

Q.  You said your -- your director told you to do

that?

A.  Yes.  Yes.

Q.  Who is that, Mr. Paul?

A.  Yes.

Q.  So Mr. Paul told you to give your password to

whom?

A.  Bea Bright Davies.  And the common password was

used was Brent Biggs.

Q.  And are you aware of any time that a password

was used to certify an exam?

A.  I wasn't aware that my password was used to

certify an exam.

Q.  But once you were asked about it, you recalled

that you did, in fact, share your password?

A.  I was -- I did not recall that, until it was

brought to my attention.  And when they told me that I

did that, I said, "Okay," because I didn't -- I didn't

know.

Q.  But once you were reminded that you did it, did

you recall doing it?

A.  I did not recall.  I just -- I had to -- if

Artis Ellis

**173**

1    they told me I did it, I was under medication, I didn't

2    know I did it.  So I didn't know, so because they told

3    me I did, I just went along with it, because they said I

4    did.  I didn't believe that they would tell me that I

14:47    5    did something that I didn't do.

6        Q.  Okay.  You said Mr. Paul told you to give Bea

7    Davis your password?

8        A.  Yes.

9        Q.  And what was that for?

14:47    10        A.  Because he had to do something -- we was off

11    site doing a -- I believe it was sometime in January --

12    I can't recall the year, but we were doing a food bank

13    drive and Bea had needed something to do in the office

14    with the computer.  She was our IT person, and they

14:47    15    needed a password to get in, and he called me up and

16    said I had to give her my password.

17        Q.  And it was for some sort of an IT function?

18        A.  Yes.

19        Q.  Okay.

14:48    20        A.  It should be on their e-mails, because it was

21    e-mailed back and forward.

22        Q.  Okay.  And do you remember thinking that there

23    was anything wrong with that, sharing your password?

24        A.  No, because I knew I could change it.

14:48    25        Q.  Did you change it?

Artis Ellis

174

1    A.   I'm sure I did.  Yes.

2    Q.   Do you know if you did?

3    A.   I don't recall -- I'm almost 99.9 percent that

4    I did.  And you have several different passwords for

14:48  5    several different programs, so the program that she

6    needed that password for, just like for the

7    certification, that was a password only for

8    certification, so it could not get into other databases.

9    Q.   Okay.  And, again, you're not aware of anyone

14:48  10   sharing their certification password with any person

11   that -- that shouldn't have been shared with?  Any --

12   anyone else?  You're not aware of anyone else doing

13   that?

14   A.   Like who?

14:49  15   Q.   I mean, anyone in any center.  Have you ever

16   heard of anyone sharing their password to certify an

17   exam and sharing it with a nonexempt person?

18   A.   Again, I wasn't aware that I shared mine, so

19   I -- I'm sure no one -- we didn't talk about that, so --

14:49  20   Q.   And the person Sharon, her last name was

21   Dalberg; correct?

22   A.   Yes.

23   Q.   That you shared your password with?

24   A.   I -- I wasn't aware that I shared my password

14:49  25   with Sharon --

Artis Ellis

175

1      Q.   But that's --

2      A.   -- until it was brought to my attention.

3      Q.   But that's the person that you all discussed

4  that you shared it with; correct?

14:49  5      A.   That is correct, Sharon Dalberg.

6           Sharon also did other things, too, Erin,

7  that she assisted me with:  Scheduling, and the things

8  on the job responsibility as assistant manager, she

9  helped out with.

14:50 10      Q.   Okay.  But with regard to certifying an exam,

11  you could have had Nancy Ambrose do that for you;

12  correct?

13      A.   If I was conscious and aware of what I was

14  doing and thinking, I would not have even -- I was

14:50 15  having surgery and out on FMLA.  I would not have even

16  thought about working.  I mean, I guess my question

17  would be to myself now, in retrospect, why was I even

18  worried about the exam or even thinking about work when

19  I was in a -- you know, life-changing event that I don't

14:50 20  know if I was going to be alive or not or even capable

21  of going back to work.  So I -- I didn't think -- I

22  wouldn't have thought about calling Nancy.  I wouldn't

23  have thought about work.

24      Q.   Well, you had had Nancy help you certify exams

14:51 25  in the past; correct, Nancy Ambrose?

DepoTexas, Inc.

Artis Ellis

**176**

          A.   If needed, you know, if on vacation or if just

out on personal day or just a regular sick day, but in

an emergency, I wouldn't have thought to call Nancy.

          Q.   But -- but that's a yes, that you have had

14:51   Nancy certify exams for you in the past?

          A.   Nancy has certified exams in the past.

          Q.   For you.

          A.   For all centers.

          Q.   But for you as well.

14:51   A.   Including Houston.

          Q.   Okay.  While you were center manager.

          A.   Yes.

          Q.   Okay.

          A.   But I think that's for -- just so I make sure

14:51   that we're all on the same page, I think that would be

for everyone.  Nancy would put out a list that she's

going to certify the exam for everyone.

          Q.   Because she -- because it was either the center

manager or Nancy that were the key people that would

14:51   certify exams; correct?

          A.   Or the assistant center manager.

          Q.   And which you didn't have an assistant center

manager, since Brent had resigned.

          A.   That is correct.

14:52   Q.   Okay.  When you attended your unemployment

Artis Ellis

**178**

1          MS. O'DRISCOLL:  Okay.

2          MR. KENNARD:  But before you answer any

3    questions, I want to look at the page before.  Okay?

4          Q.  (BY MS. O'DRISCOLL)  And if you could, look

14:53  5    where it says -- has a line, and it says the word "end"

6    and then a line on 617, where it has in all caps, which

7    is the testimony that was given at the hearing.  And I

8    should preface with, this is a certified copy that was

9    ordered from the Texas Workforce Commission that is a

14:54  10   notarized copy of everything that was submitted.

11         MR. KENNARD:  Has this been produced?

12         MS. O'DRISCOLL:  Yes.

13         Q.  (BY MS. O'DRISCOLL)  So if you could look at

14   that first paragraph and share with your counsel, in all

14:54  15   caps, it's after "END."

16         And tell me if I'm reading this correctly.

17   Right after the word "end," with the lines, it says --

18   we're on the 617.  "If they have a policy or not I

19   should have not have done that.  I understand they said

14:55  20   it was a violation of the data security policy."

21         Did I read that correctly?

22         MR. KENNARD:  I read it.

23         A.  I --

24         MR. KENNARD:  Go ahead.  Yes.  She's

14:56  25   starting right there at the top.  Right there.

Artis Ellis

**179**

           A.   Okay.

   2              MR. KENNARD:   You may want to go through

that again?

   4              MS. O'DRISCOLL:   Sure.

14:56  5    Q.   (BY MS. O'DRISCOLL) Just let me know if I'm

   6   reading this correctly.   "If they" -- "If they have a

   7   policy or not I should have not have done that.   I

   8   understand they said it was a violation of the data

   9   security policy."

14:56 10              Did I read that correctly?

  11   A.   Yes.

  12   Q.   And if you go to the next page, at the top.

  13   Okay.   Actually, I'm sorry, at the bottom of the page we

  14   were just on, it's talking about the Bryant matter --

14:56 15   I'm sorry.   If you go -- go back one page and then at

  16   the bottom sentence on that page.

