# EXHIBIT 4

Transcript of the Testimony of

# Nancy Ambrose

## Date:

September 07, 2016

## Case:

ARTIS ELLIS VS. EDUCATIONAL COMM. FOR FOREIGN MED. GRADS

Kim Tindall and Associates, LLC.
Phone:(210) 697-3400
Fax:(210) 697-3408
Email:ktindall@ktanda.com
Internet: www.KimTindallandAssociates.com

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2                 HOUSTON DIVISION

3    ARTIS ELLIS                    )
                                    )
4               PLAINTIFF,          )
                                    )
5    VS.                            ) C.A. NO. 4:14-cv-02126
                                    )
6    EDUCATIONAL COMMISSION         )
     FOR FOREIGN MEDICAL            )
7    GRADUATES                      )
                                    )
8               DEFENDANT.          )

9

10   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11                 ORAL DEPOSITION OF

12                  NANCY AMBROSE

13                 SEPTEMBER 7, 2016

14
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
15

16

17

18

19

20

21

22

23

24

25

Nancy Ambrose

September 07, 2016
Pages 2 to 5

## Page 2

1    ORAL DEPOSITION OF NANCY AMBROSE, produced as
2  a witness at the instance of the Plaintiff, and duly
3  sworn, was taken in the above-styled and numbered cause
4  on SEPTEMBER 7, 2016, from 2:07 p.m. to 3:54 p.m.,
5  before Michelle K. Miller, CSR, RPR in and for the
6  State of Texas, reported by machine shorthand, at the
7  offices of Morgan, Lewis, & Bockius, LLP, 1000
8  Louisiana, Suite 4000, Houston, Texas 77002, pursuant
9  to the Federal Rules of Civil Procedure and the
10  provisions stated on the record or attached hereto.

## Page 3

### A P P E A R A N C E S

FOR THE PLAINTIFF:
    Ms. Keenya R. Harrold
    Kennard Richard
    2603 Augusta Drive, Suite 1450
    Houston, Texas 77057
    Tel: 713.742.0900
    Fax: 713.742.0951
    Email: keenya.harrold@kennardlaw.com

FOR THE DEFENDANT:
    Ms. Erin E. O'Driscoll
    Morgan, Lewis, & Bockius, LLP
    1000 Louisiana, Suite 4000
    Houston, Texas 77002
    Tel: 713.890.5169
    Fax: 713.890.5001
    Email: erin.odriscoll@morganlewis.com

ALSO PRESENT:
    Ms. Artis Ellis
    Ms. Betty LeHew

## Page 4

### INDEX

                                          PAGE

    Appearances............................    3

NANCY AMBROSE

    Examination by Ms. Harrold.............    5
    Examination by Ms. O'Driscoll.........   53
    Examination by Ms. Harrold............   55
    Examination by Ms. O'Driscoll.........   55
    Examination by Ms. Harrold............   57

Signature and Changes....................   60
Reporter's Certificate...................   62

              EXHIBITS

NO.        DESCRIPTION              PAGE

1          Policy and Procedure
           Manuel                    21

2          Notes                     32

3          Policy and Procedures
           Manuel                    35

## Page 5

1       MS. O'DRISCOLL:  I just wanted to say for
2  the record that Betty LeHew is present on behalf of the
3  company as corporate representative.
4              NANCY AMBROSE,
5  having been first duly sworn, testified as follows:
6              EXAMINATION
7  BY MS. HARROLD:
8    Q.  Okay.  Hi, Nancy.  My name is Keenya Harrold.
9  I am the attorney for Ms. Ellis.  Do you understand
10  that my position is opposed to that of the defendant in
11  this deposition?
12    A.  Uh-huh.
13    Q.  Prior to this deposition, have we ever met?
14    A.  No.
15    Q.  Can you state your full name for the record,
16  please?
17    A.  Nancy, N-A-N-C-Y, Marilyn, M-A-R-I-L-Y-N,
18  Ambrose, A-M-B-R-O-S-E.
19    Q.  Ms. Ambrose, have you ever been deposed
20  before?
21    A.  No, I don't think so.
22    Q.  Okay.  And you are going -- you are doing a
23  good job of answering my questions orally.  Because the
24  court reporter is here, everything we say is being
25  written down.  So we have a tendency to kind of shake

Nancy Ambrose                                    September 07, 2016
                                                      Pages 6 to 9

Page 6

1  our heads and nod yes or no.  So it's -- we want to
2  make sure that all of our answers are oral.  Okay?
3      A.  Right.
4      Q.  So she can take that down.
5      A.  Got it.
6      Q.  And then do you understand that you are under
7  oath with the same penalty of perjury as if we were in
8  a courtroom?  Do you understand that?
9      A.  I do.
10     Q.  Okay.  I have a tendency to speak very
11  quickly, so if there's ever a time where you don't
12  understand my question, if you'll tell me to repeat it
13  or ask it another way, I'll definitely do that.  Okay?
14     A.  Okay.  Thank you.
15     Q.  Okay.  If you do answer the question, then, I
16  will believe that you understood what my question was.
17  Okay?
18     A.  Okay.
19     Q.  Okay.  If there's any time that you need to
20  take a break, then we can do that.  I'm not holding you
21  here.  So if you ever need to take -- use the restroom
22  or whatever you need, you just tell me you need a
23  break.  Okay?
24     A.  Okay.  Thank you.
25     Q.  The only thing is if I have a question

Page 7

1  pending, then let's kind of answer that question before
2  we go off the record.
3      A.  I understand.
4      Q.  All right.  What did you do to kind of
5  prepare for this deposition today?
6      A.  I met with Erin and Betty LeHew yesterday
7  afternoon.
8      Q.  Okay.  And about how long did you meet?
9      A.  Several hours.  I can't remember the exact
10  times.  I think whenever I arrived, around 1:00 o'clock
11  to about 5:00 or 6:00 p.m.
12     Q.  Okay.  And did you review any documents?
13     A.  Yes, we reviewed several documents.
14     Q.  Which documents did you review?
15     A.  There was a list of Houston issues.  There
16  were several policies.  Several memos, corrective
17  action that Chris Paul gave Artis in August of 2012.
18  That's all I can think of.
19     Q.  Which policies did you look at?
20     A.  The one about hiring people you know.  I'm not
21  sure what the name of the policy is.
22     Q.  Okay.
23     A.  And also the security policy that deals with
24  passwords.
25     Q.  Any others?

Page 8

1      A.  I can't remember.
2      Q.  Okay.  In terms of corrective actions, was
3  that the only one you looked at was the one that --
4  from August -- from Chris Paul?
5      A.  Yes.
6      Q.  And at any time, were you Ms. Ellis' manager?
7      A.  Not directly.
8      Q.  Besides that August -- besides that August
9  corrective action, have you ever seen any other
10  corrective action on Ms. Ellis while you were working
11  there?
12     A.  Prior to August or ever?
13     Q.  Prior to August.
14     A.  Prior to August, written -- are you talking
15  about written corrective action?
16     Q.  Yes.
17     A.  I can't think of anything written, no.
18     Q.  What about a verbal warning?  Have you ever
19  given her a verbal warning while you were working as
20  the assistant director?
21     A.  No.
22     Q.  Let's kind of start with some background
23  information on you.  Where did you go to high school?
24     A.  Skaneateles Central High School in
25  Skaneateles, New York.

Page 9

1      Q.  Can you spell that?
2          The court reporter may appreciate that.
3          THE WITNESS:  I bet you would.
4  S-K-A-N-E-A-T-E-L-E-S.
5      Q.  (BY MS. HARROLD)  Okay.  And then where did
6  you go to college?
7      A.  Messiah College.
8      Q.  Where is that?
9      A.  That's in Grantham, Pennsylvania outside
10  Harrisburg.
11     Q.  What was your major there?
12     A.  Fine art.
13     Q.  And what jobs did you hold after college?
14     A.  After college I worked at the Philadelphia
15  Stock Exchange.  I worked for Colonial Penn selling
16  life and health insurance.  The American Board of
17  Surgery.  Assessment Systems, Incorporated.  Temple
18  University.
19     Q.  What did you do at Temple University?
20     A.  I managed all of the continuing education
21  programs.
22     Q.  Okay.  And about what year was that?
23     A.  Not that good with dates.  I left in 2001 to
24  come to ECFMG.  That was when I left there.  I think I
25  started at Temple in 1997.

Nancy Ambrose

September 07, 2016
Pages 10 to 13

Page 10

1    Q.   Okay.  And you said you went to ECFMG in 2001?
2    A.   Yes.
3    Q.   And what was your first position?
4    A.   Center manager of the Philadelphia center.
5    Q.   So you held the same role that Ms. Ellis held?
6    A.   Yes.
7    Q.   But only in Pennsylvania?
8    A.   It was structured slightly differently at the
9  time.
10    Q.   What were the differences?
11    A.   In 2001, the centers had a center manager and
12  an SP manager, and about the time of 2004, we changed
13  that structure to be a center manager with an assistant
14  center manager reporting to that manager.
15    Q.   And what does "SP" stand for?
16    A.   Oh, standardized patient.  I'm sorry.  We have
17  a lot of acronyms.
18    Q.   Okay.  And I'll try to remind you so that
19  we'll make sure that the record is clear in terms of
20  acronyms and abbreviations.
21         So you were center manager in 2001.  And
22  then what was your next position?
23    A.   Assistant director, center operations.
24    Q.   And when were you promoted to that position?
25    A.   I don't remember the exact date.  It's

Page 11

1  probably late 2003, early 2004.
2    Q.   And when you were center manager in 2001, was
3  the exam the same exam that they used in 2004?
4    A.   Not exactly the same.  Very similar.  In 2001,
5  we tested only international medical graduates and it
6  was only ECFMG.  By 2004, we had started a
7  collaboration with the National Board of Medical
8  Examiners and we began to test U.S. medical graduates
9  as well.  So as part of that collaboration, some of the
10  exam content, scoring, some of those things changed.
11  But it was essentially the same type of exam.
12    Q.   Okay.  And what were your duties and
13  responsibilities as the center manager?
14    A.   I managed a staff of test administration
15  personnel.  There's a receptionist of facilities, an
16  office coordinator, a test administration supervisor,
17  control room supervisor, control room operators,
18  proctors.
19    Q.   And your job was to manage those persons?
20    A.   I managed those personnel, and I also ensured
21  that the exam was administered in a standardized,
22  secure, and fair manner.
23    Q.   Okay.  Now, let's talk about what were your
24  duties and responsibilities as the assistant director.
25    A.   There were a lot of them.  I had operational

Page 12

1  oversight for all -- by the time I left, we had six
2  centers total.
3    Q.   Okay.
4    A.   I was heavily involved in designing and
5  building new test centers in Chicago, Houston, Los
6  Angeles, and a second one in Philadelphia.
7    Q.   Uh-huh.
8    A.   I did a lot of project management.  I worked
9  closely with the assistant center managers at each test
10  center.  I drafted a lot of policies and procedures,
11  created a lot of operational manuals.  I was involved
12  with facilities management, project management as I
13  mentioned, helping design the security systems, buying
14  all the furniture and the equipment for all the
15  centers.  There's more.  I -- I can't think of it all.
16    Q.   Did you also do performance evaluations for
17  your center managers?
18    A.   The center managers did not report directly to
19  me as the assistant center -- the assistant director.
20  They reported directly to the director of center
21  operations.  There was a dotted line, reporting line,
22  to my position.
23    Q.   Okay.  So the director would do all
24  performance evaluations on their specific center
25  manager?

