# EXHIBIT 5

# Transcript of the Testimony of

# Betty Lehew

**Date:**

September 07, 2016

**Case:**

ARTIS ELLIS VS. EDUCATIONAL COMM. FOR FOREIGN MED. GRADS

Kim Tindall and Associates, LLC.
Phone:(210) 697-3400
Fax:(210) 697-3408
Email:ktindall@ktanda.com
Internet: www.KimTindallandAssociates.com

Betty Lehew                                                September 07, 2016

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3    ARTIS ELLIS                    )
                                     )
 4                PLAINTIFF,         )
                                     )
 5    VS.                            ) C.A. NO. 4:14-cv-02126
                                     )
 6    EDUCATIONAL COMMISSION         )
      FOR FOREIGN MEDICAL            )
 7    GRADUATES                      )
                                     )
 8                DEFENDANT.         )

 9

10    ****************************************************

11                    ORAL DEPOSITION OF

12                       BETTY LEHEW

13                    SEPTEMBER 7, 2016

14
      ****************************************************
15

16

17

18

19

20

21

22

23

24

25
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900     San Antonio, Texas 78232
210-697-3400                                                                  210-697-3408

Betty Lehew

September 07, 2016
Pages 2 to 5

## Page 2

```
 1       ORAL DEPOSITION OF BETTY LEHEW, produced as a
 2   witness at the instance of the Plaintiff, and duly
 3   sworn, was taken in the above-styled and numbered cause
 4   on SEPTEMBER 7, 2016, from 11:09 a.m. to 12:06 p.m.,
 5   before Michelle K. Miller, CSR, RPR in and for the
 6   State of Texas, reported by machine shorthand, at the
 7   offices of Morgan, Lewis, & Bockius, LLP, 1000
 8   Louisiana, Suite 4000, Houston, Texas 77002, pursuant
 9   to the Federal Rules of Civil Procedure and the
10   provisions stated on the record or attached hereto.
```

## Page 3

```
              A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Alfonso Kennard, Jr.
    Ms. Keenya R. Harrold
    Kennard Richard
    2603 Augusta Drive, Suite 1450
    Houston, Texas 77057
    Tel: 713.742.0900
    Fax: 713.742.0951
    Email: alfonso.kennard@kennardlaw.com
           keenya.harrold@kennardlaw.com

FOR THE DEFENDANT:
    Ms. Erin E. O'Driscoll
    Morgan, Lewis, & Bockius, LLP
    1000 Louisiana, Suite 4000
    Houston, Texas 77002
    Tel: 713.890.5169
    Fax: 713.890.5001
    Email: erin.odriscoll@morganlewis.com


ALSO PRESENT:
    Ms. Artis Ellis
```

## Page 4

                          INDEX

                                                       PAGE

    Appearances...........................        3

BETTY LEHEW

    Examination by Ms. Harrold.............        5

Signature and Changes......................       51
Reporter's Certificate.....................       53

                        EXHIBITS

NO.         DESCRIPTION                            PAGE

 1    Policy and Procedures
      Manual                                        13

 2    Policy and Procedures
      Manual                                        23

 3    Email String                                  44

## Page 5

            BETTY LEHEW,
having been first duly sworn, testified as follows:
            EXAMINATION
BY MR. KENNARD:
    Q.  Ms. LeHew, my name is Alfonso Kennard.  How are you today?
    A.  Good.  How are you?
    Q.  All right, thank you.  You understand that I represent Artis Ellis in this lawsuit, correct?
    A.  Yes.
    Q.  What is your title?
    A.  Assistant Vice President of Human Resources.
    Q.  Are you at the top of the food chain when it comes to human resources?
    A.  Yes.
    Q.  You might want to speak a little louder to make sure that the court reporter can hear you well enough to transcribe what you're saying.  Okay?
    A.  Okay.
    Q.  All right.  Have you ever given your deposition before?
    A.  Yes.
    Q.  How many occasions?
    A.  Probably three or four.
    Q.  Okay.  So you know the general rules?

Betty Lehew                                             September 07, 2016
                                                              Pages 6 to 9

### Page 6

1   A.  Yes.
2   Q.  Okay. I'll just ask that you allow me to
3   finish asking my question before you answer; is that
4   fair?
5   A.  Yes.
6   Q.  And if you don't understand a question, will
7   you let me know?
8   A.  Yes.
9   Q.  And please make sure to give verbal answers.
10  A.  Okay.
11  Q.  Okay. Were you involved in the termination of
12  Ms. Ellis?
13  A.  I'm not sure exactly what you mean by
14  "involved."
15  Q.  Were you a decision maker?
16  A.  No.
17  Q.  Who was the decision maker?
18  A.  Nancy Ambrose.
19  Q.  Okay. And I'm going to need you to speak up.
20  A.  Nancy Ambrose.
21  Q.  Okay. Did Ms. Ambrose consult with you before
22  terminating Ms. Ellis?
23  A.  Yes, she did.
24  Q.  Can you tell me the basis of -- or tell me
25  what you-all discussed.

### Page 7

1   A.  Nancy shared with me some issues that were
2   uncovered at the center and expressed those issues to
3   Artis, who was given an opportunity to explain them,
4   and Nancy looked into them further and found that it
5   was grounds for termination.
6   Q.  Okay. Did you agree with her assessment?
7   A.  Yes.
8   Q.  Did you review -- strike that question.
9       Did you do -- sorry -- did you do
10  anything to independently confirm what Ms. Ambrose had
11  said to you about Ms. Ellis?
12  A.  I'm not sure what you mean.
13  Q.  Did you investigate anything relating to the
14  issues that Ms. Ambrose raised about Ms. Ellis?
15  A.  No. That's not my role.
16  Q.  What is your role when someone comes to you
17  with recommending termination of an employee?
18  A.  To hear what the manager has to say. To make
19  sure that the manager has expressed those issues and
20  concerns with the employee, and that the employee has
21  had a chance to respond. That's really kind of what
22  the role is.
23  Q.  Okay. As the director of human resources --
24  A.  I'm the assistant vice president.
25  Q.  Okay. I'm sorry.

