# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ARTIS ELLIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| Vs. | : | |
| | : | CIVIL ACTION NO. |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | : | 4:14-cv-02126 |
| | : | |
| Defendant. | : | |

*************************************************************

VIDEOTAPED / REALTIMED DEPOSITION OF

TROI A. BRYANT

SEPTEMBER 8, 2016

*************************************************************

VIDEOTAPED / REALTIMED DEPOSITION of TROI A. BRYANT, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on Thursday, the 8th day of September, 2016, from 11:18 a.m. to 1:09 p.m., before Pat English-Arredondo, CSR, RMR, CRR in and for the State of Texas, reported by machine shorthand in realtime translation, at the law offices of Morgan, Lewis & Bockius, LLP, 1000 Louisiana Street, Suite 4000, Houston, Texas, pursuant to the Federal Rules of Civil Procedure; that the Witness will read the deposition.

APPEARANCES

COUNSEL FOR PLAINTIFF ARTIS ELLIS:
Ms. Keenya R. Harrold
KENNARD
2603 Augusta Drive, 14th Floor
Houston, Texas 77057
Phone: 713.742.0900
e-mail: keenya.harrold@kennardlaw.com

COUNSEL FOR DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES:
Ms. Erin E. O'Driscoll
MORGAN, LEWIS & Bockius, LLP
1000 Louisiana, Suite 4000
Houston, Texas 77002
Phone: 713.890.5000
e-mail: codriscoll@morganlewis.com

ALSO PRESENT:
Ms. Artis Ellis

VIDEOGRAPHER:
Mr. Jamie Rodgers

COURT REPORTER:
Ms. Pat English-Arredondo, CSR, RMR, CRR, CLR

INDEX

PAGE

APPEARANCES.................................... 2

WITNESS: TROI A. BRYANT

EXAMINATION BY MS. O'DRISCOLL ................ 6

EXAMINATION BY MS. HARROLD .................. 85

FURTHER EXAMINATION BY MS. O'DRISCOLL ........ 90

FURTHER EXAMINATION BY MS. HARROLD ........... 93

FURTHER EXAMINATION BY MS. O'DRISCOLL ........ 95

FURTHER EXAMINATION BY MS. HARROLD ........... 101

CHANGES AND SIGNATURE............................ 103

REPORTER'S CERTIFICATE........................... 104

EXHIBITS INDEX

VIDEOTAPED / REALTIMED DEPOSITION OF
TROI A. BRYANT
SEPTEMBER 8, 2016
NOS.

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| EXHIBIT 1 | Subpoena issued to Mr. Bryant, with attachments, 8 pages | 9 |
| EXHIBIT 2 | Personnel files for Mr. Bryant at ECFMG, top document titled "Notice to All Standardized Patients and Acknowledgement of Receipt," dated 11-3-08 and signed by Troi Bryant, Bates Nos. ECFMG-ELLIS 007267 - 239 | 49 |
| EXHIBIT 3 | ECFMG Personnel Information Change Form, Bates ECFMG-ELLIS 007235 - 223 | 63 |
| EXHIBIT 4 | Clinical Skills Evaluation Collaboration (CSEC) Ownership, Confidentiality, and Non-Disclosure Agreement, Bates ECFMG-ELLIS 007227-7231 | 68 |

EXHIBITS INDEX

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| EXHIBIT 5 | Confidential letter dated 4-27-10 to Troy Bryant from Ann Jobe; Re: Acceptance of promotion to full-time position, Bates Nos. ECFMG-ELLIS 007215 - 7211 | 69 |
| EXHIBIT 6 | Thank you letter for interview sent to Mrs. Ellis and Mr. Biggs from Troy Bryant, Bates ECFMG-ELLIS007213 | 75 |
| EXHIBIT 7 | Order/Notice to Withhold Income for Child Support," Bates ECFMG-ELLIS 006750 - 767 | 83 |

* * *

6

THE VIDEOGRAPHER: Good morning. It's Thursday, September 8, 2016. The time is approximately 11:18 a.m., and we are on the record.

THE REPORTER: We're taking this pursuant to Federal Rules. Correct?

MS. O'DRISCOLL: Yes.

THE REPORTER: And you-all have chosen to waive the reading of the 30(b)(5).

Sir, will you go ahead and raise your right hand to be administered the oath?

TROI A. BRYANT,

being called as a witness, and having been duly sworn, testified as follows:

THE WITNESS: Yes.

THE REPORTER: Thank you, sir.

EXAMINATION

BY MS. O'DRISCOLL:

Q. Can you state your full name for the record, sir?

**A. Troi Alan Bryant.**

Q. Okay, Mr. Bryant. My name is Erin O'Driscoll and I represent ECFMG in a matter that Ms. Artis Ellis has filed, a lawsuit in federal court.

Do you understand I represent the company and I do not represent you? Do you understand that?

7

**A. Uh-huh.**

Q. Okay. And are you represented at all by a lawyer today?

**A. Do I need one?**

Q. You're just a fact witness. You're not a party to this lawsuit, so --

**A. No.**

Q. I just wanted to make sure there wasn't anything I wasn't aware of.

**A. Oh, no, no, no.**

Q. Okay. And Ms. Keenya Harrold, Ms. Artis Ellis' lawyer, she does not represent you. Is that --

**A. No, no. No, huh-uh.**

Q. And if you wouldn't mind just letting me finish my question before you start to respond? And that's just so that it's very clear for the court reporter so that -- because she can't type what we're saying both at the same time.

**A. Absolutely. Uh-huh.**

Q. And if you could continue to answer verbally --

**A. Okay.**

Q. -- and so just don't nod your head up and down.

**A. Okay.**

8

Q. We do have a video here today, but just so that we'll be able to read it on the written record, as well, what your responses are.

**A. Sure.**

Q. Okay. Wonderful.

And if you don't understand my question, if you could just please let me know, I'm happy to rephrase it. And if you don't ask me to clarify or rephrase it, then I'm just going to assume that you understand my question.

Does that make sense?

**A. Sure.**

Q. Okay. Mr. Bryant, what did you do to prepare for your deposition today?

**A. Scheduled off to be here.**

Q. Okay. Did you meet with anyone to discuss the facts of this lawsuit or what the allegations are?

**A. Well, I actually got some counsel from my brother-in-law -- he's a judge -- because I've never been to a deposition before.**

Q. Okay. Have you looked up the pleadings or any of the --

**A. No.**

Q. -- allegations in this matter?

**A. No, no.**

9

Q. And did you review any documents or anything that may be -- that may be related to this matter in any way?

**A. No, other than the ones I signed, the subpoena that I signed.**

Q. Okay. And that's the subpoena that you were served with?

**A. Right, right.**

Q. And the subpoena that you were served with I'm going to mark as Exhibit No. 1.

(Marked was Bryant Exhibit No. 1.)

Q. (By Ms. O'Driscoll) Is this the subpoena that you referenced a moment ago?

**A. (Reviewing) Yes.**

Q. And you were served by a process server and given a witness fee to appear today?

**A. Yes.**

Q. And is that your signature on Page 2 towards the bottom?

**A. Yes.**

Q. And if you could skip to the last page that's listed as Exhibit A of that document --

**A. Uh-huh.**

Q. -- did you bring any documents with you today that were responsive to these requests?

A. **No. Other than communications, no.**
Q. I'm sorry?
A. **Other than communications, no.**
Q. And what do you mean by "communications"?
A. **Just my knowledge of whatever you're going to ask me. Nothing written.**
Q. And did you take a moment, when you received this subpoena, to review to see if you had any documents or things or communications to or from or between you or ECFMG before, during, or after your employment at ECFMG?
A. **Yes, I did.**
Q. And you didn't have any documents?
A. **No.**
Q. Okay. And that was Request No. 1 on that Exhibit A.
A. **Right, right.**
Q. And on Request No. 2, "All documents and things and communications to or from or between you and Artis Ellis (also known as Artis Fowler or Artis Harden or any variation thereof) from January 1, 2007 to present."
Did you check and see if you had any documents responsive?
A. **No, I don't.**

Q. And then No. 3, "All documents and materials reviewed by you in preparation for your deposition."
You already said you didn't review anything.
A. **Right.**
Q. Okay. And have you ever spoken with Ms. Harrold or anyone in her office, in Artis Ellis' attorneys office, whether a paralegal or any other attorneys, prior to today?
A. **Briefly yesterday.**
Q. Okay. Did you speak -- what time of day yesterday?
A. **Late evening. I'm not sure.**
Q. And how long did you talk for?
A. **Five minutes.**
Q. Okay. And what did you talk about?
A. **She just wanted to make sure I was going to be here.**
Q. Okay.
A. **And that I knew where I was going.**
Q. Okay. And did you-all discuss anything else about the case or about Ms. Artis' allegations in the case?
A. **No.**
Q. Do you know what Ms. Ellis is alleging in

this case?
A. **Vaguely.**
Q. And how do you know that?
A. **Something has to do with our relationship or past relationship and employment. That's what I know.**
Q. Okay. Anything else?
A. **No.**
Q. And when you said "employment," is that employment at ECFMG?
A. **Yes. Yes, employment at ECFMG.**
Q. Because you-all both worked there at the same time?
A. **Yes. Yes, uh-huh.**
Q. And I just wanted to also mention just -- at the very beginning I meant to tell you if you need a break at any time, just feel free to let us know and we're happy to let you go to the restroom or get a drink or stretch.
I don't think we're going to be here for very long, but I just wanted to make sure in case you need a break. I would just ask that you finish answering the question, if there is one pending --
A. **Sure.**
Q. -- before we take the break.
A. **Sure.**

Q. And then also, as you know, you're under oath today as if you're testifying before a judge and jury and you understand that that's under penalty of perjury?
A. **Yes, ma'am.**
Q. Okay, great.
And when you said just a moment ago, when I asked you about what this lawsuit was about, you said you had a vague knowledge about that.
A. **Uh-huh.**
Q. You referenced that it was -- that it was your understanding that it was about your relationship with Ms. Artis Ellis.
A. **Uh-huh.**
Q. How did you know that?
A. **I'm not sure. I don't remember how I know that. I just know that.**
Q. Was it through talking with Ms. Keenya Harrold?
A. **It could have been --**
Q. Okay.
A. **-- part of that conversation, I guess. I'm not sure.**
Q. And do you remember anything else that might have been discussed about the relationship with

Ms. Keenya or anybody else in her office?
**A. No, I haven't spoken to anyone else in her office.**
Q. Have you spoken with Ms. Artis Ellis at any time in the last two years prior to coming today, this morning?
**A. On occasion. During the holidays, I guess.**
Q. Okay. And is that normal, for you-all to talk during the holidays?
**A. Well, at least text or -- yeah.**
Q. Okay.
**A. Yes.**
Q. And do you-all text each other back pretty freely?
**A. I'm not sure what you mean by that.**
Q. Well, how often? What's a normal week for you-all to communicate as far as number of times?
**A. It wouldn't be weekly. I would say seasonally during the holidays.**
Q. So during any of the holidays?
**A. Christmas, Thanksgiving, New Year. Happy New Year's.**
Q. Okay. Mr. Bryant, are you currently married?
**A. Yes.**
Q. And what is your wife's name?

