# Exhibit "B"

STATE OF TEXAS           §

COUNTY OF HARRIS    §

### AFFIDAVIT OF ARTIS ELLIS

Before me, the undersigned notary, on this day, personally appeared **ARTIS ELLIS**, a person whose identity is known to me. After I administered an oath to her, upon her oath, she said:

1. "I am over the age of eighteen years old and legally competent. I am of sound mind, capable of making this affidavit, and fully competent to testify to the matters stated herein, and I have personal knowledge of each of the matters stated herein.

2. I began my employment at Educational Commission for Foreign Medical Graduates ("ECFMG") on or about April 8, 2005 as an Assistant Manager of the Houston Center. I was promoted to Center Manager in October of 2008—where I was responsible for the management of 80 to 100 employees at any given time.

3. During my tenure at ECFMG, I had stellar performance evaluations and had no complaints from administration or staff. However, in November 2011, my previous supervisor, Betty Hite, retired and was replaced by Chris Paul. Almost immediately after Mr. Paul took over Ms. Hite's position, the environment at ECFMG changed—especially for me. It went from an environment I once felt very fortunate to be a part of, to one of stress and hostility. I made multiple complaints to management about Mr. Paul's inappropriate comments and his constant harassment.

4. On August 23, 2012, for the first time in my career, I received a memo of concern from Mr. Paul. I promptly responded to Mr. Paul's accusations, and no further action was taken. Thus, in over seven (7) years of employment I did not have a single negative performance evaluation or any formal disciplinary action.

5. However, due to extreme stress and anxiety of work, I began suffering from headaches and ended up in the emergency room on or about August 29, 2012. While at the hospital, the doctors found a large mass on my brain, and I underwent a CAT Scan. While awaiting the results of the CAT Scan, I was rushed back to the emergency room suffering from migraines on or about September 12, 2012. I was told, at that time, I had a brain tumor that required immediate, unexpected surgery. On or about September 14, 2012, I underwent extensive brain surgery.

6. Since I had to have emergency surgery, I properly requested leave under the Family Medical Leave Act shortly after surgery. I requested FMLA leave for the time I missed work and for the time it would take me to recover from brain surgery.

7. Against the advice of one of my doctors, who did not believe I was physically ready to return to work, I returned to work on October 22, 2012 (a little over a month of having extensive, invasive surgery). Instead of receiving a warm welcome, as I anticipated, I

Ellis Affidavit

walked into a literal ambush. As soon as I arrived in the office, I was met by Chris Paul, (Director), Betty Lehew (Human Resources) and Nancy Ambrose (Assistant Director), and immediately called into a meeting to discuss my "mistakes". I was shocked that the very day I returned from FMLA leave—after brain surgery and months of recovery, I was forced into an alleged disciplinary meeting.

8. Mr. Paul, Ms. Lehew and Ms. Ambrose began to discuss a laundry list of alleged infractions, most of which included alleged policy violations and allegations that I threw away an employee's food. I requested that Betty Lehew further investigate the allegations. Notably, I did not have any staff complaints prior to taking leave. I was told that Ms. Lehew and Ms. Ambrose would investigate these allegations.

9. Overwhelmed, and not completely healed from surgery, I immediately requested to go back out on FMLA to complete the remainder of FMLA time, because I had not exhausted my 12 weeks of leave. I feared the stress of the job, coupled with these new unfound allegations, would cause me to become ill—since one of my doctors had previously advised me not to go back to work so soon after having surgery. Rather than allow me to go back out on leave, I was told that it would be better to take an administrative leave rather than make a formal request pursuant to the FMLA—until the conclusion of ECFMG's investigation. I was placed on administrative leave until I was terminated 10 days later.

10. In regards to hiring a full-time employee at ECFMG, the standard procedure for an internal or external candidate to seek employment at ECFMG is for the candidate to apply online. If the position is a part-time SPAN( Standardized Patient as Needed) position, someone from the Houston office would contact the candidate to schedule an application session. If the candidate is selected to be hired, the candidate goes through a physical screening by a physician, an interview with two sets of trainers, and would meet with a manger. The candidate goes through a background check and a reference check. If they are selected the manager calls the candidate and gives the candidate a date to start orientation. Mr. Repasch (Houston Center Manager), called Mr. Bryant and informed him of his orientation date. At the time that Mr. Bryant was hired at ECFMG, and went through orientation, Mr. Repasch was transitioning to the role of Center Manager in Philadelphia. I was acting as Center Manager since he was moving to Philadelphia. As acting Center Manager, I signed off on all new hire paperwork—even though I did not have an active role in the hiring of each new employee. In the case of Mr. Bryant, I signed off on his paperwork, like I did for any other new hire, though I did not have an active role in hiring him.

