# Exhibit "C"

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| ARTIS ELLIS | : | |
|     Plaintiff, | : | |
| vs. | : | |
| EDUCATIONAL COMMISSION | : | C. A. No. |
| FOR FOREIGN MEDICAL | : | 4:14-cv-02126 |
| GRADUATES, | : | |
|     Defendant. | : | |

VIDEOTAPED DEPOSITION OF ARTIS ELLIS

Called as a witness by the Defendant, taken before Peggy Ann Antone, a Certified Shorthand Reporter in and for the State of Texas, on May 11, 2016, beginning at 9:51 a.m., at the offices of Kennard Richard P.C., 2603 Augusta Drive, Suite 1450, Houston, Texas, pursuant to the Federal Rules of Civil Procedure.

For Review Only

## Page 2

APPEARANCES

COUNSEL FOR ARTIS ELLIS, Plaintiff:
Kennard Richard, P.C.
ALFONSO KENNARD, JR.
KEENYA HARROLD
2603 Augusta Drive
Suite 1450
Houston, Texas 77057
Phone: 713.742.0900
Fax: 713.742.0951
Alfonso.kennard@kennardlaw.com
Keenya.harrold@kennardlaw.com

COUNSEL FOR EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, Defendant:
Morgan, Lewis & Bockius, LLP
ERIN E. O'DRISCOLL
1000 Louisiana
Suite 4000
Houston, Texas 77002
Phone: 713.890.5000
Fax: 713.890.5001
Eodriscoll@morganlewis.com

ALSO PRESENT:

Barry Pett, Videographer, DepoTexas, Inc.

## Page 3

INDEX
FOR THE DEPOSITION OF
ARTIS ELLIS
ARTIS ELLIS vs. EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES
05/11/2016

Examination                                      Page
QUESTIONS BY MS. O'DRISCOLL..................10
QUESTIONS BY MR. KENNARD.....................301
QUESTIONS BY MS. O'DRISCOLL..................317

INDEX OF EXHIBITS..............................4

REQUESTS FOR INFORMATION
Request for information......................266
Request for information......................274
Request for information......................277
Request for information......................283

INDEX OF VIDEOTAPES
2..........................................65
3.........................................120
4.........................................185
5.........................................252

## Page 4

6................................................ 301

## Page 5

INDEX OF EXHIBITS

Exhibit No.   Description                          Page
1    Defendant Educational Commission for
     Foreign Medical Graduates' Third
     Amended Notice of Intention to Take
     the Oral Deposition of Plaintiff
     Artis Ellis........................... 23
2    ECFMG/Ellis 120-121, Résumé of Artis
     Ellis; CONFIDENTIAL................... 35
3    ECFMG/Ellis 124-126, References for
     Artis Ellis; CONFIDENTIAL............. 37
4    ECFMG/Ellis 113-114, Offer letter to
     Artis Ellis dated April 5th, 2005,
     from ECFMG; CONFIDENTIAL.............. 41
5    ECFMG/Ellis 160-163, and ECFMG/Ellis
     92-93, Benefits package for Artis
     Ellis; CONFIDENTIAL................... 42
6    ECFMG/Ellis 144-147, Job description
     for Artis Ellis as center assistant
     manager; CONFIDENTIAL................. 58
7    ECFMG 73-74, Letter dated October
     27th, 2008, promoting Artis Ellis to
     acting center manager; CONFIDENTIAL... 62

## 34

1  Q. Do you have any -- have you come across any
2  writings that you haven't given to your lawyer yet?
3  A. I'm not sure.
4  Q. So you think you may have come across writings?
5  A. That I have not given to my lawyers?
6  Q. Correct.
7  A. No.
8  Q. Okay. So -- so you don't -- you're not
9  aware -- as you sit here, you're not aware of any -- any
10 writings that would relate to this case that you have
11 not given to your lawyer yet.
12 A. Not at this time.
13 Q. Okay. Okay. And if you do find any, you'll be
14 sure to give them to your lawyer so that he can give
15 them to me?
16 A. Absolutely. Yes.
17 Q. Thank you.
18 A. Erin, this would be a good time to take a
19 break.
20 Q. You need a break now?
21 A. Yes.
22 Q. Sure.
23 A. Thank you.
24     THE VIDEOGRAPHER: Time is approximately
25 10:22. We're off the record.

## 35

1     (Recess taken from 10:22 a.m. to 10:34
2     a.m.)
3     THE VIDEOGRAPHER: Time is approximately
4  10:34. We're back on the record.
5  Q. (BY MS. O'DRISCOLL) Ms. Ellis, I'm going to
6  hand you what's been marked as Exhibit 2.
7     (Exb. No. 2 was marked.)
8  Q. (BY MS. O'DRISCOLL) This is ECFMG/Ellis 120
9  through 121.
10    Do you recognize this document?
11 A. Yes.
12 Q. And what is that document?
13 A. My résumé.
14 Q. And is this the résumé you submitted to ECFMG
15 when you were applying for a job there?
16    If you looked at the second page, it might
17 help you refresh your memory.
18 A. Yes.
19 Q. And you recall when you applied for that job
20 that you submitted a cover letter to -- to human
21 resources, Betty LeHew?
22 A. Yes.
23 Q. And Betty LeHew was the same human resources
24 person that still worked for ECFMG throughout --
25 throughout your employment; correct?

