# Exhibit "D"

# Transcript of the Testimony of

# Nancy Ambrose

**Date:**

September 07, 2016

**Case:**

ARTIS ELLIS VS. EDUCATIONAL COMM. FOR FOREIGN MED. GRADS

Kim Tindall and Associates, LLC.
Phone:(210) 697-3400
Fax:(210) 697-3408
Email:ktindall@ktanda.com
Internet: www.KimTindallandAssociates.com

Nancy Ambrose                                                    September 07, 2016

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3    ARTIS ELLIS                     )
                                      )
 4              PLAINTIFF,            )
                                      )
 5    VS.                             ) C.A. NO. 4:14-cv-02126
                                      )
 6    EDUCATIONAL COMMISSION          )
      FOR FOREIGN MEDICAL             )
 7    GRADUATES                       )
                                      )
 8              DEFENDANT.            )

 9


10    **********************************************************

11                      ORAL DEPOSITION OF

12                        NANCY AMBROSE

13                      SEPTEMBER 7, 2016

14
      **********************************************************
15

16

17

18

19

20

21

22

23

24

25
```

Page 14

1  the approval from Ann; is that correct?
2     A.  Correct.
3     Q.  Did you also conduct the investigation?
4     A.  Yes, I did.
5     Q.  And you did that alone, or did you have
6  assistance?
7     A.  I may have had assistance in doing some of the
8  research. I think the SPOS in Houston helped me with
9  some timekeeping and data records that I --
10    Q.  Did you say SP --
11    A.  SP, standardized patients -- patient operation
12 specialist.
13    Q.  And who would that with be?
14    A.  That was Forrest.
15    Q.  Forrest. What's the last name?
16    A.  Roberts.
17        THE WITNESS: Is that right?
18    Q.  (BY MS. HARROLD) Throughout Ms. Ellis'
19 employment, you were assistant director the entire
20 time, correct?
21    A.  I believe so, yes.
22    Q.  Okay. And are you still working for ECFMG?
23    A.  No. I ended my employment there on July 31st,
24 2015.
25    Q.  And what was the reason why you left ECFMG?

Page 15

1     A.  My husband and I relocated to the Midwest.
2     Q.  So where do you work now?
3     A.  I'm unemployed now.
4     Q.  Okay. Have you worked since you left ECFMG?
5     A.  Just volunteer work.
6     Q.  Where do you volunteer?
7     A.  Habitat for Humanity.
8     Q.  Uh-huh.
9     A.  Also on the homeowner's association board in
10 my townhouse development. And the American Sewing
11 Guild.
12    Q.  How did you find out about this lawsuit?
13    A.  I believe Betty LeHew called me.
14    Q.  About how long ago?
15    A.  I'm not that good with dates. I was in
16 Kansas, so it was probably early 2015.
17    Q.  Okay.
18    A.  I don't know exactly when.
19    Q.  When you were assistant director, and this is
20 during the time that Ms. Ellis was working for ECFMG,
21 do you remember who the director was in Houston?
22    A.  There is no director in Houston.
23    Q.  Okay. So then any kind of discipline that
24 would happen to the center manager in Houston would be
25 your responsibility?

Page 16

1     A.  I don't understand the question. What was
2  that again?
3     Q.  Well, say, for instance, a center manager, the
4  center manager in Houston -- Ms. Ellis has to be
5  written up for some disciplinary reason, right?
6     A.  Uh-huh.
7     Q.  You said usually that would happen through the
8  director and then you would kind of just assist. But
9  since there was no director in Houston, if any
10 disciplinary action needed to occur with Ms. Ellis,
11 then you would take care of that?
12    A.  When I said there's no director in Houston, I
13 meant that literally. The director is in Philadelphia.
14    Q.  Okay. So if you have --
15    A.  So there was a director in employment, just
16 not situated in Houston.
17    Q.  In Houston. Okay. And how many directors are
18 actually in place? If I'm looking at the
19 organizational chart, how many directors are there?
20    A.  There's one director of center operations.
21 There's several other directors in different areas
22 within the collaboration.
23    Q.  What was Chris Paul's title?
24    A.  Director of center operations.
25    Q.  And before Chris, who held that position?

Page 17

1     A.  Betty Hite. H-I-T-E.
