Exhibit "G"

Betty Lehew                                      September 07, 2016

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3   ARTIS ELLIS                    )
                                    )
 4              PLAINTIFF,          )
                                    )
 5   VS.                            ) C.A. NO. 4:14-cv-02126
                                    )
 6   EDUCATIONAL COMMISSION         )
     FOR FOREIGN MEDICAL            )
 7   GRADUATES                      )
                                    )
 8              DEFENDANT.          )

 9

10   *********************************************************

11                  ORAL DEPOSITION OF

12                     BETTY LEHEW

13                  SEPTEMBER 7, 2016

14
     *********************************************************
15

16

17

18

19

20

21

22

23

24

25
```

Betty Lehew

September 07, 2016
Pages 2 to 5

## Page 2

```
1            ORAL DEPOSITION OF BETTY LEHEW, produced as a
2   witness at the instance of the Plaintiff, and duly
3   sworn, was taken in the above-styled and numbered cause
4   on SEPTEMBER 7, 2016, from 11:09 a.m. to 12:06 p.m.,
5   before Michelle K. Miller, CSR, RPR in and for the
6   State of Texas, reported by machine shorthand, at the
7   offices of Morgan, Lewis, & Bockius, LLP, 1000
8   Louisiana, Suite 4000, Houston, Texas 77002, pursuant
9   to the Federal Rules of Civil Procedure and the
10  provisions stated on the record or attached hereto.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1                        INDEX
2
                                                    PAGE
3
        Appearances...........................    3
4
5
    BETTY LEHEW
6
        Examination by Ms. Harrold.............    5
7
8
9   Signature and Changes.....................   51
10  Reporter's Certificate....................   53
11
12                     EXHIBITS
13
    NO.        DESCRIPTION                       PAGE
14
15  1          Policy and Procedures
               Manual                             13
16
    2          Policy and Procedures
17             Manual                             23
18  3          Email String                       44
19
20
21
22
23
24
25
```

## Page 3

```
1                  A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       Mr. Alfonso Kennard, Jr.
        Ms. Keenya R. Harrold
5       Kennard Richard
        2603 Augusta Drive, Suite 1450
6       Houston, Texas 77057
        Tel: 713.742.0900
7       Fax: 713.742.0951
        Email: alfonso.kennard@kennardlaw.com
8              keenya.harrold@kennardlaw.com
9
10  FOR THE DEFENDANT:
11      Ms. Erin E. O'Driscoll
        Morgan, Lewis, & Bockius, LLP
12      1000 Louisiana, Suite 4000
        Houston, Texas 77002
13      Tel: 713.890.5169
        Fax: 713.890.5001
14      Email: erin.odriscoll@morganlewis.com
15
16
    ALSO PRESENT:
17      Ms. Artis Ellis
18
19
20
21
22
23
24
25
```

## Page 5