  17              MR. KENNARD:   Bless you.

  18              MS. O'DRISCOLL:   God bless you.

  19   Q.   (BY MS. O'DRISCOLL)   If you start with "I

14:56 20   understand," if you could show your counsel.   It's those

  21   last two sentences at the bottom, "I understand they

  22   said that."

  23              MR. KENNARD:   Yes.

  24   Q.   (BY MS. O'DRISCOLL)   So tell me if I'm reading

14:57 25   this correctly.   "I understand" that "they said that the

Artis Ellis

180

1    following day on the phone with the AVP of HR that I

2    admitted that I lied about Mr. Bryant being my

3    daughter's father because my conscious needed to come

4    clean.  That is true."

14:57   5                Did I read that correctly?

6        A.   That's what's typed here, yes.

7        Q.   Okay.  And this was testimony that -- that you

8    gave under oath to the Texas Workforce Commission

9    related to your unemployment; correct?

14:57   10       A.   I don't recall this, because this was so long

11   ago, but --

12       Q.   But you could have said that?

13       A.   I could have.

14       Q.   If you go further, it says, "That is true.

14:57   15   When I got ambushed with this information" --

16                MS. O'DRISCOLL:  Do you want to read this

17   next paragraph, Alfonso, or --

18                MR. KENNARD:  I read it.

19       Q.   (BY MS. O'DRISCOLL)  The top, "When I got

14:58   20   ambushed with this information I lied out of fear but I

21   came back and said the truth.  Regarding the second

22   violation, this is correct.  I had been put under alot

23   of stress.  I was given a list before I got sick of

24   concerns.  I was in the hospital having major brain

14:58   25   surgery.  I made a bad decision on my part.  I gave a

Artis Ellis

**181**

regular employee my password to certify the exam."

Did I read that correctly?

A.  Yes, but I -- I think it was not put all in context what -- everything I was -- I said.

14:58  Q.  I understand there was additional testimony, but this is -- this is the -- rather than reading the entire document -- and the entire document is an exhibit and in the record, so it's there.

A.  Okay.

14:58  Q.  But I just wanted to pull out portions since it was referring to earlier discussions that you and I had about giving your conscience clean and things of that nature.  I just wanted to make sure I was reading that correctly.

14:58  A.  Yeah, you -- you read this -- what is typed correctly.

Q.  Okay.  Okay.  If you could also turn to, in that set, ECFMG --

A.  Did you read, also, we had no -- we were never 14:59 married, we have no blood relation?

Q.  Yes.

A.  Okay.

Q.  If you could turn to ECFMG 530 --

A.  530.

14:59  Q.  -- in the same exhibit.

Artis Ellis

**183**

A.   I don't recall how often I had to go in.   I
know I was told that if I signed a waiver that ECFMG
would not fight me on my unemployment, and they had
offered me a severance package.

Q.   Okay.   But I -- I just want to know the answer
to my question, if you had to go in each week and answer
questions with the un -- for the unemployment?

A.   I don't recall --

Q.   Okay.

A.   -- if it was each week or if it was every other
week.

Q.   Okay.   Do you remember the date of your
termination?

A.   So technically the date was October the 22nd,
because I never went back to the office.

Q.   Well, you were put on administrative leave
while they were conducting an investigation; correct?

A.   That is correct.

Q.   Okay.   And during that time, you were told that
Betty and her colleague were going to investigate any
allegations that you made related to what employees were
saying; correct?

A.   That is correct.

Q.   And you were also told that Ms. Ambrose was
going to investigate the list of violations -- or

Artis Ellis

**188**

Q.  Yes, ma'am.

A.  -- to the one that talked about -- that was
never an exam that was not fully -- the one that talked
about the exam not fully covered, and that it was short
staffed.  Even with short staff, we -- because people
were resigning and going -- for whatever reason, they
said they were going back to school or they was moving
or whatever, because we had a retrofit, and so some
people just could not get the new way of doing the exam.

And when they said they did not no longer
want to work there, it was okay, you know, we have to
now find new staff and --

Q.  And when you say "retrofit" -- "retrofit," just
so everyone under -- I understand what you're saying,
but can you describe for everyone else what that means,
retrofat -- "retrofit"?

A.  Yes.  So the exam was going to be done a
different way than what we were doing -- the way that it
was used to being done, so it was -- it was re --
completely redone.

Q.  And so you had to retrain the patients?

A.  Retrain all the SPs.

Q.  Okay.  And there were significant staffing
issues that -- that you had to attend to to make sure
that the center was ready for those changes; correct?

Artis Ellis

**189**

1     A.  That is correct.

2     Q.  And that was something that you were working

3 with, with Chris, and your assistant center manager,

4 Brent Biggs, and that your team -- that was the main

15:32 5 focus in the months leading up to the spring of 2012?

6     A.  Along with the trainers, along with all staff.

7     Q.  Okay.  And -- and you did have a lot of people

8 leave during that time.

9     A.  Along with other centers, we knew that was

15:32 10 going to be some transitions.

11     Q.  Okay.  So staffing was one of your key

12 responsibilities; correct?

13     A.  And every exam had -- was fully staffed.

14 When --

15:32 15     Q.  You're not aware of any short-staffed exams?

16     A.  No, no short-staffed exams.

17     Q.  Okay.

18     A.  Because the exam could not go on if it was

19 short staffed, so you had to have SPs to be in every

15:33 20 exam.

21     Q.  Okay.  Are you aware of any SPs being

22 improperly paid, that if they were sent home, which is

23 the next bullet, "Artis did not follow policy when

24 removing" standardized patients, "SP's from the exam in

15:33 25 terms of paying them.  Artis, after pulling people,

Artis Ellis

204

1       A.   At that time, I was not -- I was not working.

2   I was on administrative leave, so --

3       Q.   You were on paid administrative leave.

4       A.   Paid administrative leave, as Betty had

15:50  5   instructed me to go.

6       Q.   But did you at any time between October 22nd

7   and November 1st ever request to go back out on FMLA and

8   tell ECFMG, "I have a doctor's note.  I have a serious

9   medical condition, or some other qualifying need, I need

15:50  10  to go back out on FMLA"?  Did you ever say anything like

11  that?

12                   MR. KENNARD:  Objections.  It assumes facts

13  and calls for a legal conclusion.

14       Q.   (BY MS. O'DRISCOLL)  Did you ever ask FMLA --

15:51  15  did you ever ask to go back out on FMLA for a serious

16  medical condition?

17       A.   No, because I was on personal leave of absence.

18       Q.   And did --

19       A.   Administrative leave of absence.  I'm sorry.

15:51  20       Q.   And -- and you never called Sharon Roman

21  Trowell [sic] up in Philadelphia to request FMLA

22  paperwork to fill out; correct?

23       A.   Because I was on administrative leave, I was

24  waiting for them to call me to let me know what was the

15:51  25  outcome of Betty's investigation, and I -- I knew that I

Artis Ellis

205

1    was probably going to be terminated.