Page 13

1    A.   Yeah.  But I would -- I generally helped,
2  assisted the directors in writing the performance
3  evaluations and giving my input with interactions with
4  those center managers.
5    Q.   And what about in the case of having to
6  discipline a center manager?  Would that discipline
7  happen from the director?
8    A.   Generally from the director, but there were
9  situations where I was asked to handle the -- those
10  responsibilities.
11    Q.   And what kind of situation would warrant you
12  handling those situations?
13    A.   Well, one instance, my -- my director had
14  asked me to handle a termination as a way of training
15  me to do her position further.  She wanted me to be
16  able to step in and take care of her responsibilities
17  should she be out of the office or unavailable.
18    Q.   And were you the decision maker in Ms. Ellis'
19  termination?
20    A.   Yes, I was.
21    Q.   Were you the sole decision maker?
22    A.   I wouldn't say sole.  I had approval from Ann
23  Jobe, who was the executive director of the Clinical
24  Skills Evaluation Collaboration or CSEC as we call it.
25    Q.   Okay.  So -- but you made the decision and got

Nancy Ambrose

September 07, 2016
Pages 14 to 17

Page 14

1    the approval from Ann; is that correct?
2        A.   Correct.
3        Q.   Did you also conduct the investigation?
4        A.   Yes, I did.
5        Q.   And you did that alone, or did you have
6    assistance?
7        A.   I may have had assistance in doing some of the
8    research.  I think the SPOS in Houston helped me with
9    some timekeeping and data records that I --
10       Q.   Did you say SP --
11       A.   SP, standardized patients -- patient operation
12   specialist.
13       Q.   And who would that with be?
14       A.   That was Forrest.
15       Q.   Forrest.  What's the last name?
16       A.   Roberts.
17            THE WITNESS:  Is that right?
18       Q.   (BY MS. HARROLD)  Throughout Ms. Ellis'
19   employment, you were assistant director the entire
20   time, correct?
21       A.   I believe so, yes.
22       Q.   Okay.  And are you still working for ECFMG?
23       A.   No.  I ended my employment there on July 31st,
24   2015.
25       Q.   And what was the reason why you left ECFMG?

Page 15

1        A.   My husband and I relocated to the Midwest.
2        Q.   So where do you work now?
3        A.   I'm unemployed now.
4        Q.   Okay.  Have you worked since you left ECFMG?
5        A.   Just volunteer work.
6        Q.   Where do you volunteer?
7        A.   Habitat for Humanity.
8        Q.   Uh-huh.
9        A.   Also on the homeowner's association board in
10   my townhouse development.  And the American Sewing
11   Guild.
12       Q.   How did you find out about this lawsuit?
13       A.   I believe Betty LeHew called me.
14       Q.   About how long ago?
15       A.   I'm not that good with dates.  I was in
16   Kansas, so it was probably early 2015.
17       Q.   Okay.
18       A.   I don't know exactly when.
19       Q.   When you were assistant director, and this is
20   during the time that Ms. Ellis was working for ECFMG,
21   do you remember who the director was in Houston?
22       A.   There is no director in Houston.
23       Q.   Okay.  So then any kind of discipline that
24   would happen to the center manager in Houston would be
25   your responsibility?

Page 16

1        A.   I don't understand the question.  What was
2    that again?
3        Q.   Well, say, for instance, a center manager, the
4    center manager in Houston -- Ms. Ellis has to be
5    written up for some disciplinary reason, right?
6        A.   Uh-huh.
7        Q.   You said usually that would happen through the
8    director and then you would kind of just assist.  But
9    since there was no director in Houston, if any
10   disciplinary action needed to occur with Ms. Ellis,
11   then you would take care of that?
12       A.   When I said there's no director in Houston, I
13   meant that literally.  The director is in Philadelphia.
14       Q.   Okay.  So if you have --
15       A.   So there was a director in employment, just
16   not situated in Houston.
17       Q.   In Houston.  Okay.  And how many directors are
18   actually in place?  If I'm looking at the
19   organizational chart, how many directors are there?
20       A.   There's one director of center operations.
21   There's several other directors in different areas
22   within the collaboration.
23       Q.   What was Chris Paul's title?
24       A.   Director of center operations.
25       Q.   And before Chris, who held that position?

Page 17

1        A.   Betty Hite.  H-I-T-E.
2        Q.   And do you remember when Chris Paul took over
3    that position?
4        A.   I think it was September 2011.
5        Q.   Okay.  And before Betty, who held that
6    position?
7        A.   Ann Homan.  H-O-M-A-N.
8        Q.   Do you recall ever having to assist Betty Hite
9    with any disciplinary issues with Ms. Ellis?
10       A.   Not formally.
11       Q.   When you said "not formally," what do you
12   mean?
13       A.   Both Betty and I had conversations with Ellis
14   over -- over the years just talking about coaching for
15   basic management, mentoring.
16       Q.   But never to the point where she had any kind
17   of written -- any kind of write-ups or anything like
18   that?
19       A.   Not that I can recall.
20       Q.   Okay.  And what about with Chris Paul?  Prior
21   to that August memo, had Chris Paul previously written
22   Ms. Ellis up for any reason?
23       A.   He may have; I don't remember.
24       Q.   Okay.  Did Ms. Ellis ever complain to you
25   about -- about Chris Paul?

Nancy Ambrose

Page 18

1     A.  Yes.

2     Q.  When did she make those complaints to you?

3     A.  I think when Artis was in Philadelphia for a

4  manager's meeting.  I don't remember the date offhand.

5  It would have been March --

6     Q.  March of 2012?

7     A.  It would have to be, because Chris wasn't

8  there in March of 2011.  Yeah.

9     Q.  Okay.  And what kind of complaints -- if you

10  can remember, what kind of complaints did she make

11  about -- about Chris?

12     A.  I can't remember exactly.  I think she was

13  having difficulty communicating with him.  I can't

14  remember the specifics.

15     Q.  And did you investigate those complaints?

16     A.  She wasn't formally complaining to me.  She

17  was just, I think, sharing some frustration over her

18  interactions with Chris.

19     Q.  Uh-huh.

20     A.  And my advice was, you know, just to talk to

21  him directly about any issues she had.

22     Q.  Okay.  And when you say she wasn't doing a

23  formal complaint, what happens when an employee gives a

24  formal complaint versus what Ms. Ellis did?

25     A.  I don't know.  I never really had formal

Page 19

1  complaints.  If it was something significant, I would

2  probably tell them to go to HR and share their

3  concerns.

4     Q.  Okay.  And let's kind of talk about Ms. Ellis'

5  termination.  When was the decision made to terminate

6  Ms. Ellis?

7     A.  I don't remember the dates specifically.  We

8  met with her on October 22nd or 23rd.  I had the

9  investigation, and then it was after that the

10  investigation -- I think after the 29th, on or around

11  October 29th --

12     Q.  Okay.

13     A.  -- I would have been making that decision.

14     Q.  And who did you talk to during the course of

15  your investigation?

16     A.  I talked to Betty LeHew, human resources vice

17  president; and I talked to Ann Jobe, our executive

18  director.

19     Q.  And what were the reasons for Ms. Ellis'

20  termination?

21     A.  Several policy violations.

22     Q.  Okay.

23     A.  Distrust.  Some poor -- poor judgment and poor

24  management.

25     Q.  And had anyone made these complaints prior to

Page 20

1  her going out on leave?

2     A.  Yes.

3     Q.  When?

4     A.  Which one?

5     Q.  About the policy violations.

6     A.  Well, there were two policy violations.  One

7  we found out as she was -- we discovered as she was on

8  leave.  The other one we found out -- I can't remember

9  exactly when.  I think on or before her leave.

10     Q.  Okay.  What were the two policies that

11  Ms. Ellis violated?

12     A.  Hiring and promoting significant other, and

13  sharing her password with a nonmanagement staff person.

14     Q.  And how did you find out that she allegedly

15  hired and promoted a significant other?

16     A.  I believe Chris Paul found out initially

17  through an anonymous letter.

18     Q.  An anonymous letter that he received when?

19     A.  I can't remember the exact date.

20     Q.  Was Ms. Ellis out on leave when he received

21  this anonymous letter?

22     A.  She may have been.

23     Q.  Okay.  And so Chris Paul brought you this

24  anonymous letter, and then what did you do with that

25  information?

Page 21

1     A.  I -- I didn't do anything with it.

2     Q.  Did you believe at that time that she was in

3  violation of some policy?

4     A.  I believe there was some -- we had some

5  questions that we needed to look into.  I wasn't

6  investigating Artis at that point.

7     Q.  Okay.  So about what time period are we in

8  right now?  About what month and what year?

9     A.  2012, this would be -- I don't know --

10  September, October, thereabouts.

11     Q.  So Chris Paul received an anonymous letter

12  claiming that Ms. Ellis had hired or promoted a

13  significant other in September or October of 2012?

14     A.  Yes.

15     Q.  And you didn't do anything with that

16  information, no investigation was done until she came

17  back from FMLA leave?

18     A.  I didn't do the investigation at that point.

19  Chris Paul was looking into it.

20     Q.  Okay.  And who made the decision that she had

21  actually violated the policy?

22     A.  I did.

23     Q.  Okay.  And we'll mark a copy of the policy as

24  an exhibit to your deposition.  We'll mark it as 1.

25        (Exhibit 1 was marked.)