### Page 8

1       -- assistant vice president in charge of
2   human resources --
3   A.  Uh-huh.
4   Q.  -- do you think it's important to conduct
5   internal investigations relating to employees such as
6   Ms. Ellis?
7   A.  I'm not sure what you mean by that.
8   Q.  Okay. What was Ms. Ellis' position prior to
9   her termination?
10  A.  Center manager.
11  Q.  So she ran a center?
12  A.  Yes.
13  Q.  In Houston?
14  A.  Yes.
15  Q.  Do you think it's prudent to investigate
16  concerns in your human resources function that relate
17  to someone that is a manager for an entire center?
18  A.  I'm not sure what you mean.
19  Q.  Okay. Do you think it is within your function
20  to investigate claims that are made against a center
21  manager --
22      MS. O'DRISCOLL: Objection.
23  Q.  (BY MR. KENNARD) -- in your function as the
24  human resources professional for the company?
25      MS. O'DRISCOLL: Objection, form; asked

### Page 9

1   and answered.
2   A.  I'm not sure I understand what you mean,
3   "claims."
4   Q.  (BY MR. KENNARD) Okay. So Ms. Ambrose -- you
5   testified already that Ms. Ambrose raised concerns to
6   you about Ms. Ellis; is that correct?
7   A.  Yes.
8   Q.  Okay. And you have stated that you did not
9   independently investigate those claims; is that
10  correct?
11  A.  I did not investigate the claims that
12  Ms. Ambrose brought to my attention, no.
13  Q.  Regarding Ms. Ellis?
14  A.  Right.
15  Q.  So my question to you -- in your function as
16  the top HR person for the company, my question to you
17  is: Do you think it would have been prudent to
18  investigate the claims that Ms. Ambrose made regarding
19  Ms. Ellis who, at the time, was a center manager?
20      MS. O'DRISCOLL: Objection, form; asked
21  and answered.
22      MR. KENNARD: She keeps telling me she
23  doesn't understand what I'm asking her, so she hasn't
24  answered. So I'm asking it again.
25  Q.  (BY MR. KENNARD) You can answer my

Betty Lehew
September 07, 2016
Pages 10 to 13

Page 10

1  question --
2  A. Repeat it again.
3  Q. I'll have the court reporter repeat the
4  question to you.
5      (The requested portion was read back.)
6  A. No. That is not my role.
7  Q. (BY MR. KENNARD) Whose role is that? Is
8  there someone else in human resources that would
9  otherwise investigate?
10  A. No. We don't investigate a decision for
11  termination.
12  Q. Okay. Were you aware of Ms. Ellis' medical
13  issues?
14      MS. O'DRISCOLL: Objection, form.
15  A. I was aware that she had taken FMLA for
16  medical reasons, yes.
17  Q. (BY MR. KENNARD) Okay. Were you aware that
18  she was terminated from her employment as soon as she
19  came back from FMLA?
20  A. She was not.
21  Q. She wasn't?
22  A. No. She was put on administrative leave.
23  Q. Okay. She was put on administrative leave?
24  A. Yes.
25  Q. Did she ever return after that administrative

Page 11

1  leave?
2  A. No, she did not.
3  Q. So when was she put on administrative leave?
4  A. On the day that she returned, after a meeting.
5  Q. On the day that she returned from FMLA leave,
6  correct?
7  A. After a meeting with her supervisors.
8  Q. And did she ever return to work after that
9  administrative leave?
10  A. No.
11  Q. As the head of HR for the company, did that
12  not raise any concerns for you?
13  A. Not sure what you mean by that.
14  Q. Were you concerned that she was put on
15  administrative leave the day she got back from FMLA
16  leave?
17  A. No, I was not.
18  Q. Why not?
19  A. Because she was given the opportunity to
20  explain the issues that were presented to her, and the
21  explanations were not clear enough to erase or
22  eliminate the issues, so they had to be looked into by
23  her supervisors.
24  Q. When were those issues presented to her?
25  A. On the day that she returned from leave.

Page 12

1  Q. Let me get this right. So the day that she
2  returns from leave, these issues are raised to her,
3  correct?
4  A. Yes.
5  Q. And that same day, she was put on
6  administrative leave, correct?
7  A. Yes.
8  Q. Do you think that gave her an ample
9  opportunity to respond to those issues in that same day
10  before being placed on administrative leave?
11  A. She -- we were -- sat with her for two hours
12  going over the issues, and she responded to each one
13  that we went through and gave a response enough that
14  her managers had to look into what she was saying for
15  each issue.
16  Q. So you made the decision that day to put her
17  on administrative leave, right?
18      MS. O'DRISCOLL: Objection.
19  A. I did not make the decision.
20  Q. (BY MR. KENNARD) You acquiesced to that
21  decision; is that correct?
22      MS. O'DRISCOLL: Objection, form.
23  A. What do you mean?
24  Q. (BY MR. KENNARD) You didn't do anything to
25  stop it?

Page 13

1  A. No.
2  Q. Okay. What is the policy for administrative
3  leave at the company?
4  A. When the --
5  Q. Yes, hold on. Let me make sure that you
6  understand my question, what I'm asking for and what
7  I'm looking for.
8  A. Okay.
9  Q. What is the policy for placing someone on
10  administrative leave at the company?
11  A. I can't quote the whole policy without looking
12  at it, but I can summarize it.
13      MR. KENNARD: I'm going to mark this as
14  Exhibit 1 to your deposition.
15      (Exhibit 1 was marked.)
16  Q. (BY MR. KENNARD) Please review that document,
17  and let me know when you've had a chance to review it.
18      Do you recognize this document?
19  A. Yes.
20  Q. What is this document?
21  A. This is our corrective action policy.
22  Q. Can you go to page 2 of 5, please, of the
23  correction action -- corrective action policy?
24  A. Page what?
25  Q. Page 2 of 5. It's numbered here at the top.

Betty Lehew

September 07, 2016
Pages 14 to 17

Page 14

1  A. Oh. Okay.
2  Q. Do you see the section -- the subsection
3  called "Administrative leave"?
4  A. Yes. The definition.
5  Q. Okay. Can you read the administrative leave
6  policy for me, please?
7     MS. O'DRISCOLL: Objection, form.
8  A. Well, it's not the policy. It's just the
9  definition.
10  Q. (BY MR. KENNARD) Okay. Can you -- can you
11  read the definition of -- of -- for administrative
12  leave?
13  A. Yes. "Administrative leave is used when a
14  supervisor/manager perceives that the employee may
15  cause a potential threat to themselves or others or
16  when the employee is behaving in a disruptive and/or
17  unruly manner that management is not able to handle.
18  The employee should be sent home for the day with pay,
19  pending investigation of the situation by the
20  supervisor/manager. HR must be informed when an
21  employee has been put on administrative leave to assist
22  with the investigation."
23  Q. Okay. So you're HR, right?
24  A. Yes.
25  Q. Did you assist with an investigation?