**A. Jacquelyn.**
Q. And how long have you been married to her?
**A. 27, 28 years.**
Q. And have you ever been married before that?
**A. No.**
Q. And do you have any children?
**A. Yes.**
Q. And how many children do you have?
**A. Three.**
Q. And what are their names?
**A. Brittani, Troi and Ervin.**
Q. And how old are they?
**A. 29, 22 and 20.**
Q. And --
**A. Or 19. He will be 20 soon.**
Q. Sorry. Who will be --
**A. My youngest will be 20 in October.**
Q. And what are their last names?
**A. Bryant.**
Q. And who are the mothers of those children? Mother or mothers?
**A. Jacquelyn is the mother of Troi and Ervin, and Artis is the mother of Brittani.**
Q. Okay. When did you meet Artis Ellis?
**A. 20-plus years ago. 28 years ago, 29 years**

**ago, something.**
Q. Okay. And how did you meet Ms. Ellis?
**A. I can't recall exactly how I met her. I'm not sure. Kind of like knew the same people, I guess.**
Q. Did you-all go to school together?
**A. Not really.**
Q. I mean --
**A. We attended the same school, but we didn't go to school together.**
Q. But you attended the same school?
**A. I'm older than her, so I think I was gone already. I'm not sure how much older I am than her. I vaguely remem -- I didn't know her very well. When we were young people, I didn't know her very well.**
Q. Okay. So you said you went to school -- but you did attend the same schools?
**A. Yes.**
Q. Was it high school?
**A. High school, yes.**
Q. What about middle school?
**A. No. Not that I know of.**
Q. What about college?
**A. No.**
Q. Elementary school?
**A. No.**

Q. And what high school did you attend?
**A. Ross Shaw Sterling.**
Q. And did you attend that school for all four years of high school?
**A. Yes.**
Q. You said that you and Artis knew some of the same people.
**A. I would imagine because we went to the same -- yes, I'm sure we did.**
Q. Okay. .
**A. I'm not sure who they were, but...**
Q. You don't remember their names?
**A. No, no.**
Q. You think that you may be a year or two older than her?
**A. At least.**
Q. And did you-all attend the same church?
**A. No.**
Q. And did you and Ms. Ellis ever date?
**A. No.**
Q. Did you ever have any romantic involvement at all?
**A. Yes.**
Q. And how long was that romantic involvement?
**A. Once.**

Q. Okay. And when was that?
A. I don't recall exactly when it was, but just prior to my daughter being conceived.
Q. Okay.
A. Yeah, but I don't know dates and times.
Q. Okay. So you -- when you say "once," was that one period of time? Was that --
A. One encounter.
Q. Okay. And when you say "encounter," you mean sexual encounter?
A. Sexual encounter, yes.
Q. And so you and Ms. Artis -- and when was this romantic involvement?
A. What do you mean by "when"?
Q. Was it -- you said it was -- you said Brittani is 29 years old. And that's currently, right?
A. Yeah. I think she is, yes.
Q. And was she born in -- was it 1987?
A. Yes.
Q. And so does -- do you know when you were romantically involved? Was it just prior to Brittani being born?
A. It was in spring of that year, I guess. I don't remember exactly.
Q. Okay. When you say "that year," would that

be -- if she was -- was she born in March of 1987?
A. She was born in March of '87, so just previous, the previous year, a few months. So it was nine months. I don't remember the month. We can do the math. It was nine months before that. I don't know.
Q. Okay. And do you remember -- I know you said you went to the same high school and that you-all knew some of the same people. But do you remember how you met her, how you met Ms. Ellis, back during that spring time frame when you had the sexual encounter?
A. Are you asking me for an event or something?
Q. Well, how you met her. I'm just wondering, did friends introduce you? Did you see her in the hallway? Do you remember?
A. No, I don't. I think it was at a party or something. I'm not sure.
Q. Okay. You think you met her at a party?
A. I don't remember. I don't recall.
Q. Okay.
A. I have no idea where I met her.
Q. Did you-all go to the prom together?
A. No. Actually, I went with someone else.
Q. Okay. And do you remember if the sexual encounter with Ms. Artis was before, during or after

the prom?
A. It was later that -- yeah. Later that night, yeah.
Q. And where was that?
A. What do you mean?
Q. Location-wise, geographically, where was that?
A. In Houston.
Q. Okay. Was it in a house? Was it in a school?
A. It was --
MS. HARROLD: Objection, relevance.
A. Yeah, I'm not sure where you're going. I'm sure it was in a house, but I don't know exactly the details.
Q. (By Ms. O'Driscoll) Okay. After that house, did you -- you said that you-all had sex. Did you talk to her the next day?
A. I don't remember. I'm not sure.
Q. Well, do you remember talking to her after that evening of the prom?
A. Oh, yeah.
Q. And how often would you talk to her?
A. When she told me she was pregnant.
Q. Okay.

A. A few months later, couple of months later.
Q. Okay. And how did you respond?
A. I don't know. Like a 19-year-old. I don't know.
Q. And what does that mean?
A. A little scared, a little surprised, a little shocked. All of the above.
Q. And before she called you to let you know she was pregnant, had you spoken with her during that time period?
A. Huh-uh.
Q. Okay.
A. I don't remember speaking to her.
Q. And did she call you? Or did you talk to her in person when she told you that she was pregnant?
A. I don't recall whether it was over the phone or not.
Q. Did you-all have any mutual family friends?
A. No. What do you mean by that?
Q. Well, were any of your family friends or anyone in your family friends with her family or family friends?
A. Oh, not that I know of.
Q. And then once you found out that she was pregnant, you said you were a little scared as a

22

19-year-old.
Did you have any discussions after that, finding out she was pregnant?
**A. Oh, yeah, the whole parent thing. I went through all of that drama. It was, you know, a lot going on, so...**
Q. Right. Okay. And when you say "the whole parent thing," what do you mean? Do you mean being a parent with Ms. Ellis?
**A. No. Our parents. Her parents being upset, my parents being upset. Typical, "What are you doing? What have you been doing?" type of -- I had to explain myself.**
Q. Okay. And then did you propose to Ms. Ellis?
**A. No.**
Q. Were there any discussions at all about getting married?
**A. No.**
Q. Did you talk to her throughout her pregnancy?
**A. I'm sure, yes.**
Q. And were you there when her daughter -- when your daughter was born?
**A. Yes.**
Q. And did you help in raising Brittani?
**A. We co-parented, yes.**

23

Q. And when you say "co-parented," how did you help in raising her together?
**A. You know, guiding her, mentoring, feeding her, clothing her.**
Q. And so you were actively involved in her upbringing?
**A. Uh-huh.**
Q. And where did Brittani live when she was a baby?
**A. With her mom.**
Q. And would you go over and visit?
**A. No, she was married. Ms. Ellis was married shortly after that and so -- and I had a girlfriend, Jacquelyn.**
**So my wife would pick her up from -- I didn't visit, but I would get my daughter. I visited with my daughter, yeah.**
Q. So Jacquelyn would go and pick up your daughter?
**A. Uh-huh.**
Q. And where would she pick her up?
**A. I'm sure from the house.**
Q. From Ms. Artis Ellis' house?
**A. Uh-huh.**
Q. And did you -- how often would you see

24

Brittani while she was growing up?
**A. As often as I could.**
Q. Did you live close by?
**A. No, not close, no. I've always resided in Spring. I think they lived somewhere south of Houston.**
Q. And you lived in Spring during that time when Brittani was a child?
**A. Uh-huh.**
Q. Okay. And so Jacquelyn would go and pick up Ms. Ellis [sic]. And during this -- while Brittani was growing up, would you and Ms. Ellis talk frequently about Brittani?
**A. As parents would, I guess, whenever there's issues, I guess.**
Q. And what types of issues would you talk about?
**A. I don't know. Teenager issues, raising a kid issues, school, I guess.**
Q. Do you have specific recollections of having those types of conversations with Ms. Ellis on a regular basis?
**A. I don't remember every moment. No, I don't have specific ...**
Q. But you remember generally talking to her?
**A. Uh-huh, yeah.**

25

Q. Regularly?
**A. Co-parent, yes.**
Q. And you said that she lived with Ms. Ellis as a child. Did -- sorry, that Brittani lived with her mom as a child.
Did Brittani ever live with you?
**A. After she graduated college.**
Q. And do you remember how old or what year that was or how old she was?
**A. I think she graduated in -- I'm not sure when she graduated. '09, I guess. I'm not sure.**
Q. Okay. And was it during that time period when you were working at ECFMG?
**A. No. I was actually -- I was in another industry.**
Q. Do you remember what year you started working at ECFMG?
**A. No. I think it's here somewhere (indicating). I don't remember exactly when.**
Q. Okay. We'll look at some documents on that in a little bit.
**A. Yeah.**
Q. But you remember Brittani living with you --
**A. In '09.**
Q. -- after she graduated from college?

A. Uh-huh.
Q. And do you -- how long did she live with you for?
A. A couple of years. She lived with me, she moved out, she moved back in. So there was a period there, but I imagine it was a couple of years altogether.
Q. Okay. Did you help her pay her bills? Did you -- strike that.
Did you and Artis work out some sort of financial arrangement while Brittani was growing up?
A. I paid child support.
Q. Did that come right out of your paycheck?
A. Uh-huh.
Q. And did you pay that child support throughout the entire time that Brittani was a child?
A. Absolutely.
Q. Until she was 18?
A. Absolutely, yeah.
Q. And did you continue to financially support Brittani after she was 18?
A. Uh-huh, yes.
Q. In what types of ways would you help her financially?
A. As she needed. She was in college, so just

as a dad would.
Q. Food?
A. Yeah.
Q. Cars?
A. Yeah. All of that.
Q. Did you help with college tuition?
A. No. Fortunately, she "scholarshipped" most of her education, so I was fortunate.
Q. Okay.
A. Very little, if any, that I can recall.
Q. So you helped on the necessities?
A. (Moving head up and down.)
Q. Did Brittani go on vacation with you and Jacquelyn?
A. I'm sure she did.
Q. Do you recall her going on vacation?
A. Yeah.
Q. Did you -- did your family with Jacquelyn and Brittani, did you ever take any vacations together with Ms. Ellis?
A. Oh, no. No.
Q. Did you-all ever celebrate -- did you ever celebrate holidays with Brittani growing up as a child?
A. With my family, sure.
Q. So she would come over for Christmas?

A. Oh, yes.
Q. Or Thanksgiving?
A. (Moving head up and down.)
Q. And did you -- do you remember what your visitation was throughout Brittani growing up?
A. Not specifically, no. Not exactly what it was.
Q. Do you remember seeing her every week?
A. No, I didn't get a chance to see her every week.
Q. Every other week?
A. I'm sure, at least.
Q. And during the summers when she was on school break?
A. Uh-huh.
Q. Do you think you had a standard visitation where it was every 1st, 3rd and 5th weekend and summers.
A. It probably was. Probably, yeah. I paid child support, so whatever the rule was.
Q. Okay. Did you also carry Brittani on your medical insurance at any time when she was growing up?
A. Uh-huh.
Q. And your other children as well, Troi and Ervin, did they also live with you?