11. Mr. Bryant worked as a SPAN with ECFMG for about three years. He decided to apply for a fulltime trainer position at ECFMG. This process requires you to send a letter of intent to Sharon Trowell in Human Resource. Sharon Trowell, unilaterally made the determination that a candidate meets the qualifications for the position, she would call the candidate into meet with her. From that pool of potential candidates, the top 3, as selected by Sharon Trowell, were sent to meet with me and Brent Biggs, to interview and we made the final hiring decision.

Ellis Affidavit

12. In the case of Troi Bryant, I did not hire Mr. Bryant nor did I tell Mr. Bryant about the job at ECFMG or encourage him to apply. I was not aware that Mr. Bryant applied for the position or had been interviewed until he was selected for the position. I was not initially involved in Mr. Bryant being hired as a part-time SPAN. However, I was involved in Mr. Bryant being hired as a full-time SPAN Trainer.

13. At the time that I returned from FMLA, and was confronted with allegations about Mr. Bryant, Mr. Bryant had not worked for ECFMG in over a year. I simply could not show favoritism to an <u>ex-employee</u> that was <u>no longer working at the company</u>.

14. In addition, Mr. Bryant is not my family member nor has he ever been. Mr. Bryant and I have never been married. Frankly, we were never in a relationship nor has he ever been my "significant other". I admittedly got pregnant as the result of a one night stand that occurred when I was in high school (on prom night). I was 18 years old. This occurred over 29 years ago. We were, unfortunately, both young and careless. I have gone on to have a very successful marriage and career.

15. However, at the time that I was confronted about Mr. Bryant, I was honestly a little embarrassed. I felt it was inappropriate for management to ask me about a one night stand that occurred when I was in high school (on prom night)—which resulted in me getting pregnant. Further, I simply could not understand why I was being asked about Mr. Bryant, since he had not been at ECFMG in over a year, and we are not relatives as defined by ECFMG's Relative Policy.

16. Further, at the time that Mr. Bryant worked for ECFMG, our daughter (who resulted from our one encounter as teenagers) was an adult in college. She communicated directly with her father during the time that he worked at ECFMG. Our daughter was not a child, and we were not required to discuss "parenting" decisions. Thus, Mr. Bryant and I had no outside interaction while he was at ECFMG. Again, his wife also worked at ECFMG—which ironically was not a policy "violation."

17. There are several other employees that actually have relatives that work at ECFMG, and they were not terminated for violating the Relationship Policy. Notably, I know that Ms. Lehew's step-daughter worked for ECFMG in the Human Resources Department. Ms. Lehew was not terminated for violating ECFMG's Relative Policy though her step-daughter worked in the same department. Ms. Lehew still works at ECFMG to this very day.

18. During the meeting, on the same day I returned from FMLA leave, I was told that I gave my password to my subordinate while I was out on leave. I was shocked by the accusation. I was in the hospital recovering from surgery, and highly medicated at the time that management alleges that I gave my subordinate my password. Notably, I do not remember ever speaking to anyone while I was in the hospital about the password. Further, other managers, including Ms. Ambrose and Mr. Paul could have administered the exam in my absence. There was simply no reason for my subordinate to call me while I was out on leave. I am aware of other employees that gave out their passwords and were not

Ellis Affidavit

terminated. Specifically, Brent Biggs gave his password to Rich Conn and Gail Foreman. He was not terminated as a result. The employee that I allegedly gave my password to, Sharon Dalberg, was not reprimanded or terminated for allegedly using my password.

19. After the meeting on the day I returned from FMLA leave, I was placed on administrative leave. I was not allowed to correct my alleged bad behavior in accordance with the disciplinary policy at ECFMG nor was I allowed to return to ECFMG. Instead, on November 1, 2012, I was asked to meet with Ms. Ambrose and Ms. Lehew at a hotel, and I was terminated.

FURTHER AFFIANT SAYETH NOT.

_____
ARTIS ELLIS

SWORN TO and SUBSCRIBED before me by ARTIS ELLIS, on 10/27, 2016.

_____
Notary Public in and for the State of Texas



LANELL HOWARD
MY COMMISSION EXPIRES
November 18, 2017