## 36

1  A. I'm sorry?
2  Q. Betty LeHew was the same human resources person
3  that still worked at ECFMG throughout your employment,
4  correct?
5  A. Yes.
6  Q. And this Exhibit Number 2, it appears you
7  applied for the assistant manager for the Houston center
8  location?
9  A. Yes.
10 Q. And -- and you obtained that position?
11 A. Yes.
12 Q. And did you -- do you remember what month you
13 started in that position?
14 A. I believe April.
15 Q. April of 2005?
16 A. Yes.
17 Q. And who was your supervisor?
18 A. John Repasch.
19 Q. And was he the center manager?
20 A. Yes.
21 Q. And did you interview with Mr. Repasch for that
22 position?
23 A. I originally interviewed with Betty LeHew.
24 Q. Okay.
25 A. And then John Repasch.

## 37

1  Q. And was Mr. Repasch the center manager until
2  the time that you were promoted to center manager?
3  A. Yes.
4     (Exb. No. 3 was marked.)
5  Q. (BY MS. O'DRISCOLL) I hand you Exhibit 3.
6  This is ECFMG/Ellis 124, 125, and 126.
7     If you turn to the second page --
8     MR. KENNARD: I've got to step out for a
9  second. You can continue.
10    MS. O'DRISCOLL: Do you want us to pause?
11    MR. KENNARD: No.
12 Q. (BY MS. O'DRISCOLL) If you turn to the second
13 page, is -- are these the written references that you
14 filled out on the job application for ECFMG?
15 A. On the second page?
16 Q. Yes, ma'am.
17 A. I don't see where it says references.
18 Q. Well, I'm sorry, work experience. I apologize.
19 A. Yes.
20 Q. Okay. And I just wanted to briefly touch on
21 where you worked prior to the time that you applied at
22 ECFMG.
23    I see Harris Counseling Services from March
24 2004 to present, to March 2005, when you were applying;
25 is that correct?

### 106

1  second, I have a" 25 "year old stepdaughter and a 40
2  year old wife... do the math. And like Patty, I have
3  always had a tremendous respect for you because you
4  worked hard to build yourself up while raising three
5  amazing children.
6      "BUT, I wish you had been straight with me
7  when we hired Jackie. I can't say, knowing this
8  information now, whether we would have hired Troi, but
9  we could have at least cleared either of their hiring
10 with Hite and HR."
11     And Hite was the head of ECFMG at the time;
12 correct?
13 A. Not --
14 Q. Betty Hite?
15 A. She wasn't the head. She was our director.
16 Q. Was the director.
17 A. Yes.
18 Q. That was who you-all reported to at the time.
19 A. Yes.
20 Q. Okay. "Doing that would have eliminated any
21 appearance of conflict of interest or that you had tried
22 to hide your relationship with them. And you have to
23 know from other people's perspective that's how it
24 appears to them. I hope" that "makes sense."
25     And then you respond to that; correct? You

### 107

1  respond to that e-mail on the front of the first page on
2  February 21st, 2014.
3  A. Yes.
4  Q. Okay. And in this response to -- to
5  Mr. Repasch, you state, "Just for the record....I wasn't
6  hiding anything from you, I really couldn't see the
7  problem. Now I can see your point how someone could
8  have perceived malice intent."
9      Did I read that correctly?
10 A. I -- I think you're missing a whole lot of
11 other things, too, Erin. I also said, "You have no idea
12 how much shame I dealt with about" the "pregnancy." I
13 was a 18-year-old girl that went to a prom that had a
14 one-night stand and got pregnant. I did not abort my
15 child. I had a baby. I was very young. And then right
16 after that, I kind of grew up. I went to school, tried
17 to make a difference for myself. And I was also
18 explaining to that. That was John's point of view, and
19 I said, yeah, okay, if that's what -- how other people
20 have seen that, hey, I can -- yeah, I can see maybe how
21 their point of view could have been taken, but now I'm
22 over 40. My daughter, by the time Troi came there, she
23 had already graduated with a degree. There was nothing
24 to gain. So, no, I -- I mean, I -- I still don't think
25 that hiring Troi or being part of that, I'm not going to

### 108

1  associate myself with that.
2  Q. Okay. So even though the policy at ECFMG
3  was -- was not to have direct reporting relationships
4  and hiring decisions and promoting decisions and
5  evaluations performed by folks that are related by
6  blood, that -- or that have similar relationships.
7  A. I'm not --
8      MR. KENNARD: Hold on. I'm going to
9  object. Assumes facts not in evidence. A compound
10 question. And misstates previous testimony.
11 Q. (BY MS. O'DRISCOLL) So this would be a good
12 time, we'll look at the policy that ECFMG has. I'm
13 going to mark this as Exhibit 17.
14     (Exb. No. 17 was marked.)
15 Q. (BY MS. O'DRISCOLL) And I know you've seen
16 this policy before.
17     This is ECFMG/Ellis 356-357. And the title
18 of this document is "Employment of Relatives and
19 Relationships in the Workplace."
20     Did I read that correctly?
21 A. Yes.
22 Q. And -- and this is a policy that you were
23 familiar with at ECFMG; correct?
24 A. Correct.
25 Q. And you were aware that this policy existed

### 109

1  both while you were assistant center manager as well as
2  while you were the center manager; correct?
3  A. That is correct.
4  Q. Okay. Roman numeral I for the -- states that
5  the policy -- "It is the policy of ECFMG to regulate the
6  working and reporting relationships of individuals who
7  are related by blood, adoption, marriage, or domestic
8  partnership, affianced or significant other in order to
9  avoid real or perceived conflicts of interest,
10 influence, or favoritism."
11     And that's the conflict of interest that
12 you and John were discussing on that e-mail; correct?
13 A. That is not.
14 Q. It's not?
15 A. No.
16 Q. How -- how is that not?
17 A. Because I am not related to Troi Bryant by
18 blood, adoption, marriage, domestic partnership,
19 affianced, significant others, in order -- by no means
20 am I related to him. I am -- I am the mother of
21 Brittani Bryant, not Troi Bryant or Jackie Bryant.
22 Q. And, again, Troi Bryant was paying child
23 support through the attorney general's office and -- and
24 as Brittani's father to this day, and during the time he
25 worked with -- worked for ECFMG; correct?