2     Q.  And do you remember when Chris Paul took over
3  that position?
4     A.  I think it was September 2011.
5     Q.  Okay. And before Betty, who held that
6  position?
7     A.  Ann Homan. H-O-M-A-N.
8     Q.  Do you recall ever having to assist Betty Hite
9  with any disciplinary issues with Ms. Ellis?
10    A.  Not formally.
11    Q.  When you said "not formally," what do you
12 mean?
13    A.  Both Betty and I had conversations with Ellis
14 over -- over the years just talking about coaching for
15 basic management, mentoring.
16    Q.  But never to the point where she had any kind
17 of written -- any kind of write-ups or anything like
18 that?
19    A.  Not that I can recall.
20    Q.  Okay. And what about with Chris Paul? Prior
21 to that August memo, had Chris Paul previously written
22 Ms. Ellis up for any reason?
23    A.  He may have; I don't remember.
24    Q.  Okay. Did Ms. Ellis ever complain to you
25 about -- about Chris Paul?

Nancy Ambrose

September 07, 2016
Pages 18 to 21

Page 18

1  A.  Yes.
2  Q.  When did she make those complaints to you?
3  A.  I think when Artis was in Philadelphia for a
4  manager's meeting. I don't remember the date offhand.
5  It would have been March --
6  Q.  March of 2012?
7  A.  It would have to be, because Chris wasn't
8  there in March of 2011. Yeah.
9  Q.  Okay. And what kind of complaints -- if you
10 can remember, what kind of complaints did she make
11 about -- about Chris?
12 A.  I can't remember exactly. I think she was
13 having difficulty communicating with him. I can't
14 remember the specifics.
15 Q.  And did you investigate those complaints?
16 A.  She wasn't formally complaining to me. She
17 was just, I think, sharing some frustration over her
18 interactions with Chris.
19 Q.  Uh-huh.
20 A.  And my advice was, you know, just to talk to
21 him directly about any issues she had.
22 Q.  Okay. And when you say she wasn't doing a
23 formal complaint, what happens when an employee gives a
24 formal complaint versus what Ms. Ellis did?
25 A.  I don't know. I never really had formal

Page 19

1  complaints. If it was something significant, I would
2  probably tell them to go to HR and share their
3  concerns.
4  Q.  Okay. And let's kind of talk about Ms. Ellis'
5  termination. When was the decision made to terminate
6  Ms. Ellis?
7  A.  I don't remember the dates specifically. We
8  met with her on October 22nd or 23rd. I had the
9  investigation, and then it was after that the
10 investigation -- I think after the 29th, on or around
11 October 29th --
12 Q.  Okay.
13 A.  -- I would have been making that decision.
14 Q.  And who did you talk to during the course of
15 your investigation?
16 A.  I talked to Betty LeHew, human resources vice
17 president; and I talked to Ann Jobe, our executive
18 director.
19 Q.  And what were the reasons for Ms. Ellis'
20 termination?
21 A.  Several policy violations.
22 Q.  Okay.
23 A.  Distrust. Some poor -- poor judgment and poor
24 management.
25 Q.  And had anyone made these complaints prior to

Page 20

1  her going out on leave?
2  A.  Yes.
3  Q.  When?
4  A.  Which one?
5  Q.  About the policy violations.
6  A.  Well, there were two policy violations. One
7  we found out as she was -- we discovered as she was on
8  leave. The other one we found out -- I can't remember
9  exactly when. I think on or before her leave.
10 Q.  Okay. What were the two policies that
11 Ms. Ellis violated?
12 A.  Hiring and promoting significant other, and
13 sharing her password with a nonmanagement staff person.
14 Q.  And how did you find out that she allegedly
15 hired and promoted a significant other?
16 A.  I believe Chris Paul found out initially
17 through an anonymous letter.
18 Q.  An anonymous letter that he received when?
19 A.  I can't remember the exact date.
20 Q.  Was Ms. Ellis out on leave when he received
21 this anonymous letter?
22 A.  She may have been.
23 Q.  Okay. And so Chris Paul brought you this
24 anonymous letter, and then what did you do with that
25 information?

Page 21

1  A.  I -- I didn't do anything with it.
2  Q.  Did you believe at that time that she was in
3  violation of some policy?
4  A.  I believe there was some -- we had some
5  questions that we needed to look into. I wasn't
6  investigating Artis at that point.
7  Q.  Okay. So about what time period are we in
8  right now? About what month and what year?