```
1           BETTY LEHEW,
2   having been first duly sworn, testified as follows:
3           EXAMINATION
4   BY MR. KENNARD:
5       Q.  Ms. LeHew, my name is Alfonso Kennard.  How
6   are you today?
7       A.  Good.  How are you?
8       Q.  All right, thank you.  You understand that I
9   represent Artis Ellis in this lawsuit, correct?
10      A.  Yes.
11      Q.  What is your title?
12      A.  Assistant Vice President of Human Resources.
13      Q.  Are you at the top of the food chain when it
14  comes to human resources?
15      A.  Yes.
16      Q.  You might want to speak a little louder to
17  make sure that the court reporter can hear you well
18  enough to transcribe what you're saying.  Okay?
19      A.  Okay.
20      Q.  All right.  Have you ever given your
21  deposition before?
22      A.  Yes.
23      Q.  How many occasions?
24      A.  Probably three or four.
25      Q.  Okay.  So you know the general rules?
```

Betty Lehew                                           September 07, 2016
                                                      Pages 6 to 9

Page 6
1   A.  Yes.
2   Q.  Okay.  I'll just ask that you allow me to
3   finish asking my question before you answer; is that
4   fair?
5   A.  Yes.
6   Q.  And if you don't understand a question, will
7   you let me know?
8   A.  Yes.
9   Q.  And please make sure to give verbal answers.
10  A.  Okay.
11  Q.  Okay.  Were you involved in the termination of
12  Ms. Ellis?
13  A.  I'm not sure exactly what you mean by
14  "involved."
15  Q.  Were you a decision maker?
16  A.  No.
17  Q.  Who was the decision maker?
18  A.  Nancy Ambrose.
19  Q.  Okay.  And I'm going to need you to speak up.
20  A.  Nancy Ambrose.
21  Q.  Okay.  Did Ms. Ambrose consult with you before
22  terminating Ms. Ellis?
23  A.  Yes, she did.
24  Q.  Can you tell me the basis of -- or tell me
25  what you-all discussed.

Page 7
1   A.  Nancy shared with me some issues that were
2   uncovered at the center and expressed those issues to
3   Artis, who was given an opportunity to explain them,
4   and Nancy looked into them further and found that it
5   was grounds for termination.
6   Q.  Okay.  Did you agree with her assessment?
7   A.  Yes.
8   Q.  Did you review -- strike that question.
9        Did you do -- sorry -- did you do
10  anything to independently confirm what Ms. Ambrose had
11  said to you about Ms. Ellis?
12  A.  I'm not sure what you mean.
13  Q.  Did you investigate anything relating to the
14  issues that Ms. Ambrose raised about Ms. Ellis?
15  A.  No.  That's not my role.
16  Q.  What is your role when someone comes to you
17  with recommending termination of an employee?
18  A.  To hear what the manager has to say.  To make
19  sure that the manager has expressed those issues and
20  concerns with the employee, and that the employee has
21  had a chance to respond.  That's really kind of what
22  the role is.
23  Q.  As the director of human resources --
24  A.  I'm the assistant vice president.
25  Q.  Okay.  I'm sorry.

Page 8
1        -- assistant vice president in charge of
2   human resources --
3   A.  Uh-huh.
4   Q.  -- do you think it's important to conduct
5   internal investigations relating to employees such as
6   Ms. Ellis?
7   A.  I'm not sure what you mean by that.
8   Q.  Okay.  What was Ms. Ellis' position prior to
9   her termination?
10  A.  Center manager.
11  Q.  So she ran a center?
12  A.  Yes.
13  Q.  In Houston?
14  A.  Yes.
15  Q.  Do you think it's prudent to investigate
16  concerns in your human resources function that relate
17  to someone that is a manager for an entire center?
18  A.  I'm not sure what you mean.
19  Q.  Okay.  Do you think it is within your function
20  to investigate claims that are made against a center
21  manager --
22       MS. O'DRISCOLL:  Objection.
23  Q.  (BY MR. KENNARD)  -- in your function as the
24  human resources professional for the company?
25       MS. O'DRISCOLL:  Objection, form; asked

Page 9
1   and answered.
2   A.  I'm not sure I understand what you mean,
3   "claims."
4   Q.  (BY MR. KENNARD)  Okay.  So Ms. Ambrose -- you
5   testified already that Ms. Ambrose raised concerns to
6   you about Ms. Ellis; is that correct?
7   A.  Yes.
8   Q.  Okay.  And you have stated that you did not
9   independently investigate those claims; is that
10  correct?
11  A.  I did not investigate the claims that
12  Ms. Ambrose brought to my attention, no.
13  Q.  Regarding Ms. Ellis?
14  A.  Right.
15  Q.  So my question to you -- in your function as
16  the top HR person for the company, my question to you
17  is:  Do you think it would have been prudent to
18  investigate the claims that Ms. Ambrose made regarding
19  Ms. Ellis who, at the time, was a center manager?
20       MS. O'DRISCOLL:  Objection, form; asked
21  and answered.
22       MR. KENNARD:  She keeps telling me she
23  doesn't understand what I'm asking her, so she hasn't
24  answered.  So I'm asking it again.
25  Q.  (BY MR. KENNARD)  You can answer my