2        Q.  So the answer is to my -- and could you read

3    back the question that I asked?

4            THE REPORTER:  QUESTION:  "And -- and you

15:51 5  never called Sharon Roman Trowell up in Philadelphia to

6    request FMLA paperwork to fill out; correct?"

7            MR. KENNARD:  Objection.  Asked and

8    answered.

9        Q.  (BY MS. O'DRISCOLL)  Is that statement correct,

15:52 10 that you never contacted Sharon Trowell for FMLA

11   paperwork?

12           MR. KENNARD:  Same objection.

13       Q.  (BY MS. O'DRISCOLL)  Is that correct?

14       A.  I never called Sharon while I was on

15:52 15 administrative leave to ask for additional FMLA

16   paperwork.

17       Q.  And you never contacted any of your doctors for

18   a doctor's note to go back out on FMLA leave, did you?

19       A.  I was not physically at work.  I was on paid

15:52 20 administrative leave, so I was at home.  I wasn't

21   physically in the office.

22       Q.  So the answer to that question is no, you never

23   contacted doctor -- doctors for a doctor's note to go

24   back out on leave; correct?

15:53 25           MR. KENNARD:  Objection.  Confusing.

Artis Ellis

**206**

Misleading as worded.  And to the extent that it calls

for a legal conclusion.

        Q.  (BY MS. O'DRISCOLL)  October 22nd, 2012, or any

day thereafter prior to your termination, did you ever

call one of your physicians and ask for a doctor's note

to approve FMLA leave?

        A.  No, because I was out on administrative leave.

        Q.  Okay.  And during that time after October 22nd,

2012, and thereafter, you were able and willing to work;

correct?  You were in a physical condition such that you

could work; correct?

        A.  Repeat the question one more time.

        Q.  October 22nd, 2012, when you returned to work

on full release, you, from that point forward, were able

to work; correct?

                MR. KENNARD:  Hold on.  Objection.  Assumes

facts.  Misstates -- and to the extent it misstates

previous testimony.  And misleading as worded.

                MS. O'DRISCOLL:  How does that misstate

previous testimony?

                MR. KENNARD:  Can you repeat back the

question, please?  And to the extent that it does, but

go ahead and read back the question.

                THE REPORTER:  QUESTION:  "October 22nd,

2012, when you returned to work on full release, you,

Artis Ellis

219

1    having a brain surgery and -- a brain tumor and --

2    removed and, also, having eye issues.

3         Q.   Anything else?

4         A.   Just array of medical -- medical issues.

5         Q.   Any other medical issues that you can think of

6    at -- at that time period, as of October 22nd, 2012?

7         A.   From the brain tumor, I've had major --

8    strokes.

9         Q.   Since -- since -- since you've left ECFMG,

10   after leaving ECFMG; correct?

11        A.   I left ECFMG October the 22nd.

12        Q.   Well, you were terminated on November 1st;

13   correct?

14        A.   I -- my last day at the office was October the

15   22nd.  Then I went on personal -- administrative leave

16   and was given November the 1st as my termination date.

17   And from November the 1st, yes, I've had some medical

18   issues.

19        Q.   But -- but prior -- prior to the time that you

20   were terminated from ECFMG, are there any other medical

21   issues that you believe you suffered from?

22        A.   From the surgery?

23        Q.   From -- from -- not just the surgery, but -- I

24   just -- I'm trying to get a sense of what you believe is

25   the basis of your disability claim.

Artis Ellis

220

1        Why do you believe you were discriminated

2    against?

3        A.   Because when I asked for accommodation, I was

4    not given those accommodations, or when I even -- I

16:14  5    wasn't even given the opportunity to come back to work

6    and see how I could work or if I could work.

7        Q.   Anything else?

8        A.   No.

9        Q.   If we look at your complaint -- I know I have

16:14  10   three copies of it.  Let me just find -- here we go.

11   Mark as Exhibit 27 your complaint.

12               (Exb. No. 27 was marked.)

13       Q.   (BY MS. O'DRISCOLL)  Have you ever reviewed the

14   complaint that your lawyers filed on your behalf in this

16:15  15   lawsuit?

16       A.   I reviewed some documents that my lawyer had

17   given me.

18       Q.   But did you ever reviewed this document,

19   plaintiff's original complaint?

16:16  20       A.   Yes.

21       Q.   And if you look -- if you look at paragraph 18

22   under "Disability discrimination," "Defendant, by and

23   through Defendant's agents, intentionally engaged in

24   unlawful employment practices involving Plaintiff

16:17  25   because of her disability."

Artis Ellis

**221**

Other than -- well, you've already told me
that you believe your disability was your brain surgery,
your brain tumor, your eye issues, and you said medical
issues generally.

Is there any -- any other basis that you
believe you're bringing a claim for today, your
disability claim?

A.  Not that I'm aware of.

Q.  Did you ever hear any comments from Ms. Ambrose
or Mr. Paul or Betty LeHew or anyone else at ECFMG
management saying that they believed you were disabled?

A.  That they told me that I was disabled?

Q.  That they believed -- did they ever tell you
that they believed you were disabled?

A.  No.  I never heard them tell me that.

Q.  Did you ever hear any -- any negative comments
about any of these conditions that you -- that you
mentioned:  Brain surgery, brain tumor, eye issues,
medical issues?  Did you ever hear any negative comments
from Ms. LeHew, Ms. Ambrose, Mr. Paul, or any other
EC -- ECFMG management?

A.  Did I hear any negative comments?

Q.  Yes.

A.  No.

Q.  On number 19, you say, "At all times material

Artis Ellis

**224**

meetings that you had between October 22nd up until

the -- the day of your termination on November 1st, did

anyone in ECFMG management ever say, "I don't believe

you're going to be able to come back and do the job"?

16:21       Did anyone ever say that or anything of

that nature, not those specific words, but anything to

that effect?

MR. KENNARD:  Objection.  Confusing.

Misleading.  And compound.

16:21       You can answer the question if you're able

to.

Q.  (BY MS. O'DRISCOLL)  You just -- you just said

I believe that I was retaliated against because I had a

disability and I took familiar leave.

16:21       All I want to know is why -- what is the

basis for that belief?  Why do you believe that?

A.  That's just my belief, that based on me taking

a leave, or going out on leave, because I had had a

brain surgery or a brain tumor, I don't think that they

16:22  thought that I was going to be the same.

Q.  Did anyone ever tell you that?

A.  It's just my belief.

Q.  Okay.  Fair enough.

Did you -- and the date of your

16:22  termination, did -- did you meet off campus with

Artis Ellis

226

1   up.

2           You took FMLA leave in 2006; correct?

3       A.  I did.

4       Q.  And then multiple times in 2008; correct?

16:24  5       A.  I -- I remember taking it one time in 2008.  I

6   requested it twice in 2008, but I came back to work

7   because one -- my husband's -- our transplant was

8   rescheduled.

9       Q.  Okay.  But you -- you had requested it, and it

16:24  10  was approved for you to take it multiple times in 2008,

11  but you think you only took it once.