Nancy Ambrose

September 07, 2016
Pages 22 to 25

Page 22

1    Q.  (BY MS. HARROLD)  Here's a copy of the
2  relative policy.
3    A.  Uh-huh.
4    Q.  I'll give you a chance to review it, or have
5  you already read it?
6    A.  Oh, okay.
7    Q.  And in your opinion, how did Ms. Ellis violate
8  this policy?
9    A.  She both hired and promoted a significant
10  other, and she also failed to disclose that
11  relationship to upper management.
12    Q.  So was the -- so was the violation the hiring,
13  or was the violation not disclosing it?
14    A.  Both.
15    Q.  So you can hire a relative, you just have to
16  disclose it?
17    A.  No, I didn't say that.
18    Q.  Okay.  Well, I'm asking -- I'm asking:  Is
19  hiring a policy violation, or can you hire a relative
20  as long as you disclose it?
21    A.  Disclosure doesn't automatically mean
22  approval.
23    Q.  Uh-huh.
24    A.  So you could disclose it, in other words be
25  above board about your relationship with that potential

Page 23

1  employee, and then the decision about whether or not
2  you can hire them would be made by either the director
3  of operations, probably, the executive director.
4    Q.  When you say that Ms. Ellis violated this
5  policy because she hired a significant other, we're
6  talking about Troi Bryant, right?
7    A.  Correct.
8    Q.  And in your opinion, he's a significant other?
9    A.  Yes.
10    Q.  Okay.  And why do you have that opinion
11  looking at the policy?
12    A.  Well, when we met Artis on October 22nd, we
13  asked her about the relationship with Troi Bryant
14  because we had received that anonymous letter, and I
15  believe Chris had heard from some other staff members
16  in Houston that this was a possibility.
17        And she said that he wasn't the
18  biological father of her daughter, but he did help
19  raise her and he gave his name on school documents and
20  was helpful in raising her child.
21    Q.  Uh-huh.
22    A.  To me, that is significant.
23    Q.  Okay.  But if we kind of look at the
24  definition of what a significant other is, if you can
25  kind of read that definition for me, we want to kind of

Page 24

1  go through it and see if he falls in this category
2  under this definition and then get some explanation on
3  why this was a policy violation.
4        So if you can read that definition of
5  "significant other."
6    A.  "Significant other, for the purpose of this
7  policy, is any other interpersonal relationships
8  between individuals which create a relationship similar
9  to those described in the definition above may be
10  included under the provisions of this policy if one of
11  the parties has influence over the other."
12    Q.  Okay.  And it says:  As a -- create a
13  relationship similar to those described in the
14  definition above and they -- and the definitions above
15  are, a relative, domestic partner, and then also those
16  persons that are engaged to be married.
17        So when you were looking at that
18  relationship between Ms. Ellis and Troi Bryant, they
19  are not related by virtue of blood, adoption, or
20  marriage, are they?
21    A.  No.
22    Q.  And they -- Troi is not her spouse, right?
23    A.  Not that I know of, no.
24    Q.  And Troi is not her child, and Ms. Ellis is
25  not his child, correct?

Page 25

1    A.  Correct.
2    Q.  So under these definitions of "relative," they
3  are not relatives to each other; is that right?
4    A.  Well, they are in a significant other
5  relationship.
6    Q.  And you made that determination?
7    A.  Yes.
8    Q.  Okay.  And the reason that you made the
9  determination that she violated the policy was from
10  this anonymous letter, correct?
11        MS. O'DRISCOLL:  Objection, form.
12    A.  Can you repeat that?
13    Q.  (BY MS. HARROLD)  I said the reason that
14  this -- I'll rephrase it.  Strike that.
15        The reason that this policy violation
16  even came to your attention was from an anonymous
17  letter, correct?
18    A.  That's how we initially heard about it, and
19  then several staff members came to Chris Paul and
20  complained about it.
21    Q.  Okay.  So what was stated in that anonymous
22  letter?
23    A.  I can't remember specifically, but there were
24  complaints about Artis' management and favoritism.
25    Q.  And the letter said that she was showing

Nancy Ambrose

September 07, 2016
Pages 26 to 29

Page 26

1  favoritism to Troi?
2     A.  Uh-huh.  Yes.
3     Q.  And then when you, also, interviewed some
4  employees, they said that she was showing favoritism to
5  Troi?
6     A.  I didn't interview any employees --
7     Q.  Okay.
8     A.  -- about that specific issue.
9     Q.  Do you know if Chris Paul went to go talk to
10  other employees about these claims of favoritism?
11     A.  I believe he did.
12     Q.  Okay.  And did he report back to you about his
13  findings after talking to these employees?
14     A.  I think so.
15     Q.  Okay.  And what can you recall from his
16  findings of talking to other employees?
17     A.  I don't remember the specifics.
18     Q.  Okay.  But all you remember is there were some
19  claims of favoritism?
20     A.  Yes.
21     Q.  Okay.  And you -- were you aware that during
22  this time period, Troi Bryant didn't even work at --
23  didn't even work at ECFMG anymore?
24     A.  Correct.
25     Q.  And when was Troi Bryant's last day at ECFMG?

Page 27

1     A.  I don't remember the exact day.  I think it
2  was at least a year prior.
3     Q.  Okay.  So any claims of favoritism --
4  Ms. Ellis couldn't favor him because he had not worked
5  there in a year, correct?
6           MS. O'DRISCOLL:  Objection, form.
7     A.  I -- I don't understand the question.
8     Q.  (BY MS. HARROLD)  It's difficult to show
9  favoritism to an employee who is no longer an employee,
10  correct?
11     A.  I think the damage had been done.
12     Q.  And what damage is that that had been done?
13     A.  The perception of bias amongst Artis' staff.
14     Q.  So they had a perception that she was biased
15  for an employee that no longer worked there?
16     A.  That she was possibly biased, yes.
17     Q.  To an employee that no longer worked there,
18  correct?
19     A.  Correct.
20     Q.  And no one had ever complained prior to this
21  anonymous letter when she was out on FMLA leave of --
22  of favoritism or perception of bias, correct?
23     A.  I don't remember.
24     Q.  But not -- to your knowledge, this was the
25  first time that when Chris got this anonymous letter --

Page 28

1  I think you testified that when Chris Paul got this
2  anonymous letter was -- was the reason why you started
3  investigating or he started investigating this policy
4  violation, right?
5     A.  Yeah.  Prior to the anonymous letter, we did
6  not know about the relationship with Troi Bryant.
7     Q.  Okay.  And then you said there was another
8  policy violation.  What other policy violation was
9  there?
10     A.  That was the security policy, and that was the
11  sharing of a password.
12     Q.  Okay.  Talk to me about this password.
13  What -- what does this pass -- what's the purpose of
14  the password?
15     A.  The password protects the security of
16  everything in Artis' computer and all of her computer
17  access.
18     Q.  So in order to administer the exam, then they
19  had to have her password?
20     A.  What do you mean by "administer the exam"?
21     Q.  What was the purpose of her subordinate
22  getting her password?
23     A.  I believe Artis gave Sharon Dolberg her
24  password to have Sharon certify the exam when Artis was
25  out on medical leave.

Page 29

1     Q.  Okay.  Was Artis the only person who could
2  certify the exam?
3     A.  Generally, the center manager or the assistant
4  center manager can certify.  I could certify in my
5  position, and Chris Paul as the director could also
6  certify.
7     Q.  Was this the only exam that was administered
8  while Ms. Ellis was out on FMLA leave?
9     A.  No.  Exams proceeded as they were normally
10  scheduled during her leave.
11     Q.  Okay.  But only this one exam, Sharon called
12  Artis for the password and certified that exam?
13     A.  I don't know that Sharon called Artis.  I
14  believe that Artis called Sharon.
15     Q.  Was this the only exam that was
16  certified by Ms. Ellis while she was out on FMLA leave?
17     A.  She did not certify it.  She had Sharon
18  Dolberg certify it.
19     Q.  Okay.  And did you talk to Sharon about how
20  she got Ms. Ellis' password?
21     A.  Yes.
22     Q.  And Sharon said that Ms. Ellis called her and
23  gave the password?
24     A.  And instructed her to certify the exam.
25     Q.  The other exams that were administered while

Page 30

1   Ms. Ellis was out on leave, who certified those exams?
2      A.   I did.
3      Q.   And about how many exams were there?  About
4   how many exams do you think you certified while she was
5   out on leave?
6      A.   We generally had two exams a day, and
7   sometimes we had an evening exam.  I don't know the
8   exact number.  But two to three exams a day.  I'll say
9   that.
10     Q.   Five days a week?
11     A.   And sometimes Saturdays.  Two exams on
12  Saturdays.
13     Q.   And was Sharon aware that you could certify
14  exams?
15     A.   Sharon wouldn't normally know much about
16  certification as it wasn't part of her responsibility
17  or her training.
18          Oh, wait.  She probably would know.  I
19  probably worked with her in the past to certify exams,
20  so I think she would have a general knowledge that I
21  could and would generally certify.
22     Q.   Okay.  So what kind of made this particular
23  exam different?  If you were certifying the other
24  exams, what made this particular exam different where
25  Sharon certified the exam?

Page 31

1      A.   There's nothing different about that exam.
2   There's no reason someone else other than myself should
3   have certified.
4      Q.   And everyone was aware that Ms. Ellis was out
5   on FMLA leave?
6      A.   Correct.
7      Q.   And you had been certifying the exams, so
8   there was really no reason for Sharon to call Ms. Ellis
9   or for Ms. Ellis to call Sharon, correct?
10     A.   Correct.
11          MS. O'DRISCOLL:  Objection, form.
12     Q.   (BY MS. HARROLD)  Were those the only two
13  policy violations that led to Ms. Ellis' termination?
14     A.   There were some other violations.  I don't
15  know if they were -- they were more procedural than
16  policy violations.
17     Q.   Okay.  Let kind of work through the -- the
18  procedural violations.  What was the first procedural
19  violation?
20     A.   Well, as well as I can recall without having
21  the list in front of me, she had -- she was running the
22  exam with short staff, only three proctors instead of
23  four, and only one control room operator instead of
24  two.
25     Q.   Okay.  Let me mark this as Exhibit Number 2.

Page 32

1   Maybe this will help out a little bit.
2          (Exhibit 2 was marked.)
3          MS. HARROLD:  And Exhibit 2 is -- has
4   been previously produced by defense counsel.
5          Just for the record, it's labeled as
6   ECFMG Ellis 007293.  Title of the document is called
7   "Notes.  Artis Ellis meeting with Chris Paul, Nancy
8   Ambrose, and Betty LeHew."
9      Q.   (BY MS. HARROLD)  Where were these notes
10  actually taken?
11     A.   They were taken during the meeting with Artis
12  on October 22nd.
13     Q.   And October 22nd was the day that Ms. Ellis
14  returned from FMLA leave?
15     A.   Correct.
16     Q.   That was her first day back in the office?
17     A.   Correct.
18     Q.   About what time was the meeting?
19     A.   Probably early to midmorning.
20     Q.   Okay.  So pretty much as soon as she got
21  there, you guys called her into a meeting?
22     A.   No.
23     Q.   She was there for one or two hours, and then
24  you called her into this meeting where these notes were
25  taken?