Page 15

1  A. No, I did not.
2  Q. Okay. And did -- were you aware -- or did you
3  believe that Ms. Ellis was a potential threat to
4  herself or others?
5  A. No, I did not.
6  Q. Okay. And you realize that she had just come
7  back from brain surgery, right?
8     MS. O'DRISCOLL: Objection, form.
9  A. I realized she just came back from a procedure
10  from FMLA.
11  Q. (BY MR. KENNARD) Okay. Is there anything in
12  this administrative leave policy that states an
13  employee should be placed on administrative leave
14  because a manager perceives she's having work issues?
15     MS. O'DRISCOLL: Objection, form;
16  mischaracterizes the document.
17  A. I'm not sure what you mean by "work issues."
18  Q. (BY MR. KENNARD) Issues with her employment.
19     Does -- is that stated anywhere in this
20  definition of "Administrative leave"?
21  A. Not specifically the way you worded it.
22  Q. Well, anywhere in here -- how would you word
23  it?
24  A. How would I word what?
25  Q. To justify Ms. Ellis being placed on

Page 16

1  administrative leave in light of this definition.
2  A. The part that says the employee is behaving in
3  a disruptive or unruly manner that management is not
4  able to handle.
5  Q. Okay. How was she acting in a disruptive or
6  unruly manner that management was unable to handle?
7  A. At that moment, she wasn't. The reports that
8  they were investigating were things that they felt they
9  were not able to handle and investigate with her in the
10  center.
11  Q. But she had been on FMLA leave prior to being
12  placed on administrative leave, correct?
13  A. Yes. I'm not talking about when she was on
14  the administrative leave. The issues that were
15  uncovered were not issues that occurred when she was on
16  the administrative leave. They were things that
17  occurred prior to that.
18  Q. Okay. But she was allowed back into the
19  facility, correct?
20  A. That morning, yes.
21  Q. That morning, was she acting in a disruptive
22  or unruly manner?
23  A. That morning, she was not.
24  Q. All right. Let's look at "Termination of
25  employment."

Page 17

1  A. Uh-huh.
2  Q. Can you read that definition for me?
3  A. Yes. "Termination of employment is a
4  consequence for not meeting the expectations of a" --
5  "of in" -- sorry, that's a typo -- "the formal
6  corrective action process. Termination occurs when the
7  employee has failed to correct a problem or situation
8  despite receipt of a written warning and/or a final
9  written warning. In addition to foregoing -- to the
10  foregoing, termination may occur immediately without
11  prior corrective action, depending on the nature,
12  frequency, and severity of the violation. Termination
13  decisions must be reviewed with human resources before
14  they take effect."
15  Q. Did you review the decision to terminate
16  Ms. Ellis before it took effect?
17  A. Yes.
18  Q. And you approved it, correct?
19  A. Yes. Well, I didn't approve it. I'm not
20  someone that approved it. It's not an approval. It's
21  just a review process.
22  Q. You allowed it to take effect?
23  A. I didn't get in the way of it.
24  Q. Okay. Fair enough.
25     Do you know if Ms. Ellis was allowed to

Page 18

1 engage in the formal corrective action process?
2     MS. O'DRISCOLL: Objection, form.
3   A. I don't understand what you mean by allowed to
4 engage in it.
5   Q. (BY MR. KENNARD) Was she -- okay. Let me ask
6 you this: What is the formal corrective action process
7 at the company?
8   A. It's on here. Let's see. I mean, do you want
9 me to read the whole thing that's on here?
10  Q. Just tell me about it. Tell me what the
11 corrective action process is.
12  A. Are you asking me to summarize it?
13  Q. I want you to tell me -- to testify from your
14 experience as the top person in HR for the company what
15 the corrective action -- formal corrective action
16 process is.
17  A. Is that we would normally give a written
18 warning and then possibly a second written warning or a
19 final written warning before termination, but that at
20 any point if the manager feels the violations are
21 severe or frequent, that it can be accelerated to
22 immediate termination.
23  Q. Okay. Was Ms. Ellis given the opportunity to
24 correct a problem or situation?
25     MS. O'DRISCOLL: Objection, form.

Page 19

1   Q. (BY MR. KENNARD) I'm just reading from the
2 definition or the -- where the --
3   A. I don't know which specific one you're talking
4 about.
5   Q. -- in the corrective action policy. Let's go
6 back to "Termination of employment."
7   A. Okay.
8   Q. You read that to me.
9   A. Yes.
10  Q. In here it says, "Termination occurs when the
11 employee has failed to correct a problem or problems or
12 situations despite receipt of a written warning" --
13 "and/or final written warning."
14     Was Ms. Ellis given a written and/or
15 final written warning?
16     MS. O'DRISCOLL: Objection, form.
17  A. She was given a written warning.
18  Q. (BY MR. KENNARD) I'm asking you, was she?
19  A. Yes.
20  Q. When?
21  A. In August, I believe, of 2012.
22  Q. Was that before or after her FMLA leave?
23  A. Before.
24  Q. Okay. All right.
25     You don't expect that she would have had

Page 20

1 the opportunity to correct any problems or situations
2 while she was on FMLA leave, do you?
3   A. No.
4   Q. Okay. And she was presented with issues the
5 day she got back?
6   A. Yes.
7   Q. Was she given the opportunity to correct any
8 problems or situations upon her coming back to work
9 from FMLA leave?
10  A. She was given the opportunity to respond and
11 explain the concerns that were uncovered while she was
12 out on leave.
13  Q. But not the opportunity to correct; is that
14 right?
15  A. No.
16  Q. Do you know of any instances in your
17 experience as an HR professional for the company where
18 employees who had problems or situations at work were
19 given the opportunity to correct --
20     MS. O'DRISCOLL: Objection, form.
21  Q. (BY MR. KENNARD) -- their -- those issues?
22  A. I'm sorry. Can you repeat that?
23  Q. Sure. Do you know -- are you aware of any
24 instances where an employee was given the opportunity
25 to correct a problem or situation after having been

Page 21

1 given a written warning?
2   A. Yes.
3   Q. But Ms. Ellis was not given that opportunity,
4 correct?
5   A. Not when she was presented with the issues on
6 the day that she returned. She was given an
7 opportunity to explain them.
8   Q. Well, let's talk about the issues that were
9 raised. From your understanding, why was Ms. Ellis
10 terminated?
11  A. There were several reasons, but the primary
12 one was a lack of trust on her part by her supervisors
13 based on several issues that could not be answered.
14  Q. Let's talk about them. I want to know what
15 your understanding is of why she was terminated. So
16 let's go through each one.
17  A. Okay.
18  Q. So I'll let you start wherever you'd like.
19 Let's start with -- so what was the first reason that
20 you can think of that she was terminated?
21  A. I believe we gave you a document that lists
22 the issues that were presented to her.
23  Q. And I can appreciate that, but I'm asking you
24 to tell me from your understanding, as you sit here
25 right now, why she was terminated.