A. Yes.
Q. And did -- and prior to college did Brittani live with you --
A. No.
Q. -- except for when she was visiting?
A. No.
Q. And related to the child support and custody, did you and Artis talk about what worked best for you-all to decide how that was going to be handled?
MS. HARROLD: Objection, relevance.
Q. (By Ms. O'Driscoll) You can go ahead and answer.
A. I don't recall how that was decided. I'm sure we came to an agreement. We didn't have -- we didn't have problems, I guess. I'm trying to -- I can't remember how that was done.
Q. So you never refused to pay child support?
A. Oh, no, no.
Q. You wanted to be actively involved in her life?
A. Sure, yeah. She has my last name. Yeah.
Q. Okay. And are you and Brittani close?
A. I think so.
Q. And have you always been close?
A. Yes.

Q. While she was growing up, did you go to her school functions?
A. Sure.
Q. Did you go to parent-teacher conferences?
A. I'm sure I did.
Q. And would you attend parent-teacher conferences with Ms. Ellis?
A. No.
Q. You-all wouldn't be there talking to the teacher?
A. I don't ever recall that, no.
Q. And throughout Brittani growing up, would you talk to Ms. Ellis just on holidays; or was it more frequently than that?
A. I would say seasonally.
Q. Okay.
A. When we had to. You know, we were civil.
Q. Because you were co-parenting?
A. Right.
Q. So if Brittani was sick, you would talk about it?
A. I don't know if I knew every time she was sick. I can't say that, no.
Q. Not every time; but, I mean, you knew what was going on in Brittani's life when she was at her

mom's, correct?
A. I would like to think I knew, yeah.
Q. Okay. Okay.
Did Brittani get married recently?
A. Yes.
Q. Was it within the last couple of years?
A. Yes. She's been married at least two years now.
Q. And were you involved in that wedding?
A. Yes.
Q. Did you help pay for the wedding?
A. No.
Q. Did you and your wife ever help Brittani buy cars when she was growing up or as a young adult during college?
MS. HARROLD: Objection, relevance.
Q. (By Ms. O'Driscoll) You can answer.
A. I bought her a car.
Q. And what kind of a car was that?
A. A Honda.
Q. Do you remember when that was?
A. Not exactly. After she -- for graduation from college. Close to that.
Q. It was a graduation present?
A. Uh-huh.

Q. From college?
A. Uh-huh.
Q. And where did she go to college?
A. University of Texas.
Q. And was that a four-year degree?
A. Yes.
Q. Did she go on to graduate school?
A. Yes.
Q. And where did she go to graduate school?
A. Lamar University.
Q. Did you say "Lamar"?
A. Lamar University, yeah.
Q. And has she graduated from Lamar?
A. Yes.
Q. Do you remember when she graduated?
A. No. I don't remember the year, no.
Q. Mr. Bryant, where do you currently work?
A. I work for Austin Industrial.
Q. And how long have you worked there?
A. Five years this October.
Q. And what's your position there?
A. I'm a HSE manager, health and safety manager.
Q. And have you had that same position the whole entire time?
A. No. They hired me as a tech. I've been a

manager the past four years.
Q. I'm sorry?
A. I've been a manager for the past four years. They hired me as a tech before that.
Q. Okay. And where did you work before Austin Industrial?
A. ECFMG.
Q. And how long did you work there?
A. I'm not sure. I'm not sure if I was there two years or not. I'm not sure if I made it two years.
Q. Do you remember how you came to work at ECFMG?
A. Vaguely, yes.
Q. And how did you learn about that job?
A. My wife was working there.
Q. And is that Jacquelyn?
A. Yes.
Q. And how did you -- and what position did you apply for?
A. It was standardized patient.
Q. And you found out about that position through Jacquelyn?
A. Uh-huh.
Q. Did you know -- do you remember how long Jacquelyn had been working there --

A. No.
Q. -- at that time?
A. Huh-uh, no.
Q. But did you know that Ms. Ellis worked at ECFMG?
A. Yes.
Q. And how did you know that?
A. My wife worked there.
Q. And your wife told you that?
A. Yeah.
Q. But --
A. Pretty sure. I mean ...
Q. And you also spoke with Ms. Ellis or texted with her on the holidays; so you knew where she worked, didn't you?
A. I guess, yes. I guess that's how I knew, yeah. I didn't keep track of her. Ms. Ellis, I mean.
Q. Right, right. But you would communicate throughout the holidays and so you knew where she worked, didn't you?
A. I can't say that I did. Before my wife worked there, I can't say that I did, no.
Q. But you knew she worked there while your wife --
A. Yes.

MS. HARROLD: Objection, asked and answered.
Q. (By Ms. O'Driscoll) You knew Ms. Ellis worked there during -- while Jacquelyn worked there?
A. Yes. Yes, I did.
Q. And did you know what her position was? I'm sorry. Let me make sure that's clear.
Did you know what Artis Ellis' position was at ECFMG while your work wife was working there?
A. I'm not sure if I did or not. I don't know if I knew what she did, or not.
Q. Do you remember knowing that she ran the center?
A. No, I wasn't sure she ran the center, no.
Q. You found out that she ran the center when you were hired, correct?
A. Well, actually, when I interviewed, I guess I found -- she wasn't, like, running the center when I was interviewed.
Q. Was she running the center when you started working there?
A. No.
Q. Are you sure about that?
A. Yeah. There was a guy named John. There was a guy named John running the center when I got there.

Q. Okay. And did you understand that on the day that you started that Ms. Ellis was the center manager?
A. I thought I worked under John. I thought I worked for John.
Q. And how long do you think you worked for John?
A. I don't know. I'm not sure. I know he interviewed me. That's what I do remember. I am sure about that.
Q. And how did you find out that you were going to be interviewed at ECFMG?
A. I'm not sure. Correspondence, maybe a phone call or mail. I'm not sure how I found out I got the interview.
Q. Had you met John before that interview? Had you met him before?
A. I don't know. I don't know. I don't think so.
Q. Did you ever -- and you said that Jacquelyn, your wife, work at ECFMG during that time when you interviewed at ECFMG?
A. Right.
Q. Had you ever gone to ECFMG functions --
A. I had, yes.
Q. -- with Jacquelyn?

A. Yes.
Q. What kinds of functions did you go to?
A. Like a Christmas party.
Q. Any other functions?
A. That's the only thing I remember, a holiday party or something.
Q. Any baseball games?
A. Maybe. Maybe.
Q. Okay.
A. Yeah. I probably went to a baseball game, yeah.
Q. Okay. Do you remember how many functions you went to?
A. No.
Q. Okay. Do you remember, going to those functions, did you see Ms. Ellis at any of those functions?
A. Uh-huh.
Q. Okay. Would Brittani ever go with you to those functions?
A. No.
Q. Did -- would you and Ms. Ellis talk at those functions?
A. Yes.
Q. Because you were co-parenting with Brittani?

**A. Right, right.**

Q. And do you remember -- you said that you remember that John interviewed you for that position and that was for a standardized patient position?

**A. Uh-huh, yes.**

Q. Was that a part-time job?

**A. It was, yes.**

Q. Do you remember who trained you?

**A. Kristy.**

Q. Kristy Edens?

**A. Yes, yes.**

Q. And do you remember -- do you remember having to fill out a job application to apply for the job at ECFMG?

**A. Sure.**

Q. Was it -- did you fill out a hard copy one or went on-line or did you mail one in? How did you do that?

**A. I'm not sure. I think they do it on-line. I'm not sure. I think I did it on line.**

Q. And did you apply for the job application before you went to work at ECFMG?

**A. Yeah. Uh-huh.**

Q. And do you remember seeing Ms. Ellis when you started working at ECFMG?

**A. Sure, yes, I saw her.**

Q. And you knew she was center manager?

**A. At some point. But I don't think she was center manager when I got hired there. I mean, she may have been; but I just remember working for John, so...**

Q. Okay. And do you remember who you reported to when you were hired?

**A. As an SP, I reported to the trainers. That's typically who I reported to.**

Q. Okay. Do you remember who did your job evaluations?

**A. I don't know that I had a job evaluation.**

Q. Do you remember if you ever received any raises while you worked at ECFMG?

**A. No, I don't. I don't think I got any raises.**

Q. In that part-time position as an SP when you were hired, how many hours a week would you open?

**A. I don't know. Around 20 hours a week, I guess.**

Q. And did you have any benefits with that position as an SP?

**A. No. I don't think I had benefits. I had benefits somewhere else at another job at the time.**

Q. Were you working multiple jobs?

**A. Uh-huh.**

Q. What was the other job as well?

**A. I was a financial rep for Met Life.**

Q. And was that also a part-time position, or was that full-time?

**A. No, it was full-time.**

Q. So you were working full-time for -- I'm sorry -- Met Life?

**A. Uh-huh.**

Q. And then you would work part-time over at ECFMG?

**A. Uh-huh.**

Q. You said that you remember John being there at some point towards the beginning. Do you remember him ever leaving and not being in Houston?

**A. Sure, uh-huh.**

Q. And do you remember when he left?

**A. No.**

Q. Do you know where he went?

**A. I think he went to Philadelphia, back to Philadelphia.**

Q. Okay. And is it your understanding that when John left that Ms. Ellis became center manager?

**A. Right, right. That's what I -- yeah.**

Q. Before going to work at ECFMG do you remember having any conversations with Ms. Ellis about the

prospect of going to work there?

**A. No, I don't remember any conversations like that.**

Q. You don't remember asking her anything about the business or the job or what it was like to work there, anything along those lines?

**A. No. My wife -- I got all of that from my wife.**

Q. Okay. And do you remember how long Jacquelyn worked there?

**A. No. I'm not sure how long she worked there.**

Q. But you-all worked there for some period of time at the same time?

**A. Uh-huh.**

Q. So Jacquelyn was working at ECMFG the same time you were and the same time that Ms. Ellis was center manager?

**A. Yes.**

Q. And did Jacquelyn get along with Ms. Ellis?

**A. Yeah, I think so.**

Q. I mean, was there any animosity --

**A. No.**

Q. -- since you and Ms. Ellis were co-parenting with a child?

**A. No.**

Q. So everyone got along?
A. Yes.
Q. Do you know if your wife, Jacquelyn, knew Ms. Ellis before going to work at ECFMG?
A. Could you ask me that again?
Q. Sure. Did Jacquelyn, your wife, know Ms. Ellis before she went to go work at ECFMG?
A. Yes.
Q. And how did she know her?
A. She is the mother of my daughter. We were co-parenting.
Q. Right. So Jacquelyn is your daughter's stepmom?
A. Yes.
Q. And Jacquelyn knew Artis Ellis because you-all were raising Brittani together?
A. Yes.
Q. You and Jacquelyn -- I know you said -- I think you said you were dating during that time period when Ms. Ellis was pregnant with Brittani. Was that right? Or you said you had a girlfriend, but I wasn't sure.
A. She was born -- I started dating Jackie -- Brittani was really small, so like a few months, so...