**150**

1  visions for -- even when I came back, and, you know,
2  thereafter.
3  Q. And did -- did you -- when you mentioned the
4  eye patch, did you say, "It's not going to affect my
5  job, I just need my husband to drive me to work because
6  I can't drive"?
7  A. No.
8  Q. You didn't say anything like that?
9  A. No. I said I'm going to need accommodation. I
10 just don't know what they are yet. May be, you know, a
11 screen, it may be the lighting for the computers, a
12 different font. I'm not sure.
13 Q. And -- and did you ever, in fact, ask for a
14 specific accommodation when you went back?
15 A. Yes.
16 Q. What was --
17 A. Not specific, because I -- I wasn't given that
18 opportunity to say what the specific accommodations
19 were. I just said, "I know I'm going to need some
20 accommodation."
21 Q. Did -- but you didn't say a -- what a specific
22 accommodation was that you needed?
23 A. I said --
24    MR. KENNARD: Objection to the extent that
25 it calls for a legal conclusion.

**151**

1  Q. (BY MS. O'DRISCOLL) Did you -- did you ask for
2  anything specific that you needed when you returned?
3  A. I just said I needed possibly a computer
4  screen, that it needs to be larger, those things.
5  Q. You did actually say that?
6    MR. KENNARD: Hold on. Hold on. Let's let
7  her finish answer -- hold on. Let's let her finish
8  answering the question, then you're free to ask her
9  another question as it pertains to anything that she
10 responded with. But I would really ask that we allow
11 her, before we jump in and cut her off, to let her
12 finish answering the question.
13    So you may continue, with your response.
14 Were you done?
15 A. Computer screen may need to be larger, the
16 lighting, chair. I didn't know exactly which one
17 because I had not been at work. I walked into my
18 office -- to the office, said hello to a few of the
19 employees, and then I was ambushed by these special
20 needs or concerns.
21 Q. (BY MS. O'DRISCOLL) Okay. And let's talk
22 about -- let's talk about your -- your return.
23    On October 22nd --
24 A. Yes.
25 Q. -- 2012, that's the day we're talking about;

**152**

1  correct?
2  A. Yes.
3  Q. And -- and this is -- when you first walked in,
4  did you meet with -- with Betty LeHew from HR?
5  A. No. When I first walked in, I said hello to a
6  few of the employees.
7  Q. And then did you meet with someone?
8  A. Yes.
9  Q. Did you meet --
10 A. I said hello.
11 Q. Did you meet alone with Ms. LeHew?
12 A. I wouldn't say meet. I said, "Hello." And
13 when I walked in my office, Betty LeHew was in my
14 office, and then we exchanged. Betty told me that --
15 because I had told Betty and Sharon and people in HR
16 that I could not be under stress. My doctor said that,
17 the same thing, that he could not afford to lose me on
18 this side of the table and I could not be up under
19 that -- up under stress. And Betty said, "Well, your
20 directors are here, and they need to talk to you about
21 some concerns they have."
22    And I said, "Was this one of those meetings
23 we should have at the hotel?"
24    And she said, "Well, do you think we need
25 to go to the hotel?"

**153**

1     I said, "I don't know what the meeting is
2  about."
3     And then she -- they -- they walked in,
4  Betty and -- I'm sorry -- Nancy and Chris.
5  Q. Okay. And before they walked in, though, did
6  Betty tell you that -- that ECFMG had received the full
7  release -- your full release to return to work?
8  A. I don't recall her saying that to me.
9  Q. Did she say, "I want to make sure that you're
10 fine to proceed. We're about to have a discussion. I
11 want to make sure that you're feeling good and that
12 you're fine to proceed with this meeting today."
13    Do you remember that?
14 A. She said something similar to that, yes.
15 Q. Okay. And then did you assure her, yes, let's
16 go forward with the meeting?
17 A. I did.
18 Q. Okay. And then you said that you also met with
19 was it Nancy Ambrose?
20 A. It was Nancy Ambrose and Chris Paul and Betty
21 LeHew.
22 Q. Okay. And where were -- where were you-all at
23 ECFMG that day?
24 A. We were in my office.
25 Q. Okay. So before we -- before we turn to that,

**154**

1  let me just -- there's one document I will mark as
2  Exhibit 22nd.
3  (Exb. No. 22 was marked.)
4  Q. (BY MS. O'DRISCOLL) I'm sorry. 22, and that's
5  ECFMG/Ellis 398 through 399.
6  And just let me know once you've finished
7  reviewing this document.
8  A. Yes.
9  Q. So this is a letter dated October 19th, 2012,
10  addressed to you; correct?
11  A. Yes.
12  Q. From ECFMG?
13  Sharon Trowell-Roman, that was the HR
14  manager that you'd been working with on your FMLA leave;
15  correct?
16  A. Yes.
17  Q. And in this letter, she tells you that -- that
18  they received the fit for duty form completed by your
19  physician releasing you to return to work at full
20  capacity as of October 22nd, 2012.
21  Did I read that correctly?
22  A. Yes.
23  Q. And then the second paragraph, it says, she
24  reminds -- she tells you about the leave, that "You
25  previously used FMLA leave beginning January 18th, 2012,