9  A.  2012, this would be -- I don't know --
10 September, October, thereabouts.
11 Q.  So Chris Paul received an anonymous letter
12 claiming that Ms. Ellis had hired or promoted a
13 significant other in September or October of 2012?
14 A.  Yes.
15 Q.  And you didn't do anything with that
16 information, no investigation was done until she came
17 back from FMLA leave?
18 A.  I didn't do the investigation at that point.
19 Chris Paul was looking into it.
20 Q.  Okay. And who made the decision that she had
21 actually violated the policy?
22 A.  I did.
23 Q.  Okay. And we'll mark a copy of the policy as
24 an exhibit to your deposition. We'll mark it as 1.
25      (Exhibit 1 was marked.)

Kim Tindall and Associates, LLC  16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Page 26

1 favoritism to Troi?
2  A. Uh-huh. Yes.
3  Q. And then when you, also, interviewed some
4 employees, they said that she was showing favoritism to
5 Troi?
6  A. I didn't interview any employees --
7  Q. Okay.
8  A. -- about that specific issue.
9  Q. Do you know if Chris Paul went to go talk to
10 other employees about these claims of favoritism?
11  A. I believe he did.
12  Q. Okay. And did he report back to you about his
13 findings after talking to these employees?
14  A. I think so.
15  Q. Okay. And what can you recall from his
16 findings of talking to other employees?
17  A. I don't remember the specifics.
18  Q. Okay. But all you remember is there were some
19 claims of favoritism?
20  A. Yes.
21  Q. Okay. And you -- were you aware that during
22 this time period, Troi Bryant didn't even work at --
23 didn't even work at ECFMG anymore?
24  A. Correct.
25  Q. And when was Troi Bryant's last day at ECFMG?

Page 27

1  A. I don't remember the exact day. I think it
2 was at least a year prior.
3  Q. Okay. So any claims of favoritism --
4 Ms. Ellis couldn't favor him because he had not worked
5 there in a year, correct?
6       MS. O'DRISCOLL: Objection, form.
7  A. I -- I don't understand the question.
8  Q. (BY MS. HARROLD) It's difficult to show
9 favoritism to an employee who is no longer an employee,
10 correct?
11  A. I think the damage had been done.
12  Q. And what damage is that that had been done?
13  A. The perception of bias amongst Artis' staff.
14  Q. So they had a perception that she was biased
15 for an employee that no longer worked there?
16  A. That she was possibly biased, yes.
17  Q. To an employee that no longer worked there,
18 correct?
19  A. Correct.
20  Q. And no one had ever complained prior to this
21 anonymous letter when she was out on FMLA leave of --
22 of favoritism or perception of bias, correct?
23  A. I don't remember.
24  Q. But not -- to your knowledge, this was the
25 first time that when Chris got this anonymous letter --

Page 28

1 I think you testified that when Chris Paul got this
2 anonymous letter was -- was the reason why you started
3 investigating or he started investigating this policy
4 violation, right?
5  A. Yeah. Prior to the anonymous letter, we did
6 not know about the relationship with Troi Bryant.
7  Q. Okay. And then you said there was another
8 policy violation. What other policy violation was
9 there?
10  A. That was the security policy, and that was the
11 sharing of a password.
12  Q. Okay. Talk to me about this password.
13 What -- what does this pass -- what's the purpose of
14 the password?
15  A. The password protects the security of
16 everything in Artis' computer and all of her computer
17 access.
18  Q. So in order to administer the exam, then they
19 had to have her password?
20  A. What do you mean by "administer the exam"?
21  Q. What was the purpose of her subordinate
22 getting her password?
23  A. I believe Artis gave Sharon Dolberg her
24 password to have Sharon certify the exam when Artis was
25 out on medical leave.

Page 29

1  Q. Okay. Was Artis the only person who could
2 certify the exam?
3  A. Generally, the center manager or the assistant
4 center manager can certify. I could certify in my
5 position, and Chris Paul as the director could also
6 certify.
7  Q. Was this the only exam that was administered
8 while Ms. Ellis was out on FMLA leave?
9  A. No. Exams proceeded as they were normally
10 scheduled during her leave.
11  Q. Okay. But only this one exam, Sharon called
12 Artis for the password and certified that exam?