Betty Lehew

September 07, 2016
Pages 10 to 13

Page 10

1  question --
2      A.  Repeat it again.
3      Q.  I'll have the court reporter repeat the
4  question to you.
5          (The requested portion was read back.)
6      A.  No.  That is not my role.
7      Q.  (BY MR. KENNARD)  Whose role is that?  Is
8  there someone else in human resources that would
9  otherwise investigate?
10     A.  No.  We don't investigate a decision for
11  termination.
12     Q.  Okay.  Were you aware of Ms. Ellis' medical
13  issues?
14         MS. O'DRISCOLL:  Objection, form.
15     A.  I was aware that she had taken FMLA for
16  medical reasons, yes.
17     Q.  (BY MR. KENNARD)  Okay.  Were you aware that
18  she was terminated from her employment as soon as she
19  came back from FMLA?
20     A.  She was not.
21     Q.  She wasn't?
22     A.  No.  She was put on administrative leave.
23     Q.  Okay.  She was put on administrative leave?
24     A.  Yes.
25     Q.  Did she ever return after that administrative

Page 11

1  leave?
2      A.  No, she did not.
3      Q.  So when was she put on administrative leave?
4      A.  On the day that she returned, after a meeting.
5      Q.  On the day that she returned from FMLA leave,
6  correct?
7      A.  After a meeting with her supervisors.
8      Q.  And did she ever return to work after that
9  administrative leave?
10     A.  No.
11     Q.  As the head of HR for the company, did that
12  not raise any concerns for you?
13     A.  Not sure what you mean by that.
14     Q.  Were you concerned that she was put on
15  administrative leave the day she got back from FMLA
16  leave?
17     A.  No, I was not.
18     Q.  Why not?
19     A.  Because she was given the opportunity to
20  explain the issues that were presented to her, and the
21  explanations were not clear enough to erase or
22  eliminate the issues, so they had to be looked into by
23  her supervisors.
24     Q.  When were those issues presented to her?
25     A.  On the day that she returned from leave.

Page 12

1      Q.  Let me get this right.  So the day that she
2  returns from leave, these issues are raised to her,
3  correct?
4      A.  Yes.
5      Q.  And that same day, she was put on
6  administrative leave, correct?
7      A.  Yes.
8      Q.  Do you think that gave her an ample
9  opportunity to respond to those issues in that same day
10  before being placed on administrative leave?
11     A.  She -- we were -- sat with her for two hours
12  going over the issues, and she responded to each one
13  that we went through and gave a response enough that
14  her managers had to look into what she was saying for
15  each issue.
16     Q.  So you made the decision that day to put her
17  on administrative leave, right?
18         MS. O'DRISCOLL:  Objection.
19     A.  I did not make the decision.
20     Q.  (BY MR. KENNARD)  You acquiesced to that
21  decision; is that correct?
22         MS. O'DRISCOLL:  Objection, form.
23     A.  What do you mean?
24     Q.  (BY MR. KENNARD)  You didn't do anything to
25  stop it?

Page 13

1      A.  No.
2      Q.  Okay.  What is the policy for administrative
3  leave at the company?
4      A.  When the --
5      Q.  Yes, hold on.  Let me make sure that you
6  understand my question, what I'm asking for and what
7  I'm looking for.
8      A.  Okay.
9      Q.  What is the policy for placing someone on
10  administrative leave at the company?
11     A.  I can't quote the whole policy without looking
12  at it, but I can summarize it.
13         MR. KENNARD:  I'm going to mark this as
14  Exhibit 1 to your deposition.
15         (Exhibit 1 was marked.)
16     Q.  (BY MR. KENNARD)  Please review that document,
17  and let me know when you've had a chance to review it.
18         Do you recognize this document?
19     A.  Yes.
20     Q.  What is this document?
21     A.  This is our corrective action policy.
22     Q.  Can you go to page 2 of 5, please, of the
23  correction action -- corrective action policy?
24     A.  Page what?
25     Q.  Page 2 of 5.  It's numbered here at the top.

Page 14

1    A.  Oh.  Okay.
2    Q.  Do you see the section -- the subsection
3  called "Administrative leave"?
4    A.  Yes.  The definition.
5    Q.  Okay.  Can you read the administrative leave
6  policy for me, please?
7         MS. O'DRISCOLL:  Objection, form.
8    A.  Well, it's not the policy.  It's just the
9  definition.
10    Q.  (BY MR. KENNARD)  Okay.  Can you -- can you
11  read the definition of -- of -- for administrative
12  leave?
13    A.  Yes.  "Administrative leave is used when a
14  supervisor/manager perceives that the employee may
15  cause a potential threat to themselves or others or
16  when the employee is behaving in a disruptive and/or
17  unruly manner that management is not able to handle.
18  The employee should be sent home for the day with pay,
19  pending investigation of the situation by the
20  supervisor/manager.  HR must be informed when an
21  employee has been put on administrative leave to assist