12      A.  I -- it was -- not multiple times, twice.

13      Q.  Well, more than once.

14      A.  Yes.

16:24  15      Q.  And -- and then you took leave again in January

16  of 2012 for -- for your husband's transplant -- to redo

17  the transplant; correct.

18      A.  That is correct.

19      Q.  And then you took leave again in the fall of

16:25  20  2012 for your brain surgery.

21      A.  That is correct.

22      Q.  And -- and you never heard a negative comment

23  related to any of those FMLA leaves from management?

24      A.  Because -- because I was approved.  I was -- I

16:25  25  qualified each time.

Artis Ellis

227

1    Q.   And -- and no one ever tried to prevent you

2    from taking FMLA leave; correct?

3    A.   Legally, I don't think they could.   And --

4    Q.   But did anyone try to prevent you from taking

16:25  5    your FMLA leave?

6    MR. KENNARD:   Were you done answering your

7    previous -- were you done with your answer to the

8    previous question?

9    THE WITNESS:   Yes.

16:25  10    MR. KENNARD:   Okay.

11    Q.   (BY MS. O'DRISCOLL)   And -- and do you -- do

12    you feel like anyone tried to dissuade you from taking

13    leave, in ECFMG management, or tried to prevent you from

14    taking leave?

16:25  15    A.   No.   I worked there over seven years.   So if I

16    was there over seven years and these life-changing

17    events happened, I qualified each time to take it.

18    So no one said, "No, you cannot take it,"

19    because I qualified.

16:26  20    Q.   Okay.   Understood.

21    And in your complaint, you also allege FMLA

22    interference.

23    What -- what leave were you prevented from

24    taking?

16:26  25    A.   No.   That interference was that I received

Artis Ellis

228

1    calls every day from staff, multiple times during the

2    day -- during the day.

3        Q.  Well, if -- if staff called -- did you tell the

4    staff not to call you?

16:26  5   A.  You -- absolutely.  They knew not to call me.

6    Chris, I think, made mention to them about calling me,

7    and they continued to call me.

8        Q.  And -- and Chris told them not to call you.

9        A.  Correct.

16:26 10   Q.  And --

11       A.  And even my husband told them not to call me.

12       Q.  And did you tell anybody in human resources

13   that you were being contacted by staff?

14       A.  At that time, I didn't even think to call human

16:27 15  resource to say the staff is contacting me.  They

16   were -- they were disturbed, the center was in a rut,

17   and it was just a lot of things going on.  They were

18   unhappy, and they were venting.  And -- they were

19   calling to check on me, to see how things were going,

16:27 20  and then they were also just telling me, you know, when

21   are you coming back, we really need you to come back,

22   are you better, hurry up and get better so you can come

23   back and we can stop all this, because this -- the

24   center is just in an uproar.

16:27 25   Q.  Did anyone from ECFMG management ever call you

DepoTexas, Inc.

Artis Ellis

230

1    didn't think that would probably be the most safest and

2    appropriate thing for me.  So at that point, I think I

3    started waking up, saying, "No, this is work-related.  I

4    should not be going to the center, nor should my

16:29  5    director be calling me to come in to be doing work.

6    That's work related, and I should not be there."

7         Q.  And you said, "No, I'm not coming in"; correct?

8         A.  No.  I just did not show.

9         Q.  Okay.  And were you ever written up or

16:29  10   reprimanded or ever given a verbal reprimand for not

11   coming in for that interview?

12        A.  I was never given a verbal reprimand or written

13   corrective action for anything during my duration at

14   ECFMG.  I think one time, and I didn't even know it was

16:29  15   a corrective -- written -- a corrective action.  I had

16   to call Betty and ask her about it.  And I was making

17   several complaints to HR about my director at that

18   particular time.

19        Q.  About Mr. Paul?

16:29  20        A.  Yes.

21        Q.  And when you say "at that time," is this -- is

22   this prior to the time that you went out on leave in the

23   fall?

24        A.  This was prior -- this was prior to the time I

16:30  25   went out on leave.

Artis Ellis

**231**

1    Q.   Okay.   And what type of complaints did you make

2    about Mr. Paul?

3    A.   I complained that he -- he was retaliating

4    against me, he was -- he called me names, or out of my

16:30  5    name.   He -- he subjected me to a lot of things that

6    other managers did not have to talk about.

7    Q.   Like what?   Like what?

8    A.   Oh, he used inappropriate language.

9    Q.   Like what?

16:30  10    A.   I choose not to repeat those things.   I can't

11    even recall a lot of the stuff.   I know he called me a

12    witch.

13    Q.   Anything else?

14    A.   I think it's in my -- he -- he was telling my

16:30  15    staff that I wasn't a good manager.

16    Q.   Who -- who told you that Mr. Paul said you

17    weren't a good manager?

18    A.   David Strom.

19    Q.   How do you spell the last name?

16:31  20    A.   S T R O M.

21    Q.   M as in Mary?

22    A.   Yes.

23    Q.   And when did he tell you that Mr. Paul said

24    that you weren't a good manager?

16:31  25    A.   I don't recall the -- the month and day.

Artis Ellis

232

1      Q.   Was it before you went out on leave?

2      A.   Yes.

3      Q.   Okay.   When you said that Mr. Paul was

4  retaliating against you, what does that mean to you?

16:31  5      A.   That means that anytime I would bring something

6  to him, he then will just come full force and would say

7  things negative to my staff or to -- if I brought

8  anything to his attention, he would say negative things

9  to my staff or to other managers, to my assistant

16:32  10  manager.

11      Q.   And what -- what was he saying to staff and

12  managers about you?

13      A.   Some of the things I just mentioned to you.

14      Q.   Well, I -- I was taking notes while you were

16:32  15  saying them, and you said called names and using

16  inappropriate language, but -- and specifically I have

17  that he called you a witch.

18              Is there anything else specific that you

19  can -- that you can recall that he --

16:32  20      A.   I know he said that I wasn't a good manager,

21  because I remember I had called -- I had text him and

22  told him I -- and that's how we used to -- we could text

23  him and say that we weren't going to be in the office if

24  we needed to take a sick day.   And I text him, and he

16:32  25  came into Houston, pulled in unexpectedly, and I texted

Artis Ellis

233

1    him and told him that I was going to be out.  And he

2    said that I wasn't a good manager to David, and David

3    had e-mailed me.

4                He -- it was several things.  He told Brent

16:33  5    a couple of things.  It was inappropriate.  And when I

6    would -- like, he would call Brent a baby, and he was

7    still on breast milk.  And so when I would talk to him

8    side-bar or on the outside of the office, just he and I,

9    saying can you please not address staff inappropriately,

16:33 10    he then will retaliate and say things, you know,

11    publicly, or openly in a group setting about me or

12    something like that.

13        Q.  So other than -- other than Mr. Paul saying

14    that you weren't a good manager, can you think of any

16:33 15    other specific comments that -- that you -- that you

16    heard, either from him or from staff telling you that he

17    said?

18        A.  I report -- I -- I reported them to HR.  I

19    reported them to Ann Jobe, his -- his manager.  And

16:34 20    seeming that when I reported them to his manager, things

21    had gotten worse.

22        Q.  And when you -- when you reported them to his

23    manager and to HR, do you feel like ECFMG listened

24    and -- and looked into what -- what you were saying?