Page 33

1      A.   Approximately.  Probably an hour or so
2   beforehand.
3      Q.   And who actually took the notes?
4      A.   I did.
5      Q.   Okay.  And so you were taking notes as you-all
6   were kind of meeting with her, and then you transcribed
7   them after the meeting?
8      A.   Correct.
9      Q.   Okay.  And so when I see the word "response,"
10  then that is what you believe Ms. Ellis said during the
11  meeting?
12          And then when was a further investigation
13  done?
14     A.   Correct.  The response is what she said in the
15  meeting.  The further investigation took place about --
16  within the week following, week -- week and a half.
17  I'm not sure.
18     Q.   And you had not done any investigation prior
19  to this meeting?
20     A.   No.
21     Q.   Okay.  And we talked about Number 1 and 2,
22  about the personal -- the alleged personal relationship
23  and the password.  Who made the decision to put her --
24  put Ms. Ellis on administrative leave?
25     A.   Chris Paul.

Nancy Ambrose

Page 34

1    Q.   And it's in his discretion to put an employee
2  on administrative leave?
3    A.   Correct.
4    Q.   Did he have to get approval from HR to put her
5  on administrative leave?
6    A.   HR doesn't approve those decisions, but they
7  are consulted.
8    Q.   Okay.  But the final decision had -- is made
9  by him?
10    A.   Yeah.  He may have made it in conjunction with
11  Ann Jobe, I'm not sure.
12    Q.   And is it customary for an employee to stay on
13  administrative leave for two weeks?  Is that usually
14  how long an employee stays on administrative leave?
15    A.   It's hard to say what's customary.  It's very
16  rare that we put anyone on administrative leave.  I
17  think the policy may have a maximum period of two
18  weeks.
19    Q.   Okay.  In your experience, have you -- have
20  you ever seen an employee be put on administrative
21  leave for two weeks?
22    A.   Not that I can recall.
23    Q.   In your experience, have you ever seen an
24  employee be put on administrative leave for violating a
25  policy?

Page 35

1    A.   I can't remember.
2    Q.   And you looked at the corrective action policy
3  on -- yesterday?
4    A.   I think so.
5         (Exhibit 3 was marked.)
6    Q.   (BY MS. HARROLD)  Let's mark this as 3.  And
7  if you look on page 2, second page of the
8  administrative leave, it says, "Administrative leave is
9  used when a supervisor/manager perceives that the
10  employee may cause a potential threat to themselves or
11  others."
12         Is it your understanding that Chris Paul
13  found Ms. Ellis to be a threat to him?
14    A.   No.
15    Q.   So do you know why she was placed on
16  administrative leave if she was not a threat to him or
17  others?
18    A.   I believe she was placed on administrative
19  leave because her management decisions and her
20  dishonesty caused management issues that were
21  detrimental to the Houston center.
22    Q.   Okay.  But Ms. Ellis had only been back at the
23  office for an hour, right?
24    A.   Correct.
25    Q.   Okay.  So management was under the impression

Page 36

1  that things she had done pre-leave that had not been
2  investigated were a potential threat to the center?
3    A.   Correct.
4    Q.   Okay.  And when you say "dishonesty," what do
5  you mean by "dishonesty"?
6    A.   She had lied about her relationship with Troi
7  Bryant.
8    Q.   But at that time, you had not investigated
9  that to know that, correct?  Because the investigation
10  happened after your meeting, so you would not have
11  known that she was dishonest at that time, correct?
12         MS. O'DRISCOLL:  Objection, form;
13  mischaracterizes the evidence.
14    Q.   (BY MS. HARROLD)  It says "further
15  investigation" -- "and upon further investigation,
16  management discovered what her relationship was."
17         But at the time of the meeting on the
18  22nd, you-all did not know what their relationship was;
19  is that correct?
20    A.   Well, she told us at the meeting that they had
21  a significant relationship in that he took care of
22  her -- her daughter, which is an undisclosed
23  significant relationship.
24    Q.   But at that time, you didn't know if that was
25  an honest or a dishonest statement, correct?

Page 37

1    A.   She hadn't disclosed it.
2    Q.   But you said -- okay.  And we'll -- let me
3  just make sure, I don't want to put words in your
4  mouth.  You said part of the reason she was placed on
5  administrative leave was because of her dishonesty?
6    A.   Yes.
7    Q.   But at that time, you did not know if she was
8  being honest or dishonest about her relationship with
9  Troi Bryant.  That didn't happen until further
10  investigation which was a week following, right?
11         MS. O'DRISCOLL:  Objection, form;
12  mischaracterizes evidence.
13    A.   We didn't know that Troi was her daughter's
14  father.  But we did know that she did not disclose that
15  relationship.
16    Q.   (BY MS. HARROLD)  Okay.
17    A.   Which is a policy violation.
18    Q.   And that was enough to impose or perceive her
19  as a threat to justify administrative leave?
20    A.   There was another issue of dishonesty.
21    Q.   Okay.  What is the other issue of dishonesty?
22    A.   It's in the 7293 document.  Item 5 on second
23  page.
24    Q.   If you want to read Number 5 into the record
25  for us.

Nancy Ambrose

September 07, 2016
Pages 38 to 41

Page 38

1    A.  "Artis abandoned the strict policy that
2  required SPs" -- standardized patients -- "to wear
3  bathrobes in all common areas of the building (this is
4  because SP uniforms consist of a hospital gown with an
5  open back and underwear and bra for women).  It was
6  pointed out to Artis that she previously told the
7  assistant director of center operations that she lets
8  SPs wear shorts under their gowns in lieu of robes
9  during the assistant director's visit to the Houston
10  center the week of September 4th."
11    Q.  And in your opinion, her -- Ms. Artis
12  allegedly not making SP -- SPs wear bathrobes is
13  dishonest?
14    A.  No.  Denying that she told me that she had
15  changed that policy.
16    Q.  Okay.  And was Ms. Ellis ever given the
17  opportunity to remedy any of these issues that were
18  brought up to her in this October 22nd meeting?
19    A.  I'm not sure how you remedy dishonesty.
20    Q.  Was she able to ever go back to work and make
21  sure that she made the SPs wear bathrobes?
22    A.  The bathrobes is one issue, but denying that
23  she ever said she changed the policy is the dishonesty.
24    Q.  Did you know at the time that you had this
25  meeting with her that she did, in fact, not adhere to

Page 39

1  the policy, or did that come up in further
2  investigation?
3    A.  I knew at the meeting that she was not
4  following the policy.
5    Q.  And how did you know that she was not
6  following the policy if you did not investigate prior
7  to the meeting?
8      MS. O'DRISCOLL:  Objection, form;
9  mischaracterizes the evidence.  Which issue are you
10  talking about investigating?  Because there's a lot of
11  issues on here.  So I don't know if you're -- are you
12  just talking about number 5 or are you talking about --
13    Q.  (BY MS. HARROLD)  Well, okay.  Let's talk
14  about in general.  You previously testified that you
15  did not do any -- the investigation, when I see
16  "further investigation" under Number 1, "further
17  investigation" under Number 2, Number 3, throughout
18  this document, the further investigation occurred the
19  week following the meeting, not prior to the meeting;
20  is that right?
21      MS. O'DRISCOLL:  I'm going to object to
22  mischaracterizing the evidence.  We can look back on
23  the record, but she said she didn't investigate the
24  relationship policy violation prior to this day that
25  Chris had.  But that -- I don't think she's been asked

Page 40

1  about the other --
2      MS. HARROLD:  I'll ask that.
3      MS. O'DRISCOLL:  Just want to make sure
4  it's clear.
5    Q.  (BY MS. HARROLD)  So in Number 5, when did you
6  investigate about the bathrobes?  Number 5.
7    A.  I'm reading it.  There really wasn't much in
8  the way of investigation.  I mean, the policy was the
9  policy.  And it's in the SP handbook.  She failed to
10  follow the policy, which I knew of.  I didn't have to
11  investigate it.  I knew that before the meeting, but
12  when we brought it up to her in the meeting, she denied
13  she ever told me that she had allowed SPs to wear
14  shorts in lieu of bathrobes.
15    Q.  How did you know that prior to the meeting?
16    A.  How did I know what?
17    Q.  That she was allowing SPs to -- to not wear
18  bathrobes?  How did you know that prior to the meeting?
19    A.  She told me personally.
20    Q.  Okay.  When did she tell you that?
21    A.  The week of September 4th.
22    Q.  And when she told you that on the week of
23  September 4th, what was your response to her?
24    A.  I did not have a response.
25    Q.  You did not tell her that she needed to --

Page 41

1  that there was a strict policy in place and that she
2  needed to adhere to the policy?
3    A.  I didn't get into it at that time.
4    Q.  In your opinion, is violation of this policy
5  grounds for termination?
6    A.  I didn't make the decision to terminate based
7  on a single cause.
8    Q.  Okay.  This was just one of the factors?
9    A.  Correct.
10    Q.  And what is the policy exactly in regards to
11  SPs wearing bathrobes?
12    A.  It's to maintain a professional work
13  environment.  We don't want to accidentally see
14  somebody's naked body, parts of their body.
15    Q.  But the policy does not specifically say they
16  have to wear bathrobes, it just says they have to cover
17  their bodies?
18    A.  Wearing a robe.
19    Q.  September 4th, was that the first time that
20  you had heard that -- for some reason Ms. Artis was --
21  Ms. Ellis was not making SPs wear bathrobes?
22    A.  Yes.
23      MS. HARROLD:  We'll go off the record for
24  about five minutes.  Take a small break.
25      (A break was taken from 2:58 p.m. to

Nancy Ambrose

Page 42

1    3:14 p.m.)

2        Q.   (BY MS. HARROLD)  Okay.  We're back on the

3    record.

4            Ms. Ambrose, you understand you're still

5    under oath?

6        A.   I do.

7        Q.   What's the minimum number of proctors that

8    have to be present when an exam is administered?

9        A.   Depends on the type of exam.

10       Q.   Is there a policy for it that kind of lays out

11   the number of proctors?

12       A.   Yeah.  The proctor manual lays out how many

13   proctors and what the responsibility is for each

14   proctor.