Betty Lehew

September 07, 2016
Pages 22 to 25

Page 22

1   A.  There were several policy violations. There
2   were complaints that were looked into from the
3   employees. Numerous complaints. There were a lot of
4   different policy violations.
5   Q.  What else?
6   A.  Off the top of my head, I can't recall all the
7   specifics without looking at the document. I didn't
8   make the termination decision.
9   Q.  What policy violations?
10  A.  Giving her password out, hiring an employee --
11  or hiring someone that she had a personal relationship
12  with that wasn't disclosed or given approval for, were
13  two of them.
14  Q.  Did you look into the personal relationship
15  issue?
16  A.  I didn't, no. Her supervisors did.
17  Q.  Did you look into the password issue?
18  A.  No, I did not.
19  Q.  Before the termination decision was made, were
20  you told about the personal relationship issue being a
21  factor in her termination?
22  A.  Was I told about it?
23  Q.  Yes.
24  A.  Yes.
25  Q.  Okay. So you were aware that one of the

Page 23

1   reasons for her termination before she was terminated
2   was because of some purported personal relationship,
3   right?
4   A.  Yes, I was aware of it.
5   Q.  Okay.
6       (Exhibit 2 was marked.)
7   Q.  (BY MR. KENNARD) I'm going to hand you what
8   we're marking as Exhibit 2 to your deposition.
9       Do you recognize this document?
10  A.  Yes.
11  Q.  What is this?
12  A.  It looks a little different because there's
13  things at the top that I don't recognize, but the
14  content of it is our employment of relatives policy.
15  Q.  Okay. And can you read the definition of
16  "Relative" in Subsection 2 under "Definitions" where it
17  says "Relative"?
18  A.  Yes. "Relative is defined as any of the
19  following including by virtue of blood, adoption,
20  marriage, or remarriage, or domestic partnership
21  (significant other or affianced), spouse, children,
22  grandchildren, parents, grandparents, siblings, uncles,
23  aunts, nephews, nieces, and cousins."
24  Q.  So how did Ms. Ellis violate the personal
25  relationship policy?

Page 24

1   A.  That would fall under the definition of
2   "significant other."
3   Q.  Significant other. How so?
4   A.  She hired and then subsequently promoted a man
5   who was the father of her child without disclosing that
6   or getting approval from anyone in a direct reporting
7   relationship.
8   Q.  We're talking about Troi, right?
9   A.  Yes.
10  Q.  Okay. Do you know if Troi and Ms. Ellis were
11  related by blood?
12  A.  I don't have that information, no.
13  Q.  Do you have any reason to believe that they
14  are not related by blood?
15  A.  Do I have any reason to what?
16  Q.  Do you have any reason to dispute that they
17  are not related by blood?
18  A.  No.
19  Q.  Do you have any reason to dispute that they
20  are not related by virtue of adoption?
21  A.  No.
22  Q.  Do you have any reason to dispute that they
23  are not related by virtue of marriage?
24  A.  No.
25  Q.  Do you have any reason to believe they are not

Page 25

1   related by virtue of remarriage?
2   A.  No.
3   Q.  Okay. Do you have any reason to believe that
4   they are not related by virtue of domestic partnership?
5   A.  No.
6   Q.  Do you have any reason to dispute that they
7   are not related by virtue of them being a spouse to one
8   another?
9   A.  No.
10  Q.  Do you have any reason to believe that they
11  are not related by virtue of one being a child of
12  another?
13  A.  No.
14  Q.  Do you have any reason to dispute that they
15  are not related by virtue of them being a grandchild to
16  one another?
17  A.  No.
18  Q.  Do you have any reason to dispute that they
19  are not related by virtue of being a parent of one
20  another?
21  A.  No.
22  Q.  Or a grandparent?
23  A.  No.
24  Q.  A sibling?
25  A.  No.

Kim Tindall and Associates, LLC  16414 San Pedro, Suite 900     San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Page 26

1  Q. An uncle?
2  A. No.
3  Q. An aunt?
4  A. No.
5  Q. A nephew?
6  A. No.
7  Q. A niece?
8  A. No.
9  Q. Or a cousin?
10 A. No.
11 Q. Are you aware of any instances where someone
12 that is deemed a relative was allowed to work at the
13 company?
14 A. Several, yes.
15 Q. Okay. And were those individuals terminated?
16 A. No.
17 Q. In fact, you're one of them, right?
18 A. Yes.
19 Q. Okay. Who did you hire?
20 A. I didn't specifically hire anyone.
21 Q. Okay. Didn't your stepdaughter work for the
22 company?
23 A. She did.
24 Q. Did you make it known that your stepdaughter
25 was working there?

Page 27

1  A. Yes.
2  Q. Were you terminated?
3  A. No.
4  Q. You're still there, right?
5  A. Yes.
6  Q. Okay. Is your stepdaughter a relative to you?
7  A. Yes. Yes.
8  Q. What department did your stepdaughter work in?
9  A. She worked in the ERAS department, and she
10 worked in the HR department.
11 Q. Okay. The same HR department that you're the
12 head of?
13 A. Yes.
14 Q. Do you believe that's a violation of the
15 policy?
16 A. No.
17 Q. Why not?
18 A. Because there was very clear disclosure and
19 approval given for that, and it was also a part-time,
20 temporary summer help and it was approved by an
21 executive. Actually, it was requested by an executive.
22 Q. Okay. Let's look at "Eligibility."
23 A. Uh-huh.
24 Q. Can you read that sentence under
25 "Eligibility"?

Page 28

1  A. "This policy applies to all employees, and
2  independent contractors, agency contractors, agency
3  temporary staff, and interns."
4  Q. Okay. So your stepdaughter was a temporary
5  worker, correct?
6  A. Yes.
7  Q. So this policy would have applied to you and
8  her, correct?
9  A. Yes.
10 Q. Let's look at the guidelines.
11 A. Uh-huh.
12 Q. Can you read that first paragraph for me,
13 please?
14 A. "ECFMG will not hire or employ anyone in a
15 reporting relationship within the following" -- "with
16 the following relation to an existing part-time or
17 full-time employee: Spouse, parent, child or sibling,
18 including step or adopted relationships, grandparent or
19 grandchild or in-laws to the same degree.
20    ECFMG will not hire or employ anyone on a
21 full-time or part-time basis in the same department
22 with a supervisory relationship to an existing
23 full-time or part-time employee."
24 Q. Were you in a supervisory relationship to your
25 stepdaughter?

Page 29

1  A. Not an immediate supervisor.
2  Q. But a supervisor nonetheless?
3  A. Above the supervisor, yes.
4  Q. And you see where it says there that "ECFMG
5  will not hire or employ anyone in a reporting
6  relationship including a step or adoptive
7  relationship." Do you see that?
8  A. Yes.
9  Q. So you were in violation of the policy,
10 correct?
11     MS. O'DRISCOLL: Objection, form.
12 A. No.
13 Q. (BY MR. KENNARD) Was your stepdaughter hired
14 in a part-time role?
15 A. Yes.
16 Q. And was she in the same department as you?
17 A. Yes.
18 Q. At the time that Artis Ellis was terminated,
19 Troi was not her spouse, right?
20 A. Correct.
21 Q. Troi was not her parent, right?
22 A. I'm sorry, what?
23 Q. Troi was not her parent, right?
24 A. Right.
25 Q. She was not Troy's parent, right?