Not while she was pregnant, but I know I introduced Brittani to Jacquelyn when she was really small, like within a couple of months, two or three months, or something like that.
Q. So Brittani grew up with her --
A. Yes, yes.
Q. -- as a stepmom?
A. Yes, always. Even when we dated, yes.
Q. And how long did you and Jacquelyn date before getting married?
A. A year or two.
Q. And did Jacquelyn and Brittani get along really well while growing up?
A. Uh-huh. Yes, yes.
Q. You said Ms. Ellis and Jacquelyn got along very well while Brittani was growing up as well?
A. Not always, but we eventually got there.
Q. Okay. Do you remember any specific -- anything specific that you're thinking of when you say "we eventually got there"?
A. No. Just -- you know, we were young. We were all pretty young. So it was -- it wasn't perfect, but nothing -- I don't remember any events or anything. It just wasn't perfect. It wasn't a perfect circumstance, so ...

Q. Okay. But you-all got along well?
A. Yes.
Q. So you recall applying at ECFMG because Jacquelyn told you there was an opening?
A. (Moving head up and down.)
Q. Do you remember ever applying for a promotion from the SP position?
A. Yes, I did.
Q. And what promotion did you apply for?
A. Trainer.
Q. And did you get that position?
A. Yes.
Q. What was the process of applying? What did you have to do to apply for the trainer position?
A. So I'm not sure of their process, but I think you apply on-line. I sent in a resume', all of that stuff.
And then, over some period of time they scheduled the interviews in Houston, a lady from Philadelphia came through and did interviews, and sometime after that I was told I got the position.
Q. Okay. And do you remember if there were other folks interviewing for that position?
A. Uh-huh.
Q. Do you remember how many folks?

A. No. A lot.
Q. Do you remember any of the names of the people that were interviewing for that promotion?
A. No.
Q. Do you -- you remember interviewing with someone from -- who came in from Philly.
A. Yes.
Q. Did you interview with anyone else for that promotion?
A. After I got through that, I interviewed with Artis and Brent.
Q. Brent Biggs?
A. Yes.
Q. And did you tell anyone at ECFMG that you and Ms. Ellis shared a daughter?
A. No.
Q. Did you tell Mr. Biggs that?
A. No.
Q. Do you ever remember telling any of your co-workers that Brittani was your daughter?
A. No.
Q. Do you remember Brittani ever going to any Christmas parties during the time when you worked there at ECFMG?
A. No.

46

MS. HARROLD: Objection, asked and answered.
A. No.
Q. (By Ms. O'Driscoll) Do you ever remember showing any pictures of Brittani to Kristy Edens?
A. No, I don't remember doing that.
Q. And you didn't -- you didn't tell anyone in management at ECFMG that you and Artis shared a daughter?
A. No.
Q. Did Artis tell you not to tell anybody that you and Brittani [sic] shared a daughter?
A. No.
Q. Did anyone at ECFMG know that Jackie was Brittani's stepdaughter -- I'm sorry, stepmom. I apologize.
A. I'm not sure if anybody there knew that Brittani was my daughter.
Q. Okay.
A. I never discussed -- that wasn't workplace discussion.
Q. You don't remember talking with any of the other SPs or trainers about Brittani being your daughter?
A. It's possible; but no, I don't remember it.

47

Q. But it's possible?
A. I guess, yeah.
Q. When you applied for that promotion as trainer, you said you did, in fact, get it, correct?
A. Uh-huh.
Q. And was that a full-time position?
A. Yes.
Q. And you received benefits?
A. Yes.
Q. And who did you report to at that time as full-time trainer?
A. Ms. Ellis and Brent.
Q. And do you recall Ms. Ellis doing any evaluations for you while you were trainer?
A. I don't remember getting an evaluation. Like I said, I don't even know how long I was there.
Q. Okay.
A. I don't remember an evaluation.
Q. Do you remember getting raises while you were working there?
A. I don't. I don't remember.
Q. You don't remember if your wage increased during the time?
A. When I went from SP to trainer, it certainly did. But I don't remember -- I don't think I was there

48

long enough for a raise.
I'm not even sure if I did the position for a year or not. I just -- I don't remember an evaluation.
Q. Okay. When you applied for the job at ECFMG, did you -- there is a question that asks, "Who do you know that works at ECFMG?"
Did you list Ms. Ellis?
A. I'm sure I did if they asked it, yeah.
Q. When you started at ECFMG as an SP, do you remember seeing Ms. Ellis when you started?
A. Yes.
Q. And was she surprised that you were there? Did she know that you were going to be there?
A. I remember -- yeah, she knew I was there. She knew I was going to be there.
Q. How did she know that?
A. I remember seeing her when I interviewed with John.
Q. Okay. And did you talk with her then when you interviewed with John?
A. I'm not sure. That's a busy place. I remember John wet and sweaty and moving fast, so it's busy. I'm sure it was, "Oh, hey." I'm sure it was in passing.

49

Q. But Ms. Ellis wasn't -- she didn't act surprised when she saw you when you started working at ECFMG?
A. No.
Q. Because she knew that you were going to be starting there?
A. I assume so, yes.
Q. And when you first start and you go through orientation, is there some sort of a presentation on that first day?
A. I don't remember the orientation process.
Q. I will mark this as Exhibit 2.
Mr. Bryant, if you could take a look at this, we will walk through the pages together.
(Marked was Bryant Exhibit No. 2.)
A. Uh-huh.
Q. (By Ms. O'Driscoll) These are documents from your personnel file at ECFMG.
A. Uh-huh.
Q. And if you wouldn't mind going to Page 2, do you recognize that letter dated November 3rd, 2008?
A. Not particularly, but ...
Q. Is that your address, 3318 La Mer Lane, Spring, Texas 77388?
A. Uh-huh.

Q. And that was your address back then in 2008?
**A. Uh-huh.**
Q. You just don't have a specific recollection of receiving the offer letter?
**A. Right.**
Q. If you turn to the second page, that line towards the bottom where it says your name and date, is that your signature?
**A. Uh-huh. Yes.**
Q. And the date on that is November 3rd?
**A. Right.**
Q. And above that, after "Sincerely," do you recognize that to be Ms. Ellis' signature?
**A. I do.**
Q. If you go back to the first page of that offer letter, the first line, "It gives me great pleasure to confirm our offer of employment to you for the position of standardized patient. I've outlined the specific details of our offer below."
First bullet, "You will report directly to Artis Ellis, Acting Center Manager."
**A. Uh-huh.**
Q. Did I read that correctly?
**A. Uh-huh.**
Q. When you were hired at ECFMG, does that

refresh your recollection that you were reporting to Ms. Ellis?
**A. No, because I remember reporting to John. I mean, that may be true; but I remember John being there. I specifically -- I mean, I know what the guy looks like, so...**
Q. Do you remember him being there for very long?
**A. No.**
Q. Or do you remember how long he was there?
**A. No idea. This was -- I don't remember what I did yesterday. You're asking -- I don't remember this letter, so ...**
Q. I understand. I understand. But this letter -- this offer letter is from Artis Ellis to you.
**A. Okay.**
Q. Correct?
**A. Sure.**
Q. And that's your signature on the second page?
**A. Yes.**
Q. And on that first page of the offer letter it walks through a number of dates related to orientation on November 3rd. Is that correct?
**A. Okay. Uh-huh.**
Q. And then a number of workshops --

**A. Okay.**
Q. -- that are going to happen through December 2008. Is that correct?
**A. Uh-huh, yes.**
Q. And if you go to the next page after the offer letter, in the lower right-hand corner I may refer to Bates numbers. That's "ECFMG-ELLIS 7269."
Do you see that in the --
**A. Okay.**
Q. If you could turn one more page.
**A. Oh, I'm sorry.**
Q. That's okay. Those are Bates numbers; so if I refer to a number that's just in the bottom right-hand corner, it kind of helps us --
**A. Okay.**
Q. -- guide through.
**A. Okay.**
Q. That just means that I've provided it to Ms. Ellis' counsel, so I went ahead and numbered it.
**A. Okay.**
Q. If you would, just take a minute to look at this job description.
**A. Okay.**
Q. You don't have to read through it in substance necessarily, but I just wanted you to take a

minute to see if you recognize this job description.
**A. (Reviewing) Okay.**
Q. And on that first page of the job description where it says "Reports To: CSE Center Manager," that would be the center manager at Houston. Correct?
**A. What section? Oh, yes, uh-huh.**
Q. Where it says --
**A. Yes, uh-huh.**
Q. And if you look on the last page of that job description in the lower right-hand corner, it's ECFMG-ELLIS 7272. Is that your signature towards the bottom of the page dated 11-3-08?
**A. Yes.**
Q. And a couple of lines above that you see Artis Ellis' signature?
**A. Uh-huh.**
Q. And do you remember when you signed your paperwork, job description, and other paperwork?
**A. Uh-huh.**
Q. Do you remember -- do you have a specific recollection of how you received that paperwork when you started working at ECFMG?
**A. No, I can't say that I do.**
Q. Do you remember filling it out at orientation or remember where you were when you were filling it

12:13:56 out?
12:13:56 A. **No. It sounds like an orientation process.**
12:13:08 Q. But you don't recall?
12:13:03 A. **No.**
12:13:03 Q. Okay. If you turn -- after that last page go to the next page. It's hard to read the letter -- the number on the bottom. They kind of overlapped.
12:13:58 A. **Yes, ma'am.**
12:13:59 Q. But the title of the document at the top left-hand corner says "Troi Bryant."
12:14:02 A. **Yes.**
12:14:02 Q. And the title is "Application for Employment".
12:14:04 A. **Yes.**
12:14:06 Q. If you would just take a minute to look at this, it's a few pages long. Is this the application that you filled out for ECFMG?
12:14:10 A. **(Reviewing).**
12:14:13 Q. Was this an on-line application?
12:14:15 A. **I think so. I don't remember now.**
12:14:16 Q. If you go to -- in the upper right-hand corner it says "Page 1 of 9"; and if you flip over to Page 7 of 9, it's something that appears to be an electronic signature. I don't know if this is will -- is that your electronic signature?

12:14:28 A. **Yes.**
12:14:23 Q. Do you remember if you did this at a computer or how you filled this out?
12:14:35 A. **I'm sure I did it at a computer. That's the only way you could do that, yeah. I don't remember where I was, but ...**
12:14:40 Q. If you look back at that first page of the application, right below Application for Employment, do you see that date that's to the right of your name?
12:14:56 A. **Okay.**
12:12:58 Q. And what is that date?
12:12:58 A. **11-4 of '08.**
12:13:02 Q. Do you know why this application is dated the day after your offer letter?
12:13:07 A. **I have no idea.**
12:13:10 Q. Do you remember filling out the application paperwork prior to receiving an offer?
12:13:18 A. **No, huh-uh. It doesn't make sense to me, no.**
12:13:29 Q. So you don't know why that's the day after your offer letter?
12:13:36 A. **No.**
12:13:42 Q. If you go a little bit further down, it says, "Position Applying For: Standardized Patient," on the first page of the Application for Employment. "Starting Salary, $16 an hour."