**155**

1  until January 30th, 2012, to care for your spouse. You
2  currently have four weeks and six days of FMLA remaining
3  in this 12 month period. If you have the need for
4  additional FMLA" leave -- "FMLA time, please contact
5  me."
6  Did I read that correctly?
7  A. That is correct.
8  Q. Okay. And did you ever contact Ms. Sharon
9  Trowell-Roman for any additional leave after this
10  letter?
11  A. I did. I did. I talked --
12  Q. When -- when did you do that?
13  A. I contacted her before I went back to work to
14  tell her that I was going to be going to work only for
15  half days for the first week.
16  Q. Did you provide any documentation at all from
17  your physician --
18  A. I --
19  Q. Wait. Let me finish.
20  MR. KENNARD: Let her finish.
21  Q. (BY MS. O'DRISCOLL) Did you provide any
22  documentation from your physician or any additional FMLA
23  paperwork to request half days?
24  A. I don't recall -- I don't believe I did. I
25  told her that I would be using some of my sick time for

**156**

1  those half days.
2  Q. So for the -- for the half days, were you
3  wanting to use sick time and not FMLA?
4  A. Correct.
5  Q. Okay. So in using -- in using the sick time,
6  you didn't believe that you needed to fill out any
7  additional paperwork?
8  A. Correct.
9  Q. Okay. And when you returned on October 22nd,
10  2012, you were starting to tell me that you met with
11  Ms. Ambrose as well as Chris Paul and that Ms. LeHew --
12  that they were in your office on that day; correct?
13  A. They weren't in my office. I met with Betty --
14  I met with the -- I walked down the hallway, saw a few
15  employees, and then Betty was in my office, and then
16  Nancy Ambrose and Chris Paul walked in shortly
17  thereafter.
18  Q. Okay. Okay. And what did they say when --
19  when they walked in?
20  A. We greeted each other, said hello, with some
21  pleasantries, and then they ambushed with firing -- they
22  knew I wasn't supposed to be up under stress. They
23  started ambushing with firing questioning and gave me
24  a -- they didn't even give me a list of concerns. They
25  just started with a whole list of things that -- it was

**157**

1  brought to my attention, employees stated, management --
2  manage -- management did this, and none of -- a lot of
3  it I had never even heard before.
4  Q. Do you -- do you remember anything specific?
5  Does anything specific come to mind that -- that they
6  addressed with you that day?
7  A. It was brought to my attention about Troi
8  Bryant. It was brought to my attention about some
9  robes, plates.
10  Q. I'm sorry. What did you say, some robes and
11  plates?
12  A. Robes.
13  Q. Anything else?
14  A. Something about I was eating someone's food.
15  Q. And did they tell you that -- that these were
16  complaints that they had received from other employees?
17  A. Yes, but they never told me who the employees
18  were. I had never heard that before or the complaints
19  before. Never was given a corrective written action
20  to -- to even correct the -- the action. Never even
21  seen a memo like that before. And then I brought -- you
22  know, we stopped it, and brought it to Betty LeHew's
23  attention that a list of people that had called me, gave
24  her specific names that she needed to investigate and
25  talk to and with part time and full time that during my

**158**

14:29
1 whole FMLA time, being off work, how these employees
2 every day were calling my home till my husband had to
3 finally say, "My wife is recovering," to please stop
4 calling my home.
5  Q. Did -- you said you gave a list of names to
6 Betty to investigate?
7  A. Yes.
8  Q. What did you want her to investigate?
9  A. Because the -- the employees were saying that
14:29
10 Chris was undermining everything that I was doing, so I
11 wanted her to talk to all of the full-time employees
12 that were calling my home during my leave of absence,
13 and saying these things that was going on, the part-time
14 employees, as well, that were saying these things. And,
14:29
15 I mean, I couldn't even refute all the things that were
16 said. I wasn't given the opportunity to refute.
17   I was told by Betty LeHew that -- you know,
18 I said, "Well, Betty, I can go back on leave."
19   And she said, "No. You should take -- off
14:30
20 the record, you should take the personal leave of
21 absence."
22   And I said, "Okay," because I didn't know
23 any -- I didn't -- I didn't know. I didn't know. So I
24 said, "Okay." Called my husband. She told me to give
14:30
25 her my cell phone. I gave her my cell phone, called my

**159**

1 husband to come pick me up. She walked me outside, and
2 that was it until I heard back from -- Betty left a
3 message on my voice mail to meet her at a hotel, I did,
4 gave them my things, and then we started corresponding
14:30
5 on how to get my personal belongings.
6  Q. Okay. Let's -- let's back up a little bit.
7 On -- when you were having this discussion with
8 Ms. Ambrose, Mr. Paul, and Ms. LeHew, you said they gave
9 you a list of concerns.
14:30
10  A. I did not say they gave me a list of concerns.
11  Q. They -- they -- they listed a list of concerns.
12  A. Yes.
13  Q. You eventually were given a list; correct?
14  A. I had to request a list.
14:30
15  Q. Okay. And you were given that list?
16  A. Yes.
17  Q. Okay.
18  A. After I requested that list.
19  Q. Okay. And did you receive that list that day
14:30
20 or some day after that?
21  A. That day.
22  Q. Okay. And did you -- that day, on October
23 22nd, 2012 -- I was making a list of the items that
24 you -- that I noted that you mentioned.
14:31
25   The first thing you mentioned was Troi

**160**

1 Bryant and --
2  A. That was not the first thing I mentioned.
3  Q. I wrote down Troi Bryant, robes and plates, and
4 eating someone's food.
5   Did I miss one?
6  A. There was a list. We can go back on -- the
7 court reporter to see, actually, what I said.
8   MS. O'DRISCOLL: Can we go back to what she
9 responded had been --
10   THE REPORTER: QUESTION: "Do you -- do you
11 remember anything specific? Does anything specific come
12 to mind that -- that they addressed with you that day?"
13   ANSWER: It was brought to my attention
14 about Troi Bryant. It was brought to my attention about
15 some robes, plates.
16   MS. O'DRISCOLL: Thank you.
17  Q. (BY MS. O'DRISCOLL) So I wanted to get a
18 little more detail, when you say they brought to your
19 attention about Troi Bryant, are you referring to fact
20 that he's your daughter's father?
21  A. Yes.
22  Q. And did they reference the relationship policy
23 at that time?
24  A. No, I don't recall it.
25  Q. Okay. Do you remember, did they reference