13  A. I don't know that Sharon called Artis. I
14 believe that Artis called Sharon.
15  Q. Okay. Was this the only exam that was
16 certified by Ms. Ellis while she was out on FMLA leave?
17  A. She did not certify it. She had Sharon
18 Dolberg certify it.
19  Q. Okay. And did you talk to Sharon about how
20 she got Ms. Ellis' password?
21  A. Yes.
22  Q. And Sharon said that Ms. Ellis called her and
23 gave her the password?
24  A. And instructed her to certify the exam.
25  Q. The other exams that were administered while

Nancy Ambrose

September 07, 2016
Pages 30 to 33

Page 30

1  Ms. Ellis was out on leave, who certified those exams?
2     A.  I did.
3     Q.  And about how many exams were there?  About
4  how many exams do you think you certified while she was
5  out on leave?
6     A.  We generally had two exams a day, and
7  sometimes we had an evening exam.  I don't know the
8  exact number.  But two to three exams a day.  I'll say
9  that.
10    Q.  Five days a week?
11    A.  And sometimes Saturdays.  Two exams on
12 Saturdays.
13    Q.  And was Sharon aware that you could certify
14 exams?
15    A.  Sharon wouldn't normally know much about
16 certification as it wasn't part of her responsibility
17 or her training.
18        Oh, wait.  She probably would know.  I
19 probably worked with her in the past to certify exams,
20 so I think she would have a general knowledge that I
21 could and would generally certify.
22    Q.  Okay.  So what kind of made this particular
23 exam different?  If you were certifying the other
24 exams, what made this particular exam different where
25 Sharon certified the exam?

Page 31

1     A.  There's nothing different about that exam.
2  There's no reason someone else other than myself should
3  have certified.
4     Q.  And everyone was aware that Ms. Ellis was out
5  on FMLA leave?
6     A.  Correct.
7     Q.  And you had been certifying the exams, so
8  there was really no reason for Sharon to call Ms. Ellis
9  or for Ms. Ellis to call Sharon, correct?
10    A.  Correct.
11        MS. O'DRISCOLL:  Objection, form.
12    Q.  (BY MS. HARROLD)  Were those the only two
13 policy violations that led to Ms. Ellis' termination?
14    A.  There were some other violations.  I don't
15 know if they were -- they were more procedural than
16 policy violations.
17    Q.  Okay.  Let kind of work through the -- the
18 procedural violations.  What was the first procedural
19 violation?
20    A.  Well, as well as I can recall without having
21 the list in front of me, she had -- she was running the
22 exam with short staff, only three proctors instead of
23 four, and only one control room operator instead of
24 two.
25    Q.  Okay.  Let me mark this as Exhibit Number 2.

Page 32

1  Maybe this will help out a little bit.
2        (Exhibit 2 was marked.)
3        MS. HARROLD:  And Exhibit 2 is -- has
4  been previously produced by defense counsel.
5        Just for the record, it's labeled as
6  ECFMG Ellis 007293.  Title of the document is called
7  "Notes.  Artis Ellis meeting with Chris Paul, Nancy
8  Ambrose, and Betty LeHew."
9     Q.  (BY MS. HARROLD)  Where were these notes
10 actually taken?
11    A.  They were taken during the meeting with Artis
12 on October 22nd.
13    Q.  And October 22nd was the day that Ms. Ellis
14 returned from FMLA leave?
15    A.  Correct.
16    Q.  That was her first day back in the office?
17    A.  Correct.
18    Q.  About what time was the meeting?
19    A.  Probably early to midmorning.
20    Q.  Okay.  So pretty much as soon as she got
21 there, you guys called her into a meeting?
22    A.  No.
23    Q.  She was there for one or two hours, and then
24 you called her into this meeting where these notes were
25 taken?

Page 33

1     A.  Approximately.  Probably an hour or so
2  beforehand.
3     Q.  And who actually took the notes?
4     A.  I did.
5     Q.  Okay.  And so you were taking notes as you-all
6  were kind of meeting with her, and then you transcribed
7  them after the meeting?
8     A.  Correct.
9     Q.  Okay.  And so when I see the word "response,"
10 then that is what you believe Ms. Ellis said during the
11 meeting?
12        And then when was a further investigation
13 done?
14    A.  Correct.  The response is what she said in the
15 meeting.  The further investigation took place about --
16 within the week following, week -- week and a half.
17 I'm not sure.