22  with the investigation."
23    Q.  Okay.  So you're HR, right?
24    A.  Yes.
25    Q.  Did you assist with an investigation?

Page 15

1    A.  No, I did not.
2    Q.  Okay.  And did -- were you aware -- or did you
3  believe that Ms. Ellis was a potential threat to
4  herself or others?
5    A.  No, I did not.
6    Q.  Okay.  And you realize that she had just come
7  back from brain surgery, right?
8         MS. O'DRISCOLL:  Objection, form.
9    A.  I realized she just came back from a procedure
10  from FMLA.
11    Q.  (BY MR. KENNARD)  Okay.  Is there anything in
12  this administrative leave policy that states an
13  employee be placed on administrative leave
14  because a manager perceives she's having work issues?
15         MS. O'DRISCOLL:  Objection, form;
16  mischaracterizes the document.
17    A.  I'm not sure what you mean by "work issues."
18    Q.  (BY MR. KENNARD)  Issues with her employment.
19         Does -- is that stated anywhere in this
20  definition of "Administrative leave"?
21    A.  Not specifically the way you worded it.
22    Q.  Well, anywhere in here -- how would you word
23  it?
24    A.  How would I word what?
25    Q.  To justify Ms. Ellis being placed on

Page 16

1  administrative leave in light of this definition.
2    A.  The part that says the employee is behaving in
3  a disruptive or unruly manner that management is not
4  able to handle.
5    Q.  Okay.  How was she acting in a disruptive or
6  unruly manner that management was unable to handle?
7    A.  At that moment, she wasn't.  The reports that
8  they were investigating were things that they felt they
9  were not able to handle and investigate with her in the
10  center.
11    Q.  But she had been on FMLA leave prior to being
12  placed on administrative leave, correct?
13    A.  Yes.  I'm not talking about when she was on
14  the administrative leave.  The issues that were
15  uncovered were not issues that occurred when she was on
16  the administrative leave.  They were things that
17  occurred prior to that.
18    Q.  Okay.  But she was allowed back into the
19  facility, correct?
20    A.  That morning, yes.
21    Q.  That morning, was she acting in a disruptive
22  or unruly manner?
23    A.  That morning, she was not.
24    Q.  All right.  Let's look at "Termination of
25  employment."

Page 17

1    A.  Uh-huh.
2    Q.  Can you read that definition for me?
3    A.  Yes.  "Termination of employment is a
4  consequence for not meeting the expectations of a" --
5  "of in" -- sorry, that's a typo -- "the formal
6  corrective action process.  Termination occurs when the
7  employee has failed to correct a problem or situation
8  despite receipt of a written warning and/or a final
9  written warning.  In addition to foregoing -- to the
10  foregoing, termination may occur immediately without
11  prior corrective action, depending on the nature,
12  frequency, and severity of the violation.  Termination
13  decisions must be reviewed with human resources before
14  they take effect."
15    Q.  Did you review the decision to terminate
16  Ms. Ellis before it took effect?
17    A.  Yes.
18    Q.  And you approved it, correct?
19    A.  Yes.  Well, I didn't approve it.  I'm not
20  someone that approved it.  It's not an approval.  It's
21  just a review process.
22    Q.  You allowed it to take effect?
23    A.  I didn't get in the way of it.
24    Q.  Okay.  Fair enough.
25         Do you know if Ms. Ellis was allowed to

Betty Lehew                                        September 07, 2016
                                                   Pages 18 to 21

                                                        Page 18
1  engage in the formal corrective action process?
2          MS. O'DRISCOLL:  Objection, form.
3      A.  I don't understand what you mean by allowed to
4  engage in it.
5      Q.  (BY MR. KENNARD)  Was she -- okay.  Let me ask
6  you this:  What is the formal corrective action process
7  at the company?
8      A.  It's on here.  Let's see.  I mean, do you want
9  me to read the whole thing that's on here?
10     Q.  Just tell me about it.  Tell me what the
11 corrective action process is.
12     A.  Are you asking me to summarize it?
13     Q.  I want you to tell me -- to testify from your
14 experience as the top person in HR for the company what
15 the corrective action -- formal corrective action
16 process is.
17     A.  Is that we would normally give a written
18 warning and then possibly a second written warning or a
19 final written warning before termination, but that at
20 any point if the manager feels the violations are
21 severe or frequent, that it can be accelerated to
22 immediate termination.
23     Q.  Okay.  Was Ms. Ellis given the opportunity to
24 correct a problem or situation?
25         MS. O'DRISCOLL:  Objection, form.

                                                        Page 19
1      Q.  (BY MR. KENNARD)  I'm just reading from the
2  definition or the -- where the --