16:34 25        A.  At first, I thought they did.  And then at a

Artis Ellis

234

1    period, it shifted and the complaints seemed to have

2    just stopped.  I mean, it was -- Betty and I met, and

3    she had asked me if I was willing to step down to the

4    assistant manager position.  And I told her, no, that I

16:34  5    wasn't willing to step down to the assistant manager

6    position, that I was okay with staying, that Chris and I

7    just had some difference -- philosophical differences,

8    some differences and that we just should learn -- we're

9    going to have to learn how to work together.  Because

16:34  10    she --

11        Q.  And was --

12        A.  -- told me that --

13        Q.  I'm sorry.  I was going to ask for a time

14    frame.  Is this -- is this in the -- when is this?

16:35  15        A.  This is after May -- this is when we had dinner

16    at Del Frisco.  So it was after May, probably around --

17    before I left in September, so somewhere July.

18        Q.  Okay.  After May, maybe around July.  So around

19    July is when you said, Chris and I -- Chris and I have

16:35  20    differences, but we just need to find a way to work

21    together.

22        A.  Because she told me Chris wasn't going

23    anywhere, and I realized that ECFMG was not going to --

24    I mean, they were probably tired of me making complaints

16:35  25    about Chris, because she made it clear, Chris wasn't

Artis Ellis

**235**

1   going anywhere.  So -- and I wasn't stepping down to go

2   to the ACM position, so we just had to learn how to work

3   together.

4       Q.  And did you -- did you feel like your main

16:36  5   complaint about Chris was his management style?

6       A.  It was beyond his management style.  It was --

7   I never complained about Chris' management style.  It

8   was Chris, the way he -- he addressed me.  He was very

9   inappropriate.

16:36  10      Q.  What's an example of being inappropriate?

11      A.  I'm -- I was the only African-American manager,

12  and I really believe that Chris had some racial issues.

13  And he just came across very, very aggressive, and like

14  I'm going to keep you in your place.

16:36  15              And when I wasn't accepting about being in

16  my place, he was let -- he let me know clearly that he

17  was the director.

18      Q.  Let's look at this set of e-mails I'm going to

19  mark as Exhibit 28, ECFMG/Ellis 220 through 223.

16:37  20              (Exb. No. 28 was marked.)

21      Q.  (BY MS. O'DRISCOLL)  If you could just take a

22  minute to glance at these, and we can walk through them,

23  see if they're in chronological order.

24              You recall these e-mails?

16:37  25      A.  I do.

Artis Ellis

236

1    Q.   Okay.  And is this during the time -- spring

2    and summer of 2012 when you were talking with Betty and

3    ECFMG management about Chris?

4    A.   Yes.

16:38  5    Q.   If you look at the -- the third page, ECFMG

6    222, this appears to be an e-mail from you to Betty

7    thanking her for lunch and the opportunity to be heard;

8    is that right?

9    A.   Uh-huh.

16:38  10   Q.   And did you -- based on this e-mail, it appears

11   you felt good that you could get everything off your

12   chest.

13   A.   Yes.

14   Q.   And -- and that you valued Betty, her

16:38  15   friendship and her mentoring you; is that right?

16   A.   Yes.

17   Q.   Did you later -- that was dated May 1st, 2012.

18   There's another e-mail from you to Ann Jobe and also to

19   Chris Paul copied -- I'm sorry, to Ann Jobe and Chris

16:38  20   Paul, "Hi Ann, I hope this e-mail finds you well.  I

21   just had a meeting with Chris and we have come to an

22   impasse.  I'm requesting your" -- you "assisting so

23   Chris and I... have a professional working relationship.

24   I like to share some concerns I have with you that I

16:39  25   have shared with Chris.  Please let me know a good time

Artis Ellis

237

1    we can meet.  My son is graduating... therefore I'm

2    traveling on Friday.  This is not an urgent request,

3    but" -- "but a well needed one."

4                   Did I read that correctly?

16:39  5    A.  You did.

6    Q.  And if you look at the first page, so the ECFMG

7    220, at the very bottom, you send it to Betty and say,

8    "Betty, please call me to discuss.  I will be in the

9    office....  Sorry I forgot to CC you on the e-mail."

16:39  10                  It appears you meant to copy her on that --

11    on that e-mail I read a moment ago?

12    A.  I did.

13    Q.  And did Betty get back with you quickly so that

14    you-all could address your concerns about Chris?

16:39  15    A.  Betty LeHew?

16    Q.  Yes.

17    A.  Based on the e-mail?

18    Q.  Well, I mean, do you recall after these e-mails

19    you reaching out again?  It sounded like you guys had

16:40  20    lunch and then --

21    A.  No.  These are separate -- yes, Betty got back

22    with me.  She was -- Betty was part of it.  She knew --

23    she heard my complaints.  That was a period -- yes,

24    Betty was fully aware that was going on during that time

16:40  25    period.  This was in May.  This was when I made the

Artis Ellis

238

1   complaint.  Ann Jobe did not get right back with me.

2       Q.  But Betty LeHew was getting back with you?

3       A.  Betty LeHew did get back with me.

4       Q.  Okay.  And did you -- did you feel like, in

16:40 5   these discussions, that -- that they were trying to help

6   you move forward and -- and find a -- a middle ground

7   for you and Chris to work together better?

8       A.  I was told that they had spoke with Chris and

9   that some things were going to change, and it did not.

16:41 10       Q.  And when you say "it did not," what --

11       A.  When Chris would come to Houston, he would

12   still be him -- himself.  I think he was trying to work

13   on it, but he -- he could not find that ground to move

14   forward.  So we were still coming that -- that impasse,

16:41 15   and I would still call Betty and tell her and complain

16   that these are still some issues that are going on.

17       Q.  Did -- I know you said that you wouldn't

18   characterize it as a -- as a difference in -- in

19   management style.

16:41 20               Would you characterize it as a personality

21   conflict?

22       A.  I would -- I would characterize it as a

23   personality conflict.  And I would see him more as a

24   bully.

16:41 25       Q.  In -- in what sense?

DepoTexas, Inc.

Artis Ellis

240

1    earlier?

2        A.  Uh-huh.  Yes.

3        Q.  Leading up to that time, did you receive a memo

4    from Chris that talked about a number of performance

16:43 5   issues in -- in August of 2012?

6        A.  Which he was incorrect on a lot of those

7    things, too, that I made some corrections, and he had to

8    take some things out.

9        Q.  So if we can look at ECFMG/Ellis 225 through

16:43 10   230, I'm marking as Exhibit 29.  And I printed color

11    copies, so I'm hoping that it'll be easier to walk

12    through this.

13                  (Exb. No. 29 was marked.)

14        A.  And once again, I want to say that this was one

16:43 15   that came late in the -- this was supposed to have been

16    my first corrective action, my entire time at ECFMG.  I

17    called Betty LeHew when I received this through an

18    e-mail, and she told me that this was -- "Yes, consider

19    it a corrective action."