15       Q.   And what's the minimum number?  Let's kind of

16   walk through the exams and give me the minimum number

17   of proctors that have to be present.

18       A.   During a daytime exam where we're running two

19   sessions concurrently, it's 24 examinees.  We need four

20   proctors on duty.

21       Q.   That's the minimum you can have, but sometimes

22   you can have more?

23       A.   We don't usually have more.

24       Q.   Do you ever have less?

25       A.   It's not advisable.

Page 43

1        Q.   And in the manual, it will say four proctors

2    for the daytime exam?

3        A.   Correct.

4        Q.   Okay.

5        A.   And for PM exam, which is a single session, of

6    12 examinees, you generally have three proctors.

7        Q.   What is the three-man rotation?

8        A.   I don't recall.

9        Q.   Is that something that's used with proctors?

10       A.   It could be.

11       Q.   What about control room operators during the

12   exam?  How many do you have to have?

13       A.   It's generally two control room operators for

14   the exam.

15       Q.   Is that the minimum amount?

16       A.   Correct.

17       Q.   Under the policy?  Under the manual?

18       A.   Under the -- yeah.  The procedures in the

19   manual.

20       Q.   And is that for AM and PM?

21       A.   I can't really remember the PM.  I think it's

22   two for either session.  Yeah, I think so.

23       Q.   When you were certifying exams, did you ever

24   do -- have a daytime exam with only three proctors?

25       A.   Certifying the exam doesn't have anything to

Page 44

1    do with the staffing of the exam.

2        Q.   Who deals with the staffing?  Like when

3    Ms. Ellis was out on -- on leave, who was dealing with

4    the staffing for the exam?

5        A.   Normally, the assistant center manager would

6    handle the staffing.

7        Q.   Okay.  So in this case, it would have been

8    who?

9        A.   Well, Brent Biggs was the assistant center

10   manager, but he left sometime in August.

11       Q.   August of 2012?

12       A.   Yes.

13       Q.   And then who took his place?

14       A.   We had that position open until --

15   probably until November or December.

16       Q.   Okay.  But there were exams going on during

17   that time when Ms. Ellis was out on leave, so who was

18   dealing with that staffing while there was nobody in

19   Brent's position?

20       A.   Chris Paul and I took turns flying down to

21   Houston to check on it.  I don't know who exactly was

22   scheduling the staff at that point.

23       Q.   So was no one actually present in Houston to

24   make sure that the staffing was appropriate or the exam

25   was administered properly while Ms. Ellis was out on

Page 45

1    leave?

2        A.   The entire staff was still there.

3        Q.   Okay.  But who was actually in charge, like,

4    on the ground making sure that everything was happening

5    properly?

6        A.   At what point?

7        Q.   When Ms. Ellis was out on FMLA leave, so from

8    September to October 22nd.

9        A.   We took turns.  I think either Chris Paul or

10   myself was down in Houston, and several of the other

11   center managers were flown in for a period of a week to

12   two weeks each and they just rotated through to help

13   out.

14       Q.   Okay.  Who were the other center managers?

15       A.   Sandy Pullen.

16       Q.   Can you spell her last name?

17       A.   P-U-L-L-E-N.

18       Q.   Uh-huh.

19       A.   Elizabeth Denton, D-E-N-T-O-N.

20       Q.   And Ms. Denton, where did she usually work?

21       A.   At that time, she was stationed in the

22   Philadelphia center.

23       Q.   And what about Ms. Pullen?

24       A.   From the Atlanta center.

25       Q.   Okay.  And are the exams and staffing --

Nancy Ambrose

September 07, 2016
Pages 46 to 49

Page 46

1    A.   There were more managers that came.  Did you
2  want all the names?
3    Q.   Yes.  Thank you.
4    A.   Valerie McCluskey.
5    Q.   Spell the last name for me.
6    A.   M-C-C-L-U-S-K-E-Y.  McCluskey from Chicago.
7  Peter O'Colmain, O'-C-O-L-M-A-I-N, from the LA center.
8  Also Ron Linka, L-I-N-K-A, from the Chicago center.
9    Q.   And are the exams staffed and certified the
10 exact same way in each office?  So if I went to
11 Atlanta, would the exam be administered and certified
12 the same way as it is in Houston?
13   A.   Very, very similar.  As similar as possible.
14   Q.   Okay.  Do any of these center managers still
15 work for ECFMG?
16   A.   Yes.  Oh, wait.  Sandy Pullen left I think
17 within the last year or so.
18   Q.   Okay.
19   A.   Elizabeth Denton still works there.  She's now
20 the director of center operations.  Valerie McCluskey
21 is still in her position at Chicago, center manager.
22 Ron Linka has retired from assistant manager of
23 Chicago.  And Peter O'Colmain left the company.
24   Q.   Okay.  So only Elizabeth and Valerie are left?
25   A.   Yes.

Page 47

1    Q.   Ms. Ambrose, when -- when you-all were in this
2  meeting with Ms. Ellis kind of going through these
3  Houston issues and then placed her on administrative
4  leave, did you-all ever consider coaching or taking any
5  action to correct these issues prior to termination?
6    A.   I want to clarify that it was Chris Paul's
7  decision to put her on administrative leave.
8    Q.   Okay.
9    A.   And that was made after that meeting the
10 following day.
11   Q.   Okay.
12   A.   After Betty LeHew had a phone call
13 conversation with Artis.
14   Q.   Okay.
15        MS. HARROLD:  I want to object as
16 nonresponsive.
17   Q.   (BY MS. HARROLD)  My question is:  Did you-all
18 ever consider coaching -- coaching Ms. Ellis or doing
19 any kind of -- or giving her time to correct any of
20 these issues that were addressed in the October 22nd
21 meeting?
22   A.   I can't speak for Chris Paul.  I did not.
23 Upon my investigation, I found enough issues to make a
24 decision.  I didn't feel that coaching would remedy the
25 problems.

Page 48

1    Q.   Okay.  And if we kind of look at the
2  corrective action policy, usually in the case of -- do
3  you have a copy of the corrective action policy?
4    A.   Yes.
5    Q.   When we look at the instance of termination of
6  employment, I think that's page 2 of 5.  It says:  A
7  termination of employment is a consequence for not
8  meeting the expectation of -- in formal corrective
9  action process.  Termination occurs when an employee
10 has failed to correct a problem or situations -- or
11 situations despite receipt of written warning and/or
12 final written warning.
13        So in Ms. Ellis' case, did she fail to
14 correct a problem or a situation?
15        MS. O'DRISCOLL:  I'm going to object to
16 the extent that the full provision hasn't been read
17 into the record.
18   Q.   (BY MS. HARROLD)  "In addition to the
19 foregoing, termination may occur immediately without
20 prior corrective action depending on the nature,
21 frequency, and severity of the violation.  Termination
22 decisions must be reviewed with human resources before
23 they" -- "they take effect."
24        Did I read the entirety of the provision,
25 Ms. Ambrose?

Page 49

1    A.   Yes, for the termination of employment.
2    Q.   Okay.  And so was it ever a consideration for
3  Ms. Ellis to have the opportunity to correct any of
4  these problems?
5    A.   No.  I felt they were severe enough to warrant
6  termination.
7    Q.   Okay.  And you believe that her not disclosing
8  the identity of Troi Bryant was severe enough for her
9  to warrant termination?
10   A.   As I mentioned before, I didn't make the
11 decision based on a single issue.  It was the -- the --
12 the entirety of the list of complaints that we had
13 received.
14   Q.   Okay.
15        (Telephone interruption.)
16        THE WITNESS:  Do we need to get that?
17        (A break was taken.)
18        MS. O'DRISCOLL:  Do you want to read back
19 that last question?  I apologize for the -- is
20 everything okay?
21        MS. HARROLD:  No, everything is fine.
22   Q.   (BY MS. HARROLD)  And you said Chris Paul made
23 the decision to put Ms. Ellis on administrative leave?
24   A.   Correct.
25   Q.   Okay.  And to your knowledge, you nor Betty

Nancy Ambrose

Page 50

1  LeHew had any say in that decision to put Ms. Ellis on
2  administrative leave?
3      A.  I believe we agreed with it, but Betty
4  doesn't -- as HR, she doesn't approve.  She's
5  consulted.
6      Q.  Okay.  In the meeting on October -- no, I'm
7  sorry.  When Ms. Ellis was terminated, kind of walk me
8  through what happened.  She was out on administrative
9  leave, and then did someone call her and let her know
10  she was terminated?
11      A.  No.  Betty LeHew and I flew down to Houston
12  and met with Artis.
13      Q.  Okay.  What day was that?
14      A.  That was -- I believe it was November 2nd.
15  I'm not sure on the dates.
16      Q.  Okay.  And so basically when Ms. Ellis
17  returned from FMLA leave, she went into a meeting and
18  then was placed on administrative leave; is that
19  correct?
20      A.  The following day.
21      Q.  The following day.
22      A.  Administrative leave.
23      Q.  Uh-huh.  And then she never returned back from
24  the office from administrative leave.  You and Betty
25  met with Ms. Ellis and terminated her employment,

Page 51

1  correct?
2      A.  I terminated it, correct.
3      Q.  Okay.  You terminated her employment.  What
4  role did Ms. LeHew play in that, she just wanted to
5  attend the meeting?
6      A.  Her role was human resources.
7      Q.  Just to be there to attend because she had no
8  decision-making power in that decision, right?
9      A.  She was consulted in it.  She reviewed the
10  decision.  It was approved by Ann Jobe.
11      Q.  And so Ms. Ellis was terminated for cause; is
12  that correct?
13      A.  Correct.
14      Q.  Okay.  And is it customary for employees who
15  are terminated for cause to be offered separation
16  agreements?
17      A.  I -- I couldn't say.  I haven't dealt with
18  enough to say what's customary.
19      Q.  Okay.  And who made the decision to offer
20  Ms. Ellis a separation agreement?
21      A.  I don't know.
22      Q.  You just made the termination decision,
23  correct?
24      A.  Correct.
25      Q.  After Ms. Ellis' termination, did you tell the

Page 52

1  staff that Ms. Ellis left kind of on her own will to
2  take care of her health?
3      A.  Yeah.  We asked Artis during the termination
4  if she would prefer us to tell the staff that as a
5  courtesy.
6      Q.  Uh-huh.
7      A.  And she said yes.
8      Q.  But that wasn't honest, right?
9          MS. O'DRISCOLL:  Objection, form.
10      Q.  (BY MS. HARROLD)  That wasn't an honest
11  statement, right?  Because she was really terminated
12  for cause, right?
13      A.  What was the statement again?
14      Q.  That when you told the staff -- when
15  management told the staff that Ms. Ellis left to take
16  care of her health, that wasn't a true statement,
17  right?
18      A.  It wasn't the complete statement, but I don't
19  feel her staff have a right to know what -- her private
20  business with her termination.
21      Q.  Okay.
22      A.  We were being discreet as a courtesy to her.
23      Q.  But it was still dishonest, correct?
24      A.  I don't agree with that, no.
25      Q.  Okay.  It wasn't true, right?