Betty Lehew

September 07, 2016
Pages 30 to 33

Page 30

1. A. Right.
2. Q. Troi was not her child, right?
3. A. Right.
4. Q. And Troi was not her child, right?
5. A. Right.
6. Q. Troi was not her sibling, right?
7. A. Right.
8. Q. Troi was not her grandparent, right?
9. A. Right.
10. Q. She was not her -- she was not Troy's
11. grandparent, right?
12. A. Right.
13. Q. Or grandchild, right?
14. A. Right.
15. Q. Or an in-law, right?
16. A. Right.
17. Q. You mentioned earlier that you felt that Troi
18. and Ms. Ellis were significant others, right?
19. A. No.
20. Q. You didn't?
21. A. I didn't say that they were, I said it fell
22. under the definition of significant other.
23. Q. How does it fall under that definition?
24. A. Because in her manager's opinion, the director
25. of center operation, the executive director's opinion,

Page 31

1. also in my opinion, the relationship was similar to
2. those described above. Doesn't say it was one
3. described above. It says it was similar to.
4. Q. Are you married?
5. A. Yes.
6. Q. You have a stepdaughter?
7. A. Yes.
8. Q. So that means that your current husband had a
9. child with a previous spouse?
10. A. Yes.
11. Q. What's her name, the previous spouse?
12. A. Cindy.
13. Q. Cindy. What's her last name?
14. A. LeHew.
15. Q. That's your last name?
16. A. LeHew, yes.
17. Q. What's your husband's name?
18. A. Jack.
19. Q. LeHew?
20. A. LeHew.
21. Q. A lot of LeHews. Okay. Jack LeHew, you think
22. Cindy LeHew is Jack LeHew's significant other?
23. A. I would define it under this, yes.
24. Q. So he's got two significant others?
25. A. He has a spouse, and he has someone that falls

Page 32

1. under ECFMG's definition of "significant other."
2. Q. Where is "significant other" defined?
3. A. Right here in the policy.
4. Q. Okay. Read that for me.
5. A. "Significant other, for the purpose of this
6. policy, is any other interpersonal relationship between
7. individuals which creates a relationship similar to
8. those described in the definition above. May be
9. included under the provision of this policy, if one of
10. those parties has influence over the other."
11. Q. Okay. So who gets to decide if someone has a
12. significant other to someone else?
13. A. Are you asking me who --
14. Q. I'm asking you: Who gets to decide if someone
15. is a significant other to someone else?
16. A. The person who is interpreting the policy,
17. which is the manager of the employee.
18. Q. So it didn't matter to you that Ms. Ellis told
19. you that Troi was not a significant other to her?
20. A. I'm sorry. Did it matter to me?
21. Q. Yeah. Did it matter to you when -- you didn't
22. stop the termination?
23. A. Correct.
24. Q. Was it -- were you made aware that -- that
25. Troi -- were you made aware by Ms. Ellis that Troi was

Page 33

1. not a significant other to her?
2. A. Troi is the father of her daughter.
3. MR. KENNARD: Objection, nonresponsive.
4. That's not what I asked.
5. Q. (BY MR. KENNARD) Was it made known to you by
6. Ms. Ellis that she did not consider Troi to be a
7. significant other?
8. A. At that time, no.
9. Q. At any time?
10. A. No.
11. Q. It was never made known to you that Ms. Ellis
12. did not consider Troi to be a significant other?
13. A. Not until her deposition. Matter of fact, the
14. opposite happened. She told me that he was the father
15. of her baby, the biological father of her child.
16. Q. And nothing more, correct?
17. MS. O'DRISCOLL: Objection, form.
18. Q. (BY MR. KENNARD) She only -- she only told
19. you that that was the biological father of her child?
20. A. She told me that -- yep. There was more. She
21. told me that she had a long relationship with him, that
22. she had known him for over 30 years, that he stepped in
23. to raise her child, that he supported her child, that
24. he even gave her child his name because she originally
25. said he wasn't the biological father, and then the next

Page 34

1 day on the phone she told me that she had to -- she was
2 feeling her -- her conscience was bothering her and she
3 had to clear it up, and she told me that he was the
4 biological father.
5    Q.  Did she ever tell you that he was her
6 significant other?
7    A.  Not in those words.
8    Q.  Okay.  Was Troi still working at the company
9 when Ms. Ellis was terminated?
10   A.  No.
11         MS. O'DRISCOLL:  Objection, form.
12   Q.  (BY MR. KENNARD) He resigned, right?
13   A.  I --
14   Q.  Are you aware that he resigned from the
15 company?
16   A.  I don't recall the reason for his leaving.
17   Q.  And you are aware that Troi didn't work there
18 at the time that Ms. Ellis was terminated, correct?
19   A.  Yes.
20   Q.  I'll represent to you that Troi had not been
21 with the company for a year before Ms. Ellis was
22 terminated.  Do you have any reason to dispute that?
23   A.  No.
24   Q.  So why was it that a year later someone cares
25 that Ms. Ellis had a child with him many years before?

Page 35

1    A.  It was complaints from the staff that there
2 were perceptions of favoritism.
3    Q.  But he hadn't been there for a year before she
4 was terminated?
5    A.  We didn't hear about any of this from the
6 staff until after there was no management in the center
7 and we had to send people to cover.
8    Q.  How could she be playing favorites to someone
9 who wasn't there?  How does that work?
10   A.  I'm just telling you the perceptions we heard
11 from the staff.
12   Q.  Did you investigate it?
13   A.  I did.
14   Q.  And what did you find?
15   A.  I -- I spoke to staff, as did several of the
16 managers that were coming to the center, and people
17 told us that they were afraid to speak up previously,
18 but now that there was no one in the center, they were
19 sharing their concerns, and those concerns was that
20 Ms. Ellis was hiring relatives and there was a
21 perception of unfairness.  And when we asked who,
22 that's when we first learned about her hiring Troi and
23 then later promoting Troi.
24   Q.  And had you learned that Troi had not been
25 there for a year at the time that you-all terminated

Page 36

1 her?
2    A.  Yes.  Doesn't change the perception of the
3 staff.
4    Q.  Who -- who specifically did you speak with in
5 investigating that issue?
6    A.  I would have to look back through my notes on
7 individuals.
8    Q.  Do you not remember?
9    A.  Not off the top of my head.  Most of it came
10 from the managers that were covering as well as Chris
11 and Nancy talking to individuals.
12   Q.  And who were those managers?
13   A.  Valerie McCluskey was one, Peter O'Colmain was
14 one, Elizabeth Denton, Ron Linka, Sandie Pullen, I
15 believe that's all of them.  I'm not 100 percent sure
16 if I missed one.
17   Q.  Is there anyone else that you received that
18 feedback from pertaining to the issue that you
19 described?
20   A.  Well, Chris Paul and Nancy Ambrose.
21   Q.  Let's talk about the password issue.
22   A.  Uh-huh.
23   Q.  What was your understanding of the password
24 issue?
25   A.  My understanding of it was from what was