Did I read that correctly?
A. **Yes.**
Q. If you go two boxes down, "How did you learn about Step 2 CS?"
Do you know what "CS" stands for?
A. **No, I don't.**
Q. So it says, "How did you learn about Step 2 CS?"
And you put "Relative."
"Who? Jackie Bryant."
Did I read that correctly?
A. **Yes.**
Q. Then on the next line it says, "Do you know anyone who works at ECFMG?"
A. **Uh-huh.**
Q. And you answered "Yes." Is that correct?
A. **Uh-huh.**
Q. And then below that it says, "If yes, state the names of your relationship to that person."
A. **Uh-huh.**
Q. "Jackie Bryant/relative."
A. **Uh-huh.**
Q. Do you know why you didn't put "Artis Ellis" there on that job application?
A. **No, I have no idea why I didn't. To me, that**

**was -- it made sense. I wanted them to know that I knew my wife worked there, so...**
**It just made sense.**
Q. But when the question asks, "Do you know anyone who works at ECFMG?" at that time you knew multiple people that worked at ECFMG. Correct?
A. **Yes.**
Q. And one of those people included Artis Ellis?
A. **Right.**
Q. Okay. And did you attend business school at Kaplan Houston?
A. **Some training, yes.**
Q. I'm sorry?
A. **Some training through Kaplan, yes.**
Q. Training? Okay. Was there -- and what kind of training was that?
A. **It was financial service-type training, preparing for Blue Sky Law test, things like that, mutual funds test.**
Q. Okay. Did you stay working as a Met Life financial services advisor throughout the time that you were also promoted as a trainer?
A. **No.**
Q. So when you were promoted from a part-time position as SP up to trainer, you no longer worked at

Met Life?
A. I resigned.
Q. Do you remember what your salary was when you were promoted to trainer?
A. No, I don't.
Q. Was it a salary position or an hourly position?
A. I'm not sure. I think it was salary. I'm not sure. Whatever...
Q. But you got a raise?
A. Right. I did. It was ...
Q. And if you could turn to the page that's after the on-line application, so in the bottom lower corner it's ECFMG-ELLIS 6997.
At the top of this page it says "ECFMG New PTAN Employee Form."
Do you remember filling this form out?
A. No, but clearly I did.
Q. I'm sorry?
A. I said: No, but clearly I did.
Q. That's your handwriting?
A. It looks like it, yes.
MS. HARROLD: What's the page number?
MS. O'DRISCOLL: In the lower corner it's 6997.

MS. HARROLD: Okay.
Q. (By Ms. O'Driscoll) Is that your handwriting on 6997?
A. It looks like it.
Q. It looks like there's a couple of different types of handwriting.
A. That's not my handwriting (indicating).
Q. Where it says "standardized patient"?
A. Right.
Q. But before that that is your handwriting?
A. Looks like it, yeah.
Q. And your hire date is 11-3-08?
A. Uh-huh.
Q. Is that correct?
A. Uh-huh.
Q. Where it says "Supervisor Name," it lists "Artis Ellis." Correct?
A. Uh-huh.
Q. Do you also -- if you could skip a couple of pages forward at 7277 --
A. Uh-huh. Okay.
Q. -- to the Clinical Skills Evaluation Collaboration.
A. Okay.
Q. Do you remember filling out this document?

A. No, I don't.
Q. If you turn to the second page at 7279, is that your signature under "In witness whereof"?
A. Yes.
Q. A then a few lines -- and that's dated 11-3-08?
A. Uh-huh. Yes.
Q. So were you -- it appears you were filling all of these documents out on the same date. Is that correct?
A. Looks like it, uh-huh.
Q. And then that's -- do you recognize that as Artis Ellis' signature as your supervisor or manager right below that?
A. It looks like the previous ones, yes.
Q. And you understood as a standardized patient through this agreement, through the Clinical Skills Evaluation, that you were going to be handling confidential information?
A. Yes.
Q. And as a standardized patient, do you ever remember -- were you ever sent home during an exam?
A. Sent home?
Q. Yes, involuntarily. Like, for example, if you showed up and had a sore throat or had a bruise or

anything of that nature? Do you ever remember being sent home as a standardized patient?
A. No.
Q. And I know you said that you and Ms. Ellis talk or text regularly on holidays. Do you remember the last time that you spoke with her prior to today?
A. No.
Q. Or texted with her?
A. I can't remember.
Q. Would it be within the last month?
A. Maybe two or three months ago. I'm not sure.
Q. And do you remember what you-all talked about?
A. No, huh-uh.
Q. Do you remember when you first heard that Ms. Ellis had filed a lawsuit against her former employer?
A. Years ago.
Q. And how did you hear about it?
A. I don't know. Scuttlebutt. I'm not sure how I found out.
Q. Did you hear it from Ms. Ellis?
A. No.
Q. When you say "years ago," what does that mean? Few years? A couple of years? Do you remember?

62

A. I've been separated from this company for five years. It was years ago. At least five years ago.
Q. You think you heard that Ms. Ellis filed a lawsuit at least five years ago?
A. I knew that she separated from the company at least five years ago.
Q. And how did find out that she separated?
A. Scuttlebutt. I don't know.
Q. What does that mean to you, scuttlebutt?
A. Rumors, somebody told me. I'm not sure if it was in passing or what the conversation was or who.
Q. Do you remember if Brittani told you?
A. No, I don't remember Brittani telling me. No.
Q. Okay. Do you remember Ms. Ellis telling you?
A. No, I don't remember her telling me, no.
Q. Did you hear why she separated?
A. No.
Q. As you sit here today, have you ever heard why she separated from the company?
A. No. Not that I can -- no.
Q. Did you hear something?
A. No.
Q. Do you and Ms. Artis Ellis have any mutual

63

friends?
A. Uh-huh, yes.
Q. And who are those friends?
A. I know her brother.
Q. Anybody else?
A. I'm not sure. I'm sure I do, but I don't know -- I don't know their names right now.
Q. Okay. Did you know her brother from high school?
A. No.
Q. How did you know her brother?
A. I've known him in the last three years.
Q. I will mark this as Exhibit 3.
(Marked was Bryant Exhibit No. 3.)
Q. (By Ms. O'Driscoll) The first page is ECFMG-ELLIS 0235. If you could take a minute to look at that document, sir.
A. (Reviewing).
Q. At the top of this document, 7235, it's called "ECFMG Personnel Information Change Form."
A. Okay.
Q. Have you ever seen a document like this?
A. I don't remember it.
Q. Pardon?
A. I don't remember it.

64

Q. If you look where it says "Old Information" on the left side, it says "$16.00" and "New Information," it says "$18.50."
A. Uh-huh.
Q. And then the date, "Effective Date: February 20, 2009."
A. Okay.
Q. Does that refresh your recollection that you were given a raise during that time period?
A. No, it doesn't; but clearly I was.
Q. Okay. Do you remember Ms. Ellis telling you that you were getting a raise?
A. No, I don't remember her telling me that.
Q. If you go to the next page, Clinical Skills Evaluation Collaboration, dated January 12, 2010 --
A. Uh-huh.
Q. -- to Mr. Bryant. If you could, just take a minute to look at this.
Do you remember receiving this?
A. (Reviewing) No, I don't remember receiving this.
Q. In the "To" line it says it's addressed to you, correct?
A. In the -- yes, it does.
Q. And then in "From" it says, "Artis Ellis,

65

Center Manager. Angelo Williams, Standardized Patient Trainer."
Did I read that correctly?
A. Yes, you did.
Q. And then in the "RE:" line, in bold, "Annual Standardized Patient Evaluation"?
A. Okay.
Q. For 2009?
A. Okay. Yes.
Q. And did that refresh your recollection that you did receive evaluations during that time period?
A. Sure. I don't remember any of this, but clearly I did.
Q. Okay. If you go to the next page, is that your signature there where it says "Troi" -- I'm sorry, above the line, "Standardized Patient"?
A. Yes.
Q. And that's dated January -- I'm not sure if that's "11" or "13," 2010.
A. Yes.
Q. And then a couple of lines below that the center manager also signed off on that, correct?
A. Yes.
Q. Do you remember -- does that refresh your recollection at all about receiving a 2.5% pay increase

66

during that time period that Ms. Ellis signed off on?
A. I mean, clearly I did; but no, I don't remember it.
Q. Okay.
A. It might be important for you to know this was insignificant to me, so I don't remember all of these details.
Q. Okay. But you remember working at ECFMG?
A. Right, right.
Q. During this time period you were working at least 20 hours a week?
A. I'm not even sure if that was accurate, but that was -- something like that.
Q. But it was a part-time job that you were going to --
A. Yeah, right.
Q. -- each week?
A. Right.
Q. Where Ms. Ellis was center manager?
A. Right.
Q. And how often would you see Ms. Ellis when you were at work?
A. Sometimes I would. Sometimes I wouldn't. It depends. We're in an exam. We're isolated.
Q. Okay.

67

A. I probably wouldn't see her if I was there. Twice I probably wouldn't see her.
Q. I'm sorry. Twice you wouldn't see her?
A. Twice in one week.
Q. Okay. Did you-all have meetings in the mornings before the exam?
A. With the trainers, uh-huh.
Q. Would Ms. Ellis ever go to those meetings?
A. Occasionally.
Q. If you -- I'm going to mark this as Exhibit 4.
During those morning meetings didn't Ms. Ellis conduct them?
A. No, no, huh-uh.
Q. Did she conduct some of them?
A. No, I remember them being led by the trainers.
Q. Okay.
A. Because I did it as a trainer, but the morning meetings.
Q. Did you as a trainer ever have to have meetings with the assistant manager and the center manager to kind of coordinate and get a game plan on exams?
A. Not for exams. We had -- I guess, yes.

68

Yeah, we did.
Q. So you would have meetings with Ms. Ellis --
A. Right.
Q. -- as part of your job duties?
A. Right, right. As a trainer, yes.
Q. As a trainer?
A. Yes.
Q. And that was pretty regular?
A. I imagine it was, yeah.
(Marked was Bryant Exhibit No. 4.)
Q. (By Ms. O'Driscoll) We're going to mark as Exhibit 4 (tendering). This is ECFMG-ELLIS 7227 on the first page.
This is another copy of the Clinical Skills Evaluation Collaboration, the Confidentiality and Non-Disclosure Agreement?
A. Uh-huh.
Q. Does that look familiar?
A. Vaguely, yeah.
Q. If you turn to the last page, is that your signature?
A. Yes.
Q. And that's dated January 10, 2011?
A. Uh-huh.
Q. And below "Supervisor," next to the line

69

"Supervisor or Manager," that's Artis Ellis' signature, correct?
A. Yes.
Q. And during this time in 2011 had you already been promoted to the trainer position?
A. I don't know. You tell me. I'm not sure. I don't know what my promotion date was. I thought I saw it on one of these documents, but ...
Q. Well, if we look back on --
A. No, it wasn't 2010. I'm not sure when I was promoted. I was still part-time in 2010, so ...
This is 2011. I'm not sure if I was or not.
Q. I think I have another document that can help us on that, actually.
We will mark this as Exhibit 5.
(Marked was Bryant Exhibit No. 5.)
Q. (By Ms. O'Driscoll) Could you take a look at Exhibit 5 on that first page?
A. Uh-huh.
Q. This letter is dated April 27, 2010. It's addressed to Troi Bryant, again at 3318 La Mer Lane. That was still your address?
A. Yes.
Q. "Dear Troi, this letter is to confirm your

acceptance of the promotion of the full time position of Standardized Patient Trainer in the Houston Center."