**161**

1 that -- that they believed that there was some sort of a
2 policy violation related to Troi Bryant working there,
3 having been your daughter's father?
4  A. Betty did bring that to my attention, and I
5 said, "Betty, Troi hasn't worked here in over a year,
6 and -- why is that a difference when you have David and
7 Heidi working together." And Betty has her stepdaughter
8 and it clearly states about stepdaughter, Troi is not
9 related to me.
10  Q. Did -- did Betty or -- or Ms. Ambrose or
11 Mr. Paul, did anyone ask you: Is Troi Bryant your
12 daughter's father?
13  A. Yes.
14  Q. And did you respond to that question?
15  A. I -- I did, and I was trying to say that he --
16 he is, but, I mean, we were not related.
17  Q. Did -- did you say that that day? Was your
18 response that day?
19  A. I did not. I was trying to get out that he's
20 the father, but he's not related to me in any kind of
21 way, because as I mentioned earlier in the testimony, is
22 that -- that was -- that was a lot of shame, and that
23 was over 25 years ago, or longer. And that was a lot of
24 shame that was about that, regarding that, having a
25 child out of wedlock, and it was just a one-night stand.

### 162

1  But later that evening, I believe I called Betty or
2  shortly thereafter I called her and just went ahead and
3  just said, "Betty, you know, Troi is the father of
4  Brittani, but there is no relation or -- there's --
5  we're not relatives, though."
6  Q. In fact, when Betty asked you that day, on the
7  22nd, she -- when she asked you if Troi was Brittani's
8  father, didn't you say that he -- he stepped up, that,
9  no, he wasn't her father, but he -- he stepped up,
10  something to that -- something -- something to that
11  effect?
12      MR. KENNARD: Objection. Calls for
13  speculation. Assumes facts not in evidence. And
14  misstates testimony.
15  Q. (BY MS. O'DRISCOLL) I'll restate -- restate
16  the question.
17      When Betty asked you if Troi was Brittani's
18  father, did you -- in that -- in that sitting, on
19  October 22nd, did you deny that Troi was Brittani's
20  father?
21  A. Indirectly.
22  Q. And -- and can you give me a little more detail
23  on what you said?
24  A. As I was stating earlier, I didn't just
25  directly say, yes, he's the -- he's her father, because

### 163

1  of the shame that was related to that.
2      I was giving a story that, yes, but we're
3  not -- there is no blood relation or I'm not -- I'm
4  related to Brittani, but not to Troi, but -- so --
5  Q. Do you remember saying anything, something to
6  the effect of he stepped up or stepped in or something
7  to -- of that nature?
8      MR. KENNARD: Objection. Misleading.
9  Confusing. And assumes facts.
10  Q. (BY MS. O'DRISCOLL) I'm just asking you if you
11  remember saying anything like that.
12  A. I don't remember. I don't recall that.
13  Q. Okay. Okay. Do you -- do you remember calling
14  Betty either that evening or the next day and saying, "I
15  have to clean my conscience, Troi's Brittani's father"?
16  A. I --
17  Q. Clear my conscience.
18      MR. KENNARD: Objection. Assumes facts.
19  And calls for speculation.
20  Q. (BY MS. O'DRISCOLL) Did you ever say anything
21  like that to Betty --
22      MR. KENNARD: Same objection.
23  Q. (BY MS. O'DRISCOLL) -- that you have to clear
24  your conscience?
25      MR. KENNARD: Same objection.

### 164

1  Q. (BY MS. O'DRISCOLL) You can answer.
2      MR. KENNARD: You can answer if you're able
3  to?
4  A. I recall calling Betty saying that Troi was
5  Brittani's father.
6  Q. (BY MS. O'DRISCOLL) Do you remember saying
7  something to the effect of, I have to clear my
8  conscience?
9  A. I don't recall that.
10  Q. Okay. Do you also remember being asked on
11  October 22nd about sharing your password?
12  A. Yes.
13  Q. Okay. And what -- what did -- and who said it,
14  and what did they say? Was it Ms. Ambrose or Mr. Paul
15  or Ms. LeHew?
16  A. I don't remember who said -- who asked me about
17  it, but I was told that I -- I -- who I shared it with.
18  I didn't know who I had shared it with.
19  Q. Were you asked if you shared your password?
20  A. Yes. And I responded with a list of people,
21  was it Flores, was it -- because I didn't know. I was
22  under a lot -- I was having brain surgery. I talked to
23  a lot of people. I was under a lot of different
24  medication.
25  Q. And did you admit to sharing your password with

### 165

1  someone?
2  A. After I was told that I did. And I'm not --
3  I'm a fairly honest person, so I said -- if my
4  employer -- I worked with these people for seven years.
5  If they told me that I did that, then I -- I just
6  believe that they had no reason to lie to me.
7  Q. Did -- did you -- did you tell them that you
8  had shared the password with a woman named Sharon?
9  A. No. They told me.
10  Q. They told you that that's who it was?
11  A. Yes.
12  Q. Okay. And for the benefit of the jury, what --
13  what is -- what is this password? What does it do?
14  A. The -- when they told -- it certified the exam.
15  Q. Okay. And does that mean that -- what does
16  that mean, "certifying the exam"?
17  A. It actually benefits the company. It made sure
18  that the -- the examinees actually got their scores on
19  time, so it benefit the company.
20  Q. What goes into certifying an exam? What does
21  that mean?
22  A. Two buttons, that the exam happened that day,
23  and all the paperwork was done correctly, yes, yes.
24  Q. And when you provided your password to Sharon,
25  was she a management-level employee?