18    Q.  And you had not done any investigation prior
19 to this meeting?
20    A.  No.
21    Q.  Okay.  And we talked about Number 1 and 2,
22 about the personal -- the alleged personal relationship
23 and the password.  Who made the decision to put her --
24 put Ms. Ellis on administrative leave?
25    A.  Chris Paul.

Nancy Ambrose

September 07, 2016
Pages 50 to 53

Page 50

1 LeHew had any say in that decision to put Ms. Ellis on
2 administrative leave?
3    A.  I believe we agreed with it, but Betty
4 doesn't -- as HR, she doesn't approve.  She's
5 consulted.
6    Q.  Okay.  In the meeting on October -- no, I'm
7 sorry.  When Ms. Ellis was terminated, kind of walk me
8 through what happened.  She was out on administrative
9 leave, and then did someone call her and let her know
10 she was terminated?
11    A.  No.  Betty LeHew and I flew down to Houston
12 and met with Artis.
13    Q.  Okay.  What day was that?
14    A.  That was -- I believe it was November 2nd.
15 I'm not sure on the dates.
16    Q.  Okay.  And so basically when Ms. Ellis
17 returned from FMLA leave, she went into a meeting and
18 then was placed on administrative leave; is that
19 correct?
20    A.  The following day.
21    Q.  The following day.
22    A.  Administrative leave.
23    Q.  Uh-huh.  And then she never returned back from
24 the office from administrative leave.  You and Betty
25 met with Ms. Ellis and terminated her employment,

Page 51

1 correct?
2    A.  I terminated it, correct.
3    Q.  Okay.  You terminated her employment.  What
4 role did Ms. LeHew play in that, she just wanted to
5 attend the meeting?
6    A.  Her role was human resources.
7    Q.  Just to be there to attend because she had no
8 decision-making power in that decision, right?
9    A.  She was consulted in it.  She reviewed the
10 decision.  It was approved by Ann Jobe.
11    Q.  And so Ms. Ellis was terminated for cause; is
12 that correct?
13    A.  Correct.
14    Q.  Okay.  And is it customary for employees who
15 are terminated for cause to be offered separation
16 agreements?
17    A.  I -- I couldn't say.  I haven't dealt with
18 enough to say what's customary.
19    Q.  Okay.  And who made the decision to offer
20 Ms. Ellis a separation agreement?
21    A.  I don't know.
22    Q.  You just made the termination decision,
23 correct?
24    A.  Correct.
25    Q.  After Ms. Ellis' termination, did you tell the

Page 52

1 staff that Ms. Ellis left kind of on her own will to
2 take care of her health?
3    A.  Yeah.  We asked Artis during the termination
4 if she would prefer us to tell the staff that as a
5 courtesy.
6    Q.  Uh-huh.
7    A.  And she said yes.
8    Q.  But that wasn't honest, right?
9        MS. O'DRISCOLL:  Objection, form.
10    Q.  (BY MS. HARROLD) That wasn't an honest
11 statement, right?  Because she was really terminated
12 for cause, right?
13    A.  What was the statement again?
14    Q.  That when you told the staff -- when
15 management told the staff that Ms. Ellis left to take
16 care of her health, that wasn't a true statement,
17 right?
18    A.  It wasn't the complete statement, but I don't
19 feel her staff have a right to know what -- her private
20 business with her termination.
21    Q.  Okay.
22    A.  We were being discreet as a courtesy to her.
23    Q.  But it was still dishonest, correct?
24    A.  I don't agree with that, no.
25    Q.  Okay.  It wasn't true, right?

Page 53

1    A.  I don't agree with that.
2    Q.  Was it a true statement that she left because
3 of her health?
4    A.  She can take care of her health.
5    Q.  But she was terminated for cause, right?
6    A.  But we don't tell her staff all the details of
7 her termination.
8    Q.  Okay.
9        MS. HARROLD:  We'll pass the witness.
10        MS. O'DRISCOLL:  Take a quick break.
11        MS. HARROLD:  Sure.
12        (A break was taken from 3:29 p.m. to
13 3:47 p.m.)
14        MS. O'DRISCOLL:  Okay.  We're back on the
15 record after a brief break.
16             EXAMINATION
17 BY MS. O'DRISCOLL:
18    Q.  Ms. Ambrose -- this is Erin O'Driscoll -- I
19 just had a couple of follow-up questions.
20        After that time that you-all -- that day
21 when you met with Ms. Ellis on October 22nd, did she
22 work out the rest of that day?
23    A.  No.  She left immediately after that meeting.
24    Q.  Okay.
25    A.  She may have talked to Betty briefly