3      A.  I don't know which specific one you're talking
4  about.
5      Q.  -- in the corrective action policy.  Let's go
6  back to "Termination of employment."
7      A.  Okay.
8      Q.  You read that to me.
9      A.  Yes.
10     Q.  In here it says, "Termination occurs when the
11 employee has failed to correct a problem or problems or
12 situations despite receipt of a written warning" --
13 "and/or final written warning."
14         Was Ms. Ellis given a written and/or
15 final written warning?
16         MS. O'DRISCOLL:  Objection, form.
17     A.  She was given a written warning.
18     Q.  (BY MR. KENNARD)  I'm asking you, was she?
19     A.  Yes.
20     Q.  When?
21     A.  In August, I believe, of 2012.
22     Q.  Was that before or after her FMLA leave?
23     A.  Before.
24     Q.  Okay.  All right.
25         You don't expect that she would have had

                                                        Page 20
1  the opportunity to correct any problems or situations
2  while she was on FMLA leave, do you?
3      A.  No.
4      Q.  Okay.  And she was presented with issues the
5  day she got back?
6      A.  Yes.
7      Q.  Was she given the opportunity to correct any
8  problems or situations upon her coming back to work
9  from FMLA leave?
10     A.  She was given the opportunity to respond and
11 explain the concerns that were uncovered while she was
12 out on leave.
13     Q.  But not the opportunity to correct; is that
14 right?
15     A.  No.
16     Q.  Do you know of any instances in your
17 experience as an HR professional for the company where
18 employees who had problems or situations at work were
19 given the opportunity to correct --
20         MS. O'DRISCOLL:  Objection, form.
21     Q.  (BY MR. KENNARD)  -- their -- those issues?
22     A.  I'm sorry.  Can you repeat that?
23     Q.  Sure.  Do you know -- are you aware of any
24 instances where an employee was given the opportunity
25 to correct a problem or situation after having been

                                                        Page 21
1  given a written warning?
2      A.  Yes.
3      Q.  But Ms. Ellis was not given that opportunity,
4  correct?
5      A.  Not when she was presented with the issues on
6  the day that she returned.  She was given an
7  opportunity to explain them.
8      Q.  Well, let's talk about the issues that were
9  raised.  From your understanding, why was Ms. Ellis
10 terminated?
11     A.  There were several reasons, but the primary
12 one was a lack of trust on her part by her supervisors
13 based on several issues that could not be answered.
14     Q.  Let's talk about them.  I want to know what
15 your understanding is of why she was terminated.  So
16 let's go through each one.
17     A.  Okay.
18     Q.  So I'll let you start wherever you'd like.
19 Let's start with -- so what was the first reason that
20 you can think of that she was terminated?
21     A.  I believe we gave you a document that lists
22 the issues that were presented to her.
23     Q.  And I can appreciate that, but I'm asking you
24 to tell me from your understanding, as you sit here
25 right now, why she was terminated.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

Betty Lehew                                    September 07, 2016
                                               Pages 14 to 17

Page 14

1    A.  Oh.  Okay.
2    Q.  Do you see the section -- the subsection
3  called "Administrative leave"?
4    A.  Yes.  The definition.
5    Q.  Okay.  Can you read the administrative leave
6  policy for me, please?
7         MS. O'DRISCOLL:  Objection, form.
8    A.  Well, it's not the policy.  It's just the
9  definition.
10   Q.  (BY MR. KENNARD)  Okay.  Can you -- can you
11 read the definition of -- of -- for administrative
12 leave?
13   A.  Yes.  "Administrative leave is used when a
14 supervisor/manager perceives that the employee may
15 cause a potential threat to themselves or others or
16 when the employee is behaving in a disruptive and/or
17 unruly manner that management is not able to handle.
18 The employee should be sent home for the day with pay,
19 pending investigation of the situation by the
20 supervisor/manager.  HR must be informed when an
21 employee has been put on administrative leave to assist
22 with the investigation."
23   Q.  Okay.  So you're HR, right?
24   A.  Yes.
25   Q.  Did you assist with an investigation?

Page 15

1    A.  No, I did not.
2    Q.  Okay.  And did -- were you aware -- or did you
3  believe that Ms. Ellis was a potential threat to
4  herself or others?
5    A.  No, I did not.
6    Q.  Okay.  And you realize that she had just come
7  back from brain surgery, right?
8         MS. O'DRISCOLL:  Objection, form.
9    A.  I realized she just came back from a procedure
10 from FMLA.
11   Q.  (BY MR. KENNARD)  Okay.  Is there anything in
12 this administrative leave policy that states an
13 employee should be placed on administrative leave
14 because a manager perceives she's having work issues?