16:44 20                  I have to question it, why was my

21    corrective action different than anyone else?  It was

22    not on the right -- the same form that I had to do

23    corrective actions on, so that's why I'm saying I -- I

24    felt like I was treated different than any other

16:44 25   employees.

Artis Ellis

**241**

1    Q.   (BY MS. O'DRISCOLL)  Have you ever seen a

2    corrective action that Chris has done for another center

3    manager?

4    A.   No.

16:44  5    Q.   So you don't know, he could have very well done

6    it the same way.

7    A.   I'm saying, so then that goes against ECFMG

8    policies, that if the policies are to do corrective

9    actions and all employees are to be treated the same and

16:44  10   fairly, then why are -- why am I treated differently?  I

11   don't know about anyone else.  I'm saying how I had to

12   do corrective actions, and I --

13   Q.   You're a center manager; correct?

14   A.   I am a center manager, and that should be done

16:44  15   the same corrective action, I believe, on the same forms

16   that any other -- I'm still an employee.

17   Q.   But you don't know if other center managers

18   received corrective actions in this format is what I'm

19   asking.

16:44  20       You don't know that?

21   A.   No --

22   Q.   Okay.

23   A.   This doesn't even say corrective action.  It

24   says, "Concerns," so I'm thinking this is just a memo.

16:45  25   Q.   Well, and this is a memo detailing concerns and

Artis Ellis

242

1    expectations going forward that -- that you received,

2    even prior to going out on leave; correct?

3         A.  That is correct.  And the -- and then you will

4    see my -- my responses are in the different colors.

16:45  5         Q.  And so it appears -- and tell me if I'm

6    right -- the black font is Chris' font; correct?

7         A.  Yes.

8         Q.  And then your response is in red.

9         A.  Yes.

16:45  10        Q.  And then he responded to your red in blue.

11        A.  Yes.

12        Q.  And then it looks like you responded back in

13   between there in red, as well.

14             So this -- this memorandum, which is dated

16:45  15   August 23rd, 2012; correct?

16        A.  Yes.

17        Q.  This is the result of an e-mail exchange back

18   and forth between you and Mr. Paul and a number of

19   issues that were going on with staffing and -- and the

16:46  20   retrofit -- fit leading up to August 23rd; correct?

21        A.  I guess we need to go through it, because, no.

22        Q.  Sure.  I mean, if you -- if you look at -- in

23   the bottom where it talks about examples of ineffective

24   performance management and staff leadership, number 1 is

16:46  25   "Substantial turnover in the last ten months, including

Artis Ellis

265

1           You already said this is your handwriting;

2   correct?

3       A.  That is correct.

4       Q.  And when this was written, were you -- were you

17:38  5   writing it on or about that -- those days in March?

6       A.  Yes.

7       Q.  Or did you write it at some later time and --

8   and say, "Oh, I was thinking this back during that

9   time"?

17:38  10      A.  No.

11      Q.  So you wrote it in March?

12      A.  Yes.

13      Q.  Okay.  And is this part of a -- a bigger

14  notebook somewhere, where it has thoughts about Chris or

17:38  15  thoughts about anything that would be in any way related

16  to this litigation?

17      A.  No.

18      Q.  So these are all the pages that you have?

19      A.  Yes.

17:38  20      Q.  Okay.  Look on the last page, Ellis 129, number

21  3 says, "Wednesday (March 7, 2012) You made a very

22  inappropriate comment by referencing I was a" -- "a

23  wicked "witch from the west."  I know that -- that's one

24  of the names that you mentioned that you felt like were

17:39  25  inappropriate.

Artis Ellis

266

1        Can you think of anything else that Chris

2   said that you believed to be inappropriate?

3        A.   I think some of this was cut off.

4        Q.   Okay.  I'm glad you asked that -- or stated

17:40  5   that.

6             On -- so on 0129, you think that was cut

7   off?

8        A.   Yes.  Yes, at the bottom.

9        Q.   Do you -- do you still have the original, or

17:40 10   did you give the original to your lawyer such that we

11   can get a complete copy of that?

12             MR. KENNARD:  We're going to -- I'll have

13   to look.

14             MS. O'DRISCOLL:  Okay.

17:40 15             MR. KENNARD:  I'll figure it out.

16             MS. O'DRISCOLL:  Okay.

17             (A request for information made.)

18             MR. KENNARD:  Leave a blank in the

19   deposition for that.  I'll be happy to do that.

17:41 20             MS. O'DRISCOLL:  Okay.

21        Q.   (BY MS. O'DRISCOLL)  I'll mark as Exhibit 34

22   Ellis 024 -- 224 through 228.

23             (Exb. No. 34 was marked.)

24        Q.   (BY MS. O'DRISCOLL)  You talk about some of

17:42 25   Chris's remarks in this EEOC charge.

Artis Ellis

267

1          This is what you filed with the EEOC?

2     A.   Can you give me a Bates number, please?

3     Q.   Ellis 224 through 226.

4     A.   Can you be a little bit more specific on which

17:43  5  one you're talking about?

6     Q.   Well, in the very beginning, you're talking

7  about Chris and making inappropriate remarks, and you --

8  you -- you reference calling Ms. Ellis a bad witch and

9  that she would melt.  "'I must pay you too much money'

17:43 10  because of the car she drives."

11          These remarks are all centered around --

12  around racial issues.  And you mentioned race earlier.

13          There aren't any other comments or remarks

14  other than what are -- are mentioned here; correct?

17:43 15     A.   There were several other different remarks that

16  he made just -- there -- there were several that we had

17  to endure, like the one that I will make sure that I get

18  you when you're down, I'll step on you when -- when

19  you're down.

17:44 20     Q.   And is there anything else that you can think

21  of?

22     A.   There were -- there were several.  I can't -- I

23  mean, no, I can't think of all of them, but I made

24  reports.  I reported them as they came up.  So to come

17:44 25  here four years -- nearly four years later on all of

Artis Ellis

268

them, I can't think of all of them.

Q.  Who do you believe discriminated against you on the basis of disability?

A.  The -- the people?

17:45  Q.  Yes.

A.  I believe Chris Paul.

Q.  Anyone else?

A.  I mean, he worked with Nancy and Betty.  I believe that Betty just was given information.  I 17:45 don't -- I think she just, you know, had to kind of try to be as -- I think she -- she tried to be neutral -- mutual, I'm sorry -- but I think she just end up going along with -- with what she -- Chris was the director, and she was a director at that time, and then Nancy was 17:45 a director.  So I was just a manager, and it was two of them against me.

Q.  And -- and what -- you mentioned Chris, you mentioned Nancy, you said that Betty was facilitating information.

17:46       What do you believe one or any of those individuals did that you believe to have been discriminatory towards you?

A.  I -- I believe that Chris knew that I had been out on medical leave several times, and he just 17:46 completely saw an opportunity to -- he said, "I'm going

Artis Ellis

**269**

1    to get" -- you know, he was out to get me, and he saw

2    that opportunity to get -- get me while, you know, he

3    said, while you're down.  So from the onset, he said

4    that he -- he, you know, had these remarks that he would

17:46  5    make and comments that were kind of off-putting.  And

6    his plan on his part was to -- to get me.  And so with

7    my disability, I believe that that was just an

8    opportunity.