Page 53

1      A.  I don't agree with that.
2      Q.  Was it a true statement that she left because
3  of her health?
4      A.  She can take care of her health.
5      Q.  But she was terminated for cause, right?
6      A.  But we don't tell her staff all the details of
7  her termination.
8      Q.  Okay.
9          MS. HARROLD:  We'll pass the witness.
10          MS. O'DRISCOLL:  Take a quick break.
11          MS. HARROLD:  Sure.
12          (A break was taken from 3:29 p.m. to
13  3:47 p.m.)
14          MS. O'DRISCOLL:  Okay.  We're back on the
15  record after a brief break.
16              EXAMINATION
17  BY MS. O'DRISCOLL:
18      Q.  Ms. Ambrose -- this is Erin O'Driscoll -- I
19  just had a couple of follow-up questions.
20          After that time that you-all -- that day
21  when you met with Ms. Ellis on October 22nd, did she
22  work out the rest of that day?
23      A.  No.  She left immediately after that meeting.
24      Q.  Okay.
25      A.  She may have talked to Betty briefly

Nancy Ambrose

September 07, 2016
Pages 54 to 57

Page 54

1  afterwards, but I wasn't present for that.
2      Q.  Okay.  So to your knowledge, did she go home
3  from work right that day?
4      A.  Yes.  She didn't stay in the office.  She
5  didn't do any more work that day.
6      Q.  Okay.  And I know you testified earlier that
7  Mr. Paul had spoken with employees about the concerns
8  about favoritism and hiring of relatives by Ms. Ellis.
9          Did you receive any complaints from
10 employees at all about favoritism?
11     A.  Yeah.  When I was at the center, I had, I
12 think, at least one person come to me and make some
13 complaints.
14     Q.  And do you remember what that person's name
15 was?
16     A.  It was an SP, standardized patient.  I think
17 his name is Gary Dempsey.
18     Q.  And what did he complain about?
19     A.  He complained about Artis' management,
20 comments about being told not to talk to people from
21 Philadelphia.  Favoritism from -- to some of the staff
22 over some of the other staff.
23     Q.  Okay.
24         MS. O'DRISCOLL:  Okay.  I'll pass the
25 witness.

Page 55

1
2              EXAMINATION
3  BY MS. HARROLD:
4      Q.  Just to be clear, when did Gary make these
5  complaints to you?
6      A.  It was during Artis' leave when I was at the
7  Houston center helping manage the -- the operations.
8      Q.  Okay.  And -- and was Ms. Ellis ever told
9  about these complaints of favoritism?
10     A.  I can't remember if they were specifically
11 dealt with or not.
12     Q.  And Gary was complaining that Ms. Ellis was
13 showing favoritism to Troi?
14     A.  Not Troi specifically.  I think some -- I
15 can't remember other members of the staff.
16     Q.  And, again, Ms. Ellis -- was Ms. Ellis ever
17 told of Gary's complaints?
18     A.  No.
19         MS. HARROLD:  No further questions.  Pass
20 the witness.
21             EXAMINATION
22 BY MS. O'DRISCOLL:
23     Q.  Just a followup to that question.
24         Ms. Ambrose, Gary's complaint about
25 favoritism, was that -- do you know if those complaints

Page 56

1  that were reported to you from Gary, were those -- did
2  you report that to Chris Paul?
3      A.  Probably.
4      Q.  Did -- was -- was Gary's complaints about
5  favoritism similar to complaints that other employees
6  were making as well?
7      A.  Yeah.  I know a number of employees had come
8  to Chris and complained about Artis.
9      Q.  And did Chris tell you that?
10     A.  Yes.
11     Q.  And -- and during -- and you mentioned earlier
12 that there was an anonymous letter that you believe
13 Chris had received?
14     A.  Yes.
15     Q.  And that there was mention in the anonymous
16 letter about favoritism, hiring of relatives?
17     A.  Correct.
18     Q.  And do you consider this issue leading up to
19 finding out about Troi all part of the -- the issue of
20 favoritism and hiring of relatives and that all being
21 joined together as one issue?
22     A.  Yes.  The whole point of not hiring relatives
23 is to avoid the perception of bias and avoid the
24 perception of -- of favoritism.
25     Q.  And this was a complaint that was repeatedly

Page 57

1  voiced by a number of employees?
2      A.  Several employees mentioned the possible
3  relationship with Troi and also favoritism amongst
4  other members of the staff.
5          MS. O'DRISCOLL:  I'll pass the witness.
6              EXAMINATION
7  BY MS. HARROLD:
8      Q.  And when all these complaints were made, Troi
9  was no longer working there, correct?
10     A.  Correct.
11     Q.  And he had not worked there for a year; is
12 that right?
13     A.  Correct.
14     Q.  Okay.  And then you said the reason that
15 family members are not hired is to avoid the perception
16 of bias; is that right?
17     A.  And conflict of interest.
18     Q.  And conflict of interest.  Okay.  Were you
19 aware that Ms. LeHew's stepdaughter works for ECFMG?
20     A.  I wasn't at the time, but I am now.
21     Q.  Okay.  And that she also worked in the human
22 resources department?
23     A.  Correct.
24     Q.  Do you see that as some -- an employee could
25 have a perception of bias about that hiring and that

Nancy Ambrose

September 07, 2016
Pages 58 to 61

---

Page 58

1 relationship?

2    A.  That's a very different relationship.  It was

3 disclosed.  It was never done in secret.  It was not

4 lied about.  In fact, I think it was suggested to Betty

5 that she hire someone outside of the company to work

6 with sensitive information, that that would be the best

7 to deal with secure and confidential information.

8    Q.  How do you know it wasn't lied about if you

9 said you just found out about it?

10    A.  I didn't say I just find out about it.  I said

11 I've learned of it since.

12    Q.  Since what?

13    A.  Since the investigation with Artis.

14    Q.  Okay.  And so you don't know if it was lied

15 about or not, or who Ms. LeHew disclosed that to, do

16 you?

17    A.  I do.  I know that she talked to Dennis

18 Donohue about it.

19    Q.  Okay.  And you know that from investigating

20 Ms. Ellis in 2015?

21    A.  I -- no, I didn't.  I wasn't investigating

22 Betty LeHew --

23    Q.  Uh-huh.

24    A.  -- in two thousand --

25    Q.  When did you find out about Ms. LeHew's

---

Page 59

1 stepdaughter working at ECFMG?

2    A.  It came up when we had a phone call with Artis

3 Ellis.  I believe it was the EEOC phone call --

4    Q.  Okay.

5    A.  -- and Artis mentioned it.

6    Q.  Okay.

7        MS. HARROLD:  No further questions.

8        MS. O'DRISCOLL:  Defendant will save

9 questions for trial.

10        (The deposition concluded at 3:54 p.m.)

11

12

13        -- SIGNATURE REQUIRED --

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 60

1 CHANGES AND SIGNATURE

2 WITNESS NAME: NANCY AMBROSE

3 DATE OF DEPOSITION: SEPTEMBER 7, 2016

4 PAGE     LINE     CHANGE                 REASON

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

---

Page 61

1    I, NANCY AMBROSE, have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted above.

4

                    NANCY AMBROSE

5

6 THE STATE OF _____)

7 COUNTY OF _____)

8    Before me, _____, on this day

9 personally appeared NANCY AMBROSE, known to me (or

10 proved to me under oath or through

11 _____) (description of identity

12 card or other document) to be the person whose name is

13 subscribed to the foregoing instrument and acknowledged

14 to me that they executed the same for the purposes and

15 consideration therein expressed.

16    Given under my hand and seal of office this

17 _____ day of _____, _____.

18

19 _____

                NOTARY PUBLIC IN AND FOR

20                THE STATE OF _____

21 My commission expires: _____

22

23 ___ No Changes Made ___ Amendment Sheet(s) Attached,

24 Artis Ellis vs. Educational Commission for Foreign

25 Medical Graduates.

---

Nancy Ambrose

September 07, 2016
Pages 62 to 64

Page 62

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION
 3    ARTIS ELLIS                    )
                                     )
 4           PLAINTIFF,              )
                                     )
 5    VS.                            ) C.A. NO. 4:14-cv-02126
                                     )
 6    EDUCATIONAL COMMISSION         )
      FOR FOREIGN MEDICAL            )
 7    GRADUATES                      )
                                     )
 8           DEFENDANT.              )
 9
              REPORTER'S CERTIFICATION OF THE ORAL
10              DEPOSITION OF NANCY AMBROSE
                    SEPTEMBER 7, 2016
11
12        I, Michelle K. Miller, Certified Shorthand Reporter
13    in and for the State of Texas, hereby certify to the
14    following:
15        That the witness, NANCY AMBROSE, was duly sworn by
16    the officer and that the transcript of the oral
17    deposition is a true record of the testimony given by
18    the witness;
19        That the original deposition was delivered to
20    Ms. Keenya Harrold.
21        That a copy of this certificate was served on all
22    parties and/or the witness shown herein on _____.
23        I further certify that pursuant to FRCP Rule
24    30(f)(1) that the signature of the deponent was
25    requested by the deponent or a party before the
```

Page 63

```
 1    completion of the deposition and that the signature is
 2    to be before any notary public and returned within 30
 3    days from date of receipt of the transcript.
 4        I further certify that I am neither counsel for,
 5    related to, nor employed by any of the parties or
 6    attorneys in the action in which this proceeding was
 7    taken, and further that I am not financially or
 8    otherwise interested in the outcome of the action.
 9        Certified to by me on this, the 12th day of
10    September, 2016.
11
12
13
14
15    Michelle K. Miller, CSR, RPR
      Texas CSR No. 9312
      Expiration Date:  12/31/16
16
      Kim Tindall & Associates, LLC
17    Firm Registration No. 631
      16414 San Pedro, Suite 900
18    San Antonio, Texas 78232
      Tel: 210-697-3400/Fax: 210-697-3408
19
20
21
22
23
24
25
```

Page 64