Page 37

1 reported to me.
2    Q.  Did you investigate it?
3    A.  No.
4    Q.  Did you ask anybody about it?
5    A.  Yes.
6    Q.  Who did you ask about it?
7    A.  Nancy Ambrose.
8    Q.  And what did she tell you?
9    A.  She told me that she looked into the password.
10 That she did not sign off the exam; Chris Paul did not
11 sign off the exam.  She worked with IT to determine how
12 the exam was signed off, and it was signed off using
13 Artis' password and that she spoke to several staff and
14 found out that Sharon Dolberg was asked by Artis to use
15 her password -- to use Artis' password; Artis gave
16 Sharon her password to sign off the exam.
17   Q.  And that was while Ms. Ellis was on leave,
18 right?
19   A.  Yes.
20   Q.  You know she had had a surgical procedure on
21 her brain, right?
22   A.  Yes.
23   Q.  So why was anybody reaching out to Ms. Ellis
24 while she was on leave?
25         MS. O'DRISCOLL:  Objection, form.

Betty Lehew

September 07, 2016
Pages 38 to 41

### Page 38

1   A.  I wasn't told that. I was told that Artis
2   reached out to Sharon and asked her to sign it off with
3   her password.
4   Q.  (BY MR. KENNARD) You realize that Ms. Ellis
5   was at the hospital when that happened, right?
6   A.  Yes.
7   Q.  Okay. What if Ms. Ellis had not provided her
8   password? Could that exam have been signed off on?
9   A.  Yes.
10  Q.  How?
11  A.  Nancy Ambrose or Chris could have signed off
12  on the exam.
13  Q.  Did Nancy Ambrose sign off on it?
14  A.  No.
15  Q.  Did Chris sign off on it?
16  A.  No.
17  Q.  Should they have signed off on it since
18  Ms. Ellis was out on leave?
19  A.  Nancy Ambrose went in to sign off on it, and
20  that's when she discovered that it had already been
21  signed off.
22  Q.  How do you know that?
23  A.  Nancy told me.
24  Q.  Do you know of any other instances where
25  someone else had given someone else a password?

### Page 39

1   A.  No.
2   Q.  Could Nancy Ambrose administer an exam?
3   A.  I don't know. You would have to explain what
4   you mean by "administer."
5   Q.  You tell me. What does it mean to administer
6   an exam?
7   A.  There's a lot of steps in the process that
8   goes through administering an exam.
9   Q.  Could Nancy Ambrose do any of those steps?
10  A.  Yes, she could do some of them. She could
11  probably do all of them.
12  Q.  Were you aware that Brent Biggs gave Rich Conn
13  his password?
14  A.  No, I was not.
15  Q.  Were you aware that Brent also gave his
16  password to Gail Forman?
17  A.  No.
18  Q.  Is Brent Biggs still with the company?
19  A.  No.
20  Q.  Did he resign? Was he terminated?
21  A.  He resigned.
22  Q.  He was not terminated, correct?
23  A.  Correct.
24  Q.  He was not terminated for any password
25  violations?

### Page 40

1   A.  No.
2   Q.  What about Sharon Dolberg? Was she
3   terminated?
4   A.  No.
5   Q.  Was she reprimanded?
6   A.  No.
7   Q.  Would she have also been in violation of the
8   policy for using Ms. Ellis' password?
9   A.  No. She was following her manager's
10  directions.
11  Q.  So while Ms. Ellis was out on FMLA leave, who
12  was handling her function?
13  A.  There were several people that were handling
14  it because the assistant manager had resigned, so there
15  was no management in the center.
16  Q.  Okay. Who was that?
17  A.  It was -- it was rotating, and we didn't put
18  anyone there permanently for the entire time. Chris
19  Paul was there for a good portion of it, Nancy was
20  there for a good portion of it, and the same managers
21  that I just listed to you were also there. Usually,
22  there was two people, whether it was a center manager
23  or director or assistant director at any given time in
24  the center.
25  Q.  So Chris Paul?

### Page 41

1   A.  Yes.
2   Q.  Nancy Ambrose?
3   A.  Yes.
4   Q.  Who else?
5   A.  Valerie McCluskey, Sandie Pullen, Peter
6   O'Colmain, Ron Linka. I believe that's everyone, but
7   I'm not 100 percent sure. There might have been
8   another manager that helped cover.
9   Q.  And any of those managers, would they have
10  been able to administer some component of an exam?
11  A.  Yes, they all administer it in their own
12  centers.
13  Q.  Okay. Do you know why, if any of those
14  individuals were able to administer exams, why
15  Ms. Ellis had to be involved while she was in the
16  hospital?
17  A.  I would have no reason to know why she would
18  feel that she needs to be involved. We did not expect
19  that of her.
20  Q.  You say "we." Who is "we"?
21  A.  Anyone in the organization.
22  Q.  Anyone in the organization?
23  A.  Anyone that I'm aware of in the organization.
24  We did not expect that of her. We don't expect that of
25  people on leave.

Betty Lehew

September 07, 2016
Pages 42 to 45

Page 42

1  Q. Were you aware that individuals at the center
2  were still reaching out to her while she was on leave?
3  A. No, I was not.
4  Q. Is Chris Paul still there?
5  A. No.
6  Q. What happened to him?
7  A. His employment was terminated.
8  Q. Why?
9  A. There was a few different issues in 2014 that
10 came up --
11 Q. Tell me about those.
12 A. -- that was addressed.
13     One that was discovered was that he had
14 falsified his original employment application.
15     One that the executive director of CSEC,
16 which was his immediate supervisor, felt that his
17 actions undermined the executive director's authority.
18 Q. Is there any other reason?
19 A. There was, I think, a third one that was
20 not -- his -- a little bit about his leadership style
21 that was not in line with what we expected.
22 Q. Was he given a warning before he was
23 terminated?
24 A. Yes.
25 Q. Was he given the opportunity to correct his

Page 43

1  behavior?
2  A. The opportunity to correct part of the
3  behavior, yes.
4  Q. So how much time did he have from the time
5  that he was told that he -- there were certain issues
6  and the time that he was terminated?
7  A. I would have to look at the dates of the
8  corrective action and the termination to know that.
9  Q. Do you remember if it was more than a day?
10 Was Chris Paul given more than a day to correct some
11 component of his behavior?
12 A. Well, there were different issues from the
13 corrective action to the termination.
14 Q. Okay. Okay. Any of those issues, was he
15 given more -- more than a day to work on those?
16 A. Yes.
17 Q. Was he given more than two hours to work on
18 those?
19 A. On some of those issues, yes.
20     MR. KENNARD: Go off the record.
21     (A break was taken from 11:59 a.m. to
22 12:07 p.m.)
23     MR. KENNARD: Let's go back on the
24 record.
25 Q. (BY MR. KENNARD) All right. Ms. LeHew, we