Did I read that correctly?

A. Yes.

Q. "I've outlined the specifics details of your offer below."

First bullet, "You will report directly to Artis Ellis, Center Manager, Houston Center."

A. Uh-huh.

Q. Is that correct?

A. Yes.

Q. "Your start date for this position will be May 10, 2010."

Did I read that correctly?

A. Yes.

Q. And does that refresh your recollection that you were promoted in May of -- or you received the letter in late April but it was effective in May 2010?

A. Uh-huh.

Q. Okay. And that third bullet, "Your starting salary" from this non-exempt position -- "for this non-exempt position will be $46,000 per year or 25,000 -- I'm sorry, $25.27 per hour?

A. Okay.

Q. Did I read that correctly?

A. Uh-huh.

Q. So you got a significant increase from being part-time SP up to a full-time trainer?

A. Yes.

Q. In that next paragraph it describes your benefits, benefit programs. Do you recall that, receiving benefits as a trainer?

A. Yes.

Q. And in that lower right-hand corner, is that your signature dated May 4, 2010?

A. Yes.

Q. If you go to the next page, did you make more as a trainer than you did as a financial planner?

A. No, no.

Q. So what prompted you to quit doing financial planning?

A. The market crashed and I was a new -- I guess I had been in the business a couple of years. I didn't have a large enough book of business to survive that downturn, so that's why I was working two jobs.

And I took this (indicating) as just an opportunity to -- I went without -- I was a full commission guy, and I went without commission for probably about 18 months. So I literally was hustling 20 hours a week on the side, plus whatever else I could

do.

Q. Did you say 18 weeks or 18 months?

A. 18 months.

Q. And that was during the time when you were working part-time as SP and you were doing the financial planning on the side?

A. (Moving head up and down.)

Q. So were you relieved when you got that promotion to trainer?

A. Sure.

Q. Do you remember talking to Ms. Ellis, letting her know that you were going to be applying for the promotion?

A. I did not.

Q. You didn't mention it to her?

A. Huh-uh.

Q. Do you remember talking to anyone about applying for the promotion?

A. Uh-huh. I was encouraged to.

Q. And who encouraged you?

A. Some of the other trainers.

Q. And do you remember who that was?

A. I'm sure Kristy and Angelo. I didn't even remember Angelo was my trainer. But Kristy and Angelo those guys. I mean, just the group.

Q. Do you ever remember Ms. Ellis encouraging you to apply for the promotion?

A. Not really. No.

Q. If you go to the next page, it's "Vanguard 403(b)(7) New Account Form."

A. Okay.

Q. Do you remember filling out this Vanguard paperwork while you worked for ECFMG?

A. Okay.

Q. Do you recall that?

A. Vaguely, yeah.

Q. Is that your handwriting?

A. Yes.

Q. And if you could flip through this document I just want to make sure all of this document is your handwriting.

A. Uh-huh.

Q. And if you turn to Page 5 of 8 in the bottom right-hand corner ECFMG-ELLIS 7205 --

A. Yes.

Q. -- under "Individuals," you listed Brittani Bryant as a recipient of your 401(k), correct?

A. Absolutely, yes.

Q. And that went along with you helping her out financially throughout her growing up?

A. That's my child. Absolutely.

THE VIDEOGRAPHER: Counsel, can you give me a couple of minutes to change the tape?

MS. O'DRISCOLL: Yes.

THE VIDEOGRAPHER: 12:35. We are off the record.

(Recess taken at 12:35 p.m., resuming at 12:41 p.m.)

THE VIDEOGRAPHER: 12:40. Back on record, beginning Disc 2.

Q. (By Ms. O'Driscoll) Mr. Bryant, we're back on the record just after a brief break.

Do you remember how long your wife, Jackie, worked at ECFMG before you came to work there?

**A. I would say she was there a year or so, but I'm not exactly. But she probably was there a year, I guess.**

Q. And what was her position there?

**A. Proctor.**

Q. Was she a proctor the whole time?

**A. I'm not sure. I'm not sure what she was hired for. That's what I remember her doing. I'm not sure why she was there.**

Q. And she still worked there, you said, when you came to work there?

**A. Right. That's what she was doing when I worked there.**

Q. And how did Jackie hear about that job? Did you say through Ms. Ellis?

**A. No.**

MS. HARROLD: Objection, speculation.

**A. No, I have no idea how she heard about that job.**

Q. (By Ms. O'Driscoll) What did Jackie do before she came to work at ECFMG?

**A. Sometimes nothing. She was a housewife sometimes. Sometimes she wasn't.**

Q. Did she work at a dental office?

**A. She has dental background.**

Q. Do you know who hired Jackie?

**A. No.**

Q. Do you ever remember Ms. Ellis introducing you to John Repasch, the former center manager?

**A. I don't remember. I don't remember that.**

Q. I will mark as Exhibit 6 ECFMG-ELLIS 7213.

(Marked was Bryant Exhibit No. 6.)

Q. (By Ms. O'Driscoll) If you could take a look at this document, is that your signature in the lower right-hand corner?

**A. Uh-huh, yes.**

Q. And do you remember what prompted this, this letter to Ms. Ellis and Mr. Biggs?

**A. I'm sure I was thanking them for the interview.**

Q. Okay. Is this the interview that's related to your promotion?

**A. I don't know. It had to be, if Briggs was there. It could be.**

Q. Do you think it was related to you coming on at ECFMG?

**A. That's what I'm not sure of.**

Q. Do you know if Mr. Biggs was working at ECFMG when you started?

**A. That's what I'm trying to remember. I'm not sure if he was or not. Oh, I think he was -- I think he was a trainer at the time.**

Q. When you started?

**A. Yeah, I think so. I think he was.**

Q. And do you remember, would there have been a reason that you would have interviewed with a trainer for your SP position?

**A. No, no. So this had to be for the promotion. I don't remember exactly. It had to be for the promotion, then.**

Q. Do you ever remember interviewing at all with

Ms. Ellis related to when you were initially hired as an SP?

**A. No.**

Q. You said you interviewed with John Repasch?

**A. I didn't remember his name; but yeah, that sounds right.**

Q. Okay. Did you ever tell Mr. Repasch that you have a child with Ms. Ellis?

**A. No.**

Q. You understood that Ms. Ellis was the assistant center manager, second in command during that time period in 2008, in the fall of 2008?

**A. Yes.**

Q. And you didn't mention that to Mr. Repasch?

**A. No.**

Q. I knew you said that Jackie helped you raise Brittani along with Ms. Ellis. You mentioned that you bought a car for Brittani as a college graduation present. Is that right?

**A. Yes, yes.**

Q. And was that during the time that Brittani was living with you?

**A. No. She was in school.**

Q. I thought it was her college graduation present.

A. **It was.**
Q. Had she started her graduate program?
A. **No. She was home for the holidays. I bought it that Christmas. She was graduating the next spring. We just gave it to her then. She was still at UT.**
Q. So it was an early graduation present?
A. **Yeah.**
Q. And you said "we gave it to her." Did you and Jackie buy that for her?
A. **(Moving head up and down.)**
Q. Did Jackie cosign on that car?
A. **I don't know.**
Q. And that was a Honda?
A. **Uh-huh.**
Q. Do you remember -- you said you thought it was around 2009?
A. **I don't remember. Close to that, yeah.**
Q. And if you started working at ECFMG in 2008, based on the documents that we reviewed, did that refresh your recollection that you were working at ECFMG in 2009 when you bought the car?
A. **I guess so, yes.**
Q. And that was -- you said that Brittani lived with you for a period of time after college?
A. **Uh-huh.**

Q. Was that after she graduated from UT?
A. **It was sometime after that. She didn't move straight in with me. She lived by herself, then she had a roommate for a while. She got into -- so it might have been after.**
**Because she got into a Ph.D. program at U of H. So I'm not -- I'm not sure. She was constantly in school during that time, so I'm not sure of the time periods.**
Q. But you think it was sometime after she graduated from UT?
A. **I'm sure it was after that. I'm just not sure where she was in her education. I'm not sure if it was during her Master's or Ph.D. I think it was for her Ph.D. program.**
Q. And were you helping her -- when she was living by herself or with a roommate, was that in an apartment?
A. **Uh-huh.**
Q. Would you help her financially during that time?
A. **No, no. I didn't have to. She was working. I think she was teaching then. Yeah.**
Q. You bought her the car. But would you buy her things as your daughter during that time?

MS. HARROLD: Objection, relevance.
A. **Yeah, Christmas, birthdays. Gifts, yeah. But not support. She's pretty frugal, pretty sharp kid, so ...**
Q. (By Ms. O'Driscoll) Okay. And you said you heard that Artis left ECFMG at some point. You said you didn't hear why she left?
A. **Circumstances, I don't recall.**
Q. Did you know that ECFMG had a policy in place against hiring relatives or anyone with a personal relationship?
A. **No.**
Q. If a policy -- have you ever worked anywhere that had a policy like that?
A. **I probably have, but never paid much attention to it.**
Q. As manager at your current employer, do you ever make hiring decisions?
A. **Yes.**
Q. And promotion decisions?
A. **Yes.**
Q. And if you were ever interviewing -- if you were interviewing Artis, if she was applying at your job, would you let your employer know that she was the mother of your daughter?

A. **That's not relevant.**
Q. How is that not relevant?
A. **It's not relevant. I'm hiring her for her skills, not her relationship.**
Q. But if there is a policy in place that states that you're supposed to divulge and disclose any personal relationships whatsoever, would you feel like you had an obligation to follow that policy?
A. **No.**
MS. HARROLD: Objections. Calls for speculation.
A. **Absolutely not. Absolutely not.**
Q. (By Ms. O'Driscoll) If there was a policy in place?
MS. HARROLD: Objection, calls for speculation.
A. **I wouldn't -- I wouldn't think it was relevant.**
Q. (By Ms. O'Driscoll) If the policy in place is created to prevent conflicts of interest so that all management is aware of any bias that may or may not exist, could you --
MS. HARROLD: Same objection.
Q. (By Ms. O'Driscoll) -- could you see as a manager how that would be something important?

MS. HARROLD: Same objection.
A. At my business we hire -- on my site right now I have a father and three sons working there. I have a husband and a wife working for the same company there. I have a father and a daughter working for the exact same company on the exact same site.
My son just went through a vigorous, vigorous interview process that lasted weeks. They still hired my son, same job site, same company.
Q. And you said you don't think your current employer has a policy like that, correct?
A. I know we don't. We have -- yeah, I know we don't.
Q. So if ECFMG has a policy that requires that personal relationships of any sort should be disclosed to prevent conflicts of interest, if that policy exists, do you believe that that should have been disclosed?
A. No.
MS. HARROLD: Objection, asked and answered. Objection, calls for speculation.
A. I don't.
Q. (By Ms. O'Driscoll) What about if the person that's being hired is supervising that person in the personal relationship?