### 166

14:39
1  A. She was acting as the assistant manager,
2  because again, I was put in a position to be the manager
3  because the assistant manager had resigned and had left.
4  So I was the manager by myself.
5  Q. She was the acting assistant manager.
6  A. Like unofficial, yes.
7  Q. So what does that mean, "unofficial"?
8  A. She had not -- she had not gone through HR and
9  approved, but Chris had -- I had asked Chris about her
14:40
10  being -- acting assistant center manager, so she was
11  doing things for me that -- she assisted me.
12  Q. And was she given management-level
13  responsibilities to certify exams?
14  A. No.
14:40
15  Q. And you understood that your password should
16  only be used by you; correct?
17  A. Yes. But keep in mind that I -- I was not even
18  aware that I had given my password to anyone until it
19  was brought to me that day on the 22nd.
14:41
20  Q. Which was the first day you came back to work.
21  A. Which was the first day I came back to work.
22  Bearing that I was working while they were calling me on
23  leave.
24  Q. And when you say you were -- when you were
14:41
25  working, did you ever tell Betty LeHew or anyone with

### 167

1  human resources, "Hey, I'm getting calls from -- from
2  the center. I'm being asked to work while I'm on
3  leave"? Did you tell anybody?
4  A. Not until -- well, Betty knew because they were
14:38
5  interviewing the assistant center manager. And Chris
6  called me and said that I could come to the center and
7  sit in the room while they were interviewing assistant
8  center managers to, I guess, give some feedback or
9  something, but at -- during the interview, I couldn't
14:38
10  say anything.
11  Q. Did --
12  A. And I was on leave during that time.
13  Q. Did you come in --
14  A. I did not.
14:38
15  Q. -- during the interviews?
16  A. I did not. And that was a choice that I made,
17  but I was asked to.
18  Q. And who was -- who was covering center
19  manage -- your center manager responsibilities while you
14:38
20  were out on leave, in Houston?
21  A. All the center managers stepped up, with the
22  exception of John, and came to the center.
23  Q. And how many other centers are there around the
24  U.S.?
14:39
25  A. There's five other centers. Houston would be

### 168

1  six.
2  Q. And they were all filling in to -- to help
3  pitch in for the -- the center manager responsibilities?
4  A. Yes.
5  Q. Okay. And you said except John?
6  A. Yes.
7  Q. And what location is he located at?
8  A. Philadelphia.
9  Q. Okay. Mark this as Exhibit 23, ECFMG 358-359.
10  (Exh. No. 23 was marked.)
11  Q. (BY MS. O'DRISCOLL) If you could take a look
12  at that chart and tell me if you've seen that chart
13  before.
14  A. I don't recall this chart.
15  Q. You don't recall ever seeing this chart?
16  A. What's the name of it?
17  Q. It's -- it's the site business functions chart,
18  listing the -- the business functions and
19  responsibilities.
20       You don't recall ever seeing it?
21  A. (Witness indicated by shaking head.)
22  Q. Okay. But you knew that as center manager
23  that -- that for -- for certifying a session, you knew
24  that only center management could do that or central
25  S -- CSEC; correct?

### 169

1  A. CSEC is -- CSEC is the -- the -- the satellite
2  offices.
3  Q. The executive director, the director, and
4  assistant director; correct?
5  A. No.
6  Q. Well, if you look -- if you haven't seen this
7  chart before, it may not help. But on the right side
8  where it says "Central Business Functions with People or
9  Title," in the third group down on the right, "Central"
10  SEC -- "CSEC," says "Executive Director," "Director,"
11  and "Assistant Director."
12       Is that not accurate?
13  A. It says that about what, though? What are you
14  referencing?
15  Q. So in the very bottom, I'm just talking about
16  who has the ability to certify a session, certify a
17  test. And the very bottom in the left-hand corner,
18  "Session certification."
19       Do you see that?
20  A. Uh-huh. Yes.
21  Q. And then if you go over to the right, it
22  says -- there's an X, which if you follow that up, goes
23  to "Center management."
24       So that would that be you -- correct? --
25  for session certification?

198

1 you asked for a list, you were given the list, and then
2 you were told that you were being put on administrative
3 leave while these items were investigated; correct?
4    A. No. I don't remember saying these items going
5 to be investigated. I remember asking Betty if she can
6 investigate the people that had been calling me,
7 full-time and part-time staff, about some of the
8 concerns that was going on with Houston, not about this
9 list.
10    Q. You don't remember Ms. Ambrose saying, "I'm
11 going to look into these issues. We're going to put you
12 an administrative leave. Betty said I'm going to look
13 into your concerns and -- and look into any employees
14 that called you while they were on leave," but,
15 separately, Ms. Ambrose said, "I'm going to look into
16 these issues"?
17    A. I would have gone --
18    MR. KENNARD: Hold on. Hold on.
19 Objection. Compound question. Assumes facts. And
20 calls for speculation.
21    Q. (BY MS. O'DRISCOLL) Did Ms. Ambrose tell you
22 that she was going to look into these issues while you
23 were placed on administrative leave?
24    A. I don't recall that. I would have thought
25 before Betty would have allowed them to bring this to