15        MS. O'DRISCOLL:  Objection, form;
16 mischaracterizes the document.
17   A.  I'm not sure what you mean by "work issues."
18   Q.  (BY MR. KENNARD)  Issues with her employment.
19        Does -- is that stated anywhere in this
20 definition of "Administrative leave"?
21   A.  Not specifically the way you worded it.
22   Q.  Well, anywhere in here -- how would you word
23 it?
24   A.  How would I word what?
25   Q.  To justify Ms. Ellis being placed on

Page 16

1  administrative leave in light of this definition.
2    A.  The part that says the employee is behaving in
3  a disruptive or unruly manner that management is not
4  able to handle.
5    Q.  Okay.  How was she acting in a disruptive or
6  unruly manner that management was unable to handle?
7    A.  At that moment, she wasn't.  The reports that
8  they were investigating were things that they felt they
9  were not able to handle and investigate with her in the
10 center.
11   Q.  But she had been on FMLA leave prior to being
12 placed on administrative leave, correct?
13   A.  Yes.  I'm not talking about when she was on
14 the administrative leave.  The issues that were
15 uncovered were not issues that occurred when she was on
16 the administrative leave.  They were things that
17 occurred prior to that.
18   Q.  Okay.  But she was allowed back into the
19 facility, correct?
20   A.  That morning, yes.
21   Q.  That morning, was she acting in a disruptive
22 or unruly manner?
23   A.  That morning, she was not.
24   Q.  All right.  Let's look at "Termination of
25 employment."

Page 17

1    A.  Uh-huh.
2    Q.  Can you read that definition for me?
3    A.  Yes.  "Termination of employment is a
4  consequence for not meeting the expectations of a" --
5  "of in" -- sorry, that's a typo -- "the formal
6  corrective action process.  Termination occurs when the
7  employee has failed to correct a problem or situation
8  despite receipt of a written warning and/or a final
9  written warning.  In addition to foregoing -- to the
10 foregoing, termination may occur immediately without
11 prior corrective action, depending on the nature,
12 frequency, and severity of the violation.  Termination
13 decisions must be reviewed with human resources before
14 they take effect."
15   Q.  Did you review the decision to terminate
16 Ms. Ellis before it took effect?
17   A.  Yes.
18   Q.  And you approved it, correct?
19   A.  Yes.  Well, I didn't approve it.  I'm not
20 someone that approved it.  It's not an approval.  It's
21 just a review process.
22   Q.  You allowed it to take effect?
23   A.  I didn't get in the way of it.
24   Q.  Okay.  Fair enough.
25        Do you know if Ms. Ellis was allowed to

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

Betty Lehew                                      September 07, 2016
                                                    Pages 18 to 21

Page 18

1  engage in the formal corrective action process?
2           MS. O'DRISCOLL: Objection, form.
3    A.  I don't understand what you mean by allowed to
4  engage in it.
5    Q.  (BY MR. KENNARD) Was she -- okay.  Let me ask
6  you this:  What is the formal corrective action process
7  at the company?
8    A.  It's on here.  Let's see.  I mean, do you want
9  me to read the whole thing that's on here?
10   Q.  Just tell me about it.  Tell me what the
11 corrective action process is.
12   A.  Are you asking me to summarize it?
13   Q.  I want you to tell me -- to testify from your
14 experience as the top person in HR for the company what
15 the corrective action -- formal corrective action
16 process is.
17   A.  Is that we would normally give a written
18 warning and then possibly a second written warning or a
19 final written warning before termination, but that at
20 any point if the manager feels the violations are
21 severe or frequent, that it can be accelerated to
22 immediate termination.
23   Q.  Okay.  Was Ms. Ellis given the opportunity to
24 correct a problem or situation?
25           MS. O'DRISCOLL: Objection, form.

Page 19

1    Q.  (BY MR. KENNARD) I'm just reading from the
2  definition or the -- where the --
3    A.  I don't know which specific one you're talking
4  about.
5    Q.  -- in the corrective action policy.  Let's go
6  back to "Termination of employment."
7    A.  Okay.
8    Q.  You read that to me.
9    A.  Yes.
10   Q.  In here it says, "Termination occurs when the
11 employee has failed to correct a problem or problems or
12 situations despite receipt of a written warning" --
13 "and/or final written warning."
14          Was Ms. Ellis given a written and/or
15 final written warning?
16          MS. O'DRISCOLL: Objection, form.
17   A.  She was given a written warning.
18   Q.  (BY MR. KENNARD) I'm asking you, was she?
19   A.  Yes.
20   Q.  When?
21   A.  In August, I believe, of 2012.
22   Q.  Was that before or after her FMLA leave?
23   A.  Before.
24   Q.  Okay.  All right.
25          You don't expect that she would have had

Page 20