9            He knew I had had brain surgery, he had

17:47 10    came into the office and he was, you know, finding any

11    way, having closed-door meetings, he was saying I was

12    related to people, I was having sex with all the guys in

13    the office, going in, saying, I know, you know, you can

14    tell me, she's sleeping with you, I know she is, I'm not

17:47 15    going to say anything, just go ahead on and tell me.

16    That's -- that wasn't me.  That was --

17        Q.  Who told you that he said that?

18        A.  The employees were calling me telling me.

19        Q.  But which employees?

17:47 20        A.  Myron Williams.

21        Q.  Anyone else?

22        A.  Kenneth Rhome.  And it just so happened that he

23    was asking the black men were they sleeping with me.

24        Q.  Did anybody else --

17:47 25        A.  David Strom had called me saying that he

Artis Ellis

**298**

1      Q.   (BY MS. O'DRISCOLL)   So Exhibit 40, this is the

2  ECFMG handbook produced, ECFMG 316 through 355.

3            (Exb. No. 40 was marked.)

4      Q.   (BY MS. O'DRISCOLL)   Do you recall having this

18:37  5  handbook while you were employed at ECFMG?

6      A.   Yes.

7      Q.   And this handbook references a number of

8  different policies in addition to the -- to the separate

9  copies of policies that we talked about earlier;

18:37  10  correct?

11      A.   Correct.

12      Q.   And -- and you understood that based on the

13  policies as well as the handbook, that ECFMG is an equal

14  opportunity employer and has policies against

18:37  15  discriminating on basis of disability and other

16  protected -- protected basis; correct?

17      A.   Yes.

18      Q.   Okay.   And you also understood that procedures

19  related to FMLA were contained in the handbook?

18:38  20      A.   I did know FMLA was in the handbook.

21      Q.   You know, I gave you the wrong copy.  Let me --

22  sorry.   That one's highlighted.  I apologize.  I'll

23  just -- I thought I had one highlighted, and I was

24  thinking I imagined it.

18:38  25            Okay.   Sorry.   And I apologize.   I

Artis Ellis

299

interrupted you.

Did -- what were you saying?

A.  No, I did know that FMLA was in the handbook.

Q.  Okay.  And then also the policy related to employment of relatives is also touched on in the handbook; correct?

A.  Yes.

Q.  And you understood that if you for some reason didn't understand a policy or needed clarification on a policy, that you could always contact center management in Philadelphia and talk to Betty or anyone else in management; correct?

A.  Human resource?

Q.  Yes.

A.  Yes.

Q.  Have you asked anybody to be a witness in this case on your behalf?

A.  On the -- the list.  I just gave the list to my lawyer.  Possible witness, but I have not talked to anyone about being a witness.

Q.  Okay.  And the list that you're referring to is that -- the list that we talked about a few minutes ago that had David listed and Rupa; is that right?

A.  A list of witnesses, yes.

Q.  And -- did you know Rupa from a -- a prior

Artis Ellis

300

1    employment?

2        A.   Yes.

3        Q.   And did Betty Hite ever talk to you about the

4    importance -- after Rupa was hired, about the importance

18:41  5    of sharing that -- if you'd known someone from a prior

6    employment or prior relationship that you should always

7    share that information?

8        A.   She did, but Sharon Trowell knew that I knew

9    Rupa.

18:41  10       Q.   But Betty did talk to you about that?

11       A.   Betty did talk to me about that.  So prior to

12   Rupa coming to work there, HR knew that I knew Rupa.

13   And when I was asked to do a reference, I told them that

14   I did not want to do a reference with Rupa because it

18:41  15   had been over ten years since I had even seen or talked

16   to Rupa.

17       Q.   Okay.  And do you remember what year Rupa was

18   hired?

19       A.   I don't remember what year Rupa was hired.

18:42  20       Q.   Oh, and I just wanted to clarify.  Rupa had you

21   listed as a reference and they asked you to be a

22   reference, to see if you wanted to offer a reference and

23   you said I -- you declined?

24       A.   I don't know if she had me listed as a

18:42  25   reference.

Artis Ellis

310

Q.  So did the director of human resources hand you any document for you to fill out requesting an accommodation on the workplace?

A.  No.

Q.  Did she tell you that you needed to submit some sort of document or documentation in order to get an accommodation in the workplace on or after October of 2012?

A.  No.

I also told Sharon Trowell.

Q.  Okay.

A.  And Chris Paul.

Q.  Did any of those individuals offer you documentation for you to submit so that you could request an accommodation in the workplace on or after October of 2012?

A.  No.

Q.  Did any of them advise you that you needed to submit some written form of documentation in order to formally request an accommodation in the workplace on or after October of 2012?

A.  No.

Q.  You testified earlier that you believe you and Chris had a personality conflict.

Can you tell the ladies and gentlemen of

Artis Ellis

311

1    the jury why you believe he had a personal --

2    personality conflict with you?

3        A.  I believe because -- as I testified earlier,

4    because I was an African-American woman, I was strong

19:02  5    and confident, and I just believe that he strongly just

6    went against me from the very beginning.  When he did

7    not know me, he called me names.  He stated he was

8    going -- he was out to get me, he paid me too much money

9    because I drove an old Lexus.  I don't know what that

19:02  10   was about, but he just made comments after comments.

11       Q.  How did he treat you once he was aware that you

12   had medical issues?

13       A.  He said he was out to get me.  He made remarks

14   that was off-putting.

19:03  15       Q.  Did he then treat you better or even worse once

16   he realized you had medical issues?

17              MS. O'DRISCOLL:  Objection.  Form.

18       A.  I think he treated me worse.

19       Q.  (BY MR. KENNARD)  Okay.

19:03  20       A.  And everything that I put in place at the

21   Houston center, he undid.

22       Q.  Okay.  And what was his position?

23       A.  Center director.

24       Q.  So you reported to him?

19:03  25       A.  I reported to him.

Artis Ellis

313

1    did anyone request your password from you?

2         A.  No.

3         Q.  Okay.  At any time while you were not on

4    medical leave, do you recall giving any of your

19:05  5    passwords to anybody?

6         A.  Yes.

7              MS. O'DRISCOLL:  Objection.  Form.

8         Q.  (BY MR. KENNARD)  Okay.  Tell me who.

9         A.  Bea Bright Davies.

19:05 10         Q.  Tell me why.

11         A.  My direct supervisor told me to give her my

12    password so that they can do some updates.

13         Q.  Okay.  And who was your direct supervisor at

14    the time?

19:05 15         A.  Chris Paul.

16         Q.  Okay.  Is it your testimony that the same

17    individual that wrote you up for giving away a password

18    at one time asked you to give your password away?

19         A.  Yes.

19:05 20              MS. O'DRISCOLL:  Objection.  Form.

21         Q.  (BY MR. KENNARD)  While you were out on medical

22    leave, did any of your supervisors reach out to you?

23         A.  Yes.

24         Q.  Tell me who.

19:06 25         A.  Chris Paul.

Artis Ellis

**314**

Q.   Why?

A.   To come in to sit in on the assistant manager interviews.

Q.   Did he know that you were out on medical leave?

19:06   A.   Yes.