```
 1    THE STATE OF _____)
 2    COUNTY OF _____)
 3
 4        I hereby certify that the witness was notified on
 5    _____ that the witness has 30 days, or
 6    (____ days per agreement of counsel) after being
 7    notified by the officer that the transcript is
 8    available for review by the witness and if there are
 9    changes in the form or substance to be made, then the
10    witness shall sign a statement reciting such changes
11    and the reasons given by the witness for making them;
12        That the witness' signature ___ was / ___ was not
13    returned as of _____, 2016.
14        Subscribed and sworn to by me on this, the ___ day
15    of _____, 2016.
16
17
18
19
      _____
20    Michelle K. Miller, CSR, RPR
      Texas CSR No. 9312
      Expiration Date:  12/31/16
21
22    Kim Tindall & Associates, LLC
      Firm Registration No. 631
23    16414 San Pedro, Suite 900
      San Antonio, Texas 78232
24    Tel: 210-697-3400/Fax: 210-697-3408
25
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                   210-697-3408

· NDU-05-2012 14:28 From:   7134357509
3

**ECFMG**

| | | |
|---|---|---|
| t::l)Uc,\ TJON,l,L c.::OMMJ-SION I"OR FORR(i:ll M!!:OICAT. GRAD[JATES | S1.IIUt;CF: t;MPLOYll1~:"T 01' ~EL,t.TIV(:S & RF.T.i,. TIO[\SHIPS I~ T!lE WORKP!.ACE I)et'\RTMENT: HUMAN RESOURCES | POLICY xo. HR·305 |
| POLloy AND I'~OCEDlJRES MANUAL | I)ISTR.mI)TI()~: JLI., DEPARTMENTS | |

| EFFECTIVE DATE: 11/05/09 | Page 1 of 2 |
|---|---|

## I. POLICY

It is the policy of ECFMG to regulate the working and reporting relationships of individuals who are related by blood, adoption, marriage, or domestic partnership, affianced or significant other in order to avoid real or perceived conflicts of interest, influence, or favoritism.

## II. DEFINITION

<u>Employee</u>, for the purpose of this policy, is any staff member who is compensated tl'frough the ECFMG«> payroll, independent contractors, agency contractors and/or agency temporary staff.

<u>Relative</u> is defined as any of the following including those by virtue of by blood, adoption, marriage, or remarriage, or domestic partnership (significant other or affianced): spouse, children, grandchildren, parents, grandparents, siblings, uncles, aunts, nephews, nieces and cousins.

<u>Domestic Partner</u>, for the purpose of this policy is two people of either gender who are living together and involved in a personal, intimate, committed relationship

<u>Affianced</u> is defined as engaged to be married

<u>Significant Other</u> for the purpose of this policy is any other inter-personal relationships between individuals which create a relationship similar to those described in the definition above may be included under the provisions of this policy if one of the parties has influence over the other.

## III. ELIGIBILITY

ThiS policy applies to all employees, independent contractors, agency contractors, agency temporary staff and interns.

## IV. GUIDELINES

ECFMG will not hire or employ anyone in a reporting relationship with the following relation to an existing full-time or part-time employee: spouse, parent, child or sibling, including step or adoptive relationships, grandparent or grandchild, or in-jaws to the same degree,

ECFMG will not hire or employ anyone on a full or part time basis in the same department with a supervisory relationship to an existing full-time or part-time employee.

## V. PROCEDURES

A. ECFMG will not allow relatives to be placed or promoted into supervisor/suecrdinate reporting relationships.



EXHIBIT
/
Ambrose
PENGAD 800-631-6989

ELLIS - 000246

. NDV-A5-2012 14:28 From:   ('134357509

POUCY: rMP)_OYEE LIAVE:: Or ABSENCE
?~ga2-.-1r-2

D.  ECFMG will not allow relatives to be placed or promoted into supervisor/subordinate reporting relationships. No present employee may participate in or affect any recruitment or selection procedure or other action concerning the potential employment of any person to whom he is related.

E.  In the case where two employees marry, continuing employment is available for both spouses, providing they are not in a reporting relationship. If both members of a newly married couple work in a reporting relationship, one will have to transfer to a position that is not in the direct supervisory line with the other employee, if one is available, or end their employment with ECFMG. The decision as to who remains shall be made based on first, the agreement of the two employees and secondly, seniority.

.  An Employee who fails to disclose the knowledge Of a relative relationship with anott1er employee may be grounds for termination of employment An Employee who *ails to disclose the knowledge of any type of personal relationship with another employee in the lines of reporting may be grounds for termination of employment

E   Department Managers have the discretion to determine whether employees who are invol v ed in one of the relationships described above will be permitted to work in the same department

F.  ECFMG<III will make every effort to relocate existing full-time employees with relatives in the same department, if a reporting relationship is created, if a position is available.

G.  ECFMG~ will make every effort to relocate existinIII employees who disclose a new relationship within the lines of reporting, if a position is available.

Responsibility for Policy: Policy Coordinator

Approved by Senior Staff _____ _      *11/05/02* _____ _
                                             Date

Approved by -=- _____ _
              tmmfinncl C. Cassimatis, M.D., President                    Date

ELLIS - 000247

<u>NOTES</u>

<u>Artis Ellis meeting with Chris Paul, Nancy Ambrose and Betty LeHew</u>

The following list of issues (in boldface) was presented to Artis Ellis on October 22, 2012. The comments below in italics include her response and any further investigation completed after hearing her response.

1. **It has been discovered that Artis may have had a personal relationship with a former employee, Troi A Bryant, (who is reportedly the father of her daughter, Brittany). This employee was hired and subsequently promoted as a direct report to Artis. It is a violation of ECFMG policy to employ relatives or close, personal relations in the line of supervision. We are not aware that Artis disclosed her personal relationship this employee to her supervisor or HR.**

   *Response:  Artis denied that the former employee she hired and promoted, Troi Bryant, was her daughter's biological father. Artis said that he was a close family friend, someone that she and her family had known for over 30 years, who just took responsibility to act as her father because Artis became pregnant at young age.  She was asked how Brittany had the same last name as him and Artis said that he just put his name on the school papers.  She was asked whether he adopted her and Artis said, no he was not part of her life, he just stepped up to help me raise her and acted as her father.*

   *Further Investigation: When Artis was put on paid Administrative Leave pending investigation, she was asked to turn her company cell phone in.  Her cell phone has a text message between Brittany and Artis dated the day before the meeting where she was asked about her relationship with Troi, in that message Artis says that she "Googled Troi and you and me come up".  Brittany responded, "I told you so".  Artis responded, "Don't worry the devil gave me a plan."  Brittany discouraged her and hoped she "wouldn't have to go there".  The following day on the phone with the AVP of HR, Artis admitted that she lied about Troi being her daughter's father because her conscious needed to "come clean" and that she did not disclose this to anyone. These two pieces of information lead us to believe that Artis knew in advanced that she was going to be asked about the relationship and was not surprised by the question but pre-planned the lie she intended to use.  She knew she was wrong because she said that her conscience bothered her about it.  Also, whichever story was the truth, there was definitely a deception on her part about the relationship with a person she hired and subsequently promoted.*

2. **Exam session of Thursday 9-13 was certified with Artis' password while Artis was out on FMLA leave and did not have access to her computer.  It is a violation of policy to have an exam session certified by anyone other than center management or above.  It is also a violation of policy to given login/password anyone, thus allowing that staff person access to confidential information.**

   *Response: Artis admitted to giving her password to Sharon Dalberg, a non-management employee, and asking Sharon to sign off the exam on 9/13/2012, while Artis was on leave of absence.  Artis admitted that she knew it was a secure password and she did this without anyone's permission.  This is a violation of security policy.*

   *Further Investigation: The CSEC Data Security Policy (effective date 6/1/2007) posted on the common drive since 2007, specifically states that:*



EXHIBIT
2
Ambrose

ECFMG-ELLIS007293

"Each manager, assistant manager and trainer shall adhere to ECFMG's current password security policy and shall not share or communicate their password with any other person."

*This policy is referenced in the Security Manual which all CSEC Staff is required to be familiar with and is reminded of at least 2-4 times a year when manuals are updated. Also, Sharon Dalberg was questions about this and she admitted that yes, Artis gave her her password and asked her to sign off the exam. Sharon asked if she was wrong in doing so and we told her that although it is a management responsibility to sign off the exam, it was not her fault, she was simply following instructions of her manager. This verified for us that not only did Artis give away her secure password; she compromised the integrity of a high stakes exam by allowing an hourly employee to sign off on the exam.*

3. It has been discovered that the exam had been short scheduled of staff, which is risking the integrity and validity of the exam. It is the manager's responsibility to appropriately schedule the exam. There were also days when people were scheduled to work when there was no exam, thus wasting payroll dollars and possibly allowing preferential treatment and extra hours/pay to some employees, again the responsibility of the Center Manager.

*Response: Artis said that she did not believe she shorted the exam or allowed people to work when not scheduled. She said this would have to be looked into further.*

*Further Investigation: Upon researching into time keeping and payroll records, it was discovered that during the months of August and September 2012 staff schedules shows: 8/3 AM, 8/7 AM, 9/8 AM, 9/15 AM, 9/18 AM, 9/25 shifts staffed with 3 proctors instead of the required 4. On 8/7 PM, 8/21 PM, 8/28 PM, 9/11 PM, 9/18 PM, 9/25 PM, the shifts were staffed with 1 control room operator rather than the required 2. It was also discovered that staff had been scheduled to work a shift on 9/25 PM, when there actually was no exam scheduled.*

4. Artis did not follow policy when removing SP's from the exam in terms of paying them. Artis, after pulling people, forced them to "clock out" and leave which is against company policy of paying SPs for the day when they are pulled from the exam at no fault of their own. By not following this policy, it negatively impacted the morale at the Center.

*Response: Artis stated that she thought she had properly followed the policy*

*Further Investigation: Upon researching into the time keeping and payroll records for the past 2 years it was discovered that Artis had violated the policy and employees had unfairly been shorted by a total of $6,000 in pay that needed to be paid to those affected.*

5. Artis abandoned the strict policy that required SP's to wear bathrobes in all common areas of the building (this is because SP uniforms are consist of a hospital gown with open back and underwear and bra for women). It was pointed out to Artis that she had previously told the Assistant Director of Center Operations that she let SPs wear shorts under their gowns in lieu of robes during the Asst. Director's visit to the Houston Center the week of September 4th.