Page 44

1  took a short break, and now we're back on the record.
2     Let me hand you what we're going to mark
3  as Exhibit Number 3 to your deposition.
4     (Exhibit 3 was marked.)
5  Q. (BY MR. KENNARD) Do you recognize this
6  e-mail?
7  A. Yes.
8  Q. What's the date of this e-mail?
9  A. The bottom one is June 25th, and the top one
10 is June 27th.
11 Q. Okay. This is before Ms. Ellis went out on
12 FMLA leave, correct?
13 A. Yes.
14 Q. And read for me your response to her --
15 well -- tell -- tell me -- in your -- in your mind,
16 what is she talking to you about here? What did you
17 understand her to be communicating to you here?
18 A. That she spoke to Ann today, that things went
19 really well, that Ann told her that she would continue
20 to coach and counsel Chris as it relates to allowing
21 her to manage the Houston center. I mean, I can read
22 it.
23 Q. No. Just tell me your understanding.
24 A. That, you know, she had a conversation with
25 Ann about some of her concerns and that Ann is going

Page 45

1  to, you know, continue working with Chris and talking
2  to them about the concerns and looking into them.
3  Q. So even as of June 25th, 2012, Chris was
4  having issues, right?
5     MS. O'DRISCOLL: Objection, form.
6  A. According to Artis, yes.
7  Q. (BY MR. KENNARD) Okay. So, similarly, how
8  Artis' managers brought concerns to you about Artis --
9  A. Right.
10 Q. -- Artis here is bringing concerns to you
11 about Chris, correct?
12     MS. O'DRISCOLL: Objection, form.
13 A. Well, there's a difference. Her managers
14 brought things to me and they supervised her. Artis
15 did not supervise Chris; it was her boss. So the
16 situation wasn't the exact same situation.
17 Q. (BY MR. KENNARD) But she raised issues to you
18 about Chris, correct?
19 A. Yes.
20 Q. All right. And as you understand -- and who
21 is Ann?
22 A. Ann Jobe was the executive director at the
23 time.
24 Q. Okay. So she was both Chris' boss and Artis'
25 boss, correct?

Page 46

1  A. No, she was Chris' boss.
2  Q. Chris' boss. And you said Chris was Artis'
3  boss?
4  A. Yes.
5  Q. So Ann was higher up the food chain than
6  Artis, correct?
7  A. Yes.
8  Q. Okay. And here it states -- do you have any
9  reason to dispute that Ann was intending to continue to
10 coach and counsel Chris?
11 A. No, I don't have any reason to dispute that.
12 Q. Okay. And Ann is Chris' boss, right?
13 A. Yes.
14 Q. And she was going to coach and counsel Chris
15 on issues that he was having, correct?
16 A. Yes.
17 Q. Okay.
18 A. Issues that Artis had with him.
19 Q. Chris had issues with -- had performance
20 issues -- from your previous testimony today, you said
21 that Chris was having performance issues?
22 A. Not performance issues. His leadership style
23 and his interpersonal skills.
24 Q. When I say "performance," I mean in his
25 capacity -- in his work capacity.

Page 47

1  A. No, he -- he knew the centers very well. In
2  his operational functions, he was very strong. His
3  interpersonal skills --
4  Q. Okay.
5  A. -- had some concerns.
6  Q. Were you aware that he and Artis were having
7  interpersonal issues?
8  A. Yes.
9  Q. So the interpersonal issues that eventually
10 got him terminated, you were aware of, at least as of
11 June 25th, 2012, right?
12         MS. O'DRISCOLL: Objection, form.
13 A. The --
14 Q. (BY MR. KENNARD) Go ahead.
15 A. The interpersonal skills were not the reason
16 for his final termination.
17 Q. Was that one of the reasons for his final
18 termination?
19 A. It was listed in an e-mail to the president,
20 but the executive director had two bigger issues that
21 resulted in the termination.
22 Q. Didn't they get him a coach in December of
23 2012?
24 A. Yes.
25 Q. What was the purpose of that coach?

Page 48

1  A. To work with him on interpersonal skills.
2  Q. Okay. How long did that coach work with
3  Chris?
4  A. I'd have to look at the coaching contract. I
5  believe it was either three months or six months or
6  something.
7  Q. And even after the coaching, he still, in your
8  estimation, needed to be terminated; is that right?
9         MS. O'DRISCOLL: Objection, form.
10 A. No, he was not terminated strictly for
11 interpersonal skills.
12 Q. (BY MR. KENNARD) Okay. Even after he
13 received coaching, he was still terminated, correct?
14 A. He was terminated after he received coaching.
15 Q. Okay. That's my question. Thank you.
16        So did -- are you -- did Ms. Ellis get
17 coaching?
18 A. No.
19 Q. Was a coach hired for Ms. Ellis?
20 A. No.
21 Q. Okay. So you responded to Ms. Ellis on June
22 27, 2012 at 1:07 p.m., can you read the second sentence
23 for me, please?
24 A. Of my response?
25 Q. Yes, ma'am. Starting with "And."

Page 49

1  A. "And, by the way, there has never been any
2  talk of replacing the Houston manager to my knowledge,
3  and you know our process requires that."
4  Q. And when you're talking about the Houston
5  manager, you're talking about Ms. Ellis, right?
6  A. Yes.
7  Q. There had been no talk, at least as of June
8  27, 2012, of replacing the Houston manager, i.e.
9  Ms. Ellis, right?
10 A. Correct.
11 Q. Okay. And then you go on to say, "And you
12 know our process requires that." What process are you
13 talking about?
14 A. The process of termination requires it being
15 reviewed with HR.
16 Q. What else? Is there any other part of the
17 process?
18 A. It would have to be the approval of the next
19 level person, which it would have been Ann Jobe.
20 Q. What else is involved in that process?
21 A. That's all.
22 Q. Okay.
23        MR. KENNARD: I have no further
24 questions. Pass the witness.
25        MS. O'DRISCOLL: Let me take a quick

## Page 50

1  break.
2          (A break was taken.)
3          MS. O'DRISCOLL:  Defendant will reserve
4  its questions for trial.
5          (The deposition concluded at 12:16 p.m.)
6
7
8          -- SIGNATURE REQUIRED --
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 51

1  CHANGES AND SIGNATURE
2  WITNESS NAME: BETTY LEHEW
3  DATE OF DEPOSITION: SEPTEMBER 7, 2016
4  PAGE    LINE    CHANGE           REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## Page 52

1          I, BETTY LEHEW, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4                        _____
5                        BETTY LEHEW
6  THE STATE OF _____)
7  COUNTY OF _____)
8          Before me, _____, on this day
9  personally appeared BETTY LEHEW, known to me (or proved
10 to me under oath or through
11 _____) (description of identity
12 card or other document) to be the person whose name is
13 subscribed to the foregoing instrument and acknowledged
14 to me that they executed the same for the purposes and
15 consideration therein expressed.
16         Given under my hand and seal of office this
17 _____ day of _____, _____.
18
19                        _____
20                        NOTARY PUBLIC IN AND FOR
                          THE STATE OF _____
21 My commission expires: _____
22
23 ___ No Changes Made ___ Amendment Sheet(s) Attached,
24 Artis Ellis vs. Educational Commission for Foreign
25 Medical Graduates.