A. Absolutely.
MS. HARROLD: Objection, calls for speculation.
Q. (By Ms. O'Driscoll) It should be divulged?
A. Yeah.
Q. One more exhibit. We will mark it as Exhibit 7. This is ECFMG, first page is 6750.
(Marked was Bryant Exhibit No. 7.)
Q. (By Ms. O'Driscoll) Mr. Bryant, I know that you testified that there was -- that you paid child support for Brittani to Ms. Ellis.
Do you recall any orders being entered by the court related to child support?
A. Pardon me?
Q. Do you recall any orders being signed by a judge in court --
A. Yes.
Q. -- related to child support?
A. Yes.
Q. And do you remember why those orders were entered?
A. Why they were entered?
Q. You had mentioned earlier that you and Ms. Ellis had a very civil relationship and co-parented Brittani.

A. Uh-huh.
Q. So I just wanted to get clarification why there was actually a court order entered related to the child support issue.
MS. HARROLD: Objection, relevance.
Q. (By Ms. O'Driscoll) You can answer.
A. I don't know.
Q. Do you recall?
A. I mean, yeah, I'm looking at it. Yeah, sure.
Q. Do you recall why there was a court order put in place?
MS. HARROLD: Objection, relevance. Objection, asked and answered.
A. We wanted to establish support for the child. I mean, it wasn't -- it was to establish support for Brittani, financial support.
Q. (By Ms. O'Driscoll) But you had been paying child support all along, correct?
A. Absolutely.
Q. Okay. All throughout her childhood?
A. Absolutely.
Q. And you were very involved in her upbringing?
A. Sure.
Q. And you worked with Ms. Ellis to raise Brittani?

A. Yes.
Q. And Jackie worked with you, also, and Ms. Ellis --
A. Yes.
Q. -- to raise Brittani?
A. Yes.
Q. Have you understood all of my questions, sir?
A. I think I have.
Q. Okay.
A. I've tried to.
Q. Okay.
MS. O'DRISCOLL: I will pass the witness.
(Following proceeding commenced at 12:55 p.m.)
EXAMINATION
BY MS. HARROLD:
Q. Hi, Mr. Bryant. How are you?
A. Tired.
Q. I understand, and I'm not going to try to keep you here very long. But my name is Keenya Harrold. I represent Ms. Ellis in the legal matter against ECFMG.
I'm going to ask you a couple of questions, follow-up questions, but I understand that you have to get back to work.

86

A. Uh-huh.
Q. Let me first apologize for even you having to take out time to come down here and do a deposition, one, about a one-night-stand that happened when you were 19 years old and a relationship with your daughter that had nothing to do with your employment. So I apologize for making you come downtown.
A. Thank you.
MS. O'DRISCOLL: Objection, form. Assumes facts in evidence and mischaracterizes evidence.
Q. (By Ms. Harrold) During our five-minute conversation on yesterday you remember that I told you just to be honest in your deposition. Correct?
A. Yes.
Q. And I told you that the phone call was not to persuade you in any way. Is that right?
A. Yes, ma'am.
Q. You testified earlier that you found out about the part-time position from your wife. Is that correct?
A. Yes.
Q. Not from Ms. Ellis?
A. I did not, yes.
Q. And Ms. Ellis did not interview you for that

87

part-time position. Is that correct?
A. That's correct.
Q. And do you remember reporting to Ms. Ellis when you were working part-time?
MS. O'DRISCOLL: Objection, asked and answered.
A. No, I remember reporting to the trainer and John. That's what I remember.
Q. (By Ms. Harrold) And you testified that Ms. Ellis did not interview you for the promotion, right? It was someone in Philadelphia?
MS. O'DRISCOLL: Objection, form.
A. That's true.
MS. O'DRISCOLL: Mischaracterizes evidence.
Q. (By Ms. Harrold) Also, in regards to the promotion, you found out about that promotion from -- did you find out from your wife? Or how did you find out about that promotion opportunity as a trainer?
A. Through the other trainers.
Q. So Ms. Ellis did not encourage you or tell you about that position. Is that right?
A. No.
Q. Were you terminated from ECFMG?

88

A. No.
Q. So you were not terminated for not listing Ms. Ellis on your application as a relative. Is that right?
A. No.
Q. And you were not terminated for not telling John about Brittani. Is that right?
A. No.
Q. In fact, what caused you to leave ECFMG?
A. I resigned.
Q. And what caused you to resign?
A. I was going back to industry. I had a better opportunity.
Q. And you listed Jackie on your application because she was your wife. Right?
A. Yes.
Q. So you consider your wife your relative. Is that right?
A. Yes, yes.
Q. Are you and Ms. Ellis relatives?
A. No, we're not.
Q. Were you guys ever married?
A. No.
Q. In a domestic partnership of any kind?
A. No.

89

Q. Are you guys related by blood?
A. No.
Q. Adoption?
A. No.
Q. So she's never been your spouse?
A. No.
Q. She definitely is not your child, right?
A. No, no.
Q. Not your grandchild?
A. No.
Q. Not your parent?
A. No.
Q. Grandparent?
A. No.
Q. Are you and Ms. Ellis siblings?
A. No.
Q. Are you her uncle?
A. No.
Q. Is she your aunt?
A. No.
Q. What about, is she your niece?
A. No.
Q. Are you her nephew?
A. No.
Q. Are you guys cousins?

A. No.
Q. Have you guys ever lived together?
A. No.
Q. In an intimate, personal committed relationship?
A. No.
Q. Were you guys in a relationship when you guys were teenagers?
A. No.
Q. Were you ever engaged to be married?
A. No.
Q. Do you consider Ms. Ellis to be your significant other?
A. No.
MS. HARROLD: I will pass the witness.
(Following proceeding commenced at 12:59 p.m.)
FURTHER EXAMINATION
BY MS. O'DRISCOLL:
Q. Mr. Bryant, I just have a couple of follow-up questions.
Was Ms. Ellis involved in the orientation and the paperwork when you were hired?
A. I don't recall.
Q. After the Philadelphia person interviewed you for the promotion to trainer --

A. Right.
Q. -- you testified that you then interviewed with Ms. Ellis to receive that promotion. Correct?
A. Brent and Ms. Ellis, according to this (indicating).
Q. And you testified, in fact, that you recalled interviewing with Ms. Ellis for that promotion, correct?
A. Brent and Ms. Ellis, yes.
Q. But Ms. Ellis was there?
A. Yes.
Q. And to your knowledge, she approved the promotion. Correct?
A. I would assume so.
Q. Well, I mean, based on the paperwork that we looked at, she signed off as your supervisor, didn't she?
A. Okay, yeah, sure.
Q. You also mentioned that you and Ms. Ellis were co-parenting Brittani throughout her childhood --
A. Yes.
Q. -- and throughout growing up and throughout college, correct?
A. Sure.
Q. I mean, is that correct?

A. Yes.
Q. Okay.
A. I've never ceased my relationship with my daughter.
Q. Okay. And that relationship with your daughter was also tied to Ms. Ellis because that was her mother, correct?
A. Not as an adult. No, that wouldn't be true as an adult. My daughter was away at college. I had very little interaction with Ms. Ellis.
Q. Well, you texted her on holidays and you talked with her on holidays. Correct?
A. That's not a relationship. To me, that's not a relationship.
Q. Do you text strangers?
A. Absolutely not.
Q. So co-parenting with someone, that is a relationship, when you're co-parenting with someone, correct?
A. Okay. Sure.
Q. Do you agree with me?
A. Sure.
Q. And it would be also intimate to have a sexual encounter with someone, wouldn't it?
A. Oh, yes.

Q. And during the time period when you worked at ECFMG, Ms. Ellis was the assistant manager and/or the center manager for that entire time?
A. Yes, ma'am.
Q. And that was a personal relationship that you had Ms. Ellis in co-parenting Brittani, correct?
A. Yes.
MS. O'DRISCOLL: Pass the witness.
(Following proceeding commenced at 1:02 p.m.)
FURTHER EXAMINATION
BY MS. HARROLD:
Q. At the time that you were at ECFMG, Brittani was already in college. Is that right?
A. Yeah.
MS. O'DRISCOLL: Objection. He --
A. I guess.
MS. O'DRISCOLL: -- wasn't sure of the timing.
Q. (By Ms. Harrold) At the time -- Brittani graduated from the University of Texas in 2004. Does that sound right?
MS. O'DRISCOLL: Objection. Facts not in evidence.
MS. HARROLD: I'm asking him a question. You asked if she graduated in 2009. I'm asking him a

question. If he remembers now, then he remembers now. But let's see what he remembers, if she was in college at the time he was employed at ECFMG.

MS. O'DRISCOLL: That's fine. Ask your question. I'm just saying it's not in evidence. He hasn't testified to that. He actually said he didn't recall when she graduated.

Q. (By Ms. Harrold) Was Brittani in college at the time that you were at ECFMG, if you remember?

**A. I don't think so.**

Q. So you think she was still in high school?

**A. No, she wasn't in high school.**

Q. So she was either in college or in graduate school or ...

**A. Either one. She was in -- I think she might have been in graduate school, but I don't recall.**

Q. So she was basically an adult?

**A. She was an adult. When she left her mother's house to me, she was an adult.**

Q. So she was not living in her mother's house when you were working at ECFMG?

**A. No, she hadn't -- no, no.**

Q. So then you didn't have a reason to talk to Ms. Ellis --

**A. I didn't.**

Q. -- about Brittani while you were working at ECFMG, right?

MS. O'DRISCOLL: Objection, form.

**A. No, that's true. That's true.**

Q. (By Ms. Harrold) And the only time that you and Ms. Ellis had an intimate encounter was when you were 19 years old. Is that right?

**A. That is true.**

Q. About 27 years ago. Is that correct?

**A. That is true.**

Q. But you guys did not have an intimate relationship when you were working at ECFMG. Right?

**A. No, we did not.**

**MS. O'DRISCOLL: Objection, form.**

**A. We did not.**

MS. HARROLD: No further questions.

(Following proceeding commenced at 1:03 p.m.)

FURTHER EXAMINATION

BY MS. O'DRISCOLL:

Q. Just a couple of follow-up questions, Mr. Bryant.

You testified earlier under oath, in front of a judge and jury, that you've been very active in Brittani's life all throughout growing up --

**A. That's true.**

Q. -- and throughout college, throughout graduate school. Isn't that true?

**A. That's true.**

Q. And you testified that you and Ms. Ellis worked very closely together and along with Jacquelyn, your wife, to help raise Brittani. Correct?

**A. Yes.**

Q. And during the time period that you said that she moved in with you after college --

**A. Uh-huh.**

Q. -- off and on for a couple of years she lived with you --

**A. Uh-huh.**

Q. -- is it your testimony to the judge and jury that you never communicated with Ms. Ellis about Brittani or about co-parenting at all?