199

1 me, she would have already looked into these issues.
2    Q. So you don't recall being told that this was
3 being investigated?
4    A. If this was brought to me, I would have thought
5 that this would already have been investigated, that --
6 that this was brought to whoever this was brought to.
7 And Betty had already flown to Houston, so she had
8 already talked to someone. So I would have thought that
9 they had already investigated this and this was factual
10 to them, and -- that this was factual to them so Betty
11 would not have needed to tell me that she was going to
12 investigate this, because they would have already looked
13 into this.
14    Q. But they hadn't gotten your responses yet;
15 correct?
16    A. No, they had not gotten my responses yet.
17    Q. And that was -- and that was the purpose of
18 meeting with you on the 22nd and putting you on
19 administrative leave so that they could look into your
20 responses; correct?
21    A. They hadn't -- they did not get my responses to
22 all of these bullet points.
23    Q. But they did to most of them, didn't they?
24    A. I can't say to most.
25    Q. Well, didn't you have a conversation with

200

1 Ms. Ambrose -- well, you had the conversation on the
2 22nd, and then you also had additional conversation with
3 Betty when you called Philadelphia; correct?
4    A. But it was not a very intense, long
5 conversation with Betty.
6    Q. You didn't talk about multiple bullets on this
7 list?
8    A. No, I talked about probably two or three.
9    Q. And what two or three did you talk about with
10 Betty?
11    A. I know I talked to her about the food, and I
12 know I -- I believe I talked to her about the robes.
13    Q. And you talked to her about Mr. Bryant being
14 Brittani's father.
15    A. I did talk to her about Mr. Bryant being
16 Brittani's father.
17    Q. And do you remember talking about any of the
18 other bullet points?
19    A. I don't recall.
20    Q. When you met with Ms. Ambrose and Mr. Paul and
21 Ms. LeHew on the 22nd, they didn't finish going through
22 all the bullets yet in that setting; correct?
23    A. Correct.
24    Q. And did they tell you, "We're going to consider
25 your comments on what we've discussed thus far, we're

201

1 going to look into it further, and we're going to put
2 you on administrative leave"?
3    A. No. Betty said -- off the record, Betty --
4    Q. Before -- before -- before -- okay. You're
5 talking about something. And if you could just walk me
6 through, while all -- Ms. Ambrose, Mr. Paul, Betty and
7 you, while you guys were all in that same room together.
8    A. Yes.
9    Q. So first you spoke with Betty, and then --
10 alone. And then you went into the room, and there were
11 the -- and it was the four of you; correct?
12    A. Correct.
13    Q. And then at the end of that conversation with
14 the four of you, didn't someone in that room -- and I
15 don't know if it was Mr. Paul or Mr. Ambrose --
16 Ms. Ambrose or Ms. LeHew -- but didn't someone in that
17 room say, "We're going to put you on administrative
18 leave, paid administrative leave while we look into
19 these issues"?
20    A. Chris Paul said that you're going to go on
21 leave. I requested to go on family -- back on FMLA, and
22 asked for a copy of this. And then Betty LeHew -- Chris
23 told me, no, I could not get a copy of this. Betty
24 said, "Yes, she can." And then Betty asked them to step
25 out, Betty -- Nancy and Chris to step out of the room.

**202**

1  Then Betty and I talked and --
2  Q. And what -- what did -- what did y'all talk
3  about when you and Betty talked?
4  A. When I told Betty that I need to go back on
5  leave. And she then said, "Well, off the record, you
6  can go on leave -- personal leave of absence."
7  And she said that -- I said, "Betty, you
8  know me."
9  And she said, "I do." And she said that --
10 I said, "They have -- staff have been
11 calling me from -- at home while I was on leave and I
12 was sick and they were calling me about all this stuff
13 that's going on in the center and then I would come into
14 work and this is what I get."
15 And she said, "Well, you know" --
16 I said, "This is a list of people." I
17 told -- I gave her a list of some names of people that
18 she needed to talk to. And as I stated earlier, that
19 she asked for my cell phone, and I called my husband to
20 come and pick me up.
21 Q. And did you specifically say, "I need to go out
22 on FMLA leave"?
23 A. I specifically told her I need -- I wanted to
24 go back on FMLA leave.
25 Q. And --

**203**

1  A. In that group.
2  Q. You said that your -- you said it in the group,
3  not just to Betty?
4  A. I said it in the group, and I said it to Betty.
5  And then that's when she said, "Off the record, you need
6  to go back -- you know, on personal leave of absence."
7  Q. What --
8  A. Because I knew I can go back on leave. I had
9  leave time from Sharon's letter.
10 Q. And -- and how did you -- you had just received
11 your fitness for duty to return for work with a clear,
12 full release; correct?
13 A. Correct.
14 Q. How did you think that you could go -- that you
15 qualified to go back out on leave?
16 A. Because I knew that Dr. Tom said, "I cannot
17 afford to lose you on this side of the table," and that
18 that was still some concerns with my neurologist as well
19 as the endocrinologist.
20 Q. So did you at any time -- either on the October
21 22nd or anytime prior to your termination on November
22 1st, did you ever call any of your physicians and get
23 some sort of a modified fitness for duty or -- or some
24 sort of a modification that you could turn in to ECFMG
25 to request leave, to request FMLA leave?