1  the opportunity to correct any problems or situations
2  while she was on FMLA leave, do you?
3    A.  No.
4    Q.  Okay.  And she was presented with issues the
5  day she got back?
6    A.  Yes.
7    Q.  Was she given the opportunity to correct any
8  problems or situations upon her coming back to work
9  from FMLA leave?
10   A.  She was given the opportunity to respond and
11 explain the concerns that were uncovered while she was
12 out on leave.
13   Q.  But not the opportunity to correct; is that
14 right?
15   A.  No.
16   Q.  Do you know of any instances in your
17 experience as an HR professional for the company where
18 employees who had problems or situations at work were
19 given the opportunity to correct --
20          MS. O'DRISCOLL: Objection, form.
21   Q.  (BY MR. KENNARD) -- their -- those issues?
22   A.  I'm sorry.  Can you repeat that?
23   Q.  Sure.  Do you know -- are you aware of any
24 instances where an employee was given the opportunity
25 to correct a problem or situation after having been

Page 21

1  given a written warning?
2    A.  Yes.
3    Q.  But Ms. Ellis was not given that opportunity,
4  correct?
5    A.  Not when she was presented with the issues on
6  the day that she returned.  She was given an
7  opportunity to explain them.
8    Q.  Well, let's talk about the issues that were
9  raised.  From your understanding, why was Ms. Ellis
10 terminated?
11   A.  There were several reasons, but the primary
12 one was a lack of trust on her part by her supervisors
13 based on several issues that could not be answered.
14   Q.  Let's talk about them.  I want to know what
15 your understanding is of why she was terminated.  So
16 let's go through each one.
17   A.  Okay.
18   Q.  So I'll let you start wherever you'd like.
19 Let's start with -- so what was the first reason that
20 you can think of that she was terminated?
21   A.  I believe we gave you a document that lists
22 the issues that were presented to her.
23   Q.  And I can appreciate that, but I'm asking you
24 to tell me from your understanding, as you sit here
25 right now, why she was terminated.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

Betty Lehew

September 07, 2016
Pages 22 to 25

Page 22

1    A.   There were several policy violations.  There
2    were complaints that were looked into from the
3    employees.  Numerous complaints.  There were a lot of
4    different policy violations.
5        Q.   What else?
6        A.   Off the top of my head, I can't recall all the
7    specifics without looking at the document.  I didn't
8    make the termination decision.
9        Q.   What policy violations?
10       A.   Giving her password out, hiring an employee --
11   or hiring someone that she had a personal relationship
12   with that wasn't disclosed or given approval for, were
13   two of them.
14       Q.   Did you look into the personal relationship
15   issue?
16       A.   I didn't, no.  Her supervisors did.
17       Q.   Did you look into the password issue?
18       A.   No, I did not.
19       Q.   Before the termination decision was made, were
20   you told about the personal relationship issue being a
21   factor in her termination?
22       A.   Was I told about it?
23       Q.   Yes.
24       A.   Yes.
25       Q.   Okay.  So you were aware that one of the

Page 23

1    reasons for her termination before she was terminated
2    was because of some purported personal relationship,
3    right?
4        A.   Yes, I was aware of it.
5        Q.   Okay.
6            (Exhibit 2 was marked.)
7        Q.   (BY MR. KENNARD)  I'm going to hand you what
8    we're marking as Exhibit 2 to your deposition.
9            Do you recognize this document?
10       A.   Yes.
11       Q.   What is this?
12       A.   It looks a little different because there's
13   things at the top that I don't recognize, but the
14   content of it is our employment of relatives policy.
15       Q.   Okay.  And can you read the definition of
16   "Relative" in Subsection 2 under "Definitions" where it
17   says "Relative"?
18       A.   Yes.  "Relative is defined as any of the
19   following including by virtue of blood, adoption,
20   marriage, or remarriage, or domestic partnership
21   (significant other or affianced), spouse, children,
22   grandchildren, parents, grandparents, siblings, uncles,
23   aunts, nephews, nieces, and cousins."
24       Q.   So how did Ms. Ellis violate the personal
25   relationship policy?

Page 24

1        A.   That would fall under the definition of
2    "significant other."
3        Q.   Significant other.  How so?
4        A.   She hired and then subsequently promoted a man
5    who was the father of her child without disclosing that
6    or getting approval from anyone in a direct reporting
7    relationship.
8        Q.   We're talking about Troi, right?
9        A.   Yes.
10       Q.   Okay.  Do you know if Troi and Ms. Ellis were
11   related by blood?
12       A.   I don't have that information, no.