Q.   As far as you understand, were you supposed to be contacted with work-related matters while you were out on medical leave?

A.   Repeat.

19:06   Q.   Do you believe that you should have been contacted, or do you believe -- strike that.

Do you believe that you should have been contacted by a supervisor regarding work-related activities while you were out on medical leave?

19:07   A.   No.

Q.   Earlier, Ms. O'Driscoll asked you about -- asked you to review some information from a TWC transcript.

Do you remember that?

19:07   A.   Yes.

Q.   Okay.  Do you agree with the contents that were in that transcript?

MS. O'DRISCOLL:  Objection.  Form.

Q.   (BY MR. KENNARD)  I.e., do you remember having

19:07   made those statements?

Artis Ellis

315

1          MS. O'DRISCOLL:  Objection.  Form.

2     Q.  (BY MR. KENNARD)  You can answer the question.

3     A.  I don't remember making those statements.

4     Q.  Okay.  So it's possible that you made those

19:08   5  statements since they appeared on the transcript, but

6  you don't personally remember having made those

7  statements.

8          Is that your testimony?

9     A.  That is my testimony.

19:08   10    Q.  Okay.  To the extent you're confused or don't

11  recall certain statements that you allegedly made, can

12  you explain to the ladies and gentlemen of the jury why,

13  in your estimation, that might be the case?

14          MS. O'DRISCOLL:  Objection.  Form.  Calls

19:08   15  for a medical diagnosis.

16    Q.  (BY MR. KENNARD)  You can answer the question.

17    A.  Time.

18    Q.  Okay.

19    A.  And having to look over it in such a short

19:09   20  period at this particular time right now.

21    Q.  Did your medical issues impact your memory at

22  all?

23          MS. O'DRISCOLL:  Objection.  Form.

24    A.  I would say yes.

19:09   25    Q.  (BY MR. KENNARD)  You did have brain surgery;

Artis Ellis

**322**

1    differently than your -- than the medication you were on

2    back in 2012; correct?  Is that what you're saying?

3                MR. KENNARD:  Objection.  Misleading as

4    worded.  Assumes facts.

19:17  5        Q.  (BY MS. O'DRISCOLL)  Well, let me put it this

6    way.  The testimony that you gave to the Texas Workforce

7    Commission was under oath; correct?

8        A.  That is correct.

9        Q.  And as the transcript was written, as you

19:17  10   stated earlier, you could have said -- you could have

11   said those things, and -- and some things you may or may

12   not recall.

13       A.  That is correct.

14       Q.  Okay.  I'll just leave it at that, and we'll

19:17  15   look to the transcript.

16                You testified earlier, when your counsel

17   asked you a few questions about Ms. LeHew's daughter, I

18   believe it's her stepdaughter?

19       A.  Yes.

19:18  20       Q.  How did you come to learn that -- that she had

21   been hired to work at ECFMG?

22       A.  I -- I knew Betty.  We talked.

23       Q.  And -- and when -- and when -- how did you come

24   to learn that her daughter worked at ECFMG?

19:18  25       A.  We just had a -- I mean, just conversing.  I

Artis Ellis

323

don't know how that information just came out.  It's

just in, you know, conversing.  I don't -- I don't

recall who told me or how it came out.

Q.  Well, I mean, did Betty tell you, or did some

other person tell you?

A.  I -- I don't recall.  Betty may have told me.

Q.  Do you recall what position her stepdaughter

worked in?

A.  She worked in HR and I believe she was a temp

and Betty shared that in our -- in my unemployment

hearing.

Q.  And you believe that her step -- that Betty's

stepdaughter was a temp, is that what you said, that

worked in HR?

A.  I believe she was a temp originally.

Q.  And do you have any knowledge as to whether or

not it was a -- a summer job?

A.  She was employed at ECFMG.  I don't know if she

worked in the summer or if she worked part time.  I

don't know.

Q.  Do you have any knowledge as to whether or not

it was a -- a summer job for a person who was in -- in

school at the time?

A.  It's against the policy, according to ECFMG

policy.

Artis Ellis

**324**

1    Q.  That's not answering my question.

2         Do you know whether or not the position

3    that -- that Betty's daughter was working, her

4    stepdaughter, if she was working, if it was a summer job

19:20  5    for a student?  Do you know?

6    A.  I don't know.

7    Q.  Okay.  And do you know if -- prior to her

8    daughter being hired for the summer, do you know if

9    Betty went to management and asked for clearance on this

19:20  10    prior to her being hired?

11    A.  I don't know.

12    Q.  So you don't have any of the details

13    surrounding any discussions that took place with

14    management related to hiring Betty's daughter for the

19:20  15    summer?

16    A.  I -- I don't know if she worked for the summer.

17    Q.  And -- and do you know how long she worked?

18    A.  I -- I don't know.

19    Q.  And do you know if there were -- do you know

19:20  20    who her daughter reported to while she was working for

21    ECFMG?

22    A.  Betty was the director.

23    Q.  But do you know if there was a manager that the

24    daughter was -- her stepdaughter was reporting to?

19:21  25    A.  Betty was the director of HR, so they all --

Artis Ellis

334

ARTIS ELLIS

Page 2

1
2
3
4
5
6
7
8

        I, ARTIS ELLIS, have read the foregoing

deposition and hereby affix my signature that same is

true and correct, except as noted above.




ARTIS ELLIS

335

1   THE STATE OF TEXAS:

2   COUNTY  OF  HARRIS:

3

4            I, Peggy Ann Antone, Certified Shorthand

5   Reporter in and for the State of Texas, do hereby

6   certify that the facts stated by me in the caption

7   hereto are true; that the foregoing deposition of ARTIS

8   ELLIS, the witness hereinbefore named, was taken by me

9   in machine shorthand, the said witness having been by me

10  first duly cautioned and sworn under oath to tell the

11  truth, the whole truth and nothing but the truth, and

12  later transcribed from machine shorthand to typewritten

13  form by me.

14            I further certify that the above and

15  foregoing deposition, as set forth in typewriting, is a

16  full, true and correct transcript of the proceedings had

17  at the time of taking said deposition.

18            I further certify that I am neither

19  attorney or counsel for, nor related to or employed by

20  any of the parties to the action in which this

21  deposition is taken, and further that I am not a

22  relative or employee of any attorney or counsel employed

23  by the parties hereto, or financially interested in the

24  action.

25            I further certify that signature of the

Artis Ellis

336

1    witness was requested, and, if requested, the

2    corrections/changes are attached.

3              I further certify that charges for the

4    preparation of the foregoing completed deposition were $

5    _____ for the original thereof, charged to

6    Attorney(s) for _____.

7              GIVEN under my hand and seal of office on

8    this, the 20th day of May, 2016.

9

10

11   ------------------------------

12   Peggy Ann Antone, RMR, CRR

13   Notary Public, State of Texas

14   Commission expires 8/28/16

15

16        DepoTexas, Inc.

17        Firm Registration No. 95

18        13101 Northwest Freeway, Suite 210

19        Houston, Texas  77040

20        (281) 469-5580

21

22

23

24

25