*Response: Artis denied ever saying this and stated that a discussion had been covered in an Assistant Center Manager meeting where it was approved to where shorts in place of a bathrobe. (Thus leaving left the employee's back bare).*

ECFMG-ELLIS007294

*Further Investigation:*  As the Center Manager, Artis' job was to enforce policies by the employees reporting to her.  The handbook policies and the SP Handbook clearly state the following:

"You must exhibit modesty in your habits whether resting or exercising and prevent exposure by wearing a robe while in the hallways and common areas.  You are always visible in the exam room, even between encounters."

The Assistant Director also checked the all the Center management meeting minutes from 2011 to present and also the Assistant Center Manager meeting minutes from 2008 to present and found no reference to any discussions about changing the robe policy. Neither the Director or Assistant Director nor any other Center Manager had any recollection of discussion to change the bathrobe policy thus leading to the belief that it was not discussed nor changed.

6.  **Artis changed the policy requiring SP's to return to their exam room within two minutes of the next encounter to three minutes, without discussion or authorization.**

*Response:*  Artis stated that this change was discussed in an Assistant Center Manager meeting at the start of this year or late last year.

*Further Investigation:* The Assistant Director checked the Center Management meeting minutes from 2011 to present and also the Assistant Center Manager meeting minutes from 2008 to present and found no reference to any discussions about changing the two-minute warning procedure. Neither the Director or Assistant Director nor any other Center Manager had any recollection of discussion to change the two-minute rule, thus leading to the belief that it was not discussed nor changed.

7.  **Artis violated policy by having 5 years of paper checklists stored at the center. These are to be kept for no longer than 90 days. Along with other confidential exam materials that should have been destroyed were kept in a supply cabinet.**

*Response from Artis over the phone with B. LeHew on 10/23/2012:* Artis did not respond to this issue.

*Further Investigation:* According to the Security Manual, it is our policy that paper checklists should be scanned in and stored electronically for the USMLE and then shredded after 4 months. This was never done in the Houston Center and the checklists (which are considered secure, confidential exam materials) are backlogged for a number of years in Houston.

8.  **Because SP employees are not permitted to leave the Center and are paid for all breaks and lunch periods, it is CSEC policy to supply basic refreshment needs in addition to coffee such as tea, dish soap, cups and other items to SP's. Many SP's came and complained to the Director and other managers filling in during Artis' leave that they no longer had these provided and that Artis had required the SP's to buy/bring their own supplies.**

*Response from Artis over the phone with B. LeHew on 10/23/2012:* Artis did not respond to this issue.

*Further Investigation:* According to several SP's there were many items that Artis them told would no longer be provided to them. This was confirmed by the Facilities/Office Coordinator (FOC) as well as several SP Trainers. This is something the company has always paid for and Artis had no reason to discontinue that contributed to the low morale among the SP staff in Houston under Artis' leadership.

ECFMG-ELLIS007295

9. A special exam, scheduled in May of 2011, which was supposed to happen on Monday 9-17 was not communicated to staff by Artis nor was the center set up for the exam.

*Response from Artis over the phone with B. LeHew on 10/23/2012:* Artis said she was out that day and said that Charisse made a mistake and that there are emails to support this.

*Further Investigation:* In May of 2011, a notification for a special accommodation exam, scheduled for 9-17, was sent to the Center Manager and Assistant Center Manager. There were no preparations made for this special exam as evidenced by a conversation with the SP Operations Specialist (SPOS) during the week of 9-10. The Assistant Director and an Assistant Center Manager from a different center, working in collaboration with the SPOS were able to pull the special accommodations together and ensure the exam occurred. This is the ultimate responsibility of the Center Manager and could have created a liability for the organization had other managers not reacted to ensure the special exam occurred.

10. It was reported that Artis threw away SP's personal belongings such as food, dishes and clothing without notifying SP's, thus contributing further to the low morale among Houston staff.

*Response from Artis over the phone with B. LeHew on 10/23/2012:* Artis claimed that she did not throw anything out, she had been purchasing mugs that said "CSEC Houston" for the staff but when the CFO asked managers to watch spending, she stopped giving them out and asked staff to bring their own cups with lids.

*Further Investigation:* According to several SP's there were many personal items that were thrown away by the Artis without any prior knowledge or warning. This was confirmed by the FOC as well as several SP Trainers.

11. Artis would constantly threaten her team by saying "maybe this is not the right job for you" in a style that left feeling that their job was on the line.  No coaching or counseling was provided to the individuals who felt threatened.

*Response from Artis over the phone with B. LeHew on 10/23/2012:* Artis did not respond to this.

*Further Investigation:* no further investigation.

12. The physical condition of the building was unacceptable; server room had piles of "junk" in the corner. Ceiling tiles were mis-colored from issues that had happened months ago, there were boxes and boxes of things put in closets that the center had no use for that should have been thrown away long ago.  This is a professional, high stakes exam and thus the Center Managers were provided the support and budget to ensure a clean, safe, professional environment for staff and examinees.

*Response from Artis over the phone with B. LeHew on 10/23/2012:* Artis said that Ray Rosenberg (IT Operations Manager) came to the Center and commented on it being organized.  She also said that Sean (IT Support from Atlanta) came and threw away some old boxes and she felt everything was fine then.

ECFMG-ELLIS007296

*Further Investigation:*  This was identified and confirmed by Center Management staff who were covering the Houston Center during Artis' leave and by the Director of Center Operations during his stay in Houston to assist the center. The Director worked with FOC and these issues were rectified in a matter of days.

13.  Artis has developed an environment where "telling" on your coworker, instead of supporting each other, is accepted and expected. There is no sense of team work. One example is that a trainer had left central station unlocked and instead of locking it as required, and the next staff member who tried to enter the room left a posted noted that said "security violation" on the door, but did not lock it, and a second person ran to Nancy Ambrose and said the door is unlocked instead of locking the door themselves.  Artis created a climate that everything that happens at the center must immediately be reported back to Artis, even though she is on a medical leave, and there are several examples of this. If you do not call Artis the feeling is that you "do not have her back" and that there will be retribution from her.

*Response from Artis over the phone with B. LeHew on 10/23/2012: Artis did not have a response for this, she said she would need to know the specific names of who said this to respond.*

*Further Investigation:*   no further investigation into this claim.

14.  Artis was having conversations about one of her SP's with a trainer from a different center reporting "we are trying to fire him anyway" as they discussed how he was performing his case.

*Response from Artis over the phone with B. LeHew on 10/23/2012: Artis did not have a response for this, she said she would need to know the specific names of who said this to respond.*

*Further Investigation:*  This was reported from a manager at the other center who felt uneasy about the fact that a manager would be discussing employee relations with a non-management person, let alone a non-management person from a different center.

15.  Artis had instructed her FOC to "hoard/hide" supplies thus leaving the center staff to run around and try to patch things together rather than have the supplies they needed to run the exam.

*Response from Artis over the phone with B. LeHew on 10/23/2012: Artis said to talk with Keith and Heidi (FOC and Receptionist).  She said she told Keith not to leave things in his office.  She said she met with them about supplies.*

*Further Investigation:*
FOC confirmed that he was instructed, by the center manager, to have things stored in his office as to not "run out" of anything. This was the process instead of putting together a comprehensive inventory control plan which would ensure that the staff always had adequate supplies to run the exam effectively. I system has since been put into place to monitor supplies.

16.  Artis would often go in and ask her SP's to provide her with food.

*Response from Artis over the phone with B. LeHew on 10/23/2012: Artis did not respond*

*Further Investigation:*  no further investigation into this claim.

ECFMG-ELLIS007297

Nancy Ambrose

September 07, 2016
Page 60

| | | | |
|---|---|---|---|
| 1 | CHANGES AND SIGNATURE | | |
| 2 | WITNESS NAME: NANCY AMBROSE | | |
| 3 | DATE OF DEPOSITION: SEPTEMBER 7, 2016 | | |

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 4 | 16 | the description of Exhibit #1 is the policy about not hiring significant others not the "policy and procedure manual" | |
| 4 | 19 | The description of Exhibit #3 is "the Corrective action policy" not the "policy and procedure manual" | |
| 11 | 15 | "... receptionist, facilities and office coordinator ..." | |
| 14 | 14,15 | "Forest" is spelled with one R. | |
| 28 | 23 | "Dalberg" not "Dolberg" | |
| 29 | 18 | "Dalberg" not "Dolberg" | |
| 44 | 22 | Clarification: Exam staff schedules are routinely completed at least a month in advance, so these staff schedules should have been completed prior to Ms. Ellis' leave. | |

Nancy Ambrose                                    September 07, 2016
                                                          Page 61

1           I, NANCY AMBROSE, have read the foregoing

2     deposition and hereby affix my signature that same is

3     true and correct, except as noted above.

4                                    _____
                                     NANCY AMBROSE

5

6     THE STATE OF Maryland )

7     COUNTY OF Frederick )

8           Before me, Rebecca Folsom _____, on this day

9     personally appeared NANCY AMBROSE, known to me (or

10    proved to me under oath or through

11    State of Maryland Drivers License (description of identity

12    card or other document) to be the person whose name is

13    subscribed to the foregoing instrument and acknowledged

14    to me that they executed the same for the purposes and

15    consideration therein expressed.

16          Given under my hand and seal of office this

17    11th day of September , 2016 .

18

19    Rebecca L. Folsom
      NOTARY PUBLIC

20    Frederick County, Maryland
      My Commission Expires 03/27/17   NOTARY PUBLIC IN AND FOR
                                       THE STATE OF Maryland

21    My commission expires: 03/27/2017

22

23    ____ No Changes Made  √  Amendment Sheet(s) Attached,

24    Artis Ellis vs. Educational Commission for Foreign

25    Medical Graduates.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                          210-697-3408

CHANGES AND SIGNATURE

WITNESS NAME: NANCY AMBROSE

DATE OF DEPOSITION: SEPTEMBER 7, 2016

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |
| 4 | 16 | The description of Ex. #1 is the policy about not hiring significant others | Not the "policy and procedure manual" |
| | | | |
| 4 | 19 | The description of Exhibit #3 is "the corrective action policy" | Not the "policy and procedure manual" |
| | | | |
| 11 | 15 | "...receptionist, facilities and office coordinator..." | |
| | | | |
| 14 | 14-15 | "Forest" | Forest is spelled with one R |
| | | | |
| 28 | 23 | "Dalberg" | Not "Dolberg" |
| | | | |
| 28 | 5-6 | Prior to the anonymous letter, we did not know about the complaint of favoritism. | Troi Bryant is not mentioned in the letter |
| | | | |
| 29 | 18 | "Dalberg" | Not "Dolberg" |
| | | | |
| 44 | 22 | Clarification: Exam staff schedules are routinely completed at least a month in advance, so these staff schedules should have been completed prior to Ms. Ellis' leave. | |