## Page 53

1       IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION
3  ARTIS ELLIS                )
                              )
4          PLAINTIFF,         )
                              )
5  VS.                        ) C.A. NO. 4:14-cv-02126
                              )
6  EDUCATIONAL COMMISSION     )
   FOR FOREIGN MEDICAL        )
7  GRADUATES                  )
                              )
8          DEFENDANT.         )
9
      REPORTER'S CERTIFICATION OF THE ORAL
10          DEPOSITION OF BETTY LEHEW
               SEPTEMBER 7, 2016
11
12     I, Michelle K. Miller, Certified Shorthand Reporter
13 in and for the State of Texas, hereby certify to the
14 following:
15     That the witness, BETTY LEHEW, was duly sworn by
16 the officer and that the transcript of the oral
17 deposition is a true record of the testimony given by
18 the witness;
19     That the original deposition was delivered to
20 Mr. Alfonso Kennard
21     That a copy of this certificate was served on all
22 parties and/or the witness shown herein on _____.
23     I further certify that pursuant to FRCP Rule
24 30(f)(1) that the signature of the deponent was
25 requested by the deponent or a party before the

Page 54

1 completion of the deposition and that the signature is
2 to be before any notary public and returned within 30
3 days from date of receipt of the transcript.
4     I further certify that I am neither counsel for,
5 related to, nor employed by any of the parties or
6 attorneys in the action in which this proceeding was
7 taken, and further that I am not financially or
8 otherwise interested in the outcome of the action.
9     Certified to by me on this, the 12th day of
10 September, 2016.
11
12
13
14  _____
       Michelle K. Miller, CSR, RPR
15     Texas CSR No. 9312
       Expiration Date: 12/31/16
16
       Kim Tindall & Associates, LLC
17     Firm Registration No. 631
       16414 San Pedro, Suite 900
18     San Antonio, Texas 78232
       Tel: 210-697-3400/Fax: 210-697-3408
19
20
21
22
23
24
25

Page 55

1 THE STATE OF _____ )
2 COUNTY OF _____ )
3
4     I hereby certify that the witness was notified on
5 _____ that the witness has 30 days, or
6 (____ days per agreement of counsel) after being
7 notified by the officer that the transcript is
8 available for review by the witness and if there are
9 changes in the form or substance to be made, then the
10 witness shall sign a statement reciting such changes
11 and the reasons given by the witness for making them;
12     That the witness' signature ___ was / ___ was not
13 returned as of _____, 2016.
14     Subscribed and sworn to by me on this, the ___ day
15 of _____, 2016.
16
17
18
19  _____
       Michelle K. Miller, CSR, RPR
20     Texas CSR No. 9312
       Expiration Date: 12/31/16
21
       Kim Tindall & Associates, LLC
22     Firm Registration No. 631
       16414 San Pedro, Suite 900
23     San Antonio, Texas 78232
       Tel: 210-697-3400/Fax: 210-697-3408
24
25

```
 1        I, BETTY LEHEW, have read the foregoing
 2   deposition and hereby affix my signature that same is
 3   true and correct, except as noted above.
 4                    _____
                              BETTY LEHEW
 5
 6   THE STATE OF Pennsylvania )
 7   COUNTY OF Philadelphia )
 8        Before me, Vanessa P. Napoleon, on this day
 9   personally appeared BETTY LEHEW, known to me (or proved
10   to me under oath or through
11   Driver's License        ) (description of identity
12   card or other document) to be the person whose name is
13   subscribed to the foregoing instrument and acknowledged
14   to me that they executed the same for the purposes and
15   consideration therein expressed.
16        Given under my hand and seal of office this
17   26th  day of September
18
19                    _____
                      NOTARY PUBLIC IN AND FOR
20                    THE STATE OF  PA
21   My commission expires: April 18, 2017
22
23   ___ No Changes Made _L_ Amendment Sheet(s) Attached,
24   Artis Ellis vs. Educational Commission for Foreign
25   Medical Graduates.
```

NOTARIAL SEAL
VANESSA P. NAPOLEON, Notary Public
City of Philadelphia, Phila. County
My Commission Expires April 18, 2017
COMMONWEALTH OF PENNSYLVANIA

# Changes for Witness Betty LeHew
## Date of Deposition: September 7, 2016

| Page: | Line: | Change: | Reason: |
|---|---|---|---|
| Cover Page and Header on each page | | LeHew is spelled incorrectly | spelling |
| 16 | 13 | The issues uncovered that were believed to be disruptive to the center were not tihngs that occurred while she was on Administrative Leave or FMLA leave, they were issues that were reported to management during her FMLA leave and that had actually occurred prior to her taking FMLA leave. The employees did not feel safe in reporting them while she was in the center, but they did report them to the various members of management that were covering the center while Ellis was on the FMLA leave. These incidents led to the decision about Administrative Leave occurred by the defendent prior to her taking FMLA leave. | clarification |
| 30 | 24 | This should read: Because in the opinion of her manager, the Assistant Director of Center Operations, the Executive Director and also myself, the relationship was similar to those described above in the policy. The policy doesn't say it was the one described above. It says it was similar to the ones described above. These opinions were based on the initial explanations provided by the defended when asked about her relationship with Troi as well as her confession the following day where she admitted to lying about her relationship with Troi. | correction |
| 37 | 14 | Dalberg is spelled incorrectly | spelling |
| 39 | 16 | Furman is spelled incorrectly | spelling |
| 40 | 2 | Dalberg is spelled incorrectly | spelling |
| 47 | 19 | This should read: The interpersonal skills were listed in his email to the President, but they were not the primary reason for the termination decision. The Executive Director, Kim LeBlanc had two bigger issues, including falsification of his employment application -that was just discovered -and interfering with the Executive Director's communication with Center Managers. | clarification |
| 48 | 14 | This should read: His termination occurred after he received coaching, but just as a matter of timing, not as a result of the success or failure of the coaching. | clarification |

*Betty LeHew* 9/26/16