**A. I would suggest that. I had no reason to.**

Q. You never communicated with Ms. Ellis --

**A. About -- no.**

Q. -- about Brittani?

**A. I can't think of one, no. Not until she got ready to get married.**

Q. During the time period when Brittani was out of college and living with you, you wouldn't --

**A. No.**

Q. -- communicate with Ms. Ellis?

**A. No. No, Brittani, she was living with me. I communicated with Brittani.**

Q. Did you let Ms. Ellis know that you bought Brittani a car?

**A. No. Brittani drove up in a -- no, I didn't. I didn't need her permission to buy her a car.**

Q. I'm not saying you had to ask permission.

**A. No.**

Q. I'm saying as co-parenting --

**A. No, I did not.**

Q. -- a child --

**A. I did not consult her on buying Brittani a car.**

Q. But did you let her know that you bought her a car?

**A. I'm sure after I gave it to her. I'm sure after I gave it to her, she found out she had a car. I'm not sure how she found out. I didn't tell her. There was no reason for me to tell her.**

Q. But you said that even up until this day that you continue to text and call Ms. Ellis on holidays. That's what you testified.

**A. We communicate occasionally on holidays. I haven't seen her this year until now, and it may have**

**been the holidays the last time I texted her or her husband. Just, you know, all of my contacts, I say, "Happy Holidays" to.**
Q. But you already testified that you had a personal relationship with Ms. Ellis in co-parenting Brittani.
**A. I did.**
Q. Because your Brittani's father, correct?
**A. Yes.**
Q. And she's Brittani's mother?
**A. Yes. That's absolutely true. During the formative years, yes.**
Q. That's contrary to your testimony a little while ago.
**A. Okay.**
Q. You said throughout the time, co-parenting throughout childhood --
**A. That's true.**
Q. -- throughout college, even into adulthood, that's what you testified a little while ago. Are you changing your testimony?
**A. No. I would suggest that we're co-parenting right now; but I haven't seen the woman all year. I'm always -- I'm going to always co-parent with her. That's my child.**

Q. Right.
**A. I can't avoid that.**
Q. Right.
**A. So I'm not sure -- if you rephrase your question. I'm not sure where you're going with that. I'm never going to not be in Brittani's life.**
Q. Exactly. You'll always --
**A. So how can I not do it then? How can I not do it?**
Q. I just wanted to clarify your level of involvement in your daughter's relationship.
**A. It's as intimate as it could be with a father and a daughter.**
Q. Okay. Very close?
**A. Absolutely.**
Q. So if Ms. Ellis testified that you were barely involved in Brittani's upbringing, that would be false, wouldn't it?
**A. I have no idea what her perspective is. I know what my relationship is with my daughter.**
Q. If Ms. Ellis testified that you were hardly involved in her life after the age of 12, that would be false, would it?
**A. That's her opinion. That's not my -- that's not my perspective.**

Q. Okay. Well, your opinion is that you stayed involved --
**A. Yes.**
Q. -- throughout her childhood --
**A. Yes, absolutely.**
Q. -- into her adulthood, into college, and to getting married, to present day. Correct?
**A. Yes, ma'am.**
Q. You continued to pay child support until she was 18, right?
**A. Sure.**
Q. You continued to have visitation all throughout her childhood until she was 18. Correct?
**A. Yes.**
Q. And you continued to have that close relationship with your daughter as you were co-parenting. Correct?
**A. Yes.**
Q. Okay.
MS. O'DRISCOLL: Reserve the rest of our questions for trial.
MS. HARROLD: I have a few more questions.
MS. O'DRISCOLL: Okay.
(Following proceeding commenced at 1:08 p.m.)

FURTHER EXAMINATION
BY MS. HARROLD:
Q. So the relationship that you were talking about is the relationship between you and Brittani. Is that right?
**A. Yes.**
Q. And you -- do you have a relationship -- did you have a relationship with Ms. Ellis after Brittani graduated from high school and went on to college?
MS. O'DRISCOLL: Objection, asked and answered.
**A. No.**
Q. (By Ms. Harrold) And the text messages that you sent to Ms. Ellis on holidays, are those usually group text messages that you send to everybody on your phone?
**A. Yes.**
Q. So that is not showing a relationship between the two of you but just simply something you do to the contacts in your phone. Is that right?
MS. O'DRISCOLL: Objection, form.
**A. Yes. Yes.**
MS. HARROLD: We have no further questions.
(Following proceeding commenced at 1:09 p.m.)

01:09:28 MS. O'DRISCOLL: We will reserve our questions for trial.

01:09:33 Thank you, Mr. Bryant.

01:09:33 THE VIDEOGRAPHER: 1:09. We are off the record.

(Proceedings concluded at 1:09 p.m.)

* * *

Artis Ellis vs.
Educational Commission for Foreign Medical Graduates

VIDEOTAPED / REALTIMED DEPOSITION OF
TROI A. BRYANT
SEPTEMBER 8, 2016

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |

I, TROI A. BRYANT, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________
TROI A. BRYANT

Job No.: 299093

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ARTIS ELLIS, :
Plaintiff, :
Vs. : CIVIL ACTION NO.
EDUCATIONAL COMMISSION : 4:14-cv-02126
FOR FOREIGN MEDICAL :
GRADUATES, :
Defendant. :

REPORTER'S CERTIFICATION
VIDEOTAPED / REALTIMED DEPOSITION OF
TROI A. BRYANT
SEPTEMBER 8, 2016

I, Pat English-Arredondo, CSR, RMR, CRR, CLR, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

that the witness, TROI A. BRYANT, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__x___ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 13th day of September, 2016.

Pat English-Arredondo

Pat English-Arredondo, CSR, RMR, CRR, CLR
Texas CSR No. 3828
Expiration Date: 12/31/2017
DepoTexas, Inc.
Firm Registration No. 95
13101 Northwest Freeway, Suite 210
Houston, Texas 77040
Phone: 888.893.3767

Job No. 299093

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

ARTIS ELLIS
*Plaintiff*
v.
EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES
*Defendant*

Civil Action No. 4:14-cv-02126

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: TROI BRYANT, 3318 La Mer Lane, Spring, Texas 77338-4145 or where he may be found

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Morgan, Lewis & Bockius LLP, 1000 Louisiana, Suite 4000, Houston, TX 77002 | Date and Time: 09/08/2016 11:00 am |
|---|---|

The deposition will be recorded by this method: STENOGRAPHICALLY AND BY VIDEOTAPE

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: SEE THE ATTACHED "EXHIBIT A."

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/23/2016

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

Stefanie R. Moll

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, who issues or requests this subpoena, are:
STEFANIE R. MOLL, MORGAN, LEWIS & BOCKIUS, 1000 LOUISIANA, SUITE 4000, HOUSTON, TEXAS 77002; 713-890-5000 STEFANIE.MOLL@MORGANLEWIS.COM

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT: 1
NAME: Bryant
DATE: 9-8-16
Pat E. Arredondo, CRR, RMR

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 4:14-cv-02126

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* Troi Bryant on *(date)* 8-25-16.

☑ I served the subpoena by delivering a copy to the named individual as follows: to Mr. Troi Bryant at 3318 La Mer Lane, Spring TX 77338 (Harris County) on *(date)* 8-29-16 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ 40⁰⁰ ck #4260 .

My fees are $ ______ for travel and $ ______ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 8-29-16

[signature]
*Server's signature*

DAVID A GARZA
Authorized Private Process Server
TX SERVER LIC# SCH-502
Exp 7-31-2017
*Printed name and title*

4202 Sherwood Houston TX 77092
*Server's address*

Additional information regarding attempted service, etc.:

[signature]

Troi A. Bryant II

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer, or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c),

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party·

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information·

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must·

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has, must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed R Civ P. 45(a) Committee Note (2013)

AO 88A (Rev 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

ARTIS ELLIS
*Plaintiff*
v.
EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES
*Defendant*

Civil Action No. 4:14-cv-02126

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: TROI BRYANT, 3318 La Mer Lane, Spring, Texas 77338-4145 or where he may be found

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Morgan, Lewis & Bockius LLP, 1000 Louisiana, Suite 4000, Houston, TX 77002 | Date and Time: 09/08/2016 11:00 am |
|---|---|

The deposition will be recorded by this method: STENOGRAPHICALLY AND BY VIDEOTAPE

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: SEE THE ATTACHED "EXHIBIT A."

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/23/2016

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk*

Stefanie R. Moll
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, who issues or requests this subpoena, are:
STEFANIE R. MOLL, MORGAN, LEWIS & BOCKIUS, 1000 LOUISIANA, SUITE 4000, HOUSTON, TEXAS 77002; 713-890-5000 STEFANIE.MOLL@MORGANLEWIS.COM

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 4:14-cv-02126

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named individual as follows: ____________

______________________________________________

______________________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________

______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ARTIS ELLIS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:14-cv-02126** |
| | § | |
| | § | **Jury Demanded** |
| | § | |
| **EDUCATIONAL COMMISSION FOR** | § | |
| **FOREIGN MEDICAL GRADUATES,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' NOTICE OF INTENTION TO TAKE THE ORAL DEPOSITION OF TROI BRYANT**

TO: TROI BRYANT, 3318 La Mer Lane, Spring, Texas 77338-4145 or where he may be found.

Pursuant to Federal Rules of Civil Procedure 30 and 45, Defendant Educational Commission for Foreign Medical Graduates will take the oral deposition of TROI BRYANT on September 8, 2016 beginning at 11:00 a.m. and continuing until completion. The deposition will be taken before a certified court reporter at the offices of Morgan, Lewis & Bockius LLP, 1000 Louisiana Street, Suite 4000, Houston, Texas 77002. The deposition may be videotaped. All counsel are invited to attend.

Dated August 24, 2016                          Respectfully submitted,


                                               */s/ Stefanie R. Moll*
                                               Stefanie R. Moll
                                               State Bar No. 24002870
                                               Federal ID No. 22861
                                               smoll@morganlewis.com
                                               1000 Louisiana, Suite 4000
                                               Houston, Texas 77002
                                               (713) 890-5000 - Telephone
                                               (713) 890-5001 - Facsimile

Of Counsel:
Erin E. O'Driscoll
State Bar No. 240460
Federal ID No. 582983
eodriscoll@morganlewis.com
MORGAN, LEWIS & BOCKIUS, LLP
1000 Louisiana, Suite 4000
Houston, Texas 77002
(713) 890-5000 - Telephone
(713) 890-5001 - Facsimile

                                  ATTORNEYS FOR DEFENDANT
                                  EDUCATIONAL COMMISSION FOR
                                  FOREIGN MEDICAL GRADUATES

                        **CERTIFICATE OF SERVICE**

    I hereby certify that on the 24th day of August 2016, the foregoing was served via
Federal Express to:

                        Alfonso Kennard, Jr.
                        Keenya R. Harrold
                        KENNARD RICHARD P.C.
                        2603 August Drive, Suite 1450
                        Houston, Texas 77057

                        Troi Bryant
                        3318 La Mer Lane
                        Spring, Texas 77338-4145


                            */s/ Erin E. O'Driscoll*
                              Erin E. O'Driscoll

**EXHIBIT A**

**DUCES TECUM OF DOCUMENTS AND TANGIBLE ITEMS REQUESTED**

**REQUEST NO. 1:**

All documents and things and communications to or from or between you and ECFMG before, during or after your employment at ECFMG.

**REQUEST NO. 2:**

All documents and things and communications to or from or between you and Artis Ellis (also known as Artis Fowler or Artis Harden or any variation thereof) from January 1, 2007 to present.

**REQUEST NO. 3:**

All documents or materials reviewed by you in preparation for your deposition.