**204**

1  A. At that time, I was not -- I was not working.
2  I was on administrative leave, so --
3  Q. You were on paid administrative leave.
4  A. Paid administrative leave, as Betty had
5  instructed me to go.
6  Q. But did you at any time between October 22nd
7  and November 1st ever request to go back out on FMLA and
8  tell ECFMG, "I have a doctor's note. I have a serious
9  medical condition, or some other qualifying need, I need
10 to go back out on FMLA"? Did you ever say anything like
11 that?
12 MR. KENNARD: Objections. It assumes facts
13 and calls for a legal conclusion.
14 Q. (BY MS. O'DRISCOLL) Did you ever ask FMLA --
15 did you ever ask to go back out on FMLA for a serious
16 medical condition?
17 A. No, because I was on personal leave of absence.
18 Q. And did --
19 A. Administrative leave of absence. I'm sorry.
20 Q. And -- and you never called Sharon Roman
21 Trowell [sic] up in Philadelphia to request FMLA
22 paperwork to fill out; correct?
23 A. Because I was on administrative leave, I was
24 waiting for them to call me to let me know what was the
25 outcome of Betty's investigation, and I -- I knew that I

**205**

1  was probably going to be terminated.
2  Q. So the answer is to my -- and could you read
3  back the question that I asked?
4  THE REPORTER: QUESTION: "And -- and you
5  never called Sharon Roman Trowell up in Philadelphia to
6  request FMLA paperwork to fill out; correct?"
7  MR. KENNARD: Objection. Asked and
8  answered.
9  Q. (BY MS. O'DRISCOLL) Is that statement correct,
10 that you never contacted Sharon Trowell for FMLA
11 paperwork?
12 MR. KENNARD: Same objection.
13 Q. (BY MS. O'DRISCOLL) Is that correct?
14 A. I never called Sharon while I was on
15 administrative leave to ask for additional FMLA
16 paperwork.
17 Q. And you never contacted any of your doctors for
18 a doctor's note to go back out on FMLA leave, did you?
19 A. I was not physically at work. I was on paid
20 administrative leave, so I was at home. I wasn't
21 physically in the office.
22 Q. So the answer to that question is no, you never
23 contacted doctor -- doctors for a doctor's note to go
24 back out on leave; correct?
25 MR. KENNARD: Objection. Confusing.

52 (Pages 202 to 205)

**230**

16:29
1  didn't think that would probably be the most safest and
2  appropriate thing for me. So at that point, I think I
3  started waking up, saying, "No, this is work-related. I
4  should not be going to the center, nor should my
5  director be calling me to come in to be doing work.
6  That's work related, and I should not be there."
7  Q. And you said, "No, I'm not coming in"; correct?
8  A. No. I just did not show.
9  Q. Okay. And were you ever written up or
16:29
10 reprimanded or ever given a verbal reprimand for not
11 coming in for that interview?
12 A. I was never given a verbal reprimand or written
13 corrective action for anything during my duration at
14 ECFMG. I think one time, and I didn't even know it was
16:29
15 a corrective -- written -- a corrective action. I had
16 to call Betty and ask her about it. And I was making
17 several complaints to HR about my director at that
18 particular time.
19 Q. About Mr. Paul?
16:29
20 A. Yes.
21 Q. And when you say "at that time," is this -- is
22 this prior to the time that you went out on leave in the
23 fall?
24 A. This was prior -- this was prior to the time I
16:30
25 went out on leave.

**231**

1  Q. Okay. And what type of complaints did you make
2  about Mr. Paul?
3  A. I complained that he -- he was retaliating
4  against me, he was -- he called me names, or out of my
16:30
5  name. He -- he subjected me to a lot of things that
6  other managers did not have to talk about.
7  Q. Like what? Like what?
8  A. Oh, he used inappropriate language.
9  Q. Like what?
16:30
10 A. I choose not to repeat those things. I can't
11 even recall a lot of the stuff. I know he called me a
12 witch.
13 Q. Anything else?
14 A. I think it's in my -- he -- he was telling my
16:30
15 staff that I wasn't a good manager.
16 Q. Who -- who told you that Mr. Paul said you
17 weren't a good manager?
18 A. David Strom.
19 Q. How do you spell the last name?
16:31
20 A. S T R O M.
21 Q. M as in Mary?
22 A. Yes.
23 Q. And when did he tell you that Mr. Paul said
24 that you weren't a good manager?
16:31
25 A. I don't recall the -- the month and day.

**232**

1  Q. Was it before you went out on leave?
2  A. Yes.
3  Q. Okay. When you said that Mr. Paul was
4  retaliating against you, what does that mean to you?
5  A. That means that anytime I would bring something
6  to him, he then will just come full force and would say
7  things negative to my staff or to -- if I brought
8  anything to his attention, he would say negative things
9  to my staff or to other managers, to my assistant
10 manager.
11 Q. And what -- what was he saying to staff and
12 managers about you?
13 A. Some of the things I just mentioned to you.
14 Q. Well, I -- I was taking notes while you were
15 saying them, and you said called names and using
16 inappropriate language, but -- and specifically I have
17 that he called you a witch.
18 Is there anything else specific that you
19 can -- that you can recall that he --
20 A. I know he said that I wasn't a good manager,
21 because I remember I had called -- I had text him and
22 told him I -- and that's how we used to -- we could text
23 him and say that we weren't going to be in the office if
24 we needed to take a sick day. And I text him, and he
25 came into Houston, pulled in unexpectedly, and I texted

**233**

1  him and told him that I was going to be out. And he
2  said that I wasn't a good manager to David, and David
3  had e-mailed me.
4  He -- it was several things. He told Brent
5  a couple of things. It was inappropriate. And when I
6  would -- like, he would call Brent a baby, and he was
7  still on breast milk. And so when I would talk to him
8  side-bar or on the outside of the office, just he and I,
9  saying can you please not address staff inappropriately,
10 he then will retaliate and say things, you know,
11 publicly, or openly in a group setting about me or
12 something like that.
13 Q. So other than -- other than Mr. Paul saying
14 that you weren't a good manager, can you think of any
15 other specific comments that -- that you -- that you
16 heard, either from him or from staff telling you that he
17 said?
18 A. I report -- I -- I reported them to HR. I
19 reported them to Ann Jobe, his -- his manager. And
20 seeming that when I reported them to his manager, things
21 had gotten worse.
22 Q. And when you -- when you reported them to his
23 manager and to HR, do you feel like ECFMG listened
24 and -- and looked into what -- what you were saying?
25 A. At first, I thought they did. And then at a