13       Q.   Do you have any reason to believe that they
14   are not related by blood?
15       A.   Do I have any reason to what?
16       Q.   Do you have any reason to dispute that they
17   are not related by blood?
18       A.   No.
19       Q.   Do you have any reason to dispute that they
20   are not related by virtue of adoption?
21       A.   No.
22       Q.   Do you have any reason to dispute that they
23   are not related by virtue of marriage?
24       A.   No.
25       Q.   Do you have any reason to believe they are not

Page 25

1    related by virtue of remarriage?
2        A.   No.
3        Q.   Okay.  Do you have any reason to believe that
4    they are not related by virtue of domestic partnership?
5        A.   No.
6        Q.   Do you have any reason to dispute that they
7    are not related by virtue of them being a spouse to one
8    another?
9        A.   No.
10       Q.   Do you have any reason to believe that they
11   are not related by virtue of one being a child of
12   another?
13       A.   No.
14       Q.   Do you have any reason to dispute that they
15   are not related by virtue of them being a grandchild to
16   one another?
17       A.   No.
18       Q.   Do you have any reason to dispute that they
19   are not related by virtue of being a parent of one
20   another?
21       A.   No.
22       Q.   Or a grandparent?
23       A.   No.
24       Q.   A sibling?
25       A.   No.

Betty Lehew                                    September 07, 2016
                                               Pages 26 to 29

Page 26

1   Q.  An uncle?
2   A.  No.
3   Q.  An aunt?
4   A.  No.
5   Q.  A nephew?
6   A.  No.
7   Q.  A niece?
8   A.  No.
9   Q.  Or a cousin?
10  A.  No.
11  Q.  Are you aware of any instances where someone
12  that is deemed a relative was allowed to work at the
13  company?
14  A.  Several, yes.
15  Q.  Okay.  And were those individuals terminated?
16  A.  No.
17  Q.  In fact, you're one of them, right?
18  A.  Yes.
19  Q.  Okay.  Who did you hire?
20  A.  I didn't specifically hire anyone.
21  Q.  Okay.  Didn't your stepdaughter work for the
22  company?
23  A.  She did.
24  Q.  Did you make it known that your stepdaughter
25  was working there?

Page 27

1   A.  Yes.
2   Q.  Were you terminated?
3   A.  No.
4   Q.  You're still there, right?
5   A.  Yes.
6   Q.  Okay.  Is your stepdaughter a relative to you?
7   A.  Yes.  Yes.
8   Q.  What department did your stepdaughter work in?
9   A.  She worked in the ERAS department, and she
10  worked in the HR department.
11  Q.  Okay.  The same HR department that you're the
12  head of?
13  A.  Yes.
14  Q.  Do you believe that's a violation of the
15  policy?
16  A.  No.
17  Q.  Why not?
18  A.  Because there was very clear disclosure and
19  approval given for that, and it was also a part-time,
20  temporary summer help and it was approved by an
21  executive.  Actually, it was requested by an executive.
22  Q.  Okay.  Let's look at "Eligibility."
23  A.  Uh-huh.
24  Q.  Can you read that sentence under
25  "Eligibility"?

Page 28

1   A.  "This policy applies to all employees, and
2   independent contractors, agency contractors, agency
3   temporary staff, and interns."
4   Q.  Okay.  So your stepdaughter was a temporary
5   worker, correct?
6   A.  Yes.
7   Q.  So this policy would have applied to you and
8   her, correct?
9   A.  Yes.
10  Q.  Let's look at the guidelines.
11  A.  Uh-huh.
12  Q.  Can you read that first paragraph for me,
13  please?
14  A.  "ECFMG will not hire or employ anyone in a
15  reporting relationship within the following" -- "with
16  the following relation to an existing part-time or
17  full-time employee:  Spouse, parent, child or sibling,
18  including step or adopted relationships, grandparent or
19  grandchild or in-laws to the same degree.
20      ECFMG will not hire or employ anyone on a
21  full-time or part-time basis in the same department
22  with a supervisory relationship to an existing
23  full-time or part-time employee."
24  Q.  Were you in a supervisory relationship to your
25  stepdaughter?

Page 29

1   A.  Not an immediate supervisor.
2   Q.  But a supervisor nonetheless?
3   A.  Above the supervisor, yes.
4   Q.  And you see where it says there that "ECFMG
5   will not hire or employ anyone in a reporting
6   relationship including a step or adoptive
7   relationship."  Do you see that?
8   A.  Yes.
9   Q.  So you were in violation of the policy,
10  correct?
11      MS. O'DRISCOLL:  Objection, form.
12  A.  No.
13  Q.  (BY MR. KENNARD)  Was your stepdaughter hired
14  in a part-time role?
15  A.  Yes.
16  Q.  And was she in the same department as you?
17  A.  Yes.
18  Q.  At the time that Artis Ellis was terminated,
19  Troi was not her spouse, right?
20  A.  Correct.
21  Q.  Troi was not her parent, right?
22  A.  I'm sorry, what?
23  Q.  Troi was not her parent, right?
24  A.  Right.
25  Q.  She was not Troy's parent, right?

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                  210-697-3408